ROBERT W. HIRSH,
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507;  Facsimile: 310-275-4050

LAWRENCE C. FOX
KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
Telephone: 212-418-8600; Facsimile: 212-826-3640

Attorneys for Defendant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
SIGNATURE BANK,                                         :
                                                       :
                                      Plaintiff,  :   08 Civ. 3893 (NRB)
                                                       :
            - against -                                :
                                                       :
AHAVA FOOD CORP., LEWIS COUNTY DAIRY    :
CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO   :
FOODS, YONI REALTY, LLC, SCHWARTZ AND    :
SONS QUALITY DISTRIBUTORS, INC., MOISE    :
BANAYAN, ANA BANAYAN a/k/a  CHANA    :
BANAYAN, REBECCA BANAYAN a/k/a REBECCA   :
BARIMYAN a/k/a REBECCA BANAYAN-    :
LIEBERMAN, FARIBORZ BANAYAN a/k/a AARON   :
BANAYAN, RUBEN BEITYAKOV, ARI KATZ,    :
AHAVA OF CALIFORNIA, LLC d/b/a AHAVA    :
NATIONAL FOOD DISTRIBUTOR and NORTH    :
COUNTRY MANUFACTURING, and JOHN DOE    :
COMPANIES 1 through 10,                                :
                                                       :
                                    Defendants. :
-------------------------------------------------------------------- X

**DECLARATION OF MOISE BANAYAN IN OPPOSITION TO MOTION FOR
APPOINTMENT OF RECEIVER AND PRELIMINARY INJUNCTION**

I, Moise Banayan, declare:

1. Each fact contained in this declaration is within my personal knowledge, and if called upon to testify as to any matter herein, I could and would competently do so.

2. On or about June 11, 2007, defendant Signature Bank ("the Bank"), via its "puppet consultant", i.e. Getzler, Henrich, Management, & Financial Consultants ("Getzler Henrich") began to run defendants Ahava Food Corp ("AF"), Lewis County Dairy Corp ("LCDC"), St. Lawrence Food Corp ("SLFC"), and Schwartz and Sons, Inc. ("SS"). From on or about June 11, 2007 through in or about late November, 2007, the Bank, via Getzler Henrich, ran these businesses incompetently and fraudulently, and turned what were then profitable ventures into losing operations which were driven out of business. I witnessed the Bank's and Getzler Henrich's wrongful conduct as it was occurring, and when I complained about it, the Bank's response was, among other things, that the Bank would immediately "shut down" these businesses and foreclose on its loans to them, unless Getzler Henrich was able to run the businesses with a free hand and without complaint from anyone, including me. In or about November 2007, after SS was driven out of business by the Bank and Getzler Henrich, SS was unable to meet its lease obligations concerning its Brooklyn distribution center, i.e. 236-280 Richard Street, Brooklyn, N.Y. ("the Brooklyn Warehouse").

3. If Ahava CA had not taken over LCDC, SLFC, and SS, the LCDC and SLFC factories and SS facilities would have closed, the workers would have been unemployed, the suppliers, e.g. farmers would have been without an outlet to sell their products, the observant Jewish community would have been without a major source of Cholev Yisrael dairy products, and the cost of existing Cholev Yisrael products would have exponentially increased.

4. Attached hereto as Exhibit A is a true and correct copy of an affidavit which I signed and which was filed in the following litigation: Signature Bank v. Ahava Food Corp. et. al., Index No.

604256/07.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in Monsey, New York on May 20th, 2008.

Moise Banayan

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SIGNATURE BANK, N.A.,

                Plaintiff,

      -against-

AHAVA FOOD CORP., LEWIS COUNTY
DAIRY CORP., ST. LAWRENCE FOOD
CORP., YONI REALTY, LLC, MOISE
BANAYAN, ANA BANAYAN and
SCHWARTZ AND SONS, INC.,

                Defendants.

---

Index No. 604256/07

(Hon. Helen E. Freedman)

**AFFIDAVIT IN
OPPOSITION TO
PLAINTIFF'S MOTION
FOR SUMMARY
JUDGMENT IN LIEU OF
COMPLAINT**

STATE OF NEW YORK  )
                  ss.:
COUNTY OF KINGS    )

MOISE BANAYAN, being duly sworn, deposes and says:

1.     I am the President and owner of defendants Ahava Food Corp. ("Ahava"),

Lewis County Dairy Corp. ("Lewis County"), St. Lawrence Food Corp. ("St. Lawrence")

and Schwartz and Sons, Inc. ("Schwartz"), the majority owner of defendant Yoni Realty,

LLC ("Yoni"), and the husband of defendant Ana Banayan.  I make this affidavit in

opposition to the motion of plaintiff Signature Bank, N.A. ("Signature") for summary

judgment in lieu of complaint pursuant to CPLR 3213.  I am personally familiar with the

facts set forth in this affidavit.

DOCKETED ✓
HUGHES HUBBARD & REED, LLP
Served/Recieved  2-4-08 by hand
31007  copi 2/15 ps

**Background**

2.    I am a 1979 graduate of the University of British Columbia with a Master's degree in Business Administration. I have worked for more than twenty-three years in the kosher dairy food industry.

3.    I founded Ahava Dairy Products Corp. in 1983 and Ahava in 1999, both in Brooklyn, New York. Under my direct management, Ahava has grown to become the single largest distributor and manufacturer of kosher dairy food products to the ethnic Jewish market in the United States. Ahava distributes a variety of dairy and deli food products, including milk, cheese and deli meats, to every major Jewish geographic market.

4.    I founded Lewis County in 1994 in Lewis County, New York. Lewis County is a milk processing plant that produces the kosher dairy products that Ahava and Schwartz distribute. Lewis County manufactures milk, yogurt, cheese, butter and other dairy products. Lewis County has won numerous awards and national attention for the quality of its dairy products.

5.    I founded St. Lawrence in 2003 in St. Lawrence County, New York. St. Lawrence is also a milk processing plant that produces the kosher dairy products that Ahava and Schwartz distribute. St. Lawrence manufactures cheeses such as mozzarella, muenster, cheddar and American cheese. Today, St. Lawrence is the largest exporter of kosher mozzarella to Israel.

6.      I founded Schwartz in 2007 in Brooklyn, New York.  Like Ahava, Schwartz is in the business of dairy food distribution.  I founded Schwartz as a means to distribute kosher dairy products to ultra-orthodox Jewish neighborhoods.

7.      Ahava, Lewis County, St. Lawrence and Schwartz presently employ more than 165 people in total.

8.      I founded Yoni in 2000 in Brooklyn, New York.  Yoni manages real property at 110 Beard Street, Brooklyn, New York, where the distribution centers operated by Ahava and Schwartz are located.

**Signature's Loans**

9.      Since its inception, Ahava and my other companies have established credit lines and used commercial loans for the purposes of working capital, financing for manufacturing equipment, new acquisitions and project development.  I had good working relationships with those financial institutions — including Fleet Bank, Commerce Bank and Merrill Lynch — that extended credit to me and my companies.

10.      In 2005, Signature approached me with an offer to consolidate Ahava, Lewis County and St. Lawrence's then-existing credit lines and loans with Merrill Lynch and NBT Bank.  As an added incentive to borrow from Signature, Signature offered Ahava an additional credit line of $7.5 million, approximately $4 million more than the combined credit line that Ahava, Lewis County and St. Lawrence maintained at the time with Merrill Lynch and NBT Bank.

11.      On August 22, 2005, as a consolidation of Ahava's existing loans, Ahava and Signature entered into a Master Credit Facility Agreement.  Ahava executed two

promissory notes in the total amount of $7.5 million and a guarantee in connection with

that Agreement. (A copy of the Master Credit Facility Agreement is attached hereto as

Exhibit 1; copies of the two promissory notes are annexed as Exhibits 1-2 to the affidavit

of Signature's Vice President Robert Bloch, sworn to on December 27, 2007 ("Bloch

Aff."), previously submitted by plaintiff; a copy of the guarantee is annexed as Exhibit 8

to the Bloch Aff.)

12.     In connection with the Master Credit Facility Agreement, Signature also

loaned Lewis County $750,000 for its short-term equipment needs ("the short-term

equipment loan"), which Signature repeatedly renewed. Lewis County executed a

promissory note and Ahava executed a continuing guaranty in connection with the

short-term equipment loan. (A copy of this promissory note is annexed as Exhibit 3 to

the Bloch Aff.; a copy of the continuing guaranty is annexed as Exhibit 9 to the Bloch

Aff.)

13.     From August 2005 through March 2007, Ahava regularly made timely

payments of principal and interest on its promissory notes to Signature. By March 2007,

Ahava had repaid more than $600,000 in principal and more than $800,000 in interest on

those promissory notes.

**The Unrelated Judgments Against My Companies**

14.     In November 2005, the New York State Commissioner of Labor obtained a

$62,000 judgment against Lewis County arising from management overtime

classification for some of Lewis County's employees.

15.    In July 2006, some of Ahava's suppliers – Cape Vincent Milk Producers Cooperative, Inc., Marble City Bulk Milk Cooperative, Inc., Seaway Milk Producers Cooperative, Inc. and Northern New York Bulk Milk Producers Cooperative, Inc. (collectively, "the co-ops") -- obtained a $100,000 judgment against Ahava, Lewis County and St. Lawrence. This judgment concerned the sale of real property by the co-ops to St. Lawrence. Ahava has an account receivable for $116,000 reserved to pay for this judgment; however, Signature has asserted a claim on that account, preventing this judgment from being paid.

16.    In January 2007, M&I First National Leasing Corp. ("M&I") obtained a $700,000 judgment against Ahava, Lewis County and me. In April 2007, M&I obtained a second judgment in the same matter for $60,000 in attorney's fees. Both judgments arise from lawsuits involving financing of a waste management treatment plant at Lewis County. I and the other defendants in this matter have filed a motion to reconsider as well a notice of appeal of those judgments; both our appeal and motion to reconsider are pending.

17.    These judgments, in matters in no way involving Signature, constituted an event of default under certain covenants set forth in the Master Credit Facility Agreement. (*See* Exh. 1 at § 7(i), p. 41.) In March 2007, despite the fact that Ahava had made timely payments on the Signature promissory notes, Signature declared Ahava in default on the promissory notes and demanded repayment. Signature also refused to renew Lewis County's short-term equipment loan, thereby placing that loan in default.

18.    Signature and I then sought to resolve these covenant defaults and Lewis County's default on the short-term equipment loan. On June 11, 2007, Ahava, Lewis County, St. Lawrence, Yoni, my wife and I entered into a Forbearance Agreement with Signature. (A copy of the Forbearance Agreement is annexed as Exhibit 5 to the Bloch Aff.)

19.    On August 27, 2007, Signature and Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I executed the Joinder Agreement, Waiver, and First Amendment to Forbearance Agreement ("the First Amendment"), which amended the Forbearance Agreement. (A copy of the First Amendment is annexed as Exhibit 6 to the Bloch Aff.) I and the other parties to the First Amendment executed that document in order to add Schwartz as a new obligor to the Forbearance Agreement and to reflect Ahava's failure to pay loan interest as a new default to the Forbearance Agreement. This default on interest was the first instance of Ahava's financial default; as explained below, this default was caused by Signature's affirmative conduct. I and the other parties to the First Amendment also executed a promissory note and a Joint and Several Guaranty of Payment Agreement in connection with the First Amendment. (A copy of this promissory note is annexed as Exhibit 4 to the Bloch Aff.; a copy of the Joint and Several Guaranty of Payment Agreement is annexed as Exhibit 10 to the Bloch Aff.)

20.    On September 11, 2007, Signature and Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I executed the Second Amendment to Forbearance Agreement ("the Second Amendment") for the purposes of renewing our

previous guarantees. (A copy of the Second Amendment is annexed as Exhibit 7 to the Bloch Aff.)

## Signature's Imposition Of New Management

21.    Signature used the Forbearance Agreement to exert direct control over the management and operation of my companies. As a condition for its entry into the Forbearance Agreement, Signature demanded that I engage a "consultant" on a full-time basis, noting that this entity must be satisfactory to it. (*See* Bloch Aff. Exh. 5 at § 7(b), p. 5 and Bloch Aff. Exh. 6 at § 3(f), p. 7.)

22.    Signature introduced me to, and required me to engage, a firm known as Getzler Henrich Management & Financial Consultants ("Getzler Henrich"), located in Manhattan. At Signature's insistence, I hired Mark Samson ("Samson") and Fred Getzler ("Getzler") of Getzler Henrich. Samson worked from Ahava's offices in Brooklyn, while Getzler worked from Lewis County's office in Lowville, New York. Five weeks after Getzler started working, Getzler Henrich had to replace Getzler — who was more than 75 years old and infirm — with Ronald Geuring.

23.    Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I entered into the Forbearance Agreement on the express understanding that Getzler Henrich would work for us, at my direction. Thus, the First Amendment explicitly stated that Getzler Henrich "shall work on a full time basis . . . *for the Obligors.*" (Bloch Aff. Exh. 6 at § 3(f), p. 7; emphasis supplied.) As the President and owner of Ahava, Lewis County, St. Lawrence, Schwartz and Yoni, I expected Getzler Henrich to report to me and respond to my directions.

24.     That was not the case.  Instead, it soon became clear that Getzler Henrich had no intention of reporting to me or taking directions from me.  In fact, Samson — who had absolutely no experience in the kosher dairy food industry — sought to remove me from effective control of my own companies by excluding me from senior management meetings, informing my employees that I was no longer their boss, and making management and operational decisions that affected the core of my business.  Samson repeatedly expressed his belief that Getzler Henrich was in control of my companies.  (*See, e.g.*, email from Mark Samson dated Sept. 27, 2007, a copy of which is attached hereto as Exhibit 2.)

25.     After I hired Getzler Henrich, Signature repeatedly informed me that I should not make any decisions with respect to management or operation of my companies, but instead give Getzler Henrich full control of my companies.  Signature made these demands in the presence of Getzler Henrich, after which Getzler Henrich acknowledged its control of my companies.

26.     Getzler Henrich's management of my companies was disastrous.  During its engagement, Getzler Henrich implemented numerous decisions that severely damaged the financial well-being of Ahava and my other companies.  These decisions included the following:

   ○   Getzler Henrich claimed to have found a loss of $175,000 per week in inventory and implemented the diversion of 30% of Ahava's milk supply, or about 440,000 pounds of raw milk per week, in order to discover the source of the purported inventory loss.  The diversion in milk supply required Ahava to sell the diverted milk at a loss.  As a result, Ahava, Lewis Country and St. Lawrence lost nearly $75,000 per week for eight

weeks. The source of the inventory loss — which may well have never existed in the first place — was never discovered.

- Unable to find the purported inventory loss with its tactic of diverting supply, Getzler Henrich then terminated the supply agreement between my companies and Vandervicken Hahn's farm, one of my companies' four suppliers of raw kosher milk. This termination damaged my companies' ability to supply our customers with dairy product, reducing company sales and profitability, and resulted in a permanent loss of 225,000 pounds of milk per week, valued at more than $55,000. My companies still have not recovered from this termination, since it is extremely difficult to obtain reliable suppliers of raw kosher milk.

- Getzler Henrich placed higher priority on preparation of reports for Signature than the day-to-day operations of my companies. As a consequence, the core management staff of my companies became paralyzed. For example, Getzler Henrich gave Ahava's Sales Manager, who was responsible for pricing control as well as credit and customer service, a new position and title of "business analyst," with the sole duty of preparing weekly financial reports for Getzler Henrich. During this time, market prices for dairy products rapidly and substantially increased. Getzler Henrich's removal of the Sales Manager from his duties caused a delay in my companies' adjustment to this price rise, and my companies lost over $170,000 per week for a total of $1.3 million. Also, Getzler Henrich instructed members of Ahava's Credit Department, who were responsible for collecting accounts receivable, to spend their time preparing accounts receivable reports instead. As a result, our collection on accounts receivable decreased on average by more than $100,000 per week.

- Not surprising for someone who had no experience in the kosher dairy food industry, Samson exercised poor judgment in dealing with my companies' business relationships. For example, Samson extended lines of credit to some of Ahava's customers who lacked sufficient credit or financial resources. As a result, accounts receivable aged over 90 days (which are typically uncollectable) soon grew from less than $500,000 to more than $1.2 million. Getzler Henrich also instituted a policy for paying only the current invoices of Ahava's vendors. The industry practice — and Ahava's policy prior to Getzler Henrich's interference — had been to maintain accounts payable with its vendors so that Ahava, each week, paid invoices from several weeks earlier. This abrupt change in policy caused Ahava's weekly payments to apply to current invoices rather than past invoices, which artificially created past-due invoices that put Ahava

in default with its vendors. This poor management decision caused Ahava to lose a major supplier and forced Ahava to use an overdraft of $400,000 to cover payments to its vendors.

- Getzler Henrich also acted imprudently in using Lewis County's financial resources. For example, Getzler Henrich authorized salary increases for all employees at Lewis County without evaluation of particular employees' merit. Getzler Henrich also demanded more than $120,000 in unnecessary work, including "beautification" projects such as installing new floors and renovating the plant's walls and roof.

- Getzler Henrich also acted imprudently in using Lewis County's human resources. For example, Getzler Henrich removed members of Lewis County's maintenance department from their duties, which resulted in a 50% reduction in plant productivity.

27.     Getzler Henrich carried out these policies through November 23, 2007.

28.     On numerous occasions, I voiced my strenuous disagreement with Getzler Henrich's decisions concerning the management and operation of my companies. However, due to Signature's insistence on Getzler Henrich's governance, I was unable to prevent Getzler Henrich from carrying out its actions. Signature forced me to leave Getzler Henrich in place because it repeatedly threatened to withdraw its financial support if I terminated Getzler Henrich. (*See, e.g.*, email from Robert Bloch to me dated Nov. 21, 2007, a copy of which is attached hereto as Exhibit 3.)

29.     By late November 2007, the financial situation of my companies had grown so dire that I realized that, without my intervention, Getzler Henrich would soon drive my companies into bankruptcy.

30.     On November 23, 2007, I halted my payment of fees to Getzler Henrich, in effect terminating them. Even then, Signature insisted that I continue to work with

Getzler Henrich, offering to increase my overdraft allowance to allow me to pay Getzler Henrich's fees. I refused.

31.    From June to November 2007, Ahava lost more than $5 million as the direct result of Getzler Henrich's poor decisions and ill-conceived policies. Additionally, I was forced to pay Getzler Henrich more than $450,000 in fees during this time.

32.    Signature's insistence on Getzler Henrich was the sole reason that I engaged that firm. In turn, Getzler Henrich's poor management and operational decisions were the sole reason for my companies' failure to pay on the promissory notes.

**Getzler Henrich's Continuing Interference**

33.    Beginning in July 2007, I engaged in discussions with various entities — including Greystone Business Credit II, LLC ("Greystone") and Rosenthal & Rosenthal Inc. ("Rosenthal") — to enter into an alternative credit facility that would allow me and my companies to pay Signature under the promissory notes.

34.    Prior to entering into any credit facilities, Greystone and Rosenthal conducted audits of my companies. Getzler Henrich interfered with these audits by dictating those documents that were withheld from the auditors, restricting senior management's contact with the auditors, adjusting dates of accounts payable to appear older than they actually were, and disregarding generally accepted accounting principles in the calculation of debt. Without my knowledge or authorization, Getzler Henrich also conducted meetings with representatives of Greystone and Rosenthal in

Page 12

which Getzler Henrich portrayed Ahava as a severely mismanaged company and

criticized my credibility and management of Ahava. Getzler Henrich falsely described

the situation as one that could be saved only by Getzler Henrich. As a result, Rosenthal

withdrew its proposed term sheet and Greystone conditioned its proposed loan on my

permanent removal from management of my companies. Neither entity provided a

credit facility to me or my companies.

35.    Since the departure of Getzler Henrich in November 2007, my companies

have returned to profitability. On average, we now make more than $160,000 in gross

profit per week.

_____
                              MOISE BANAYAN

Sworn to before me this
_1ˢᵗ_ day of February 2008.

_____
   Notary Public

# Exhibit 1

AHAVA FOOD CORP., ST. LAWRENCE FOOD CORP.,
LEWIS COUNTY DAIRY CORP., YONI REALTY, LLC, MOISE BANAYAN

AND

SIGNATURE BANK

**MASTER CREDIT FACILITY AGREEMENT**

Dated: As of August 22, 2005

MASTER CREDIT FACILITY AGREEMENT, dated as of August 22, 2005, by and among AHAVA FOOD CORP., a New York corporation (the "**Borrower**"), ST. LAWRENCE FOOD CORP., a New York corporation ("**SLF Corp**"), LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD Corp**"), YONI REALTY, LLC, a New York limited liability company ("**YR LLC**") and MOISE BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("**Banayan**" and, collectively with SLF Corp, LCD Corp, YR LLC and the Borrower, the "**Obligors**" and each an "**Obligor**") and Signature Bank, a New York banking corporation (the "**Bank**").

W I T N E S S E T H:

WHEREAS, the Borrower has requested the Bank create a facility ("**Facility A**") for the Borrower to enable it to borrow a single term loan (the "**Facility A Loan**") on the Closing Date (defined below) in the principal amount of $2,000,000; and

WHEREAS, the Borrower has requested the Bank create a facility ("**Facility B**") for the Borrower to enable it to borrow loans on a revolving credit basis at any time and from time to time prior to the Facility B Termination Date (as hereinafter defined) up to $5,500,000 in aggregate principal amount outstanding at any time; and

WHEREAS, to provide assurance for the repayment of the Loans (as hereinafter defined) and all other obligations of the Borrower with respect thereto, each of the Guarantors (as hereinafter defined) will, among other things, provide the Bank with a guaranty of payment of the Borrower's payment obligations under this Agreement, the Notes (as hereinafter defined) and the other Loan Documents (as hereinafter defined); and

WHEREAS, in addition to the foregoing, in order to induce the Bank to make the Loans, each of the Obligors have agreed to make certain representations, warranties and covenants hereinafter set forth, and to accept the other terms, conditions and provisions hereinafter set forth;

NOW, THEREFORE, intending to be legally bound, all of the parties hereto agree as follows:

I.    DEFINITIONS

SECTION 1.01  <u>Definitions</u>  As used herein, the following words and terms shall have the following meanings:

"**Accounts**" shall mean those accounts arising out of the sale or lease of goods or the rendition of services by the Borrower

"**Account Debtor**" shall mean the Person who is obligated on or under an Account.

"**Actions**" shall have the meaning set forth in Section 3.06.

"**Adjusted LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of

1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"**Affiliate**" shall mean any corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or other Person which, directly or indirectly, Controls or is Controlled by or is under common Control with any of the Obligors (other than Banayan) or the Bank (as applicable).

"**Annex**" shall have the meaning set forth in Section 3.22.

"**Applicable Margin**" shall mean 2.25%.

"**Approved Subordinated Debt**" shall mean Indebtedness of the Borrower to Persons other than the Bank, which is subordinated to the Indebtedness of the Borrower to the Bank under the terms of one or more Subordination Agreements or the other Loan Documents on terms approved in writing by the Bank.

"**Assessment Rate**" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the Federal Deposit Insurance Corporation for insurance by such Corporation of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Bank to be representative of the cost of such insurance to the Bank.

"**Auditor**" shall have the meaning set forth in Section 5.03(a).

"**Bank**" - see heading.

"**Base CD Rate**" means the sum of (a) the Three Month Secondary CD Rate multiplied by the Statutory Reserve Rate plus (b) the Assessment Rate.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Bonds**" shall mean New York City Industrial Development Agency $6,950,000 Industrial Development Revenue Bonds (Ahava Food Corp Project), Series 2004, dated as of January 28, 2004.

"**Bond Documents**" shall mean any and all documents entered into in connection with the Bonds.

"**Borrower**" - see heading.

"**Borrowing**" shall refer to (i) Facility B Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, and (ii) the Facility A Loan, as converted or continued pursuant to Article II.A, as applicable.

"**Borrowing Base**" shall mean, at the relevant time of reference thereto, an amount determined by the Bank by reference to the most recent Borrowing Base Certificate delivered to the Bank pursuant to Section 5.03(c) and accepted by the Bank, which is equal to (i) 80% of the Eligible Accounts Receivable, plus (ii) the lesser of (A) 40% of Eligible Inventory and (B) $1,000,000.

"**Borrowing Base Certificate**" shall mean a certificate executed and delivered by an Executive Officer of the Borrower, certifying, as accurate and complete, the amount of the Borrowing Base as of the date set forth therein, in substantially the form Exhibit C.

"**Borrowing Date**" shall mean each date on which a Loan is disbursed (or continued or converted).

"**Business Day**" shall mean any day not a Saturday, Sunday or legal holiday, on which the Bank is open for business in New York City.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, the obligation of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with Generally Accepted Accounting Principles is required to be, classified and accounted for as a capital lease on a balance sheet of such Person; and for purposes of this Agreement the amount of such obligation shall be the capitalized amount thereof determined in accordance with such principles.

"**Change in Control**" shall mean (a) a change in the ownership of any Obligor (other than Banayan) without the prior written consent of the Bank so that Banayan (or a trust established for the benefit of one or more lineal descendants of Banayan for which Banayan is the sole trustee) shall cease to beneficially own a 100% interest in the profits and losses of such Obligor, or (b) Banayan shall cease to Control any Obligor, or (c) Banayan shall cease to be control of the day-to-day management and operations of any Obligor; provided, however, in the case of clause (a) above, such consent will not be required provided that, following any such change in ownership, such Obligor has provided to the Bank a certificate dated as of the date of such change in ownership and signed by an Executive Office of such Obligor confirming that: (i) Bayanan will retain a majority interest in the profits and losses of the Obligor in question and continue to be control of the day-to-day management and operations of such Obligor; (ii) no additional liabilities, direct or indirect, are incurred by any Obligor; (iii) there is no reduction in the Tangible Net Worth of any Obligor; (iv) no material reserves under GAAP are required to be established by any Obligor; (iv) each Obligor remains in pro-forma compliance with this Agreement and the other Loan Documents as demonstrated by the Obligors to the Bank's reasonable satisfaction; (v) no negative restatement of such Obligor's operating or financial condition is required under GAAP.

3

"**Closing Date**" shall mean the date of the execution and delivery of this Agreement.

"**Collateral**" shall mean, collectively (i) "Collateral" (as defined) in each of the Security Agreement, and (ii) any other collateral pledged under any other Loan Document.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. (Except for purposes of determining whether a Change in Control has occurred, a Person shall be presumed to "Control" another Person if the former owns, directly or indirectly, 50% or more of the equity interests of any kind in the latter; however, the foregoing is not intended to limit in any way the scope of what factors or combinations thereof can cause or constitute "Control".)

"**Documentary Letter of Credit**" means a documentary letter of credit in form and substance customarily issued by the Bank from time to time.

"**Dollars**" or "**$**" refers to lawful money of the United States of America.

"**EBITDA**" shall mean, net income (or net deficit) exclusive of extraordinary gains, if any, plus (i) interest expense, (ii) depreciation expense, (iii) amortization expense, and (iv) income tax expense (all to the extent that (i), (ii), (iii) and (iv) have been deducted in calculating net income (or net deficit)), all for the period over which EBITDA is being calculated.

"**Eligible Accounts Receivable**" shall mean those Accounts which (i) are due and payable within 90 days from the original date of invoice and which do not remain unpaid for more than 90 days from the original date of invoice, and (ii) have been validly collaterally assigned to the Bank and comply with all of the terms, conditions, warranties and representations made to the Bank under this Agreement and the other Loan Documents; but the same shall not include the following: (a) Accounts with respect to which the Account Debtor is an officer, director, employee, or agent of the Borrower or an Affiliate thereof; (b) Accounts with respect to which goods are placed on consignment, guaranteed sale, bill-and-hold, repurchase or return, or other terms by reason of which the payment of the Account Debtor may be conditional; (c) Accounts arising from progress billings, invoices for deposits, and rebills of amounts previously credited to the extent of credits issued more than 15 days prior to such rebill; (d) Accounts with respect to which the Account Debtor is not domiciled in the United States of America unless such Account is fully secured by an irrevocable letter of credit acceptable to the Bank and assigned to the Bank; (e) Accounts with respect to which the sale is on an installment sale, lease or other extended payment basis; (f) Accounts with respect to which the Account Debtor is a federal, state, local or foreign governmental authority unless such governmental authority is the United States of America or any department, agency or instrumentality of the United States, and the applicable Borrower complies with the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 203 et seq.); (g) all Accounts owing by any Account Debtor if seventy-five percent (75%) or more of the Accounts due from such Account Debtor are deemed not to be Eligible Accounts Receivable hereunder; (h) Accounts with respect to which the Account Debtor is a Subsidiary of, Affiliate of, or has common officers or directors with, the Borrower; (i)

4

Accounts with respect to which the Bank does not for any reason have a perfected first priority Lien; (j) Accounts with respect to which the Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to the Borrower, to the extent of the Borrower's existing or potential liability to such Account Debtor; (k) Accounts with respect to which the Account Debtor has disputed any liability, or the Account Debtor has made any claim with respect to any other Account due to the Borrower, or the Account is otherwise subject to any right of setoff, deduction, breach of warranty or other defense, dispute or counterclaim by the Account Debtor; (l) that portion of any Account representing late fees, service charges or interest, but only to the extent of such portion; (m) Accounts owed by any Account Debtor which is insolvent or is the subject of an insolvency proceeding; (n) that portion of any Account represented by contract rights, documents, instruments, chattel paper or general intangibles; (o) Accounts owing by Cooperative Dairy Marketing, LLC, North Central Companies and City Glatt; (p) $25,000 of reserves established in connection with the Accounts and (q) any and all Accounts of an Account Debtor whose creditworthiness is not satisfactory to the Bank, in its sole credit judgment, based on information available to the Bank; provided, however, if any Account shall be deemed ineligible in accordance with clause (q) hereof, the Bank shall provide notice to the Borrower. References to percentages of Accounts are based on dollar amount of such Accounts and not the number of such Accounts; provided, however, that in the case of clauses (g) and (p) hereof, the Bank reserves the right to modify the amounts applicable thereto in its reasonable discretion.

"**Eligible Inventory**" means all Inventory, as such term is defined in the Security Agreement, that constitutes finished goods held for sale by the Borrower and LCD Corp., normally and currently saleable in the ordinary course of the Borrower's or LCD Corp.'s business, as the case may be, and (a) which at all times pertinent hereto is of good and merchantable (or saleable, as applicable) quality, (b) free from defects, (c) as to which the Bank has a perfected first priority lien not subject to any Trust Claim, (d) which is located at the locations set forth in the Security Agreement, and (e) as to which Borrower or LCD Corp., as the case may be, has satisfied all terms, conditions, warranties and representations of this Agreement and the other Loan Documents; but Eligible Inventory does not include any of the following: (i) raw materials, (ii) work in process; (iii) any spoiled, damaged, defective or recalled items; (iv) any items of inventory which have been consigned to Borrower or LCD Corp., as the case may be, or as to which a Person claims a lien; (v) any items of inventory which have been consigned by the Borrower or LCD Corp., as the case may be, to a consignee; (vi) inventory located on premises not owned by the Borrower or LCD Corp., as the case may be, and for which the Bank does not have a Mortgagee Waiver, Landlord Waiver and Consent or Warehouse Notification; and (vii) inventory which in the reasonable judgment of the Bank is considered to be slow moving or otherwise not merchantable. Eligible Inventory shall be valued at the lower of cost, market value, or the valuation consistent with that employed in the preparation of the financial statements of the Borrower or LCD Corp., as the case may be.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

5

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Obligor (other than Banayan) or any Subsidiary of any Obligor (other than Banayan) directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same has been and may hereafter be amended.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with any Obligor (other than Banayan) is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Obligor or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Obligor or any such ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Obligor or any such ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Obligor or any such ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Obligor or any such ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall mean any Event of Default set forth in Article VII.

"**Executive Officer**" shall mean Banayan.

"**Facility A**" - see recitals.

"**Facility A Loan**" - see recitals.

6

"**Facility A Maturity Date**" shall mean August 22, 2008

"**Facility A Note**" shall mean the promissory note of the Borrower delivered pursuant to Section 2A.01

"**Facility B**" - see recitals.

"**Facility B Availability Period**" means the period from and including the Closing Date to but excluding the earlier of the Facility B Termination Date and the date of termination of the Facility B Commitment.

"**Facility B Commitment**" shall have the meaning set forth in Section 2B.01(a).

"**Facility B Loans**" shall mean each revolving credit loan made pursuant to Section 2B.01(a)

"**Facility B Note**" shall mean the promissory note of the Borrower delivered, pursuant to Section 2B.02(a)

"**Facility B Termination Date**" shall mean August 22, 2008.

"**FDA**" shall mean the Food and Drug Administration, or any successor thereto.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, consistently applied

"**Governmental Authority**" means the government of the United States of America, any other nation or any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantee**" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

7

"**Guarantors**" shall mean SLF Corp, LCD Corp, YR LLC, Banayan and any Person who hereafter becomes a Guarantor pursuant to Section 5.10.

"**Guaranty**" shall mean the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Bank, guarantying all obligations of the Borrower to the Bank with respect to the Loans, Letters of Credit and under the Loan Documents.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Hedging Obligations**" shall mean, with respect to any Person, all liabilities of such Person under interest rate, currency and commodity swap agreements, cap agreements and collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits received or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capitalized Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) Hedging Obligations, as calculated on a basis satisfactory to the Bank and in accordance with accepted practice, and (l) all other liabilities which are reflected as such on the balance sheet of the Person in question in accordance with GAAP. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Interest Payment Date**" shall mean, with respect to Eurodollar Loans, the last day of each Interest Period; and (a) with respect to the Facility A Loan, the Facility A Maturity Date; and (b) with respect to any Facility B Loan, the Facility B Termination Date.

"**Interest Period**" means with respect to any Eurodollar Borrowing, (a) in the case of the Facility A Borrowing, the period commencing on the date of such Borrowing and ending on the

8

numerically corresponding day in the calendar month that is one (1) month thereafter, and, (b) in the case of any Facility B Borrowing the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the Borrower may elect; provided, in each case, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Facility B Borrowing, thereafter shall be the Closing Date of the most recent conversion or continuation of such Borrowing.

"**Internal Revenue Code**" shall mean the Internal Revenue Code of 1986, as heretofore amended and as the same may be hereafter amended.

"**LC Disbursement**" means a payment made by the Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.

"**LCD Corp**" - see heading.

"**Landlord Waiver and Consent**" shall mean, with respect to any premises leased to any Obligor (other than Banayan) where assets of such Obligor are situated, a letter, certificate or other instrument in writing from the lessor under the related lease, in substantially the form attached hereto as Exhibit E or in such other form as may be approved by the Bank in its sole discretion.

"**Letter of Credit**" means any Documentary Letter of Credit or Standby Letter of Credit issued pursuant to this Agreement.

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Bank from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/16 of 1%) at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are

9

offered by the principal London office of the Bank in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"**LIBOR Rate Prepayment Premium**" shall mean, in the event of (a) the payment of any principal of the Facility A Loan (if such Loan is subject to the Adjusted LIBO Rate) other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) and (b) the conversion Interest Period applicable to the Facility A Loan other than on the last day of the then applicable Interest Period, the Borrower shall compensate the Bank for the loss, cost and expense attributable to such event. Such loss, cost or expense to the Bank shall be deemed to include an amount determined by the Bank to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of the Facility A Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to the Facility A Loan, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Bank would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of the Bank setting forth any amount or amounts that the Bank is entitled to receive pursuant to this "LIBOR Rate Prepayment Premium" shall be delivered to the Borrower and shall be conclusive absent manifest error.

"**Licenses**" shall have the meaning set forth in Section 3.10.

"**Lien**" shall mean with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loans**" shall mean the Facility A Loan and the Facility B Loans.

"**Loan Documents**" shall mean this Agreement, the Notes, the Security Agreement, the Guaranty, the Subordination Agreements, the Mortgagee Waiver, those other agreements pertaining to any of the Loans as to which the Bank is a party or a beneficiary on the Closing Date, any letter of credit application or any other agreement submitted by the Borrower in connection with a Letter of Credit, and all other agreements, instruments, documents and certificates, including, without limitation, pledges, powers of attorney, consents, assignments, contracts, notices, financing statements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Obligor, or by an Affiliate of any of them or by another Person, and delivered to the Bank in connection with this Agreement or the transactions contemplated hereby, excluding, however, any letter of interest or commitment letter with respect hereto.

"**Mortgagee Waiver**" shall mean the Mortgager's Waiver and Release dated as of the date hereof by Merrill Lynch Business Financial Services, Inc.

10

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Notes**" shall mean the Facility A Note and the Facility B Note.

"**Notice of Borrowing**" shall mean the notice required to be delivered pursuant to Section 2A.05 or Section 2B.01(c).

"**Obligors**" - see heading.

"**OFAC**" shall have the meaning set forth in Section 3.22.

"**OSHA**" shall mean the Occupational Safety and Health Administration, or any successor thereto.

"**PACA**" shall mean the Perishable Agricultural Commodities Act (7 U.S.C. §§ 499a-499t)

"**PASA**" shall mean the Federal Packers and Stockyards Act (7 U.S.C. §§ 181-229)

"**Patriot Act**" has the meaning set forth in Section 3.22.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Encumbrances**" shall mean:

(a)    Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.02;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than Trust Claims), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.02;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business;

11

(f)     Liens in existence on the Closing Date and set forth on <u>Schedule 6.01</u>, which Liens shall not be renewed, extended or spread in any way; and

(g)     Liens securing Indebtedness permitted under Section 6.03(e), provided such Liens encumber only the assets which are the subject of the purchase money Indebtedness in question.

"**Permitted Investments**" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     investments of the Borrower in wholly-owned Subsidiaries thereof who have become Guarantors pursuant to Section 5.10.

"**Person**" shall mean any natural person, limited liability company, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Prime Rate**" shall mean the rate per annum announced by the Bank from time to time as its prime rate in effect at its principal office.  Each change in the Prime Rate shall be effective on the date such change is announced to become effective.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

12

"**Revolving Credit Exposure**" means the sum of the outstanding principal amount of the Facility B Loans and LC Exposure at the time in question.

"**Security Agreement**" shall mean the Security Agreement, dated as of the date hereof, made by each Obligor (other than Banayan) in favor of the Bank securing its obligations as the Borrower or as a Guarantor, as the case may be, and any other Security Agreement made by a (new) Guarantor pursuant to Section 5.10.

"**SLF Corp**" - see heading.

"**Standby Letter of Credit**" means a standby letter of credit in form and substance customarily issued by the Bank from time to time, and issued for such purposes as are reasonably acceptable to the Bank.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Bank is subject (a) with respect to the Base CD Rate, for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months and (b) with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the Closing Date of any change in any reserve percentage.

"**Subordination Agreement**" means each subordination agreement of even date herewith by and among the applicable Subordinated Lender, the applicable Obligor and the Bank, subordinating such Subordinated Lender's right to repayment of the indebtedness owing to such Subordinated Lender from such Obligor to the obligations owing to the Lender and its Affiliates with respect to this Agreement or otherwise.

"**Subordinated Lender**" means the applicable lender set forth on Schedule 3.12.

"**Subsidiary**" shall mean with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity, the accounts of which could be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests, are as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by (in any case under foregoing clause (a) or

13

(b)) the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Tangible Net Worth**" shall mean (i) the aggregate amount at which the value of the assets (other than patents, patent rights, trademarks, trade names, franchises, copyrights, licenses, permits, goodwill and other intangible assets classified as such in accordance with GAAP) would appear on a balance sheet, after deducting loans and advances to Affiliates who are not Obligors, capitalized research and development costs, capitalized interest and debt discount and expense and after all appropriate adjustments in accordance with GAAP (including, without limitation, reserves for doubtful receivables, obsolescence, depreciation and amortization), but excluding the value of any account receivable from an Affiliate other than accounts receivable generated in the ordinary course of business, which are payable within 90 days of the date when they arise and are not more than 90 days old at the time in question, less (ii) the aggregate amount of all Indebtedness, other liabilities (including tax and other proper accruals) and reserves of the Borrower but excluding Approved Subordinated Debt, in each case computed in accordance with GAAP.

"**Three Month Secondary CD Rate**" means, for any day, the secondary market rate for three month certificates of deposit reported as being in effect on such day (or, if such day is not a Business Day, the next preceding Business Day) by the Board through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board, be published in Federal Reserve Statistical Release H.15(519) during the week following such day) or, if such rate is not so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) by the Bank from three negotiable certificate of deposit dealers of recognized standing selected by it.

"**Total Liabilities**" means all liabilities, including (i) Capitalized Lease Obligation, (ii) Approved Subordinated Debt, and (iii) all reserves for deferred taxes and other deferred sums appearing on the liabilities side of the balance sheet of the Borrower.

"**Trust Claim**" shall mean any Lien or claim imposed upon any asset of an Obligor in connection with PACA or PASA.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, the Prime Rate or, in the case of a Term Loan or Borrowing, the LIBO Rate.

"**UCC**" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Bank's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform

14

Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

"**Unfunded Capital Expenditures**" means capital expenditures that the Borrower has made that have not been financed with the proceeds of borrowed money or leased pursuant to a lease agreement giving rise to a Capitalized Lease Obligation.

"**Unused Fee**" shall mean have the meaning set forth in Section 2B.04.

"**Warehouse Notification**" shall mean with respect to any warehouse in which any Obligor (other than Banayan) stores assets, a letter from such Obligor (and acknowledge by the warehouse), in substantially the form attached hereto as <u>Exhibit F</u> or in such other form as may be approved by the Bank in its sole discretion.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**YR LLC**" - see heading.

SECTION 1.02. <u>Accounting Terms; Consolidation</u>. Except as otherwise specifically provided in this Agreement, each accounting term used in this Agreement shall have the meaning given to it under GAAP.

SECTION 1.03. <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans may be classified and referred to by Group (e.g., a "Facility B Loan") or by Type (e.g., a "Prime Loan") or by Group and Type (e.g., a "Facility B Eurodollar Loan").

15

Borrowings also may be classified and referred to by Group (e.g., a "Facility B Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Group and Type (e.g., a "Facility B Prime Borrowing").

## II.A.    FACILITY A - THE TERM LOAN FACILITY

SECTION 2A.01      Facility A Loan.  Subject to the terms and conditions hereof, and in particular this Article II.A, the Bank is making the Facility A Loan to the Borrower on the Closing Date, in the principal amount of $2,000,000.  The Faiclity A Loan shall remain as a single Borrowing, bearing a single interest rate at all times.

SECTION 2A.02      Facility A Note; Payments.  (a)  The Facility A Loan shall be evidenced by a single promissory note (the "**Facility A Note**"), substantially in the form attached hereto as Exhibit A, appropriately completed, duly executed and delivered on behalf of the Borrower and payable to the Bank.

(b)      The Facility A Note shall be payable, as to principal, in thirty-five (35) equal installments of $33,333.33 on the first day of each month, followed by a final payment of the then unpaid principal balance of the Facility A Loan on the Facility A Maturity Date.  Subject to the provisions of this Article II.A, which may require that the Prime Rate apply, the Facility A Loan shall bear interest from the Closing Date at the Adjusted LIBO Rate plus the Applicable Margin and interest shall be payable on each Interest Payment Date including the Facility A Maturity Date.

(c)      Amounts repaid or prepaid on account of the Facility A Loan may not be reborrowed.

SECTION 2A.03      Prepayment of Facility A Loan.  (a)  Intentionally omitted.

(b)      In the event of the payment of any principal other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) the Bank shall deliver to the Borrower a certificate of the Bank setting forth any amount or amounts of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.  For the avoidance of doubt, should any such payment be made on the last day of the Interest Period applicable thereto, no LIBOR Rate Prepayment Premium shall apply.

(c)      Intentionally Omitted

(d)      Each partial prepayment in respect of the Facility A Loan shall be in the minimum principal amount of $50,000, and in an integral multiple of $10,000, and upon not less than three (3) Business Days nor more than fifteen (15) Business Days' prior written notice to the Bank.  All partial prepayments of the Facility A Loan shall be applied to installments of principal thereof in the inverse order of maturity.  Each notice of prepayment shall specify the prepayment date and the principal amount to be prepaid, shall be irrevocable and shall commit the Borrower

16

to prepay the Facility A Loan by the amount stated therein on the date stated therein. Any such prepayment shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment and the LIBOR Rate Prepayment Premium.

(e)      Any payment of the outstanding principal balance of the Facility A Loan after the occurrence and continuance of an Event of Default shall be deemed a voluntary prepayment for the purposes of this paragraph, and the LIBOR Rate Prepayment Premium (calculated pursuant to the provisions of this Section based upon the interest rate specified herein) applicable to the outstanding principal balance of the Facility A Loan immediately prior to the occurrence of such Event of Default, shall be payable with respect thereto.

(f)      The Borrower acknowledges that the Bank might not fund or hedge its fixed rate loan portfolio or any prepayment thereof, and that the Bank makes such determination on a loan-by-loan basis. The Borrower further agrees that the calculation of the LIBOR Rate Prepayment Premium is a reasonable and appropriate method of calculating liquidated damages for any such prepayment irrespective of whether or not any of the foregoing hedging transactions have in fact occurred or occurred precisely as contemplated herein with respect to the Facility A Loan. All calculations and determinations by the Bank of the amount of the LIBOR Rate Prepayment Premium or of any element thereof, if made in accordance with its then standard procedures for so calculating or determining such amounts, shall be conclusive absent manifest arithmetic error.

SECTION 2A.04      Funds; Manner of Payment.  Unless otherwise specified herein, each payment and prepayment of principal of and interest on the Facility A Note shall be made not later than 1:00 p.m., New York City time, on the date on which it is payable and shall be made in U.S. Dollars in Federal or other immediately available funds. The Borrower hereby authorizes the Bank to automatically debit its account, account no. 1500583386, maintained at the Bank to make any such payments and agrees that it will maintain an amount in such account equal to or exceeding the amount of regularly scheduled interest and principal due and owing under the Facility A Note.

SECTION 2A.05      Interest.  (a)  The Interest Period applicable to the Facility A Borrowing should always be of a one (1) month duration.

(b)      If an Event of Default has occurred and is continuing and the Bank so notifies the Borrower, then, so long as an Event of Default is continuing, unless repaid, the Facility A Loan shall be converted to a Prime Borrowing at the end of the Interest Period applicable thereto.

(c)      All interest under this Article II A shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Adjusted LIBO Rate or LIBO Rate shall be determined by the Bank, and such determination shall be conclusive absent manifest error.

(d)      Notwithstanding the foregoing, upon the Closing Date, the Facility A Loan shall bear interest at the Prime Rate and such interest rate shall be converted to a Eurodollar Loan on the third Business Day following the Closing Date. The Interest Period applicable there to shall be of a one (1) month day duration.

17

SECTION 2A.06    Alternate Rate of Interest.   If prior to the commencement of any Interest Period for the Facility A Loan: (i) the Bank determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; (ii) the Bank determines that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Bank of making or maintaining the Facility A Loan for such Interest Period; or (iii) the Bank determines (which determination shall be conclusive absent manifest error) that it would be illegal to create a Eurodollar Borrowing at the time in question, then the Bank shall give notice thereof to the Borrower by telephone or telecopy as promptly as practicable thereafter and, until the Bank notifies the Borrower that the circumstances giving rise to such notice no longer exist, the interest rate applicable to the Facility A Loan shall be automatically converted to the Prime Rate.

SECTION 2A.07    Break Funding Payments.   At any time when the Faiclity A Loan is a Eurodollar Loan, in the event of (a) the payment of any principal of the Facility A Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), or (b) the failure to continue or prepay the Interest Period applicable to the Facility A Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance herewith) then, in any such event, the Bank shall deliver to the Borrower a certificate of the Bank setting forth the amount of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

## II.B.   FACILITY B - THE FACILITY B REVOLVING CREDIT FACILITY

SECTION 2B.01    Facility B Revolving Credit.   (a)   Subject to the terms and conditions hereof, and in particular this Article II.B, and relying upon the representations and warranties set forth herein, the Bank agrees to make revolving credit loans to the Borrower at any time or from time to time on or after the Closing Date and until the sooner of the Facility B Termination Date, or the termination of the Facility B Commitment in accordance with the terms hereof (the "**Facility B Loans**"), in an aggregate principal amount at any time outstanding not in excess of the lesser of (i) $5,500,000, less the Revolving Credit Exposure at the time in question, and (ii) the Borrowing Base less the Revolving Credit Exposure at the time in question (the "**Facility B Commitment**").   Within the foregoing limits, the Borrower may borrow, repay and reborrow the Facility B Loans.

(b)   The Facility B Loans made by the Bank on any one day shall be in a minimum aggregate principal amount of the lesser of $100,000 or the then unused portion of the Facility B Commitment shall be in an integral multiple of $10,000.   Facility B Borrowings of more than one type may be outstanding at the same time; provided that there shall be no more than a total of two (2) Facility B Borrowings outstanding at any time.   The Facility B Loans shall be made for working capital purposes of the Borrower (as required under Section 5.12).

(c)   The Borrower shall give the Bank a prior Notice of Borrowing, which may be by facsimile if followed immediately by telephonic confirmation), no later than, in the case of a

18

Prime Rate Loan, noon (New York time) on the Business Day of each proposed borrowing, and in the case of a Eurodollar Loan, no later than noon (New York time) two (2) Business Days prior to the date of the proposed Borrowing, each under this Section 2B.01. Each Notice of Borrowing shall be irrevocable and shall also specify the following information:

(i)    the aggregate amount of the requested Borrowing (which, in the case of a Eurodollar Borrowing, must be in a minimum amount of $250,000);

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be a Prime Borrowing or a Eurodollar Borrowing;

(iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)    the location and number of the account to which funds are to be disbursed, which shall be an account contemplated by Section 2B.05;

(d)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Facility B Loan if the Interest Period requested with respect thereto would end after the Facility B Termination Date.

(e)    Each Facility B Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Notice of Borrowing. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in Section 2B.01(c). The Borrower may also elect different options with respect to different portions of the affected Borrowing, in which case the Facility B Loans comprising each such portion shall be considered a separate Borrowing, all of which shall be set forth in the applicable Notice of Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Bank so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Facility B Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Facility B Eurodollar Borrowing shall be converted to a Prime Borrowing at the end of the Interest Period applicable thereto.

(f)    Notwithstanding the foregoing, any Facility B Borrowing advanced to the Borrower on the Closing Date shall bear interest at the Prime Rate and such interest rate shall be converted to a Eurodollar Loan on the third Business Day following the Closing Date. The Interest Period applicable there to shall be of a three (3) month duration.

SECTION 2B.02    Facility B Note.  (a) The Facility B Loans shall be evidenced by a single promissory note (the "**Facility B Note**"), substantially in the form attached hereto as Exhibit B, appropriately completed, duly executed and delivered on behalf of the Borrower and

payable to the order of the Bank in a principal amount equal to the Facility B Commitment. The date and amount of any Facility B Loan and of each payment, prepayment and readvance of principal thereunder shall be recorded on the grid schedule annexed to the Facility B Note or any similar electronic or other record maintained by the Bank, and the Borrower authorizes the Bank to make such record; provided, however, that the failure of the Bank to set forth any such Facility B Loan, payment, readvance and/or other information on such grid or (other similar record) shall not in any manner affect the obligation of the Borrower to repay the Facility B Loans in accordance with the terms of the Facility B Note and this Agreement, and in particular this Article II.B. Absent manifest error, the Facility B Note, the grid schedule (part thereof) and the books and records of the Bank with respect thereto shall be presumptive evidence of the Facility B Loans. The aggregate unpaid amount of the Facility B Loans at any time outstanding shall be the principal amount owing on the Facility B Note at such time.

(b)    All Facility B Loans shall be due and payable on the Facility B Termination Date and all accrued and unpaid interest thereon shall, subject to the provisions hereof, be payable on each Interest Payment Date including the Facility B Termination Date; provided, however, that if any such day is not a Business Day, such principal and such interest, if any, shall be payable on the next succeeding Business Day with additional accrued interest until paid.

SECTION 2B.03    Interest on Facility B Loans. (a) The Facility B Loans comprising each Facility B Prime Borrowing shall bear interest at the Prime Rate.

(b)    The Loans comprising each Facility B Eurodollar Borrowing shall bear interest at a rate equal to the Adjusted LIBO Rate plus the Applicable Margin for the Interest Period in effect for such Borrowing.

(c)    Foregoing clauses (a) and (b) of this Section 2B.03 are subject to Section 8.16.

(d)    Accrued interest on each Facility B Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Facility B Commitment; provided that (i) interest accrued pursuant to Section 8.16 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Facility B Loan (other than a prepayment of a Facility B Prime Loan prior to the Facility B Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Facility B Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Facility B Loan shall be payable upon such conversion.

(e)    All interest under this Article II.B shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Adjusted LIBO Rate or LIBO Rate shall be determined by the Bank, and such determination shall be conclusive absent manifest error.

20

SECTION 2B.04    Prepayment of Facility B Loans. (a) The Borrower shall have the right at any time and from time to time to prepay the Facility B Loans, in whole or in part, without premium or penalty except as set forth in Section 2B.07; provided, however, that each such partial prepayment shall be in the minimum principal amount of $25,000, and in an integral multiple of $10,000 in excess thereof.   The Borrower shall notify to Bank by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Facility B Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of a Facility B Prime Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Each partial prepayment of any Borrowing shall be in the minimum principal amount of $50,000, and in an integral multiple of $10,000 in excess thereof.

(b)    [Intentionally Omitted ]

(c)    All prepayments shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment.

(d)    The Borrower shall immediately repay any Revolving Credit Exposure in excess of the amount of the Facility B Commitment at the time in question; provided, if such payment shall not reduce the amount of Revolving Credit Exposure to an amount that is less than or equal to the amount of the Commitment, the Borrower shall provide cash collateral to the Bank for such excess amount in accordance with Section 2.08, mutatis, mutandis.

SECTION 2B.05    Funds; Manner of Payment. Unless otherwise specified herein, each payment and prepayment of principal of and interest on the Facility B Note shall be made not later than noon (New York City time) on the date on which it is payable and shall be made in U.S. Dollars in Federal or other immediately available funds.  The Borrower hereby authorizes the Bank to automatically debit its account, account no. 1500583386, maintained at the Bank to make any such payments and agrees that it will maintain an amount in such account equal to or exceeding the amount of regularly scheduled interest and principal due and owing under the Facility B Note.

SECTION 2B.06    Alternate Rate of Interest. If prior to the commencement of any Interest Period for a Facility B Eurodollar Borrowing: (i) the Bank determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; (ii) the Bank determines that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Bank of making or maintaining the Loans (or Loan) included in such Borrowing(s) for such Interest Period; or (iii) the Bank determines (which determination shall be conclusive absent manifest error) that it would be illegal to create a Eurodollar Borrowing at the time in question, then the Bank shall give notice thereof to the Borrower by telephone or telecopy as promptly as practicable thereafter and, until the Bank notifies the Borrower that the circumstances giving rise to such notice no longer exist, (i) any Notice of Borrowing that contains a request for the

21

conversion of any Facility B Borrowing to, or continuation of any Facility B Borrowing as, a Facility B Eurodollar Borrowing shall be ineffective, and (ii) if any Notice of Borrowing requests a Eurodollar Borrowing, such Borrowing shall be made as a Prime Borrowing.

SECTION 2B.07    Break Funding Payments.  In the event of (a) the payment of any principal of any Facility B Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Facility B Eurodollar Loan other than on the last day of the Interest Period applicable thereto or (c) the failure to borrow, convert, continue or prepay any Facility B Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance herewith) then, in any such event, the Bank shall deliver to the Borrower a certificate of the Bank setting forth the amount of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2B.08    Letters of Credit.  (a) General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Letters of Credit for its own account, in a form acceptable to the Bank, at any time and from time to time during the Facility B Availability Period, provided that such issuance will not cause the Revolving Credit Exposure to exceed the Facility B Commitment; provided, however, that the aggregate amount of LC Exposure shall at no time exceed $500,000.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  Standby Letters of Credit may only be issued for purposes approved by the Bank, in its reasonable discretion.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Bank) to the Bank (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit and the purpose thereof (which must be permitted under Section 5 12), the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the Bank, the Borrower also shall submit a letter of credit application on the Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, the Revolving Credit Exposure shall not exceed the Facility B Commitment.

22

(c)     Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Facility B Termination Date.

(d)     Reimbursement.  If the Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Bank an amount equal to such LC Disbursement not later than 3:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2B.01 that such payment be financed with a Facility B Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Facility B Loan.  If the Borrower fails to make such payment when due, the Borrower shall be deemed to have made a request for a Facility B Loan, which shall (initially) be a Prime Loan

(e)     Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (d) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Bank nor any Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Bank; provided that the foregoing shall not be construed to excuse the Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Bank (as finally determined by a court of competent jurisdiction), the Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of

23

a Letter of Credit, the Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(f)     Disbursement Procedures  The Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Bank shall promptly notify the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Bank with respect to any such LC Disbursement.

(g)     Interim Interest  If the Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to Facility B Prime Loans; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (d) of this Section, and such failure caused the Borrower to exceed the Facility B Commitment, then Section 8.16 shall apply.

(h)     Cash Collateralization.  Subject to the provision of the following sentence, the Borrower shall, on or before the Facility B Termination Date, deposit in an account with the Bank in the name of the Bank, an amount in cash equal to 105% of the sum of (i) the aggregate undrawn stated amount of any Standby Letter of Credit having an expiration date later than the Facility B Termination Date plus (ii) all amounts theretofore drawn under any such Standby Letter of Credit and not then reimbursed plus (iii) any accrued and unpaid interest on such unreimbursed amounts, if any.  If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Bank demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit such cash collateral in an account with the Bank, in the name of the Bank, an amount in cash equal to 105% of the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (g) or (h) of Section 7.  Such deposit shall be held by the Bank as collateral for the payment and performance of the obligations of the Borrower under this Agreement.  The Bank shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Bank and at the Borrower's risk and expense, such deposits shall bear interest at the rate applicable to standard demand savings accounts maintained at the Bank.  Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Bank to reimburse the itself for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Facility B Loans has been accelerated, be applied to satisfy

24

other obligations of the Borrower under this Agreement. If the Borrower is required to provide cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived. It is expressly agreed that amounts deposited into such account in respect of a Standby Letter of Credit shall remain on deposit after the termination of this Agreement so long as such Letter of Credit remains outstanding, and to the extent that such funds have not been applied as permitted hereunder, shall be returned to the Borrower following the expiration of such Letter of Credit or the return thereof, in each case without the same having been drawn.

(i)     Fees. The Borrower agrees to pay to the Bank a fee with respect to Letters of Credits, which shall be calculated at the rate of 0.25% of the full amount of each draw under each Documentary Letter of Credit, and shall accrue at a per annum rate of 2.25% of the face amount of each Standby Letter of Credit, during the period from and including the Closing Date to but excluding the later of the date on which the Facility B Commitment terminates and the date on which the Bank ceases to have any LC Exposure. In addition to the fees in the nature of those referred to in the preceding sentence (without duplication), the Borrower agrees to pay the Bank's standard fees with respect to the issuance, amendment renewal or extension of any Letter of Credit or processing of drawings thereunder. Fees accrued through and including the last day of [May, August, November and February] of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the Closing Date; provided that all such fees shall be payable on the date on which the Facility B Commitment terminate and any such fees accruing after the date on which the Facility B Commitment terminate shall be payable on demand. Any other fees payable to the Bank pursuant to this paragraph shall be payable within 10 days after demand. All fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2B.09     Unused Fee. The Borrower agrees to pay, in immediately available funds to the Bank, in consideration of the Facility B Commitment, an unused fee (the "**Unused Fee**") of one-quarter (1/4) of one percent (0.25%) per annum (based on a 360-day year) of the average monthly unused amount of the Facility B Commitment determined as of the end of each calendar month. The Unused Fee shall accrue from the date hereof to and including the earlier to occur of the Facility B Termination Date or the termination of the Facility B Commitment in accordance with the terms hereof, and shall be payable monthly in arrears commencing on the first day of the first whole calendar month after the date hereof and on the first day of each calendar month thereafter until and on the earlier to occur of the latest if the Facility B Termination Date or the termination of the Facility B Commitment in accordance with the terms hereof. As used in this Section 2B.09, the term "unused amount of the Facility B Commitment" shall mean $5,500,000 less the Revolving Credit Exposure at the time in question.

25

III.    REPRESENTATIONS AND WARRANTIES

The Obligors each represent and warrant to the Bank that:

SECTION 3.01. Organization, Powers, etc.  (a)  Each of the Obligors (other than Banayan) (i) is an entity duly organized or incorporated (as applicable), validly existing and in good standing under the laws of the state of its organization or incorporation (as applicable), (ii) has the power and authority to own its properties and to carry on its business as now being conducted and (iii) is duly qualified to do business in every jurisdiction wherein the conduct of its business or the ownership of its properties are such as to require such qualification and the failure to so qualify would be likely to have a material adverse effect on such Obligors and (b) each of the Obligors, (i) has the power to execute and perform this Agreement and the other Loan Documents to which it is a party, and (ii) has the power to borrow or guarantee and to pledge assets to the extent contemplated hereunder, and to execute and deliver all applicable Loan Documents.

SECTION 3.02.  Authorization of Borrowing, etc.  The execution, delivery and performance by the Obligors (other than Banayan) of this Agreement and the other Loan Documents, the grants of Collateral, and the borrowings and guaranties contemplated hereunder have been duly authorized by all requisite corporate action (or equivalent). The execution and delivery of this Agreement and the other Loan Documents by each of the Obligors will not violate (i) any provision of law or any governmental rule or regulation applicable to such party, or, in the case of the Obligors (other than Banayan), the certificate of incorporation or formation or by-laws or operating agreement and/or other organizational documents of such party, or (ii) any order of any court or Governmental Authority binding on such party, or any indenture, agreement or other instrument (including the Bond Documents) to which such party is a party, or by which such party or any of their respective property is bound, and will not be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any Lien, of any nature whatsoever upon any of the property or assets of any Obligor other than as contemplated by this Agreement. Each of this Agreement and the other Loan Documents, and all other documents, certificates or instruments related thereto, are legal, valid and binding and enforceable against each of the Obligors in accordance with their terms subject to any limitations imposed by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, rehabilitation, moratorium or other laws affecting the enforcement generally of creditors rights and remedies

SECTION 3.03.  Financial Condition.  (a)  The Borrower has heretofore furnished to the Bank (i) (A) the financial statements of the Borrower dated December 31, 2004 for the year then ended, (B) (a) management prepared income statement highlights for the Borrower for the six months ending June 30, 2005, (ii) (A) financial statements of LCD Corp dated July 31, 2004 for the year then ended and (B) management prepared financial statements for LCD Corp. dated September 30, 2004 for the two months then ended, (iii) financial statements of YR LLC dated December 31, 2004 for the year then ended, and (iv) a personal financial statement of Banayan dated February, 2005 for the 12 months then ended. All such financial statements were prepared in conformity with GAAP, and present fairly and accurately the financial condition of such

26

Obligor as of the dates of such financial statements, and between the date of said statements and the date hereof, no material adverse change in the financial condition, the business or the operations of any of the Obligors has occurred.

     (b)    There is no obligation or liability, contingent or otherwise of any of the Obligors which is material in amount and which is not reflected in the financial statements referred to in the foregoing subsection (a) for the periods covered thereby.

     (c)    The Borrower heretofore furnished to the Bank income statement projections for the fiscal year 2005, and such financial projections were prepared by the Borrower in good faith and constitute best efforts to fairly represent the expected financial condition of each such Person for each such fiscal year.

     SECTION 3.04. Taxes. Any assessed deficiencies resulting from Internal Revenue Service examinations of the Federal income tax returns of each Obligor have been discharged or reserved against. Each Obligor has filed or caused to be filed all Federal, state, local and other tax returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on said returns or on any assessment received by them, to the extent that such taxes have become due, except for any such taxes that are immaterial in amount and reserved against, or any such taxes, levies, assessments, deficiencies or claims which are being contested in good faith by appropriate proceedings on terms satisfactory to the Bank, and as to which each of the Obligors (other than Banayan), as applicable, has set aside on its books adequate reserves with respect to any such tax, levy assessment, deficiency or claim so contested.

     SECTION 3.05. Title to Properties. Each of the Obligors have good and valid title to the properties and assets reflected on the financial statements referred to in Section 3.03(a). All such properties and assets are free and clear of mortgages, pledges, liens, charges and other encumbrances, except for Permitted Encumbrances.

     SECTION 3.06 Litigation. Other than as provided herein, there are no actions, suits or proceedings (whether or not purportedly on behalf of the Obligors pending or, to the knowledge of the Obligors, threatened against or affecting one or more of the Obligors, at law or in equity or before or by any Governmental Authority ("**Actions**"), which involve any of the transactions contemplated herein or which, if adversely determined against one or more of the Obligors, would result in any materially adverse change in the business, operations, prospects, properties or assets or in the condition, financial or otherwise, of one or more of the Obligors; and none of the Obligors is in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or Governmental Authority, which would have a materially adverse effect on the condition (financial or otherwise) of such Obligors. Schedule 3.06 hereto sets forth a true and accurate description of each pending or threatened Action. Unless otherwise indicated on Schedule 3.06 hereto, with respect to any such Action affecting any of the Obligors, each of the Obligors (other than Banayan), as applicable, has established appropriate reserves in respect of each such Action, which reserves, are reflected on the applicable financial statements referred to in Section 3.03(a).

SECTION 3.07. Agreements. None of the Obligors is a party to any agreement or instrument or subject to any judgment, order, writ, injunction, decree or regulation, or, in the case of the Obligors (other than Banayan), subject to any charter or other corporate restriction, materially and adversely affecting its business, properties or assets, operations or condition (financial or otherwise). None of the Obligors is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument (including the Bond Documents) to which it is a party in any manner which would materially and adversely affect its business, properties or assets, operations or condition (financial or otherwise).

SECTION 3.08. ERISA. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a material adverse effect on any of the Obligors. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Account Standards No. 87) did not, as of the date of the financial statement referred to in Section 3.03(a), exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all under funded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the financial statement referred to in Section 3.03(a), exceed the fair market value of the assets of all such under funded Plans.

SECTION 3.09. Federal Reserve Regulations. (a) None of the Obligors is engaged principally in, or has as one of its important activities the business of, extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board as amended to the date hereof). If requested by the Bank at any time, each of the Obligors will furnish to the Bank such a statement on Federal Reserve Form U-1.

(b)    No part of the proceeds of any of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately (i) in violation of the said Regulation U, to purchase or to carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock, or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose which violates or is inconsistent with the provisions of the Regulations T or X of the Board.

SECTION 3.10. Governmental Approval; Licenses. No registration with or consent or approval of, or other action by, any Governmental Authority is required in connection with the execution, delivery and performance of any of the Loan Documents by any of the Obligors. Each of the Obligors possesses all licenses, permits, certificates, approvals and the like ("Licenses") necessary for the lawful operation of its respective business in a manner so as to not cause a material adverse effect on any of them. All such Licenses are in full force and effect and there exists no threat of a revocation or suspension of any of the Licenses.

SECTION 3.11. Subsidiaries/Affiliates. There is no Subsidiary or Affiliate of any Obligor other than as set forth on Schedule 3.11. Attached hereto as Schedule 3.11 is a correct and complete list of all Subsidiaries and Affiliates of each of the Obligors showing as to each

28

Subsidiary and Affiliate, its name, the jurisdiction of its incorporation or formation and the ownership of equity interests therein.

SECTION 3.12. Subordinated Debt. On the Closing Date, there are no outstanding obligations of any Obligor to any other Obligor or to any officer of any Obligor other than the $876,000 of Approved Subordinated Debt owing to Banayan, and that which is set forth on Schedule 3.12.

SECTION 3.13. Compliance with Applicable Laws. Each of the Obligors is in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority applicable to it (including, without limitation, all Environmental Laws, rules and regulations), the breach of which could materially and adversely affect its respective business, operations, prospects, properties or assets or the condition, financial or otherwise.

SECTION 3.14. Loans to Affiliates. Schedule 3.14 of this Agreement sets forth all loans and/or advances made by any Obligor to any Subsidiary or Affiliate of any Obligor, or by any such Subsidiary or Affiliate to any Obligor or to any other such Subsidiary or Affiliate.

SECTION 3.15. Schedules. All of the information which is required to be scheduled in this Agreement is correct and accurate in all material respects.

SECTION 3.16. Investment and Holding Company Status. None of the Obligors is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

SECTION 3.17. Solvency, etc. On the Closing Date and immediately prior to and after giving effect to each borrowing hereunder and the use of the proceeds thereof: (i) the assets of each of the Obligors, respectively, will exceed such Person's own (i.e uncombined) liabilities, and (ii) each of the Obligors will be solvent, will be able to pay its debts as they mature, will own property with fair saleable value greater than the amount required to pay its debts and will have capital sufficient to carry on its business as then constituted.

SECTION 3.18. Environmental Matters. Except as set forth in Schedule 3.18, none of the Obligors (i) has failed to comply with any material provision of any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.19. Labor Disputes. No Obligors is involved in any material labor dispute.

SECTION 3.20. Leases; Warehouses. Schedule 3.20 provides a list of all real property in which any Obligors (other than Banayan) holds a leasehold interest, as well as a list of all warehouse (or similar) locations where any of their respective property is held as of Closing

29

Date.  Other than such leasehold interests, none of such Persons owns an interest in any real property.

SECTION 3.21.  Bonds.  All material matters with respect to the obligations of the Borrower in connection with the Bonds are fairly and accurately summarized on Schedule 3.21. True copies of all existing Bond Documents have been provided to the Bank and there have been no amendments to any of the Bond Document since such delivery.

SECTION 3.22.  Patriot Act.  All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "**Patriot Act**") are incorporated into this Section.  Each of the Obligors is: (i) not a "blocked" person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "**Annex**"); (ii) in full material compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury (as used in this Section only, "**OFAC**"); (iii) operated under policies, procedures and practices, if any, that are in full material compliance with the Patriot Act and available to the Bank for its review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" person on any lists maintained by OFAC pursuant to the Patriot Act or any other list of terrorist or terrorist organizations maintained pursuant to any of the rules and regulation of  OFAC issued pursuant to the Patriot Act, or on any other list of terrorist or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; and (vii) not owned or Controlled by or now acting and/or will in the foreseeable future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or for or on behalf of any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.

SECTION 3.23.  PACA/PASA.  (a) Any and all products sold by any Obligor which are potentially subject to regulation under PASA are imported by such Obligor and manufactured prior to their import.  Therefore, PASA is not applicable to any such products.

(b)    None of the Obligors imports any perishable produce (i.e., fruits or vegetables) as defined in 7 U.S.C. § 499(b)(4) and as further described in 7 C.F.R. §§ 46.2(u) and (v) and therefore PACA is not applicable to any of the Obligors.

(c)    There currently exists no Trade Claim against any assets of any of the Obligors.

30

IV.    CONDITIONS OF LENDING

The making of the Facility A Loan and the Commitment, and the obligations of the Bank to make any Loan or to effect any Borrowing hereunder, are subject to the following conditions precedent:

SECTION 4.01.    Representations and Warranties.    On the Closing Date and on each Borrowing Date, the representations and warranties set forth in Article III of this Agreement shall be true and correct in all material respects, on and as of such time with the same effect as though such representations and warranties had been made on and as of such time, except for such subsequent matters as shall have been disclosed to the Bank in writing and approved (also in writing) by the Bank as being unlikely to have a material adverse effect on the ability of any Obligor to perform as required under the Loan Documents.

SECTION 4.02.    No Default. On the Closing Date and on each Borrowing Date, no Event of Default nor any event which upon notice or lapse of time or both would constitute such an Event of Default, shall have occurred and be continuing or would be caused by any such borrowing.

SECTION 4.03.    Executed Documents.    The following shall have been delivered to the Bank on or before the Closing Date (unless another time is indicated), all in form and substance satisfactory to the Bank, and (unless otherwise indicated) each dated as of the Closing Date:

(a)    The Facility A Note executed by the Borrower;

(b)    The Facility B Note executed by the Borrower;

(c)    The Guaranty duly executed by the Guarantors;

(d)    The Security Agreement duly executed by the Obligors (other than Banayan);

(e)    A Subordination Agreement executed by Banayan, as Subordinated Lender, and the applicable Obligor;

(f)    The Mortgagee Waiver duly executed by Merrill Lynch Business Financial Services, Inc. in favor of the Bank;

(g)    UCC-1 financing statements as to any Collateral pledged by the Obligor under the Security Agreement, which shall be filed by the Bank at the expense of the Obligors;

(h)    Certified copies of the Bond Documents,

(i)    An accounts receivable aging report and finished inventory schedule for the Borrower, together with a Borrowing Base Certificate;

(j)    A completed collateral examination, inclusive of an accounts receivable, inventory and books and records review, satisfactory to the Bank in its sole discretion;

31

(k)     An appraisal of the Borrower's machinery and equipment which is not subject to any Permitted Encumbrance and whose (i) value as calculated by dividing (a) the sum of (1) the market-value-of-such-machinery-and-equipment-and-(2)-the-net-orderly-liquidation-value-divided by (b) two, is not less than $2,000,000 and (ii) whose net orderly liquidation value is greater than or equal to $1,000,000;

(l)     Opinion letter of counsel for the Obligors addressed to the Bank;

(m)     The following supporting documents:

(i)     Certificates of good standing (or equivalent) for LCD Corp from the Secretary of the State of its respective incorporation or formation;

(ii)     Proof of filing of the necessary biennial statements of each of the Borrower, YR LLC and SLF Corp so as to cause such Obligors to be in good standing and eliminate any existing deficiencies;

(iii)     Certificates of Resolution, Incumbency and Organizational Documents for each Obligors (other than Banayan); and

(iv)     such other documents as the Bank may reasonably request;

(n)     For each Borrowing Date after the Closing Date, a certificate, dated such date and signed by an Executive Officer of the Borrower requesting such borrowing, confirming compliance with the conditions precedent set forth in Sections 4.01 and 4.02, and such other documents, opinions, searches, further assurances and the like as the Bank may, in good faith, request in order to confirm compliance with the Loan Documents;

(o)     Proof satisfactory to the Bank that the Collateral is free and clear of all liens, claims, security interests and other encumbrances, except Permitted Encumbrances;

(p)     If requested for any Borrowing Date, evidence satisfactory to counsel to the Bank that all applicable laws and regulations applicable to the Obligors have been complied with;

(q)     Certificates of insurance or other documentary evidence that casualty and risk insurance on the property of the Obligors (other than Banayan), and liability insurance covering, among other things, inability or failure to perform under contractual obligations, are in full force and effect, which certificates of insurance shall name the Bank an additional insured and a loss payee with respect to all tangible personal property;

(r)     If requested on the Closing Date or for any Borrowing Date, documentary evidence that there exists no other agreement, indenture, or contract, to which any Obligor is party, which would be violated by any of the Loan Documents or the extensions of credit contemplated hereunder; and

(s)     On the Closing Date, a letter requesting the initial disbursement of proceeds of any of the Loans, and prior to each Borrowing Date after the Closing Date (as required under Section 2B.01(c)), a Notice of Borrowing in connection with any Facility B Borrowing.

(t)     Proof satisfactory to the Bank that any Indebtedness owing to, or Liens in favor of, Merrill Lynch Business Financial Services, Inc. and NBT Bank have been satisfied and terminated.

SECTION 4.04.  Fees and Expenses.  As of the Closing Date and each Borrowing Date, the Bank shall have received payment of all fees and expenses of the Bank in connection with the Loan Documents and the transactions contemplated thereby, including fees and expenses of the Bank's counsel and, as of the Closing Date, a fully earned and non-refundable facility fee payable to the Bank in an amount equal to (a) $10,000 for Facility A and (b) $27,500 for Facility B.

SECTION 4.05.  Landlord Consents/Warehouse Notifications.  On or before the Closing Date, the Obligors (a) shall have delivered to the Bank (a) Landlord Waiver and Consent with respect to each applicable leased location, if any, and (b) a Warehouse Notification with respect to each warehouse in which any Obligor stores any Collateral, if any.

V.     AFFIRMATIVE COVENANTS

Each of the Obligors covenants and agrees with the Bank that, so long as the Facility B Commitment shall remain in effect or any of the principal of or interest on either Note or any fees incurred hereunder, or any other expense or amounts payable under this Agreement or under any of the other Loan Documents, shall be unpaid, each of the Obligors (as applicable) shall:

SECTION 5.01.  Existence, Properties, etc.  (a)  Do or cause to be done, all things necessary to preserve and keep in full force and effect the existence of each of the Obligors (other than Banayan) as a corporation or limited liability company (as applicable); (b) comply with the Bond Documents and all other material contractual obligations applicable to it (in addition to those obligations contemplated by other portions of this Article V); (c) preserve all of its property used or useful in the conduct of its business and keep the same as required under the Security Agreement and otherwise in good repair, working order and condition, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and (d) at all times maintain (i) property and business interruption insurance as required under the Security Agreement and otherwise to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) worker's compensation insurance in the amount required by applicable law, (iii) public liability insurance in the amount customary with companies in the same or similar business against claims for personal injury or death or property damage, and (iv) such other insurance as may be required by law or as may otherwise be required in writing by the Bank.  All such insurance shall be in amounts required by law and be reasonably satisfactory to the Bank, and shall, as to tangible assets which are Collateral name the Bank as an additional insured and loss payee.

33

SECTION 5.02. <u>Payment of Taxes, etc.</u>  Pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become delinquent, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien or charge upon such properties or any part thereof; <u>provided, however,</u> that except for a tax, charge, assessment, levy or claim with respect to any part of the Collateral, the Obligors shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings on terms satisfactory to the Bank, and in the case of any of the Obligors (other than Banayan), the applicable Obligor shall have set aside on its books appropriate reserves with respect to any such tax, assessment, charge, levy or claim so contested.

SECTION 5.03. <u>Financial Statements, Reports, etc.</u>  Furnish to the Bank the following, which must be in form satisfactory to the Bank:

(a)     Within 90 days after the end of each fiscal year, a balance sheet, statement of income and expense and a statement of cash flow of the Borrower together with supporting schedules (including supporting schedules showing consolidated results for the Borrower and its Subsidiaries with respect to the balance  sheet, statement of income and expense and statement of cash flow), reviewed by to by independent certified public accountants (the "**Auditor**") of recognized standing acceptable to the Bank, and prepared in each case in accordance with GAAP;

(b)     Within 90 days after the end of each fiscal year, a balance sheet, statement of income and expense and a statement of cash flow of each Guarantor (other than Banayan), together with supporting schedules (including supporting schedules of the type specified in the foregoing clause (a)), compiled by the Auditor, and prepared in accordance with GAAP;

(c)     Within 45 days after the end of each fiscal quarter, a balance sheet, statement of income and expense and a statement of cash flow of the Borrower (other than Banayan), together with supporting schedules (including a supporting schedule of the type specified in foregoing clause (a)), prepared by management in accordance with GAAP and certified by an Executive Officer of such Obligor (as applicable), showing the financial condition and the results of operations at the close of such period;

(d)     Within 30 days from the filing thereof, copies of the Federal and state income tax returns of each of the Obligors;

(e)     Together with the delivery of the copies of his tax returns pursuant to foregoing subsection (d), a personal financial statement (on the Bank's form) for Banayan;

(f)     [Intentionally omitted];

34

(g)     Within 15 days after the end of each calendar month, an accounts receivable aging report, a current inventory run and accounts payable aging report, each signed and certified by ~~Banayan together with a Borrowing Base Certificate for the Borrower for the month then ended;~~

(h)     A copy of any management letter prepared by the Auditor in connection with the financial statements furnished to the Bank pursuant to subsection (a) and (b) hereof, in the event any such management letter is prepared;

(i)     Together with the financial statements descried in clause (a), (b) and (c) above, a certificate signed by an Executive Officer of each applicable Obligor (in the form of <u>Exhibit G</u>) stating whether or not an Event of Default exists and showing the details of compliance with all financial covenants hereunder;

(j)     From time to time, such other information regarding the operations, business affairs and financial condition of each of the Obligors as the Bank may in good faith request; and

(k)     All reports and forms filed with respect to any Plan, except as are filed in the normal course of business and that would not be likely to result in an adverse action to be taken under ERISA, together with a statement explaining the details related to any ERISA Event.

SECTION 5.04.  <u>Access to Premises and Records</u>.    Maintain financial records in accordance with GAAP and permit, upon prior reasonable notice to the respective Obligor, internal consultants of the Bank or similar representatives of the Bank to have reasonable access to the financial records, and other records of the Obligors and their properties during business hours, and permit such consultants or representatives to make such excerpts from such records and to conduct, once in any 12 month period (and as often as requested after an Event of Default), at the Borrower's cost and expense, such audits of the Collateral and their books and records as such representatives reasonably deem necessary.

SECTION 5.05.  <u>Notice of Adverse Change</u>.  Promptly notify the Bank in writing of (a) any change in the business, operations or financial condition of any Obligor, or any other development (including any material labor dispute) relating to any such Person which may make it more likely that a Trust Claim could arise or may be materially adverse to any of the Obligors, disclosing the nature thereof, and (b) any information which indicates that any financial statement delivered pursuant to this Agreement, fails, to any material extent, to present fairly the financial condition and results of operations or other information purported to be presented therein, disclosing the nature thereof.

SECTION 5.06.  <u>Notice of Default</u>.  Promptly furnish to the Bank a written statement upon the occurrence of (i) any Event of Default or the occurrence of any event which, upon notice or lapse of time or both, would constitute an Event of Default, and (ii) any default under any other material agreement to which any Obligor is a party, such notice to specify the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto.

SECTION 5.07.  <u>Litigation Notice</u>.  Give the Bank prompt written notice of any Action, investigation or audit which, if adversely determined against any Obligor on the basis of the

35

allegations and information set forth in the complaint or other notice of such action, suit or proceeding, or in the amendments thereof, if any, would materially impair the right or ability of any Obligor to carry on its or his business substantially as now conducted such Obligor.

SECTION 5.08. ERISA Reports. (a) Comply in all material respects with the applicable provisions of ERISA, and (b) furnish to the Bank (i) as soon as possible, and in any event within five days after any Executive Officer knows or has reason to know that any ERISA Event has occurred with respect to any Obligor or any of their ERISA Affiliates, a statement of the chief financial officer of the applicable Obligor setting forth details as to such ERISA Event, if any, given to PBGC, and (ii) promptly after receipt thereof, a copy of any notice it may receive from the PBGC relating to the intention of the PBGC to terminate any Plan or to appoint a trustee to administer any Plan.

SECTION 5.09. Compliance with Applicable Laws. Comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, including, without limitation, Environmental Laws, and regulations promulgated by the FDA and OSHA the breach of which would be likely to materially and adversely affect the business, operations, prospects, properties or assets or the condition, financial or otherwise, of any Obligor.

SECTION 5.10. Subsidiaries/Affiliates. Upon its formation or acquisition, cause any Subsidiary or Affiliate of any Obligor to become a Guarantor of all of the Loans, and of the other obligations of the Borrower under the Loan Documents, pursuant to documentation acceptable to the Bank. Such documentation shall, among other things, require such Subsidiary or Affiliate (i) to become a grantor of Collateral under a (new) Security Agreement, in form and substance substantially the same as the Security Agreement and (ii) to comply with all of the terms and conditions of this Agreement which the Bank in good faith determines should be applicable to such Subsidiary or Affiliate. Such documentation shall, among other things, also include a new Guaranty substantially in the form of Exhibit D and a joinder and/or amendment to this Agreement and the other Loan Documents; certified resolutions and a good standing certificate.

SECTION 5.11. Licenses. Maintain all Licenses necessary for the lawful operation of its businesses, and promptly notify the Bank upon becoming aware of any revocation or suspension or the existence of any threat of a revocation or suspension of any such License.

SECTION 5.12. Use of Proceeds. Use the proceeds of (a) the Facility A Loan, only to finance the permanent working capital requirements of the Borrower and (b) any Facility B Loan, only to finance working capital requirements and for the corporate purposes of the Borrower.

SECTION 5.13. UCC Filings. Promptly after a request therefor, deliver to the Bank UCC search reports evidencing the completion of all UCC filings made in connection with the closing under this Agreement.

SECTION 5.14. Banking Relationship. In the case of each Obligor (other than Banayan), maintain all of its banking depository and disbursement relationship with the Bank and establish such accounts and maintain balances therein with the Bank sufficient to cover the

36

cost of all the Bank's services provided; provided, however, that nothing herein shall require any such Obligor to keep and maintain a specific minimum balance in any such account.

SECTION 5.15. <u>Bond Documents</u>. Promptly, upon receipt thereof, provide to the Bank copies of all proposed and actual amendments to any existing Bond Documents and any additional Bond Documents.

SECTION 5.16. <u>Affiliate and Officer Loans</u>. Subordinate all obligations of any Obligor to any other Obligor or to any officer thereof, to the obligation of the Borrower to the Bank under the Loan Documents, which subordination shall be pursuant to documentation in form and substance substantially the same as the Subordination Agreement entered into as of the Closing Date.

SECTION 5.17. <u>Post Closing</u>. (a) No later than 120 days following the Closing Date, the Borrower shall (a) implement, and cause to be operational, an accounting system which tracks inventory by its age and value and such system must be satisfactory to the Bank and (b) provide confirmation to the Bank that its general ledger is being tracked and updated on a basis no less frequent than monthly.

(b)     No later than 120 days following the Closing Date, the Obligors shall use best efforts to cause amendments to the financing statements listed on Schedule 5.17(b) to be filed and such amendments shall alter the description of collateral thereon such that it covers solely specific pieces equipment being financed by the applicable secured party; provided, however, should the Obligors not be able to effect any such amendments despite their commercially reasonable efforts, the Obligors agree to commence suit against the applicable secured party(s) to cause such secured party(s) to make such amendments and/or take other such reasonable action as is requested by the Bank in connection therewith, including, without limitation, taking any necessary action to affect the reduction of the principal amount of the Facility A Loan in an amount as determined by the Bank in its reasonable discretion; and provided further that, should any such amendment be obtained subsequent to any such reduction, the amount reduced shall be reinstated without penalty or premium;

(c)     No later than 90 days following the receipt by the Obligors of a list of certain specific equipment from the Bank, the Obligors will take any necessary action requested by the Bank as a further assurance with respect to any Liens on such specific equipment of the Obligors identified by the Bank; and

(d)     No later than 30 days following the Closing Date, the Obligors shall provide good standing certificates for each of the Borrower, SLF Corp and YR LLC without qualification or notification of deficiency thereon.

VI.    NEGATIVE COVENANTS

Each Obligor covenants and agrees with the Bank that, so long as the Facility B Commitment shall remain in effect or any of the principal of or interest on either Note, or any

fees incurred hereunder, or any other expense or other amounts payable under this Agreement or under any of the other Loan Documents, shall be unpaid, it shall not:

SECTION 6.01. Liens. Incur, create, assume or suffer to exist any Lien or other encumbrance of any nature whatsoever (including any Trust Claim or any conditional sales or other title retention agreements) on any assets now or hereafter owned by it, other than Permitted Encumbrances.

SECTION 6.02 Sale of Assets, Consolidation, Merger, etc. (i) Sell, lease, transfer or otherwise dispose of any of its properties or assets, whether or not pursuant to an order of a Governmental Authority, except in the normal course of business (including replacement of obsolete or worn out equipment), (ii) consolidate with, acquire or merge into any Person or permit a Person to merge into it or to acquire it, (iii) acquire all or substantially all of the property or assets of any other Person, or (iv) create or acquire any Subsidiary or Affiliate without compliance with Section 5.10

SECTION 6.03. Indebtedness    Incur, create, assume or suffer to exist or otherwise become liable in respect of any Indebtedness other than:

(a)    Indebtedness heretofore incurred and described in Schedule 6.03, which Indebtedness shall not be renewed, extended, refinanced or optionally prepaid;

(b)    Indebtedness to the Bank incurred in connection with this Agreement or otherwise;

(c)    Trade payables and other ordinary liabilities incurred in the normal course of business;

(d)    Any Approved Subordinated Debt;

(e)    Capital Lease Obligations of the Obligors taken as a whole not to exceed $250,000 in the aggregate during any fiscal year; and

(f)    Any consumer debt of Banayan

SECTION 6.04. Guarantees  Be or become liable under any Guarantee except:

(a)    Existing Guarantees as set forth in Schedule 6.04 , which Guarantees may not be renewed, extended or increased; and

(b)    The Guaranties or any other Guarantee in favor of the Bank

SECTION 6.05. Sales of Notes, etc. Sell, transfer, discount or otherwise dispose of notes, accounts receivable or other obligations owing to it, with or without recourse, except for collection in the ordinary course of business.

38

SECTION 6.06. <u>Loans and Investments</u>. Lend or advance money, credit or property to any Person, or invest in (by capital contribution or otherwise) or purchase or repurchase the stock, other securities, or partnership interests, other equity or Indebtedness of any Person, except for Permitted Investments.

SECTION 6.07. <u>Nature of Business</u>. Change or alter the nature of its business.

SECTION 6.08. <u>Violations of Board Regulations</u>. Permit any of the proceeds of any of the Loans to be used for purposes which might constitute a violation of any Board regulation.

SECTION 6.09. <u>Leverage Ratio</u>. In the case of the Borrower only, fail to maintain, at all times, a ratio of (a) Total Liabilities, to (b) Tangible Net Worth plus Approved, Subordinated Debt, of not greater than 3.00 to 1.00.

SECTION 6.10 <u>Debt Service Coverage</u>. In the case of the Borrower only, fail to maintain at all times, measured on a rolling four quarters basis for the term most recently completed fiscal quarters in which results are available, a ratio of (a) EBITDA (less Unfunded Capital Expenditures), to (b) the sum of the current scheduled maturities of all Indebtedness for borrowed money (including, but not limited to, Capitalized Lease Obligations) having an original term of one year or more, plus interest expense of not less than 1.25 to 1.00.

SECTION 6.11. <u>Net Loss</u>. Incur or suffer any net loss at the end of any fiscal quarter.

SECTION 6.12. <u>Sale and Leaseback</u>. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, whether real or personal, used or useful in its business, whether now owned or hereafter acquired, if at the time of such sale or disposition it intends to lease or otherwise acquire the right to use or possess (except by purchase) such property or like property for a substantially similar purpose.

SECTION 6.13. <u>Fiscal Year</u>. Change its fiscal year.

SECTION 6.14. <u>Negative Pledge</u>. Sell, lease or otherwise dispose of, or create or suffer to exist any Lien other than any Liens on the assets of YR LLC and on the subleasehold intent of the Borrower arising under the Bond Documents, on any of the real property of any of the Obligors. For the avoidance doubt, any conflict between this Section 6.14 and any of Sections 6.01, 6.04, 6.03 or 6.12 shall be construed in favor of this Section 6.14.

SECTION 6.15. <u>PACA/PASA</u>. Alter, change, expand or modify any of its lines of business or any of its business practices such that any purchase or importing of any products by any Obligor shall subject such Obligor to a Trust Claim under either PACA or PASA.

## VII. EVENTS OF DEFAULT

SECTION 7.01. <u>Events of Default</u>. In the case of the happening of any of the following events (each an "**Event of Default**"):

(a)    any representation or warranty of any Obligor made in this Agreement or in any other Loan Document shall prove to be false or misleading in any material respect when made or given or deemed made or given;

(b)    any report, certificate, financial statement or other document, agreement or instrument furnished to the Bank in connection with this Agreement or any of the other Loan Documents or any borrowing hereunder, shall prove to be false or misleading in any material respect when made or given or deemed made or given;

(c)    default shall occur in the payment of any principal when due hereunder (or under either Note), or any of interest or fees due hereunder (or under either Note), or if any Obligor shall fail to pay when due, any other amounts payable to the Bank or its representatives under this Agreement or any of the other Loan Documents as and when the same shall become due and payable and such default shall remain unremedied for a period of five (5) days following the occurrence of such default;

(d)    default shall occur in respect of any agreement or obligation relating to any Indebtedness (to the Bank or to any other Person) of any Obligor (other than the agreements and obligations referred to in the foregoing item (c)) (A) in any amount to the Bank or (B) in an aggregate amount owing to any other Person(s) exceeding $50,000 for the Obligors combined, if the effect of such default is (or would be with the giving of notice, passage of time or both) to accelerate the maturity of such obligation or to permit the holder or obligee thereof (or a trustee on behalf of such holder or obligee) to cause such obligation to become due prior to the stated maturity thereof, or if any such obligation shall not be paid when due (or within any applicable grace period);

(e)    default shall occur in the due observance or performance of any covenant set forth in Article VI hereof or of any covenant set forth in Section 5.01, 5.05, 5.06, 5.07, 5.10, 5.12, 5.14 or 5.15;

(f)    default shall occur in the due observance or performance of any covenant, condition or agreement (other than the agreements, obligations and covenants referred to in the foregoing items (c) and (e)) of any of the Obligors to be performed pursuant to this Agreement or any of the other Loan Documents and, if in the Bank's good faith opinion, such default is capable of being remedied, such default shall remain unremedied for a period of 30 days following the occurrence of such default;

(g)    any Obligor shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code or any other federal or state bankruptcy, insolvency or similar law, (ii) consent to the institution of, or fail to controvert in a timely and appropriate manner, any such proceeding or the filing of any such petition, (iii) apply for or consent to the employment of a receiver, trustee, custodian, sequestrator or similar official for itself or for a substantial part of its property, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable or admit in writing the inability or the failure generally to pay its

40

debts as they become due, or (vii) take any corporate (or equivalent) action for the purpose of effecting any of the foregoing;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Obligor, or of a substantial part of the property of any such Person under Title 11 of the United States Code or any other federal or state bankruptcy, insolvency or similar law (U.S. or foreign), (ii) the appointment of a receiver, trustee, custodian, sequestrator or similar official for any Obligor, or for a substantial part of the property of any such Person, or (iii) the winding-up or liquidation of any such Person, which, in any such case, is not dismissed or vacated within 60 days after the commencement or the filing thereof;

(i)     a final judgment or judgments for the payment of money in excess of an aggregate amount of $50,000 (or the equivalent in a foreign currency) for any or all of the Obligors or shall be rendered against any of them (as applicable), and the same shall remain undischarged, unbonded and unstayed for a period of 30 days, unless the Bank is provided with documentary evidence and information satisfactory to the Bank that the judgment is fully covered by insurance;

(j)     an ERISA Event shall have occurred that in the opinion of the Bank, when taken together with all other ERISA Events that have occurred could reasonably be expected to have material adverse effect on any obligor (other than the Borrower);

(k)     the Guaranty, the Security Agreement or any Subordination Agreement shall not be in full force and effect at any time;

(l)     a material adverse change has occurred with respect to any Obligor, in the good faith opinion of the Bank;

(m)     any Change in Control shall have occurred;

(n)     any Obligor shall (A) become named on any list of persons who are or may be engaged in or who have been or may have been engaged in possible criminal activity or other wrongdoing, which list is promulgated under the Patriot Act, or (B) be indicted, arraigned or custodially detained on charges involving money laundering or any predicate crime to money laundering;

(o)     any Lien purported to be created under any of the Loan Documents (including any documentation pertaining to a Documentary Letter of Credit) shall be asserted by any Obligor not to be a valid Lien, except as a result of (i) the sale or other disposition of the applicable assets in a transaction permitted under the Loan Documents or (ii) the termination of the Lien in accordance with Section 2.05(a);

(p)     any Obligor, any asset of any Obligor or any payment made to the Bank by or for any Obligor shall become subject to any Trust Claim;

41

then, (i) automatically upon an Event of Default under subsection (g) or (h) above, or (ii) as to any other Event of Default, at the Bank's option at any time thereafter, the Bank may, without notice (or, in the case of a default set forth in subsection (f) above as to which notice is given, without further notice), or demand upon any Obligor, take any of or all of the following actions, at the same or different times: (i) terminate the Facility B Commitment, (ii) declare the Notes and all fees accrued hereunder and all obligations of the Obligors under the Loan Documents, contingent or matured, to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest or other notice of any kind, all of which are expressly waived, anything contained in this Agreement or in any of the other Loan Documents to the contrary notwithstanding, and (iii) exercise any or all of the rights and remedies afforded to the Bank in the Guaranty, in the Security Agreement, in the other Loan Documents, by the UCC or other law, or otherwise possessed by the Bank.

VIII.  MISCELLANEOUS

SECTION 8.01.  Notices.    Except as expressly provided to the contrary in this Agreement, any notice, request, demand, statement, authorization, approval or consent made hereunder shall be in writing and shall be hand delivered or sent by Federal Express, or other reputable courier service, or by postage pre-paid registered or certified mail, return receipt requested, or by telecopier, and shall be deemed given (i) when received at the following addresses if hand delivered, sent by Federal Express or other reputable courier service, or telecopied, and (ii) five Business Days after being postmarked and addressed as follows if sent by registered or certified mail, return receipt requested:

If to the Obligors at:

c/o Ahava Food Corp.
110 Beard Street
Brooklyn, New York 11231
Telecopier No.: (718) 243-0700
Attention: Moise Banayan

With a copy to:

Stein Riso Mantel, LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telecopier No.: (212) 559-6155
Attention: Dennis L. Stein, Esq.

If to the Bank:

Signature Bank
565 Fifth Avenue
New York, New York 10017

42

Telecopier No.: (646) 822-1833
Attention: Robert Bloch

With a copy to:

Herrick, Feinstein LLP
Two Park Avenue
New York, New York 10016
Telecopier No.: (212) 592-1500
Attention: Stephen D. Brodie, Esq.

Each party may designate a change of address by notice to the other party, given at least 15 days before such change of address is to become effective.

SECTION 8.02. Survival of Agreement. All covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to this Agreement shall survive the making by the Bank of any Loan or issuing by the Bank of, any Letter of Credit, and the execution and delivery to the Bank of the Notes, and shall continue in full force and effect so long as the Facility B Commitment is unterminated or either Note is outstanding or any amount due thereunder or hereunder or under any of the other Loan Document remains unpaid or any Letter of Credit is outstanding. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party (and in the case of a natural person, such person's heirs, executors and administrators); and all covenants, promises and agreements by or on behalf of Obligors which are contained in this Agreement shall inure to the benefit of the respective successors and assigns of the Bank. None of the Obligors may assign or transfer any of its interest under this Agreement or either Note, or under any of the other Loan Documents, without the prior written consent of the Bank.

SECTION 8.03. Expenses of the Bank. Upon receipt of written demand from the Bank, the Borrower shall pay all out-of-pocket expenses incurred in good faith by the Bank in connection with the preparation and negotiation of this Agreement and the other Loan Documents (whether or not all of the transactions hereby or thereby contemplated shall be consummated), the making of any Loan, the enforcement of any rights of the Bank in connection with this Agreement and/or the other Loan Documents, or with respect to any matter arising in connection with the administration of the Loans (other than ordinary loan administration) or any proposed amendment or waiver (whether or not agreed by the Bank) or otherwise concerning any Loan, or with respect to any action or proceeding which may be instituted by any Person against the Bank in respect of any of the foregoing, or as a result of any transaction, action or non-action arising from any of the foregoing, including, but not limited to, the fees and disbursements of counsel to the Bank.

SECTION 8.04. Applicable Law. This Agreement and each Note shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

43

SECTION 8.05. <u>Waiver of Rights by the Bank</u>. Neither any failure nor any delay on the part of the Bank in exercising any right, power or privilege hereunder or under any of the other Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege. The rights and remedies of the Bank hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom, shall in any event be effective. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Bank may have had notice or knowledge of such Default at the time.

SECTION 8.06. <u>Adjustment of Maturity</u>. Except as otherwise expressly provided herein, whenever a payment to be made hereunder shall fall due and payable on any day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such adjustment of time shall be included in computing interest.

SECTION 8.07. <u>Modification of Agreement</u>. No modification, amendment or waiver of any provision of this Agreement or any of the other Loan Documents, nor consent to any departure by any Obligor therefrom shall in any event be effective unless the same shall be in writing and signed by the Bank and the party against whom enforcement of any such modification, amendment or waiver is sought, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Obligor or one or more Obligor in any case shall entitle any Obligor to any other or further notice or demand in the same, similar or other circumstance unless this Agreement expressly so requires.

SECTION 8.08. <u>Severability</u>. In case any one or more of the provisions contained in this Agreement or any of the other Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

SECTION 8.09. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

SECTION 8.10. <u>Headings</u>. Section headings used herein are for convenience of reference only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

SECTION 8.11. <u>Other Events</u>. (a) In the event that any introduction of or change in applicable law, regulation, condition, directive or interpretation thereof (including any request, guideline or policy whether or not having the force of law and including, without limitation, Regulations D or U promulgated by the Board as now and from time to time hereafter in effect) by any authority charged with the administration or interpretation thereof:

(i)    subjects the Bank to any tax with respect to any Loan or Letter of Credit (other than any tax on the overall net income of the Bank); or

(ii)    changes the basis of taxation of payments to the Bank of principal of or interest on any Loan or the Letter of Credit (other than any tax measured by or based upon the overall net income of the Bank); or

(iii)    imposes, modifies or deems applicable any reserve or deposit requirements against any assets held by, deposits with or for the account of, or loans or commitments by, an office of the Bank in connection with the obligations of the Bank hereunder; or

(iv)    imposes upon the Bank any other condition with respect to any amount paid or payable to or by the Bank pursuant to this Agreement;

and the result of any of the foregoing is to increase the cost to the Bank of maintaining the Facility B Commitment or any Loan or Letter of Credit, or to reduce the amount of any payment receivable by the Bank hereunder, or to require the Bank to make any payment on or calculated by reference to the gross amount of any sum received by it pursuant hereto, in each case by an amount which the Bank in its reasonable judgment deems material, then:

(A)    the Bank shall promptly notify the Borrower in writing of the happening of such event;

(B)    the Bank shall promptly deliver to the Borrower a certificate stating the change which has occurred or the reserve requirements or other conditions which have been imposed on the Bank or the request, direction or requirement with which it has complied, together with the date thereof, the amount of such increased cost, reduction or payment and the way in which such amount has been calculated; and

(C)    the Borrower shall pay to the Bank, within 30 days after delivery of the certificate referred to in clause (B) above, such amount or amounts as will compensate the Bank for such additional cost, reduction or payment.

Without limitation of the foregoing, if the Bank makes a demand for compensation pursuant to this Section 8.11(a), the Borrower may at any time, upon at least five Business Days' prior notice, subject to the payment of any applicable amounts set forth in the certificate of the Bank referred to in clause (B) of this Section 8.11(a) which have accrued prior to the date of such certificate, repay in full any outstanding Loans, together with accrued interest thereon to the date of prepayment (and the LIBOR Rate Prepayment Premium, if applicable).

(b)    The failure on the part of the Bank to demand compensation under paragraph (a) above on any occasion shall not constitute a waiver of its right to demand such compensation on any other occasion, and the failure on the part of the Bank to deliver any certificate in a timely manner shall not in any way reduce any obligation of the Borrower to the Bank under this

Section. The protection of this Section shall be available to the Bank regardless of any possible contention of the invalidity or inapplicability of any law, regulation or other condition which ~~shall give rise to any demand by the Bank for compensation hereunder.~~

(c)    The Bank will not exercise its rights under this Section 8.11 unless it is doing so at the same general time to other similarly situated customers, in connection with similar financings.

SECTION 8.12.  Indemnification.  (a)  The Obligors jointly and severally agree to indemnify the Bank and each Related Party of the Bank (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any other agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of any transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use of the proceeds thereof, (iii) all reasonable out-of-pocket expenses incurred by the Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by one or more of the Obligors, or any Environmental Liability related in any way to any of the Obligors, (v) any prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(b)    To the extent permitted by applicable law, none of the Obligors nor the Bank shall assert, and each of them hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby, or any Loan or Letter of Credit or the use of the proceeds thereof.

(c)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.13.  Capital Adequacy.  (a)  If the Bank shall have determined that the applicability of any law, rule, regulation or guideline or any change therein or in the interpretation or administration of any of the foregoing by any Governmental Authority, central lender or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any lending office of the Bank) or the Bank's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central lender or comparable agency, has or would have the

46

effect of reducing the rate of return on the Bank's capital or on the capital of the Bank's holding company, as a consequence of this Agreement, the Facility B Commitment or any Loan to a level ~~below that which the Bank or the Bank's holding company could have achieved but for such~~ adoption, change or compliance (taking into consideration the Bank's policies and the policies of the Bank's holding company with respect to capital adequacy) by an amount deemed by the Bank to be material, then from time to time the Borrower agrees to pay to the Bank such additional amount or amounts as will compensate the Bank or the Bank's holding company for any such reduction suffered.

(b)     A certificate of the Bank setting forth such amount or amounts as shall be necessary to compensate the Bank or its holding company as specified in the foregoing Section 8.13(a) shall be delivered to the Borrower and shall be conclusive and binding on the Borrower absent manifest error. The Borrower jointly and severally agrees to pay to the Bank the amount shown as due on any such certificate delivered by it within 10 Business Days after receipt of the same.   Without limitation of the foregoing, if the Bank makes a demand for compensation pursuant to this Section 8.13(b), the Borrower may at any time, upon at least five Business Days' prior notice, subject to the payment of any amounts set forth in the certificate of the Bank referred to in this Section 8.13(b) which have accrued prior to the date of such certificate, repay in full any outstanding sum hereunder, together with accrued interest thereon to the date of payment (and the LIBOR Rate Prepayment Premium, if applicable).

(c)     Failure on the part of the Bank to demand compensation for any reduction in return on capital with respect to any period shall not constitute a waiver of the Bank's right to demand such compensation with respect to such period or any other period. The protection of this Section shall be available to the Bank regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

(d)     The Bank agrees that it will not make a demand for payment under this Section unless it is, at the same time, generally making similar demands with respect to the other loans of this type to other similarly situated customers of the Bank.

SECTION 8.14. <u>Participation, etc.</u>  The Bank shall have the right at any time, with or without notice to any Obligor: (i) to sell, assign, transfer or negotiate all or any part of its rights and/or obligations under or in respect of the Facility B Commitment, the Loans, the Letters of Credit, this Agreement and the other Loan Documents, and/or (ii) to grant participations therein, to (in any case under either (i) or (ii)) one or more banks (foreign or domestic, including an Affiliate of the Bank and any bank managed by the Board or a Federal Reserve Bank), insurance companies or other financial institutions, pension funds, mutual funds or other Persons   In the event of an assignment pursuant to clause (i), if practicable, such assignee shall assume such rights and/or obligations in writing and shall acknowledge such assumption to the Obligors; provided, however, that the failure to so assume in writing or to so acknowledge to the Obligors shall have no effect on the assignment or the validity or enforceability thereof

SECTION 8.15. <u>Late Charges</u>.  At the option of the Bank, the Borrower shall pay a fee on any principal and/or interest payment not received by the Bank within 10 days of the date any

such payment is due, whether by acceleration or otherwise, in an amount equal to 3% of the amount overdue.

SECTION 8.16. Default Interest. At the option of the Bank, upon the occurrence and for the duration of an Event of Default, whether or not the same results in a late charge pursuant to Section 8.15, the Borrower shall, regardless of whether the Bank has exercised any of the other remedies provided for in this Agreement or any of the other Loan Documents, pay interest, to the extent permitted by law (i) on the outstanding principal of any Loan and on any unreimbursed LC Disbursement, (ii) on any amounts advanced by the Bank pursuant to this Agreement or any of the other Loan Documents to protect its security interest in any of the Collateral, or for any other reason contemplated by any of the Loan Documents (after as well as before judgment), and/or (iii) on past due interest on any Loan, at a per annum rate (based on a 360-day year) of three percentage points (3%) in excess of the Prime Rate.

SECTION 8.17. Usury Saving Clause. All payment obligations arising under this Agreement, the Notes and the other Loan Documents are subject to the express condition that at no time shall any Obligor be obligated or required to pay interest at a rate which could subject the Bank to either civil or criminal liability as a result of being in excess of the maximum rate which any of them is permitted by law to contract or agree to pay. If by the terms of this Agreement, the Notes or any other Loan Document, an Obligor is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the applicable rate of interest shall be deemed to be immediately reduced to such maximum rate, and interest thus payable shall be computed at such maximum rate, and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal.

SECTION 8.18. Waiver of Jury Trial. THE BANK AND THE OBLIGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, EITHER OF THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS.

SECTION 8.19. Conflicts. Any conflict between any term, covenant, condition or provision of this Agreement, on the one hand, and any term, covenant, condition or provision of any other Loan Document, on the other, shall be resolved in favor of the term, covenant, condition or provision which is more likely to enlarge the scope of the Collateral or to enhance better the financial security provided to the Bank by the Collateral and/or the Guaranty.

SECTION 8.20. Right of Setoff. If an Event of Default shall have occurred and be continuing, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Bank to or for the credit or the account of the Obligors, against any or all of the obligations of any or all of the Obligors now or hereafter existing under this Agreement held by the Bank, irrespective of whether or not the Bank shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of the Bank under this Section are in addition to any

48

other rights and remedies (including other rights of setoff) which the Bank may have under any other Loan Document, under the law or otherwise.

SECTION 8.21. Jurisdiction; Consent to Service of Process.

(a)    Each of the Obligors and the Bank hereby irrevocably and unconditionally submit themselves and their property to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court for any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Agreement against any or all of the Obligors or any of their properties in the courts of any other jurisdiction.

(b)    The Obligors hereby irrevocably and unconditionally waive to the fullest extent they may legally effectively do so, any objection which they now or may hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Noting in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.22. Entire Agreement. This Agreement and the other Loan Documents contain the entire agreement of the Bank and the Obligors with respect to the Loans and the subject matter of the Loan Documents, superseding entirely any prior commitment letter, letter of interest or other agreement or understanding of any kind with respect to any aspect thereof.

[Remainder of Page Intentionally Blank.]

49

IN WITNESS WHEREOF, the Obligors and the Bank have executed this Agreement by their duly authorized officers, all as of the day and year first above written.

THE OBLIGORS:

AHAVA FOOD CORP.

By: _____
Name: Moise Banayan
Title: President

ST. LAWRENCE FOOD CORP

By: _____
Name: Moise Banayan
Title: President

LEWIS COUNTY DAIRY CORP

By: _____
Name: Moise Banayan
Title: President

_____
MOISE BANAYAN

THE BANK:

SIGNATURE BANK

By: _____
Name: Robert A. Bruett
Title: SVP

Credit Agreement

IN WITNESS WHEREOF, the Obligors and the Bank have executed this Agreement by their duly authorized officers, all as of the day and year first above written.

THE OBLIGORS:

AHAVA FOOD CORP.

By: _____
Name: Moise Banayan
Title: President

ST. LAWRENCE FOOD CORP

By: _____
Name: Moise Banayan
Title: President

LEWIS COUNTY DAIRY CORP

By: _____
Name: Moise Banayan
Title: President

YONI REALTY, LLC

By: _____
Name: Moise Banayan
Title: Manager

_____
MOISE BANAYAN

THE BANK:

SIGNATURE BANK

By: _____
Name: Robert *= Bright
Title: SVP

Credit Agreement

**SCHEDULE 5.17(b)**

**FINANCING STATEMENT AMENDMENTS**

| Debtor | Secured Party | Jurisdiction | Filing No. |
|---|---|---|---|
| Borrower | NMHG Financial Services Inc. | NY Secretary of State ("NYSOS") | 034362 |
| Borrower | Central Capital Corporation | NYSOS | 200212272862788 |
| Borrower | General Electric Capital Corporation | NYSOS | 200303240638788 |
| Borrower | Valley Commercial Capital, LLC | NYSOS | 200304070767573 |
| Borrower | NMHG Financial Services Inc. | NYSOS | 200409305822337 |
| SLF Corp. | General Electric Capital Corporation | NYSOS | 200407300785453 |
| SLF Corp. | City of Ogdensburg | NYSOS | 200502160255135 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 178870 |
| LCD Corp. | California First Leasing Corporation | NYSOS | 200302240407737 |
| LCD Corp. | Development Authority of the North Country | NYSOS | 200412201297079 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | 200412271327460 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 941313 |
| LCD Corp. | Lakeland Bank Equipment Leasing Division | NYSOS | 00-1506 |
| LCD Corp. | California First Leasing Corporation | NYSOS | U2003-00054 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | U2004-000143 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 941313 |
| LCD Corp. | Lakeland Bank Equipment Leasing Division | NYSOS | 00-1506 |
| LCD Corp. | California First Leasing Corporation | NYSOS | U2003-00054 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | U2004-000143 |

## SIGNATURE BANK

### Schedule 6.04 -- Guarantees of
### Ahava Food Corp.
### and the Obligors

Any guarantees issued in connection with the Bonds transaction or to secure indebtedness owing to Merrill Lynch Business Financial Services, Inc., GE Capital or any equipment lessor, if any, that are not currently being discharged.

## ATTACHMENTS TO CREDIT AGREEMENT

SIGNATURE BANK

Schedule 6.03 – Existing Indebtedness of
Ahava Food Corp.
and the Obligors

1.  Any indebtedness owed to Merrill Lynch Business Financial Services, Inc., GE Capital and pursuant to the Bonds transaction, to the extent not currently being discharged or refinanced.

2.  Indebtedness of $1,376,000 owed by the Borrower to Moise Banayan.

3.  The following indebtedness:

| Name of Debtor | Description of Indebtedness | |
|---|---|---|
| (a)    Ahava Food Corp. | Account Name | Amount as of 3/31/05 |
| | 1st Greenwich Capital | $103,898.00 |
| | All Point Capital | 23,111.00 |
| | Alto Financial | 1,967.00 |
| | American Equipment Leasing | 23,559.00 |
| | Center Capital | 3,968.00 |
| | Dell Financial Services | 2,470.00 |
| | GE Capital | 97,204.00 |
| | Interchange Capital | 99,793.00 |
| | KeySpan | 75,714.00 |
| | Marlin Leasing | 18,900.00 |
| | NMHG Financial Services | 29,959.00 |
| | SCG Capital | 6,011.00 |
| | Security Leasing | 21,823.00 |
| | | |
| | Total | $508,377.00 |

| (b) | Lewis County Dairy Corp. | Account Name as of 3/31/05 | |
|---|---|---|---|
| | | Account Name | Amount as of 3/31/05 |
| | | All Points Capital | $      782.28 |
| | | Cal First | 129,511.50 |
| | | Development Authority | 26,868.41 |
| | | Frontier Leasing | 2,902.19 |
| | | Newcourt Financial | 9,006.27 |
| | | NMHG Financial | 983.58 |
| | | North Central Alliance | 32,914.22 |
| | | Valley Commercial | 262,198.32 |
| | | Wells Fargo | 461,869.02 |
| | | Total | $927,035.79 |
| | | Prepaid | 4,327.12 |
| | | Net | $922,708.67 |
| (c) | St. Lawrence Food Corp. | None | |
| (d) | Yoni Realty, LLC | $6,950,000 principal amount owing in connection with the Bonds transaction | |
| (e) | Moise Banayan | Mortgage debt on a personal residence, as previously disclosed to the Bank. | |

SIGNATURE BANK

### Schedule 6.01 – Existing Liens against
### Ahava Food Corp.
### and the Obligors

1. Ahava Food Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Hobart Corporation | NY SOS | 125796 | 6/28/01 | 1 Food Processor  FP400-1<br>1 Manual/Tubular Cylinder PFD-CYL<br>1 Manual Push Feed Assy. MNLPFD-     Handle<br>1 Product Cart<br>2 Clear Polycarbonate Pans<br>1 Shredder Plate 3Shred-1/16<br>1 Shredder Plate 3Shred-3/32<br>1 Shredder Plate 3 shred-1/8<br>1 Shredder Plate 3shred-3/16<br>1 Fine Grater Plate 3Grate-fine<br>1 Product Cart |
| Hobart Corporation | Kings Cty | 01PK09357 | 6/29/01 | Same as above |
| GE Capital Corp. (assigned from First Greenwich Capital, LLC & amended) | NY SOS | 172065<br>200306261238452<br>200306261238503 | 9/10/01<br>6/26/03<br>6/26/03 | 1 Spray Dryer System Model 2520A and its auxiliaries, serial number HE-1 AL-FF335, which system includes a drum carrying a serial #VB-1AL-FF-335 sold by Alaqua, Inc. |
| GE Capital Corp. (assigned from First Greenwich Capital, LLC & amended) | NY SOS | 172067<br>200306261238539<br>200306261238553 | 9/10/01<br>6/26/03<br>6/26/03 | 1 Spray Dryer System Model 2520A & its auxiliaries, serial #HE1 AL-FF335, which system includes a drum carrying a serial #VB-1AL-FF-335 sold by Alaqua, Inc. |
| Ervin Leasing Co. | NY SOS | 210874 | 10/30/01 | 1 Koch Double Chamber Packaging Machine SN:1126 |
| Diligenz, Inc. | NY SOS | 211904 | 10/31/01 | 1 Dished Top Vertical Side 1201A Cone Bottom Dimple Jacketed/Insulated SS Tank; 1 Homogenizer Eccentric |

| | | | | Subassembly |
|---|---|---|---|---|
| Alto Financial Services | NY SOS | 229439 | 11/23/01 | 1 Alto Encore Walk Behind Floor Scrubber Model S-28 and accessories |
| GE Capital (assigned from First Greenwich Capital LLC | NY SOS | 237196 20030610144222 | 12/03/01 6/10/03 | Chattel Mortgage Security Agreement on: 1 20F Refrigerated Environmental Chamber (499,800 Cu Ft) 1 35 F Refrigerated Environmental Chamber (375,060 Cu Ft) 1 Rudox 800KW Diesel generator set model RM800 set for 277/480 volt 60HZ standby 1 Lot of 1200 Amp switchgear lineup consisting of 201200 amp parallel breakers and controls; 1-1200 amp automatic transfer switch; 1-1200 amp distribution lineup w/225 amp AF breakers |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 256716 | 12/31/01 | 1 Air Compressor System consisting of 1 1R Compressor Model EP40SF; 1 1R Dryer Model DKR140; 1 1R Compressor Model T303012H; 1 1R Dryer Model DXR 100 1 Vacuum Packaging System consisting of 1 intact RM 572 Vacuum Packaging Machine; 1 MC 57 Cutter 3 Norand 4810 Printers 2 Norand 6212 Hand Held Computer 1 Norand TDK Modem |
| NMHG Financial Services, Inc. | NY SOS | 034362 | 2/12/02 | 4130498 NMHGFS Cost Center 08A24 |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 161929 200408195701551 | 7/12/02 8/19/04 | 1 80 ton Trane Mnfg Air-Cooled Chiller Package |

| | | | | |
|---|---|---|---|---|
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 188289 200408195701587 | 8/14/02 8/19/04 | 3 Heat Rec Heat Exchange |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 242137 200408195701854 | 10/25/02 8/19/04 | 1 300 Gal PZ-ST Processor 1 10,000 Gallon Silo Tank |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 200212112755865 200408195701804 | 12/11/02 8/19/04 | 1 Case and Stack Conveyor 1 Bottle Conveyor from Filler to New Haabtec Caser 1 Haabtec Caser Model #HT24DCV and installation 1 D.C.C. Stainless Steel Single Case Stacker and Installation |
| Center Capital Corporation | NY SOS | 200212272862788 | 12/27/02 | 1 Octamag Self-Contained Compactor/Container S/N 114453 |
| GE Capital Corp. | NY SOS | 200303240638788 | 3/24/03 | 1 Avanti Plumbing & Heating S/N #AL-FF295, 2003-2nd effect Stainless Steel Evaporator Subsystem complete with heater, condenser, instrumentation and feed/re-circulation pumps complete with CIP interface. |
| Valley Commercial Capital, LLC (assigned from Interchange Bank & amended to change name of debtor and to add equipment) | NY SOS | 200304070767573 200304280900622 200408195701777 200412306088399 | 4/7/03 4/28/03 4/19/04 12/30/04 | 1 Hard Cheese Finishing System, consisting of a cheese curd pump, jacketed stainless steel draining table with accessories, cheese curd elevator, weigh checker, cheese mold filler, pre-press appliance and 2 vertical mold presses; 1 soft cheese packaging system: modified atmosphere semi automatic tray packer, with exact weight ability, USDA standard for soft cheeses and butter in attractive packages with extended shelf life; 1 |

| | | | | |
|---|---|---|---|---|
| | | | | compressors & blowers: 60 HP, dual discuss, low temp, 460 volt 3 phase. 2 commercial electric defrost: extended compressor warranty, liquid line solenoid suction filter, suction accumulator, oil separator, electric defrost kit 1 S.S. Debagger |
| Wells Fargo Bank, MN NA | NY SOS | 200305221042457 | 5/22/03 | 9-GPS/CDPD Antenna 9-NET 955 Mobile Data terminal VLU+ 1-EClient Software Package 9-VLU Plus SN: 0060D618E760, 006-D618E70A, 0060D618E9FB, 0060D618F061, 0060D618E7BF, 0060D618EF4C, 0060D618EFAF, 0060D618C94 |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200306261235812 | 6/26/03 | 1 Mozzarella Cheese Configuration System 1 Soft Cheese Packaging System 1 10,000 Gallon Silo Tank 2 8,000 Gallon Silo Tank 7 Rite Hite HD1700 Series Dock Levelers 1 LB-Automatic Cap Seal/Label Applicating Machine 1 R1200-420 Automatic Vacuum Packaging Machine |
| GE Capital Corp. | NY SOS | 200307241373850 | 7/24/03 | 2 Rudox RM500 Generator Sets Serial Numbers 22254 & 21693 |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200310281783563 | 10/28/03 | 1 Multivac R230 fully automatic rollstock vacuum packaging machine with MC 96-control base machine; Tooling Section: MULTIVAC new construction die Printing Section: MULTIPRINT SM 1, Multiprint "Hot Stamp" Code dating Unit with 2 print beams Cross Cutting section: Film Punch for semi-rigid film Longitudinal Cutting section: Roller Shear Cutting |

|  |  |  |  | Accessories section: Vacuum Trim Canister for edge trims and center strips<br>Vacuum Pumps section: Busch RA0160 Vacuum Pump with single stage, direct driven, air cooled, gas ballasted, Multi-Vane pump without motor starter |
|---|---|---|---|---|
| Wells Fargo Equipment Finance Inc. (amended to add equipment) | NY SOS | 2003130285462822<br>200312035561862 | 10/28/02<br>12/03/03 | 7 Rite Hite HD1700 Series Dock Levelers<br>1 10000 Gallon Silo Tank<br>1 600 Gal Proc |
| Marlin Leasing Corp. | NY SOS | 200405135387860 | 5/13/04 | 1 Netgear Managed 48 Port Switch 2GB Ports with novel XML; 1 Sony AIT-2 50/130GB Tape Drive, 20 Symantec Anti-Virus, 1 Tape Kit, 1 Veritas Backup Exec 9.1 Server Edition, Backup Exec Netware Agent, Backup Exec SQL Agent, 1 Linksys 4 Port Proconnect KVM Switch and 3 Linksys 6Ft KVM Cables, 1 Intel S5200 Server with 2.8FHZ Processor, 1GB DDR RAM, Keyboard and Mouse, 1 CITRIX Metaframe XP, 1 Windows 2003 Server, 1 APC 700VA UPS Backup Battery, 1 APC 1500VA UPS Backup Battery, 1 Windows 2003 Terminal Server, 1 Intel S5200 Server with 2 2.8GHZ Processors, 2GB DDR RAM, Raid Level 5, Keyboard and Mouse, 1 SQL Client Access and Microsoft SQL Server 2000 |
| GE Credit Corp. | NY SOS | 200407300785453 | 7/30/04 | **See attachment A hereto** |
| M&I First National Leasing Corp. | NY SOS | 200408020789531 | 8/2/04 | Biological Wasterwater Treatment Equipment |
| Valley Commercial | NY SOS | 200408115675293<br>200409166776057 | 8/11/04<br>9/15/04 | 6 Engine Intercoolers<br>1 Roof Top Closed Loop |

| | | | | |
|---|---|---|---|---|
| Capital LLC (assigned from Interchange Bank) | | | | Intercooler |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200408300891424 | 8/30/04 | 1 Multivac Model R140 packaging Machine<br>1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping<br>1 110 Ton Chiller<br>1 Sam 15006 West Falia Milk Separator |
| Security Leasing Services | NY SOS | 200503170424265 | 3/17/05 | 1 EP 100 Air Compressor with 460 Volt Modulation Control, S/N: CK6450 |
| SCG Capital Corp. | NY SOS | 200409018283753 | 9/1/04 | 1 Comat Moulding Machine M50/B4 with 4 Modullar Drums BTR4 and 2 Mozzarella collecting trays<br>1 Curd drainage CSDR30<br>1 Multivac MR615EF |
| NMHG Financial Services, Inc. | NY SOS | 200409305822337 | 9/30/04 | All equipment now or hereafter leased by lessor to lessee |
| First Community Bank | NY SOS | 20053170424304 | 3/17/05 | 1 New Westfalia Butter Churn Model BUC-4000, Stainless Steel HP Drive for 2 Screw, 2 HP Top Drive, Controls, S/N: 078378-23888 |
| Security Leasing Services, Inc. | NY SOS | 200506065496555 | 6/6/05 | 1 Damrow Stainless Steel Cheese Block Former w/ Vacuum Chamber S/n: 91-005/P/N 161600 – CBF-E-394 |
| S I Bank & Trust | Kings Cty | 01PK09366 | 6/29/01 | No description |

2. Lewis County Dairy Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Lewis County IDA Community Development Corp. | NY SOS | 178870 continuation 073576 continuation 200403160272991 | 8/30/94 4/14/99 3/16/04 | All of Machinery, equipment, fixtures & furnishings at Route 812, New Bremen, NY |
| Lewis County IDA Community Development Corp. | Lewis Cty. | 941313 99525 continuation U2004-00019 continuation | 8/17/94 2/4/04 | All of Machinery, equipment, fixtures & furnishings at Route 812, New Bremen, NY |
| GE Capital Corp. | Lewis Cty. | 95-1467 00-1004 continuation | 10/16/95 6/26/00 | Ghester Jerisen Reconditioned MIX HTST system w/press, holding tube, balance tank & flow direction controls; Pfaulder 3,000 gal. S/S tank, refrigerated w/Sprayball C.I.P.; DamRow pasteurized cream tank, all stainless steel 2,000 gal, Rectangular refrigerated tank w/vertical agitators & C.I.P. sprayballs; S/S tank 1,000 gal., Cherry Burrell refrigerated (reconditioned) w/agitators; American 6,000 gal. Sugar tank w/roper pump; Laboratory sterilizer barnstead auto clave; Chester Jensen ice builder 60,000 lb. Insulated ice tank w/accumulation blower & 2 pumps; Firck Dyna Metric 60 H.P. cooling compressor model MR 190-4A; (2) 25 H.P. 4 cyl. Quincy Air compressors, Model 5120 w/ air teck drain, master water separator, filter & air receiver |
| European American Bank | Lewis Cty | 96-168 amended 96-1178 continued 00-1439 | 1/29/96 7/30/96 9/25/00 | 2 6200 Hanheld, 4MB, 56 Key, S/N 2901336; 2091346; Norand 6200 Handheld Computer S/N 2717680, software Label Aire 2111M, S/N 6-21859405; modification kit for Norwood Printer |

| | | | | 2 Anderson Sle Sanitary Liquid Level Transmitters; 2 Tricover 2" 3-way Tri-Clamp Stainless Steel Valves; Tri-Clover 2" Air Valve Assembly with Quick Coupler Adapter; Tri-Clover 2" 2-way Tri-Clamp Stainless Steel Valve; Eurodrive Tefc Motor Single Winding Constant Solid Haft; Eurodrive TEFC Single Winding Constant Torque Crepaco M-10 Whipper/Chiller/Freezer, S/N 1-2174 Champion Atlantic 328 Home, S/N 9314 All stainless steel 6 head federal bottle filler, including filling heads, custom conveyor, FMC cap vibrator w/stand, misc. change Champion Atlantic 328 Home s/n 9314 Gateway equipment |
|---|---|---|---|---|
| Lakeland Bank Equipment Leasing Division | Lewis Cty | 00-1505 | 10/4/00 | 1 single effect falling film evaporator S/N AL-FF335 |
| Lakeland Bank Equipment Leasing Division | Lewis Cty | 00-1506 | 10/4/00 | 1 Franz Model STSF fluid filler system inclusive of Filler bowl with 30 spouts welded and polished 30 Franz fast-fill no-drip valves Three sets of bottle handling equipment with neck supporting transfer star wheel and in-feed screw Power adjustment of filler bowl height and digital readout Electronically variable speed drive Ladish level control system including controller and valve Stainless Steel column on filler to mount throttling valve and CIP circulating pump CIP System Franz cap applying head |

| | | | | |
|---|---|---|---|---|
| | | | | and mounting to be used with cap chute and pickoff supplied by Consumer Cap Stainless mounting bracket for ink roll date coder Bottle-feed (right hand) |
| California First Leasing Corp. | Lewis Cty | U2003-00054 | 5/20/03 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| M&I First National Leasing Corp. | Lewis Cty | U2004-00089 | 8/6/04 | Biological Wastewater Treatment Equipment |
| Development Authority of North County | Lewis Cty | U2004-00140 | 12/22/04 | **Fixture filing per attachment B** |
| North County Alliance Local Development Corp. | Lewis Cty | U2004-000143 | 12/30/04 | **Fixture filing per attachment C** |
| GE Capital Corp. | NY SOS | 209799 125673 continuation | 610/18/95 6/26/00 | Ghester Jerisen Reconditioned MIX HTST system w/press, holding tube, balance tank & flow direction controls; Pfaulder 3,000 gal. S/S tank, refrigerated w/Sprayball C.I.P.; DamRow pasteurized cream tank, all stainless steel 2,000 gal, Rectangular refrigerated tank w/vertical agitators & C.I.P. sprayballs; S/S tank 1,000 gal., Cherry Burrell refrigerated (reconditioned) w/agitators; American 6,000 gal. Sugar tank w/roper pump; Laboratory sterilizer barnstead auto clave; Chester Jensen ice builder 60,000 lb. Insulated ice tank w/accumulation blower & 2 pumps; Firck Dyna Metric 60 |

| | | | | H.P. cooling compressor model MR 190-4A; (2) 25 H.P. 4 cyl. Quincy Air compressors, Model 5120 w/ air teck drain, master water separator, filter & air receiver |
| --- | --- | --- | --- | --- |
| European American Bank | NY SOS | 020636 185598 continuation | 1/31/96 9/25/00 | 2 6200 Hanheld, 4MB, 56 Key, S/N 2901336; 2091346; Norand 6200 Handheld Computer S/N 2717680, software Label Aire 2111M, S/N 6-21859405; modification kit for Norwood Printer 2 Anderson Sle Sanitary Liquid Level Transmitters; 2 Tricover 2" 3-way Tri-Clamp Stainless Steel Valves; Tri-Clover 2" Air Valve Assembly with Quick Coupler Adapter; Tri-Clover 2" 2-way Tri-Clamp Stainless Steel Valve; Eurodrive Tefc Motor Single Winding Constant Solid Haft; Eurodrive TEFC Single Winding Constant Torque Crepaco M-10 Whipper/Chiller/Freezer, S/N 1-2174 Champion Atlantic 328 Home, S/N 9314 All stainless steel 6 head federal bottle filler, including filling heads, custom conveyor, FMC cap vibrator w/stand, misc. change Champion Atlantic 328 Home s/n 9314 Gateway equipment |
| All Points Capital Corp. | NY SOS | 192305 | 10/04/00 | 1 Franz Model STSF fluid filler system inclusive of Filler bowl with 30 spouts welded and polished 30 Franz fast-fill no-drip valves Three sets of bottle handling equipment with neck supporting transfer star wheel and in-feed screw Power adjustment of filler bowl height |

| | | | | and digital readout Electronically variable speed drive Ladish level control system including controller and valve Stainless Steel column on filler to mount throttling valve and CIP circulating pump CIP System Franz cap applying head and mounting to be used with cap chute and pickoff supplied by Consumer Cap Stainless mounting bracket for ink roll date coder Bottle-feed (right hand) |
|---|---|---|---|---|
| Sterling National Bank | NY SOS | 192314 | 10/04/00 | 1 Single Effect Falling Film Evaporator S/N AL-FF335 |
| First Greenwich Capital LLC | NY SOS | 159594 | 8/22/01 | 1 Spray Dryer System Model 2520A and its auxiliaries s/n Al-DR-207 |
| GE Capital Colonial Pacific Leasing | NY SOS | 211907 | 10/31/01 | 1 Dished Top Vertical Side 120IA Cone Bottom Dimple Jacketed/Insulated SS Tank; 1 Homogenizer Eccentric Subassembly |
| All Points Capital Corp. | NY SOS | 098067 | 4/29/02 | 1 Used Cherry Burrel Double Cylinder Thermutater, Serial #s 1419 and 1293 |
| California First Leasing Corp. (Assigned, collateral added and address changed) | NY SOS | 200302240407737 200306111152598 200408050805177 200408050805191 | 2/24/03 6/11/03 8/5/04 8/5/04 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| GE Capital Corp. | NY SOS | 200303240638788 | 3/24/03 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200306261235812 | 6/26/03 | 1 Mozzarella Cheese Configuration System 1 Soft Cheese Packaging System 1 10,000 Gallon Silo Tank |

| | | | | |
|---|---|---|---|---|
| | | | | 2 8,000 Gallon Silo Tank<br>7 Rite Hite HD1700 Series Dock Levelers<br>1 LB-Automatic Cap Seal/Label Applicating Machine<br>1 R1200-420 Automatic Vacuum Packaging Machine |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200310281783575 | 10/28/03 | 1 Multivac R230 fully automatic rollstock vacuum packaging machine with MC 96-control base machine; Tooling Section: MULTIVAC new construction die<br>Printing Section: MULTIPRINT SM 1, Multiprint "Hot Stamp" Code dating Unit with 2 print beams<br>Cross Cutting section: Film Punch for semi-rigid film<br>Longitudinal Cutting section: Roller Shear Cutting<br>Accessories section: Vacuum Trim Canister for edge trims and center strips<br>Vacuum Pumps section: Busch RA0160 Vacuum Pump with single stage, direct driven, air cooled, gas ballasted, Multi-Vane pump without motor starter |
| Wells Fargo Equipment Finance, Inc. (amended to add collateral) | NY SOS | 200310285462822<br>200312035561862 | 10/28/03<br>12/03/03 | 1 10000 Gallon Silo Tank; 2 8000 Gallon Silo Tank; 1 15000 Gallon Silo Tank; 7 Rite Hite HD1700 Series Dock Levelers; 1 10000 Gallon Silo Tank; 1 600 Gal Proc |
| BBH Financial Services Company | NY SOS | 200406035454484 | 6/3/04 | 2 Omino Amjet A300 SE Printers |
| GE Capital Corp. | NY SOS | 200407300785453 | 6/30/04 | **See Attachment A** |
| M&I First National Leasing Corp. | NY SOS | 20048020789531 | 8/2/04 | Biological Wasterwater Treatment Equipment |

| Valley Commercial Capital, LLC (assigned from Interchange Bank) | NY SOS | 200408115674809 200409165778065 | 8/11/04 9/16/04 | Model 2l-40 2 Lane Inline Remanufactured Cup Filling Machine with Heat Seal for Three Diameter Containers |
|---|---|---|---|---|
| Valley Commercial Capital, LLC (assigned from Interchange Bank) | NY SOS | 200408115675837 200409165779788 | 8/11/04 9/16/04 | Pump 3- 30 GPM @60TD TEFC 460/3/60 |
| Interchange Bank (amended to change debtor's address) | NY SOS | 200408185698930 200411025918932 | 8/18/04 11/02/04 | 1 MPS Pressure Booster Mounted on 14 Gallon Tank; 1 Parker Hannifin Model #DB5 Nitrogen Generator, Oxygen Analyzer #72-730 with Alarm Capacity |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200408300891424 | 8/30/04 | 1 Multivac Model R140 packaging Machine 1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping 1 110 Ton Chiller 1 Sam 15006 West Falia Milk Separator |
| Development Authority of the North Country | NY SOS | 200412201297079 | 12/20/04 | **See attachment B** |
| North County Alliance Local Development Corporation | NY SOS | 200412271327460 | 12/27/04 | **See attachment C** |

3.  St. Lawrence Food Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Ogdensburg Growth Fund Development Corporation | NY SOS | 200402128042156 | 2/12/04 | Ammonia Refrigeration System with the following major components:  Chesler Jensen Chiller System (#16A1186 & 16315), Vilter Ammonia Compressor (Serial #31105), Jenera Ammonia Compressor (Serial #0109048); 40 HP Ingersol Rand Air Comp. (Serial #30T6222226); 20 HP Busch Vacuum Pump (serial #588633); 20 HP Busch Vacuum Pump (serial # H114887-12); Multivac 1829; Multivac 1820; Multivac 1831; SS Fabricating-Chill Tank System 0G077; SS Fabricating-mixer molder 867; APV Pasteurizer 75,000 lbs/hr (serial # HMBMMC1551) |
| Greater Massena Economic Development Loan Fund | NY SOS | 200402128042168 | 2/12/04 | Separator Inc. Separator SAMM15006; Separator Inc. Clarifer 352851; Kusel A Frame Cheese Press 3269, 3259 $ 3249; Kusel Finishing Table System 286614-0403920 |
| GE Capital Corp. | NY SOS | 200407300785453 | 7/30/04 | **See attachment A** |
| Interchange Bank (amended to change debtor's address) | NY SOS | 200408185698930 200411025918932 | 8/18/04 11/02/04 | 1 MPS Pressure Booster Mounted on 14 Gallon Tank; 1 Parker Hannifin Model #DB5 Nitrogen Generator, Oxygen Analyzer #72-730 with Alarm Capacity |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200411025919972 | 11/02/04 | 1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping |

| Interchange Bank (amended to add equipment) | NY SOS | 200412066015624 200412106033354 | 12/06/04 12/10/04 | See attachment D |
|---|---|---|---|---|
| Interchange Bank | NY SOS | 200412206056707 | 12/20/04 | 2 curd drainage case model CSDR30.251 disperser table model TSP301 pneumatic mix cutter and drum molds MC241 cheese cooker stretcher unica model BTR4 |
| ICB Leasing Corp. | NY SOS | 200502070196774 | 2/7/05 | 2 22,500 lb. SS Jacketed Curb Vats with Automatic Agitators and Motors 1 Rudox Model RM800 Diesel Generator Set, S/N 22298 2 32" Conveyor Belt, Item#BV30.00X8X534.00 1 V-Belt Applicator Tool, Item # NRE Tooling SS Pulley w/ V-Groove, Item # 24"Odx1'Wide |
| City of Ogdensburg | NY SOS | 200502160255135 | 2/16/05 | See attachment E |
| City of Ogdensburg | NY SOS | 200502160255399 | 2/16/05 | Multivac Tooling – Model #R230 – Serial #2275; Pac N Wrap – Model #LDU/2 – Serial #340682LDU – Little David Box Topper |
| Thompson & Johnson Equipment Co., Inc. | NY SOS | 200504085305398 | 4/8/05 | 1 used Clarkmodel #CGC25 Serial #5629394 |

4. Yoni Realty, LLC:

No Liens other than Liens created in connection with the Bonds transaction.

5. Moise Banayan:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Mendel Group Inc, | NY SOS | 200504040476005 | 4/4/05 | All fixtures at his residence |

ATTACHMENT A

COMPANY NAME:  ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 1 | 1 | [1987] VERTICAL JACKETED DAIRY SILO - 60,000 GAL. CAP., SIDE ENTERING AGITATOR - APPROX. 2 H.P, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | WALKER | VSHT4323 | 10053 | $ 27,500 |
| 2 | 1 | [1982] VERTICAL JACKETED DAIRY SILO - 30,000 GAL. CAP., SIDE ENTERING AGITATOR - APPROX. 2 H.P, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | WALKER | VSHT3631 | 9362 | $ 20,000 |
| 3 | 1 | STAINLESS STEEL SKID MOUNTED THREE-TANK CIP SYSTEM W/ (3) STAINLESS STEEL TANKS - 400 GAL. CAP. W/ CENTRIFUGAL PUMP - 7.5/3.75 HP W/ CENTRIFUGAL FEED PUMP W/ CONTROLS | | | | $ 7,000 |
| 4 | 1 | STAINLESS STEEL TRUCK UNLOADING ASSEMBLY - CABLE SUSPENDED FROM CEILING TRACK, CONSISTING OF: - STAINLESS STEEL CENTRIFUGAL UNLOADING PUMP - 5 HP (NOTE: MOTOR DAMAGED) - STAINLESS STEEL CENTRIFUGAL UNLOADING PUMP - 25 HP - FILTERS, SUPPORTS AND CONTROLS | | | | $ 1,000 |
| 5 | 2 | STAINLESS STEEL HORIZONTAL REFRIGERATED HOLDING TANKS - 7,000 GAL. CAP., STAINLESS STEEL INTERNALS, HAND VALVES, SPRAY BALLS AND ACCESSORIES (NOTE: DIFFICULT REMOVAL) | | | | NO VALUE |
| 6 | LOT | FLOW METERS CONSISTING OF: - FLOW METER - PROGRAMMABLE FLOW METER W/ BATCH CONTROLLER - PROGRAMMABLE FLOW METER W/ BATCH CONTROLLER | AFCO ACCURATE METERING CONTREC ACCURATE METERING | BC-32 414 TP-709 | 39836 35695 | $ 1,500 |

MARCH 2004

DALEY-HODKIN, LLC

PAGE 1

COMPANY NAME:    ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 7 | 5 | HORIZONTAL REFRIGERATED TANKS - 7,000 GAL. CAP., STAINLESS STEEL FACE AND INTERNALS, TOP MOUNTED AGITATORS, SPRAY BALLS, PNEUMATIC VALVE (NOTE: DIFFICULT REMOVAL) | N/A | | | NO VALUE |
| 8 | 1 | [1958] STAINLESS STEEL COOLING PRESS - 7,500 LBS./HR., MANUAL CLOSING, APPROX. (155) STAINLESS STEEL PLATES - 10"W X 43"H W/ 30 GAL. BALANCE TANK AND CONTROLS | CHESTER-JENSEN | 55 HMC | 1631175 | $ 10,000 |
| 9 | 1 | STAINLESS STEEL COOLING PRESS - MANUAL CLOSING, APPROX. (180) STAINLESS STEEL PLATES - 16"W X 84"H, (2) DIVIDERS W/ CONTROLS | AHLBORN | 161 | 106 | $ 10,000 |
| 10 | LOT | COMPRESSORS AND ACCESSORIES CONSISTING OF: - AMMONIA COMPRESSOR - 60 HP | VILTER | VMC-440 SIZE/A83K446R | R63943 | $ 5,000 |
| | | - AMMONIA COMPRESSOR - 60 HP | VILTER | VMC-440 | 31105 | |
| | | - AMMONIA COMPRESSOR - 60 HP (NOTE: WITHOUT MOTOR) | VILTER | SIZE/A88K446B N/A | N/A | |
| | | - HORIZONTAL INSULATED AMMONIA STORAGE TANK - 1,500 GAL. CAP., STAND, SURGE TANK AND CONTROLS | | | | |
| | | - ROOF MOUNTED COOLING TOWER | | | | |
| 11 | 2 | MEZZANINE MOUNTED ICE BUILDERS - APPROX. 1,000 LB. CAP. | | | | NO VALUE |
| 12 | 1 | PLANT STEAM SYSTEM CONSISTING OF: - [1989] COMBINATION GAS AND OIL FIRED BOILERS - 800 HP, 150 PSI | CLEAVER-BROOKS | CB-400-500 | L-86651 | $ 22,000 |
| | | - [1976] COMBINATION GAS AND OIL FIRED BOILERS - 800 HP, 150 PSI | CLEAVER-BROOKS | CB-800HP SERIES 400 | L59893 | |
| | | - DEAERATOR TANK - APPROX. 3,000 GAL. CAP. | N/A | | | |
| | | - PUMP - 25 HP (NOTE: NOT INSTALLED) | AURORA | | | |

DALEY-HODKIN, LLC

MARCH 2004

PAGE 2

**COMPANY NAME:** ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - WATER SOFTENING SYSTEM, OTHER PUMPS AND CONTROLS | | | | |
| 13 | 1 | WATER SOFTENING SYSTEM - (2) TANKS, PROGRAMMABLE CONTROLS AND VALVES | BRUNER | BRUNER-MATIC | | $500 |
| 14 | 1 | STAINLESS STEEL CIP SYSTEM - SINGLE TANK, 750 GAL. CAP. W/ BALANCE TANK, PUMPS, PNEUMATIC VALVES AND CONTROLS | CUSTOM | | | $3,500 |
| 15 | 2 | PVC VERTICAL STORAGE TANKS - 2,000 GAL. CAP. W/ TANK LINERS | | | | $650 |
| 16 | 1 | STAINLESS STEEL COP TANK - 1,500 GAL. CAP. | | | | $750 |
| 17 | 1 | STAINLESS STEEL CHEESE COOKER - STEAM INJECTION, DUAL INCLINED SCREW, 6" DIA. X 8'L W/ PUMPS AND CONTROLS | SUPREME | | | $5,000 |
| 18 | 1 | [1996] STAINLESS STEEL CHEESE SHREDDER - TOP SHREDDER HEAD, DUAL SCREW, 6" DIA. X 20'L W/ PUMPS AND CONTROLS | STAINLESS STEEL FABRICATORS | 720-E | 867 | $7,000 |
| 19 | 5 | STAINLESS STEEL CHEESE FINISHING TABLES - 22,000 LB. CAP., TILTED BOTTOM, TRAVELING MIXERS - 80" W X 36'L W/ ACCESSORIES AND CONTROLS | N/A | | | $32,500 |
| 20 | 1 | STAINLESS STEEL RINSE TANK - 7' X 4' X 26"H, STAINLESS STEEL LEGS | | | | $700 |
| 21 | LOT | BRINE TREATING EQUIPMENT CONSISTING OF: -STAINLESS STEEL OPEN TOP TANK - 26'L X 46"W X 31"H, W/ (2) ELECTRIC CHAIN HOISTS - 1 TON CAP. CEILING MOUNTED, PENDANT CONTROLS W/ (12) STAINLESS STEEL HOLDING RACKS | | | | $15,000 |

**COMPANY NAME:** ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - THREE-TIER FIBERGLASS AND WOOD BRINE TREATING TANKS - 8'W X 20'D X 10'T, 11'6" AND 11'2'L<br>- VERTICAL INSULATED STAGE TANK - 12" DIA. X 16'H<br>- WOOD AND FIBERGLASS BRINE TANK - 12' X 4' X 20'H<br>- 2-UNIT SHELL AND TUBE HEAT EXCHANGERS - STAINLESS STEEL INTERNALS, 16'L DIA. X 15' AND 20'L<br>- PUMPS, PORTABLE STAINLESS STEEL DRYING CONVEYOR, STAINLESS STEEL CHEESE HOLDER RACKS AND CONTROLS | | | | $ 9,000 |
| 22 | LOT | LABORATORY EQUIPMENT CONSISTING OF:<br>- TWO-DOOR GLASS DISPLAY REFRIGERATOR<br>- CHEST FREEZER - APPROX. 12 CU. FT.<br>- MICROWAVE MOISTURE/SOLIDS ANALYZER<br>- MILK ANALYZER<br>- PROGRAMMABLE CRYOSCOPE<br>- TABLE TOP ELECTRIC CONVEYORED OVEN - IMPINGER TYPE<br>- AUTOCLAVE<br>- STAINLESS STEEL THREE-DOOR REFRIGERATOR<br>- BACTERIA TESTER, PH METER, TOP PAN BALANCE, ELECTRIC OVENS AND MINOR LABORATORY EQUIPMENT | UNIVERSAL-NOLIN<br>GENERAL ELECTRIC<br>CEM<br>FOSS FOOD TECH<br>ADVANCED INSTRUMENTS<br>LINCOLN<br><br>NAPCO<br>POWERS | LABWAVE 9000<br>DAIRYLAB 2<br>4D3<br>1301<br><br>9000-D | LS4057<br>CL/078/6383<br>9804-003<br>3020505 | |
| 23 | 1 | HTST WHEY PASTEURIZER CONSISTING OF:<br>- STAINLESS STEEL PLATE HEAT EXCHANGER - APPROX. (15) PLATES - 20"W X 48"H, (3) DIVIDERS, MANUAL CLOSING<br>- STAINLESS STEEL BALANCE TANK - 300 GAL. CAP.<br>- STAINLESS STEEL BALANCE TANK - 100 GAL. CAP.<br>- THREE-TIER LOOP - 3-1/2" DIA. PIPE<br>- POSITIVE DISPLACEMENT PUMP - 2 HP<br>- (3) STAINLESS STEEL CENTRIFUGAL PUMPS - 10 HP<br>- STAINLESS STEEL CENTRIFUGAL PUMP - 7.5 HP<br>- PNEUMATIC VALVES AND PROGRAMMABLE CONTROLS | ALFA-LAVAL<br><br>WAUKESHA | H7-RC<br><br>30 | 3010086232 | $ 30,000 |

DALEY-HODKIN, LLC                    MARCH 2004                    PAGE 4

COMPANY NAME:    ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
300 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 24 | 1 | STAINLESS STEEL SEPARATOR W/ AUTOMATIC SLUDGE REMOVAL TANK (NOTE: REPORTED BY THE COMPANY THAT MAJOR REPAIRS ARE NEEDED) | WESTFALIA SEPARATOR | SAMM 15006 | 1844-350-4500 | $7,000 |
| 25 | 1 | STAINLESS STEEL CLARIFIER W/ AUTOMATIC SLUDGE REMOVAL (NOTE: REBUILT BY SEPARATOR INC. MAY 2001) | ALFA LAVAL | MRPX213 | 352851 | $ 30,000 |
| 26 | 1 | CREAM PRESS CONSISTING OF: - STAINLESS STEEL PLATE HEAT EXCHANGER - APPROX. (86) PLATES - 16"W X 48"H - BALANCE TANK, PUMP AND CONTROLS | APV | SR350SH | 22575 | $ 15,000 |
| 27 | 1 | [1989] REVERSE OSMOSIS MEMBRANE FILTERING SYSTEM FOR WHEY - FOUR-TIER, 9 TUBE X 15'L CONSISTING OF: - (2) STAINLESS STEEL BALANCE TANKS - 150 GAL. CAP. - STAINLESS STEEL BALANCE TANK - 75 GAL. CAP. - (2) CENTRIFUGAL PUMPS - 40 HP FOR PRE-FEED - (5) CENTRIFUGAL PUMPS FOR RECIRCULATION - PROGRAMMABLE CONTROLLER - PNEUMATIC VALVES, SUPPORTS AND ACCESSORIES | NIRO | | 28142801 | $ 85,000 |
| | | | OMRON | SYSMAC CSIG | | |
| 28 | 1 | [1989] UF FILTERING SYSTEM - THREE-TIER, 12 TUBE X 15'L, 50,000 LBS./HR., CONSISTING OF: - (4) STAINLESS STEEL CENTRIFUGAL PUMPS - APPROX. 10 HP - STAINLESS STEEL CENTRIFUGAL PUMPS - 10 HP - (2) STAINLESS STEEL BALANCE TANKS - 300 GAL. CAP. - PROGRAMMABLE CONTROLS - CIP THREE-TANK SYSTEM - 1800 GAL. CAP. - PNEUMATIC VALVES, PUMPS AND PROGRAMMABLE CONTROLS | NIRO | | M-5000-A 28142802 | $ 65,000 |
| 29 | 1 | STAINLESS STEEL OPEN TOP TANK - 44" X 44" X 22" | | | | $ 300 |

DALEY-HODKIN, LLC                                                MARCH 2004                                            PAGE 6

COMPANY NAME:  ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM# | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 30 | 1 | THREE TANK CIP SYSTEM - (2) STAINLESS STEEL TANKS - 600 GAL. CAP. - STAINLESS STEEL TANK - 800 GAL. CAP. - PROGRAMMABLE CONTROLS | | | | $3,000 |
| 31 | 1 | [1973] VERTICAL JACKETED DAIRY SILO - 30,000 LB. CAP. (NOTE: NOT IN USE) | WALKER | VHST-2337-R | N/A | $7,000 |
| 32 | 1 | THREE TANK CIP SYSTEM W/ (3) STAINLESS TANKS - 500 GAL. CAP. W/ PNEUMATIC VALVES AND PUMPS | CUSTOM | | | $7,000 |
| 33 | 2 | HORIZONTAL JACKETED STORAGE TANKS - 7,000 GAL. CAP., STAINLESS STEEL INTERNALS W/ SPRAY BALLS AND PNEUMATIC VALVES | N/A | | | $6,000 |
| 34 | 1 | VERTICAL BOLTED STEEL STORAGE TANK - APPROX. 30,000 GAL. CAP., SET ON CONCRETE PAD (NOTE: NOT IN USE) | N/A | | | $4,000 |
| 35 | 1 | HORIZONTAL JACKETED STORAGE TANK - 7,000 GAL. CAP., STAINLESS STEEL FRONT AND INTERNALS W/ SPRAY BALLS AND PNEUMATIC VALVES | N/A | | | $3,500 |
| 36 | 2 | VERTICAL JACKETED DAIRY SILOS - 50,000 GAL. CAP., SIDE ENTERING AGITATOR, APPROX. 2 HP, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | DAIRY CRAFT | | 720255 4892 | $35,000 |
| 37 | 1 | VERTICAL JACKETED DAIRY SILO - 30,000 GAL. CAP., SIDE ENTERING AGITATOR, APPROX. 2 HP, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | N/A | | | $10,000 |
| 38 | 1 | HORIZONTAL JACKETED STORAGE TANK - 7,000 GAL. CAP., STAINLESS STEEL FRONT AND INTERNALS W/ SPRAY BALLS AND PNEUMATIC VALVE | N/A | | | $2,500 |

DALEY-HODKIN, LLC

MARCH 2004

PAGE 6

COMPANY NAME:     ST. LAWRENCE FOOD CORP.
DBA PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 39 | 4 | [1987] STAINLESS STEEL DOME TOP PROCESSORS - 500 GAL. CAP., TOP TWO-SPEED AGITATOR, SPRAY BALL W/ PROGRAMMABLE CONTROLS (NOTE: DIFFICULT REMOVAL) | CHERRY-BURRELL | 500FAM EPDA | 3113 | $ 35,000 |
| | | | ALLEN-BRADLEY | SLC 5/04 | | |
| 40 | 1 | STAINLESS STEEL HTST MILK PASTEURIZER - 30,000 LBS./HR., CONSISTING OF: -STAINLESS STEEL PLATE HEAT EXCHANGER -BALANCE TANK - 300 GAL. CAP. -4-LOOP HOLDING TUBE -PNEUMATIC VALVE AND PUMP -PROGRAMMABLE CONTROLS (NOTE: BEING INSTALLED, VALUED AS COMPLETELY INSTALLED) | APV | SR6GLOSH | 22574 | $ 35,000 |
| | | | ALLEN-BRADLEY | | | |
| 41 | 1 | [2003] STAINLESS STEEL CHEESE DRAINING TABLE - 6'7 X 14" X 65" W/ (2) AGITATORS | KUSEL | DRI286614 | 0403820 | $ 80,000 |
| | | W/ UNLOADER - 8" DIA. X 6' W/ STAINLESS STEEL CHEESE PRESS AND WEIGH SCALE | KUSEL | SE C-2 | 0403E1028 | |
| | | W/ PROGRAMMABLE SCALE HEAD W/ CONTROLS | RICE LAKE | IQ-800 | | |
| 42 | 1 | STAINLESS STEEL CHEESE RING WASHER W/ HIGH PRESSURE PUMP | N/A | | | $ 5,000 |
| 43 | 1 | LPG FORKLIFT TRUCK - 3,250 LB. CAP., 3-STAGE MAST - 189" MAX. LIFT, CUSHION TIRES, OVERHEAD GUARD W/ SIDESHIFTER | TOYOTA | 42-6FGCU16 | 62829 | $ 4,500 |
| 44 | 1 | CHEESE PACKAGING LINE CONSISTING OF: - (6) [2003] DOUBLE CHAMBER SHUTTLE TYPE VACUUM PACKAGING MACHINES W/ REMOTE VACUUM PUMPS | MULTIVAC | C-600 | 1831 1830 1829 | $ 42,000 |
| | | - STAINLESS STEEL SHRINK TUNNEL - 15" X 40" X 16"H | CUSTOM | | | |

DALEY-HODKIN, LLC                    MARCH 2004                    PAGE 7

COMPANY NAME:    ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - CONVEYORIZED METAL DETECTORS | SAFE LINE | BEL506 | | |
| | | - BOX ERECTOR | BELSON | SFALR-50 | 975015 | $ 2,500 |
| | | - (1997) CASE SEALER - TOP AND BOTTOM | BEST PACK | | | |
| | | - CONVEYOR SECTIONS, INLINE SCALE SYSTEM AND CONTROLS | | | | |
| 45 | 1 | VERTICAL BALING PRESS - 60" X 30" CHAMBER | GIVES RECYCLING | 4P50 | 0177 | $ 130,000 |
| 46 | 1 | (2003) STAINLESS STEEL AUTOMATIC ROLL FED VACUUM PACKAGING MACHINE | MULTIVAC | R230 | 2275 | |
| | | W/ FORMING STATION, OVERWRAPPER, SEALING STATION AND TRIM STATION | | | | |
| | | W/ REMOTE VACUUM PUMP | MR. | M44-18 | 22716/4/A | |
| | | W/ PRESSURE SENSITIVE LABELLER | | | | |
| | | W/ PENDANT CONTROLLER | | | | |
| | | W/ PROGRAMMABLE CONTROLS | MULTIVAC | 2735E AUTO FLUSH | 040091005 | |
| | | W/ INKJET PRINTER | VIDEOJET | | | |
| 47 | 1 | STAINLESS STEEL SHREDDER | URSCHEL | RA-D | N/A | $ 15,000 |
| | | W/ MOTOR - 7.5 HP | | | | |
| | | (NOTE: MODEL SUPPLIED BY THE COMPANY) | | | | |
| 48 | LOT | PLANT AIR SYSTEM CONSISTING OF: | | | | $ 9,500 |
| | | - AIR DRYER - 250 SCFM | ARROW | SMART CYCLE | 99-99S51E | |
| | | - AIR DRYER - 250 SCFM | AIRTEK | SC220 | 30T-672 354 | |
| | | | | T-30-A35 | | |
| | | - HORIZONTAL TANK MOUNTED ROTARY SCREW AIR COMPRESSOR | INGERSOLL-RAND | | 622226 | |
| | | W/ (2) UNITS - 25 HP | | | G33Z 1195097 | |
| | | - PACKAGED ROTARY SCREW AIR COMPRESSOR - 50 HP | INGERSOLL-RAND | SSR-EP-SOSE | | |
| 49 | LOT | MAINTENANCE MACHINERY CONSISTING OF: | | | | $ 6,500 |
| | | - SHOP PRESS - 50 TON CAP. | DELTA | 17-900 | R8637 | |
| | | - DRILL PRESS - 17" | DAYTON | 32399 | | |
| | | - HORIZONTAL BAND SAW | N/A | | | |
| | | - DRILL PRESS - 15" | BRILLIANT | 400A | | |
| | | - METAL CUTOFF SAW - 16" | RIDGID | | | |
| | | - ELECTRIC PIPE THREADER | | | | |
| | | - BURNING OUTFIT | | | | |

DALEY-HODKIN, LLC                              MARCH 2004                              PAGE 8

COMPANY NAME:    ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - ARC WELDER | LINCOLN | TIG 175 | | |
| | | - PLASMA CUTTER | THERMAL DYNAMIX/RA | PAK38XL | | $ 10,000 |
| 50 | LOT | PUMPS CONSISTING OF: | | | | |
| | | -(8) STAINLESS STEEL CENTRIFUGAL PUMPS - 5 HP | | | | |
| | | -(4) STAINLESS STEEL CENTRIFUGAL PUMPS - 10 HP | | | | |
| | | -STAINLESS STEEL CENTRIFUGAL PUMP - 15 HP | | | | |
| | | -POSITIVE DISPLACEMENT PUMP - 2 HP | WAUKESHA | 30 | 141434 | |
| | | -POSITIVE DISPLACEMENT PUMP - 10 HP | WAUKESHA | 130 | 341838-07 | |
| 51 | 1 | LPG FORKLIFT TRUCK - APPROX. 4,000 LB. CAP., 2-STAGE MAST, CUSHION TIRES, OVERHEAD GUARD | CLARK | | | $ 2,000 |
| 52 | LOT | EQUIPMENT IN STORAGE INSIDE PLANT BUILDING CONSISTING OF: | | | | $ 16,000 |
| | | -6-LANE MECHANICAL SCALE SYSTEM | N/A | | | |
| | | -W/BAG MACHINE | | | | |
| | | -TUBE PACKAGING MACHINE | POLYCLIP | AG-800 | 8251 | |
| | | -(199?) TWO-STATION SHUTTLE VACUUM PACKAGING MACHINE W/ VACUUM PUMP | MULTIVAC | | | |
| | | -STAINLESS STEEL PLATE HEAT EXCHANGER | | | | |
| | | -SHREDDER | URSCHEL | RA-D | 1914 | |
| | | -SHREDDER | URSCHEL | CC | N/A | |
| | | -CONVEYOR, SMALL TANKS, KETTLES, MOTOR, DRIVES, ETC. | | | | |
| 53 | LOT | EQUIPMENT IN YARD STORAGE AREAS CONSISTING OF: | | | | $ 10,000 |
| | | -VACUUM STUFFER | | | | |
| | | -FORM, FILL AND SEAL BAG MACHINE | DEMAG | 1000 | N/A | |
| | | -VACUUM PACKAGING MACHINE - 4-STATION | TRIANGLE | SYS 21 ACCELERON | 17104 | |
| | | -CHEESE CUBER | | 8610T | 0722935 | |
| | | -CONVEYORS, TANK, STANDS, CHUTES, ETC. | | | | |
| 54 | LOT | STAINLESS STEEL PIPING - 3" AND SMALLER, APPROX. 2,000 L.F. W/ ASSOCIATED PNEUMATIC VALVES | | | | $ 2,500 |

DALEY-HODKIN, LLC                    MARCH 2004                    PAGE 9

COMPANY NAME:    ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|--------|-----|-------------|--------------|-------|---------------|---------------------------|
| 55 | LOT | GENERAL PLANT EQUIPMENT CONSISTING OF: SELF DUMPING HOPPERS, SCALES, FOAMERS, STAINLESS STEEL RINSE SINKS, STAINLESS STEEL TABLES, HAND AND POWER TOOLS | | | | $ 6,000 |
| 56 | LOT | OFFICE FURNITURE AND MACHINES CONSISTING OF: COPIERS, FAX MACHINES, OFFICE COMPUTERS, PHONE SYSTEMS, DESKS, CHAIRS, FILES CABINETS, ETC. | | | | $ 7,500 |

APPRAISAL TOTAL:  $ 904,900

542285

2004 JUL 30  PM 12: 10

DALEY-HODKIN, LLC

MARCH 2004

PAGE 10

Attachment B

SCHEDULE "A"

PARCEL I:

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of New Bremen, County of Lewis, State of New York and being further described as follows:

BEGINNING at an iron pin with cap set at the intersection of the northerly highway limits of NYS Rte. 812 and the westerly road margin of Hopps Road;

THENCE S. 69 degrees 04' 59" W. passing through an iron pin with cap set at 66.59 feet and continuing a total distance of 86.66 feet to the easterly shoreline of Black River;

THENCE along the easterly shoreline of Black River a distance of 157.50 feet being situate N. 16 degrees 23' 35" W., 153.42 feet from the end of the last course;

THENCE N. 54 degrees 04' 59" E. passing through an iron pin with cap set a 20.44 feet and continuing a total distance of 67.52 feet to an iron pin with cap set at the westerly road margin of Hopps Road;

THENCE along the westerly road margin of Hopps Road a distance 171.96 feet to the point of beginning situate S. 24 degrees 03' 13" E., 170.68 feet from the end of the last course.

CONTAINING 0.249 acres of land more or less.

PARCEL II:

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of New Bremen, County of Lewis, State of New York and being further described as follows:

BEGINNING at an iron pin with cap set at the intersection of the northerly highway limits of NYS Rte. 812 and the easterly road margin of Hopps Road;

THENCE along the easterly road margin of Hopps Road a distance of 240.11 feet to an iron pin with cap set being situate N. 25 degrees 44' 46" W., 240.21 feet from the point of beginning;

THENCE N. 54 degrees 04' 59" E. a distance of 544.67 feet to an iron pipe found;

THENCE S. 24 degrees 25' 01" E. passing through an iron pipe found at 247.98 feet and continuing a total distance of 293.02 feet to an iron pin with cap set at the northerly highway limits of NYS Rte. 812;

Schedule "A" (Continued)
Page 2

THENCE S. 55 degrees 01' 32" W. along the northerly highway limits
of New York State Rte. 812 a distance of 221.28 feet to an iron pin
with cap set;

THENCE S. 62 degrees 47' 13" W. along the northerly highway limits
of New York State Rte. 812 a distance of 311.00 feet to the point
of beginning.

CONTAINING 3.407 acres of land more or less.

SUBJECT to an easement conveyed to Central New York Power
Corporation recorded in the Lewis County Clerk's Office in Liber
181 at Page 72 on June 8, 1938.

ALSO SUBJECT TO drainage rights conveyed to Department of Highways
of the State of New York and recorded in the Lewis County Clerk's
Office in Liber 2 at Page 263 on May 31, 1916.

ALSO SUBJECT TO an easement conveyed to Continental Telephone
Company of Upstate New York and recorded in the Lewis County
Clerk's Office in Liber 444 at Page 282 on May 23, 1984.

ALSO SUBJECT TO an easement conveyed to Contel of New York d/b/a
GTE New York and recorded in the Lewis County Clerk's Office in
Liber 543 at Page 276 on December 17, 1991.

IT BEING the intent to describe the parcels of land conveyed by
Hoffman & Dudo, Inc. to Lewis County Dairy Corporation by bargain
and sale deed recorded in the Lewis County Clerk's Office in Liber
574 at Page 345 on August 17, 1994.

U2004-00089
08/08/2004 10:11AM
Page 4 of 4
Douglas P. Hanno, Lewis County Clerk    U

RECEIVED AT
LEW CO
CLERK OFC

2004 DEC 16 A 10 55

U2004-00140
12-22-04

U2004-00140
12/22/2004, 12 25PM
Page 1 of 11

Douglas P Hanna, Lewis County Clerk    13

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A NAME & PHONE OF CONTACT AT FILER (optional)
Michelle Capone

B SEND ACKNOWLEDGMENT TO (Name and Address)

Development Authority of the North Country
317 Washington Street
Watertown, NY 13601

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1 DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LEWIS COUNTY DAIRY CORP. | | | |
| 1b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 120 Third Street | Brooklyn | NY 11230 | USA |
| 1d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e TYPE OF ORGANIZATION Corporation | 1f JURISDICTION OF ORGANIZATION New York | 1g ORGANIZATIONAL ID #, if any ☑ NONE |

2 ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 2d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e TYPE OF ORGANIZATION | 2f JURISDICTION OF ORGANIZATION | 2g ORGANIZATIONAL ID #, if any ☐ NONE |

3 SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| DEVELOPMENT AUTHORITY OF THE NORTH COUNTRY | | | |
| 3b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 317 Washington Street | Watertown | NY 13601 | USA |

4 This FINANCING STATEMENT covers the following collateral

SEE ATTACHED SCHEDULE A.

| 5 ALTERNATIVE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6 This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum (if applicable) | | 7 Check to REQUEST SEARCH REPORT(S) on Debtor(s) (optional) [ADDITIONAL FEE] | All Debtors | Debtor 1 | Debtor 2 |

8 OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV 05/22/02)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9 NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

OR **LEWIS COUNTRY DAIRY CORP.**

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|

10 MISCELLANEOUS

U2004-00140
12/22/2004 12 25PM
Page 2 of 11
Douglas P Hanno, Lewis County Clerk   U

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11 ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a ORGANIZATION'S NAME

| OR | | | |
|---|---|---|---|
| 11b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e TYPE OF ORGANIZATION | 11f JURISDICTION OF ORGANIZATION | 11g ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

12 ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a ORGANIZATION'S NAME

| OR | | | |
|---|---|---|---|
| 12b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

13 This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing

14 Description of real estate

**Premises situate in the Town of New Bremen, County of Lewis and State of New York.**

16 Additional collateral description

15 Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest)

17 Check only if applicable and check only one box
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18 Check only if applicable and check only one box
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 05/22/02)

05/30/2008 14:48 FAX 315 785 2591       DANC              → SCHWERZMANN WISE   ☒004



U2004-00140
12/22/2004 12:25PM
Page 3 of 11
Douglas P Hanno, Lewis County Clerk   U

## SCHEDULE A

Damroe Pressure Wall Processor, with agitator, piping, valves, and associated equipment.

Bottle handling equipment, with labeler, label applicator, hot stamp printer, and associated furnishings, conveyors, connectors and supporting machinery.

Tri-Clover Pump with associated tubing, clamps, controllers and associated fittings.

PMO 50-gallon balanced tank.

APV Gaulin Model 1220MS18-2.5 TPS Homogenizer, serial number 88610146, with associated motor, valves and piping.

Heat exchanger.

Tank, curd mill, whey pump and line, loadout pump, associated pumping for all CIP piping, vats, etc.

Muzan diaphram pump.

Cherry Burrell carton filler model Q80-110, serial number 2124.

Excello stainless steel hydraulic caser, model C74-ST-19, with Texas Instruments controls.

Creamery package 1,000 gallon dome top processor, serial number 8829.

Cherry Burrell 600 gallon hinged lid processor.   -         -

Cherry Burrell 300 gallon hinged lid processor model PT, serial number 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.

Case washer with pump.

DeLaval Separator, model MRPX214, serial number 2898315.

Fogg 18-valve half gallon filler, model LH with screw capper and cap feeder.

Intact RM 572 conveyor assembly.

MC57 Cutter.

Trays and cutting heads.

All equipment on the annexed list located at the site of Hoffman and Dudo, Inc., Route 812, Town of New Bremen, Lewis County, New York.

All other machinery, tools and equipment used in the operation of Lewis County Dairy Corp. located at Route 812, Town of New Bremen, Lewis County, New York.

... .. .... .... ... ... ... ....     DANL     → SCHWERZMANN WISE  @005



# Hoffman and Dudo, Inc.

ESTABLISHED 1938

MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE



P.O. BOX 71       7508 STATE ST.       LOWVILLE, NEW YORK  13367       315 - 376 7031

## EQUIPMENT LIST

### OFFICE

1.  Swivel Desk Chair
2.  Wooden Book Case
3.  Coffee maker
4.  Steel 2 door cabinet/closet
5.  Desk
6.  4 - 3 line phone system (Smart talk 308)
7.  Texas Instrument (TI 5045ll Calculator)
8.  Texas Instrument (TI5045 Calculator)
9.  Hole Punch
10. Pencil sharpener
11. Alarm clock digital sparticus
12. Secretary's desk
13. Tape dispenser (3)
14. Chair office (office)
15. Staples
16. Wooden swivel office chair
17. Coat tree
18. Fire extinguisher (2)
19. Oscilating fan
20. Invoice holder/dispenser
21. Shaw walker 4 drawer file
22. Shaw walker 4 drawer fire safe file
23. File holders and baskets (25)
24. Door alarm
25. Wall clock
26. Waste baskets (4)
27. Plastic rug protector (for chair)
28. 6 drawer file box (wooden)
29. Tape dispenser
30. Various office supplies & catalogs

U2004-00140
12/22/2004 12 25PM
Page 4 of 11
Douglas P Hanno, Lewis County Clerk   U



08/30/2004 14:46 FAX 315 785 2591        DANC                → SCHWERZMANN WISE  ☒006



# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## *MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE*

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

Page 2
Equipment list



U2004-00140
12/22/2004 12 28PM
Page 6 of 11
Douglas P. Hanno, Lewis County Clerk    U

### OUTSIDE AND TANK ROOM

31. Picnic table
32. 3 whey tanks with s/s pipe and values
33. whey pump.
34. Stect Cop tank
35. Fire extinguisher
36. Stainless truck ladder
37. 2 truck blocks
38. Wooden extension ladder
39. 1 saw horse
40. 1 truck canvas
41. 1 can    sulfuric acid

### LAB

42. 1 electric hot water heater
43. coat stand
44. 3 garbage cans
45. sanyo refrigerator
46. chest freezer
47. Steel cabinet
48. Wooden chair
49. Wooden stool
50. Wooden cabinet filled with supplies
51. Brabendo moisture test
52. 1 plate drier
53. p ph meter with probe
54. Acid dispenser

55. centrifuge
56. test bottle shaker
57. Balance scale
58. Microscope
59. DHC Slide Reader
60. clock
61. various bottles &supplies for L.
62. scales



05/30/2006 14:49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE    Ø007



# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71          7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

page 3
Equipment list



U2004-00140
12/22/2004 12 26PM
Page  6 of 11
Douglas P  Hanno, Lewis County Clerk    U

### MAKE ROOM

| | |
|---|---|
| 63. Wooden desk | 89. milk unloading pump with line |
| 64. Store countertop with cabinets | 90. Aetiyn torch gaue & cart |
| 65. Toledo scale/ with printer | 91. s/s pin pail with hool pins |
| 66. Paper wrap dispenser | 92. steel COP tank |
| 67. Digital scale with printer | 93. Square s/s/ blance tank |
| 68. Cash register | |
| 69. Impulse sealer (small) | |
| 70. store display case (wooden) | |
| 71. Wooden stool | |
| 72. 4/ 20,000l s/s cheese vats | |
| 73. 2 cheese presses with 4 heads | |
| 74. 1 clock radio | |
| 75. 24 agitator paddles | |
| 76. 12 agitator forks | |
| 77. 8 s/s pails | |
| 78. 1 squeege | |
| 79. 2 s/s forks | |
| 80. 1 s/s table | |
| 81. 1 positive draw whey pump | |
| 82. s/s whey strainer | |
| 83. 2 saw horses | |
| 84. s/s balance tank with pump | |
| 85. 2 Toedo dial scales | |
| 86. 2 Frau separators | |
| 87. 3 s/s drip pans | |
| 88. salt bin with scoop | |



05/30/2004 14:49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE  @006



## *Hoffman and Dudo, Inc.*

ESTABLISHED 1938

### MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71          7608 STATE ST.        LOWVILLE, NEW YORK  13387          315-376-7031

page 4
Equipment list



Douglas P. Hanna, Lewis County Clerk   U

U2004-00140
12/22/2004 12:26PM
Page 7 of 11

UPPER MAKE ROOM

| | |
|---|---|
| 94. | Butter churn |
| 95. | s/s/ tray with wheels |
| 96. | s/s top table |
| 97. | 5 8' tables |
| 98. | Balance scale |
| 99. | hot plate |
| 100. | acid tester with various tubes and bottles |
| 101. | s/s/ butter frame |
| 102 | wooden stool |
| 103. | air compressor |
| 104. | standing fan |
| 105. | 2 vat pasturizers complete |
| 106 | 1 Diari Kool ice bank cooler with compressor |
| 107. | Steel Ladder |
| 108. | S/S balance tank |
| 109. | Cream pump |
| 110. | Steel wash tank |
| 111. | s/s station can |
| 112. | Exhaust fan (window) |
| 113. | Safe |
| 114. | Lunch room table, 3 chairs, bench |
| 115. | 1 steel cabinet |
| 116. | 1 trash barrell |

BOILER HOUSE

| | |
|---|---|
| 117. | Refrigerator |
| 118. | 1 water syste, pump, etc. |
| 119. | Inside oil tank |
| 120. | Large boiler |
| 121. | Small boiler |
| 122. | Wooden step ladder |
| 123. | Boiler water feed tank |
| 124. | Shop vac |
| 125. | Fire extinguisher |

LOADING DOCK AND BACK ROOM

| | |
|---|---|
| 126. | Lewis Shipper Pallet Lift |
| 127. | (2) Compressor for display coolers |
| 128. | Steam heater |
| 129. | 2 wheel cart (wooden) |
| 130. | Deck plate |
| 131. | Trash can |
| 132. | River water system pressure tank |
| 133. | Mammoth cheese press & hoop  complete |
| 134. | 3 s/s milk tanks |
| 135. | positive milk pump |
| 136. | s/s wash tub (2 bay) |
| 137. | 1 5' Step ladder |
| 138. | 1 lift jack |
| 139. | S/S balance tank |
| 140. | Garbage cans |



08/30/2004 14:49 FAX 315 785 2581    DANC    → SCHWERZMANN WISE    ☒009

# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71    750B STATE ST.    LOWVILLE, NEW YORK  13367    315 - 376-7031

page 5
Equipment lits



U2004-00140
12/22/2004 12 25PM
Page 8 of 11
Douglas P. Hanno, Lewis County Clerk  U

### LOADING DOCK AND BACK ROOM cont'd

| | |
|---|---|
| 141. | Deli display case w/ compressor |
| 142. | Eye wash station |
| 143. | Lock out board |
| 144. | Steel cabinent |
| 145. | Sheeter |
| 146. | Cheese cutter |
| 147. | 12' refrigerated display case |
| 148. | 1 electric pallet lift |
| 149. | wash tubs |
| 150. | Box tape sealer |
| 151. | (2) wooden tables |
| 152. | (3) wax tanks |
| 153. | small s/s top table |
| 154. | (3) Large wooden bench |
| 155. | (5) shelf carts |



08/48/2004 14 49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE   ⊠010



# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1988

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

Equipment List
Page 6

<u>SHOP</u>

| | |
|---|---|
| 156. | Air compressor & tank |
| 157. | Vice |
| 158. | Pipe threader |
| 159. | Grind wheel ~ electric |
| 160. | Helarc Welder |
| 161. | Steel work bench |
| 162. | Mechanics wrench set |
| 163. | 5 agitators for parts. |
| 164. | 2 metal file cabinets |
| 165. | ½ inch drill |
| 166. | Tap & die set large |
| 167. | 1 screw driver set |
| 168. | 1 round pointed shovel |
| 169. | Snow shovels (3) |
| 170. | Greese guns (3) |
| 171. | Electric heater |
| 172. | Base board electric heater |
| 173. | Fire extinguisher |
| 174. | Fire extinguisher small (3) |
| 175. | Heli arc guage |
| 176. | Small wheeler pulley |
| 177. | Large wheel puller |
| 178. | Solder gun |
| 179. | 1 small      welder |
| 180. | 1 Hand sye |
| 181. | 1 large hand grinder |
| 182. | 1 large pipe cutter electric |
| 183. | 1 small air  grinder |

U2004-00140
12/22/2004 12 25PM
Page  9 of 11
Douglas P. Hanno, Lewis County Clerk    U



LEWIS COUNTY DAIRY CORP.

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being

PARCEL ONE:  SITUATE in the Town of New Bremen, County of Lewis and State of New York, bounded and described as follows, to wit: BEGINNING at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a right of way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the North easterly boundary of State Land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 658 feet to a post set for the Northeasterly corner in the line of a farm fence; thence South 18 degrees and 30 minutes East along farm fence 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees West along the center of the State Road 389 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning, containing 4 and 35/100 acres of land be the same more or less.

PARCEL TWO:  all THAT TRACT OR PARCEL OF LAND, situate in the Town of New Bremen, County of Lewis, and State of New York, bounded and described as follows:  Beginning at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a Right of Way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the Northeasterly boundary of State land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North Westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 408 feet to a corner; thence South 18 degrees and 30 minutes East 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees, West along the center of the State Road 139 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning.

U2004-00140
12/22/2004 12 25PM
Page 10 of 11
Douglas P. Hanno, Lewis County Clerk   U

<u>AFFIDAVIT</u>

STATE OF NEW YORK    )
COUNTY OF Lewis )   ss.:

ROBERT S. JURAVICH, being duly sworn, deposes and says that:

1.  I am the Executive Director of the Development Authority of the North Country.

2.  This affidavit is given in connection with the recording and filing in the Lewis    County Clerk's office of a financing statement filed for on behalf of the Development Authority of the North Country.

3.  The Authority is a public benefit corporation created by special act of the State Legislature under Title 29 of the Public Authorities Law.

4.  The Authority is exempt, under Section 2719 of the Public Authorities Law, from mortgage recording taxes and recording fees, to wit:

> ". . . nor shall the authority be required to pay any filing or recording fee or transfer tax of any kind on account of instruments filed or recorded by it or on its behalf. Mortgages made or financed (directly or indirectly) by the authority shall be exempt from the mortgage recording taxes imposed by article eleven of the tax law."

_____
Robert S. Juravich

Sworn to before me on

December 20, 2004

_____
Notary Public

AMY B. AUSTIN
Notary Public, State of New York
Qualified in Jefferson County
Commission Expires 1-25-06
No. 4914343

U2004-00140
12/22/2004 12 25PM
Page 11 of 11

Douglas P Hanno, Lewis County Clerk   U

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Michelle Capone

B. SEND ACKNOWLEDGMENT TO   (Name and Address)

NCA
317 Washington Street
Watertown, NY 13601

*U2004-00143*
*12-30-04*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LEWIS COUNTY DAIRY CORP. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 120 Third Street | Brooklyn | NY | 11230 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | corporation | New York | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| North Country Alliance Local Development Corporation | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 317 Washington Street | Watertown | NY | 13601 | US |

4. This FINANCING STATEMENT covers the following collateral:

SEE ATTACHED SCHEDULE A.

||||||||
*U2004-00143*
12/30/2004 11:43AM
Page  1 of 16
Douglas P. Hanno, Lewis County Clerk    U

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |
| Lewis Co. Clerk | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

**LEWIS COUNTY DAIRY CORP.**

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

10. MISCELLANEOUS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | NONE |

12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |
| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing

14. Description of real estate

**Premises situate in the Town of New Bremen, County of Lewis and State of New York**

16. Additional collateral description

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest)

U2004-00143
12/30/2004 11:43AM
Page 2 of 10
Douglas P Hanno, Lewis County Clerk  U

17. Check only if applicable and check only one box
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 05/22/02)

LEWIS COUNTY DAIRY CORP.

ALL that certain plot, piece or parcel of land, with the buildings
and improvements thereon erected, situate, lying and being

PARCEL ONE:   SITUATE in the Town of New Bremen, County of Lewis and
State of New York, bounded and described as follows, to wit:
BEGINNING at a point in the center of the Old Road leading from
Lowville to Croghan North 69 degrees East 139 feet from the East
end of the old bridge crossing Black River at the Easterly margin
of a right of way crossing said property and runs North 31 degrees
West along the Easterly side of Right of Way 125 feet to a corner;
thence South 75 degrees West crossing said Right of Way and along
the North easterly boundary of State Land, so called, 100 feet plus
or minus to the Easterly bank of Black River; thence along Black
River as it crooks and turns a general North westerly direction 163
feet to a small Ash Tree blazed for the Northwesterly corner;
thence North 60 degrees East through Olley land 658 feet to a post
set for the Northeasterly corner in the line of a farm fence;
thence South 18 degrees and 30 minutes East along farm fence 327
feet to the center of the State Road leading from Lowville to
Croghan; thence South 60 degrees West along the center of the State
Road 389 feet to an angle; thence South 69 degrees West along the
approximate center of the Old Road 175 feet to the place of
beginning, containing 4 and 35/100 acres of land be the same more
or less.

PARCEL TWO:   all THAT TRACT OR PARCEL OF LAND, situate in the Town
of New Bremen, County of Lewis, and State of New York, bounded and
described as follows:  Beginning at a point in the center of the
Old Road leading from Lowville to Croghan North 69 degrees East 139
feet from the East end of the old bridge crossing Black River at
the Easterly margin of a Right of Way crossing said property and
runs North 31 degrees West along the Easterly side of Right of Way
125 feet to a corner; thence South 75 degrees West crossing said
Right of Way and along the Northeasterly boundary of State land, so
called, 100 feet plus or minus to the Easterly bank of Black River;
thence along Black River as it crooks and turns a general North
Westerly direction 163 feet to a small Ash Tree blazed for the
Northwesterly corner; thence North 60 degrees East through Olley
land 408 feet to a corner; thence South 18 degrees and 30 minutes
East 327 feet to the center of the State Road leading from Lowville
to Croghan; thence South 60 degrees, West along the center of the
State Road 139 feet to an angle; thence South 69 degrees West along
the approximate center of the Old Road 175 feet to the place of
beginning.

U2004-00143
12/30/2004 11:43AM
Page 3 of 10

Douglas P Hanno, Lewis County Clerk   U

Attachment C



U2004-00140
12/22/2004 12 25PM
Page 3 of 11
Douglas P Hanno, Lewis County Clerk  U

## SCHEDULE A

Damroe Pressure Wall Processor, with agitator, piping, valves, and associated equipment.

Bottle handling equipment, with labeler, label applicator, hot stamp printer, and associated furnishings, conveyors, connectors and supporting machinery.

Tri-Clover Pump with associated tubing, clamps, controllers and associated fittings.

PMO 50-gallon balanced tank.

APV Gaulin Model 1220MS18-2.5 TPS Homogenizer, serial number 88610146, with associated motor, valves and piping.

Heat exchanger.

Tank, curd mill, whey pump and line, loadout pump, associated pumping for all CIP piping, vats, etc.

Muzan diaphram pump.

Cherry Burrell carton filler model Q80-110, serial number 2124.

Excello stainless steel hydraulic caser, model C74-ST-19, with Texas Instruments controls.

Creamery package 1,000 gallon dome top processor, serial number 8829.

Cherry Burrell 600 gallon hinged lid processor.

Cherry Burrell 300 gallon hinged lid processor model PT, serial number 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.

Case washer with pump.

DeLaval Separator, model MRPX214, serial number 2898315.

Fogg 18-valve half gallon filler, model LH with screw capper and cap feeder.

Intact RM 572 conveyor assembly.

MC57 Cutter.

Trays and cutting heads.

All equipment on the annexed list located at the site of Hoffman and Dudo, Inc., Route 812, Town of New Bremen, Lewis County, New York.

All other machinery, tools and equipment used in the operation of Lewis County Dairy Corp. located at Route 812, Town of New Bremen, Lewis County, New York.

⊣ SCHWERZMANN WISE   @005

# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## *MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE*



P.O BOX 71       7508 STATE ST.       LOWVILLE, NEW YORK 13367       315 - 376 7031

## EQUIPMENT LIST

### OFFICE

1. Swivel Desk Chair
2. Wooden Book Case
3. Coffee maker
4. Steel 2 door cabinet/closet
5. Desk
6. 4 – 3 line phone system (Smart talk 308)
7. Texas Instrument (TI 5045ll Calculator)
8. Texas Instrument (TI5045 Calculator)
9. Hole Punch
10. Pencil sharpener
11. Alarm clock digital spactious
12. Secretary's desk
13. Tape dispenser (3)
14. Chair office (office)
15. Staples
16. Wooden swivel office chair
17. Coat tree
18. Fire extinguisher (2)
19. Oscilating fan
20. Invoice holder/dispenser
21. Shaw walker 4 drawer file
22. Shaw walker 4 drawer fire safe file
23. File holders and baskets (25)
24. Door alarm
25. Wall clock
26. Waste baskets (4)
27. Plastic rug protector (for chair)
28. 6 drawer file box (wooden)
29. Tape dispenser
30. Various office supplies & catalogs



U2004-00140
12/22/2004 12 25PM
Page  4 of 11
Douglas P  Hanno, Lewis County Clerk   U



### Hoffman and Dudo, Inc.

ESTABLISHED 1938

MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71     7508 STATE ST.     LOWVILLE, NEW YORK 13367     315 - 376-7031

Page 2
Equipment list



U2004-00140
12/22/2004 12 26PM
Page 8 of 11
Douglas P. Hanno, Lewis County Clerk   U

#### OUTSIDE AND TANK ROOM

31. Picnic table
32. 3 whey tanks with s/s pipe and values
33. whey pump.
34. Steel Cop tank
35. Fire extinguisher
36. Stainless truck ladder
37. 2 truck blocks
38. Wooden extension ladder
39. 1 saw horse
40. 1 truck canvas
41. 1 can  sulfuric acid

#### LAB

42. 1 electric hot water heater
43. coat stand
44. 3 garbage cans
45. sanyo refrigerator
46. chest freezer
47. Steel cabinet
48. Wooden chair
49. Wooden stool
50. Wooden cabinet filled with supplies
51. Brabendo moisture test
52. 1 plate drier
53. p ph meter with probe
54. Acid dispenser

55. centrifuge
56. test bottle shaker
57. Balance scale
58. Microscope
59. DMC Slide Reader
60. clock
61. various bottles &supplies for l.
62. scales



ꝏꝏꝏꝏ ꝏꝏꝏꝏ 14:48 FAX 315 785 2591    DANC    → SCHWERZMANN WISE    ☑007



# Hoffman and Dudo, Inc.

ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

page 3
Equipment list



U2004-00140
12/22/2004 12 26PM
Page 6 of 11
Douglas P Hanna, Lewis County Clerk    U

MAKE ROOM

| | |
|---|---|
| 63. Wooden desk | 89. milk unloading pump with line |
| 64. Store countertop with cabinets | 90. Aetlyn torch gage & cart |
| 65. Toledo scale/ with printer | 91. s/s pin pail with hool pins |
| 66. Paper wrap dispenser | 92. steel COP tank |
| 67. Digital scale with printer | 93. Square s/s/ blance tank |
| 68. Cash register | |
| 69. Impulse sealer (small) | |
| 70. store display case (wooden) | |
| 71. Wooden stool | |
| 72. 4/ 20,000# s/s cheese vats | |
| 73. 2 cheese presses with 4 heads | |
| 74. 1 clock radio | |
| 75. 24 agitator paddles | |
| 76. 12 agitator forks | |
| 77. 8 s/s pails | |
| 78. 1 squeege | |
| 79. 2 s/s forks | |
| 80. 1 s/s table | |
| 81. 1 positive draw whey pump | |
| 82. s/s whey strainer | |
| 83. 2 saw horses | |
| 84. s/s balance tank with pump | |
| 85. 2 Toedo dial scales | |
| 86. 2 Frau separators | |
| 87. 3 s/s drip pans | |
| 88. salt bin with scoop | |



08/30/2004 14:49 FAX 315 785 2591    DANC    → SCHWERZMANN WISE    @008



# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.,        LOWVILLE, NEW YORK  13367        315 - 376-7031

page 4
Equipment list



U2004-00140
12/22/2004 12 25PM
Page 7 of 11
Douglas P. Hanno, Lewis County Clerk    U

### UPPER MAKE ROOM

| | |
|---|---|
| 94. | Butter churn |
| 95. | s/s tray with wheels |
| 96. | s/s top table |
| 97. | 5 8' tables |
| 98. | Balance scale |
| 99. | hot plate |
| 100. | acid tester with various tubes and bottles |
| 101. | s/s butter frame |
| 102 | wooden stool |
| 103. | air compressor |
| 104. | standing fan |
| 105. | 2 vat pasturizers complete |
| 106 | 1 Diari Kool ice bank cooler with compressor |
| 107. | Steel Ladder |
| 108. | S/S balance tank |
| 109. | Cream pump |
| 110. | Steel wash tank |
| 111. | s/s station can |
| 112. | Exhaust fan (window) |
| 113. | Safe |
| 114. | Lunch room table, 3 chairs, bench |
| 115. | 1 steel cabinet |
| 116. | 1 trash barrell |

### BOILER HOUSE

| | |
|---|---|
| 117. | Refrigerator |
| 118. | 1 water syste, pump, etc. |
| 119. | Inside oil tank |
| 120. | Large boiler |
| 121. | Small boiler |
| 122. | Wooden step ladder |
| 123. | Boiler water feed tank |
| 124. | Shop vac |
| 125. | Fire extinguisher |

### LOADING DOCK AND BACK ROOM

| | |
|---|---|
| 126. | Lewis Shipper Pallet Lift |
| 127. | (2) Compressor for display coolers |
| 128. | Steam heater |
| 129. | 2 wheel cart (wooden) |
| 130. | Deck plate |
| 131. | Trash can |
| 132. | River water system pressure tank |
| 133. | Mammoth cheese press & hoop  complete |
| 134. | 3 s/s milk tanks |
| 135. | positive milk pump |
| 136. | s/s wash tub (2 bay) |
| 137. | 1 5' Step ladder |
| 138. | 1 lift jack |
| 139. | S/S balance tank |
| 140. | Garbage cans |



08/30/2004 14:49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE  @009



# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71          7508 STATE ST.          LOWVILLE, NEW YORK  13367          315 · 376-7031

page 5
Equipment lits

### LOADING DOCK AND BACK ROOM cont'd

```
U2004-00140
12/22/2004 12 28PM
Page  8 of 11      U
Douglas P. Hanno, Lewis County Clerk
```

| | |
|---|---|
| 141. | Deli display case w/ compressor |
| 142. | Eye wash station |
| 143. | Lock out board |
| 144. | Steel cabinent |
| 145. | Sheeter |
| 146. | Cheese cutter |
| 147. | 12' refrigerated display case |
| 148. | 1 electric pallet lift |
| 149. | wash tubs |
| 150. | Box tape sealer |
| 151. | (2) wooden tables |
| 152. | (3) wax tanks |
| 153. | small s/s top table |
| 154. | (3) Large wooden bench |
| 155. | (5) shelf carts |



06/48/2004 14 49 FAX 315 785 2591        DANC                → SCHWERZMANN WISE   @010



## *Hoffman and Dudo, Inc.*

ESTABLISHED 1938

MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

Equipment List
Page 6

<u>SHOP</u>

| | |
|---|---|
| 156. | Air compressor & tank |
| 157. | Vice |
| 158. | Pipe threader |
| 159. | Grind wheel – electric |
| 160. | Helarc Welder |
| 161. | Steel work bench |
| 162. | Mechanics wrench set |
| 163. | 5 agitators for parts. |
| 164. | 2 metal file cabinets |
| 165. | ½ inch drill |
| 166. | Tap & die set large |
| 167. | 1 screw driver set |
| 168. | 1 round pointed shovel |
| 169. | Snow shovels (3) |
| 170. | Greese guns (3) |
| 171. | Electric heater |
| 172. | Base board electric heater |
| 173. | Fire extinguisher |
| 174. | Fire extinguisher small (3) |
| 175. | Heli arc guage |
| 176. | Small wheeler pulley |
| 177. | Large wheel puller |
| 178. | Solder gun |
| 179. | 1 small     welder |
| 180. | 1 Hand sye |
| 181. | 1 large hand grinder |
| 182. | 1 large pipe cutter electric |
| 183. | 1 small air  grinder |



U2004-00140
12/22/2004 12 25PM
Page  9 of 11
Douglas P. Hanno, Lewis County Clerk   U



# Attachment D

COLLATERAL ATTACHMENT    949058    2004 Dec 06 PM 12:41 pg. 1

QuantityDescriptionVendor: Urschel Laboratories Incorporated1Urschel Model CCD, S/N: 45451Change Parts: Head Assy, Shred 124V, GL., 8S, 5A, DR1Setting Block, 670 Shred, DD-D1Extra Parts: Knife, Slicing, V-Cut, 8S, Pkg/561Video Tape, CC, Shred Head, NTSCVendor: MTI Communication1Alarm System16Installation of a Sony 1/3" CCD with HAD Waves Technology Hi Res. Color Cameras1Installation of a Dedicated Micro Color Digital Video Recorder for 16 Cameras1Installation of a Indoor/Outdoor weather Resistance Camera Housing with bracket16Installation of a Vari Focal Auto Iris Lens1Installation of a Power Supply for 16 Cameras1Complete Installation and Programming of Access Control System capable of handling up to 256 doors with Anti Passback.200Proximity CardsComplete Installation and required programming of an Avaya IP-403 System. Avaya IP Office is an all-in-one solution specially designed to meet the communications challenges facing the home office, small office and medium enterprise with 2 to 100 extensions.Vendor: Comat2Curd Drainage Case Model CSDR30.251Dispenser Table Model TSP301Pneumatic Mix Cutter and Drum Molds MC241Cheese Cooker Stretcher Unico Model STR4Vendor: LDS Technologies Inc.1Reverse Osmosis Command System with Logical Interfaces including CPU-43 and I/O modules.Vendor: Cyclotherm of Watertown, Inc.1LPF 60-C-2N Boiler, 200 P.S.I. S/N: 26003, Gas and #2 oil optionVendor: Pac 'n' Wrap Corporation3"A" Automatic continuous Frame Press. 40 lb., block stainless steel, 8-row 4x4x7 high adjustable P.S.I. with 160 stainless steel hoops; S/N's KOSLOO-41, KOSLOO-42, KOSLOO-43Vendor: General Machinery Corporation1One Model 3000 TU-WAY Pneumatic Cheese Portioner, designed to accommodate wire cuttable cheese up to 7" high, 11" wide and 14" long, with vertical and horizontal cutting frames set to cut 1 1/2" x 1 1/2" x 1 1/2" portions, and cutting blocks to match, all of stainless steel or otherwise easily cleaned construction, equipped with pneumatic controls, casters safety lockout door, cheese positioners angles discharge chute, ready to install and operate on delivery.

**950862**          **2004 Dec 10 PM12:39**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: [Name and Address]

    UCC Direct Services
    2727 Allen Parkway
    Houston, TX 77019, USA
    nyark@uccdirect.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #  200412066015924 Filedate: 06-DEC-04

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] [or recorded] in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor _or_ ☐ Secured Party of record. Check only _one_ of these two boxes.
Also check _one_ of the following three boxes _and_ provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any   ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only _one_ box.

Describe collateral ☐ deleted _or_ ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.
Quantity/Description:Vendor: Urschel Laboratories Incorporated1One new Urschel Laboratories Model CC-D Food Slicer, S/N: 4546Vendor: MTI Communications1New Avaya Model IP-403 Voice and Data Communications System. The communications system is complete with 28 incoming/outgoing lines, 24 digital extensions, 2 analog extensions, 8 port 180ST switch terminals and a 8 port voice mail system. The system also includes a Gemini Alarm System, 16 sony security cameras with a sony digital video recorder and an access control system.Vendor: LDS Technologies Inc.1Reverse Osmosis Command System with Logical Interfaces including CPU-42 and I/O modules.Vendor: Cyclotherm of Watertown, Inc.1LPF 88-C-2N Boiler, 268 P.S.I. S/N: 28063, Gas and #2 oil option.Vendor: Pac 'n' Wrap Corporation2"A" Automatic continuous Frame Press. 40 lbs. block stainless steel, 6-row 4x4x7 high adjustable P.S.L with 156 stainless steel hoops; EIN's KOSLOD-41, KOSLOD-42, KOSLOD-43.Vendor: General Machinery Corporation1One Model 3008 TU-MAY Pneumatic Cheese Portioner, designed to accommodate wire cutable cheese up to 7" high, 11" wide and 14" long, with vertical and horizontal cutting frames set to cut 1 1/2" x 1 1/2" x 1 1/2" portions, and cutting blocks to match, all of stainless steel or otherwise easily cleaned construction, equipped with pneumatic controls, casters safety lockout door, cheese positioners angles discharge chute, ready to install and operate on delivery.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME  INTERCHANGE BANK | | | |
|---|---|---|---|
| OR  9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA  NY-0-12701649-JHADAI

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## Filing Number-200412106033354

**Attachment E**

ST. LAWRENCE FOOD CORPORATION

008970        2005 FEB 16  AM 9: 00

**SCHEDULE "A"**

Cleaver Brooks Boiler (800 HP)
    CB Packaged Boiler
    Model CB 400-800
    SN: L-85651

Cleaver Brooks Boiler (800 HP)
    CB Packaged Boiler
    Model CB 800 HP  Series 400
    SN: L-59963

Aurora Pump
    Model 431 with accessories
    SN: 04-1005881

Culture Vat
    Debelak Technical Systems
    Control Panel w/ 2 chart recorders
    ABB N/28405/6/6
    ABB N/28405/6/5
    Chemical pumps (2)
    Knight PMP Series
    SN: 892759
    SN: 892760
    Resource Controller Model 1055
    SN: L03-227459463

    Cooling System
    Three Heat Exchangers
    #1 Delta Model M3
    #2 Delta Model M6
    #3 Delta Model M3
    Stainless Steel Plates
    Packaged Cooling System 37586
    Skid Mounted Pump Model PS-30
    Three Pumps
    #1 30 GPM @ 60 TDH TEFC 460/3/60
    #1 30 GPM @ 60 TDH TEFC 460/3/60
    #1 35 GPM @ 60 TDH TEFC 460/3/60
    Heat Plates
    L003450E LCC (End)
    R023400 RAC
    R120400 RBA
    L1200505 LBB
    L120050E LBB (End)

A-966 Suction Bell Heater (j.w. stevens co)

Direct-Drive Wall Exhaust Fan (2)
    McMaster Part # 2187K18

Portable Heavy Duty Dehumidifier
    McMaster Part # 2129K32

Process Cheese Line
    11G cheese grinder for 40# blocks (#6761)
    20 HP motor c/p attachments for top & front of
      grinder
    11S-300 Koss single screw 300lb cooker (#35005)
    500# scraped surface cone bottom  (#3038)
    surge hopper existin gunit (#3038)
    Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp c-face, gear reducer & SS
    base w/coupling guard
    dual wedge wire strainer assembly  (#75010)
      with automatic switching
    500# scraped surface cone bottom
    surge hopper 1hp super E for adding  (#8716)
      condiments
    Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp C-face, gear reducer & SS
    base w/coupling guard
    cone bottom vacuum hopper w/ sediment (#8717)
    Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp C-face gear reducer & SS
    base with coupling guard
    single lane box filler station for 3# to  (#10511)
      to 6# fill
    single lane box filler indexing
    conveyor under filler 3# to 6# fills  (#55172)
    control panel w/chart recorder; AB PLC high
      voltage panel, AC drives, motor starters &
      disconnect
    catwalk to support grinder, pallet of  (#10510)
      of cheese & 1 person

**EXHIBIT A**

~~FORM OF FACILITY A NOTE~~

U.S. $2,000,000                                                    New York, New York
                                                                  As of August 22, 2005

FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "**Borrower**") promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "**Bank**"), at its office located at 565 Fifth Avenue, New York, New York 10017 (or at such other place the Bank designates in writing) the principal sum of Two Million and 00/100 ($2,000,000), in lawful money of the United States of America and in immediately available funds, on the Facility A Maturity Date (as defined in the Credit Agreement (defined below)), and sooner as required below and under the Credit Agreement, in the manner provided in the Credit Agreement.

The Borrower further promises to pay principal as set forth in <u>Section 2A.01</u> of the Credit Agreement from the date hereof until the Facility A Loan is paid in full, all at the Adjusted LIBO Rate and at the times set forth in the Credit Agreement.

This Note is the promissory note made pursuant to Section 2A.01 of that certain Master Credit Facility Agreement dated as of August 22, 2005 (as amended, modified or supplemented from time to time, the "**Credit Agreement**"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility A Loan made by the Bank under the Credit Agreement, and in particular Section 2A.01 thereof. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in <u>Section 8.17</u> thereof.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles other than as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

A-1

HF 3082102v.7 #06406/0023

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.


By:_____
        Name:
        Title:


A-2

**EXHIBIT B**

FORM OF FACILITY B NOTE

$5,500,000                                                    New York, New York
                                                             As of August ~22~ 2005

     FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "**Borrower**"), hereby promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "**Bank**") at its office located at 565 Fifth Avenue, New York, New York 10017, or at such other place the Bank designates in writing, the principal sum of Five Million Five Hundred Thousand Dollars and 00/100 ($5,500,000) or, if less, the then outstanding principal amount loaned by the Bank to the Borrower as Facility B Loans (as defined in the Credit Agreement (defined below)) pursuant to the Credit Agreement, in lawful money of the United States of America and in immediately available funds, on the Facility B Termination Date (defined below), or sooner if required under the Credit Agreement, and in the manner provided in the Credit Agreement.

     The Borrower further promises to pay interest on the unpaid principal balance hereof, for the period such balance is outstanding, at the said office of the Bank, or at such other place as the Bank directs in writing, in like money, at the rate(s) of interest as provided in the Credit Agreement (for Facility B Loans) on the dates and in the manner provided in the Credit Agreement.

     The date and amount of each Facility B Loan made by the Bank to the Borrower under the Credit Agreement, and each payment of principal thereof, shall be recorded by the Bank on its books and prior to any transfer of this Note (or, at the discretion of the Bank, at any other time), endorsed by the Bank on Schedule A attached hereto or any continuation thereof; provided however, that the failure of the Bank to make such a notation or any error therein shall not affect the obligation of the Borrower to repay the Facility B Loans made by the Bank in accordance with the Credit Agreement and this Note.

     This Note is the promissory note made pursuant to Section 2B.02 of that certain Master Facility Credit Agreement dated as of August ~22~ 2005 (as amended, modified or supplemented from time to time, the "**Credit Agreement**"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility B Loans made by the Bank under the Credit Agreement. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

     The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

B-1

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in <u>Section 8.17</u> thereof.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles except as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

B-2

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.

By:_____
      Name:
      Title:

B-3

## SCHEDULE A

| Loan | Date | Amount of Payment | Balance Outstanding | Notation By |
|------|------|-------------------|---------------------|-------------|
|      |      |                   |                     |             |

B-4

**EXHIBIT C**

**FORM OF BORROWING BASE CERTIFICATE**

dated:_____

| | | |
|---|---|---|
| I. | Gross Accounts receivable at | $_____ |
| II. | Less:<br>  i.   Amounts greater than 90 days past invoice date<br>  ii.  Credits greater than 90 days past due date<br>  iii. Cross-age @ 75% (90 days)<br>  iv. Cooperative Dairy Marketing LLC<br>  v.  North Central Companies<br>  vi. City Glatt<br>  vii. Reserve for NSF customer checks<br>  viii. Contra accounts | (          )<br>(          )<br>(          )<br>(          )<br>(          )<br>(          )<br>(   25,000  )<br>(          )<br>$_____ |
| III. | Eligible accounts receivable (I-II) | $_____ |
| IV. | Advance rate | <u>80%</u> |
| V. | Available account receivable (III* 80%) | $_____ |
| VI. | Ahava perpetual inventory at _____ | $_____ |
| VII. | Lewis County perpetual inventory at _____ | $_____ |
| VIII. | Total Finished Inventory (VII-VIII) at _____ | $_____ |
| IX. | Less: | _____ |
| X. | Eligible inventory (VIII-IX) | $_____ |
| XI. | Advance rate | <u>40%</u> |
| XII. | Total available inventory  (VIII* 40%)<br>(capped at the lesser of total available inventory and $1,000,000) | _____ |
| XIII. | Total available collateral (V+XII) | $_____ |
| XIV. | Revolving Credit Exposure | $_____ |
| XV. | Excess (Deficit) (XIII-XIV) | $_____ |

Certified Correct & Accurate:

_____
Moise Banayan, President
Ahava Food Corp.

C-1

HF 3082102 v.7 #06406/0023

**EXHIBIT D**

**FORM OF GUARANTY**

### JOINT AND SEVERAL
### GUARANTY OF PAYMENT

In order to induce SIGNATURE BANK (which together with its successors, endorsees and assigns, is hereinafter called the "**Bank**") to enter into the Loan Agreement (defined below) and to make advances, loans or extensions of credit, directly or indirectly, to AHAVA FOOD CORP. (hereinafter called "**Ahava**") and in consideration thereof and of any loans, advances, or other financial accommodations heretofore or hereafter granted by the Bank to or for the account of the Borrower, and to grant to the Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of rights as the Bank may deem advisable, and for other valuable consideration, the receipt of which is hereby acknowledged, the Guarantors (as defined in the Loan Agreement; each Guarantor being hereinafter an "**undersigned**") hereby jointly and severally, absolutely and unconditionally guaranty to the Bank the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, and the full and prompt payment by the Borrower of all of its Indebtedness (as hereinafter defined), whether now existing or hereafter arising from time to time, and promises to pay to the Bank, or order, on demand, in lawful money of the United States, all of the Indebtedness of the Borrower, and all out-of-pocket costs and expenses, including reasonable attorneys fees and legal expenses, paid or incurred by the Bank in endeavoring to collect the Indebtedness, or any part thereof, and in enforcing this Guaranty. All payments made in connection with this Guaranty shall be in lawful money of the United States of America in immediately available funds.

1.    **Terms as Defined in Loan Agreement.** Capitalized terms used herein, that are not otherwise defined herein, shall have the meanings given to them in the Loan Agreement.

2.    **Definition of Indebtedness.** The term "**Indebtedness**" is used herein in its most comprehensive sense and includes the principal of and interest on and all other sums payable with respect to any and all advances, debts, reimbursements, obligations and liabilities of the Borrower to the Bank (including any interest which, but for the application of the provisions of the U.S. Bankruptcy Code, would have accrued on such amounts), heretofore, now or hereafter made, incurred, created, or arising, whether originally contracted with the Bank or with another and transferred to the Bank or otherwise acquired by the Bank, whether direct or indirect, absolute or contingent, voluntary or involuntary, joint or several, due or to become due, liquidated or unliquidated, determined or undetermined, secured or unsecured, matured or unmatured, has any right or power to assert any claim or defense to the validity or enforceability thereof.

3.    **Obligations.** Each undersigned's obligations hereunder are independent of the obligations of the Borrower and of each other undersigned, and a separate action or actions may be brought and prosecuted against any undersigned, irrespective of whether an action is brought against the Borrower or any other undersigned, or whether the Borrower or any other undersigned is joined in any such action or actions. Each undersigned waives the benefit of any statute of limitations affecting such undersigned's liability hereunder or the enforcement hereof to the fullest extent permitted by law.

D-1

**4.    Indemnity.** Each undersigned agrees to indemnify and hold the Bank harmless from and against all claims, actions, causes of action, demands, obligations, liabilities, losses, ~~costs and expenses in connection with, on account of, or in any way relating to or arising from~~ the Bank's transactions with any of the undersigned; provided, that the forgoing indemnification shall not extend to liabilities, damages, losses, obligations, judgments and expenses arising from the gross negligence or willful misconduct of the Bank.

**5.    Continuation of Terms.** This Guaranty shall not be affected or impaired by any modifications, supplements, extensions or amendments of any contract or agreement to which the parties thereto may hereafter agree, nor by any modifications, releases or other alterations of any of the Indebtedness hereby guarantied or of any security therefor, nor by any agreements or arrangements whatever with the Borrower or any other Person.

**6.    Acknowledgement.** Each undersigned agrees that its liability hereunder shall remain unaffected in any way notwithstanding the fact that the Bank may, without notice or demand, from time to time and any number of times, take any or all of the following actions:

(a)    renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon;

(b)    take and hold security for the payment of this Guaranty or the Indebtedness from the Borrower, another undersigned or another Person, and exchange, enforce, waive and release any such security;

(c)    apply such security and direct the order or manner of sale thereof as the Bank in its discretion may determine;

(d)    release or substitute any other undersigned, guarantors, sureties, or endorsers of the Indebtedness; and

(e)    assign, without notice, this Guaranty in whole or in part, or the Bank's rights hereunder, to any Person at any time in accordance with Section 8.14 of the Loan Agreement.

**7.    Waivers.** Each undersigned waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Indebtedness guarantied hereunder, has destroyed any of such undersigned's rights of subrogation and reimbursement against the Borrower. Each undersigned subordinates, and agrees not to assert, any right of subrogation, contribution, indemnity or reimbursement that such undersigned has or may have against the Borrower with respect to the Indebtedness guarantied hereunder until such time as the Indebtedness guarantied hereunder has been indefeasibly paid in full. Each undersigned waives any right to require the Bank to (a) proceed against the Borrower, any other undersigned or any other Person; (b) proceed against or exhaust any security held from the Borrower or any other undersigned; or (c) pursue any other right or remedy in the Bank's power whatsoever. Each undersigned waives any

defense arising by reason of any disability or other defense of the Borrower or any other undersigned, or by reason of the cessation from any cause whatsoever of the liability of the ~~Borrower. Each undersigned agrees that nothing shall discharge or satisfy its liability hereunder~~ except the full and indefeasible payment and performance of all of Ahava's Indebtedness and obligations to the Bank with interest. Ahava's Indebtedness and obligations shall not be considered indefeasibly paid until all payments to the Bank are no longer subject to any right, by any Person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential. In the event any portion of any such payments shall be set aside or restored, then each undersigned shall be jointly and severally liable for the full amount the Bank is required to repay, plus any costs and expenses (including attorneys fees) paid by the Bank in connection therewith. Any and all present and future debts and obligations of the Borrower to any undersigned are hereby postponed in favor of and subordinated to the full payment and performance of all of each undersigned's obligation under this Guaranty to the Bank. Each undersigned agrees that the Bank's books and records showing the account between the Bank and the Borrower shall be admissible in any action or proceeding and shall be binding upon each undersigned (and the Bank) for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. Each undersigned waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notices of acceptance of this Guaranty and of the existence, creation or incurrence of new or additional Indebtedness, notice of any and all favorable and unfavorable information, financial or otherwise, about the Borrower or any other undersigned, heretofore, now or hereafter learned or acquired by the Bank and all other notices to which each undersigned might otherwise be entitled.

8. **Maintenance of Information.** Each undersigned hereby represents to the Bank that the undersigned is and will remain informed of the financial condition of the Borrower and of all other circumstances which bear upon the risk of non-payment of the Indebtedness and any other obligations of the Borrower guarantied hereby. Each undersigned agrees that the Bank is not obligated to inform any undersigned of any such circumstances, whether now existing or hereafter arising, and that the Bank is not required to inquire into the powers of the Borrower or the officers, directors, partners, agents or other Related Parties acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guarantied hereunder.

9. **Attorneys Fees.** Each undersigned agrees to pay reasonable attorneys fees (including the allocated costs of the Bank's in-house counsel) and all other costs and expenses which may be incurred by the Bank in the enforcement of this Guaranty or any claim hereunder.

10. **Amendments In Writing.** No termination or modification of this Guaranty shall be effective for any purpose unless it is in writing and executed by an authorized officer of each undersigned and of the Bank.

11. **Demand Payment.** Each undersigned agrees that upon the occurrence and during the continuing of any "Event of Default" under the Loan Agreement or any other Loan Documents, the undersigned, immediately following a demand in writing for payment from the Bank, shall pay the Bank the amount of the Indebtedness then due and owing. Each undersigned

further agrees that upon the acceleration by the Bank of the Indebtedness and the Bank's demand for payment thereof, the undersigned shall pay to the Bank the full amount of such accelerated Indebtedness.

**12.    Successors and Assigns.** The termination or dissolution of any or all of the undersigned shall not terminate this Guaranty. This Guaranty shall be binding upon the successors and assigns of each undersigned and shall inure to the benefit of the Bank, its successors and assigns.

**13.    Collateral; Right of Setoff.** As collateral security for the performance of this Guarantee and all other obligations of any or all of the undersigned to the Bank, whether now or hereafter owed to, or held by, the Bank and/or any Affiliate thereof, including, without limitation, the Indebtedness, each undersigned hereby grants to the Bank a security interest in and transfers and assigns to the Bank the following property: (i) any and all monies and/or other property now or hereafter held by the Bank and/or any Affiliate on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to such undersigned or in which such undersigned shall have any interest, (ii) any and all claims and demands, presently existing or hereafter arising, and all interest heretofore or hereafter accrued thereon, and any and all collateral or security interests relating thereto and the proceeds thereof, which such undersigned now has or may hereafter have or acquire against the Borrower (such claims and demands referred to herein as the "**Claims**") and (iii) any and all property of such undersigned now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting the Bank or any Affiliate a security interest or other lien or encumbrance and (iv) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Indebtedness, together with all amendments, modifications, renewals, or extensions thereof and any additions and accessions thereto and substitutions therefore and the products and proceeds thereof. All of the property described in clauses (i), (ii), (iii), and (iv) above shall be collectively referred to herein as the "**Collateral**". The Bank at any time may, but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the Collateral, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like Collateral any or all interest, dividends and income thereon and if any securities are held in the name of Bank or its nominee. To the extent any Collateral is transferred into the Bank's (or an Affiliate's) own name, the Bank, at any time may, but shall not be obligated to, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner thereof, but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the Collateral against prior parties, or to take any action whatsoever in regard to the Collateral or any part thereof, all of which such undersigned assumes and agrees to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any Collateral, unless such undersigned gives written notice to the Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. At any time, without demand or notice, if permitted by applicable law, the Bank may setoff all deposits, credits, collateral and property, now or hereafter

D-4

in the possession, custody, safekeeping or control of the Bank or any of its Affiliates, or in transit to any of them, or any part thereof and apply the same to any of the Indebtedness even though unmatured and regardless of the adequacy of any other collateral securing the Indebtedness. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE INDEBTEDNESS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY OF THE UNDERSIGNED, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

14.     **Incorporation by Reference.** Sections 1.03, 8.04, 8.08, 8.09, 8.10, 8.18, 8.20, 8.21 and 8.22 of the Loan Agreement are hereby incorporated by reference into this Guaranty, and shall apply, mutatis mutandis, to this Guaranty.

[signatures appear on the following page.]

D-5

~~IN WITNESS WHEREOF, the undersigned have executed this Guaranty this 22~~nd~~ day of August,~~
2005.

WITNESS/ATTEST:

ST. LAWRENCE FOOD CORP.

By: _____ _____
    Name:
    Title:

LEWIS COUNTY DAIRY CORP.

By: _____
    Name:
    Title:

YONI REALTY, LLC

By: _____
    Name:
    Title:

MOISE BANAYAN

D-6

**EXHIBIT E**

FORM OF

## LANDLORD'S WAIVER AGREEMENT

LANDLORD'S WAIVER AGREEMENT dated as of August __, 2005, made by, _____ having an address at _____ (the "the Landlord"), in favor of SIGNATURE BANK, a New York banking corporation (the "Bank").

PRELIMINARY STATEMENTS

(1) _____ (the "Tenant") is party to credit agreements of one kind or another with the Bank, including, without limitation that certain Master Credit Facility Agreement, dated as of August 22, 2005, among Ahava Food Corp., St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank (such credit agreements, collectively, as amended, modified, supplemented or restated from time to time being hereinafter, the "Credit Agreement").

(2) Pursuant to the Credit Agreement and to secure the payment and performance of all of the Tenant's obligations and liabilities to the Bank under the Credit Agreement (collectively, the "Tenant's Liabilities"), the Tenant granted to the Bank a security interest in and to all of the Tenant's equipment, inventory, accounts, chattel paper, instruments, deposit accounts, general intangibles and other obligations, whether now existing or hereafter acquired by the Tenant, wherever located, and all proceeds and products of any and all of the foregoing, together with certain other collateral granted to the Bank, all as more fully described in one or more security agreements (and referred to therein and herein on a collective basis as the "Collateral").

(3) Some or all of the Collateral is now and/or from time to time hereafter may be located at the Tenant's leased premises commonly known and described as _____ (the "Leased Premises"), which Leased Premises are owned and leased by the Landlord, in whole or in part, to the Tenant pursuant to an oral lease (as extended, amended, modified, supplemented, replaced or restated from time to time, the "Lease").

(4) The Tenant may request loans, advances or other financial accommodations from the Bank pursuant to the Credit Agreement, and the Bank, as a condition precedent to making such loans, advances or other financial accommodations available to the Tenant, requires that the Landlord execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to make the loans, advances or other financial accommodations under the Credit Agreement, the parties hereto do agree as follows:

1. The Landlord waives each and every right that the Landlord now has or hereafter may have, under the laws of the State of _____, or by virtue of the Lease, or by virtue of the Tenant's occupation of the Leased Premises to distrain upon, or to claim or assert

E-1

any lien, right or title to any or all of the Collateral, which now is or hereafter may be located at the Leased Premises, whether for rent (in arrears or in advance) or for any other monetary obligation arising as a result of, or due to a default by, the Tenant under the Lease.

     2.    The Landlord agrees that the Collateral (i) is and shall remain personal property notwithstanding the manner or mode of the attachment of any item of Collateral to the Leased Premises, and (ii) is not and shall not become or be deemed to be fixtures or to be property otherwise subject to the Landlord's rights under the Lease.

     3.    The Landlord recognizes and acknowledges that the security interest of the Bank in the Collateral is superior to any lien, right, claim or title of any nature which the Landlord now has or hereafter may have or assert in or to the Collateral pursuant to statute, the Lease, other agreement or otherwise

     4.    In the event of default by the Tenant in the payment or performance of any of the Tenant's Liabilities, but subject to all terms and provisions of the Lease, the Bank may remove the Collateral or any part thereof from the Leased Premises in accordance with the terms and conditions of the Lease, the Credit Agreement and statutory law pertaining thereto without objection, delay, hindrance or interference by the Landlord, and in such case the Landlord will make no claim or demand whatsoever against the Collateral. In the event of any such default by the Tenant, the Landlord agrees that, at the Bank's option, the Collateral may remain upon the Leased Premises for a period not to exceed thirty (30) days after the receipt by the Bank of written notice from the Landlord directing its removal; provided, however, that the Bank shall be required to pay all rent (of any nature whatsoever) due and payable under the terms of the Lease attributable to any period of time when the Bank is exercising the foregoing right (but not on account of rent arrears accruing prior to or after the Bank's exercise of such rights).

     5.    The Bank may, without affecting the validity of this Agreement, extend, amend, modify, supplement or restate in any way, the Credit Agreement and the terms of payment or performance of any of the Tenant's Liabilities, without the consent of the Landlord and without giving notice thereof to the Landlord.

     6.    This Agreement shall inure to the benefit of the successors and assigns of the Bank and shall be binding upon the heirs, personal representatives, successors and assigns of the Landlord.

     7.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

     8.    This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all which when taken together shall constitute one and the same agreement.

[Signatures appear on the following page.]

E-2

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the date first above written.

[LANDLORD]

By:_____

       Name:

       Title:


SIGNATURE BANK

By:_____

       Name:

       Title:


Agreed to and Acknowledged
this _____ day of August, 2005


[TENANT]

By:_____

       Name:

       Title:

HF 3082102 v 7 #06406/0023

**EXHIBIT F**

~~WAREHOUSE NOTIFICATION AND ACKNOWLEDGMENT~~

OF SECURITY INTEREST

_____, 20__

CERTIFIED MAIL/RETURN RECEIPT REQUESTED

[Name and Address of Addressee]

Gentlemen/Ladies:

Please be advised that Signature Bank ("Signature") may from time to time extend credit to Ahava Food Corp. (the "Borrower") and/or one or more of its affiliates either under that certain Master Credit Facility Agreement dated on or about August 22, 2005 (as the same may be hereafter amended, modified, supplemented, restated or replaced the "CA") or under other facilities. In connection with the CA and other financial accommodations provided by Signature, each of the Borrower, St. Lawrence Food Corp. ("SLF Corp"), Lewis County Dairy Corp. ("LCD Corp") and Yoni Realty, LLC ("YR LLC", and collectively with SLF Corp, LCD Corp, the "Corporate Guarantors"; and the Corporate Guarantors together with the Borrower, the "Collateral Grantors") has granted or will grant to Signature a security interest in, among other collateral, all of its existing and future inventory, including without limitation, all goods which may at any time now or hereafter be located on or in real property, buildings, rail cars or other equipment or facilities owned, leased or otherwise in your possession or control (collectively, the "Facilities").

By your signature below, you acknowledge receipt of the above notice of Signature's security interest and you agree to hold the collateral for its benefit, and agree to follow all instructions that Signature may from time to time hereafter give to you with respect to all goods of any of the Collateral Grantors and/or their affiliates which are at any time located on or in the Facilities.

For the present, Signature consents to your continuing to release goods pursuant to the instructions given you by the Borrower, or any authorized agent of any of the Collateral Grantors, but this consent may be terminated or changed at any time by notice to you from Signature. Upon being so notified by Signature you are to abide solely by Signature's instructions with respect to any of such goods and you are not to release any of the goods to any of the Collateral Grantors or to anyone else except according to written instructions that may be given to you from time to time by Signature.

F-1

You agree and acknowledge that you do not have, and in no event will you assert as against Signature, any lien, right of distraint or levy, right of offset, claim, deduction, counterclaim, security or other interest in any goods of any of the Collateral Grantors and/or their respective affiliates now or hereafter located in or on any of the Facilities, which might otherwise arise or exist in your favor pursuant to any agreement, common law, statute (including the United States Bankruptcy Code) or otherwise. You certify that you do not know of any security interest or other claim with respect to such goods other than the security interest which is the subject of this agreement. You agree and acknowledge that no negotiable or non-negotiable warehouse receipts, documents of title or similar instruments have been or will be issued by you with respect to any of the goods of any of the Collateral Grantors or their affiliates, except for nonnegotiable receipts naming Signature or such Collateral Grantors in an appropriate capacity. You shall not take any action purporting to encumber or transfer any interest in such goods. The provisions of this paragraph are intended to be solely for the benefit of Signature and shall not confer any rights upon any of the Collateral Grantors or anyone else other than Signature.

You further agree to allow Signature and its designees to enter upon and have access to the Facilities during business hours for the purpose of examining, removing, taking possession of or otherwise dealing with any goods of any of the Collateral Grantors and/or their affiliates at any time in your possession, or making copies of any books and records related thereto; provided, however, that Signature shall promptly pay to you the per diem charges (at the rate charged to such Collateral Grantors for storage immediately prior to the commencement of such exercise of access rights by Signature ) for each day when Signature is exercising such access rights at the Facilities. You agree that payment by Signature of any such sum shall not be construed as an assumption of any obligations of any of the Collateral Grantors to you.

You understand that Signature is relying upon this acknowledgement in connection with its financing arrangements with the Collateral Grantors. This agreement shall be binding upon your successors and assigns and shall inure to the benefit of Signature and its successors and assigns.

The consent of each of the Collateral Grantors hereto constitutes its acknowledgment that Signature may asset any of the rights set forth or referred to herein, and that the Borrower shall have no objection or claim with respect thereto.

*[Signatures appear on the following page.]*

F-2

HF 3082102 v.7 #06406/0023

Please acknowledge your agreement to the foregoing by signing in the space provided below.

Very truly yours,

**SIGNATURE BANK**

By: _____
         Its

CONFIRMED AND APPROVED IN ALL RESPECTS:

**AHAVA FOOD CORP.**

By: _____

**ST. LAWRENCE FOOD CORP.**

By: _____

**LEWIS COUNTY DAIRY CORP.**

By: _____

**YONI REALTY, LLC**

By: _____

The undersigned, being the Facilities owner or operator identified above, acknowledges its receipt and understanding of, and its consent and agreement to the foregoing Warehouse Notification and Acknowledgement of Security Interest in all respects.

_____

By: _____
         Its

Date Signed: _____

F-3

<u>EXHIBIT G</u>

~~FORM OF COMPLIANCE CERTIFICATE~~

### AHAVA FOOD CORP.
#### Compliance Certificate of Officer

Re:     Master Credit Facility Agreement dated as of August 22, 2005 (the "<u>Credit Agreement</u>") among Ahava Food Corp. (the "<u>Borrower</u>"), St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and Signature Bank (the "<u>Bank</u>")

      I, Moise Banayan, hereby certify that I am the President of AHAVA FOOD CORP., a New York corporation (the "**Obligor**"), and that, as such officer, I have access to their corporate records and am familiar with the matters herein certified, and I am authorized to execute and deliver this Certificate in the name and behalf of the Obligor, and that:

      (a)     This certificate is being delivered pursuant to Section 5.03(i) of the Revolving Credit Agreement, dated as of August 22, 2005 (the "**Credit Agreement**"), between the Obligor and Signature Bank. The terms used in this certificate and not defined herein have the respective meanings specified in the Credit Agreement.

      (b)     Except as set forth on Exhibit B attached hereto, no Event of Default exists.

      (c)     Attached hereto as Exhibit A are the calculations demonstrating compliance with the financial covenants set forth in Sections 6.09, 6.10, and 6.11 of the Credit Agreement.

      IN WITNESS WHEREOF, I have executed this certificate in the name and on behalf of the Obligor on (date)_____.


                    AHAVA FOOD CORP.

                    By: _____
                        Name: Moise Banayan
                        Title: President

**Exhibit (A)**

As of _____

I.   Section 6.09 **Leverage Ratio**
     Calculation: Ratio of:
         (a)   Total Liabilities                          $ _____
               to the sum of
         (b)   Tangible Net Worth
               plus Approved Sub. Debt                    $ _____
     Ratio (Actual) (a) / (b):                            _____

     Requirement:                                         A maximum of 3.0 to 1.0
     Compliance: (Yes/No)                                 _____

II.  Section 6.10 **Debt Service**
     Calculation: Ratio of :
         (a) EBITDA                                       $ _____
         Minus: (b) Unfunded CAPEX                        $ _____
         (a-b) Result                                     $ _____
         Divided by the sum of:
         (c) CPLTD                                        $ _____
             plus
         (d) Interest                                     $ _____
         (c+d) Result                                     $ _____
     Ratio (Actual): (a-b) / (c+d):                       _____
     Requirement:                                         **1.25x Minimum**
     Compliance: (Yes/No):                                _____

III. Section 6.11 **Net Loss**
     Requirement:                                         Net profit $\geq$ $1.00 for each fiscal quarter
     Actual:                                              $ _____

     Compliance: (Yes/No):                                _____


_____
Moise Banayan, President

G-2

HF 3082102 v.7 #06406/0023

<u>**Exhibit (B)**</u>
(Events of Default)

---

_____
Moise Banayan, President

G-3

SIGNATURE BANK

Schedule 3.06 – Actions Relating to
Ahava Food Corp. or the Obligors

| Name of Plaintiff | Name of Defendant | Jurisdiction of Action | Amount in Controversy |
|---|---|---|---|
| American Equities Group, Inc. | Ahava Dairy Products Corp., Lewis County Dairy Corp, Ahava Food Corp. and Moise Banayan | U.S. Bankruptcy Court, S.D.N.Y. Adv. Pro. No. 01-2580 | $8,000,000 -- Plaintiff alleges breach of payments by Ahava Dairy Products Corp. under a factor agreement; Defendants dispute the allegations and allege full payment |
| GE Capital | Ahava Food Corp. | NY Supreme Court Case No. 602140/2005 | $1,000,000 – Plaintiff alleges breach of payments by Ahava Food Corp. under an equipment lease; Defendant disputes the allegations and alleges improper equipment liens |

SIGNATURE BANK

Schedule 3.11 – Subsidiaries or Affiliates of
Ahava Food Corp. or the Obligors

1. No Obligor has any subsidiary.

2. The name, jurisdiction and ownership of each Obligor, all of which are affiliates of each other, are as follows:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava Food Corp. | NY | Moise Banayan- Sole shareholder |
| St. Lawrence Food Corp. | NY | Moise Banayan - Sole shareholder |
| Lewis County Dairy Corp. | NY | Moise Banayan - Sole shareholder |
| Yoni Realty, LLC | NY | Moise Banayan - Sole Member |

3. Non-obligor affiliates:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava of California, LLC | CA | Moise Banayan - and Fariborz Banayan - Members |
| Ahava Dairy Products Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |
| Ahava Dairy Manufacturing Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |

SIGNATURE BANK

Schedule 3.12 – Subordinated Debt of
**Ahava Food Corp. and the Obligors**

Moise Banayan, from time to time, makes loans to one or more of the Obligors to finance the working capital needs of such entities. Such loans do not bear interest, carry no maturity date and, as of the date hereof, aggregated $1,376,000, $876,000 of which is to be subordinated to Signature Bank.

**SIGNATURE BANK**

### Schedule 3.14 – Loans or Advances among
### Ahava Food Corp. and the Obligors

There are no loans or advances among Ahava Food Corp. and any of the Obligors other than the subordinated debt set forth on Schedule 3.12.

SIGNATURE BANK

---

**Schedule 3.18 -- Environmental Matters of**
**Ahava Food Corp.**
**and the Obligors**

There are no exceptions.

# SIGNATURE BANK

## Schedule 3.20 – Real Property Leasehold Interests of
## Ahava Food Corp.
## and the Obligors

1. The real property leasehold interest of the Obligors is as follows:

| Name of Landlord | Name of Tenant | Date of Lease | Leased Premises |
|---|---|---|---|
| New York Industrial Development Agency | Yoni Realty, LLC | 1/1/2004 | 236-280 Richards Street, Brooklyn, NY; Block 604, Lots 1,4,5,13,16 and 46; a/k/a 110 Beard Street, Brooklyn, NY 11231 |
| Yoni Realty, LLC | Ahava Food Corp. | 1/1/2004 | Same as above |

2. No inventory of the Obligors is stored in a public warehouse.

SIGNATURE BANK

---

Schedule 3.21 – The Bonds

The New York City Industrial Development Agency (the "Agency") Industrial Development Revenue Bonds, Series 2004 (Ahava Food Corp. Project) (the "Bonds") are special obligations of the Agency issued under an Indenture of Trust, dated as of January 1, 2004 (the "Indenture"), between the Agency and The Bank of New York, New York, New York, as Trustee (the "Trustee"). The Bonds were issued to provide for the refunding of the Agency's Industrial Development Revenue Bonds, Series 2000A and Series 2000B (Ahava Food Corp. Project) (the "Prior Bonds"), which Prior Bonds were issued on June 8, 2000 to finance the acquisition, construction, renovation and equipping by the Agency of a manufacturing facility (the "Facility") consisting of the acquisition, improving, equipping, renovating and reconstructing an approximately 63,000 square foot existing manufacturing facility located at 236-280 Richards Street, and 118-126 Beard Street, Brooklyn, New York for the manufacturing, importing and distribution of kosher dairy products (the "Project").

The Facility was leased to the Agency by Yoni Realty, LLC (the "Lessee"), a limited liability company organized and existing under and by virtue of the laws of the State of New York, pursuant to a Company Lease Agreement dated as of January 1, 2004, between the Lessee and the Agency (the "Company Lease Agreement"). The Agency subleased the Facility back to Lessee pursuant to a Lease Agreement dated as of January 1, 2004 between the Lessee and the Agency (the "Lease Agreement") and the Lessee, as sublessor, subleased the Facility to Ahava Food Corp., a New York corporation (the "Sublessee" and sometimes collectively with the Lessee, the "Company") pursuant to a Sublease Agreement dated as of January 1, 2004 between the Lessee and the Sublessee, all to provide for the financing of a portion of the costs of the Project by the Agency.

The Bonds are secured by a letter of credit issued by Bank of America (the "L/C Bank") pursuant to a Credit Agreement between the Company and Merrill Lynch Business Credit (the "Credit Bank"). The Company entered into a reimbursement agreement with the Credit Bank, which agreement was secured by a mortgage on the Project. The Credit Bank has agreed to reimburse the L/C Bank for any draws under the L/C and the Company has agreed pursuant to the Reimbursement Agreement to reimburse the Credit Bank for any expenses or advances incurred by the Credit Bank.

The terms of the Bonds are set forth in the following Summary of Terms (with terms used with an initial capital letter having the meaning assigned to them in the Indenture):

Issuer:                New York City Industrial Development Agency
                       110 William Street
                       New York, New York 10038

Use of Proceeds:       The Bonds will be issued to provide financing for the
                       current refunding of the outstanding amount of the

Agency's $7,140,000 Industrial Development Revenue Bonds, Series 2000A and Series 2000B (Ahava Food Corp. Project) (the "Project").

| | |
|---|---|
| Description of the Bonds: | The Bonds are authorized to be issued under and pursuant to the Act, a resolution of the Agency adopted on October 14, 2003 (the "Resolution") and an Indenture of Trust, dated as of January 1, 2004 (the "Indenture"). The Bonds are issued in book-entry only form and in authorized denominations of $100,000 or any integral multiple of $5,000 in excess thereof. |
| Redemption Provisions: | The Bonds are subject to optional redemption, extraordinary redemption and mandatory redemption as described herein. |
| Interest Rate: | Interest on the Bonds initially will be paid at the Weekly Interest Rate through the first Wednesday following the date of original issuance of the Bonds and thereafter at the lesser of (a) a Weekly Interest Rate as determined in accordance with the Indenture, (b) the maximum interest rate permitted by or enforceable under applicable law, and (c) the maximum interest rate specified by the Letter of Credit then in effect subject to adjustment as provided in the Indenture, as such Interest Rate may be adjusted from time to time in accordance with the Indenture, effective on Thursday. |
| Interest Payment Date: | The Interest Payment Date during the term of the Initial Letter of Credit, with respect to Bonds bearing interest at a Weekly Interest Rate, the first Thursday of the calendar month, provided such day is a Business Day, and if such day is not a Business Day, on the next succeeding Business Day, commencing February 5, 2004. |
| Record Date: | Record Date shall mean with respect to Bonds bearing interest at a Weekly Interest Rate, the calendar day immediately preceding each Interest Payment Date. |
| Interest Rate Accrual: | So long as the Bonds bear interest at the Weekly Interest Rate, the interest shall be payable for the period from Thursday of a calendar week through and including the next succeeding Wednesday. Bonds authenticated prior to the first Interest Payment Date shall bear interest from the date of the first authentication and delivery of Bonds. Bonds issued in exchange for or upon the registration of transfer of Bonds on or after the first Interest Payment Date thereon |

shall bear interest from and including the Interest Payment Date next preceding the date of the authentication thereof, unless the date of such authentication shall be an Interest Payment Date to which interest on the Bonds has been paid in full or duly provided for, in which case they shall bear interest from and including such Interest Payment Date; provided that if, as shown by the records of the Trustee, interest on the Bonds shall be in default, Bonds issued in exchange for or upon the registration of transfer of Bonds shall bear interest from the date to which interest has been paid on the Bonds, or if no interest has been paid on the Bonds, the date of the first delivery of fully executed and authenticated Bonds.

| | |
|---|---|
| Weekly Interest Rate Mode: | During each Weekly Interest Rate Period, the Bonds shall bear interest at the Weekly Interest Rate, determined by the Remarketing Agent initially no later than the first day of each Weekly Interest Rate Period and thereafter no later than Wednesday (or the next preceding Business Day, if such Wednesday is not a Business Day) of each week immediately preceding such Weekly Interest Period to be effective the following Thursday. Initially the Bonds shall bear interest at the initial Weekly Interest Rate from their date of issuance through the first Wednesday thereafter or February 4, 2004. The Weekly Interest Rate shall be the minimum rate of interest which, in the opinion of the Remarketing Agent, would be necessary to sell the Bonds on such date of determination in a secondary market sale at the principal amount thereof. |
| Optional Tender for Purchase: | When interest on the Bonds is payable at a Weekly Interest Rate, a Holder of any such Bonds may irrevocably tender such Bond for purchase by giving telephonic notice to the Remarketing Agent, confirmed in writing to the Remarketing Agent and the Tender Agent (addressed below) by 4:00 p.m., New York City time, on a Business Day stating the principal amount of the Bond, the Bond number and the date (which must be a Business Day at least seven days after the notice is given) on which such Bond is to be purchased. The Tender Agent shall promptly inform the Trustee of such notice, if applicable. In the case of a Bond to be purchased prior to an Interest Payment Date and after the Record Date in respect thereof, if the Holder is other than a Securities Depository or its nominee, the Holder shall deliver a due bill, in form satisfactory to the Trustee, for interest due on such Purchase Date. |

Mandatory Tender for Purchase:

All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the effective date of an Alternate Rate applicable thereto. If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall include the applicable information required by the Indenture.

All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase upon the date of adjustment to a different Interest Rate Determination Method. For such purposes, a Term Interest Rate shall be deemed not to differ from the immediately preceding Term Interest Rate Period to a day immediately preceding a Business Day. If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall include the applicable information required by the Indenture.

All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the Business Day immediately prior to the substitution of a Substitute Letter of Credit unless prior to such date the Lessee shall deliver or cause delivery of a written confirmation from the Rating Agency to the effect that the substitution of the Substitute Letter of Credit will not, by itself, result in a reduction or withdrawal of its ratings then in effect on the Bonds secured by the Letter of Credit. If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall (i) state the effective date of the substitution, (ii) describe the terms of the Substitute Letter of Credit to be provided, (iii) if applicable, state that one or more of the ratings then assigned to the Bonds secured by the Letter of Credit may be reduced or withdrawn and (iv) if available, state the Rating Category or Categories (including any refinements or graduations thereof) in which the Bonds secured by the Letter of Credit are expected to be rated by the Rating Agency on the effective date of the substitution.

At the option of the Credit Bank all Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the Business Day specified by the Credit Bank that is not more than five days after receipt by the Trustee of written direction by the Credit Bank, copies of which the Trustee shall give to the Lessee, the Tender Agent and Agency, to cause the mandatory repurchase of such Bonds as a result of the occurrence of an "Event of Default" under the Reimbursement Agreement. If such mandatory tender for purchase is required, the Trustee will prepare and send a

notice in the form attached to the Indenture to all Holders of Bonds, the Agency, the Tender Agent, the Remarketing Agent, the Lessee and the Credit Bank by first class mail, postage prepaid, that such mandatory repurchase will occur on the Business Day specified by the Credit Bank that is not more than five days after the date of receipt by the Trustee of the written direction sent by the Credit Bank, that Holders of the Bonds shall have no right to retain their Bonds after such date so specified and upon such date all Bonds shall be purchased in whole at a Purchase Price equal to the principal amount thereof, without premium, plus accrued interest, if any, to, but excluding, the date of purchase.

Security for Bonds:

Letter of Credit -

Pursuant to the terms of the WCMA Reimbursement and Security Agreement dated as of January 23, 2004 (the "Reimbursement Agreement") between the Lessee and Merrill Lynch Business Financial Services Inc. (the "Credit Bank"), the Credit Bank has caused Bank of America, N.A. (the "Bank") to issue an irrevocable, direct pay Letter of Credit issued, and dated the date of original issuance of the Bonds, the initial term of which will expire, unless earlier terminated or extended, on January 31, 2005.   Under the Letter of Credit, the Trustee will be entitled to draw an amount not to exceed $6,950,000 in principal plus up to 50 days' accrued interest on the Bonds at an assumed rate of 10% per annum notwithstanding the actual rate borne by the Bonds from time to time, based on a 366-day year. The Letter of Credit will terminate upon the earliest to occur of (i) the date on which the Credit Bank honors any draft which has the effect of paying all principal and interest on the Bonds that are outstanding, or the portion of the Redemption Price thereof representing all of the principal and interest on the Bonds, (ii) the date on which the Credit Bank receives a certificate from the Trustee requesting the Bank to reduce to zero the amount available for drawings under the Letter of Credit; or, if later, the effective date specified in such certificate, (iii) the date on which the Credit Bank receives a certificate from the Trustee stating that the Trustee has been provided and has accepted a Substitute Letter of Credit or Substitute Credit Facility (as defined in the Indenture) or, if later, the effective date specified in such certificate, and (iv) the close of business on the fifteenth (15th) Business Day following receipt by the Trustee of written notice from the Credit Bank (a) that

an Event of Default, as defined in the Reimbursement Agreement, has occurred and is continuing, and (b) instructing the Trustee to cause acceleration of the Bonds pursuant to the terms of the Reimbursement Agreement, or (v) the close of business on January 31, 2005 or earlier or later as provided in the Letter of Credit. The Bonds are subject to mandatory redemption at par if the Letter of Credit expires or terminates and a substitute or alternate Letter of Credit is not in effect.

Lease Agreement -

The Lessee will be absolutely and unconditionally obligated pursuant to the Lease Agreement to make rental payments to the Trustee which in the aggregate will be sufficient to enable the Agency to pay when due (whether upon maturity, upon redemption or upon acceleration) the principal of, Sinking Fund Installments for, Redemption Price, if applicable, Purchase Price and interest on the Bonds as the same respectively become due.

Sublease Agreement -

The Sublessee will be absolutely and unconditionally obligated pursuant to the Sublease Agreement to make rental payments which, in the aggregate, will be sufficient to cover the payments required to be made by the Lessee under the Lease Agreement.

Guaranty Agreement -

The payments, obligations, covenants and agreements of the Lessee under the Lease Agreement, the payments, obligations and agreements of the Sublessee under the Sublease Agreement and the payment of the principal of, redemption premium, if applicable, purchase price, if any, and interest on the Bonds have been guaranteed by the Lessee, the Sublessee, Lewis County Dairy Corp., all as corporate guarantors and Moise Banayan, as individual guarantor (collectively, the "Guarantors") pursuant to the Guaranty Agreement.

## SCHEDULE 5.17(b)

SPECIFIC EQUIPMENT TO BE PERFECTED UPON

# Exhibit 2

Subj:    **RE: FW: REPORTS**
Date:    9/27/2007 4:22:30 P.M. US Mountain Standard Time
From.    msamson@getzlerhenrich.com
To:      Videa6@aol.com                77

You won't fail....we will clean this up within weeks,....I will force the owner to send up help we can trust key is to
win who you think can takeover in terms of discipline .... I can cotrol the rest...I just need credible answers ...I will
give you the green light when we start copying Fred Langer... I want you first to absorb the business.

Mark G. Samson

(from my handheld)

Managing Director

Getzler Henrich & Associates LLC
Tel:  212 697 2400 ext 354
Cell:  631 553 8228
Fax:  212 697 4812
WEB:  www.getzlerhenrich.com

----Original Message-----
From: "Videa6@aol.com" <Videa6@aol.com>
To: "msamson@getzlerhenrich.com" <msamson@getzlerhenrich.com>
Sent: 9/27/07 7:11 PM
Subject: Re: FW: REPORTS

maybe my reputation too, I have never had a failure but there is  always the
first time.

*************************** See what's new at http://www.aol.com

YTD   PRODUCTION

Thursday, September 27, 2007 America Online: Videa 6

Exhibit 3

Subj:    RE: FW: Ahava/St. Lawrence Overdraft
Date:    11/21/2007 11:30:54 A.M. Eastern Standard Time
From:    RBloch@signatureNY.com
To:      Ahavafood@aol.com

Moise.

It is virtually impossible for the Bank to continue to support the company without the uninterrupted involvement of the consultants. Your temporary termination of them would convey that you no longer require our support What if we extended the additional $38k today and required that the overdraft was reduced by $18k by Monday, thus effectively raising our exposure by $20k?

Rob

---

**From:** Ahavafood@aol.com [mailto:Ahavafood@aol.com]
**Sent:** Wednesday, November 21, 2007 11:21 AM
**To:** Bloch, Robert
**Subject:** Re: FW: Ahava/St. Lawrence Overdraft

Rob,

At the present, there is no way for us to have the cash to pay Getzler. We have bounced too many checks and I need to start paying the farmers back immediately.

I suggest the Getzler people take 1 week vacation until the cash or the mortgage from Ikey come in and with the new funding, a new arrangement soul be made.

Thanks  Moise

In a message dated 11/21/2007 11:13:21 A.M. Eastern Standard Time, RBloch@signatureNY.com writes:

Moise.

Prior to executing a deal on the mortgage it is difficult to fund a increase in our exposure at this time  I could possibly approve the payment as long as we were back at the $1,982,000 OD level within a few days, perhaps Monday of next week. Thus, this would allow you to spread the outflow over a few days.

Rob

---

**From:** Ahavafood@aol.com [mailto:Ahavafood@aol.com]
**Sent:** Wednesday, November 21, 2007 10:53 AM
**To:** Bloch, Robert
**Subject:** Re: FW: Ahava/St. Lawrence Overdraft

Rob,

I am willing to approve payment to Getzler, as long as the bank increases the overdraft to match such funding. Can we proceed?

please advise.  Thanks  Moise

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

SIGNATURE BANK, N.A.,

                        Plaintiff,

            -against-

AHAVA FOOD CORP., LEWIS COUNTY
DAIRY CORP., ST. LAWRENCE FOOD
CORP., YONI REALTY, LLC, MOISE
BANAYAN, ANA BANAYAN and
SCHWARTZ AND SONS, INC.,

                        Defendants.

Index No.  604256/07

(Hon. Helen E. Freedman)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF KINGS      )

        I, John Clancy, being duly sworn, depose and say that I am over the age of
eighteen years, not a party to this action, and am in the employ of Hughes, Hubbard &
Reed, LLP.

        That on February 4, 2008, at approximately 4:30pm, deponent
served **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT and
AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT IN LIEU OF COMPLAINT** by hand upon:

                        Alan D. Kaplan
                        Herrick, Feinstein LLP
                        2 Park Avenue
                        New York, New York, 10016

        By personally delivering true copies to and leaving with Ed Strecker the
Managing Clerk for Herrick Feinstein at the office located at 2 Park Avenue, New York,
New York, 10016, who stated that he was authorized to accept service on behalf of Alan
D. Kaplan.

60147982_1.DOC

Mr. Strecker can be described as a white male, approximately 35 years of age, approximately 5'11" and 175 pounds, with short brown hair.

John R. Clancy

Sworn to before me this
2ᵈ day of February, 2008

Notary Public

PATRICIA E. SMITH
Notary Public, State of New York
No. 1SM4796951
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires March 30, 20 __11

60147982_1.DOC

COUNTY CLERK'S INDEX
No. 604256/07

Supreme Court

COUNTY OF NEW YORK

SIGNATURE BANK, N.A.,

Plaintiff,

- against -

AHAVA FOOD CORP., LEWIS COUNTY DAIRY CORP., ST. LAWRENCE FOOD CORP., YONI REALTY, LLC, MOISE BANAYAN, ANA BANAYAN and SCHWARTZ AND SONS, INC.,

Defendants.

ORIGINAL

AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

Hughes Hubbard & Reed LLP

One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212 837-6000

Attorneys for Defendants

By: _____
Daniel H. Weiner