ROBERT W. HIRSH,
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507;  Facsimile: 310-275-4050

LAWRENCE C. FOX
KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
Telephone: 212-418-8600; Facsimile: 212-826-3640

Attorneys for Defendant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
-
SIGNATURE BANK,                                              :
                                                            :
                                           Plaintiff,  :  08 Civ. 3893 (NRB)
                                                            :
                    - against -                             :
                                                            :
AHAVA FOOD CORP., LEWIS COUNTY DAIRY        :
CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO  :
FOODS, YONI REALTY, LLC, SCHWARTZ AND       :
SONS QUALITY DISTRIBUTORS, INC., MOISE      :
BANAYAN, ANA BANAYAN a/k/a  CHANA           :
BANAYAN, REBECCA BANAYAN a/k/a REBECCA      :
BARIMYAN a/k/a REBECCA BANAYAN-             :
LIEBERMAN, FARIBORZ BANAYAN a/k/a AARON     :
BANAYAN, RUBEN BEITYAKOV, ARI KATZ,         :
AHAVA OF CALIFORNIA, LLC d/b/a AHAVA        :
NATIONAL FOOD DISTRIBUTOR and NORTH         :
COUNTRY MANUFACTURING, and JOHN DOE         :
COMPANIES 1 through 10,                     :
                                                            :
                                       Defendants. :
-------------------------------------------------------------------- X


**DECLARATION OF FARIBORZ BANAYAN IN OPPOSITION TO MOTION FOR
APPOINTMENT OF RECEIVER AND PRELIMINARY INJUNCTION**

I, Fariborz Banayan, declare:

1. I am the sole member of defendant Ahava of California, LLC ("Ahava CA"). Each fact contained in this declaration is within my personal knowledge, and if called upon to testify as to any matter herein, I could and would competently do so.

2. On or about March 8, 2000, Ahava CA was formed in California as a limited liability company via its Articles of Organization ("the Articles"), a true and correct copy of which is attached hereto as Exhibit A. The Articles were signed on or about February 11, 2000. Ahava CA was formed by my brother Moise Banayan ("Moise") and me. We both signed Ahava CA's Operating Agreement on or about February 11, 2000, a true and correct copy of which is attached hereto as Exhibit B.

3. Since its inception, Ahava CA has distributed kosher (primarily dairy) Cholev Yisrael food products. Cholev Yisrael dairy products are primarily consumed by the most observant segment of the orthodox Jewish community. The manufacture of Cholev Yisrael products requires the strictest scrutiny so that the products meet the highest kosher standards. Manufacturing and selling Cholev Yisrael dairy products is a unique and highly specialized. process.

4. It is my understanding that the factories which belong to defendant Lewis County Dairy Corp ("LCDC") and St. Lawrence Food Corp ("SLFC") (which, as discussed below, Ahava CA is leasing) are the only Cholev Yisrael dairy factories in the United States.

5. It is my understanding that Ahava CA controls approximately 50 % of the kosher dairy sales in the United States.

6. It is my further understanding that if Ahava CA were to go out of business:

a. the United States orthodox Jewish community would face drastic shortages and perhaps elimination of milk and dairy products upon which they depend; and,

b. the prices of remaining Cholev Yisrael milk and dairy products would exponentially increase, and many families would be unable to afford these basic staples of life.

7. I have always been Ahava CA's managing member. Moise has never been a managing member of Ahava CA. It is my understanding that Moise has never had the ability to contractually bind Ahava CA. On or about March 27, 2001, Ahava CA issued a resolution, a true and correct copy of which is attached hereto as Exhibit C, that only I have the ability to sign contracts on behalf of Ahava CA.

8. Ahava CA's assets have never been commingled or diverted to anyone's personal use.

9. Since on or about August 15, 2005, Moise has not been a member of Ahava CA. On or about August 15, 2005, I purchased Moise's interest in Ahava CA for the sum of $169,284.32 pursuant to documents entitled: "Agreement" and "Assignment Of Interest and Consent of Managing Member" (collectively "the Buy Out Documents"). True and correct copy of the Buy Out Documents are attached hereto as Exhibit D.

10. Pursuant to the Buy Out Documents, Moise had an option to repurchase his interest in Ahava CA up and until 2007. However, Moise never exercised his option, which has now expired.

11. At all times, I relied upon Ahava CA's certified public accountant, Robert Friedbauer ("Friedbauer") for tax advice relating to the completion and filing of Ahava CA's 2006 tax return, among other things. Ahava CA's 2006 tax return was prepared and filed by Friedbauer pursuant to Friedbauer's advice.

12. Ahava CA's primary books and records are and have always been maintained in California. It is my understanding that they are properly maintained under California law. Ahava CA does not keep minutes which I understand California limited liability companies are not required to do.

13. I have never had an ownership interest in any of the following companies: LCDC, SLFC, Ahava Food Corp ("AF"), Yoni Realty, LLC ("Yoni"), and Schwartz and Sons, Inc. ("SS"). I have never been an director, officer, member, or employee of LCDC, SLFC, AF, Yoni or SS.

14. At all relevant times, Ahava CA was fully and adequately capitalized, and was able to pay its bills in the ordinary course of business. Ahava CA currently has approximately 150 employees.

15. From in or about 2000 through in or about July 2007, Ahava CA competed with AF by selling like products made by different manufacturers. For example:

a. Ahava CA sold Hod Lavan turkey products while AF sold Hod Golan turkey products;

b. Ahava CA sold Kessler frozen products while AF sold Seachef. products; and

c. Ahava CA sold Mehadrin products while Ahava Foods sold Morning Select products, etc.

16. From in or about June 2007 through in or about October 2007, Ahava CA purchased products from SS to sell and distribute to Ahava CA's customers.

17. From in or about July 2007 through in or about November July 2007, SS purchased certain products from Ahava CA to sell and distribute to its customers.

4

18.  I understand that the Bank recently obtained a monetary judgment ("the Judgment") against LCDC, SLFC, AF, Yoni, Moise, and Ana Banayan (collectively "the Remaining Defendants") in New York State court litigation ("the NY Action").  Ahava CA was not a party in the NY Action and is not the Bank's judgment debtor.  Other than this litigation (now before Judge Buchwald), the Bank has never sued Ahava CA.  Ahava CA has never done business of any sort with the Bank.  Ahava CA has never consented to the Bank taking an interest in any of its assets and the Bank has none.

19.  I know of no situation where Ahava CA has received an asset from any of the Remaining Defendants for which it did not pay fair consideration.  Ahava CA never received a fraudulent transfer from any of the Remaining Defendants.

20.  Ahava CA has never been a guarantor of any debt of any of the Remaining Defendants.  Ahava CA is and has always been a separate profit center: it has never "shared" profits with any of the Remaining Defendants.

21.  In or about July 2007, I learned from Moise that:

a.  LCDC, a manufacturer of kosher dairy products,  had ceased operations due to financial difficulties, e.g. judgments which had been taken against LCDC by third parties; and,

b.  LCDC could not pay its bills, e.g. pay suppliers and make payroll, because certain judgment creditors of LCDC had levied upon LCDC's bank accounts, such that any monies deposited into its bank accounts would be diverted to the judgment creditors.

22.  It has always been my understanding that the kosher dairy products manufacturing business, if run correctly, is very profitable.  When I learned of LCDC's problems,  I saw an immediate business opportunity for Ahava CA to go into the kosher dairy products

5

manufacturing business.

23.  Accordingly, in or about July 2007, Ahava CA laterally expanded and went into the kosher dairy manufacturing business by leasing LCDC's upstate New York factory.

24.  In entering into this venture, Ahava CA was required to and in fact made a significant financial investment, which, among other things, included;

      a.  buying new equipment for the LCDC factory; and,

      b.  paying certain of LCDC's debt, including LCDC's back payroll owing, so that Ahava CA would not lose the opportunity to retain LCDC's highly trained workers who specialize in the unique business of manufacturing Cholev Yisrael products.

25.  Ahava CA spent over $800,000.00 to begin its operations with LCDC.

26.  On or about August 29, 2007, Ahava CA and LCDC entered into a written lease, a true and correct copy of which is attached hereto as Exhibit E, which, in part, memorialized the agreement between Ahava CA And LCDC.

27.  As of October 2007, I understood that there were only two kosher dairy factories in the United States, i.e. LCDC and SLFC.

28.  In or about October 2007, I learned from Moise that SLFC had ceased operations due to a judgment creditor commencing enforcement of judgment activity against it.

29.  I saw another business opportunity for Ahava CA to further expand its kosher dairy manufacturing operation, and in or about October 2007, I caused Ahava CA to lease the SLFC facility pursuant to a written lease dated October 30, 2007, a true and correct copy of which is attached hereto as Exhibit F.

30.  Similar to the LCDC venture, in taking over the SLFC operation, Ahava CA made a

significant monetary investment, which included, among other things:

      a.  buying new equipment for the factory; and,

      b.  paying monies owed by SLFC, including past payroll, so again, Ahava CA

would not lose the opportunity to retain these highly trained workers as its own.

    31.  Ahava CA spent over $500,000.00 to begin its operations with SLFC.

    32.  From on or about August 1, 2007 through on or about November 2007, Ahava CA

sold its products (including its products that it was now manufacturing in its newly leased

factories) to SS for SS to distribute throughout the United States.  During this time period, Ahava

CA sold SS over $9,000,000.00 in products, which Ahava CA would in the ordinary course of

business cause to be delivered to SS's warehouse facility located at 236-280 Richard Street,

Brooklyn, N.Y. ("the Brooklyn Warehouse").

    33.  As of late November 2007, when I understand SS went out of business, SS owed

Ahava CA approximately $800,000.00 in unpaid bills.

    34.  SS's going out of business created a big problem for Ahava CA: aside from owing

Ahava CA significant monies, Ahava CA needed to immediately find a means to sell the

products that it was manufacturing at the LCDC and SLFC factories.

    35.  Out of business necessity, on or about November 27, 2007, Ahava CA entered into a

written agreement with SS, a true and correct copy of which is attached hereto as Exhibit G, in

which, among other things, Ahava CA assumed SS's lease for the Brooklyn Warehouse, and

purchased certain equipment for the Brooklyn Warehouse.  The lease assumptions gave Ahava

CA the ability to sell the products that it was manufacturing.

    36.  If Ahava CA had not acted as it did, the Brooklyn Warehouse would have closed, the

LCDC and SLFC factories would have closed, over 150 workers would have lost their jobs, the farmers would have been without a outlet to sell their products, the observant Jewish community would have been deprived of dairy products upon which they depend, and the prices of the remaining Cholev Yisrael products would have exponentially increased, thus depriving poor, observant families of the ability to buy affordable dairy products.

37.  Ahava CA has not forgiven SS of its debt owing to it.

38.  Ahava CA plans to take legal steps to recover the SS debt.

39.  For a short period of time from in or about December 2007 through in or about January 2008, I caused Ahava CA retain Moise as a consultant to assist it in its new business ventures.

40.  Shortly after Ahava CA retained Moise as a consultant, it became very clear to me that Moise's presence was a liability because of his personal disputes with the Bank: accordingly, I caused Ahava CA to terminate Moise in or about January 2008.

41.  On or about February 20, 2008, AF and Ahava CA entered into a written agreement entitled "Trademark Purchase Agreement," a true and correct copy of which is attached hereto as Exhibit H, pursuant to which Ahava CA agreed to pay $575,000 for certain trademarks ("the Marks").

42.  It is my understanding that Ahava CA never received any trademarks from any of the Remaining Defendants without payment of fair consideration.

43.  It is my understanding that the Marks were transferred on or about March 6, 2008, pursuant to a "Trademark Assignment," a true and correct copy of which is attached hereto as Exhibit I.

44. It is my understanding that the Bank does not have a perfected security interest in the Marks.

45. Ahava CA paid more monies for the Marks than what they were worth.

46. Ahava CA never invoiced any customer for goods which it did not sell. It never sold goods belonging to anyone other than itself. Ahava CA began distributing products to certain of SS's former customers on or about December 1, 2007. All monies which Ahava CA has collected and kept from any former customer of any of the Remaining Defendants relate to goods which Ahava CA sold to such customers **after** December 1, 2007.

47. To the extent that Ahava CA received any monies for goods sold by any of the Remaining Defendants, Ahava CA returned those monies to their rightful owner.

48. Ahava CA did not take for itself any receivable arising from any goods sold to Moishe Discount, Macabee Foods, and Yeshiva Chaim Berlin ("YCB") by any person other than Ahava CA, as I understand the Bank inaccurately contends.

49. On or about December 17, 2007, Ahava CA invoiced Moishe Discount for goods which it shipped. A copy of the invoice is attached hereto as Exhibit J. In or about December 2007, Ahava CA received a check from Moishe Discount for $18,051.45, a true and correct copy of which is attached hereto as Exhibit K, for goods which I understand were shipped to Moishe Discount by SS. I gave this check to Moise, whom I understand deposited it into SS's Commerce Bank account.

50. Ahava CA invoiced Macabee Foods for products delivered to it by Ahava CA, a true and correct copy of which is attached hereto as Exhibit L. Ahava CA sued Macabee Foods in a Rockland County lawsuit for goods shipped to it by Ahava CA and no one else. Ahava CA did

May 21 08 09:58a          simon                         818 763 1023          p.1
Case 1:08-cv-03893-NRB-MHD   Document 18   Filed 05/22/2008   Page 10 of 40
05/21/2008 12:58 FAX 212 826 3674   KORNSTEIN VEISZ WEXLER &

not invoice Macabee Foods for goods shipped to it by any of the Remaining Defendants.

51. Ahava CA invoiced YCB for products delivered to it by Abava CA. Ahava CA never invoiced YCB for goods shipped by anyone else. Ahava CA has never collected monies which YCB owes to other persons.

52. On or about, January 31, 2008, Ahava CA's attorney, Todd Robinson wrote and sent a letter to Ahava CA's customers, a true and correct copy of which is attached hereto as Exhibit M, which, among other things, advised Ahava CA's customers to pay the Bank any monies owing by them to the Remaining Defendants. This letter was sent, even though Ahava CA contends that the Bank owes it significant monies through the Bank's wrongful conduct, including the conversion of Ahava CA's monies

53. I am not aware of Ahava CA having had any communication with OSHA at any time.

54. Ahava CA is not using the New York phone numbers of the Remaining Defendants to sell its products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in Beverly Hills, California on May 21, 2008.

_____
Fariborz Banayan

10

# EXHIBIT A



State of California

# Bill Jones
## Secretary of State

# LIMITED LIABILITY COMPANY
# ARTICLES OF ORGANIZATION

A $70.00 filing fee must accompany this form.
**IMPORTANT** - Read instructions before completing this form.

FILED
In the Office of the Secretary of State
of the State of California

MAR 0 8 2000

BILL JONES, Secretary of State

This Space For Filing Use Only

1. Name of the limited liability company (end the name with the words "Limited Liability Company," "Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.")
AHAVA . OF CALIFORNIA , LLC

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea limited liability company act.

3. Name the agent for service of process and check the appropriate provision below:
FARIBORZ BANAYAN
[X] an individual residing in California. Proceed to item 4.                                which is
[ ] a corporation which has filed a certificate pursuant to section 1505. Proceed to item 5.

4. If an individual, California address of the agent for service of process:
Address: 90'S Rose Ave.
City: Venice          State: CA          Zip Code: 90271

5. The limited liability company will be managed by: (check one)
[X] one manager   [ ] more than one manager   [ ] single member limited liability company   [ ] all limited liability company members

6. Other matters to be included in this certificate may be set forth on separate attached pages and are made a part of this certificate. Other matters may include the latest date on which the limited liability company is to dissolve.

7. Number of pages attached, if any:
none

8. Type of business of the limited liability company. (For informational purposes only)
food, juices, sales and distribution

9. DECLARATION: It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

Signature of Organizer

MILTON T. SIMON, ESQ
Type or Print Name of Organizer

February 11, 2000
Date

10. RETURN TO:
NAME
FIRM      AHAVA      OF CALIFORNIA, L.L.C
ADDRESS   90B ROSE Ave.
CITY/STATE  VENICE   Ca   90271
ZIP CODE



Approved by Secretary of State

# EXHIBIT B

# OPERATING AGREEMENT

## OF

## AHAVA OF CALIFORNIA, LLC

This Operating Agreement of Ahava of California, LLC, a limited liability company organized pursuant to the California Limited Liability Company Law or such similar statutes, is entered into and shall be dated and effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I

### Definitions

The terms and Conditions used in this Agreement shall have the meanings set forth in Section 102 of the Act, or as set forth below (unless otherwise expressly provided herein)

1.1    "Act" shall mean the California Limited Liability Company Law or such similar statutes, and all Amendments thereto.

1.2    "Additional Member" shall mean a member other than an initial member or a substitute member who has acquired a membership interest in the Company.

1.3    "Agreement" shall mean this Operating Agreement, as originally executed and as it may be amended from time to tome.

1.4    "Articles of Organization" shall mean the Articles of Organization of the Company filed or to be filed with the State of California or its agencies, pursuant to the Act, as they may from time to time be amended.

1.5    "Assignee" shall mean the transferee of a Membership Interest who has not been admitted as a substituted member.

1.6    "Bankrupt Member" shall mean a Member who (1) has become the subject for an order for relief under the United States Bankruptcy Code, (b) has initiated, either in an original proceeding or by way of answer in any state, insolvency receivership proceeding, an action for liquidation arrangements, composition, readjustment, dissolution or similar relief.

1.7    "Capital Account" as of any date shall mean the Capital Contribution to the Company by a Member, adjust as of such date pursuant to the terms of this Agreement.

1.8 "Capital Contribution" shall mean any contribution by a Member to the capital of the Company in cash, property, services rendered or a promissory note or other binding obligation to contribute cash or property or to render services. "Initial Capital Contribution" shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement.

1.9 "Capital Interest" shall mean the proportion that the member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances, as may be adjusted from time to time.

1.10 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any superseding federal revenue statute.

1.11 "Company" shall refer to Ahava of California LLC, and any successor limited liability company.

1.12 "Company Property" shall mean any Property owned by the Company.

1.13 "Default Interest Rate" shall mean the higher of the legal rate or the then prime rate quoted in the Wall Street Journal plus two percent (2%).

1.14 "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(1) credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1 (b)(2) (ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (I)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner's nonrecourse debt (as determined under Section 1.704-2(I)(3) of the Treasury Regulations); and

(2) debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

1.15 "Distributable Cash" shall mean all cash, revenues and funds received by the company from Company operations, less the sum of the following to the extend paid or set aside by the Company; (I) all principal and interest payments on

1.16    indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business; and (iii) Reserves.

1.17    "Disposition" ("Dispose") shall mean any sale, assignment, exchange, mortgage, pledge-grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions of operation of law).

1.18    "Disassociation" shall mean any action which causes a person to cease to be a Member as described in Article XIII hereof.

1.19    "Dissolution Event" shall mean an event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

1.20    "Distribution" means any cash and other property paid by the Company to a Member of the Company in his, her or its capacity as a Member.

1.21    "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Nautiluses and Distributions of the Company's assets pursuant to this Operating Agreement and the Act, but it shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

1.22    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.23    "Effective Date" shall mean the date the State of California files the Article of Organization.

1.24    "Entity" Shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust or foreign business organization.

1.25    "Fiscal Year" shall mean the fiscal year of the Company, which shall be the year ending December 31.

1.26    "Gifting Member" shall mean any Member or Economic Interest Owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest.

1.27    "Majority Interest" shall mean one or more Interests of Members which, taken together, exceed fifty percent (50%) of the aggregate of all Capital Interests.

1.28   "Manager" Shall mean one or more managers. Specifically, "Manager" shall mean those names listed on Exhibit B, or any other persons that succeed him in that capacity. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

1.29   "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member, and each of the parties who may hereafter become Members in accordance with Article XII. To the extent a Manager has acquired a Membership Interest in the Company, he will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent he has purchased such Membership Interest in the Company. If a Person is a Member immediately prior to the purchase or other acquisition by a Person of an Economic Interest, such person shall have all the rights as a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. The term shall include initial members, substituted members and additional members

1.30   "Membership Interest" shall mean a Member's entire interest in the Company, including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act and as defined in Exhibit "A".

1.31   "Net Losses" shall mean the losses and deductions of the Company, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

1.32   "Net Profits" shall mean the income and gains of the Company, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

1.33   "Person" shall mean any association, corporation, stock company, estate, general partnership (including any Registered Limited Liability Partnership or Foreign Limited Liability Partnership), limited association, limited liability company (including a professional service limited liability company), foreign limited liability company (including a foreign professional service limited liability company)(, joint venture, limited partnership, natural person, real estate investment trust, business trust or other trust, custodian, nominee or other

individual in its own or any representative capacity. In addition, it shall mean the heirs, executors, administrators, legal representatives, successors and assigns of such "Person" where the context so permits.

1.34    "Proceeding" shall mean any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator or governmental agency may enter a judgment, order, decree or other determination which if not appealed and reversed, would be binding on the Company, a Member or other Person subject to the jurisdiction of such court, arbitrator or governmental agency.

1.35    "Property" shall mean any Property, real or personal, tangible or intangible, including money and legal or equitable interest in such Property, but excluding services an promises to perform services in the future.

1.36    "Reserves" shall mean, with respect to any fiscal period, funds set aside or amounts allocated during such period to Reserves which shall be maintained in an amount deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

1.37    "Resignation" shall mean the act by which a Manager ceases to be a Manager.

1.38    "Selling Member" shall mean any Member or Economic Interest Owner who or which desires to or does sell, assign, pledge, hypothecate or otherwise transfers for a consideration all or any portion of the Member's Membership Interest or Economic Interest.

1.39    "Taxable Year" shall mean the taxable year of the Company as determined pursuant to 706 of the code.

1.40    "Taxing Jurisdiction" shall mean any state, local or foreign government that collects tax, interest or penalties, however designated, and any Member's share of the income or gain attributable to the company.

1.41    "Transferring Member" shall collectively mean a Selling Member and a Gifting Member.

1.42    "Treasury Regulations" shall mean all proposed, temporary and final regulations promulgated under the Code as from time to time in effect.

## ARTICLE II

### Organization

2.1   Formation.  On February 11th 2000 Fariborz Banayan. organized a California Limited Liability Company by executing and delivering Article of Organization to the State of California or one of its agencies in accordance with and pursuant to the Act.

2.2   Agreement.  For and in consideration of the mutual covenants herein contained, and for other good an valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement as it may be from time to time amended according to its terms.  It is the express intention of the Members that the Agreement shall be the sole source of agreement of the parties, and except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to the sections of the Code of Regulations, or as expressly prohibited or ineffective under the Act, even when inconsistent with or different from the provisions of the Act or any other law or rule.  To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3   Name.  The name of the Company is Ahava of California LLC, and all business of the Company shall be conducted under the name or any other name, but in any case only to the extent permitted by applicable law.

2.4   Effective Date.  This Agreement shall be effective on the date of execution hereof.

2.5   Principal Place of Business.  The principal place of business of the Company within the State of California shall be 908 Rose Avenue, Venice, CA 90291. The Company may establish any other places of business as the Managers may from time to time deem advisable.

## ARTICLE III

### Business of the Company

3.1     Nature of Business. The Company is formed for, and the business of the Company shall be:

3.1.1   to accomplish any lawful business whatsoever or which shall at any time appear conductive to or expedient for the protection or benefit of the Company and its assets.

3.1.2   to exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Act.

### ARTICLE IV

### Members

4.1     Names and Addresses and Membership Interests. The names and addresses and membership Interests of the Initial Members are as set forth in Exhibit A to this Agreement.

4.2     Additional Members. In the event that a Person is hereafter admitted as an Additional Member in accordance with Section 12.2, their name, address and Capital Contribution shall be added to Exhibit A.

### ARTICLE V

### Right s and Duties of Members

5.1     Management Rights. The managing member Fariborz Banayan shall be entitled to vote on any matter submitted to a vote of the Members. The non-managing member Moise Banayan shall not have voting rights or the right to control the Company or any of its actions. Notwithstanding the foregoing, the following actions require the vote of consent of a majority of the Members;

5.1.1   any amendment to this Agreement

5.1.2   the admission of Assignees as a Member

5.1.3   the continuation of the Company after a Dissolution Event.

5.2     Majority. Whenever any matter is required or allowed to be approved by a Majority of the Members or a Majority of the Remaining Members under the Act or this Agreement, such matter shall be considered approved or consented to upon

the receipt of the affirmative approval or consent, either in writing or at a meeting of the Members, of Members having Capital Accounts in excess of one-half of the Capital Accounts of all the Members entitled to vote on a particular matter. A majority shall be determined by membership interest voted. The members shall vote in proportion to their membership interest. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, disassociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided in Section 11.6.2, the Capital Account of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Capital account.

5.3    Limitation of Liability of Members. Members shall not be liable for any debts, obligations or liabilities of the Company or each other, whether arising in tort, contract or otherwise, solely by reason of being such Member. However, each Member shall remain personally liable for payment of his, her or its Capital Contribution as set forth in Section 502 of the Act or as otherwise provided in this Agreement.

5.4    Indemnification. the Company shall indemnify the Members, Managers, and agents for all costs, losses, liabilities and damages paid or accrued by such Member, Manager or agent inn connection with the business of the Company, to the fullest extent provided or allowed by the laws of California.

5.5    Books and Records. In accordance with Section 9.9 hereof, the Managers shall maintain and preserve during the term of the Company and for sex (6) years thereafter, all accounts, books, minutes of meetings of Members, and all other relevant Company documents. Upon reasonable request, each Member and each Economic Interest Owner shall have the right, during ordinary business hours and at the principal place of business of the Company, to inspect and copy such documents, at the request Member's and Economic Interest Owner's expense.

5.6    Sale of All Assets. The Members shall have the right, by the vote or written consent of Members holding at least tow-thirds of all Capital Interests, to approve the sale, lease, exchange or other disposition of all or substantially all of the assets of the Company which is to occur as part of a single transaction or plan.

5.7    Priority and Return of Capital. Except as may be expressly provided in Articles VIII or IX, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, New Losses or a Distribution; provided, however, that this Section shall not apply to loan or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

5.8    Liability of a Member to the Company.  A Member who or which rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the Act.  A Member who or which receives a Distribution made by the Company in violation of this Agreement, or made when the Company's liabilities exceed its assets (after giving effect to such Distribution) shall be liable to the Company for the amount of such Distribution for a period of six (6) years after such Distribution.

5.9    Financial Adjustments.  No Members admitted after the date of this Agreement shall be entitled to any retroactive allocations of losses, income or expense deductions incurred by the Company.  the Manager may, at the discretion of the Manager, at the time a Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations for loss, income and expense deductions to such Member for that Portion of the Fiscal Year in which such Member was admitted in accordance with the Code.

5.10    Representations and Warranties.  Each Member, and in the case of an organization, the person(s) executing the Agreement on behalf of the organization, hereby represents and warrants to the Company and each other member and Manager that:  (a) if that Member is an organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization, and that it had full organizational power to execute and agree to the Agreement to perform its obligations hereunder; (b) that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest; (c) the Member acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or availability of any exemption from such requirements.

5.11    Conflicts of Interest.

5.11.1  A Member shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company it being expressly understood that some of the Members may enter in to transactions that are similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any property, profit or benefit derived by the member, without the consent of the other Members in the conduct and winding up of the Company business or from a use or appropriation by the member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

5.11.2  A member does not violate a duty or obligation to the Company merely because the member's conduct furthers the Member's own interest.  A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the

Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if either the transaction is fair to the Company, or disinterested Members in, either case knowing the material facts of the transaction and the Member's interest, authorized, approve or ratify the transaction.

## ARTICLE VI

### Rights and Duties of Managers

6.1    Management. The business and affairs of the Company shall be managed by its Managers. The Managers shall direct, manage, and control the business of the Company to the best of their ability. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non waive able provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control he business, affairs and properties of the company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one of the Managers is expressly required pursuant to this Operating Agreement or the Act.

6.2    Number, Tenure and Qualification of Managers. The Company initially have 1 Manager. Each of the individuals listed on Exhibit B to this Agreement shall initially serve as a Manager. The number of Managers of the Company may be amended from time to time by the vote or written consent of Members holding a Majority of the Membership Interests. Each Manager shall hold office until the next annual meeting of Members, or until a successor shall have been elected or qualified. Managers shall be elected by the vote or written consent of Members holding at least a Majority of all Membership Interest and need not be residents of the State of California or Members of the Company.

6.3    Certain Powers of Managers. Except as set forth in this Agreement, the Managers shall have the power and authority on behalf of the Company to:

6.3.1    Purchase, lease or otherwise acquire from, or sell, lease or otherwise dispose of, to any Person any property.

6.3.2    Open bank accounts and otherwise invest the funds of the Company.

6.3.3    Borrow money for the Company from banks or other lending institutions and on such terms as the Members deem appropriate, and in connection therewith, to hypothecate, encumber or grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted nor liability

incurred by or on behalf of the Company except by the Managers or, to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers.

6.3.4   Purchase insurance on the business and assets of the Company.

6.3.5   Commence lawsuits and other proceedings.

6.3.6   Enter into any agreement, attorneys or other agents.

6.3.7   If approved by the Members holding a Majority of Membership Interests, the Managers and each of them shall have the right to make a filing under terms of the United States Bankruptcy Code.

6.3.8   Take any other lawful action that the Managers consider necessary, convenient or advisable in connection with any business of the Company.

6.4      Binding Authority.  Unless authorized to do so by the Managers, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.  No Member shall have any power or authority to bind the Company unless the member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

6.5      Liability for Certain Acts. Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by the Manager.

6.6      No Exclusive Duty to Company.  The Managers shall not be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right pursuant to this Agreement to share or participate in such other business interests or activities of the Managers or to the income or proceeds derived therefrom.  The Managers hall incur no liability to the Company or any Member as a result of engaging in any other business interests or activities.

6.7    Indemnification. The Company shall indemnify and hold harmless the Managers from and against all claims and demands to the maximum extent permitted under the Act.

6.8    Resignation. Any Manager may resign at any time by giving written notice to the Company with a copy to each Member. The resignation of any Manager shall take effect upon receipt of such notice by Company or at any later time specified in such notice. Unless otherwise specified in such notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of the Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of such Member.

6.9    Removal. Any Manager may be removed or replaced with or without cause by the vote or written consent of Members who hold at least a Majority of Membership Interests. the removal of a Manager who is also a Member shall not affect the manager's rights as a Member and shall not constitute a withdrawal of such Member.

6.10   Vacancies. Any vacancy occurring for any reason in the number of Managers may be filled by the vote or written consent of at least a Majority of the Membership Interests. A Manager elected to fill a vacancy shall be elected for the unexpired term of the Manager's predecessor in office and shall hold office until the expiration of such term and until the Manager's successor has been elected and qualified. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until a successor has been elected and qualified.

6.11   Salaries. Each Manager shall be reimbursed for all reasonable expenses incurred in managing the Company. The salaries and other compensation of the Managers shall be fixed from time to time by the vote or written consent of at least a majority of the The managing members... No Manager shall be prevented from receiving such a salary or other compensation because such Manager is also a Member.

## ARTICLE VII

### Meetings of members

7.1    Annual Meeting. The annual meeting of the Members shall be held at such times as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting.

7.2     Special Meetings. Special meetings of the Members, fro any purpose or purposes, may be called by any Manager or any Member or group of Members holding collectively not less than ten percent (10%) of the Membership Interests.

7.3     Place of Meetings. Meetings of the Members may be held at any place, within or outside the State of California, for any meeting of the Members designated in any notice of such meeting. If no such designation is made, the place of any such meeting shall be the chief executive office of the Company.

7.4     Notice of Meetings. Except as per written notice stating the place, day and hour of the meeting, indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called, shall be delivered no fewer than ten (10) nor more that fifty (50) days before the date of the meeting.

7.5     Record Date. For the purpose of determining the Members entitled to notice of or to vote at any meeting of Members or any adjournment of such meeting, or Members entitled to receive payment of any Distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring Distribution is adopted, as the case may be, shall be the record date for making such a determination. When a determination of Members entitled to vote at any meeting of Members has been made pursuant to this Section, the determination shall apply to any adjournment of the meeting.

7.6     Quorum. Members holding not less than a Majority of all Membership Interests, representing in person or b proxy, shall constitute a quorum at any meeting of members. In the absence of a quorum at any meeting of Members, a Majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at such meeting. At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed. the members present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Membership Interests whose absence results in less than a quorum being present.

7.7     Manner of Acting. If a quorum is present at any meeting, the vote or written consent of Members holding not less than a Majority of Membership Interests shall be the act of the members, unless the vote of a greater or lesser proportion or number is otherwise required by the Articles of Organization or this Agreement.

7.8    Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

7.9    Action by Members Without a Meeting.

7.9.1    Whenever the Members of the Company are required or permitted to take any action by vote or consent, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken shall be signed by the Members who hold the Membership Interests, having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote therein were present and voted, and shall be delivered to the office of the Company, its principal place of business or a Manager, employee or agent of the Company.

7.9.2    Every written consent shall bear the date of signature of each Member who signs the consent, and not written consent shall be effective to take the action referred to therein unless within sixty (60) days of the earliest dated consent delivered in the manner required by this Section to the Company, written consents signed by a sufficient number of Members to take the action are delivered to the office of the Company, its principal place of business or a Manager, employee or agent of the Company having custody of the records of the Company.

7.9.3    Deliver of consents to such office or principal place of business of Manager, employee or agent shall be by hand, including messenger or other courier, or by certified or registered mail, return receipt requested.

7.9.4    Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to each Member who has not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

7.10    Waiver of Notice. Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting. The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by him or her.

7.11    Voting Agreements. An agreement between two or more Members, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the Membership Interests held by them shall be voted as therein provided, or as they may agree, or as determined in accordance with a procedure agreed upon by them.

## ARTICLE VIII

### Contributions and Capital Contributions

8.1    Capital Contributions. Each Member shall contribute such amount as is set forth in Exhibit A hereto as its share of the Initial Capital Contribution.

8.2    Additional Contributions. Except as set forth in Section 8.1, no Member shall be required to make any Capital Contributions. To the extent unanimously approved by the Managers, from time to time, the Members may by permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate in connection with the conduct of the Company's business (including without limitation, expansion or diversification). In such event, the members shall have the opportunity (but not he obligation) to participate in such additional Capital Contributions on a pro rata basis in accordance with their Membership Interests.

8.3    Capital Accounts. A Capital account shall be established and maintained for each Member and each Assignee. Each member's Capital Account shall be increased by the value of each Capital Contribution made by the Member, allocations to such Member of the Net Profits and any other allocation to such Member of income pursuant tot he Code. Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, allocations to such Member of Net Losses, and other allocations to such Member pursuant to the Code.

8.4    Transfers. Upon a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring his, her or its Membership Interests shall become the Capital Account of the Person to which or whom such Membership Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

8.5    Modifications. The manner in which Capital Accounts are to be maintained pursuant to the Section is intended to comply with the requirements of Section 704(b) of the Code. If, in the opinion of the Managers, the manner in which Capital Accounts are to maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which the Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

8.6    Deficit Capital Account. Except as otherwise required in the Act or this Agreement, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

8.7    Withdrawal or Reduction of Capital Contributions. A Member shall not receive fro the Company any portion of his Capital Contribution until all indebtedness and liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of the Managers, sufficient to pay them. No distributions shall be made from the Capital Contributions of a Member without the consent of Members owning a majority of Membership Interests in the Company. A Member, irrespective of the nature of the Capital Contribution of such Member, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE IX

### Allocations and Distributions

9.1    Allocations of Profits and Losses. The Net Profits and the Net Losses of the Company for each Fiscal Year shall be allocated as follows: to each Member in accordance with the ration of the value of his, her or its Capital Account bears to the value of all Capital Accounts in the aggregate.

9.2    Distributions. Except for a Distribution on Dissolution in accordance with Section 14.2.3, the Managers may, from time to time, in the discretion of the Managers, make Distributions to the Members. All Distributions shall be made to the Member as follows: to each member in accordance with the ratio of the value of his, her or its Capital Account bears to the value of all Capital Accounts in the aggregate.

9.3    Offset. The Company may offset all amounts owing to the Company by a Member against and Distribution to be made to such Member.

9.4    Limitation Upon Distributions. No Distributions shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.

9.5    Interest on and Return of Capital Contributions. No Member shall be entitled to interest on his Capital Contributions, or to a return of his Capital Contribution, except as specifically set forth in this Agreement.

9.6    Accounting Principles. The profit and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using generally accepted methods of accounting. It is intended that the company will elect those accounting methods which provide the greatest tax benefits.

9.7    Accounting Period. The accounting period of the Company shall be the calendar year.

9.8     Loans to Company. Nothing in this Operating Agreement shall prevent any
Member from making secured or unsecured loans to the Company by agreement
with the Company.

9.9     Records, Audits and Reports. At the expense of the Company, the Manager shall
maintain records and accounts of all operations and expenditures of the Company.
At a minimum, the Company shall keep at its principal place of business the
following records:

(a) A current list of the full name and last known business, residence, or
mailing address of each Member, Economic Interest Owner and Manager,
both past and present;

(b) A copy of the Articles of Organization of the Company and all
amendments therto, together with executed copies of any powers of
attorney pursuant to which any amendment has been executed;

(c) Copies of the Company's currently effective written Operating
Agreement, copies of any writings permitted or required with respect to a
Member's obligation to contribute cash, property or services, and copies
of any financial statements of the Company for the three (3) most recent
years.

(e) Minutes of every annual, special, and court-ordered meeting.

(f) Any written consents obtained from Members for actions taken by
Members without a meeting.

### ARTICLE X

### Taxes

10.1     Tax Returns. The Managers shall cause to be prepared and filed
all necessary federal and state income tax returns for the Company. Copies of
such returns or pertinent information therefrom, shall be furnished to the
Members within a reasonable time after the end of the Company's Fiscal
Year. Each Member shall furnish to the Managers all pertinent information in
its possession relating to Company operations that is necessary t enable the
Company's income tax returns to be prepared and filed.

10.2     Tax Elections. The Company shall make the following elections
on the appropriate tax returns.

(a) To adopt the calendar year as the Fiscal Year.

(b) To adopt the generally accepted methods of accounting and keep the Company's books and records on the income tax method;

(c) If a Distribution as described in Section 734 of the Code occurs, or if a transfer of a Membership Interest described in Section 743 of the Code occurs, upon the written request of any Member, to elect to adjust the basis of the property of the company pursuant to Section 754 of the Code;

(d) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company under Section 185 of the Code ratably over a period of sixty (60) months as permitted by Section 708(b) of the Code; and

(e) Any other election that the Managers may deem appropriate and in the best interests of the Members. Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

10.3      Tax Matters Partners. The Managers shall designate one Manager to be the "tax matters partner" of the company pursuant to Section (a) (7) of the Code. Any Manager who is designated "tax matters partner" shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.

## ARTICLE XI

### Disposition of Interests

11.1      General. Except as otherwise specifically provided herein, neither a Member nor an Economic Interest Owner shall have the right to:

(a) sell, assign, pledge, hypothecate, transfer, exchange, or otherwise transfer for consideration (collectively, "sell")

(b) gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy) all or any part of its Membership Interest or Economic Interest

11.2      Gift of Membership Interest. A Transferring Member may gift all or any portion of its Membership Interest or Economic Interest (without regard to Sections 11.3.1, 11.3.2 and 11.3.3), provided that the donee or other successor-in-interest (collectively, "donee") complies with Section 11.4 and further provided that the donee is

either the Gifting Member's spouse, former spouse, or lineal descendent (including adopted children). In the event of the gift of all or any portion of a Gifting Member's Membership Interest or Economic Interest to one or more donees who are under eighteen (18) years of age, one or more trusts shall be established to hold the gifted interest(s) for the benefit of such donee(s) until all of the donee(s) reach the age of at least eighteen (18) years.

11.3      Sale of Membership Interest.

11.3.1 If a Selling Member desires to sell all or any portion of its Membership Interest or Economic Interest to another person, the Selling Member shall obtain from such purchaser a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made. The Selling Member shall give written Notice to the remaining Members of its intention to so transfer such interest, with a copy of such bona fide written offer to purchase such interest.

11.3.2 Each of the remaining Members, on a basis pro rata to their Capital Interests or on a basis pro rata to the Capital Interests of those remaining Members exercising their right of first refusal, shall have the right to exercise a right of first refusal to purchase all (but not less than all) of the interest proposed to be sold by the Selling Member upon the same terms and conditions as stated in the bona fide written offer to purchase by giving Notice to the Selling Member of their intention to do so within sixty (60) days after receiving written notice from the Selling Member. The failure of the remaining Members to so notify the Selling Member of their desire to exercise this right of first refusal with respect to all of the interest desired to be sold within said sixty (60) day period shall result in the termination of the right of the first refusal, and the Selling Member shall be entitled to consummate the sale of its interest in the Company, or such portion of its interest, if any, with respect to which the right of the first refusal has not been exercised, to such third party purchaser.

11.3.3 In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining; Members shall have the right to designate the time, date and place of closing, provided that the data of closing shall be the later of the date set forth for the closing in the bona fide offer or within sixty (60) days after receipt of written notification from the Selling Member of the third party offer to purchase.

11.4     Conditions of Transfer. In the event of either the purchase of the Selling Member's interest in the Company by a third party purchaser or a gift of an interest in the Company (including an Economic Interest), and as a condition to recognizing one or more of the effectiveness and binding nature of any such sale or gift and (subject to Section 11.6 below) substitution of a new Member as

against the Company or otherwise,, the Managers may require the Selling Member or Gifting Member and/or the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the remaining Members, such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Managers may deem necessary or desirable to:

(I)    Constitute such purchaser, as a Member, donee or successor-in-interest as such;

(ii)    confirm that the person desiring to acquire an interest or interests in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Operating Agreement, as the same may have been further amended (whether such Person is to be admitted as a new Member or will merely be an Economic Interest Owner)

(iii)    Preserve the Company after the completion of such sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized, or does business;

(iv)    maintain the status of the Company as a partnership for federal tax purposes; and

(v)    assure compliance with any applicable state and federal laws, including securities laws and regulations.

11.5    **Effective Date.** Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article XI shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given or, if no such consent was required pursuant to Section 11.2, then on such date that the donee or successor interest complies with the provisions of Section 11.4. The Selling Member agrees, upon request of the Managers, to execute such certificates or other documents and perform such other acts as may be reasonably requested by the Managers from time to time in connection with such sale, transfer, assignment or substitution. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article XI.

11.6    **Transferee Not Member in Absence of Unanimous Consent.**

11.6.1    Notwithstanding anything contained herein to the contrary (including, without limitation, Section 11.3 hereof), if all of the remaining Members do not approve by unanimous consent of the proposed sale or gift of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a

Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee of donee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the non-transferring Member(s).

11.6.2   Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by one Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), the Company shall purchase from the Transferring Member, and the Transferring Member shall sell to the Company, for a purchase price of $100.00, all remaining rights and interests retained by the Transferring Member which immediately prior to such sale or gift were associated with the transferred Economic Interest.

## ARTICLE XII

## Admission of Assignees and Additional Members

12.1     Admission of New Members or Assignees. From the date of the formation of the Company, and Person or Entity acceptable to the Members by their unanimous vote thereof may become a Member in the Company, subject to the terms and conditions of this Operating Agreement, either by the issuance by the Company of Membership Interests for such consideration as the Members, by their unanimous votes shall determine, or as an Assignee of a Member's Membership Interest or a portion therof.

12.2     No Retroactive Allocations. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager or Managers may, at his or their option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE XIII

## Dissociation of Member

13.1    Dissociation.  A Person shall cease to be a Member upon the happening of any of the following events (a "Withdrawal Event")

13.1.1  the withdrawal of a Member with the consent of the Majority of the remaining Members;

13.1.2  a Member becoming a Bankrupt Member;

13.1.3  in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person estate/

13.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee;

13.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization

13.1.6  in the case of a Member which is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

13.2    Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of a stated term of existence as set forth in the Articles of Organization, or in Section 2.7 above:

13.2.1  if the dissociation causes a dissolution and winding up of the Company under Article XIV, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member, except that any Distributions t which the member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

13.2.2  if the dissociation does not cause a dissolution and winding up of the Company under Article XIV, the member shall be entitled to an amount equal to the value of the Member's Membership Interest in the Company, to be paid within six (6) months of the date of dissociation.  Notwithstanding the foregoing, if the dissociation is other than as a result of the death or incompetence of the Member, the Managers may pay the value of the Member's Membership Interest in the Company out over a period not to exceed five (5) years, provided that the dissociating Member shall be entitled to participate as an Assignee in the Company until the value of such interest (plus interest at the Default Interest Rate) is paid in full.  The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Agreement and the fair value of the Member's Membership Interest as of the date of dissociation, based upon the Member's right to share in distributions from the

Company, reduced by any damages sustained by the Company as a result of the Member's dissociation.

13.2.3 If the dissociation is a consensual withdrawal pursuant to Section 13.1.1, then the disposition of the Member's interest shall be provided in the terms of the consent to withdraw.

## ARTICLE XIV

### Dissolution and Winding Up

14.1    Dissolution. The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following Dissolution Events:

14.1.1 The latest date on which the Company is to dissolve, if any, as set forth in the Articles of Organization or in Section 2.7;

14.1.2 The vote or written consent of Members who own at least a majority of the Membership Interests or;

14.1.3 The dissociation of any Member or of any other event that terminates the continued membership of any Member, unless within one hundred eighty (180) days after such event, the Company is continued by the vote or written consent of a Majority Interest of all of the remaining Members, and there are at least two (2) remaining Members. Each of the Members hereby agrees that within eighty (80) days after the occurrence of a Withdrawal Even (and provided that there are at least two (2) remaining Members of the Company), they will promptly consent, in writing, to continue the business of the Company. Such consents shall be mailed or hand delivered to the principal place of business of the Company set forth in Section 2.3 hereof (or to such other address designated by the Managers) no later than eighty (80) days after each Withdrawal Event or transfer by a Member of its entire Economic Interest or Membership Interest. The sole remedy for breach of a Member's obligation under this Section shall be money damages (and no specific performance).

14.2    Winding Up. Upon the dissolution of the Company, the Managers may, in the name of and for and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Company's business, dispose of and convey the Company's property, discharge the Company's liabilities, and distribute to the Members and remaining assets of the Company, all without affecting the liability of Members. Upon winding up of the Company, the assets shall be distributed as follows:

14.2.1 To creditors, including any Member who is a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by

established of adequate reserves, other than liabilities for distributions to Members under Section 507 or Section 508 of the Act;

14.2.2  To Members and former Members in satisfaction of liabilities for Distributions under Section 507 or Section 508 of the Act; and

14.2.3  To Members and owners of Economic Interests, first for the return of their Capital Contributions, to the extent not previously returned, and second, respecting their Membership Interests, in the proportions in which the Members share in Distributions in accordance with this Agreement.

14.3  Articles of Dissolution. Within eighty (80) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, the Manager shall file articles of dissolution with the California Secretary of State pursuant to the Act.

14.4  Deficit Capital Account. Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the member shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose.

14.5  Non recourse to Other Members. Except as provided by applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall receive a return of his, her, or its Capital Contribution solely from the assets of the Company. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against any other Member.

## ARTICLE XV

### General Provisions

15.1  Notices. Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if it is in writing and (a) delivered personally to the party or to an executive officer of the party to whom such notice, demand or other communication is directed or (b) sent by messenger, or by overnight courier, or by registered or certified mail, postage prepaid, addressed to the member, Manager or the Company at his, her or its address set forth in this Agreement, or such address as the member, Manager or Company shall give notice of. Except as otherwise provided in the Agreement, any such notice shall be deemed to be

given, upon deliver, except if sent by registered or certified mail, then five (5) business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this Section.

15.2    **Entire Agreement and Amendments.** This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by he Members with respect thereto, whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or any rights and remedies of a Member pursuant to this Agreement. No amendment to this Agreement shall be effective unless made in a writing duly executed by all Members and specifically referring to each provision of this Agreement being amended.

15.3    **No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the California Uniform Partnership Act or the California Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by work or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

15.4    **Rights of Creditors and Third Parties under Agreement.** The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

15.5    **Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.6    **Telephonic Conferences.** The Members and/or Managers may participate in a meeting of Members or a meeting of Managers, as the case may be, by means of conference telephone or similar communications equipment by means of which

all Persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence of the Person at the meeting.

15.7    Construction. Whenever the singular number is used in this Agreement, and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

15.8    Headings. The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

15.9    Waiver. No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy. No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in writing duly executed by all Members and specifically referring to each such right or remedy being waived.

15.10   Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibited or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

15.11   Binding. This Agreement shall be binding upon and inure to the benefit of all Members, and each of the successors and assignees of the Members, except that right or obligation of a Member under this Agreement may be assigned by such Member to another Person without first obtaining the written consent of all other Members.

15.12   Counterparts. This Agreement may be executed in counter parts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

15.13   Governing Law. This Agreement shall be governed by, and interpreted and construed in accordance with, the law of the State of California, without regard to principles of conflict laws.

IN WITNESS WHEREOF, the individuals and entities signing this Agreement below conclusively evidence their agreement to the terms and conditions of this Agreement by so signing this Agreement.

DATED   February 11, 2000

_____
Managing member Furiborz Banayan

_____
Member  Moise Banayan

# EXHIBIT C

## RESOLUTION OF
## AHAVA OF CALIFORNIA, L.L.C.

It is resolved and agreed that AHAVA OF CALIFORNIA authorizes FARIBORZ BANAYAN the company's majority shareholder, chief financial officer and chief executive officer to open bank accounts and sign alone for the company at his sole discretion in amounts in his sole discretion.

Dated: March 27, 2001

AHAVA OF CALIFORNIA, L.L.C.

FARIBORZ BANAYAN, CHIEF EXECUTIVE OFFICER

# EXHIBIT D

# AGREEMENT

The agreement **Made** this 15th day of August 2005 by and between Moise Banayan an individual residing in Monsey New York ("Seller") and Fariborz Banayan residing in Venice Beach California ("Buyer") referred to herein as the "parties".

**Whereas,** The parties have shares in the stock of Ahava of California, LLC, a California corporation as follows: Moise Banayan 50% of the shares and Fariborz Banayan 50% of the shares.

**Whereas,** There was a certain inheritance fund at the above date from the deceased father of the parties in the amount of $507,852.94, and the seller is holding on to this fund, and is unable to distribute the 1/3 due to the buyer.

**Whereas,** The seller is requesting to pay this sum back to the buyer at a future date but prior to January 2nd 2007, and the buyer agrees to give this extended grace period to collect the debt arising from the inheritance proceed.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1: **STOCK SALE**

The Seller shall sell and fully transfer to the Buyer 50% stock shares of Ahava of California for the debt due.

2. **OPTION TO RE BUY THE TRANSFERRED STOCK**

The seller can buy back the sold and transferred stock from the buyer prior to January 2nd 2007, by paying to the buyer $167,284.32.

3 **VALUE OF STOCK AND PAYMENT**

The value of the stock is hereby established to be $169,284.32 as of January 2nd 2007, and it will remain the same until January 2nd 2007. The seller accepts the cancellation of the debt as full payment for the 50% shares in Ahava of California LLC

4. **GOVERNING LAW AND VENUE**

This agreement shall be construed and governed by the Laws of the State of California.

5.    **AUTHORITY**

Each party represents it has the capacity to enter this Agreement.

6.    **MODIFICATION**

No modification, amendment, or waiver of any of the provisions of this agreement shall be effective unless in writing and executed by all the parties hereto.

7.    **SUCCESSORS AND ASSIGNS**

This agreement shall be binding on the parties hereto and their respective successors and assigns.

8.    **WHOLE AGREEMENT**

This Agreement supercedes any and all prior agreements among the parties hereto with respect to the subject hereof and sets forth the final and entire agreement of the parties hereto

9.    **HEADINGS**

The headings in this agreement are for convenience only, and shall not effect the meaning of the terms hereof.

10.    **SEVERABILITY**

If any provision of this agreement shall be deemed invalid or unenforceable as written, it shall be construed to the greatest extent possible, in a manner which will render it valid and enforceable and any limitation of the scope or duration of such provision so necessary to make it valid and enforceable shall be so construed, no such unenforceability shall effect any other portion of this agreement unless the portion so deemed invalid and unenforceable is a material element of the agreement, taken as a whole.

Moise Banayan, Seller

Fariborz Banayan, Buyer

AHAVA OF CALIFORNIA, LLC

## ASSIGNMENT OF INTEREST AND CONSENT OF MANAGING MEMBER

In accordance with an agreement dated August 15th 2005, for One hundred sixty seven thousand and two hundred eighty four DOLLARS and 32 cent ($167,284.32) AND OTHER GOOD AND VALUABLE CONSIDERATION, **MOISE BANAYAN**, an individual, ("Assignor") hereby assigns all of its right, title, and interest in and to a fifty (50%) percent membership interest in Ahava of California, LLC, to **FARIBORAZ BANAYAN**, an individual ("Assignee").

Assignee hereby assumes all of the obligations of Assignor as a member under the Operating Agreement, dated Feb 11 2000 from and after the date hereof.

This Assignment of Interest may be executed in multiple counterpart copies, all of which shall constitute a single document and may be delivered by facsimile transmission.

Dated: 15th of August , 2005

ASSIGNOR:

_Moise Banayan_
Moise Banayan

ASSIGNEE:

_Fariborz Banayan_
FARIBORZ BANAYAN

CONSENTED TO:
AHAVA OF CALIFORNIA, LLC

Name: _Fariborz Banayan_
Title:   Managing Member

# EXHIBIT E

# Commercial Lease

This lease is made between _LEWIS COUNTY DAIRY Corp._

of _____, herein called Lessor, and

_AHAVA OF CALIFORNIA_ _____, of _____,

herein called Lessee. Lessee hereby offers to lease from Lessor the premises situated in the City of _Lowville_, County of _LEWIS_,

State of _NY_, described as _DAIRY PlanT_ _____

_____

upon the following TERMS and CONDITIONS:

**1. Term and Rent.** Lessor demises the above premises for a term of _5_ years, commencing _August 29/07_,
20 _07_, and terminating on _August 28_, 20 _12_, or sooner as provided herein at the annual rental
of _SEE ATTACHED_ Dollars ($ _ATTACHED_) payable in equal installments in advance on the first day
of each month for that month's rental, during the term of this lease. All rental payments shall be made to Lessor, at the address
specified above.

**2. Use.** Lessee shall use and occupy the premises for _DAIRY MANUFACTURING_. The premises shall
be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose. Lessee shall not use
the premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous
substance, chemical, thing, or device.

**3. Care and Maintenance of Premises.** Lessee acknowledges that the premises are in good order and repair, unless
otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the premises in good and safe condition,
including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the premises
and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted. Lessee
shall be responsible for all repairs required, excepting the roof, exterior walls, structural foundations, and: _____
_____ SEE ATTACHED _____

_____

_____

which shall be maintained by Lessor. Lessee shall also maintain in good condition such portions adjacent to the premises, such
as sidewalks, driveways, lawns and shrubbery, which would otherwise be required to be maintained by Lessor.

**4. Alterations.** Lessee shall not, without first obtaining the written consent of Lessor, make any alterations, additions, or
improvements, in, to or about the premises.

**5. Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and
federal authorities now in force, or which may hereafter be in force, pertaining to the premises, occasioned by or affecting the
use thereof by Lessee.

**6. Assignment and Subletting.** Lessee shall not assign this lease or sublet any portion of the premises without prior written
consent of the Lessor, which shall not be unreasonably withheld. Any such assignment or subletting without consent shall be
void and, at the option of the Lessor, may terminate this lease.

**7. Utilities.** All applications and connections for necessary utility services on the demised premises shall be made in the name
of Lessee only, and Lessee shall be solely liable for utility charges as they become due, including those for sewer, water, gas,
electricity, and telephone services. In the event that any utility or service provided to the premises is not separately metered,
Lessor shall pay the amount due and separately invoice Lessee for Lessee's pro rata share of the charges. Tenant shall pay such
amounts within fifteen (15) days of invoice. Lessee acknowledges that the leased premises are designed to provide standard of-
fice use electrical facilities and standard office lighting. Lessee shall not use any equipment or devices that utilize excessive elec-
trical energy or that may, in Lessor's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

**8. Entry and Inspection.** Lessee shall permit Lessor or Lessor's agents to enter upon the premises at reasonable times and
upon reasonable notice, for the purpose of inspecting the same, and will permit Lessor at any time within sixty (60) days prior to
the expiration of this lease, to place upon the premises any usual "To Let" or "For Lease" signs, and permit persons desiring to

lease the same to inspect the premises thereafter.

**9. Parking.** During the term of this lease, Lessee shall have the nonexclusive use in common with Lessor, other tenants of the building, their guests and invitees, of the nonreserved common automobile parking areas, driveways, and foot ways, subject to rules and regulations for the use thereof as prescribed from time to time by Lessor. Lessor reserves the right to designate parking areas within the building or in a reasonable proximity thereto, for Lessee and Lessee's agents and employees. Lessee shall provide Lessor with a list of all license numbers for the cars owned by Lessee, its agents and employees. Separated structured parking, if any, located about the building is reserved for Lessees of the building who rent such parking spaces. Lessee hereby leases from Lessor _____ spaces in such a structural parking area, such spaces to be on a first-come first-served basis. In consideration of the leasing to Lessee of such spaces, Lessee shall pay a monthly rental _____ Dollars ($_____) per space throughout the term of the lease. Such rent shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals.

**10. Possession.** If Lessor is unable to deliver possession of the premises at the commencement hereof, Lessor shall not be liable for any damage caused thereby, nor shall this lease be void or voidable, but Lessee shall not be liable for any rent until possession is delivered. Lessee may terminate this lease if possession is not delivered within _____ days of the commencement of the term hereof.

**11. Indemnification of Lessor.** To the extent of the law, Lessor shall not be liable for any damage or injury to Lessee, or any other person, or to any property, occurring on the demised premises or any part thereof. Lessee agrees to indemnify and hold Lessor harmless from any claims for damages which arise in connection with any such occurence. Said indemnification shall include indemnity from any costs or fee which Lessor may incur in defending said claim.

**12. Insurance.** Lessee, at his expense, shall maintain plate glass and public liability insurance including bodily injury and property damage insuring Lessee and Lessor with minimum coverage as follows:

> Lessee shall provide Lessor with a Certificate of Insurance showing Lessor as additional insured. The Certificate shall provide for a ten-day written notice to Lessor in the event of cancellation or material change of coverage. To the maximum extent permitted by insurance policies which may be owned by Lessor or Lessee, Lessee and Lessor, for the benefit of each other, waive any and all rights of sub rogation which might otherwise exist.

> If the leased premises or any other part of the building is damaged by fire or other casualty resulting from any act of negligence of Lessee or any of Lessee's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Lessee shall be responsible for the costs of repair not covered by insurance.

**13. Eminent Domain.** If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Lessee's use of the premises, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent, and any additional rent, shall be apportioned as of the termination date, and any rent paid for any period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a claim for any taking of fixtures and improvements owned by Lessee, and for moving expenses.

**14. Destruction of Premises.** In the event of a partial destruction of the premises during the term hereof, from any cause, Lessor shall forthwith repair the same, provided that such repairs can be made within sixty (60) days under existing governmental laws and regulations, but such partial destruction shall not terminate this lease, except that Lessee shall be entitled to a proportionate reduction of rent while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business of Lessee on the premises. If such repairs cannot be made within said sixty (60) days, Lessor, at his option, may make the same within a reasonable time, this lease continuing in effect with the rent proportionately abated as aforesaid, and in the event that Lessor shall not elect to make such repairs which cannot be made within sixty (60) days, this lease may be terminated at the option of either party. In the event that the building in which the demised premises may be situated is destroyed to an extent of not less than one-third of the replacement costs thereof, Lessor may elect to terminate this lease whether the demised premises be injured or not. A total destruction of the building in which the premises may be situated shall terminate this lease.

**15. Lessor's Remedies on Default.** If Lessee defaults in the payment of rent, or any additional rent, or defaults in the performance of any of the other covenants or conditions hereof, Lessor may give Lessee notice of such default and if Lessee does not cure any such default within ___30___ days, after the giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such ___30___ days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this lease on not less than ___30___ days' notice to Lessee. On the date specified in such notice the term of this lease shall terminate, and Lessee shall then quit and surrender the premises to Lessor, without extinguishing Lessee's liability. If this lease

shall have been so terminated by Lessor, Lessor may at any time thereafter resume possession of the premises by any lawful means and remove Lessee or other occupants and their effects. No failure to enforce any term shall be deemed a waiver.

**16. Security Deposit.** Lessee shall deposit with Lessor on the signing of this lease the sum of 3 8,000 Dollars ($ 0 ) as security for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided. If Lessor applies any part of the deposit to cure any default of Lessee, Lessee shall on demand deposit with Lessor the amount so applied so that Lessor shall have the full deposit on hand at all times during the term of this lease.

**17. Tax Increase.** In the event there is any increase during any year of the term of this lease in the City, County or State real estate taxes over and above the amount of such taxes assessed for the tax year during which the term of this lease commences, whether because of increased rate or valuation, Lessee shall pay to Lessor upon presentation of paid tax bills an amount equal to 100 % of the increase in taxes upon the land and building in which the leased premises are situated. In the event that such taxes are assessed for a tax year extending beyond the term of the lease, the obligation of Lessee shall be proportionate to the portion of the lease term included in such year.

**18. Common Area Expenses.** In the event the demised premises are situated in a shopping center or in a commercial building in which there are common areas, Lessee agrees to pay his prorata share of maintenance, taxes, and insurance for the common area.

**19. Attorney's Fees.** In case suit should be brought for recovery of the premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

**20. Waiver.** No failure of Lessor to enforce any term hereof shall be deemed to be a waiver.

**21. Notices.** Any notice which either party may or is required to give, shall be given by mailing the same, postage prepaid, to Lessee at the premises, or Lessor at the address specified above, or at such other places as may be designated by the parties from time to time.

**22. Heirs, Assigns, Successors.** This lease is binding upon and inures to the benefit of the heirs, assigns and successors in interest to the parties.

**23. Option to Renew.** Provided that Lessee is not in default in the performance of this lease, Lessee shall have the option to renew the lease for an additional term of 6 0 months commencing at the expiration of the initial lease term. All of the terms and conditions of the lease shall apply during the renewal term except that the monthly rent shall be the sum of $ 20,000. ___ . The option shall be exercised by written notice given to Lessor not less than 9 0 days prior to the expiration of the initial lease term. If notice is not given in the manner provided herein within the time specified, this option shall expire.

**24. Subordination.** This lease is and shall be subordinated to all existing and future liens and encumbrances against the property.

**25. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in ___ ___ . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**26. Entire Agreement.** The foregoing constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties. The following Exhibits, if any, have been made a part of this lease before the parties' execution hereof: *SEE AttAched* .∴ *equipment list* MB FB

Signed this 29 th day of August , 20 0 7.

Lessor: *Nasi Beacfon*

Lessee: *Fariborz Bonayon*

## Amendment to Lease dated August 29, 2007

This agreement amends and supplements the lease agreement (the `lease`) made this August 29th 2007 by and between Lewis County Dairy Corp. ( the "Landlord"), with an office at 100 Beard Street, Brooklyn, New York and Ahava of California, LLC a California Limited Liability Company (" Tenant" ), with an office at 908 Rose Av Venice California.

1.    Premises and Equipment. Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord (a) the land, the buildings and other improvements located at Route 812 , Lowville, New York and more particularly described (the "Premises") and (b) all of the personal property and equipment located at the Premise, including, without limitation, the items presently therein (the "Equipment"). The list of such equipment is attached in schedule "A".

2.    Terms and Early Termination term.    Tenant shall have the right to terminate this Lease at any time upon 90 days prior written notice to Landlord within the first year of this agreement.

3.    Rent.    Tenant agrees to pay rent during the term of this Lease as per the following rent schedule: With the signing of this contract the tenet is to pay a six month advance rate at $6,000 per month for a total sum of $36,000. Thereafter from march 1st 2008 the rent shall increase to $12,000 per month for the remainder of this lease. Payable on the first of each month.

4.    Landlord's Default. The Landlord failure to timely pay its obligations to any creditor holding an interest of whatever kind in the premises or the equipment outlined in schedule 'A" constitutes a default by landlord in addition to any other conditions of default set forth in the lease.

5.    Right of Tenant to Cure Landlord's Default.    If Landlord defaults in the making of any payment or the doing of any act required under this Lease, Tenant may make such payment or do such act and shall be entitled to set-off the amount of such payment against the Rent owed under this Lease.

6.    Severability In the event any portion of this amendment shall be declared void, invalid or illegal the remainder of the agreement shall remain in full force and effect. In the event of a dispute between the lease and this amendment, this amendment shall govern provided, however, that no provision of this amendment shall invalidate or impair the lease.

7.    Applicable Law and Venue This agreements shall be construed in accordance with the laws of the State of New York. Jurisdiction and venue are agreed to be the Supreme Court of the State of New York, County of Lewis.

8.    Modification. This agreement and the lease may not be modified except by a writing signed by all parties to this agreement.

9.    _Independent Status_ The parties acknowledge that this agreement is the only relationship between the parties and that neither party is the employee, agent, subsidiary, shareholder or neither is responsible for the actions of the other.

10.    _Successors and Assigns_ This agreement is binding upon the parties hereto and their successors and assigns.

11.    _Notices_ Notices shall be sent to the parties at the addresses set forth above.

IN WITNESS WHEREOF, the parties have entered into this agreement.

IN WITNESS WHEREOF, the parties have entered into this agreement.

Ahava of California LLC                Lewis County Dairy Corp.


By _____            By _____

Fariborz Banayan Sole Managing member    Moise Banayan President

Witness                                Witness

Joseph M Cohn
Aug 29 2007                            Aug. 29th 2007.

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 2000 | **Centrifugal Seperator**<br>Make:        Westfalia<br>Model:       ASA6-01-076<br>Serial #:     1720706<br>Stainless steel 24" CIP, 7,560 RPM |
| 1 | 1999 | **Tub filler**<br>Make:        ATS<br>Model:       SP1-2L<br>Serial #:     0999<br>Stainless steel bulk tub filler with cello over wrapper, RF sealer, turret film unwind, die cutter, scrap rewind, 3 head with PLC controls, auto feed and discharge |
| 1 | 2002 | **Vertical Silo**<br>Make:        Walker<br>10,000 USG stainless steel refrigerated, Tri-clover air vales, CIP spray balls, front mount agitator, front manway, Anderson AV-9000 digital chart recorder |
| 1 | 2002 | **Refrigerated box truck**<br>Make:        International<br>Model:       4400<br>VIN:         1HTMSAAR62T033924<br>T/A 6 X 4, DT 466 275 HP, Eaton Fuller 8 speed Syncro-Stick transmission, 26' aluminum box with Carrier reefer, spring suspension, 102,752 miles |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | 2003 | Condensed milk processing system<br>Make:        Alaqua<br>(2) stainless steel 1,320 USG single wall hinged lid vertical water feed tanks, 60 USG balance tank, APV stainless steel heat exchangers, (2) evaporator steam jacketed cone bottom processing tanks, stainless steel piping and pumps, all associated equipment |
| 1 | 2000 | Bottle filler<br>Make:        Franz<br>30 head automatic rotary plastic bottle filler, 1 Qt. - 1/2 USG with feed conveyor |
| 2 | 2002 | Vertical Silo<br>Make:        Walker<br>Serial #:    PC24862<br>Stainless steel 40,000 USG refrigerated with CIP spray balls. Tri-clover air valves, 1 HP front mounted agitator, front manway, Anderson AV-9000 dogota; chart recorders |
| 1 | 2000 | Whey separator<br>Make:        Separators Inc.<br>Model:       MR-PX214<br>Serial #:    2937333<br>36" stainless steel high speed centrifugal |
|  |  |  |

| Qty | Year | Description |
|---|---|---|
| 1 | 2005 | **Processing tank**<br>Make:      Walker<br>Model:      PZ SP6<br>Serial #:      41007<br>Stainless steel 800 USG dome top, full sweep agitator, steam jacketed |
| 1 | 2001 | **Processing tank**<br>Make:      Viatec<br>Stainless steel batch processing tank, dome top, steam jacketed, 440 USG with 1 HP full sweep agitator |
| 1 | 2006 | **Bottle filler**<br>Make:      General Films<br>Portable stainless steel bag-in box filler |
| 1 | | **Vacuum packer**<br>Make:      Koch<br>Model:      Ultra-Vac II<br>Semi-automatic twin chamber with gas flush |
| 1 | 2002 | **Processing tank**<br>Make:      Walker<br>Model:      PZ<br>Stainless steel Glycol jacketed, top hatch, 1/2 HP full sweep agitator, 300 USG, CIP spray balls |
| 3 | | **Cheese vat**<br>Stainless steel steam jacketed open top, 28' X 64" X 40" with bridge mounted twin traveling agitators |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 1971 | **Vertical Silo**<br>Make:        Walker<br>Model:        VSHT-2139R<br>Serial #:        7848<br>40,000 USG stainless steel refrigerated, Tri-clover air valves, front mount agitaor, CIP spray balls, front manway, Partlow and Anderson digital chart recorders |
| 1 |  | **Tanks and Fixtures**<br>Lot of assorted stainless steel small balance tanks, accumulation tables, stainless steel pumps, free standing sinks, COP tanks, and related equipment |
| 1 | 1999 | **Processing tank**<br>Make:        Feldmeier<br>stainless steel batch tank, 1 HP full sweep agitator, dome top, electronic load cells on four legs with Weightronix WI-127 digital read out |
| 1 |  | **Processing tank**<br>Make:        Walker<br>Model:        PZ 600<br>Stainless steel cold water jacketed, dome top, front manway, full sweep agitator |
| 1 | 2002 | **Processing tank**<br>Make:        Walker<br>Model:        PZ800<br>Stainles steel dome top wit full sweep agitator |
|  |  |  |



| Qty | Year | Description |
|---|---|---|
| 2 | | **Equalizing tank**<br>Make:       Secado<br>Model:       Galaxy<br>Stainless steel cone bottom, 3,000 USG |
| 1 | | **Processing tank**<br>Stainless steel vertical cold water jacketed, 1,250 USG with full sweep agitator |
| 1 | | **Processing tank**<br>Stainless steel vertical cold water jacketed, 1,000 USG with full sweep agitator |
| 1 | | **Processing tank**<br>Make:       Cherry Burrell<br>Stainless steel batch processing tank, Glycol jacketed, 5 HP full sweep agitator with gear reduction, 850 USG |
| 1 | | **Processing tank**<br>Stainless steel 1,000 USG dome top, full sweep agitator, top hatch, cold water jacketed |
| 1 | | **Homogenizer**<br>Make:       Gaulin<br>Stainless steel 3 piston |
| 1 | 1985 | **Butter Churn**<br>Make:       Paasch & Silkborg<br>Model:       NCE<br>Serial #:       9518<br>Cold water jacketed continuous with CIP |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | **CIP system**<br>150 USG rectangular steam jacketed tank, 150 USG single wall hinged lid stainless steel tank, 500 USG steam jacketed hot water feed tank, 5 - 7 1/2 HP pumps |
| 1 | | **CIP system**<br>(2) Stainless steel steam jacketed tanks, stainless steel pumps, PLC controls, Anderson ACR700 digital chart recorder |
| 1 | 1979 | **Processing tank**<br>Make:        Walker<br>Model:        PZ-ST<br>Stainless steel steam jacketed, top hatch, 1/2 HP agitator, 200 USG |
| 1 | 1989 | **Heat Exchanger**<br>Make:        Proflow<br>Model:        AR56-5<br>Stainless steel 56 size plate frame |
| 2 | | **Printer**<br>Make:        Domino<br>Model:        A300SE<br>Ink jet encoders with DRO |
| 1 | | **Homogenizer**<br>Make:        Gaulin<br>Stainless steel 3 piston |
| 1 | | **Whipping machine**<br>Make:        Cherry Burrell<br>Stainless steel vertical cylinder 40 HP drive |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | | **Chiller**<br>Make:    Cherry Burrell<br>Model:    648L<br>Stainless steel twin barrel<br>thermulator, 6" diameter X 48" |
| 1 | | **Lab equipment**<br>Lot of assorted including INDEX<br>SNAPSHOT tester, Orion and<br>Corning digital Ph meters, digital lab<br>balances, digital parts counting<br>scales, Leica dark field colony<br>counter, environmental test chambers<br>and incubators |
| 3 | | **Horizontal tank**<br>Stailess steel refrigerated 6,800 USG<br>with CIP spray balls, Tri-clover air<br>valves, front mounted agitators,<br>Anderson AJ-300 chart recorder |
| 1 | 1957 | **Horizontal tank**<br>Make:    Chicago Stainless<br>Stainless steel refrigerated, CIP<br>spray balls, Tri-clover air valves, 5<br>HP stainless steel pump, front hatch |
| 1 | | **Chiller**<br>Make:    Cherry Burrell<br>Model:    624L<br>Stainless steel twin barrel<br>thermulator, 6" diameter X 24" |
| | | |

# EXHIBIT F

# Commercial Lease

This lease is made between _St Lawrence Food Corp._
of _____, herein called Lessor, and
_AHAVA of California LLC_ , of _____
_____, herein called Lessee. Lessee hereby offers to lease from Lessor the
premises situated in the City of _Ogdensburg_ , County of _St Lawrence_,
State of _NY_ , described as _cheese plant_

upon the following TERMS and CONDITIONS:

**1. Term and Rent.** Lessor demises the above premises for a term of __5__ years, commencing _Oct to Nov_
_30th_ 20 _07_, and terminating on _Oct. 29th_ , 20 _12_ , or sooner as provided herein at the annual rental
of _Each sum IV_ Dollars ($ _15,000_ ) payable in equal installments in advance on the first day
of each month for that month's rental, during the term of this lease. All rental payments shall be made to Lessor, at the address
specified above.

**2. Use.** Lessee shall use and occupy the premises for _CHEESE Aceiling_ . The premises shall
be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose. Lessee shall not use
the premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous
substance, chemical, thing, or device.

**3. Care and Maintenance of Premises.** Lessee acknowledges that the premises are in good order and repair, unless
otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the premises in good and safe condition,
including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the premises
and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted. Lessee
shall be responsible for all repairs required, excepting the roof, exterior walls, structural foundations, and: _____
_____ SEE ATTAChed _____ _____
_____
_____
_____

which shall be maintained by Lessor. Lessee shall also maintain in good condition such portions adjacent to the premises, such
as sidewalks, driveways, lawns and shrubbery, which would otherwise be required to be maintained by Lessor.

**4. Alterations.** Lessee shall not, without first obtaining the written consent of Lessor, make any alterations, additions, or
improvements, in, to or about the premises.

**5. Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and
federal authorities now in force, or which may hereafter be in force, pertaining to the premises, occasioned by or affecting the
use thereof by Lessee.

**6. Assignment and Subletting.** Lessee shall not assign this lease or sublet any portion of the premises without prior written
consent of the Lessor, which shall not be unreasonably withheld. Any such assignment or subletting without consent shall be
void and, at the option of the Lessor, may terminate this lease.

**7. Utilities.** All applications and connections for necessary utility services on the demised premises shall be made in the name
of Lessee only, and Lessee shall be solely liable for utility charges as they become due, including those for sewer, water, gas,
electricity, and telephone services. In the event that any utility or service provided to the premises is not separately metered,
Lessor shall pay the amount due and separately invoice Lessee for Lessee's pro rata share of the charges. Tenant shall pay such
amounts within fifteen (15) days of invoice. Lessee acknowledges that the leased premises are designed to provide standard of-
fice use electrical facilities and standard office lighting. Lessee shall not use any equipment or devices that utilize excessive elec-
trical energy or that may, in Lessor's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

**8. Entry and Inspection.** Lessee shall permit Lessor or Lessor's agents to enter upon the premises at reasonable times and
upon reasonable notice, for the purpose of inspecting the same, and will permit Lessor at any time within sixty (60) days prior to
the expiration of this lease, to place upon the premises any usual "To Let" or "For Lease" signs, and permit persons desiring to

lease the same to inspect the premises thereafter.

9. **Parking.** During the term of this lease, Lessee shall have the nonexclusive use in common with Lessor, other tenants of the building, their guests and invitees, of the nonreserved common automobile parking areas, driveways, and foot ways, subject to rules and regulations for the use thereof as prescribed from time to time by Lessor. Lessor reserves the right to designate parking areas within the building or in a reasonable proximity thereto, for Lessee and Lessee's agents and employees. Lessee shall provide Lessor with a list of all license numbers for the cars owned by Lessee, its agents and employees. Separated structured parking, if any, located about the building is reserved for Lessees of the building who rent such parking spaces. Lessee hereby leases from Lessor _____ spaces in such a structural parking area, such spaces to be on a first-come first-served basis. In consideration of the leasing to Lessee of such spaces, Lessee shall pay a monthly rental _____ Dollars ($ _____ ) per space throughout the term of the lease. Such rent shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals.

10. **Possession.** If Lessor is unable to deliver possession of the premises at the commencement hereof, Lessor shall not be liable for any damage caused thereby, nor shall this lease be void or voidable, but Lessee shall not be liable for any rent until possession is delivered. Lessee may terminate this lease if possession is not delivered within _____ days of the commencement of the term hereof.

11. **Indemnification of Lessor.** To the extent of the law, Lessor shall not be liable for any damage or injury to Lessee, or any other person, or to any property, occurring on the demised premises or any part thereof. Lessee agrees to indemnify and hold Lessor harmless from any claims for damages which arise in connection with any such occurrence. Said indemnification shall include indemnity from any costs or fee which Lessor may incur in defending said claim.

12. **Insurance.** Lessee, at his expense, shall maintain plate glass and public liability insurance including bodily injury and property damage insuring Lessee and Lessor with minimum coverage as follows:

> Lessee shall provide Lessor with a Certificate of Insurance showing Lessor as additional insured. The Certificate shall provide for a ten-day written notice to Lessor in the event of cancellation or material change of coverage. To the maximum extent permitted by insurance policies which may be owned by Lessor or Lessee, Lessee and Lessor, for the benefit of each other, waive any and all rights of sub rogation which might otherwise exist.

> If the leased premises or any other part of the building is damaged by fire or other casualty resulting from any act of negligence of Lessee or any of Lessee's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Lessee shall be responsible for the costs of repair not covered by insurance.

13. **Eminent Domain.** If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Lessee's use of the premises, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent, and any additional rent, shall be apportioned as of the termination date, and any rent paid for any period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a claim for any taking of fixtures and improvements owned by Lessee, and for moving expenses.

14. **Destruction of Premises.** In the event of a partial destruction of the premises during the term hereof, from any cause, Lessor shall forthwith repair the same, provided that such repairs can be made within sixty (60) days under existing governmental laws and regulations, but such partial destruction shall not terminate this lease, except that Lessee shall be entitled to a proportionate reduction of rent while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business of Lessee on the premises. If such repairs cannot be made within said sixty (60) days, Lessor, at his option, may make the same within a reasonable time, this lease continuing in effect with the rent proportionately abated as aforesaid, and in the event that Lessor shall not elect to make such repairs which cannot be made within sixty (60) days, this lease may be terminated at the option of either party. In the event that the building in which the demised premises may be situated is destroyed to an extent of not less than one-third of the replacement costs thereof, Lessor may elect to terminate this lease whether the demised premises be injured or not. A total destruction of the building in which the premises may be situated shall terminate this lease.

15. **Lessor's Remedies on Default.** If Lessee defaults in the payment of rent, or any additional rent, or defaults in the performance of any of the other covenants or conditions hereof, Lessor may give Lessee notice of such default and if Lessee does not cure any such default within _____ 30 _____ days, after the giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such _____ 3 _____ days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this lease on not less than _____ 30 _____ days' notice to Lessee. On the date specified in such notice the term of this lease shall terminate, and Lessee shall then quit and surrender the premises to Lessor, without extinguishing Lessee's liability. If this lease

shall have been so terminated by Lessor, Lessor may at any time thereafter resume possession of the premises by any lawful means and remove Lessee or other occupants and their effects. No failure to enforce any term shall be deemed a waiver.

**16. Security Deposit.** Lessee shall deposit with Lessor on the signing of this lease the sum of _____ Dollars ($ _____ *cA* _____ ) as security for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided. If Lessor applies any part of the deposit to cure any default of Lessee, Lessee shall on demand deposit with Lessor the amount so applied so that Lessor shall have the full deposit on hand at all times during the term of this lease.

**17. Tax Increase.** In the event there is any increase during any year of the term of this lease in the City, County or State real estate taxes over and above the amount of such taxes assessed for the tax year during which the term of this lease commences, whether because of increased rate or valuation, Lessee shall pay to Lessor upon presentation of paid tax bills an amount equal to _*/oo*_ % of the increase in taxes upon the land and building in which the leased premises are situated. In the event that such taxes are assessed for a tax year extending beyond the term of the lease, the obligation of Lessee shall be proportionate to the portion of the lease term included in such year.

**18. Common Area Expenses.** In the event the demised premises are situated in a shopping center or in a commercial building in which there are common areas, Lessee agrees to pay his prorata share of maintenance, taxes, and insurance for the common area.

**19. Attorney's Fees.** In case suit should be brought for recovery of the premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

**20. Waiver.** No failure of Lessor to enforce any term hereof shall be deemed to be a waiver.

**21. Notices.** Any notice which either party may be required to give, shall be given by mailing the same, postage prepaid, to Lessee at the premises, or Lessor at the address specified above, or at such other places as may be designated by the parties from time to time.

**22. Heirs, Assigns, Successors.** This lease is binding upon and inures to the benefit of the heirs, assigns and successors in interest to the parties.

**23. Option to Renew.** Provided that Lessee is not in default in the performance of this lease, Lessee shall have the option to renew the lease for an additional term of _*5 O*_ months commencing at the expiration of the initial lease term. All of the terms and conditions of the lease shall apply during the renewal term except that the monthly rent shall be the sum of $ *2C,00 0* ____ . The option shall be exercised by written notice given to Lessor not less than _*9 0*_ days prior to the expiration of the initial lease term. If notice is not given in the manner provided herein within the time specified, this option shall expire.

**24. Subordination.** This lease is and shall be subordinated to all existing and future liens and encumbrances against the property.

**25. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in _____ _____ . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**26. Entire Agreement.** The foregoing constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties. The following Exhibits, if any, have been made a part of this lease before the parties' execution hereof:

*See     Attached*                                          *MB*
                                                            *FB*

Signed this _*30th*_ day of _*October*_ , 200 *7* .

Lessor: _____*Loile Benejon*_____

Lessee: _____*Fariboz Banogan*_____

This agreement amends and supplements' the lease agreement (The `lease') made this October 30th 2007 by and between St Lawrence Food Corp. ( the "Landlord"), with an office at 30 main street, Odgensburg, New York and Ahava of California, LLC a California Limited liability corporation (" Tenant" ), with an office at 908 Rose Av Venice California.

1.     Premises and Equipment.     Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord (a) the land, the buildings and other improvements located at 30 main street Odgensburg, New York and more particularly described (the "Premises") and (b) all of the personal property and equipment located at the Premise, including, without limitation, the items presently therein (the "Equipment"). The list of such equipment is attached in schedule "A".

2.     Term and Early Termination term.     Tenant shall have the right to terminate this Lease at any time upon 90 days prior written notice to Landlord within the first year of this agreement. The term of the lease shall be for a period of 5 years commencing on the 30th day of October 2007 and concluding upon the 29th day of October 2012.

3.     Rent.     Tenant agrees to pay rent during the term of this Lease as per the following rent schedule: With the signing of this contract the tenet is to pay a four month advance rate at $15,000 per month for a total sum of $60,000. Thereafter from march 1st 2008 the rent shall be paid on the first of each and every month for $15,000 per month.

4. Landlord's Default.     The Landlord failure to timely pay its obligations to any creditor holding an interest of whatever kind in the premises or the equipment outlined in schedule 'A" constitutes a default by landlord in addition to any other conditions of default set forth in the lease.

5. Right of Tenant to Cure Landlord's Default.     If Landlord defaults in the making of any payment or the doing of any act required under this Lease, Tenant may make such payment or do such act and shall be entitled to set-off the amount of such payment against the Rent owed under this Lease.

6. Severability In the event any portion of this amendment shall be declared void, invalid or illegal the remainder of the agreement shall remain in full force and effect. In the event of a dispute between the lease and this amendment, this amendment shall govern provided, however, that no provision of this amendment shall invalidate or impair the lease.

7. Applicable Law and Venue This agreements shall be construed in accordance with the laws of the State of New York. Jurisdiction and venue are agreed to be the Supreme Court of the State of New York, County of Lewis.

8. Modification. This agreement and the lease may not be modified except by a writing signed by all parties to this agreement.

9.    <u>Independent Status</u> The parties acknowledge that this agreement is the only relationship between the parties and that neither party is the employee, agent, subsidiary, shareholder or neither is responsible for the actions of the other.

10.    <u>Successors and Assigns</u> This agreement is binding upon the parties hereto and their successors and assigns.

11.    <u>Notices</u> Notices shall be sent to the parties at the addresses set forth above.

IN WITNESS WHEREOF, the parties have entered into this agreement.

IN WITNESS WHEREOF, the parties have entered into this agreement.

Ahava of California LLC                          St Lawrence Food Corp.

By_____          By_____

Fariborz Banayan Sole managing Member        Moise Banayan  President

witness                                          Witness

Joseph H Cohen
October 30, 2007                               October 30th 2007.

| Qty | Year | Description |
|---|---|---|
| 2 | | **Vertical Silo** Stainless steel vertical refrigerated 35,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 4 | 2002 | **Processing tank** Make:       Cherry Burrell Stainless steel steam jacketed starter tanks, 650 USG- 60" diameter X 52", 24" top hatch on dome top, 1/2 HP agitators, CIP spray balls, ABB digital chart recorder, Allen Bradley PLC controls |
| 1 | | **CIP system** (3) stainless steel tanks- 36" diameter X 48", 7 1/2 HP circulating pump with AC TECH drive control, 20 HP delivery pump with AC TECH drive control, 2" - 2.5" piping with TENOR 763 PLC chemical delivery system and digital control panel, Anderson digital chart recorder |
| | | **CIP system** (2) 36" X 42" X 72" stainless steel tanks, 5 HP pump with AC TECH drive control, stainless steel piping, foamer, (3) ACR 700 digital chart recorder, PLC controls, (3) pump AFTROL MAGNUM III chemical system, stainless steel hot water delivery surge tank |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | 2001 | **Centrifugal Separator**<br>Make:        Separators Inc.<br>Model:       MRPX 213<br>36" whey separator, 4,500 RPM with digital drive control |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 30,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | 2002 | **Water treatment system**<br>Reverse osmosis water purification system, skid mounted stainless steel, 4" diameter X 40 tube system, (4) Fristam 10 HP pumps, (2) Fristam 25 HP pumps, AC drive controls on all pumps, PLC controls |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 2 | 2002 | **Vacuum packer**<br>Make:    Multivac<br>Model:    C-500<br>dual chamber stainless steel with gas flush |
| 1 | | **Water treatment system**<br>Ultra-fine water purification membrane type system, skid mounted stainless steel, 4" diameter X 38 tube, (4) Fristam 25 HP stainless steel pumps, 3 stage system, AC drive controls on all pumps, PLC controls |
| 1 | 2002 | **Cheese former**<br>Make:    COMAT<br>Model:    M50B4<br>Stainless steel with hopper feed, 4 tube extruder head with assorted dies, 18" wide with 8" diameter heads |
| 1 | | **CIP system**<br>(3) stainless steel tanks with chemical pumps, foamer, AC TECH digital drive controls on pumps, PLC controls, ABB Commander 1900 digital chart recorder |
| 1 | | **Machine Shop**<br>Assorted machine tools and service equipment |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | **Cheese shredder**<br>Make:        Urschell<br>24" stainless steel rotary with 10 HP drive, 6' X 48" diameter stainless steel ambient air tumble dryer with segmented feed conveyor- discharge conveyor |
| 9 | | **Horizontal tank**<br>Stainless steel refrigerated, 7,200 USG with front agitator, front hatch, CIP spray balls, Tri-clover air valves |
| 5 | | **Cheese vat**<br>Make:        Stoelting<br>Stainless steel open top steam jacketed oval, 60" X 48" X 32' with overhead bridge traveling dual agitators, 2" piping, digital temp controls |
| 2 | 1988 | **HTST system**<br>Make:        Alfa Laval<br>Model:        H7-RC<br>Stainless steel plate press heat exchanger, 100 USG stainless steel balance tank, stainless steel piping and pumps, ABB PLC controls, AC TECH drive controls on all pumps, Anderson AV-900 digital chart recorder |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |

| Qty | Year | Description |
|---|---|---|
| 1 | 1989 | **Boiler**<br>Make:   Cleaver Brooks<br>Model:   CB400-600<br>Serial #:   L85851<br>400 HP gas-oil fired packaged steam |
|  |  | **Lab equipment**<br>Lot of assorted |
| 1 |  | **Vertical Silo**<br>Stainless steel vertical refrigerated 35,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 |  | **CIP system**<br>(3) stainless steel tanks- 36" diameter X 48", 7 1/2 HP circulating pump with AC TECH drive control, 20 HP delivery pump with AC TECH drive control, 2" - 2.5" piping with TENOR 783 PLC chemical delivery system and digital control panel, Anderson digital chart recorder |
| 1 |  | **Cheese shredder**<br>Make:   Urschell<br>Stainless steel portable |
| 1 |  | **Cheese cutter**<br>Make:   Urschell<br>Stainless steel portable cuber |
| 1 |  | **Tanks and Fixtures**<br>Lot of assorted stainless steel sinks, tables, rolling COP tanks, surge tanks, balance tanks, and related |
|  |  |  |

| Qty | Year | Description |
|---|---|---|
| 1 | | Pallet rack<br>Lot of assorted |
| | 1975 | Boiler<br>Make:    Cleaver Brooks<br>Serial #:    L59963<br>400 HP gas-oil fired packaged steam, new tubes installed 2005 |
| 1 | | Cheese cutter<br>Make:    Tu-Way<br>Stainless steel pneumatic up acting automatic cuber, 12" X 15" platform |
| 1 | 1995 | Air Compressor<br>Make:    Ingersoll Rand<br>Model:    SSREP505E<br>Rotary screw with digital controls, 50 HP |
| 1 | 2005 | Ice maker<br>Make:    Alcion<br>Model:    Ice-o-matic<br>48" bin automatic |
| 1 | 1996 | Forklift<br>Make:    Toyota<br>Model:    42-GFCGU18<br>Solid tire LP, 3,000# with side shift, 11,399 Hrs. |
| 1 | | Air Compressor<br>Make:    Ingersoll Rand<br>Model:    T-30<br>25 HP twin cylinder with air holding tank |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | | Mixing tank<br>Stainless steel seam jacketed, 48" X 52" 500 USG with .5 HP lightning mixer |
| 1 | | Heat Exchanger<br>Make:        Ahborn<br>Model:        151<br>Stainless steel plate press |
| 1 | | Metal detector<br>Make:        Safeline<br>Model:        Powerphase |
| 2 | | Box taper<br>Make:        Little David<br>Top/bottom with Micro-Jet encoders |
| 1 | | Cooling tank<br>Stainless steel with overhead bridge crane, (2) 1/2 ton electric chain fall hoists, 24' X 48" X 36" |
| 1 | | Cleaning tank<br>Portable COP steam coil jacketed with 3 HP pump, 90" X 28" X 30" |
| 1 | | Baler<br>Model:        HP-50<br>60" hydraulic vertical |
| 1 | | Extruder<br>Make:        Tramalina<br>Stainless steel twin cylinder, 12' X 8" |
| 1 | 1963 | Heat Exchanger<br>Make:        Chester Jensen<br>Model:        HMC<br>Stainless steel 55 size plate press frame |

# EXHIBIT G

## SETTLEMENT AGREEMENT

November 27th 2007

This is an settlement agreement between Ahava of California.LLC (AOC) a California limited liability corporation with an address of 908 Rose Venice California and Schwartz and Sons Quality Distributor (SSQD) a NY corporation with an address of 110 Beard street Brooklyn NY, as follows:

Whereas there exist a certain lease agreement (LEASE) dated October 26 2006 between Yoni realty LLC a NY limited Liability company with various addresses on Beard and Richard street Brooklyn NY (YONI) and Ahava Food Corp. (AFC) a NY corporation with address 110 Beard Street Brooklyn and,

Whereas AFC assigned and SSQD assumed the LEASE on July 30th 2007 for a period of two years in an agreement dated July 30th 2007, as attached and

Whereas Signature bank no longer honors any check drawn by SSQD, and thus SSQD can no longer fulfill the required financial obligations of the LEASE and such nonpayment will put the mortgage with YONI in default and would cause serious financial loss to the sole owner and stock holder of SSQD, Moise Banayan and,

Whereas SSQD bought certain office and warehouse items and software, from AFC as per agreement dated July 30th 2007, and that the parties agree that these items have a value of $40,000 or less and,

Whereas SSQD now owes AOC over $780,000 for merchandize that it has purchased and not paid for. And now SSQD claims that it is unable to pay its debt to AOC, and,

Whereas due to this debt AOC has stopped shipping and selling to SSQD and,

Whereas SSQD now has run out of its inventory and has bounced checks to its employees and truck leasing companies and various vendors and farmers and utility companies and the utility companies have given SSQD shut down notices and SSQD is no longer operating, and,

Whereas SSQD has certain outstanding account Receivable

NOW THE PARTIES AGREE TO SETTLE AS FOLLOWS:

AOC assumes the LEASE and obligations and SSQD agree to this assumption and give up all its right and title in this lease agreement for the remaining period of two years starting July 30th 2007, ending July 29th 2009 and thus secures the value of stock of Moise Banayan in Yoni.

AOC now purchases the entire office asset and warehouse equipment that SSQD purchased according to an agreement dated July 30th 2007 between AFC and SSQD for $40,000 and reduces SSQD obligation by same.

SSQD remains fully obliged for the balance of its debt to AOC.

It is further understood that AOC by assuming the LEASE will NOT take on or pay any equipment lease obligation of SSQD or AFC.

It is further understood that AOC by assuming the LEASE will NOT take on any trucking lease or any other contractual obligation of AFC and SSQD.

It is further understood that AOC by assuming the LEASE is NOT required to pay any vendor of SSQD and AFC.

SSQD further agrees that it will collect its receivables to satisfy its debt to AOC, and Moise Banayan will invest his time and collect from SSQD until obligations to SSQD have been satisfied.

Signed for

Schwartz & Sons Quality Distributors

*Moise Banayan*

Moise Banayan

President

Ahava of California

*Farij B*

Fariborz Banayan

Managing member

## LEASE ASSUMPTION AGREEMENT

July 30th 2007

This is an assumption agreement between Ahava Food Corp. (AFC) a NY corporation and Schwartz and Sons Quality Distributor (SSQD)a NY corporation as follows:

Whereas there exist a certain lease agreement (LEASE) dated October 26 2006 between Yoni realty LLC and Ahava Food Corp. and,

Whereas Signature bank has been served by M&I a seizure order against AFC,(JUDGMENT) and, consequently AFC is unable to satisfy the financial obligations as required by the lease agreement due to the enforcement of the JUDGMENT by M&I and,

Whereas in addition to above, AFC can no longer meet its financial obligations to the vendors for the equipment (EQUIPMENT) that are used at the location that is subject of the LEASE, and is asking SSQD to take on these payment obligations so that AFC not lose the EQUIPMENT,

Whereas AFC owns and has title to certain physical office and warehouse asset namely computers and software and telephone system and all other equipment that is needed to operate a distribution facility (ASSET) and

Whereas AFC leases trucks for delivery and distribution (TRUCK) and,

Whereas AFC is asking SSQD to enter into an agreement with Signature bank and join and take on the obligations of AFC, and Signature has agreed for SSQD to join (JOINDER).

Now comes SSQD for consideration listed above, and assumes the LEASE and AFC agree to this assumption and gives up all it's right and title in this lease agreement for a period of two years from above date.

Further, SSQD for the value of the lease payment for the EQUIPMENT and for the value of and consideration of the JOINDER will lease and use the TRUCK for the period of this lease, and buys the ASSET from AFC

Signed for

Ahava Food Corp.                                    Schwartz & Sons Quality Distributors

*(signature)*                                       *(signature)*

Moise Banayan                                       Moise Banayan

President AFC                                        President SSQD

# EXHIBIT H

## TRADEMARK PURCHASE AGREEMENT

This Agreement is entered into on February 20th, 2008, between AHAVA FOOD

CORPORATION, a New York corporation ("AFC"), and AHAVA OF CALIFORNIA, LLC, a

California limited liability company ("AOC").

### RECITALS

1.      AFC was a defendant in an action brought by American Equities Group, Inc.

against AFC and others in the United States District Court for the Southern District of New

York, entitled *American Equities Group, Inc. v. Ahava Dairy Products Corp., et al.,* Case No. 01

Civ. 5207 (RWS) (the "AEG Action").

2.      In February 2008, the parties to the AEG Action entered into a Stipulation and

Agreement of Settlement (the "Stipulation"), which provides, *inter alia,* (i) for a judgment to be

entered against AFC in the amount of $325,000 (the "AFC Judgment"), and (ii) for defendants to

remit to AEG a total of $250,000, payable in 10 monthly installments commencing March 13,

2008 (the "Settlement Payment").  The Stipulation also provides that in the event of the failure to

pay any of the installments of the Settlement Payment when due, and the default is not cured

within the period specified in the Stipulation, then AEG may, *inter alia*, enter judgment against

AFC in the amount of $3.5 million.

3.      AOC has agreed to satisfy the AFC Judgment in full and to fund the Settlement

Payment for AFC's benefit, in exchange for AFC's transfer and assignment to AOC of all right,

title and interest possessed and owned by AFC in the following registered trademarks: New

Square, reg no. 1,925,643, Morning Select,reg .no. 1,820, 739, , Ahava, reg no. 3,038,963,

OFGolan, reg. no. 2,960,129 Best Mooo, reg. no. 2,795,127,  Golan, the Height of good taste,,

reg. no. 2,404,337, 50% share of Hod Golan, reg no 2,629,824, Achuza, reg no 2,283,410, ,
You cant choose a better milk  reg no. 2,159,177, , SlimU  reg. no. 2,716,873,  Gideaon reg no
2,721,299, fruityoglicious reg. no. 3,349,275  (the "Trademarks").

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the mutual undertakings described below, the
parties agree as follows:

1.      AFC hereby irrevocably transfers, conveys and assigns to AOC all of AFC's
right, title and interest, and right of exclusive use, in and to the Trademarks, effective as of the
date of this Agreement.

2.      AFC represents and warrants that it owns and has exclusive possession of the
Trademarks, free and clear of any liens, mortgages, encumbrances, and rights of any third person
to the use of the Trademarks.

3.      AOC shall satisfy the AFC Judgment by payment of the judgment, with accrued
interest thereon, to AEG, in 12 monthly equal payments to start after the  completion of the
Settlement installment payments due to AEG.

4.      AOC shall pay the Settlement Payment, and each installment payment thereof, in
the manner in which they are required to be paid according to the terms of the Stipulation.

5.      The parties agree to execute such other further documents, consents, and
authorizations as may be necessary to effectuate the intent and purpose of this Agreement.

2

6.     This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

7.     The terms of this Agreement may not be changed and/or modified except by a writing signed by the party or parties whose rights, obligations and/or interests under this Agreement are being changed and/or modified.

8.     This agreement shall be construed and enforced in accordance with the laws of the state of California.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first above written.


AHAVA FOOD CORPORATION          AHAVA OF CALIFORNIA, LLC,


By: _Moise Banayan_             By: _Fariborz Banayan_
Name:                           Name:

Moise Banayan  President        Fariborz Banayan  Member

3

# EXHIBIT I

# TRADEMARK ASSIGNMENT

WHEREAS, AHAVA FOOD CORP., a New York corporation, having its principal place of business at 110 Beard Street, Brooklyn, New York 11231 (hereinafter "Assignor"), has adopted, used and is using the trademarks listed in the attached Schedule of Trademarks (the "Marks"); has registered the Marks in the United States Patent and Trademark Office under the registration numbers listed in the Schedule of Trademarks; and is the sole owner of the entire right, title and interest in and to the Marks and the registrations therefor, together with the good will of the business symbolized by the Marks; and

WHEREAS, AHAVA OF CALIFORNIA, LLC, a California limited liability company, having its principal place of business at 908 Rose Avenue, Venice, California 90291 (hereinafter "Assignee"), desires to acquire the entire right, title and interest in and to the Marks, together with the good will of the business symbolized thereby and the registrations therefor.

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign and transfer to said Assignee, and its successors and assigns, *nunc pro tunc,* as of February 20, 2008, the entire right, title and interest in and to the Marks, together with the good will of the business symbolized thereby, and the United States Trademark registrations therefor, as listed in the attached Schedule of Marks.

AHAVA FOOD CORP.

By: _____

Moise Banayan
President

Date: 03/06/08

SCHEDULE OF TRADEMARKS

| Trademark | Reg. No. | Reg. Date |
|---|---|---|
| NEW SQUARE | 1925643 | 10-10-1995 |
| MORNING SELECT | 1820739 | 2-8-1994 |
| AHAVA | 3038963 | 1-10-2006 |
| OF GOLAN | 2960129 | 6-7-2005 |
| BEST MOOO | 2795127 | 12-16-2003 |
| ACHUZA | 2283410 | 10-5-1999 |
| THE HEIGHT OF GOOD TASTE | 2404337 | 11-14-2000 |
| YOU CAN'T CHOOSE A BETTER MILK | 2159177 | 5-19-1998 |
| SLIM U | 2716873 | 5-20-2003 |
| FRUIT YOGLICIOUS | 3349275 | 12-4-2007 |
| GIDEON | 2721299 | 6-3-2003 |

## SCHEDULE

| Trademark | Reg. No. | Reg. Date |
|-----------|----------|-----------|
| HOD GOLAN | 2,629,824 | 10-8-2002 |

# EXHIBIT J



TOTAL P.03



Account:00000-000004352 MOSHES DISCOUNT SUPERMARKET
Address:                 325 AVE M
                         n6 - SHEVI BA?A
                         Brooklyn,NY, 11230

### Sales

| Item# Description | Case/Unit Units | Price | Amount |
|---|---|---|---|
| 0191 020742-00501 | 40/ 0 480 | 2.0000 | $960.00 |
| NEW SQ MILK REG HALF GALLON ( | 24/ 0 192 | 2.2000 | $422.40 |
| 1854 720742011224 | | | |
| NEW SQUARE ORANGE JUICE Gr56oz | 2/ 0 16 | 1.0000 | $16.00 |
| 2028 720742-00680 | | | |
| NEW SQ LEMONADE (*B*140) | 2/ 0 16 | 1.0000 | $16.00 |
| 2030 720742-33540 | | | |
| NEW SQ FRUIT PUNCH Add6 | 2/ 0 16 | 2.7500 | $44.00 |
| 2078 720742-00705 | | | |
| NEW SQUARE GRAPEFRUIT JUICE 6n | 10/ 0 80 | 2.3000 | $184.00 |
| 2966 720742290357 | | | |
| NS ORANGE MANGO JUICE 6N64 | | | |
| | 80/ 0 800 | | $1642.40 |

| | List Price | Allowance | Net Amount |
|---|---|---|---|
| Sales | $1642.40 | $0.00 | $1642.40 |

Total Allowance                    $0.00
Net sales pre tax                          $1642.40

Net Due This Invoice               $54598.73
Previous Balance

Total Amount Due:                  $52241.19

DUPLICATE

*Ahava National Food Distributor*

Vehicle#:         Driver#:060021 PINK            Date: 12/17/07 Time: 14:34
Route#:060021 Transaction#:000000000060910      Invoice#:020212121005 Page:001

AHAVA NATIONAL FOOD DISTRIBUTOR
P.O. BOX 310048
BROOKLYN, NY 11231

Tel. 718-264-8230                               Fax 718-243-0700

Account:00000 000004352 MOSHES DISCOUNT SUPERMARKET
Address:                 325 AVE M
                         n6 - SHEVI BA?A
                         Brooklyn, NY, 11230

POSTED

### Sales

| Item# Description | Case/Unit Units | Price | Amount |
|---|---|---|---|
| 0191- 020742-00501 | 40/ 0 480 | 2.0000 | $960.00 |
| NEW SQ MILK REG HALF GALLON ( | 24/ 0 192 | 2.2000 | $422.40 |
| 1854 720742011224 | | | |
| NEW SQUARE ORANGE JUICE Gr56oz | 2/ 0 16 | 1.0000 | $16.00 |
| 2028 720742-00680 | | | |
| NEW SQ LEMONADE (*B*140) | 2/ 0 16 | 1.0000 | $16.00 |
| 2030 720742-33540 | | | |
| NEW SQ FRUIT PUNCH Add6 | 2/ 0 16 | 2.7500 | $44.00 |
| 2078 720742-00705 | | | |
| NEW SQUARE GRAPEFRUIT JUICE 6n | 10/ 0 80 | 2.3000 | $184.00 |
| 2966 720742290357 | | | |
| NS ORANGE MANGO JUICE 6N64 | | | |
| | 80/ 0 800 | | $1642.40 |

| | List Price | Allowance | Net Amount |
|---|---|---|---|
| Sales | $1642.40 | $0.00 | $1642.40 |

Total Allowance                    $0.00
Net sales pre tax                          $1642.40

Net Due This Invoice               $50690.73
Previous Balance

Total Amount Due:                  $52241.19

DUPLICATE

# EXHIBIT K



# EXHIBIT L

JAN-31-2008  14:43    P.05/10

INVOICE P120707888 12/07/07
Cus PO#

AHAVA NATIONAL FOOD DISTRIBUTOR
P.O.BOX 310648
BROOKLYN, NY 11231-
718-254-8230

MACABEE FOOD INC.
BOB SILVERMAN & ERIC 914-403-2730
140 WEST COMMERCIAL AVE
Moonachie, NJ 07074

| Item | UPC | Item Code | Quantity Cases | Pieces | Price | Total |
|------|-----|-----------|----------------|--------|-------|-------|
| | | | | | 3.05 | 23185.25 |
| GOLAN PART SKIM MOZZARELLA 8x5lb | 720742691488 | 1711 | 7601.72 lbs. | | | |
| | | | | 0.00 | | |
| Total Cases | | | 7601.72 | | | |
| Total Weighted Items | | | 7601.72 | | | |
| Total Lbs. | | | | | | |

Customer Discount:     0.00
            Total: 23,185.25
   Amount Paid:     0.00
Grand Total: 23,185.25



12-10

S4246
S4246
S4246

12/07/

Page no 1

AHAVA NATIONAL FOOD DISTRIBUTOR
P.O.BOX 310648
BROOKLYN, NY 11231-
718-254-8230          718-243-0700

MACABEE FOOD INC. (5814)
BOB SILVERMAN  DONNA X200
250 WEST NYACK ROAD
West Nyack, NY 10994

| Date | Inv # | Total | Credit/ Discount | Paid | Owes | Running |
|------|-------|-------|------------------|------|------|---------|
| 12/07/07 | P120707888 | 23185.25 | 0.00 | 0.00 | 23185.25 | 23185.25 |
| Total: | | 23185.25 | 0.00 | 0.00 | 23185.25 | |

# EXHIBIT M

## COHEN, ESTIS & ASSOCIATES, L.L.P.
### ATTORNEYS AT LAW

RONALD J. COHEN (NY BAR & LL.M. IN TAXATION)
DEBORAH WEISMAN-ESTIS (NY & NJ BAR)
--------------------------------------
TODD N. ROBINSON (NY BAR)
--------------------------------------
STEPHEN P. LA BARBERA (NY BAR - OF COUNSEL)
STUART THALBLUM (NY - IL - CA BAR - OF COUNSEL)

40 MATTHEWS STREET, SUITE 203
GOSHEN, NEW YORK 10924
TELEPHONE (845) 291-1900
FACSIMILE (845) 291-8601 *
EMAIL: cohestis@frontiernet.net
--------------------------------------
ELY CHAIT (LAW CLERK)
SHALANDREA M. MARTIN (PARALEGAL)
SUSAN M. YEOMAN (PARALEGAL)
* Not for service of process

January 31, 2008

CHAIM BERLIN YESHIVA
1573 Coney Island Ave.
Brooklyn, New York 11230

Re: Ahava of California, LLC d/ba/ Ahava National v. Signature Bank

To Whom it May Concern:

As you may recall, this firm represents Ahava of California, LLC. It has come to our attention that you have received a further communication from Signature Bank. Ahava of California, LLC has maintained from the first that it is not a debtor of Signature Bank, and this continues to be true. Signature Bank's first communication to your company, which we understand was attached to Signature's most recent communication, made false allegations as to the relationship between Ahava of California, LLC and Signature Bank's various debtors.

As was true before, Ahava of California LLC is not now, and has never been, a debtor of Signature Bank. Ahava of California LLC has never granted Signature Bank an interest in Ahava of California LLC's receivables.

As was true before, on the basis of the documents we have examined, and our knowledge of applicable law, it is our legal opinion that you are under no obligation to tender payment in respect of Ahava of California, LLC's invoices to Signature Bank. As was true before, all invoices tendered by Ahava of California LLC are due for merchandise or inventory sold and delivered by Ahava of California LLC, and not as a result of merchandise or inventory sold or delivered by or on behalf of any other party that has a relationship or obligation to Signature Bank.

It is important to note that Signature Bank's most recent communication does <u>not</u> allege that it holds a security interest in monies owed by your company to Ahava of California, LLC. Rather,

X:\RJCDATA\WPDOCS\Litigation Files\Ahava of California\1.30.08 letter to customers.wpd

this second communication states that to the extent your firm owes money to the specific debtors listed, Signature Bank asserts a security interest. Ahava of California, LLC does not disagree. To the extent that your company owes money to the specific debtors listed, Signature Bank does indeed have a security interest. Ahava of California, LLC, however, is not one of the debtors listed in Signature Bank's further communication. Accordingly, Ahava of California, LLC's customers should pay Ahava of California LLC's invoices as they always have.

Ahava of California LLC appreciates the understanding and cooperation of its customers.

Very truly yours,
COHEN, ESTIS & ASSOCIATES L.L.P.

Todd N. Robinson, Esq.

X:\RJCDATA\WPDOCS\Litigation Files\Ahava of California\1.30.08 letter to customers.wpd