ROBERT W. HIRSH
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507;  Facsimile: 310-275-4050

LAWRENCE C. FOX (LF-2503)
KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
Telephone: 212-418-8600; Facsimile: 212-826-3640

Attorneys for Defendant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

SIGNATURE BANK,                                    :
                                                   :
                                      Plaintiff,   :   08 Civ. 3893 (NRB)
                                                   :
                  - against -                      :
                                                   :
AHAVA FOOD CORP., LEWIS COUNTY DAIRY               :
CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO         :
FOODS, YONI REALTY, LLC, SCHWARTZ AND SONS         :
QUALITY DISTRIBUTORS, INC., MOISE BANAYAN,         :
ANA BANAYAN a/k/a  CHANA BANAYAN, REBECCA          :
BANAYAN a/k/a REBECCA BARIMYAN a/k/a               :
REBECCA BANAYAN-LIEBERMAN, FARIBORZ               :
BANAYAN a/k/a AARON BANAYAN, RUBEN                 :
BEITYAKOV, ARI KATZ, AHAVA OF CALIFORNIA,          :
LLC d/b/a AHAVA NATIONAL FOOD DISTRIBUTOR          :
and NORTH COUNTRY MANUFACTURING, and JOHN          :
DOE COMPANIES 1 through 10,                        :
                                                   :
                                     Defendants.   :
                                                   :
---------------------------------------------------------------------- X

## DEFENDANT AHAVA OF CALIFORNIA'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR APPOINTMENT OF RECEIVER
## AND PRELIMINARY INJUNCTION

3305000BRILF.00002.wpd

Table of Contents

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    General Background Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The Bank and the Remaining Defendants
            (Not Ahava CA) Start Doing Business In 2005 . . . . . . . . . . . . . . . . . . . . . . 7

      C.    Ahava CA's 2007 Expansion and Other Events of 2007 . . . . . . . . . . . . . . . . . 7

            1.    In March 2007, the Bank Declared The Remaining
                  Defendants To Be In Default Of Their Loans . . . . . . . . . . . . . . . . . . . 7

            2.    The Bank, Via Its "Puppet" Consultant
                  Getzler Henrich, Ruins The Remaining Defendants' Businesses . . . . . . 7

            3.    Ahava CA Becomes a Manufacturer By
                  Leasing LCDC's Upstate New York Factory . . . . . . . . . . . . . . . . . . . . . 8

            4.    Ahava CA Expands Its Manufacturing
                  Capacity By Leasing the SLFC Factory . . . . . . . . . . . . . . . . . . . . . . . . 10

            5.    The SS Disaster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            6.    Ahava CA Expands Its Distribution Capacity
                  By Assuming  SS's Lease In Brooklyn After
                  The Bank and Getzler Henrich Forced SS Out of Business . . . . . . . . . . 11

            7.    Moise's Very Brief Stint As A Consultant To Ahava CA . . . . . . . . . . . 12

      D.    Ahava CA Did Not Receive Any Fraudulent Transfers . . . . . . . . . . . . . . . . . . 12

            1.    Ahava CA Paid Fair Consideration For Trademarks . . . . . . . . . . . . . . . 12

            2.    Ahava CA Never Kept Any Receivable
                  Belonging To the Remaining Defendants . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    Ahava CA Told Its Customers To Pay the Bank Where Appropriate . . . 14

      E.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

Page

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.  AHAVA CA IS NOT AN ALTER EGO
OF THE REMAINING DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1.  Ahava CA Has Adhered To California LLC Formalities  . . . . . . . . . . . 16

2.  Ahava CA Was Adequately
Capitalized When Formed and Pays Its Bills . . . . . . . . . . . . . . . . . . . . . 17

3.  Ahava CA Assets Have Never Been Diverted or Commingled  . . . . . . . 17

4.  Ahava CA Has No Overlap In Ownership, Directors
Or Officers With The Remaining Defendants  . . . . . . . . . . . . . . . . . . . . 17

5.  Ahava CA Has Always Had Its Own Identity and Phone Numbers  . . . . 18

6.  Ahava CA Has Never Been
Dominated  by Any of the Remaining Defendants  . . . . . . . . . . . . . . . . . 18

7.  Ahava CA Dealt With the Remaining
Defendants At Arms Length At All Times  . . . . . . . . . . . . . . . . . . . . . . . 18

8.  Ahava CA Was Always A Separate Profit Center . . . . . . . . . . . . . . . . . 19

9.  The Remaining Defendants Did Not
Pay/Guarantee Ahava CA's Debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10.  Ahava CA's Assets Were
Never Used By The Remaining Defendants  . . . . . . . . . . . . . . . . . . . . . . 19

B.  AHAVA CA NEVER RECEIVED FRAUDULENT
TRANSFERS FROM ANY OF THE REMAINING DEFENDANTS . . . . . . . 19

C.  THE MOTION FAILS TO MAKE THE REQUISITE SHOWING FOR
APPOINTMENT OF A RECEIVER OR A PRELIMINARY INJUNCTION . . 21

D.  THE MOTION SHOULD BE DENIED BECAUSE
IT IS NOT SUPPORTED BY ANY COMPETENT EVIDENCE . . . . . . . . . . 24

Page

E.    ASSUMING <u>ARGUENDO</u> THAT THE MOTION'S
REQUESTED RELIEF ISSUES, AN UNDERTAKING
OF AT LEAST $54 MILLION SHOULD BE ORDERED . . . . . . . . . . . . . . . . . 24

IV    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.

## __INTRODUCTION__

Plaintiff  Signature Bank's ("the Bank") overreaching Motion for Appointment of a

Receiver and for Preliminary Injunction (the "Motion") should be denied on any and all of the

following grounds:

1. Ahava of California LLC ("Ahava CA") is not an alter ego of any person or entity,

including defendants Ahava Food Corp ("AF"),  Lewis County Dairy Corp ("LCDC"), St.

Lawrence Food Corp ("SLFC"), Yoni Realty, LLC ("Yoni"), Moise Banayan ("Moise"),  Ana

Banayan, and Schwartz and Sons, Inc. ("SS")  (collectively "the Remaining Defendants").

Historically, Ahava CA, a kosher food distributor, was a competitor and customer of many of the

Remaining Defendants. Ahava CA is a creditor of SS, LCDC, and SLFC.

In 2007, Ahava CA and its sole principal Fariborz Banayan expanded Ahava CA's

operations by leasing two upstate dairy factories from LCDC and SLFC, and by leasing a

Brooklyn warehouse from SS after the Bank had crippled SS's operations and essentially driven

it out of business.  Ahava CA spent over a million dollars of its own money in connection with

these expansions.

The Bank wrongly contends that this expansion renders the Remaining Defendants the

alter ego of Ahava CA.  In doing so, the Bank confuses an alter ego relationship with the scenario

here, where a company legitimately expands to fill a void in the marketplace when another

company goes out of business.

Ahava CA has never done business with the Bank.  Ahava CA never made any

representation to the Bank to induce it to issue credit to anyone. The Bank wrongfully attributes

to Ahava CA certain statements made by Fariborz Banayan's brother, Moise Banayan, to the

Bank. Respectfully, this is not Ahava CA's problem: any alleged representation that Moise made to the Bank is between Moise and the Bank. Moise has not been a member of Ahava CA since 2005. Moise never had the authority to contract or sign agreements for Ahava CA at any time. Moise has never been a managing member of Ahava CA. The Bank's attempt to link Moise to Ahava CA is legally and factually misguided.

2.  Ahava CA never received fraudulent transfers from anyone. The Bank's claim that Ahava CA improperly collected receivables owed to SS or AF is false.  Indeed, in January 2008, Ahava CA had its attorney contact its customers and direct them not to pay Ahava CA any receivable belonging to the Remaining Defendants.

To the extent  Ahava CA received any asset from any of the Remaining Defendants, it paid fair consideration.  For example, the Bank contends that Ahava CA received AF's trademarks without paying consideration. To the contrary: Ahava CA paid $575,000, which was more than the trademarks were worth.

3.  The Motion makes no showing of great, irreparable or imminent injury necessitating the appointment of a receiver or any injunctive relief.

4.  The Motion is not supported by any competent evidence. It is almost entirely attorney argument, which is insufficient to support relief of any type.  The impropriety of the Declarations submitted by the Bank is addressed below and in Ahava CA's concurrently-filed Objections to Evidence and Request to Strike.

5.  If the Motion's draconian requested relief were granted, there is a strong probability that Ahava CA would be forced out of business. That would deprive the orthodox Jewish population in the United States of a critical source of milk and other dairy products, and the price

2

of the remaining products would dramatically increase. Literally, milk would be taken out of the mouths of families who depend on these products.

6.  Finally, assuming <u>arguendo</u> that the Motion's requested relief issues, an undertaking of at least $54 million should be ordered.  In 2007, the Bank drove the Remaining Defendants out of business.  The Bank's counsel has stated that it is the Bank's intent to drive Ahava CA out of business. The Motion argues that Ahava CA's business has revenues of $18 million per year. Based upon this figure, it is appropriate for the Bank to post an undertaking in the amount of $54 million, <u>i.e.</u> three years of revenues.

## II.

## <u>FACTUAL BACKGROUND</u>

### A. <u>General Background Facts</u>

On or about March 8, 2000, Ahava CA was formed in California as a limited liability company via its Articles of Organization, which were signed on or about February 11, 2000. (<u>See</u> Declaration of Fariborz Banayan ("FB Dec.") at ¶ 2, Ex. A.)  Ahava CA was formed by Fariborz Banayan ("Fariborz") and his brother Moise, both of whom signed Ahava CA's Operating Agreement on or about February 11, 2000.  (FB Dec. ¶ 2, Ex. B.)

Since its inception, Ahava CA has distributed kosher (primarily dairy) Cholev Yisrael food products. (FB Dec. ¶ 3.)  Cholev Yisrael dairy products are primarily consumed by the most observant segment of the orthodox Jewish community.  (<u>Id</u>.)  The manufacture of Cholev Yisrael products requires the strictest scrutiny so that the products meet the highest kosher standards. (<u>Id</u>.)  Manufacturing and selling Cholev Yisrael dairy products is a unique and highly specialized process. (<u>Id</u>.)  SLFC and LCDC are the only Cholev Yisrael dairy factories in the United States.

3

(FB Dec. ¶ 4.)

The Bank has stated its intent to drive Ahava CA out of business by selling all of the assets at the SLFC and LCDC facilities, in which the Bank claims to have an exclusive interest. (See Declaration of Robert W. Hirsh ("RH Dec.") at ¶¶ 2-4.)

Ahava CA controls approximately 50 % of the Cholev Yisrael dairy sales in the United States. (FB Dec. ¶ 5.)

If Ahava CA were to go out of business:

  a. the United States orthodox Jewish community would face severe shortages of milk and dairy products upon which it depends; and,

  b. the prices of remaining Cholev Yisrael milk and dairy products would increase dramatically, such that many families might be unable to afford these basic staples of life. (FB Dec. ¶ 6.)

Fariborz has always been Ahava CA's managing member. (FB Dec. at ¶ 7, last pg. of Ex. B.) Moise has never been a managing member of Ahava CA. (FB Dec. ¶ 7.) Moise has never had the ability to contractually bind Ahava CA. (Id.) On or about March 27, 2001, Ahava CA issued a resolution authorizing Fariborz, as "majority shareholder [sic], chief financial officer, and chief executive officer"[1] "to open bank accounts and sign alone for the company at his sole discretion in amounts in his sole discretion." (FB Dec. ¶ 7, Ex. C.)

Ahava CA's assets have never been commingled or diverted for anyone's personal use. (FB Dec. ¶ 8.)

---

[1] The resolution used the wrong nomenclature: limited liability companies have membership interests, not shares. There are no officers: there are members and managers.

Since on or about August 15, 2005, Moise has not been a member of Ahava CA.  (FB Dec. ¶ 9.)  On or about August 15, 2005, Fariborz purchased Moise's interest in Ahava CA for $169,284.32, pursuant to documents entitled: "Agreement" and "Assignment Of Interest and Consent of Managing Member" (collectively "Buy Out Documents").  (Id., Ex. D.)

Pursuant to the Buy Out Documents, Moise had an option to repurchase his interest in Ahava CA until January 2, 2007.  (FB Dec. ¶ 10, Ex. D.)  Moise never exercised that option, which has now expired.  (FB Dec. ¶ 10.)

Ahava CA's 2006 tax return, which states that Moise was a member of Ahava CA for that year, was prepared by certified public accountant Robert Friedbauer.  Mr. Friedbauer advised Ahava CA that, for tax purposes, Moise should be listed as an Ahava CA member because in 2006 Moise still had an option to repurchase his membership interest in Ahava CA.  Ahava CA relied on Mr. Friedbauer's advice.  (See Declaration of Robert Friedbauer ¶ 3; FB Dec. ¶ 11.)

Ahava CA's books and records conform to California law, and its primary books and records have always been maintained  in California.  (FB Dec. ¶ 12.)  Ahava CA does not keep minutes because, under California law, a limited liability company is not required to do so. (FB Dec. ¶ 12; RH Dec. ¶ 6.)

Ahava CA was never ordered by the state court in this case to produce its books and records to the Bank, other than its formation documents which were produced.  (RH Dec.  ¶ 7.)

Fariborz has never had an ownership interest in AF, LCDC, SLFC, Yoni or SS. (FB Dec. ¶ 13.)  Fariborz has never been an director, officer, member or employee of AF, LCDC, SLFC, Yoni or SS.  (Id.)

At all relevant times, Ahava CA was fully and adequately capitalized, and was able to pay its bills in the ordinary course of business. (FB Dec. ¶ 14.)  Ahava CA currently has approximately 150 employees.  (Id.)

From about 2000 through in or about July 2007, Ahava CA competed with AF by selling like products made by different manufacturers.  For example:

1. Ahava CA sold Hod Lavan turkey products while AF sold Hod Golan turkey products;

2. Ahava CA sold Kessler frozen products while AF sold Seachef products; and

3. Ahava CA sold Mehadrin products while Ahava Foods sold Morning Select products, etc. (FB Dec. ¶ 15.)

From about June 2007 through in or about October 2007, Ahava CA purchased products from SS to sell and distribute to Ahava CA's customers. (FB Dec. ¶ 16.)

From about July 2007 through in or about November 2007, SS purchased certain products from Ahava CA to sell and distribute to its customers.  (FB Dec. ¶ 17.)

Ahava CA understands that the Bank has obtained a money judgment ("the Judgment") against the Remaining Defendants in New York State court litigation.  (FB Dec. ¶ 18.) The Bank has never obtained any judgment of any sort against Ahava CA. (Id.)  The Bank has never sued Ahava CA in any litigation except this case. (Id.). Ahava CA has never done business of any sort with the Bank. (Id.) Ahava CA has never consented to the Bank taking an interest in any of its assets. (Id.)  The Bank has never had an interest in any asset of Ahava CA.  (Id.)

Ahava CA has not received any asset from any of the Remaining Defendants for which it did not pay fair consideration. (FB Dec. ¶ 19.)  Ahava CA never received fraudulent transfers from any of the Remaining Defendants. (Id.)

6

Ahava CA has never been a guarantor of any debt of any of the Remaining Defendants. (FB Dec. ¶ 20.) Ahava CA is and has always been a separate profit center: it has never "shared" profits with any of the Remaining Defendants. (Id.)

**B. The Bank and the Remaining Defendants (Not Ahava CA) Start Doing Business In 2005**

On August 22, 2005, the Bank and several of the Remaining Defendants began their business relationship, in which, among other things, the Bank provided the Remaining Defendants with loans and a line of credit. See Declaration of Moise Banayan ("MB Dec.") ¶ 4 and Ex. A thereto (February 1, 2008 Affidavit [of Moshe Banayan] In Opposition To Plaintiff's Motion For Summary Judgment In Lieu Of Complaint) ("2/08 Moise Aff.") at ¶¶ 9-12.

**C. Ahava CA's 2007 Expansion and Other Events of 2007**

**1.    In March 2007, the Bank Declares The Remaining Defendants To Be In Default On Their Loans**

In March 2007, as a result of the Remaining Defendants having had judgments taken against them by third parties, the Bank declared the Remaining Defendants in technical default of the financial agreements that the Remaining Defendants had entered into with the Bank in 2005, and demanded repayment of the loans. (2/08 Moise Aff. ¶ 17.)  In addition, the Bank refused to renew an equipment loan with LCDC, thus placing its loan with LCDC in default. (Id.)

**2.    The Bank, Via Its "Puppet" Consultant Getzler Henrich, Ruins The Remaining Defendants' Businesses**

On or about June 11, 2007, the Bank and the Remaining Defendants entered into a forbearance agreement, which, among other things, forced the Remaining Defendants to retain the Bank's agent and "puppet" consultant -- Getzler Henrich Management & Financial Consultants ("Getzler Henrich") -- to run their businesses and report to the Bank. (See 2/08

Moise Aff. ¶ 4.) On or about June 11, 2007, Getzler began to run the Remaining Defendants' businesses. (MB Dec. ¶ 2.)

From on or about June 11, 2007 through in or about late November 2007, the Bank, via Getzler Henrich, ran the Remaining Defendants's businesses incompetently and fraudulently, and turned what were then profitable ventures into losing operations which were driven out of business.[2] (2/08 Moise Aff. ¶¶ 21-34; MB Dec. ¶ 2.) Moise witnessed the Bank's and Getzler Henrich's wrongful conduct as it was occurring, and when he complained about it, the Bank's response was, among other things, that the Bank would immediately "shut down" the Remaining Defendants' businesses and foreclose on the loans unless Getzler Henrich was able to run the Remaining Defendants' businesses with a free hand and without complaint from the Remaining Defendants and especially Moise. (MB Dec. ¶ 2.)

### 3.     Ahava CA Becomes a Manufacturer By Leasing LCDC's Upstate New York Factory

In or about July 2007, Ahava CA, via Fariborz, learned from Moise that:

a. LCDC, a manufacturer of kosher dairy products, had ceased operations due to financial difficulties, e.g. judgments which had been taken against LCDC by third parties; and,

b. LCDC could not pay its bills, e.g., pay suppliers and make payroll, because certain judgment creditors of LCDC had levied upon LCDC's bank accounts, such that any monies deposited into its bank accounts would be diverted to the judgment creditors. (FB Dec. ¶ 21.)

---

[2] It appears that the Remaining Defendants have significant legal rights against the Bank for lender liability, and against Getzler Henrich Management & Financial Consultants for negligence, fraud, and breach of fiduciary duty. (Hirsh Dec. ¶ 5.)

Ahava CA saw an immediate business opportunity and decided to go into the kosher dairy products manufacturing business, which Ahava CA investigated and learned was very profitable. (FB Dec. ¶ 22.)  Accordingly, in or about July 2007, Ahava CA laterally expanded and went into the kosher dairy manufacturing business by leasing LCDC's upstate New York factory. (FB Dec. ¶ 23, Ex. E.)

In entering into this venture, Ahava CA, was required to and in fact made a significant financial investment, which, among other things, included;

        a. buying new equipment for the LCDC factory; and,

        b.   paying certain of LCDC's debt, including LCDC's back payroll owing, so that Ahava CA would not lose the opportunity to retain LCDC's highly trained workers who specialize in the unique business of manufacturing Cholev Yisrael products. (FB Dec. ¶ 24.)

Ahava CA acted as a "white knight" and spent over $800,000.00 to begin its operations with LCDC. (FB Dec. ¶ 25.)

On or about August 29, 2007, Ahava CA and LCDC entered into a written lease, which, in part, memorialized the agreement between Ahava CA and LCDC.  (FB Dec. ¶ 26, Ex. E.)

If Ahava CA had not acted as it did, the LCDC factory would have closed, its workers would have been unemployed, its suppliers (e.g., the farmers) would not have had an outlet to sell their products, the observant Jewish community would have been without a major source of Cholev Yisrael dairy products, and the cost of existing Cholev Yisrael products would have dramatically increased.  (MB Dec. ¶ 3.)

**4.    Ahava CA Expands Its Manufacturing
Capacity By Leasing the SLFC Factory**

As of October 2007, Ahava CA understood that there were only two Cholev Yisrael dairy factories in the United States, those of LCDC and SLFC. (FB Dec. ¶ 27.)

In or about October 2007, Ahava CA, via Fariborz, learned that SLFC had ceased operations due to a judgment creditor commencing judgment enforcement against it. (FB Dec. ¶ 28.)

As with LCDC, Ahava CA, seeing another business opportunity, decided to further expand its kosher dairy manufacturing operation, and in or about October 2007, Ahava CA leased the SLFC facility pursuant to a written lease dated October 30, 2007. (FB Dec. ¶ 29, Ex. F.)

Similar to the LCDC venture, in taking over the SLFC operation Ahava CA made a significant monetary investment, which included, among other things:

a. buying new equipment for the factory; and,

b.  paying monies owed by SLFC, including past payroll, so again Ahava CA would not lose the opportunity to retain these highly trained workers as its own. (FB Dec. ¶ 30.)

Ahava CA again acted as a "white knight" and spent over $500,000.00 to begin its operations with SLFC. (FB Dec. ¶ 31.)

If Ahava CA had not acted as it did, the SLFC factory would have closed, its workers would have been unemployed, its suppliers (e.g., the farmers) would not have had an outlet to sell their products, the observant Jewish community would have been without a major source of Cholev Yisrael dairy products, and the cost of existing Cholev Yisrael products would have

10

dramatically increased.  (MB Dec. ¶ 3.)

     **5.**      **The SS Disaster**

From in or about August 1, 2007 through in or about November 2007, Ahava CA sold its products (including the products which it was now manufacturing in its newly-leased factories) to SS for SS to distribute throughout the United States. (FB Dec. ¶ 32.)  During this time period, Ahava CA sold SS over $9,000,000 in products that Ahava CA delivered to SS's warehouse facility located at 236-280 Richard Street, Brooklyn, N.Y. ("the Brooklyn Warehouse").  (Id.)

SS went out of business in late November 2007 due to the Bank's and Getzler Henrich's wrongful conduct.  (2/08 Moise Aff. ¶¶ 21-34, attached as Exhibit A to MB Dec.)  When SS went out of business, it owed Ahava CA approximately $800,000.00 in unpaid bills.  (FB Dec. ¶ 33.)

     **6.**      **Ahava CA Expands Its Distribution Capacity By Assuming SS's Lease In Brooklyn After The Bank and Getzler Henrich Forced SS Out of Business**

The demise of SS created an urgent and critical problem for Ahava CA: it needed to immediately find a means to distribute the products that it was manufacturing at the LCDC and SLFC factories. (FB Dec. ¶ 34.)  For its part, SS had a lease obligation on the Brooklyn Warehouse that it was unable to meet.  (MB Dec. ¶ 3.)

On or about November 27, 2007, Ahava CA entered into written agreements with SS in which, among other things, Ahava CA assumed SS's lease for the Brooklyn Warehouse and purchased certain equipment in the Brooklyn Warehouse.  (FB Dec. ¶ 35, Ex. G.)  This lease assumption gave Ahava CA the ability to seamlessly distribute the products that it manufactures (id.), and relieved SS of a financial obligation that it could no longer meet.  (MB Dec. ¶ 3.)

If Ahava CA had not acted as it did, the Brooklyn Warehouse would be closed, the LCDC and SLFC factories would most likely be forced to close, over 150 workers would have lost their jobs, farmers would be without an outlet to sell their products, the observant Jewish community would be deprived of dairy products upon which they depend, and the prices of the remaining Cholev Yisrael products would have dramatically increased, thus impairing observant families' ability to buy affordable dairy products.  (MB Dec. ¶ 2; FB Dec. ¶ 36.)

Ahava CA has not forgiven SS's debt: Ahava CA plans to take legal steps to recover this debt.  (FB Dec. ¶ 37-38.)

Ahava CA contends that the Bank and Getzler Henrich wrongfully converted monies that SS owes to Ahava CA, which Ahava CA anticipates will be the subject of further litigation.  (FB Dec. ¶ 38.)

**7.    Moise's Very Brief Stint As A Consultant To Ahava CA**

For a short period of time, from in or about December 2007 through in or about January 2008, Ahava CA retained Moise as a consultant to assist Ahava CA in its new business ventures. (FB Dec. ¶ 39.)

Shortly after Ahava CA retained Moise as a consultant, it became clear to Ahava CA that Moise's presence was a liability because of his personal disputes with the Bank.  As a result, Ahava CA terminated Moise in or about January 2008.  (FB Dec. ¶ 40.)

**D.    Ahava CA Did Not Receive Any Fraudulent Transfers**

**1.    Ahava CA Paid Fair Consideration For Trademarks**

On or about February 20, 2008, AF and Ahava CA entered into a written agreement entitled "Trademark Purchase Agreement," pursuant to which Ahava CA agreed to pay

12

$575,000.00 for certain trademarks ("the Marks"). (FB Dec. ¶ 41, Ex. H.) Ahava CA never received any trademarks without payment of consideration. (FB Dec. ¶ 42.) The Marks were transferred on or about March 6, 2008 pursuant to a "Trademark Assignment." (FB Dec. ¶ 43, Ex. I.) Ahava CA understands that the Bank does not have a perfected security interest in the trademarks that Ahava CA purchased. (FB Dec. ¶ 44.) Ahava CA paid more for the trademarks than their value in the market. (FB Dec. ¶ 45.)

### 2. Ahava CA Never Kept Any Receivable Belonging To the Remaining Defendants

Ahava CA never invoiced any customer for goods that Ahava CA did not itself sell, and Ahava CA never sold any goods belonging to anyone other than itself. (FB Dec. ¶ 46.) After SS was forced out of business at the end of November 2007, Ahava CA began distributing products to certain of SS's former customers beginning on or about December 1, 2007. (Id.) All monies that Ahava CA has collected and kept from any former customer of any of the Remaining Defendants relates to goods that Ahava CA itself sold to such customers **after** December 1, 2007. (Id.)

To the extent that Ahava CA received any monies for goods sold by any of the Remaining Defendants, Ahava CA turned those monies over to their rightful owner. (FB Dec. ¶ 47.)

Contrary to the Bank's assertion, Ahava CA did not collect and keep any receivables belonging to any of the Remaining Defendants. (FB Dec. ¶ 48.)

The Bank wrongfully contends that Ahava CA collected receivables to which the Bank was entitled for goods sold and delivered by SS to Moshe's Discount Supermarket, Macabee Food, and Yeshiva Chaim Berlin ("YCB"). (FB Dec. ¶¶ 48-51.)

13

Moshe's Discount Supermarket. Ahava CA (using its authorized dba Ahava National Food Distributor) invoiced Moshe's Discount on or about December 17, 2007 for goods shipped and sold by Ahava CA. (FB Dec. ¶ 49, Ex. J.) On or about December 3, 2007, Ahava CA received a check from Moshe's Discount for $18,051.45. (FB Dec. ¶ 49, Ex. K.) Ahava CA turned that check over to Moise. (FB Dec. ¶ 49.)

Macabee Food: Ahava CA invoiced Macabee Foods for products that Ahava CA delivered to Macabee. (FB Dec. ¶ 50, Ex. L.) Ahava CA sued Macabee Foods in a Rockland County lawsuit for nonpayment for products shipped to Macabee by Ahava CA and no one else. (Id.) Ahava CA did not invoice Macabee Foods for goods shipped to it by any of the Remaining Defendants. (Id.)

YCB: Ahava CA invoiced YCB for products delivered to YCB by Ahava CA. (FB Dec. ¶ 51.) Ahava CA never invoiced YCB for goods shipped by anyone else. (Id.) Ahava CA has never collected monies that YCB owes to other persons. (Id.)

**3.     Ahava CA Told Its Customers To Pay the Bank Where Appropriate**

On January 31, 2008, Ahava CA had its attorney send a letter advising its customers to pay the Bank any monies that the customers owed to the Remaining Defendants. (FB Dec. ¶ 52, Ex. M -- "To the extent that [the customer] owes money to the specific [judgment] debtors listed, Signature Bank does indeed have a security interest. Ahava of California, however, is not one of the debtors listed.") That letter was sent even though Ahava CA contends that the Bank owes Ahava CA significant monies through the Bank's wrongful conduct, including the conversion of Ahava CA's receivables. (Id.)

14

E. **Miscellaneous**

Ahava CA has never had any communication with OSHA at any time. (FB Dec. ¶ 53.)

Ahava CA does not use the former phone numbers of the Remaining Defendants.  (FB Dec. ¶ 54.)

**III.**

**ARGUMENT**

A. **AHAVA CA IS NOT AN ALTER EGO OF THE REMAINING DEFENDANTS**

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991), identifies ten factors that a trier of fact should consider in deciding an alter ego issue:

1.  Non-Adherence to Corporate Formalities

2.  Inadequate Capitalization

3.  Use of Funds For A Personal Purpose

4.  Overlap In Ownership, Officers, Directors And  Personnel

5.  Common Office Space, Addresses and Telephone Numbers of Corporate Entities

6.  The Amount of Business Discretion Displayed By The Allegedly Dominated Corporation

7.  Common Office Space, Addresses and Telephone Numbers of Corporate Entities

8.  Whether The Entities Are Treated As Separate Profit Centers

9.  The Payment Or Guarantee of Debts of the Dominated Corporations

10. Whether The Corporation In Question Had Property That Was Used By Other Corporations As If It Was Its Own

Here, in the latter half of 2007, Ahava CA expanded its business into dairy manufacturing when LCDC and SLFC went out of business.  In early December 2007, after SS also went out of

15

business, threatening the distribution of the products Ahava CA had recently begun

manufacturing, Ahava CA leased the former SS facility, i.e. the Brooklyn Warehouse, to

maintain its distribution channel. Those legitimate and needed expansions in the wake of the

Remaining Defendants' business distress in no way suggest that any of the Remaining

Defendants was or is Ahava CA's alter ego.  To the contrary, those facts preclude a finding that

Ahava CA was "completely dominat[ed]" by the Remaining Defendants, or that any such

domination was used to commit a fraud or serious wrong against the Bank, as would be required

for alter ego liability.  E.g., Sheridan Broadcasting Corp. v. Small, 19 A.D.3d 331, 332, 798

N.Y.S.2d 45, 46 (1st Dep't 2005) (proponent of alter ego/veil piercing claim bears a "'heavy

burden of showing that the corporation was dominated as to the transaction attacked and that

such domination was the instrument of fraud'") (quoting TNS Holdings, Inc. v. MKI Securities

Corp, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893 (1998)); Morris v. N.Y. State Dep't of

Taxation & Finance, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 811 (1993) ("complete domination

of the corporation is the key" to alter ego/veil piercing claim).

Application of the Passalacqua Builders factors, including the complete absence of the

requisite domination of Ahava CA, establish that the Bank cannot possibly prevail on its alter

ego claim:

### 1. **Ahava CA Has Adhered To California LLC Formalities**

Ahava CA is a California limited liability company. It was formed pursuant to Articles of

Organization and has an operating agreement. (FB Dec. Exs. A, B.)  Moise's sale of his Ahava

CA membership interest is properly documented. (Id., Ex. C.)  The Bank's argument about lack

of corporate minutes and lack of corporate formalities is misplaced, because Ahava CA is not a

corporation: it is a limited liability company which is not required to keep "minutes" under California law. (<u>Compare</u> California Corporations Code §§ 17050-17062 and 17150-17158, which do not require limited liability companies to keep minutes, with California Corporations Code § 314, which requires corporations to keep minutes.)  The Bank has not and cannot show that Ahava CA did not comply with California law concerning its obligations as a limited liability company.

### 2.  **Ahava CA Was Adequately Capitalized When Formed and Pays Its Bills**

The Bank has not presented any evidence that Ahava CA was not adequately capitalized when it was formed or that Ahava CA cannot currently pay its bills.  To the contrary, the Bank recognizes that Ahava CA is a successful $18 million per year company. It is not "at risk."

### 3.  **Ahava CA Assets Have Never Been Diverted or Commingled**

The Bank has not introduced any evidence that any person used Ahava CA assets for a personal purpose or that any of Ahava CA's assets were commingled. The FB Dec. attests to the contrary.  (FB Dec. ¶ 8.)

### 4.  **Ahava CA Has No Overlap In Ownership, Directors Or Officers With The Remaining Defendants**

There is no overlap in ownership, directors or officers between Ahava CA and the Remaining Defendants.

Moise has not been a member of Ahava CA since 2005 and has never been a managing member. Moise has never had the ability to sign contracts for Ahava CA. Fariborz has never been an owner, member, officer, employee or shareholder of LCDC, SLFC, AF or SS.

Fariborz has been Ahava CA's sole managing member since its inception and sole member since 2005. For a short period of time during December 2007 and January 2008, Ahava CA retained Moise as a consultant to assist it in its new business venture. However, Ahava CA terminated Moise when it became obvious that Moise's disputes with the Bank made him a liability.

**5.  <u>Ahava CA Has Always Had Its Own Identity and Phone Numbers</u>**

Ahava CA's main address and phone numbers are in California. Naturally, the two dairy factories and the Brooklyn Warehouse that Ahava CA leases have the same physical addresses that they did before.  Ahava CA has never used the former phone numbers of the Remaining Defendants.

**6.  <u>Ahava CA Has Never Been Dominated by Any of the Remaining Defendants</u>**

The Bank has presented no evidence that any of the Remaining Defendants dominated Ahava CA in connection with the relevant transactions, and this Opposition presents compelling evidence that Ahava CA is a separate and independent company that acted solely in its own interests in those transactions.   As stated above, the complete absence of such domination is, by itself, fatal to the Bank's alter ego claim.

**7.  <u>Ahava CA Dealt With the Remaining Defendants At Arms Length At All Times</u>**

Ahava CA entered into formal written leases with LCDC, SLFC, and SS at substantial rents. (FB Dec. Exs. E, F, G.)  Ahava CA purchased the Marks pursuant to a written agreement and paid more than fair value for them. (FB Dec. Ex. H.)  These documented transactions  with full consideration establish that Ahava CA dealt with the Remaining Defendants at "arms length" at all times.

18

**8. Ahava CA Was Always A Separate Profit Center**

Ahava CA is and has always been a separate profit center: it has never "shared" profits

with any of the Remaining Defendants (except with Moshe until Fariborz bought him out in

2005).

**9. The Remaining Defendants Did Not Pay/Guarantee Ahava CA's Debts**

The Remaining Defendants did not pay or guarantee Ahava CA's debts. To the contrary,

it was Ahava CA that stepped in as a "white knight" when the Remaining Defendants were in

financial distress. That reality is exactly the opposite of the scenario that the Bank would have to

prove to establish that the Remaining Defendants were the alter egos (i.e., "dominators") of

Ahava CA.

**10. Ahava CA's Assets Were Never Used By The Remaining Defendants**

Ahava CA's property was never used by any entity other than Ahava CA. The Bank has

proffered no competent evidence to the contrary. Ahava CA paid valuable consideration for the

Marks, in which the Bank does not have a perfected security interest.

Finally, the Remaining Defendants cannot be an alter ego of Ahava CA because Ahava

CA has been a separate and independent company since 2000 and, among other things, was a

competitor and a customer of several of the Remaining Defendants.

**B. AHAVA CA NEVER RECEIVED FRAUDULENT
TRANSFERS FROM ANY OF THE REMAINING DEFENDANTS**

A fraudulent transfer claim obviously must establish that something of value has been

transferred. In addition, as the Bank acknowledges, the asset must have been transferred either

"(i) without fair consideration if the conveyance would leave the transferor insolvent . . ., or (ii)

19

with the actual intent to hinder, delay or defraud" creditors.  (Bank Br. at 17.)

The Bank's fraudulent transfer claim fails on all fronts.  There is no evidence to support the Bank's contention that the Remaining Defendants transferred their receivables to Ahava CA. As the Fariborz Banayan Declaration explains, Ahava CA billed customers in its own right after December 1, 2007 for products that Ahava CA supplied.  Thus, the Bank's supposed "proofs" about receivable transfers -- i.e., that Ahava CA billed "old" customers such as Moshe's Discount Supermarket and  Macabee Foods after December 1, 2007 -- prove absolutely nothing.

The Bank repeatedly asserts that the Marks were assigned to Ahava CA without consideration.  (Bank Br. at 17, Am. Complaint at ¶¶ 5-6.)  In truth, Ahava CA paid $575,000 for those trademarks.  (FB Dec. ¶¶ 41-45, Ex. H.)  Ahava CA has demonstrated that it has made and is making substantial monthly lease payments to the Remaining Defendants for the use of the upstate manufacturing facilities and the Brooklyn Warehouse, all pursuant to properly documented leases.  In short, Ahava CA has demonstrated that it provided fair consideration in regular transactions for every interest or right it has received from the Remaining Defendants.[3]

As for the "actual intent" alternative for establishing a fraudulent transfer, the Bank relegates that to a footnote (note 15 at page 17) where it simply lists some of the traditional "badges of fraud" without even attempting to show that they apply here.  Moreover, even  indicia that, in some cases, are probative of an intent to hinder creditors (such as transactions between family members), can have completely innocent explanations that in no way suggest an improper intent.  In the context here, where Fariborz incrementally expanded his separate business into

---

[3]  The Bank also has offered no evidence that any of the supposed transfers caused any of the Remaining Defendants to become insolvent.

vacuums created by the failures of Moise's businesses, the fact that Fariborz and Moise are brothers in no way supports an inference of fraudulent intent.

With respect to the supposed receivables transfers, during the transitional period Ahava CA had its attorneys send a letter to customers advising them to pay the Bank any monies they might owe the Remaining Defendants on old bills, while paying Ahava CA on newer bills for products that Ahava CA delivered after December 1, 2007 . (FB Dec. ¶ 52, Ex. M.)  The Bank ignores that letter because it clearly precludes any inference of an intent to hinder, delay or defraud the Bank.

## C.    THE MOTION FAILS TO MAKE THE REQUISITE SHOWING FOR APPOINTMENT OF A RECEIVER OR A PRELIMINARY INJUNCTION

"The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interest in the property."  12 C. Wright, A. Miller, R. Marcus, Federal Practice and Procedure § 2983 at 24 (2d ed. 1997) (citing numerous cases).

As the Bank acknowledges (Br. at 20), a plaintiff seeking appointment of a receiver must demonstrate:

1. Fraudulent conduct by the defendant;

2. The imminent danger of the property being lost, concealed, stolen, injured, diminished in value or squandered;

3. The inadequacy of legal remedies;

4. The probability that harm to plaintiff will occur by denial of the appointment would be greater than the injury to the parties opposing appointment; and,

21

5. Plaintiff's probability of success on the merits.

The Motion does not satisfy <u>any</u> of those requirements:

1.  There is no evidence that Ahava CA engaged in any fraudulent or deceptive conduct. To the contrary, Ahava CA has acted as a "white knight" by spending significant monies to resuscitate businesses that were <u>in</u> <u>extremis</u> because of the Bank's mismanagement.

2. The Bank has made no showing whatsoever that there is any "imminent danger" to its property, let alone the great and irreparable injury required to obtain equitable relief.  <u>Polymer</u> <u>Technology Corp. v. Mimran</u>, 37 F.3d 74, 77-78 (2d Cir. 1994).  With respect to the receivership, the Motion states in the most conclusory terms (at 22) "Here, there is no question that . . . there is a clear and present danger that the property will somehow be removed, lost or materially injured or destroyed."  But the Bank does not even provide an explanation of that wholly conclusory statement, let alone evidence to support it.

3.  The Bank has made no showing that possible remedies other than a receivership are inadequate.  Assuming <u>arguendo</u> that Ahava CA is in possession of any property upon which the Bank has a perfected security interest, the Bank could have a remedy against the collateral itself under N.Y. U.C.C. § 9-609.  Assuming <u>arguendo</u> that Ahava CA was the recipient of a fraudulent transfer from the Remaining Defendants, the Bank could have a remedy to recover the property conveyed or its value. "'The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance.'"  <u>Geren v. Quantum Chemical Corp.</u>, 832 F. Supp. 728, 736 (S.D.N.Y. 1993), <u>quoting</u> <u>Marine Midland Bank v Murkoff</u>, 122 A.D.2d 122, 133, 508 N.Y.S.2d 17, 25 (2d Dep't 1986).  The existence of secured property or alleged fraudulent transfers are not, however, a

reason to appoint a receiver over an entire business. Further, the Motion offers no evidence that Ahava CA could not satisfy a money judgment. To the contrary, the Motion emphasizes that Ahava CA is an operational business with $18 million in annual revenues.

4. For the reasons already stated, the Motion offers no evidence or reason to believe that the Bank will be harmed if a receiver is not appointed. Ahava CA, on the other hand, would have to submit to the control and oversight of a receiver beholden to the Bank. When such control and oversight was imposed on the Remaining Defendants in 2007, those businesses rapidly deteriorated and ultimately collapsed under the consultant's mismanagement. Obviously, being stripped of operational control over one's business is a serious injury in itself.

5. As demonstrated above, the Bank's claims to impose liability on Ahava CA on an alter ego or fraudulent transfer theory fail in multiple major respects. The weight of the evidence is that Ahava CA will prevail in this case.

In addition, the Bank is not entitled to equitable relief because it is responsible for the problem about which it complains. The Bank created the problem by destroying the Remaining Defendants' businesses. It is not entitled to equitable relief under any circumstances.[4]

---

[4] For many of the same reasons, the Bank is not entitled to injunctive relief continuing the prior TROs prohibiting transfers outside the ordinary course of business and mandating access by the Bank to premises leased by Ahava CA. The Bank argues (n. 18 at page 19) that it has met the irreparable injury standard for the asset transfer TRO because there is a risk of "dissipation of assets to a foreign country" and "irreversible damage to Signature's collateral." But the Bank offers no evidence whatsoever that anyone is leaving the country with Ahava CA's assets or that the Bank's collateral is at any risk. The Bank's other argument for the injunction (at 19) -- that "AOC will be insolvent . . .without the Judgment Debtor's assets [and] irreparable harm is [therefore] presumed" -- is based on the false assumption that the Bank will prevail on its alter ego claim. The Bank's Brief says absolutely nothing as to why it would suffer irreparable injury if the second TRO regarding access to books, records and premises is not extended. The exigency that supposedly justified this relief originally was the then-impending sale of Moise's stock in the Debtor companies. (See Oleske 4/22/08 Affirmation ¶ 2.) With Moise's bankruptcy,

**D.    THE MOTION SHOULD BE DENIED BECAUSE**
<u>**IT IS NOT SUPPORTED BY ANY COMPETENT EVIDENCE**</u>

As set forth in the concurrently filed Objections to Evidence and Request to Strike, the Motion is not supported by any competent evidence.  The only purported evidence offered is:

a.  the hearsay-laden Mara Levin declaration which improperly attempts to introduce exhibits into evidence which she cannot properly authenticate or proffer for admission in a declaration; and

b.  the irrelevant/hearsay declarations of Robert Bloch and John Oleske, both of which relate to a "staged" April 24, 2008 surprise visit by the Bank to Ahava's CA's Brooklyn warehouse during the Passover holiday. The Bank inaccurately claims that a prior Supreme Court ordered Ahava CA to admit the Bank to its premises. In any event, the April 24, 2008 incident is irrelevant to the issues on this Motion.

**E.    ASSUMING <u>ARGUENDO</u> THAT THE MOTION'S**
**REQUESTED RELIEF ISSUES, AN UNDERTAKING**
<u>**OF AT LEAST $54 MILLION SHOULD BE ORDERED**</u>

Appointing a receiver will destroy Ahava CA.

The Bank's attorneys have stated the Bank's intent to put Ahava CA out of business.

The Bank has already destroyed LCDC, SLFC, and SS. There is no reason to believe that the Bank will not pursue its stated intention vis-a-vis Ahava CA or that the outcome would be different than it was with the Remaining Defendants.

The Motion argues that Ahava CA has revenues of $18 million per year. Based upon this figure, it is appropriate for the Bank to post an undertaking in the amount of three years of

---

there is no impending sale, so that exigency no longer exists.  Further, as discussed with the Court, the problem with access has largely been the Bank's heavy-handed approach.

business.  See 28 U.S.C. § 754; N.Y. C.P.L.R. § 6403; Cal. Civ. Proc. Code § 567(b).

## IV

## CONCLUSION

The Bank has no right or claim against Ahava CA, and Ahava CA does not belong in a lawsuit between the Bank and the Remaining Defendants. Accordingly, no relief of any sort should issue against Ahava CA.

In addition, seeking a receiver is against the Bank's own interests (as well as that of Ahava CA). Ahava CA's lease payments are a steady income stream for the Bank to utilize to satisfy its judgment against the Remaining Defendants. The Bank should want Ahava CA to thrive, and imposition of a receiver will have the opposite effect.

The Motion should be denied in its entirety.


Dated: New York, New York
       May 22, 2008


                        ROBERT W. HIRSH & ASSOCIATES
                        KORNSTEIN VEISZ WEXLER & POLLARD, LLP

                        By: _____
                              Lawrence C. Fox (LF-2503)

                        Attorneys for Defendant Ahava of California, LLC