ROBERT W. HIRSH (102731)
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507; Facsimile: 310-275-4050

SETH EISENBERGER (SE-6769)
108 Airport Executive Park
Nanuet, New York 10954
Telephone: 845-426-3400; Facsimile: 845-426-3401

Attorneys for Defendant, Counter-claimant and Cross-claimant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

| | |
|---|---|
| SIGNATURE BANK, | : |
| | : |
| Plaintiff, | :   08 Civ. 3893 (NRB) (MHD) |
| | : |
| - against - | :   **NOTICE OF MOTION** |
| | :   **FOR SANCTIONS** |
| AHAVA FOOD CORP., LEWIS COUNTY DAIRY | : |
| CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO | : |
| FOODS, YONI REALTY, LLC, SCHWARTZ AND | : |
| SONS QUALITY DISTRIBUTORS, INC., MOISE | : |
| BANAYAN, ANA BANAYAN a/k/a CHANA | : |
| BANAYAN, REBECCA BANAYAN a/k/a REBECCA | : |
| BARIMYAN a/k/a REBECCA BANAYAN- | : |
| LIEBERMAN, FARIBORZ BANAYAN a/k/a | : |
| AARON BANAYAN, RUBEN BEITYAKOV, | : |
| ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a | : |
| AHAVA NATIONAL FOOD DISTRIBUTOR | : |
| and NORTH COUNTRY MANUFACTURING, and | : |
| JOHN DOE COMPANIES 1 through 10, | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------------------X

PLEASE TAKE NOTICE that upon the attached Declarations of Robert W. Hirsh, dated July 3, 2008 and Lawrence C. Fox dated July 3, 2008, the concurrently filed Memorandum of Law, defendant, counter-claimant, and cross-claimant Ahava of California LLC ("Ahava CA") will move this Court before the Honorable Michael Dolinger, United States Magistrate Judge at the United States Courthouse, 500 Pearl Street, New York, New York at a time and place to be designated by the Court, for an Order awarding attorney's fees in the sum of $124,097.60 against plaintiff Signature Bank ("the Bank") and its attorneys, i.e. Herrick Feinstein, LLP, Mara Levin, David Feuerstein, and John Oleske (collectively "Bank's Attorneys") in order to reimburse Ahava CA for its attorneys fees and costs which it incurred in opposing the Bank's Order to Show Cause  for a Preliminary Injunction and for Appointment of Receiver ("the Motion") and in connection with discovery and motion practice relating to the Motion, and for having to file this motion for sanctions.

This motion is made pursuant to:

a.      the court's inherent power to sanction bad faith conduct; and

b.      28 U.S.C. Section 1927.

This motion is being made because of the following conduct committed by the Bank and the Bank's Attorneys:

a.      they filed and maintained the Motion in bad faith. The Motion was filed and maintained despite the fact that it was devoid of evidentiary support. Among other things, they misrepresented to the Court that the Bank possessed evidence that Ahava CA had impaired collateral in which the Bank had a security interest, thus necessitating the Motion's relief; and,

b.      they disobeyed multiple discovery orders.

This wrongful conduct caused Ahava CA to needlessly incur significant attorneys fees and costs for which it is entitled to recover.

Dated: Beverly Hills, California
     July 3, 2008

ROBERT W. HIRSH & ASSOCIATES

By: /s/ Robert W. Hirsh
     ROBERT W. HIRSH
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507
Facsimile: 310-275-4050

- and -

SETH EISENBERGER (SE-6769)
LAW OFFICE OF SETH EISENBERGER
108 Airport Executive Park
Nanuet, New York 10954
Telephone: 845-426-3400
Facsimile: 845-426-3401

*Attorneys for Defendant, Counter-claimant
and Cross-claimant Ahava of California, LLC*

ROBERT W. HIRSH (102731)
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507; Facsimile: 310-275-4050

SETH EISENBERGER (SE-6769)
108 Airport Executive Park
Nanuet, New York 10954
Telephone: 845-426-3400; Facsimile: 845-426-3401

Attorneys for Defendant, Counter-claimant and Cross-claimant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SIGNATURE BANK,                                   :
                                                  :
                              Plaintiff,          :     08 Civ. 3893 (NRB) (MHD)
                                                  :
       - against -                                :
                                                  :
AHAVA FOOD CORP., LEWIS COUNTY DAIRY              :
CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO        :
FOODS, YONI REALTY, LLC, SCHWARTZ AND             :
SONS QUALITY DISTRIBUTORS, INC., MOISE :
BANAYAN, ANA BANAYAN a/k/a CHANA                  :
BANAYAN, REBECCA BANAYAN a/k/a REBECCA            :
BARIMYAN a/k/a REBECCA BANAYAN-                   :
LIEBERMAN, FARIBORZ BANAYAN a/k/a                 :
AARON BANAYAN, RUBEN BEITYAKOV,                   :
ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a          :
AHAVA NATIONAL FOOD DISTRIBUTOR                   :
and NORTH COUNTRY MANUFACTURING, and              :
JOHN DOE COMPANIES 1 through 10                   :
                                                  :
                              Defendants.         :
-----------------------------------------------------------------------X

## DECLARATION OF ROBERT W. HIRSH

       I, Robert W. Hirsh, declare:

1

1.      I am a member of Robert W. Hirsh & Associates, attorneys of record for

defendant, counter-claimant, and cross-claimant Ahava of California, LLC ("Ahava CA") in this

case.  Each fact contained in this declaration is within my personal knowledge.

# I.
# INTRODUCTION

2.      This declaration is submitted in support of Ahava CA's motion for sanctions

against plaintiff Signature Bank ("the Bank") and its attorneys, Herrick Feinstein, LLP, Mara

Levin ("Ms. Levin"),  David Feurstein (" Mr. Feurstein"), and John Oleske ("Mr. Oleske")

(collectively "Bank's Attorneys").

3.      As set forth in paragraphs 4-37 below, the Bank and the Bank's Attorneys:

      a.      filed its Order to Show Cause for a Preliminary Injunction and for

              Appointment of Receiver ("the Motion") without possessing any

              supporting evidence;

      b.      repeatedly misrepresented to the Court that the Bank possessed evidence

              that Ahava CA had impaired collateral in which the Bank claims an

              interest; and

      c.      repeatedly disobeyed multiple discovery orders.

This conduct forced Ahava CA to needlessly incur significant attorney's fees and costs.

# II.
# FACTUAL BACKGROUND

4.      On or about April 24, 2008, before this case was removed to federal court, the

Bank filed the Motion brought by Order to Show Cause in the New York Supreme Court, which,

among other things, sought appointment of a receiver to take control of Ahava CA and a preliminary injunction. A true and correct copy of the Order to Show Cause without exhibits is attached hereto as Exhibit A.

5.      The Bank based its Motion upon repeated misrepresentations that Ahava CA was impairing its collateral and is diverting assets. For example, on April 25, 2008 the Bank's Attorneys represented to Judge Buchwald:

> ...there is a real and imminent threat that defendants [which includes Ahava CA]...will continue to direct or secrete [the] Collateral. In fact, our client [the Bank] has heard from market participants that Ahava CA is now offering discounts to customers that pay in cash.

Attached hereto as Exhibit B is a true and correct copy of an April 25, 2008 letter from Mara Levin. to Judge Buchwald.

6.      Ms. Levin's representations to the Court were not true. Despite repeated discovery orders the Bank never produced any evidence that Ahava CA:

a.      "directed or secreted" any asset in which the Bank has and/or had a

security interest to any third person; or

b.      offered cash discounts to its customers to pay its bills in cash.


7.      The Bank and its counsel were well aware that Ahava CA disputed its unsupported allegations. Attached hereto as Exhibit C (without attachments) is a true and correct copy of my April 28, 2008 letter to Judge Buchwald, which states, in pertinent part that "contrary to Levin's letter, there is no evidence that Ahava CA is transferring its assets away." Thus, the Bank and its counsel were warned that their claims were not true.

3

8.     Despite the Bank's knowledge that their allegations were not true, the Bank's Attorneys' continued repeating its unsupported allegations to the Court. On April 29, 2008, my co-counsel, Lawrence Fox ("Fox") and I participated in a telephone conference with Judge Buchwald.  Ms. Levin and Mr. Feuerstein participated on behalf of the Bank and David Antonucci ("Antonucci") appeared for the Judgment Debtors[1].  During this call, the Bank's counsel  represented, among other things, to the Court that the Bank had "hard evidence" that Ahava CA had impaired property in which the Bank had a security interest which had been conveyed to the Bank by the Judgment Debtors ("the Collateral").

9.     The Bank's counsel made these representations at later court conferences as well.  During a May 9, 2008 court conference Mr. Feuerstein represented to Judge Buchwald, among other things, that:

> Our concern, is that the collateral, including the machinery, including the receivables, including the trademarks, are going to be damaged by the continued operation of Fariborz Banayan

5/9/08 Transcript ("Transcript") at 15:24-16:2.

> addition to the equipment, there are receivables that can be harmed.

Transcript at 16:20-21.

> we understand that Ahava CA has gone out to the community and offered to take a discount on its receivables if people would pay in cash.

---

[1]  Defendants Ahava Food Corp. ("AF"), Lewis County Dairy Corp. ("LCDC"), St. Lawrence Food Corp. ("SLFC"), Yoni Realty, LLC ("YR"), Moise Banayan ("Moise"), Ana Banayan and Schwartz and Sons, Inc. ("SS") (collectively the "Judgment Debtors").

4

Transcript at 17:2-4.

A copy of the transcript of the May 9, 2008 conference is attached hereto as Exhibit D.

      10.     The Bank utilized its claimed "emergency" as a bootstrap for expedited discovery

and an immediate hearing.  The Bank's counsel stated:

> what we would ask for is that Ahava CA be required to produce all
> its organizational material, including anything to the extent of
> minutes or any other corporate documents, as well as their
> financial information which they were in part ordered to
> produce...If we could get that by the June 4 date, I think we could
> be satisfied with that.

Transcript at 46:13-20.

      11.     Also, as a result of the Bank's claims at the May 9, 2008 conference, among other

things, Judge Buchwald scheduled the Motion for a June 6, 2008 hearing, with Ahava CA's

opposition papers being due on May 22, 2008.

      12.     The Bank multiplied the proceedings and requested additional unnecessary

discovery.  Attached hereto as Exhibit E is a true and correct copy of Mr. Feuerstein's May 19,

2008 letter to Judge Buchwald requesting five immediate deposition.  This letter was sent in

derogation of Mr. Feuerstein's May 9, 2008 representations to the Court when Mr. Feuerstein

said that the Bank only needed documents to prosecute the Motion.  Exhibit E requests five

depositions, i.e. Moise, Fariborz Banayan ("Fariborz"), Ana Banayan, Ari Katz, and Reuben

Baityakov ("Baityakov").

      13.     From May 9, 2008 through on or about May 22, 2008, I worked "around the

clock" to prepare Ahava CA's voluminous opposition to the Motion. In addition, I reviewed and

responded to multiple letters sent by the Bank's counsel to the Court. The central theme of the

Bank's letters was its demand for discovery relating to obtaining evidence in support of the

Motion.

14.     The Bank's claim of emergency was utilized to avoid common professional courtesies for short extensions.  For example, Ahava CA requested a short two day extension to file its opposition to the Motion.  The Bank opposed the requested extension and claimed the emergency need of relief due to the purported impairment.  Judge Buchwald denied Ahava CA's request.   A true and correct copy of Judge Buchwald's denial of my request for an extension is attached hereto as Exhibit F.

15.     Despite its lack of evidence of its claims, the Bank's counsel continued  to press the Court for emergency expedited discovery.  All of the Bank's requests were predicated upon unsupported claims of impairment of collateral. During a May 22, 2008 telephone conference Judge Buchwald:

>   a.     granted the Bank's request to take several depositions to obtain evidence in support of the Motion;
>
>   b.     granted the Bank's request to review Ahava CA's financial books and records to obtain evidence in support of the Motion;
>
>   c.     granted the Bank's request to inspect the Lewis County dairy manufacturing plant which was being leased by Ahava CA to discover potential evidence of impairment of Collateral;
>
>   d.     granted the Bank's request to inspect the St. Lawrence County dairy manufacturing plant which was being leased by Ahava CA to discover potential evidence of impairment of Collateral;
>
>   e.     granted the Bank's request to inspect the Kings County distribution facility which was being leased by Ahava CA to discover potential

evidence of impairment of Collateral;

f.      granted defendants' request to depose various Bank witnesses, including

Robert Bloch ("Bloch");

g.      vacated the June 6, 2008 hearing on the Motion; and

h.      referred the Motion to Magistrate Judge Dolinger, who was charged with

hearing it, ordering an expedited discovery schedule, and overseeing all

discovery issues, all related to the Motion.

16.     At this hearing, I argued that the hearing should not be continued and the Bank

should not be entitled to extensive discovery because:

a.      the Bank should not have filed or maintained the Motion if it did not have

supporting evidence;

b.      the Bank's counsel had repeatedly represented to the Court that it

possessed sufficient evidence to support the relief sought in the Motion,

and the ordering of a vast amount of discovery to take place in a short

period of time was unjust; and

c.       it was unjust for the hearing to be adjourned, because Ahava CA's

counsel had been working "around the clock" over the then past two

weeks to file its opposition, which in fact had just been filed.

17.     After this Motion was referred to Magistrate Judge Dolinger, the Bank's counsel

continued to multiply the proceedings by requesting additional discovery.  Attached hereto as

Exhibit G is a true and correct copy of Mr. Feuerstein's May 23, 2008 letter to Magistrate Judge

Dolinger, which requested extensive additional discovery.

18.     During a May 23, 2008 conference with Magistrate Judge Dolinger, Mr.

Feuerstein said that the Motion's relief was premised upon the Bank being able to prove that Ahava CA had impaired the Collateral, and that the discovery which the Bank wanted to take would produce further evidence in support of the existing "hard evidence" which the Bank possessed that Ahava CA had impaired the Collateral.

19.    As a result of the Bank's continued prosecution of the unwarranted Motion, Magistrate Judge Dolinger issued a very comprehensive, omnibus, 15 point order, a true and correct copy which is attached hereto as Exhibit H, which, among other things:

a.    ordered in point 1 that the Bank can inspect Ahava CA's three New York facilities on May 28 and 29, 2008 for the purpose of determining whether there has been any impairment of the Collateral and for general discovery purposes. These inspections included production of Ahava CA's books and records, including the information stored on its computers. Further, the Court ordered that Ahava CA produce all of the documents identified in Feuerstein's May 23, 2008 letter motion;

b.    ordered in point 2 that:

1.    by June 4, 2008, the Bank must advise Ahava CA that it will be arguing at the hearing of the Motion whether Ahava CA impaired the Collateral;

2.    by June 4, 2008, the Bank must produce any documents in support of its claim that Ahava CA impaired the Collateral[2]; and

3.    on June 5, 2008, the Bank must produce for deposition a FRCP 30(b)(6)

---

[2] The Bank never produced a single document supporting impairment of the Collateral.

witness(es) supporting impairment of Collateral;

c.    ordered in point 7 that Fariborz be deposed on June 2, 2008;

d.    ordered in point 10 that the Bank must produce Bloch for deposition on June 12, 2008 and produce  two other Bank witnesses for deposition on June 13, 2008;

e.    ordered in point 15 that this discovery order was being made in connection with the Motion; and

f.    ordered in point 14 that the Motion would be heard on June 18, 2008.


20.    Ahava CA fully complied with Magistrate Judge Dolinger's order.  All three of its New York facilities were inspected by the Bank and Ahava CA produced documents for production and copying on four separate occasions.

21.    It is my understanding that there were four document inspections due to the Bank's inadvertence; the Bank failed to copy documents during its first three visits to Ahava CA's Kings County facility; and the Bank even failed to send attorneys to these productions.

22.    To insure that the documents were properly produced per Magistrate Judge Dolinger's order, Los Angeles based Fariborz flew cross-country to New York to supervise the document production.

23.    The Bank failed to comply with the Court's order and failed to produce documents supporting its claim. As a result, the Court entered an Order that if by May 30, 2008, the Bank had not notified Ahava CA that it was contending that Ahava CA impaired physical collateral, the Bank was deemed to have waived the issue for the purposes of the Motion. A copy Attached hereto as Exhibit I is a true and correct copy of the May 30, 2008 order.

24.    The Bank failed to produce any documents supporting its claim of impairment of

9

physical collateral by May 30, 2008 or any other time.

25.     In response to my letter application concerning the Bank's continued and repeated failure to abide by the Court's discovery orders, on June 4, 2008, Magistrate Judge Dolinger entered an Order extending the Bank's time to serve Ahava CA with "documents pertaining to any alleged financial impairment" of the Collateral to no later than June 4, 2008, 5:00 pm.  A true and correct copy of the endorsed order is attached hereto as Exhibit J.

26.     The Bank once again disregarded the Court's Order and never served Ahava CA with documents establishing impairment of non-physical collateral.

27.     The Bank and the Bank's Attorney's repeatedly flouted Court Orders -- even orders that required simple administrative compliance.  For example, Magistrate Judge Dolinger ordered, among other things, that the Bank purchase and cause to be delivered to Fariborz his deposition transcript on an overnight basis such that he could immediately correct it so that the parties could timely prepare reply and sur-reply briefs. This Order was issued because June 6; all of June 7; the latter part of June 8; and June 9-10, 2008 were days which Fariborz and I could not work due to the Jewish Sabbath and the Jewish holiday of Shavous. Attached hereto as Exhibit K is a true and correct copy of the endorsed order.

28.     The Bank and the Bank's Attorneys disregarded the Court's July 4, 2008 order. Fariborz's June 4, 2008 deposition transcript did not arrive at my office until on or about June 6, 2008 in the afternoon, which prevented Fariborz from timely reviewing it.

29.     On June 4, 2008, the day before the Bank's FRCP 30(b)(6) deposition, Mr. Feuerstein emailed  six documents to me which he represented in a June 4, 2008 email to be "the impairment documents".  As further explained below, the Bank's designated witness did not support Mr. Feuerstein's claim and did not identify these documents as proving any "impairment"

10

by Ahava CA.  A true and correct copy of Feuerstein's June 4, 2008 email to me is attached hereto as Exhibit L.

30.    On June 5, 2008, I deposed the Bank' FRCP 30(b)(6)  witness, Edward C. Gibbon ("Gibbon"), whom Mr. Feuerstein had previously represented to Magistrate Judge Dolinger and me would testify that Ahava CA had impaired Collateral in its possession in which the Bank had a security interest; and that Ahava CA had allegedly engaged in other wrongful conduct. Attached hereto as Exhibit M is a true and correct copy of the "compressed" June 5, 2008 Gibbon deposition transcript.

31.    Contrary to Mr. Feuerstein's representations, Gibbon failed to testify that Ahava CA had impaired Collateral or had engaged in wrongful conduct. In particular, Gibbon testified:

a.    at 102:12-15, that the documents he has been able to review so far does allow him to render any kind of opinion in regard to the operations of Ahava CA;

b.    at 103:3-5, that he cannot give any opinion that Ahava CA transferred any of its assets outside the ordinary course of business;

c.    at 103:20, that he has no opinion as to whether Ahava CA impaired its own assets;

d.    at 104:15-17, that he has no opinion as to whether Ahava CA impaired assets belonging to AF;

e.    at 104:21, that he has no opinion as to whether Ahava CA impaired assets belonging to SS;

f.    at 104:24, that he has no opinion as to whether Ahava CA impaired assets belonging to YR;

11

g.    at 105:3, that he has no opinion as to whether Ahava CA impaired assets belonging to Moise;

h.    at 105:6, that he has no opinion as to whether Ahava CA impaired assets belonging to LCDC;

I.    at 105:9, that he has no opinion as to whether Ahava CA impaired assets belonging to SLFC;

j.    at 106:9, that he has no opinion as to whether Ahava CA received an asset from AF for which it failed to pay consideration;

k.    at 106:16, that he has no opinion as to whether Ahava CA received an asset from LCDC for which it failed to pay consideration;

l.    at 106:21, that he has no opinion as to whether Ahava CA received an asset from SLFC for which it failed to pay consideration;

m.    at 106:25, that he has no opinion as to whether Ahava CA received an asset from YR for which it failed to pay consideration;

n.    at 107:4, that he has no opinion as to whether Ahava CA received an asset from SS for which it failed to pay consideration;

o.    at 107:6, that he has no opinion as to whether Ahava CA received an asset from Moise for which it failed to pay consideration; and

p.    at 100:19-23, that he was unaware of any impropriety relating to Ahava of California LLC.

32.    The Bank never served Ahava CA with documents establishing impairment of non-physical collateral. The Bank failed to produce any evidence establishing impairment of any Collateral by Ahava CA of any sort at any time.

33.     On June 6, 2008, Magistrate Judge Dolinger held a telephonic conference call in which Mr. Oleske on behalf of the Bank admitted to Magistrate Judge Dolinger, among other things, that the Bank had breached Magistrate Judge Dolinger's recent discovery order by not serving all counsel with documents in connection with Moise's deposition, which had already started.  Magistrate Judge Dolinger gave the Bank another opportunity to comply and issued a June 6, 2008 Order, a true and correct copy which is attached hereto as Exhibit N, which, among other things, ordered that the Bank cause all counsel to receive all documents in connection with Moise's deposition no later than June 6, 2008, close of business.

34.     The Bank breached Magistrate Judge Dolinger's June 6, 2008 Order and failed to produce the documents.

35.     On June 11, 2008, during a telephonic conference call, Magistrate Judge Dolinger noted that the Bank had breached the June 6, 2008 discovery order and the Court allowed the Bank another opportunity to comply and again ordered that the Bank provide documents to defendants' counsel. A true and correct copy of the June 11, 2008 order is attached hereto as Exhibit O.

36.     Once again, the Bank failed to comply with the Court's Order.  The Bank never produced the "impairment" documents.  After numerous representations to Judge Buchwald and Magistrate Judge Dolinger, the Bank and its counsel essentially conceded that it could not provide any documents to support its Motion despite repeated misrepresentations to the Court that it possessed such documents and evidence. Attached hereto as Exhibit P is a true and correct copy of a June 11, 2008 letter from Mr. Oleske to Magistrate Judge Dolinger, which states, among other things:

> In light of the Court's ruling with respect to the production of
> documents to...[Ahava CA's] counsel, and the indefinite

13

adjournment of the previously scheduled hearing, Signature {the
Bank] has instructed us to withdraw its Motion...[The Bank]
believes that alternate means of protecting its interests are
available that may achieve its goal more efficiently and without the
need for additional expedited discovery and motion practice that
the continued prosecution of its motion would require.

37.     During the June 12, 2008 telephonic conference call, Magistrate Judge Dolinger:

    a.     granted the Bank's request to withdraw the Motion; and

    b.     ordered that defendants will have up and until July 7, 2008 to file a motion

for attorneys fees and costs.  A true and correct copy of the Court's order

is attached hereto as Exhibit Q.


### III.
### SUMMARY OF ATTORNEYS FEES AND COSTS

**My Personal Background**

38.     I have been practicing law since 1982.  I obtained my *Juris Doctor* from Boston

University School of Law.  I am admitted to practice in the following courts: state courts of New

York, California and Massachusetts; United States District Courts for the Southern, Eastern,

Central and Northern Districts of California; and the United States Court of Appeals for the

Ninth Circuit.

39.     I have participated in many trials in state and federal courts, including as lead trial

counsel. I have extensive experience in commercial litigation.


**The Work In This Case**

40.     I, and to a lesser extent Lawrence C. Fox, supervised the work of all attorneys working on this case.  I was involved in every aspect of this case, including the expedited discovery and depositions.  With respect to the Bank's 30(b)(6) witness, I established that the Bank's claims of impairment were without any basis whatsoever.

41.     As detailed above, the Bank and its counsel unduly caused the extremely fast pace and extraordinary amount of work.  As a result, the amount of my work and Mr. Fox's firm was extensive and necessary.  Ahava CA was forced to incur great expense to oppose the Motion from on or about April 23 to on about June 11, 2008. These tasks included: numerous letter applications and responses, reviewing and analyzing the Motion; legal research; factual research; gathering evidence; reviewing documents, including contracts, leases, trademarks and other agreements; writing the opposition including the supporting declarations; preparing, reviewing, and analyzing multiple letters, faxes and emails; communicating with co-counsel, opposing counsel, and counsel for other parties in this case; preparing for and participating in multiple telephonic court hearings; defending a deposition; taking a deposition; and coordinating four document productions.

42.     My hourly rate of $400 and the hourly rates charged for the attorneys working on this matter were the same as those charged during the same time period to fee-paying clients of the firm for those attorneys' work, and to my knowledge are in line (or lower) than the hourly rates charged by Beverly Hills and New York City firms for attorneys of similar experience. Those hourly rates are:

| Attorney | Hourly Rate | Bar Admission |
| --- | --- | --- |
| Robert H. Hirsh | $400.00 | 1982 |

| | | |
|---|---|---|
| Lawrence C. Fox | $450.00 | 1983 |
| Joel Rosner | $335.00 | 2005 |

43.    The time spent by the attorneys are summarized as follows:

| Attorney | Hourly Rate | Hours |
|---|---|---|
| Robert H. Hirsh | $400.00 | 208.5 |
| Lawrence C. Fox | $450.00 | 43.0 |
| Joel Rosner | $335.00 | 51.8 |

44.    The detailed contemporaneous invoices containing the time records for my time spent on this matter, as well as a detailed listing of the expenses incurred in connection with the prosecution of this case, are submitted herewith as Exhibit R and are summarized below.  The time records are based on the contemporaneous time entries made by me. Any time for which we are not requesting attorney's fees has been redacted.  Ahava CA incurred $83,400.00 for legal services in opposing the Motion.  This amount does not include the cost of this motion.

45.    In addition, Ahava CA incurred expenses.  The costs include but are not limited to deposition transcripts, telephone charges, faxes and other out of pocket costs. Accordingly, with respect to opposing the Motion, Ahava CA, incurred at least $3,238.60 in fees and costs from my firm.

46.    As detailed in the accompanying Declaration of Lawrence C. Fox. Ahava CA incurred a total of $37,459.00 of fees and costs from Mr. Fox's firm.

16

47.    Therefore, Ahava CA respectfully requests that Court award it a total of

$124,097.60 in fees and costs.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct, and that this declaration was executed in Beverly Hills, California

on July 3, 2008.

_____/s/ Robert W. Hirsh_____
Robert W. Hirsh

**EXHIBIT**

A

At IAS Part 39 of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York on the 4 day of April, 2008.

PRESENT Helen Freedman, Justice

009607

------------------------------------------------------------ x

SIGNATURE BANK,

               Plaintiff,

     - against -

AHAVA FOOD CORP. d/b/a NORTH COUNTRY CHEESE CORP., LEWIS COUNTY DAIRY CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO FOODS, YONI REALTY, LLC, SCHWARTZ AND SONS QUALITY DISTRIBUTORS, INC., MOISE BANAYAN, ANA BANAYAN a/k/a CHANA BANAYAN, REBECCA BANAYAN a/k/a REBECCA BARIMYAN a/k/a REBECCA BANAYAN-LIEBERMAN, FARIBORZ BANAYAN a/k/a AARON BANAYAN, RUBEN BEITYAKOV, ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a AHAVA NATIONAL FOOD DISTRIBUTOR and NORTH COUNTRY MANUFACTURING, and JOHN DOES 1 through 50,

               Defendants.

------------------------------------------------------------ x

Index No.: 600959/2008

**MOTION SEQUENCE # 002**

**ORDER TO SHOW CAUSE**

Upon the annexed Affirmation of John Oleske, dated April 22, 2008, the Amended Verified Complaint, dated April 22, 2008, and the exhibits attached thereto, submitted in support of Plaintiff Signature Bank's motion for a temporary restraining order and a preliminary injunction, it is hereby

        **ORDERED**, that the parties to this action, or their attorneys, show cause at Part 39 of this Court, located in Room 208, 60 Centre Street, New York, New York, on May 1, 2008, at 2:00 p.m., or as soon thereafter as counsel can be heard, why an Order should not be entered:

1.    Appointing a temporary receiver from the list of approved temporary receivers kept by the Chief Administrator of the Courts pursuant to 22 NYCRR § 36 over all of the corporate defendants in this action, namely, Ahava Food Corp. ("Ahava Food"), Lewis County Dairy Corp. ("Lewis"), St. Lawrence Food Corp. ("St. Lawrence"), Yoni Realty, LLC ("Yoni"), Schwartz & Sons Quality Distributors, Inc. ("Schwartz & Sons") (collectively, the "Judgment Debtors"), and Ahava of California LLC ("Ahava of California"), with said receiver being empowered to exercise all powers of ownership, management and/or operation of any and all of said corporate defendants and their businesses, as said receiver sees fit and proper in order to preserve the operations, assets, and going-concern value of the corporate defendants, *provided however* that the receiver shall not challenge or interfere with Signature's right and/or ability to seize and/or dispose of assets in accordance with any agreements between Signature and any of the defendants and/or pursuant to the Uniform Commercial Code; and

2.    Ordering the defendants to provide Signature with full, immediate and unconditional access to the premises, physical property, books, records, and all other documents owned, occupied, used by, or in the possession, custody, or control of any of the Judgment Debtors and/or Ahava of California as provided for in the loan documents between the Judgment Debtors and Signature; and

3.    Granting such other and further relief as the Court deems just and proper.

**ORDERED** that pending the hearing of this motion, a temporary receiver shall be hereby appointed from the list of approved temporary receivers kept by the Chief Administrator of the Courts pursuant to 22 NYCRR § 36 over all of the corporate defendants in this action, namely, Ahava Food Corp. ("Ahava Food"), Lewis County Dairy Corp. ("Lewis"), St. Lawrence

Food Corp. ("St. Lawrence"), Yoni Realty, LLC ("Yoni"), Schwartz & Sons Quality

Distributors, Inc. ("Schwartz & Sons") (collectively, the "Judgment Debtors"), and Ahava of

California LLC ("Ahava of California"), with said receiver being empowered to exercise all

powers of ownership, management and/or operation of any and all of said corporate defendants

and their businesses, as said receiver sees fit and proper in order to preserve the operations,

assets, and going-concern value of the corporate defendants, *provided however* that the receiver

shall not challenge or interfere with Signature's right and/or ability to seize and/or dispose of

assets in accordance with any agreements between Signature and any of the defendants and/or

pursuant to the Uniform Commercial Code; and it is further

**JSC**

**ORDERED** that pending the hearing of this motion, defendants shall provide

Signature with full, immediate and unconditional access to the premises, physical property,

books, records, and all other documents owned, occupied, used by, or in the possession, custody,

*any Ahava entity,*

or control of any of the Judgment Debtors and/or Ahava of California, as provided for in the loan

documents between the Judgment Debtors and Signature; and it is further

**JSC**

**ORDERED** that Plaintiff shall serve a copy of this Order and its supporting

papers on counsel for all parties, by overnight mail, on or before April 2 4, 2008 and such

**JSC**    service shall be deemed good and sufficient.

ENTERED:

ORDERED, that opposition papers, if any,
shall be served on the _____
on or before _____ .

_____
J.S.C.

**ORAL ARGUMENT
DIRECTED**

_____
**J.S.C.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

SIGNATURE BANK,

                     Plaintiff,

           - against -

AHAVA FOOD CORP. d/b/a NORTH COUNTRY
CHEESE CORP., LEWIS COUNTY DAIRY CORP.,
ST. LAWRENCE FOOD CORP. d/b/a PRIMO
FOODS, YONI REALTY, LLC, SCHWARTZ AND
SONS QUALITY DISTRIBUTORS, INC., MOISE
BANAYAN, ANA BANAYAN a/k/a CHANA
BANAYAN, REBECCA BANAYAN a/k/a
REBECCA BARIMYAN a/k/a REBECCA
BANAYAN-LIEBERMAN, FARIBORZ BANAYAN
a/k/a AARON BANAYAN, RUBEN BEITYAKOV,
ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a
AHAVA NATIONAL FOOD DISTRIBUTOR and
NORTH COUNTRY MANUFACTURING, and
JOHN DOES 1 through 50,

                    Defendants.

------------------------------------------------------------- x

Index No.: 600959/2008

**AFFIRMATION OF JOHN OLESKE IN SUPPORT OF MOTION BY ORDER TO SHOW CAUSE FOR THE APPOINTMENT OF A TEMPORARY RECIEVER AND FOR OTHER RELIEF**

        John Oleske, an attorney duly admitted to practice in the Courts of this state affirms under penalty of perjury as follows:

        1.      I am an associate of the firm of Herrick, Feinstein LLP, attorneys for plaintiff Signature Bank ("Signature"). I submit this affirmation in support of Signature's motion by Order to Show Cause for a temporary restraining order and preliminary injunction: (a) appointing a temporary receiver over all of the corporate defendants pursuant to CPLR § 6401(a); and (b) ordering defendants to immediately provide access to the corporate defendants' premises, physical property and financial records as guaranteed to Signature in the loan agreements with the Judgment Debtors.

        2.      While this Court granted Signature certain preliminary relief to protect its $9 million judgment at the previous April 4, 2008 hearing in the form of a restraint on the assests of

Ahava of California LLC, defendants' ongoing concealment of information, their plain denial to Signature of access as contractually required, their threatened bankruptcy, and their misrepresentations to the Court, requires the aforementioned additional relief given the pending sheriff's sale of the Judgment Debtors' businesses this coming Tuesday, April 29, 2008.

     3.    Specifically:

- On April 15, 2008, defendants barred Signature from the Judgment Debtors' premises, and otherwise refused to permit Signature access to the Judgment Debtors' collateral for inspection, despite Signature's absolute rights of entry and inspection under the loan documents;

- At the April 4, 2008 hearing, Ahava of California's counsel represented to the Court that Moise Banayan was not a member of Ahava of California. On April 22, 2008, Ahava of California's counsel sent me the Articles of Organization for Ahava of California, showing that Moise Banayan was a founding member of that company. In his letter, Ahava of California's counsel represented that Moise Banayan has not been a member of Ahava of California since 2005. But Ahava of California's 2006 federal tax return, acquired independently by Signature, shows that he *was* a member as recent as 2006;

- At the April 4, 2008 hearing, Ahava of California's counsel represented to the Court that he was unaware of any transfers of the Judgment Debtors' assets to Ahava of California other than a few, isolated instances of the Judgment Debtors accounts receivable being paid to Ahava of California. But Signature has since learned that on March 7, 2008, the Judgment Debtors transferred all of their trademarks to Ahava of California, and that Ahava of California has since been conducting business in complete reliance on those trademarks;

- While counsel represented at the April 4, 2008 hearing that Ahava of California was a separate and unaffiliated company from the Judgment Debtors, Moise Banayan himself in seeking funding on behalf of Ahava of California represented that the accounts receivable due Ahava Food Corp. were now the accounts receivable of Ahava of California since the business of Ahava Food Corp. (and the other Judmgnet Debtors) was now being operated solely by Ahava of California.

- Since the April 4, 2008 hearing, and then again following the April 15, 2008 conference call with the Court, Ahava of California has relentlessly stonewalled Signature in its efforts to gain access to books and records. Contrary to the Court's explicit instruction, Ahava of California's counsel has repeatedly asserted that accounts payable and receivable ledgers are somehow privileged, and that Ahava of California is entitled to restrict the production of information to that solely to the Judgment Debtors, and then only where counsel deems it "appropriate".

2

4. When Signature first applied to the Court for interim relief, it had an expectation that defendants would obey the Court's order, both in letter and spirit. It is now evident that defendants, who appear to have misled not only Signature, but also the Court, and even their own counsel, cannot be trusted. As a result, the Court must compel defendants to provide immediate access to their premises, assets, and financial information, and must appoint a receiver to ensure defendants' compliance with the Court's earlier directives, as well as to safeguard the Judgment Debtors' business generally.

5. In the absence of the requested relief, the following irreparable harm will result:

- <u>Dissipation of Assets to a Foreign Country.</u> Ahava of California is paying unknown sums to the individual defendants as "consulting fees"[1], at the same time that at least one of those defendants, Moise Banayan, is preparing to leave the country permanently, for the express purpose of avoiding the Court's judgment. The risk of irreparable harm to Signature is heightened by the fact that the business is likely receiving its largest cash infusion of the fiscal year, *i.e.*, shortly after the Passover holiday, and thus will have the greatest ability to finance the individual defendants' efforts to evade the judgment. Given defendants' willingness to conceal their actions from their own attorneys, the Court's order restraining further asset transfers is unlikely to be respected, especially by a defendant intent on fleeing the jurisdiction to avoid payment of a judgment against him. Only a receiver can ensure that the assets rightfully belonging to Signature stay within the reach of the Court's powers.

- <u>Loss of Innocent Employees' Jobs.</u> On April 29, 2008, Signature will become the legal owner of the Judgment Debtors' assets and operations at a foreclosure sale. But because of the veil of secrecy created by defendants, Signature has no information as to the state of the business' payroll. Moreover, given Ahava of California's asserted legal position, it is probable that Signature will not gain access to payroll information, let alone control over payroll decisions, until well after the foreclosure sale. Unless a receiver is appointed to get this information, and to direct responsible decision making vis-a-vis the payroll accounts in the interim, there will be a substantial risk that Signature will be forced to terminate some or all of the business' employees when it assumes control.

- <u>Irreversible Damage to Signature's Collateral.</u> Having fraudulently conveyed the Judgment Debtors' entire business to Ahava of California in order to evade Signature's judgment, defendants will undoubtedly continue to handle the business in an illegal and

---

[1] Ahava of California's counsel represented at the April 4, 2008 hearing in chambers that such fees were being paid to Moise Banayan. Given the positions of Fariborz Banayan and Ruben Bietyakov as members and/or officers of Ahava of California, Signature presumes that they are receiving cash from the business as well, whether as fees, salary, or otherwise.

3

deceptive manner, until this Court's rulings force them to abandon the enterprise. If Ahava of California is permitted to continue operating the business without any kind of accountability, then, the entire going concern that is Signature's collateral -- the trademarked brand names, the goodwill the business has established with customers, and the value inherent in the continuity of the business' operations, will be destroyed or diverted beyond Signature's reach. A receiver is necessary to ensure that defendants do not bring this valuable going concern down with them.

6.       As evidenced by the existing Temporary Restraining Order, this Court has already determined that Signature is likely to prevail on the merits of its underlying claims for fraud.

7.       The balance of the equities also favors the appointment of a receiver and the imposition of an injunction. On the one hand, without the receiver and an injunction, Signature will have no way to know whether the security for its judgment is being kept in good condition and otherwise safeguarded. On the other hand, the appointment of the receiver and the imposition of the injunction will cause no harm at all to defendants, other than possibly disrupting their fraudulent scheme, which is obviously not a protectable interest.

8.       In fact, given that the Judgment Debtors have already agreed in the loan documents to provide Signature with access to the collateral in the event of a default or non-payment, they cannot possibly claim that the injunction should not be granted.

9.       Finally, Signature has met the conditions required for the appointment of a temporary receiver pursuant to CPLR § 6401(a):

> Upon motion of a person having an apparent interest in property which is the subject of an action in the supreme or a county court, a temporary receiver of the property may be appointed, before or after the service of summon and at any time prior to judgment, or during the pendency of an appeal, where there is danger that the property will be removed from the state, or lost, materially injured or destroyed.

4

Signature undeniably has "an apparent interest" in the property of the Judgment Debtors, including all of the assets and operations fraudulently transferred to Ahava of California. And as explained above, and as fully evidenced in the Amended Verified Complaint, there is a clear and present "danger that the property will be removed from the state, or lost, materially injured or destroyed."

10.    Courts have not hesitated to appoint temporary receivers under similar circumstances. Directly on point is *Johnson Matthey & Co. v. Permadent Mfg. Corp.*, 16 A.D.2d 750 (1st Dep't 1962), *aff'd* 12 N.Y.2d 747 (1962). In *Johnson*, the defendant corporation, a seller of dental products, defaulted on a debt to the plaintiff. Instead of paying the debt, the defendant corporation conveyed its assets to another company, "which had been specifically organized for the purpose of acquiring certain of the assets" of the defendant." The only consideration the transferee company paid to the defendant for these assets was an inchoate interest in speculative future profits. *Id.*

11.    The trial court in *Johnson* appointed a temporary receiver over the transferred assets, undoubtedly concluding that the purported consideration was likely to be proven a sham, and that the transfers from the defendant to the new company were thus likely to be found to be fraudulent conveyances. Both the First Department and the Court of Appeals affirmed the trial court's order as an appropriate appointment of a temporary receiver. *Id.*

12.    The *Johnson* decision has since been followed repeatedly by courts appointing temporary receivers under similar circumstances. *See, e.g., Singh v. Brunswick Hosp. Ctr., Inc.*, 2 A.D.3d 433 (2d Dep't 2003) (affirming receivership over hospital where owners conveyed hospital property to new entity to avoid claims by contract vendees); *Chaline Estates, Inc. v. Furcraft Assocs.*, 278 A.D.2d 141 (1st Dep't 2000) (affirming appointment of receiver where certain partners transferred assets to new entity without knowledge of other partner

5

"manifest[ing] a predisposition to take unilateral action in disregard of [the other partner's]

rights, thereby demonstrating a danger of material injury to the property within the meaning of

CPLR 6401(a)"); *Butler v. Gibbons*, 225 A.D.2d 335 (1st Dep't 1996) (affirming appointment of

receiver where joint venturer transferred funds out of joint venture bank account and refused to

provide access to account records); *Wong v. Wong*, 161 A.D.2d 710 (2d Dep't 1990) (affirming

appointment of receiver over married couple's rent-producing apartment building, where

husband had transferred rent proceeds out of building's account).

13.     The need for a receiver is even more compelling in this case than it was in

*Johnson, Singh, Chaline, Butler, and Wong*.  In *Johnson*, the defendants at least tried to create

the appearance of consideration for their transfer of an entire business from a debtor entity to a

new, unencumbered entity that they controlled.  Here, the defendants' transfer of the Judgment

Debtors' assets and operations to Ahava of California was done for no consideration at all.

14.     In *Singh, Chaline, Butler, and Wong*, there was not even a judgment in

place when the receivership was ordered, just a finding that the plaintiffs were likely to prove

their interest in the subject property.  Here, the underlying liability of the defendants, and

Signature's concomitant interest in the property, has already been proven and memorialized in a

judgment.

15.     And there is no indication in any of the cases discussed above that there

was any danger of a defendant fleeing the United States with the subject business' fraudulently-

conveyed assets in order to avoid a judgment.  Here, by contrast, Moise Banayan has explicitly

admitted, in writing, that he is preparing to do exactly that.  Where a defendant is attempting to

defeat a judgment held by a secured creditor by dissipating assets, irreparable harm should be

found and an injunction should issue. *See Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94

N.Y.2d 541, 545-546 (2000).

HF 4103698 v.8  #06406/0023 04/23/2008 11:42 AM

16. · With Signature's entitlement to a receivership over all of the corporate defendants established, the only issue is the scope of that receivership. The powers of a temporary receiver pursuant to CPLR § 6401(b), although bounded by the Court's orders, can be wide-ranging:

> The court appointing a receiver may authorize him to take and hold real and personal property, and sue for, collect and sell debts and claims, upon such conditions and for such purposes as the court shall direct . . . . Upon motion of the receiver or a party, powers granted to a temporary receiver may be extended or limited or the receivership may be extended to another action involving the property.

17. It is well-established that the Court's discretion to define the receiver's powers includes the discretion to delegate day-to-day management authority to the receiver. *Key Bank v. Anton*, 241 A.D.2d 482, 483 (2d Dep't 1997) (receiver properly "granted authority to operate [a] restaurant as an ongoing concern"); *64 B Venture v. American Realty Co.*, 194 A.D.2d 504 (1st Dep't 1993) ("the Supreme Court properly exercised its equitable powers to appoint the receiver to operate [a] nursing home"); *Aiello v. Aiello*, 23 Misc. 2d 276 (Sup. Ct. Kings Cty. 1960) (appointing receiver to operate family dairy food business in the midst of family dispute); *Decker v. Gardner*, 124 N.Y. 334 (1891) (approving of appointment of receiver to operate railroad).

18. Here, the Court should authorize the temporary receiver to manage the day-to-day operations of the corporate defendants, as the courts did in *Key Bank*, *64 B Venture*, *Aiello*, and *Decker*.

19. While a receivership limited to supervisory powers may be appropriate in some cases, this is not one of them. Given defendants' willingness to engage in brazen, fraudulent transfers of assets, there is no reason to believe that.a receiver who is only empowered

7

to observe, and not to manage, will be able to secure and preserve the subject assets and business operations.

20.    In addition, the Court should order that the receiver provide Signature with full, immediate and unconditional access to the premises, physical property, books, records, and all other documents owned, occupied, used by, or in the possession, custody, or control of any of the Judgment Debtors and/or Ahava of California pursuant to CPLR § 6404.

21.    Signature respectfully submits that it has met its burden in establishing the urgent need for the appointment of a temporary receiver and its right to an injunction compelling defendants to provide Signature with access to its collateral, and therefore requests that the Court grant its motion for interim relief in its entirety.

Dated: New York, New York
     April 22, 2008

_____
       John Oleske

HF 4103698 v.8  #06406/0023 04/23/2008 11:42 AM

EXHIBIT

B

# HERRICK

MARA B. LEVIN
PARTNER
Direct Tel:  212.592.1458
Direct Fax:  212.545.3358

Email:  mlevin@herrick.com

NEW YORK
NEWARK
PRINCETON

April 25, 2008

VIA FACSIMILE

Hon. Naomi R. Buchwald
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 2270
New York, NY 10007
Fax: (212) 805-7927

Re:   *Signature Bank v. Ahava Food Corp., et al.*, 08 Civ. 3893

Dear Judge Buchwald:

This firm represents plaintiff Signature Bank ("Signature") in the above-entitled action, which was removed to this Court and assigned to your Honor earlier today. Pursuant to Your Honor's individual practices, I write to request that the Court schedule a pre-motion conference at its earliest convenience to discuss: (1) defendants' blatant disobedience of the Temporary Restraining Order entered by Justice Freedman in New York State Supreme Court on April 24, 2008; and (2) to schedule a Preliminary Injunction hearing to consider Signature's request to continue the relief already granted by Justice Freedman, and for additional relief in the form of a receivership over Ahava of California LLC ("AOC").

By way of background, Signature's claims for fraud, conversion, and RICO arise out of defendants' attempts to evade a $9 million judgment that Justice Freedman awarded Signature on March 14, 2008 against Ahava Food Corp., Lewis County Dairy Corp., St. Lawrence Food Corp., Yoni Realty, LLC, Moise Banayan, Ana Banayan, and Schwartz & Sons, Inc. (the "Judgment Debtors"). As set forth more fully in the Amended Verified Complaint, the Judgment Debtors -- who had previously borrowed or guaranteed roughly $11 million in loans from Signature -- have been engaged in a fraudulent scheme with the other defendants to frustrate Signature's ability to collect on its loans and/or judgment. In large part, defendants' scheme involves the Judgment Debtors' fraudulent transfer of virtually all of their assets, including their $18 million kosher food business, to its alter-ego AOC.

Signature has submitted extensive, detailed evidence that supports its claims, including evidence establishing that (i) Moise Banayan co-owns AOC (along with his brother) and operates AOC as his business (rather than a separate and distinct entity), (ii) when it became clear that Signature was going to seek legal redress to collect on its loans, the Judgment Debtors transferred the collateral -- including $8 million in accounts receivable -- to AOC, and (iii) as

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

HERRICK

Hon. Naomi Buchwald
April 25, 2008
Page 2

recently as March 2008, defendants were still engaged in conduct that was designed to unlawfully evade Justice Freedman's judgment.

Based in part on this evidence, Justice Freedman granted Signature two Temporary Restraining Orders. The first order enjoined AOC from transferring any assets outside the ordinary course of business, and attached the bank accounts of Moise Banayan and his wife Ana Banayan. The second order directed all defendants, including "all Ahava entities", to provide Signature with full and immediate access to all of the property that was given as collateral securing the loans underlying Signature's judgment. That order, issued yesterday, also scheduled a hearing for May 1, 2008 to consider Signature's request for a receivership over AOC to ensure compliance with Justice Freedman's first order.

Earlier today and with advance notice having been provided, representatives of Signature presented themselves at the corporate defendants' premises in Brooklyn, seeking access to the premises in accordance with Justice Freedman's April 24th order. They were refused. While the exigency of inspecting the assets is no longer present -- because Moise Banayan, the principal and/or owner of all the corporate Judgment Debtors, filed bankruptcy this morning in the Bankruptcy Court for the Northern District of New York, effectively staying the UCC sale that was scheduled for April 29, 2008[1] -- there is no question that defendants' conduct constitutes contempt. Nor can there by any question given defendants' blatant disregard for Justice Freedman's May 1st order, that there is a real and imminent threat that defendants will continue disobey Justice Freedman's first order with respect to AOC and continue to divert or secrete Signature's collateral. In fact, our client has heard from market participants that AOC is now offering discounts to customers that pay in cash.

In light of the evidence already before Your Honor, and the urgency of this matter, we respectfully request that the Court convene a telephonic pre-motion conference at the earliest possible opportunity, so that the Court may fix an expedited schedule for submission of Signature's motion papers (which are essentially ready for presentation to the Court, but for a covering declaration, and the conformance of the papers with the federal rules), and for a hearing on Signature's application to this Court for the relief Signature had requested from Justice Freedman and for a continuation of the first TRO. Moreover, in light of FRCP 65(b) and the fact

---

[1] Because Mr. Banayan filed only in his individual capacity, and the Judgment Debtors have not yet filed, it is unlikely that this action will be stayed in its entirety under the Bankruptcy Code's automatic stay provision.

# H ERRICK

Hon. Naomi Buchwald
April 25, 2008
Page 3

that all parties were prepared to be before Justice Freedman on May 1, 2008 in any event, we respectfully request that the Court hear Signature's application on that day or soon thereafter so that Signature has some assurance that its collateral will not continue to be improperly dissipated.

Respectfully submitted,

Mara B. Levin

cc:     Robert Hirsh, Esq.
        Lawrence Fox, Esq.
        David Antonucci, Esq.

MBL:jo

**EXHIBIT**

C

# ROBERT W. HIRSH & ASSOCIATES
### Attorneys At Law
### 8383 WILSHIRE BOULEVARD, SUITE 510
### BEVERLY HILLS, CALIFORNIA 90211

TELEPHONE
310-275-7800

FACSIMILE
310-275-4050

April 28, 2008

<u>**VIA FACSIMILE: 212-805-7927**</u>
Honorable Naomi R. Buchwald
United States District Judge
500 Pearl Street, Room 2270
New York, New York 10007

<u>Re: Ahava.002/Signature Bank v. Ahava Food Corp. et. al. 08 Civ. 3893 (NRB)(MHD)</u>

Your Honor:

I , along with local counsel, Lawrence C. Fox, represent defendant Ahava of California LLC ("Ahava CA"). Ahava CA manufactures and distributes Kosher food products, upon which the observant Jewish community relies.

I respond to Mara Levin's ("Levin") April 25, 2008 largely false and misleading faxed letter to the court. As the court is aware, Levin represents plaintiff Signature Bank ("the Bank").

First, contrary to Levin's representations, Ahava CA is a separate California company. It is not anyone's alter ego. In fact, Ahava CA has, over the years, competed with some of the "judgment debtors" identified in Levin's letter. No competent evidence exists to support the Bank' unfounded claim that Ahava CA is an alter ego of anyone.

Second, contrary to Levin's letter, there is no evidence that Ahava CA is transferring its assets away. There is not even a  colorable argument for the appointment of a receiver. It is my understanding that one of the primary reasons that the judgment debtors' (as that term is defined in Levin's letter), are in their current dire financial straits, e.g. under the control of the bankruptcy court,  is that the Bank placed a receiver/consultant to run the judgment debtors' businesses, and the receiver promptly ran them into the ground.

Third, contrary to Levin's representations, the April 24, 2008 TRO did not order Ahava CA to  provide access to its property and/or its books and records. Justice Freedman specifically excluded Ahava CA from the TRO by modifying it. Levin's  letter to this court did not (a) state that Judge Freedman struck Ahava CA from the TRO or (b) attach a copy of the TRO for the Court to review. (I am attaching the April 25, 2008 TRO for the court's convenience, along with another TRO issued by the state court). This sort of tactic by the Bank has been all-too-common thus far in this case. Also, during an April 25, 2008 telephone call between Justice Freedman and counsel, Justice Freedman specifically stated that it was her intent to exclude Ahava CA from her April 24, 2008 order. The Bank's failing to report Justice Freedman's

<u>VIA FACSIMILE: 212-805-7927</u>
Honorable Naomi R. Buchwald
April 28, 2008
p. 2

statements to this court is a glaring omission and is very disturbing.

Fourth, Levin's letter misstates what we understand to have occurred on April 25, 2008 . It is my understanding that on April 25, 2008, early in the morning in New York, **without notice to Ahava CA or its counsel**, the Bank simply showed up at Ahava CA's Brooklyn warehouse facility and "demanded access." None was given. The skeleton crew on duty (during Passover week) did not know what was going on. This "visit" was obviously intended to create an incident. After the incident, I sent the Bank's counsel an email in which I stated that I was attempting to investigate what had occurred. I asked several basic questions, e.g. who appeared, what happened, etc. The Bank's counsel has refused to answer a single question, which confirms my suspicions that the Bank was simply trying to stage an incident for effect. I attach my email and the Bank's counsel's response for the Court's review in light of Levin's attacks.

Fifth, it is my understanding that defendant Moise Banyan, who is represented by David Antonucci, filed a Chapter 11 bankruptcy petition, and a court order has issued staying this and any other lawsuit against the "judgment debtors", as that term is defined in Levin's letter. It is my further understanding that Mr. Antonucci will be participating in the April 29, 2008 telephonic conference with the Court. I anticipate that he will be informing the court about the status of the bankruptcy. We believe that this case should be stayed in light of the bankruptcy filing..

Sixth, the court should be aware that before the Bank commenced this lawsuit, Ahava CA sued the Bank in California, for, among other things, tortiously contacting its customers and clients, and falsely stating that Ahava CA is an alter ego and/or responsible for the debt of the judgment debtors. The Bank has answered Ahava CA's complaint. The California lawsuit and this case deal with many of the same issues. At some point, Ahava CA may ask this court to dismiss the case before your Honor in light of the pending, senior action in California.. Please note that none of the judgment debtors are parties in the California lawsuit.

Finally, please note that Justice Freedman issued an order that no further letters be sent to her after the Bank's counsel incessantly communicated with her via letters and phone calls. We suggest that your honor consider issuing the same order.

Very truly yours,

Robert W. Hirsh

cc:   Mara Levin, via fax: 212-545-3448
      David Antonucci, via fax:315-788-1643
      Lawrence Fox, via fax: 212-826-3640

**EXHIBIT**

D

1

859PsigM
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   SIGNATURE BANK,
3
4                   Plaintiff,
4
5           v.                           08 Civ. 3893 (NRB)
5
6   AHAVA FOOD CORP., et. al.,,
6
7                   Defendants.
7
8   ------------------------------x
8                                       New York, N.Y.
9                                       May 9, 2008
9                                       11:15 a.m.
10
10  Before:
11
11                  HON. NAOMI REICE BUCHWALD,
12
12                                      District Judge
13
13                       APPEARANCES
14
14  DAVID T. FEUERSTEIN,
15  JOHN P. OLESKE,
15       Attorneys for Plaintiff
16
16  ROBERT M. HIRSH, (via telephone)
17  LAURENCE C. FOX, (via telephone)
17       Attorneys for Defendants
18
19
20
21
22
23
24
25
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

2

859PsigM

```
 1                (In open court)

 2                THE COURT:  Good morning, this is Judge Buchwald.

 3                MR. FOX:  Good morning, Laurence Fox, local counsel

 4      for Ahava of California.

 5                MR. HIRSH:  Good morning, Robert Hirsh, H-I-R-S-H, for

 6      defendants Ahava of California.

 7                MR. FEUERSTEIN:  Good afternoon, your Honor, David

 8      Feuerstein, representing Signature Bank.  And with me is John

 9      Oleske.

10                THE COURT:  Let's begin by at least establishing sort

11      of where we are.

12                I have before me an order to show cause submitted by

13      Signature Bank with supporting memorandum of law.

14                Let me just confirm whether copies of at least the

15      main papers have been faxed or e-mailed to counsel for Ahava of

16      California.  Mr. Fox?

17                MR. FOX:  Your Honor, this morning, and only at my

18      request, I received a copy of the brief.  And I also received a

19      copy of the transcript of the proceedings in the Bankruptcy

20      Court yesterday.  Those are the only papers that I've received.

21      I don't know what the relief is that is being requested.  And I

22      have not seen the declaration or any of the exhibits.

23                MR. HIRSH:  Your Honor, I have not received the moving

24      papers.

25                THE COURT:  We have a court reporter here, Mr. Hirsh,
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

3

859PsigM

1    as you requested.  But to make that a valuable experience,

2    before either person who is on the phone speaks, you must say

3    this is Mr. Hirsh or this is Mr. Fox.

4         Mr. Hirsh, you were about to say something, I think.

5         MR. HIRSH:  Yes, your Honor.  I've just received -- I

6    am going through my e-mails right now, it appears I just

7    received only a piece of their -- of the moving papers.

8         And I also want to state that I had some communication

9    with Mr. Oleske yesterday of the Herrick firm, and all that was

10   suggested, that the plaintiff was seeking was a temporary

11   restraining order.

12        My understanding from the last telephone conference

13   which we had, was that the plaintiff's counsel represented to

14   the Court that it was going to be filing a notice motion.

15        We had then talked about a briefing schedule.  I

16   informed the Court that I was set to start a trial on May 5.

17   If you recall, I said I am trying the largest palimony case in

18   American history, and I am first chair.

19        By the way, the answer to that question, we are

20   trailing, as we speak, our Judge is involved in another trial,

21   so we are waiting for him to open up.

22        Since we were in court last time, a couple of days ago

23   Ahava of California, in the California action, went in for a

24   temporary restraining order and order to show cause.  Right now

25   that is under submission.  I wrote a letter, or letters to the

4

859PsigM

1    can Court prior, to see really, what was happening there.  And

2    now it appears that that notice to us, about serving us papers,

3    the plaintiffs in this case, which is the later case, not the

4    senior case, the California case, is going in on an order to

5    show cause for relief other than a TRO.

6        THE COURT::  Excuse me.  Since you don't have the

7    papers, then why are you making assertions about what it is

8    that the Signature Bank is seeking?

9        MR. HIRSH:  Because as I am opening up their e-mail as

10    I speak, and I see a brief of points and authorities, they are

11    discussing a receiver --

12        THE COURT:  -- yes, but that's not their TRO request.

13    So get it right.

14        Relax.  You know, indeed, everybody in this case has

15    really got to relax.  Because these daily nasty letters are

16    already irritating me, just like, I know, because I bumped into

17    Judge Freeman, she was not thrilled either.  So let's get it

18    straight.

19        The TRO simply asks for the extension of the TROs that

20    Justice Freedman asked for.  There are requests for preliminary

21    relief.  Yes, the whole thing is brought on by order to show

22    causes.  As any experienced lawyer knows an order to show cause

23    is simply a notice of motion which advances a hearing a date.

24        MR. FEUERSTEIN:  Your Honor, may I address?

25        THE COURT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

5

859PsigM

1             MR. FEUERSTEIN:  We finished our papers early this

2     morning, and PDF'd as soon as I signed the memo of law to

3     counsel for Ahava of California, as well as to the judgment

4     debtors.  And Mr. Antonucci is not on the phone now, but he has

5     a copy as well.

6             Obviously our papers are voluminous.  We had left

7     instructions to PDF, or to scan them to counsel as well.

8     Evidently that hasn't been done yet, but it is in transit.

9             I would say that virtually all the exhibits that we

10    have attached to our motion papers have been provided to Ahava

11    of California, vis-a-vis our verified amended complaint, which

12    they received, I think, on April 24 or April 25.

13            I also want to address, if you don't mind, your Honor,

14    a few procedural things that have been outstanding based on

15    some of what you described as the nasty letters back and forth,

16    but also what you addressed on our telephone conference --

17            MR. HIRSH:  -- your Honor, I apologize for

18    interrupting counsel, but if counsel -- if your Honor could ask

19    counsel to speak in a louder voice, because it is difficult to

20    hear him.

21            MR. FEUERSTEIN:  I'd be happy to, Rob.

22            What I was saying was that I'd like to just address a

23    few procedural points that was raised in our last telephone

24    conference with Judge Buchwald, and have been the subject of

25    some of the letters that have been going back and forth between

6

859PsigM

1    counsel.

2          The first one is, Judge Buchwald and I think all of us

3    were talking about on the last call was whether or not the

4    preliminary injunction, or pardon me, the TRO is required to

5    extend the TROs that Justice Freedman entered in the state

6    court previously.

7          We looked at this issue and Rule 65(b)(2) in

8    particular.  And 65(b)(2) deals with temporary restraining

9    orders that are made without notice.  This is not -- these

10   temporary restraining orders are not those types of retraining

11   orders.  In fact, the commercial rules of New York State, as I

12   am sure Mr. Fox can attest, require that notice be provided to

13   the adversary before any TRO is entered.

14         Mr. Hirsh and Mr. Fox were both present for the TRO

15   arguments.  We gave them notice of the TRO arguments.  And

16   Mr. Antonucci, once his presence was made in the case was at

17   the second hearing on the 24th.  So these are not, your Honor,

18   and Rob and Larry, these are not TROs that are made without

19   notice.  And it is our position, in fact, that we do not really

20   need to technically extend it because they stay in force.

21         What we do need, and which is why we are here today,

22   is to set a date so that we don't have this indefinite TRO, and

23   that we don't end up in this kind of land where there is some

24   uncertainty as to when we are going to decide it or when it

25   will lapse and be enforced as a preliminary injunction.  That's

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

7

859PsigM

1    the first point.

2        The second point is there's been some communications

3    concerning what happened yesterday at the bankruptcy hearing.

4    I was at the hearing.  Rob you said you had gotten a

5    transcript.  We provided a transcript as well to Judge

6    Buchwald.  I will say that the Judge in the Bankruptcy Court

7    denied the 105 injunction.  He then provided an additional ten

8    days to the debtor corporation, what we have been referring to

9    as the judgment debtors, to file for Chapter 11 if they so

10    choose, or another bankruptcy provision, or that's it, or we

11    can enforce our provisions pursuant to the New York law.  The

12    Judge also modified his order and allowed us to make the

13    application that we are making today.

14        And so that's what happened.  And there are other

15    points substantively that happened in the court but we can push

16    those beyond.

17        The last point of kind of procedure that I want to

18    raise is, there has been discussion which was raised, I believe

19    in Mr. Hirsh's May 7 letter about seeking a stay of this

20    litigation.  Because there is a first-filed litigation in

21    California.

22        I am not sure, Mr. Hirsh's letter wasn't entirely

23    clear, but to the extent he is relying on what people refer to

24    as the first-filed rule, that rule is inapplicable here,

25    because that is a rule which deals with federal courts and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8

859PsigM

1    federal courts not federal courts and state courts.  But

2    leaving that aside, even if it was the first-filed rule, for

3    all of the reasons we set forth in our letter, we think this

4    case is properly formed here, but we can discuss that later.

5         THE COURT:  This is still an abstention argument --

6         MR. FEUERSTEIN:  -- right, under Colorado.

7         Those are the procedural issues I just wanted to

8    address up front.  If there is something your Honor wants to

9    speak about --

10        THE COURT:  There is another issue from the Bankruptcy

11   Court transcript which is unclear to me.  And that is when the

12   Judge was modifying his ten-day stay, and permitting Signature

13   to seek, whether they technically needed it or not, extensions

14   of the TRO, Mr. Antonucci said, no objection, your Honor, that

15   was just my concern because there was relief granted and relief

16   pending.  And those orders, because also we are not litigating

17   the pendings.  So I have to head down to the Southern District.

18   But I, quite frankly, consented to their extension once

19   already, so how can I say no.  I think it is very reasonable.

20        That is not totally clear to me whether he was

21   consenting to the extensions of Justice Freedman's TRO or he

22   was consenting to the application that is being made this

23   morning, and saying that he had no objection to it.

24        So maybe it would be helpful for me to hear from

25   either Mr. Fox or Mr. Hirsh as to whether there is a consent to

9

859PsigM

1    the extensions of the TROs that Justice Freedman, you know,

2    entered.

3         MR. HIRSH:  Firstly, Mr. Antonucci does not represent

4    Ahava of California.  Does not or has not ever spoken for Ahava

5    of California.  So no statements by Mr. Antonucci can be made

6    on behalf of Ahava of California.

7         THE COURT:  Okay.  Then we will ignore the question.

8         MR. HIRSH:  With respect to the matters that took

9    place in the Bankruptcy Court, I object, and I move to strike

10   at this time the plaintiff's, Signature Bank, referencing

11   materials from the hearing apparently which took place

12   yesterday.  On the grounds that I requested from Signature Bank

13   for copies of any and all papers that they were filing before

14   the Bankruptcy Court.  And Mr. John Oleske, of the Herrick,

15   Feinstein firm, categorically refused to send me anything.  For

16   the bank now to be relying upon anything arising out of a

17   hearing in which the bank has refused to send me even courtesy

18   copies of papers is disturbing.

19        Thirdly, with respect to the temporary restraining

20   order, since I have not been served with any moving papers, I

21   am not even aware of what the bank is trying to restrain.

22        THE COURT:  Are you telling me you don't have a copy

23   of Justice Freedman's two TROs?

24        MR. HIRSH:  I have a copy of Justice Freedman's TRO.

25   And if your Honor is representing to me that is both of what is

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

10

859PsigM

1   seeking -- if the extension of that TRO is the sole relief, I

2   am prepared to argue that.

3          THE COURT:  That is the sole TRO relief requested is,

4   and I will quote, (Reading)  Ordered, that pending a hearing on

5   plaintiff's application, the temporary restraining orders

6   entered by the state court in this action, on April 4, 2008 and

7   April 24, 2008, are hereby extended as against Ahava of

8   California and the judgment debtors.  That is the TRO.

9          MR. HIRSH:  Thank you, your Honor, I apologize, I just

10  have not been served with those papers.  So I am not in a

11  position to know what I don't know.

12         But we -- during our last telephone conference, which

13  was not reported, your Honor asked me whether I would be

14  voluntarily willing to extend Justice Freedman's TRO.  And

15  please recall, your Honor, that Justice Freedman had asked

16  whether we would voluntarily agree, just simply to keep the

17  status quo agreed to this type of what should be a benign TRO.

18         And I argued in front of your Honor last time that

19  relief itself I didn't object to.  But I objected to the

20  potential mischief that might be caused with the relief.  And

21  unfortunately my prediction or my words were --

22         THE COURT:  -- pressured is the proper word.

23         MR. HIRSH:  No. 1, the bank has been contacting Ahava

24  of California clients and customers.  And my understanding is,

25  has been representing that they have obtained a major court

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1    victory, and as a result of this major court victory, i.e., the

2    TRO, our customers shouldn't pay Ahava of California bills for

3    goods delivered to it.

4         And obviously if Ahava of California is not paid its

5    receivables, Ahava of California goes out of business.

6         Number 2, at the temporary restraining order hearing

7    before Judge Fahey, the Superior Court Judge on Wednesday, the

8    bank represented that it obtained a TRO seeking to, shall we

9    say, make hay of it.  Which also is inappropriate when simply

10   it was an accommodation, Ahava of California, the going

11   concern, is not transferring its assets outside the ordinary

12   course of business.  And Ahava of California, when we appeared

13   before your Honor telephonically, simply wanted to appear to be

14   reasonable; which we are.  We are not transferring our assets

15   outside the ordinary course of business.

16        But we simply cannot allow the bank to misrepresent.

17        And among other things, if your Honor saw the

18   restraining order that was submitted to Judge Fahey, which is

19   under submission which is attached to one of my letters, he

20   asked for all kinds of relief from California to enjoin

21   Signature Bank from contacting our customers and clients.

22        On its face there is no evidence proffered by the bank

23   which shows any great or irreparable injury that Ahava of

24   California has transferred its assets.

25        The little papers that I have seen from the bank argue

859PsigM

1    that Ahava of California is the recipient of fraudulent

2    transfers.  And it argues that Ahava of California is an alter

3    ego of the judgment debtors in the underlying first litigation,

4    of which Ahava of California was not a party.  But there is no

5    showing of any sort, no evidentiary showing, there is no

6    competent evidence before your Honor which shows that Ahava of

7    California is transferring away its assets.  On that ground

8    alone, the TRO should be denied.

9          MR. FEUERSTEIN:  May I respond, your Honor?

10          THE COURT:  Sure.

11          MR. FEUERSTEIN:  I am going to try to take them in the

12    order that Mr. Hirsh raised his issues.

13          His first point, I believe, is that he is objecting to

14    our submitting papers in the Bankruptcy Court.

15          I believe what the communications back and forth

16    between our firm said was that it was Ahava of California's

17    position that they're a totally separate entity from everybody

18    else that was involved in the bankruptcy.  That being the case

19    we said we don't understand why we are obligated to provide

20    them with papers.  They are not the bankruptcy, they are not in

21    the papers.  So we are not obligated to give them anything.

22          And there is nothing that prevents us submitting that

23    as evidence today.  We have given Mr. Hirsh the transcript.  He

24    has the transcript in front of him, he can read it just as well

25    as the Court can.

859PsigM

```
 1            He talked about a little bit about, how there is --
 2    there is no evidence that these -- we're sending
 3    communications -- he is saying we are communicating with Ahava
 4    of California's customers.
 5            Well, if the Court could turn to the bankruptcy
 6    transcript, I believe it is on page 46, Judge --
 7            MR. HIRSH:  -- may I ask counsel to please keep his
 8    voice up?
 9            MR. FEUERSTEIN:  Page 46.
10            MR. HIRSH:  Page 46 of what?  I have to open it up on
11    my computer.
12            I have page 46 before me, your Honor.
13            MR. FEUERSTEIN:  What is going on just for some
14    background.  Mr. Antonucci had given a long discussion why he
15    thought the judgment debtor and the 105 injunction thought it
16    should be applied.  And Mr. Eisenberg was responding to that.
17    And then the Court said, quote, (Reading)  Well, it is not
18    entirely true that they're, referring to the judgment debtors
19    are not operating or generating any income.  They are, in
20    effect, operating, as Mr. Antonucci suggests they are operating
21    just like they did before they entered into their lease
22    agreement.  All of the income apparently is flowing pursuant to
23    that lease to Ahava of California.  And then net net of that
24    lease $40,000 is being returned into, apparently, back to those
25    corporations.
```

14

859PsigM

1        And what the internal operation is to then get, that

2    $40,000 into the pocket of the debtor, is something that nobody

3    really is familiar with either at this point in time.

4        And Mr. Eisenberg states, well, that's fair enough,

5    your Honor, but that would that almost conclusively suggest

6    that Ahava of California is, in fact, nothing more than the

7    alter ego of the four nondebtor corporations.

8        To which Judge Girling said, at this point apparently

9    it is.

10        What was represented, and the Court can read the

11    entire transcript for itself, was that the judgment debtors are

12    still running as the judgment debtors except for the fact that

13    Ahava of California is invoicing the customers and the money is

14    going to Ahava of California, not to the judgment debtors.

15        Now, that was represented not by us, but by

16    Mr. Antonucci, who represents Mr. Banayan, the sole owner

17    shareholder, all four judgment debtors.

18        Also, we have submitted with our papers and with our

19    complaint, sufficient evidence to show just how this scheme or

20    this plan worked.

21        There were invoices that were, for example, to Macabee

22    Foods, that was in June, I believe, or April of '07, on Ahava

23    Food Corp. letterhead, for lack of a better word.

24        Four months later Schwartz & Sons is billing that same

25    entity.  Four months after that Ahava of California is doing

15

859PsigM

1    it.

2        These invoices are all remarkably identical, excerpt

3    for the fact that the name is changed on who the entity is.

4        So I am not sure that Mr. Hirsh can really establish

5    that the customers we're contacting aren't customers of the

6    judgment debtors.  And under the UCC, we have a right, under

7    the section to send a notice to them to say that our

8    receivables are actionable.  That we are entitled to.

9        I've already discussed what's going on in the

10   California litigation.  And I think we just have a disagreement

11   as to what happened.  I personally was not there, but I have --

12   we have local counsel who was there and reported to us as

13   Ms. Levin represented in her papers.

14       Finally, Mr. Hirsh says that there is no irreparable

15   harm here.  I think that is just not a right statement.

16       We have shown already that there had been transfers of

17   assets from Ahava Food and the other judgment debtors to Ahava

18   of California.

19       We have also shown or Mr. Banayan has shown that these

20   entities are absolutely insolvent.  And we have also shown, in

21   addition, that before these assets were transferred, Ahava of

22   California was making somewhere in the neighborhood of $400,000

23   total in revenue.

24       Our concern, is that the collateral, including the

25   machinery, including the receivables, including the trademarks,

859PsigM

1    are going to be damaged by the continued operation of Fariborz

2    Banayan, and that nobody once these -- this collateral is

3    damaged will be able to pay us.  Certainly that judgment

4    debtors can't pay us because they are insolvent.  And Ahava of

5    California, whose only wealth is really through, only through a

6    fraudulent transfer.

7         So that's our position, with respect to irreparable

8    harm.  I am not sure if I missed any other of Mr. Hirsh's other

9    comments.  But I am satisfied.

10        MR. HIRSH:  May I respond, your Honor?

11        THE COURT:  Sure.

12        MR. HIRSH:  Counsel, if I understand counsel's

13   argument, your Honor, I have heard him say that the only

14   potential for irreparable harm is that equipment which my

15   client is leasing from the judgment debtors, may be harmed.

16        MR. FEUERSTEIN:  That's not my argument.

17        THE COURT:  I don't think that was the limit of what

18   he said.

19        MR. FEUERSTEIN:  No, that wasn't.

20        What I said, Rob, was that in addition to equipment,

21   there are receivables that can be harmed, there are trademarks

22   that can be harmed, there is goodwill that can be harmed.  I

23   remind the Court and Rob that Mr. Banayan had noted in his

24   papers to get the 105 injunction, that the simple filing of the

25   bankruptcy could destroy the goodwill of the judgment debtors.

859PsigM

 1          In addition, I admittedly don't have hard evidence of

 2    the documents in evidence, and we understand that the Ahava of

 3    California has gone out to the community and offered to take a

 4    discount on its receivables if people would pay in cash.

 5          I also understand that, from my client, that the

 6    Lovell plant seems to be closed.  And that equipment that was

 7    potentially our collateral is, instead of inside the building,

 8    out on the street.

 9          So that is the scope of our potential irreparable

10    harm.

11          MR. HIRSH:  The concerns of the bank does not

12    constitute grave or irreparable injury.

13          The potential threat of milking equipment which milk

14    cows every day, whether or not that equipment can or cannot be

15    harmed, the argument is a silly is argument.  That is not a

16    showing of grave or irreparable injury.  There is no showing of

17    any sorts that Ahava of California has transferred away a

18    single asset.

19          THE COURT:  But there is also no showing on your part

20    that this TRO, which only restricts you to dealing in the

21    normal course of business --

22          MR. HIRSH:  -- I can't hear you, your Honor, I'm

23    sorry.

24          THE COURT:  I said, there is also no showing that the

25    TROs that Justice Freedman signed, and which are sought to be

18

859PsigM

1    extended, create any harm to you whatsoever.  You may continue

2    to operate in the normal regular course of business, unhampered

3    by these TROs.

4            It is only if you do things outside the regular course

5    of business that you are restrained.

6            So we are balancing here no harm to you and potential

7    harm to the bank, which stand as a judgment creditor.

8            This seems close -- I mean this isn't even a close

9    question --

10            MR. HIRSH:  -- I beg your pardon?

11            THE COURT:  This is not a close question.

12            MR. HIRSH:  What's not a close question, your Honor?

13            THE COURT:  The balance.

14            MR. HIRSH:  I agree.  I agree it is not a close

15    question.

16            THE COURT:  Right.

17            MR. HIRSH:  But I believe it is not -- I think that

18    relief of -- there is no relief of any type on that, no relief

19    should be able to be obtained against a party which never had a

20    contractual relationship with this bank, where there has never

21    been any kind of a finding of any sort that the bank has any

22    kind of an interest in my client's assets.

23            THE COURT:  Yes, what about this lease arrangement,

24    which is all over the record with the Bankruptcy Court?

25            MR. HIRSH:  My client entered into a lease with St.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

19

859PsigM

1   Lawrence and with Lewis County.  And is paying rent to those

2   corporations for use of plants and equipment.

3           How does my client's paying rent on a lease in any way

4   constitute my client's fraudulently transferring away assets?

5           MR. FEUERSTEIN:  I think there is two responses --

6           MR. HIRSH:  -- if I could finish.

7           MR. FEUERSTEIN:  I'm sorry.

8           MR. HIRSH:  What was happening, your Honor, is that,

9   you know, it sounds nice to say, well, it's no harm for Ahava

10  of California to agree not to transfer its assets outside the

11  ordinary course of business.  And yet when we were together

12  last time telephonically, I agreed with the Court that the

13  relief in and of itself, there is no problem, we don't

14  disagree, we are not going to do it anyway.

15          THE COURT:  Well, that's all I am talking about at

16  this time.  And that's all that is being asked for.

17          MR. HIRSH:  I understand.  But it's a dangerous

18  precedent for two reasons.

19          Firstly, the bank is going to continue to trump this

20  as a legal victory, and instruct and demand that Ahava of

21  California's customers not pay it.  The bank is going to

22  mischaracterize the TRO, as its done before in the TRO issues.

23          Secondly, if the bank wants a TRO, the bank should

24  be -- be the TRO in California.  Which is why we wanted to have

25  a premotion conference on our motion to abstain  -- stay,

                        SOUTHERN DISTRICT REPORTERS, P.C.

                               (212) 805-0300

859PsigM

1    transfer or dismiss the case.

2          THE COURT:  Look, I am not stopping you from making

3    that motion.  But the reality is, we have a New York judgment,

4    we have a case that is here.  And until such time as it is

5    determined, if ever, that the California case trumps the New

6    York case, I will continue to deal with this.

7          I mean, this is, you know, the first-filed rule does

8    not apply when it is a state case and a federal case.  We did a

9    little research on that yesterday.

10          So the mere fact that you filed first is not

11    dispositive.  Whether in the end it is inefficient for both

12    these cases to be proceeding at the same time, you know --

13          MR. HIRSH:  -- I'm sorry, your Honor is breaking up on

14    me.

15          THE COURT:  I said, if in the end it is found to be

16    inefficient, to have both cases proceeding at once, then there

17    is a Colorado River abstention doctrine that applies.  But

18    there is no first-filed rule that applies at this point.

19          MR. HIRSH:  I hear what your Honor is saying.  We have

20    a different view and I will be happy to brief that out.

21          THE COURT:  Brief it.  But right now, look, the

22    bottomline is that I am going to extend those TROs.

23          Now, what I think would be helpful is, if instead of

24    the TRO, simply being, in effect, several documents, you know,

25    where it is incorporated in the order to show cause, there

21

859PsigM

1    ought to be a single document which reflects the TRO.  That

2    will be of assistance, I think, to Ahava of California, because

3    if your concern is that Signature is engaging in some activity

4    with respect to your customers, that is interfering with the

5    regular course of your business, and if your view is if that's

6    improper, then if you have the TRO in a neat single document,

7    you can show to your customers that there is nothing in that

8    TRO which says that you have been restrained from doing

9    anything other than operating in the normal course of business.

10           MR. FEUERSTEIN:  Your Honor, we'd -- we'd be happy --

11   to submit that --

12           MR. HIRSH:  -- I think the Court's suggestion is a

13   good one with a modification to it.  That built into the TRO

14   should be an affirmative order that the bank not contact our

15   client -- customers.

16           THE COURT:  I can't --

17           MR. HIRSH:  -- accounts receivable --

18           THE COURT:  -- no --

19           MR. HIRSH:  -- then I am happy to stipulate to this

20   TRO all day long.  If the bank's true concern is that we do not

21   transfer away our assets outside the ordinary course of

22   business, I would stipulate to that as a preliminary

23   injunction.  If I can get the same relief that the bank stop

24   having any contact with our customers and clients, which is

25   damaging our business on a daily basis.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1          MR. FEUERSTEIN:  Your Honor, we simply cannot agree to

2    that.

3          MR. HIRSH:  That is the concern.

4          MR. FEUERSTEIN:  Rob --

5          MR. HIRSH:  -- that is the concern, your Honor.

6          We are not interested in transferring away our assets.

7    We want the bank to stop interfering with our ability to do

8    business.

9          MR. FEUERSTEIN:  Can I respond, Rob?

10          THE COURT:  Go ahead.

11          MR. FEUERSTEIN:  We simply can't agree to that, your

12    Honor.

13          I think what Mr. Hirsh is referring to, of our

14    contacts, were two UCC 9606 letters that were sent out to the

15    individuals or the customers that Mr. Banayan represented were

16    the judgment debtors' customers.

17          He is essentially asking the Court to stop us from

18    exercising our rights under the UCC.  We are not sending -- we

19    don't have the information of who all the customers are of

20    Ahava of California.  These are customers of the judgment

21    debtors who we're notifying, that we have a judgment against.

22    That's our right under the UCC.

23          MR. HIRSH:  I think we can craft a stipulation, your

24    Honor, assuming that counsel means what he says and says what

25    he means.  I think we can craft a stipulation which it simply

23

859PsigM

1    states that the -- there is a TRO preventing Ahava of

2    California from transferring assets outside the ordinary course

3    of business, that the bank can inform the judgment debtor's

4    customers, which is not my client's -- which is not my clients,

5    but the judgment debtors' customers, that there is a judgment

6    against the judgment debtors, but that the bank cannot --

7    cannot claim any rights against Ahava of California.  And which

8    is what they have been doing.

9        MR. FEUERSTEIN:  If Mr. Hirsh is prepared to come

10   forward and make an evidentiary showing that the customers of

11   Ahava of California were not the customers of the judgment

12   debtors, then perhaps we can come to an arrangement.

13       But all I've heard and all I've seen from defense

14   counsel thus far, are their own statements that we are an

15   independent entity, that we have our own business, that we have

16   always been an independent entity, that we never had any

17   crossover.

18       Frankly, given the evidence that we have on the

19   documents, that's not sufficient for us, we can't just take you

20   at your word and agree to something, unless you can make a

21   showing to us that these customers were always yours.

22       MR. HIRSH:  Your Honor, that's simply an inaccurate

23   statement as a matter of law.  And we are -- the plaintiff has

24   the burden of proof not us, the plaintiff has the burden of

25   proof to prove an alter ego, which they cannot do.  We are

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

24

859PsigM

1      separate companies, we are historically competitors.

2              We don't have to make a showing beyond a reasonable

3      doubt as the bank apparently wants us to, that everything is to

4      the bank's satisfaction.

5              The bank is the one that engaged in the tortious

6      conduct.  It's the bank's tortious conduct that started this

7      litigation, which was again the California case.  I don't want

8      to get too far off track.  We don't have any disagreements with

9      the substantive TRO relief that is being sought, we never have.

10     It's certain the mischief that the bank has continued to cause.

11             What I would like to do, your Honor, is, I would like

12     to prepare and lodge a proposed order for your Honor to

13     consider, which would satisfy the Court's concerns about

14     maintaining the status quo, which would be that my client

15     doesn't transfer its assets away from the ordinary course of

16     business.  And the bank has to leave our customers alone.

17             MR. FEUERSTEIN:  We are not going to agree to that.

18             THE COURT::  Let's leave it right now in the following

19     way, Justice --

20             MR. HIRSH:  -- can't hear.

21             THE COURT:  Let's leave it in the following way:

22     Justice Freedman's TROs are continued as, you know, she wrote

23     them.

24             MR. HIRSH:  Can I get an order --

25             THE COURT:  -- just a moment, please.

859PsigM

1            MR. HIRSH:  I'm sorry.

2            THE COURT:  I am prepared and would like to transform

3    those TROs into a separate document on the -- with the caption

4    of this case in this court.

5            I will accept from each party their proposals as to

6    what I should sign.  But in the interim, before I sign any

7    substitute TRO document, the TROs that were signed by Justice

8    Freedman remain in effect.

9            Is that clear to everybody?

10           MR. FEUERSTEIN:  Yes, your Honor.

11           MR. HIRSH:  Yes, your Honor.

12           THE COURT:  Okay.

13           MR. FEUERSTEIN:  May I just add one thing, your Honor?

14           THE COURT:  Yes.

15           MR. FEUERSTEIN:  Mr. Hirsh had represented, I believe,

16   in one of his letters that he had considered the TROs to have

17   expired.  I don't know when he thought they were expired, and I

18   am paraphrasing about when he believed they expired --

19           THE COURT:  -- he agreed last week with me on the

20   phone to continue them until today.

21           MR. FEUERSTEIN:  Okay.

22           THE COURT:  Regardless, I consider them in effect now.

23   I have just extended them.  And that's where we are as far as I

24   am concerned.

25           MR. FOX:  Your Honor, this is Larry Fox.  I haven't

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

859PsigM

1    spoken to this point, but there is one thing I need to mention

2    that came to my attention.

3              In the second TRO, which is was the issue of access --

4              THE COURT:  -- yes --

5              MR. FOX:  -- we discussed this last time, there was a

6    problem in Brooklyn, Judge Freedman had stricken Ahava of

7    California as a target of that provision.

8              THE COURT:  Right.

9              MR. FOX:  And she subsequently confirmed that she did

10   not mean to include Ahava of California in that provision.

11             I just got an anguished note from my client saying

12   that they are people at one of the upstate plants terrorizing

13   the workers trying to get access, and to remove materials --

14   again, this is just a note that I just received -- this is

15   precisely the problem --

16             THE COURT:  -- wait a second --

17             MR. FOX:  -- that we have --

18             THE COURT:  Who do you represent, sir?

19             MR. FOX:  I represent Ahava of California.  We are

20   local counsel for Mr. Hirsh, Ahava of California.

21             THE COURT:  And this upstate plant, is that Ahava of

22   California?

23             MR. FOX:  Ahava of California is leasing that plant,

24   your Honor.  Leasing that plant from the judgment debtors.

25             There is -- there is a bankruptcy going on, this can

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

27

859PsigM

1    be done in an organized -- again, this is without notice and

2    people are just showing up.

3            THE COURT:  Here is my question, and I thank you for

4    bringing this up, because I had a question about that.

5            The way I read Justice Freedman's order, it sounded to

6    me as if this access right was contractual.

7            MR. FEUERSTEIN:  It's correct, your Honor.

8            THE COURT:  And if it is contractual, it is nothing

9    really to do with me.  If that's the term of the loan

10   agreement, then the access right is there, because there has

11   been a breach and there is a judgment.

12           MR. FOX:  Access vis-a-vis whom?  And under what

13   circumstances and with what controls?

14           THE COURT:  Vis-a-vis the judgment debtors.

15           MR. FOX:  I understand that.  But that's the problem,

16   is that Ahava of California is now leasing the premises.

17           MR. FEUERSTEIN:  But the assets belong to the judgment

18   debtors.

19           MR. FOX:  I understand that.  It's just not that

20   simple.  And all that I am suggesting is that people shouldn't

21   be showing up and, you know, essentially, you know, banging

22   down the doors, which is the impression I am getting.  Because

23   it leads to a host of problems.

24           And, you know, I got an anguished note in front of me,

25   and there is a standoff upstate, because the bank just shows up

859PsigM

1    and it is proceeding in a very heavy-handed way.  Even though

2    there is a bankruptcy going on.

3            THE COURT:  The bankruptcy doesn't apply.  Those

4    companies didn't file for bankruptcy.

5            MR. FOX:  That's very true, your Honor.

6            THE COURT::  And the bankruptcy Judge found yesterday

7    that the effort by Mr. Banayan to cover those companies was

8    just an end run around the bankruptcy laws because he didn't

9    want the right of access, which would come with filing for

10   bankruptcy to apply.

11           So he wanted the good part, the stay, but he didn't

12   want the, what he would regard as the bad part, the control

13   over the assets.  So, you know, they didn't file.

14           MR. HIRSH:  Your Honor, this is Robert Hirsh.

15           My understanding today is that the TRO which we're

16   referring to is to enjoin Ahava of California from transferring

17   its assets away outside the ordinary course of business.

18           THE COURT:  There is more than one TRO.

19           MR. HIRSH:  Without consideration.

20           THE COURT:  That's one TRO.  That's not the only --

21           MR. FEUERSTEIN:  -- that's not what it says.

22           MR. HIRSH:  This is the exact problem --

23           THE COURT:  -- no, I'm sure, sir, that you have a copy

24   of that TRO.  You know exactly what it says.

25           MR. HIRSH:  Your Honor, it's, respectfully, I do.  But

859PsigM

1    unless I see the moving papers, which I hadn't seen, I did not

2    know, when I argued earlier, that that matter was also on the

3    table.

4            THE COURT:: Excuse me, I read to you the TRO

5    provision which made clear reference to two orders.

6            MR. HIRSH: Right.

7            THE COURT: By date. Both of which you have.

8            MR. HIRSH: Right. I have them in my office. That is

9    correct. I am not at my office now and I did not have any

10   moving papers in front of me. All I have is a brief on my

11   computer. And the bankruptcy transcripts on my computer.

12           MR. FEUERSTEIN: Your Honor, we are happy to submit

13   the proposed order this afternoon.

14           MR. HIRSH: The bank should seek discovery in the

15   ordinary course.

16           THE COURT: They have contractual rights.

17           MR. HIRSH: Not with my client they don't.

18           THE COURT:: Your client doesn't own those companies,

19   right?

20           MR. HIRSH: No, but my --

21           THE COURT: -- what exactly, by the way, is Ahava of

22   California leasing from Saint Lawrence Food corp. or Lewis

23   Country Dairies?

24           MR. HIRSH: The companies that make the milk and the

25   cheese.

30

859PsigM

1          Allow me to explain, my understanding, and I would

2     again get this verified in an affidavit, which I think is

3     important that the Court rely upon as opposed to the arguments

4     of counsel, and other hearsay documents in front of the Court,

5     is that Louis County and Saint Lawrence own, respectively, two

6     factories in Upstate New York.  One of them makes hard cheeses

7     and milk, I think and the other one makes soft cheeses and

8     milk.

9          There are written leases.  My client is a tenant, my

10     client pays rent.  My client manufactures dairy products and

11     sells those dairy products throughout the country primarily to

12     the Orthodox Jewish community, and in particular the Hasidic

13     community.

14          THE COURT:  Is your client leasing the building or the

15     entire operation?

16          MR. HIRSH:  My understanding is my client is leasing

17     the buildings, I have not read the leases --

18          THE COURT:  -- if it is just the building, then you

19     don't much care whether the bank's representatives are looking

20     at documents.

21          If you are, in fact, operating the business, then I

22     can understand your greater sensitivity about the issue.

23          MR. HIRSH:  We are operating our business out of

24     plants that we are leasing from the judgment debtors.

25          If the bank wants to look at the judgment debtors'

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1  documents, that's between the judgment debtors on the one hand

2  and the bank on the other.  The bank can serve discovery on the

3  judgment debtors.  It has nothing to do with us.

4       The problem is that the bank continuously, ad nauseam,

5  is seeking to join Ahava of California and the judgment debtors

6  at the hip, claiming they're one and the same.

7       And based upon that bootstrap, asking for all kinds of

8  relief.

9       There is no evidence, there is no competent evidence

10  of any sort, that they're one and the same.  Despite the

11  hyperbole, despite the innuendoes, despite the broken mirrors.

12  They never briefed anything out.

13       All that was before Justice Friedman was a hearsay

14  verified complaint by a bank officer.

15       And there is no evidence of any sort that that bank

16  officer had personal knowledge of anything contained in the

17  verified complaint.  The verified complaint, which commenced

18  this proceeding, contains double and triple hearsay.  It is

19  simply not competent evidence.

20       I was -- I telephonically participated.  Mr. Fox was

21  physically there.  Mr. Fox led me to believe that Justice

22  Freedman simply listened to argument of counsel about how and

23  why all kinds of bad things would happen.  And simply said,

24  okay, I am just going to stay the status quo.  You have a

25  problem with it?

859PsigM

1          And I responded, I don't have a problem because Ahava

2     of California is not going anywhere, we are a going concern, we

3     are not transferring anything.

4          Let's be very clear, we have nothing to do with these

5     companies.  And we are vigorously going to defend this lawsuit.

6          THE COURT:  There is simply, very frankly, very odd

7     going on here.  And the bottom line is that these companies,

8     Lewis County, St. Lawrence, they still exist.  They have not

9     filed for bankruptcy yet.  Maybe they will, maybe they won't.

10    And they haven't gone out of business.  And he --

11         MR. HIRSH:  -- they are landlord.  Lewis County and

12    St. Lawrence are my client's landlord.  We are leasing the

13    plants to manufacture.  That doesn't make us one and the same

14    as our landlord --

15         MR. FEUERSTEIN:  -- your Honor, let's assume just for

16    the moment, that what Mr. Hirsh is saying is absolutely true.

17         Let's say that there really is a lease agreement,

18    which triple meant that Mr. Banayan gets $40,000.  We haven't

19    seen that lease agreement even though it was the crux of

20    Mr. Banayan's argument yesterday in front of the Bankruptcy

21    Court.  And he conceded that he's only seen a draft.

22         Let's just assume it's true, the fact that it's been

23    leased, in quotes, to Ahava of California, does not extinguish

24    our rights to the assets that were pledged as collateral.

25    Maybe we have to communicate with Ahava of California's

859PsigM

1    counsel, but we have -- that's our asset.

2           You don't make it not our asset by virtue of the fact

3    that it's been leased to Ahava of California.

4           Mr. Banayan has represented in his papers to the

5    Bankruptcy Court, that that equipment in Upstate New York is

6    worth roughly $3.5 million.

7           Now, this is simply incredible that Mr. Hirsh and

8    Mr. Fox are somehow objecting to our ability to go inspect it.

9           It is our collateral, we have a judgment, we have an

10   agreement.  You right, under the agreement, are clear and,

11   frankly, even if you read Justice Freedman's order to exclude

12   Ahava of California, it still applies to allow us to inspect

13   it.

14          MR. HIRSH:  Counsel's argument is analogous to a bank

15   having a mortgage interest on an office building and then

16   saying, okay, law firm tenants, medical office tenants, because

17   we have rights to come in and inspect, guess what, we're

18   banging down the doors and coming into your law firm and your

19   medical office.

20          THE COURT:  When was this lease signed, Mr. Hirsh?

21          MR. HIRSH:  I'm sorry, I couldn't hear?

22          THE COURT::  When was the lease signed?

23          MR. HIRSH:  I do not have the leases in front of me,

24   so I would rather not say.  I don't want to shoot from the hip.

25          But if we -- but that's one of the opportunities,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

34

859PsigM

1  excuse me, that's one of the advantages of having hearings such

2  as this done on notice, so that we have an opportunity to be

3  heard to present competent evidence.

4         THE COURT:::  Excuse me, this is a request for a TRO.

5  You have gotten all the notice that the law permits you to

6  have.  We've been on the phone for over an hour.  That's called

7  real notice.  We are going to set a schedule on the preliminary

8  injunction aspect of this.  All right?

9         MR. HIRSH:  May I request that we have an adjournment

10  of this hearing for just no more than an hour, so I have the

11  opportunity to go from my home, where I am right now, it is

12  only 10:00 where I am, to my office, I can then pull the

13  leases, I can then be in a position to discuss briefing and --

14         THE COURT:  -- well, I already have a schedule that I

15  intend to impose on you.  Because if we don't do it on a

16  certain schedule I am not here.  I am interrupting a trial in

17  order to be able to hear you guys soon.  And if, you know, if

18  you don't want to live on my schedule, the bottomline is you

19  are being put off till June.  I can on do it in May on a

20  certain schedule.

21         But before we get to that, I mean, we still have this,

22  and I don't know if it is really in front of me, issue of the

23  so-called standoff in Upstate New York.

24         MR. FOX:  When they got the TRO to get immediate

25  access, the ostensible urge for that was that there was going

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1   to be a sale imminently.  And they needed to look at their

2   collateral to see what they were selling.  That's not the case

3   anymore.  They don't need immediate access.

4          THE COURT:  Is there somebody there today?

5          MR. FOX:  Yes.  Again, I got an anguished message that

6   people are there now, trying to get access to remove stuff and

7   terrorizing workers.

8          MR. FEUERSTEIN:  Your Honor, I am happy to call my

9   client as soon as we are off this phone, and call them and

10   see --

11          MR. FOX:  -- let's just pull back the troops.  People

12   shouldn't be showing up unannounced and trying to get access

13   when there is a dispute about it.  It is not conducive to

14   healthy civilized behavior.  And that's what's going on right

15   now.

16          MR. FEUERSTEIN:  At some level --

17          MR. HIRSH:  -- my understanding is that the same thing

18   happened in Brooklyn several weeks ago, your Honor.  Where

19   during the Passover holiday --

20          THE COURT:  -- I heard about this already.  I don't

21   want to hear about it again.

22          MR. FEUERSTEIN:  Your Honor, I somewhat agree with

23   Mr. Fox's sentiment, that there has got to be some type of

24   order.

25          THE COURT:  You have to give them access, then you

859PsigM

1    will have order.  That's really very simple.  You will schedule

2    it.  Are you prepared to do that, Mr. Fox?  Or not?  And you

3    let them in, you could have a lawyer there.  You can have, you

4    know, whoever you want from your client, they look at the

5    records.  If -- and look around.

6           They don't necessary -- walk out with anything.  They

7    can make a record of what is there so that it can't be

8    destroyed afterwards.  There are ways to do this.

9           But if you don't want them showing up, you really,

10   unannounced, you need to cooperate with them, and make -- you

11   know, so that it is on a schedule that everyone knows about.

12   And so that the bank is able to make a record of what it is

13   that they're finding, so that it can't be destroyed after they

14   leave.

15           MR. HIRSH:  Your Honor, this is Robert Hirsh.

16           As lead counsel for Ahava of California, on a

17   mutually-agreeable date and place and time, if the bank -- I'd

18   like the bank to simply send me a request for inspection.  I

19   will look at it, if the date is good, that will be fine.  If

20   the date is not good, then I will propose alternative dates and

21   times.  And counsel and I can craft something.  Like it's done

22   in over other lawsuit.

23           The bank doesn't simply have to show up like stalkers.

24           MR. FEUERSTEIN:  I somewhat resent that reference.

25   But leaving that aside, I think at some level, as I said

37

859PsigM

1    before, we are agreeable.  We are not trying to do this.

2              But there are two concerns that we have.  One, we

3    haven't agreed on anything in this litigation to date.  So I am

4    not necessarily certain we are going to agree on a date.

5              Two, and more importantly, that our concern is, as

6    expressed in our papers, and throughout this litigation, is

7    that there has been a fraudulent conveyance.

8              We have unbelievable concern of giving advance notice

9    of our arrival and finding what's going to be there.  I can't

10   say that -- you know, we've said that there has been a

11   fraudulent conveyance, all of a sudden.  For a month we have

12   been litigating this and yesterday we heard about a purported

13   triple net lease, yet we don't see the documents.  There are

14   statements and representations being made.

15             We think if we agree upon a date, that something may

16   happen before we get there.  And that's our concern.

17             Now, I don't know anything if people from the bank are

18   there or not.  I checked my Blackberry in, my cellphone in, I

19   haven't had contact with anybody since 10:00 this morning,

20   since I sent an e-mail in saying we were coming down to court.

21   So I can't deny what I don't know.

22             But I will absolutely look into what's going on.  And

23   if, in fact, there is an issue, I will address it with my

24   client.

25             MR. FOX:  Your Honor, we would --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

38

859PsigM

1          MR. HIRSH:  -- we would simply invite the bank to

2    serve a request under the Federal Rules of Civil Procedure and

3    we will respond.  We will do the right thing.

4          MR. FEUERSTEIN:  We don't need to go under the rules

5    of civil procedure.  This is not a discovery request in the

6    normal course that we are asking for documents.  This is our

7    contractual right.  This is what we are trying to enforce

8    today.

9          MR. HIRSH:  Once again, here's the bootstrap, your

10   Honor.  We have no contract with the bank.  And the bank keeps

11   saying they have a contractual right, not with us the don't.

12   We never signed a contract with the bank --

13         MR. FEUERSTEIN:  -- but we have a contract with the --

14         MR. HIRSH:  -- as based upon competent evidence that I

15   am somehow mistaken, let them make that showing.  And then we

16   can review the papers, we will respond.  But the simple way to

17   do this is to follow the Federal Rules of Civil Procedure.

18         THE COURT::  No.  Because that's not it the point.

19   The point is that they have a judgment against certain parties.

20   Those parties may have the role of landlord, but they also have

21   the role as judgment debtors.  They have a contract.

22         MR. HIRSH:  You are right, your Honor.

23         THE COURT:  Okay.

24         MR. HIRSH:  I respectfully submit that's a matter

25   between the bank on the one hand and those parties who are

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1    under contract with it.

2              THE COURT:  Okay.

3              MR. HIRSH:  But not to include my client in with one

4    fell swoop, because my client does not have any contract with

5    the bank.

6              THE COURT:  Fine.  But your client isn't the owner of

7    the premises.  And the hard equipment that is there belongs to

8    the debtor.

9              Why can't, if they have a contractual right to inspect

10   those premises, what prevents them from doing that?

11             MR. FEUERSTEIN:  I would add, your Honor, that if

12   there is a -- Mr. Hirsh, I was speaking --

13             MR. HIRSH:  -- I did not know whether there is

14   equipment up there.

15             THE COURT:  What are you using to make the milk?

16             MR. HIRSH:  I received from the bank, a list of what

17   the bank -- of which equipment the bank thinks a security

18   interest in -- based upon that I would then go to my client and

19   I would ask my clients, are you in possession of this asset.

20             So I don't necessarily accept the first premise, based

21   upon the bank saying so.  I don't know.  I don't know one way

22   or the other.  I have suspicions, and my argument doesn't

23   constitute evidence.

24             Secondly, the answer is that the bank doesn't have the

25   right to intrude on my client's business.  The bank would need

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1    to serve a discovery request.  The bank can't simply just show
2    up because it doesn't have a contract with my client.  The bank
3    is making assertions that my client is an alter ego.  We
4    dispute that.
5           THE COURT:  You don't own the premises.  You are a
6    lessee.  You do not own the equipment that is there.
7           MR. HIRSH:  But the -- assuming for argument's sake
8    that there is equipment that the bank has security interest --
9           THE COURT:  -- you know what we need to get?  We
10    really need to get copies of these lease agreements.  Because,
11    lo and behold, if they happen to say that you have leased
12    everything that's there now, at the point that the lease is
13    signed, and provides for a certain kind of operation, using
14    what is there, we will all know that what is there belongs to
15    the debtors.
16           So those leases had best be produced very quickly.
17           MR. FEUERSTEIN:  Your Honor, I just want to add --
18           MR. HIRSH:  -- the problem that the bank shouldn't be
19    coming in on a TRO and asking for extraordinary relief.
20           THE COURT:  They already got that TRO from Justice
21    Freedman.  It has been in effect for a long time.
22           MR. HIRSH:  They he never got a TRO against us.
23           MR. FEUERSTEIN:  If they are a sublessee --
24           THE COURT:  -- and the --
25           MR. HIRSH:  -- for -- against their own judgment

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

41

859PsigM

1    debtors.

2           THE COURT:  That's exactly right.  And they have a TRO

3    and certain respects against you.

4           MR. FEUERSTEIN:  And if Ahava of California is leasing

5    the property from whom we have a contract with, then they are

6    contractually bound to our contract.

7           It is not that difficult.  This happens all the time.

8    If there is a tenant and subtenant, that subtenant is subject

9    to the landlord.

10          MR. HIRSH:  I believe that's a misstatement of the

11    law.

12          THE COURT:  All right, let me tell you the schedule

13    that works for me.  And there can be alternate schedules, but

14    they would he involve you putting off the hearing.

15          I can as I say, interrupt a trial, and hear this

16    motion at 3:00 on the afternoon of May 22.  That would mean

17    that I would need Ahava of California's papers by the 15th of

18    May, next Thursday.  And the reply papers by the 19th of May.

19    Both by 5:00 in hand to chambers.

20          MR. HIRSH:  That date does not work for me.

21          My parents, both of whom are 80 years old, are coming

22    from New York to Los Angeles on May 21, and we have a family

23    gathering from all over the country the week of May 21 through,

24    towards the end of the week of May 29.  So I would ask that

25    perhaps if we move this to a different time.

42

859PsigM

1          THE COURT:  Well, that all sort of depends a lot on

2    what restrains are in effect in the interim.

3          I cannot hear this case the last week in May.  I am

4    also somewhat out of the box the first week in June, because it

5    is the judicial conference.  I just have two meetings that I

6    will not be in the office.

7          I can do this during the week of June 9.  Or I can do

8    it before I get out of the box.

9          But the issues concern what's going to happen in the

10   interim.  And that's why I was prepared to interrupt a trial to

11   hear this as soon as I could, allowing reasonable time.

12         MR. HIRSH:  Could we do it the end of the week of June

13   9?  That would work for me, June 9 and June 10 are Shavouth,

14   which I observe.

15         What is your Honor's motion days?

16         THE COURT:  I don't have, quote, motion days.  I have

17   a calendar.

18         MR. FOX:  What would be the briefing -- Larry Fox --

19         MR. HIRSH:  -- hold on, Larry.  Could we do it, then,

20   your Honor, June 16, Monday --

21         THE COURT:  -- no.

22         MR. HIRSH:  -- that way I can fly --

23         THE COURT:  -- no, I am on trial again.

24         MR. FEUERSTEIN:  Your Honor --

25         THE COURT:  -- you are trying to put this off, I am

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

43

859PsigM

1    not saying they aren't like good human being reasons, but at

2    the same time we are presented with a situation in which the

3    bank has zero level of comfort about what's going to happen

4    between, you know, now and any time in the future.  And I have

5    to deal with that in a responsible way.  And I really cannot

6    operate on the, you know, schedule that you are, you know,

7    suggesting.  It's just not possible.

8            MR. HIRSH:  How about, then, the end of the week of --

9    I just want to do it after my parents have left.  So how about,

10   why don't we do it on Thursday, May 29?

11           THE COURT::  Because I am totally out that entire week

12   at a meeting of a judicial conference committee.

13           MR. HIRSH:  The first thing the morning on Friday --

14   you are out that week?

15           THE COURT:  The entire week.

16           MR. HIRSH:  The following week, how about Thursday the

17   5th.

18           THE COURT::  It's the Second Circuit Judicial

19   Conference.

20           MR. HIRSH:  How about Wednesday the 4th?

21           MR. FEUERSTEIN:  Your Honor, you expressed our concern

22   exactly on point.

23           And, I mean, this has been the game all along, is to

24   get a date, they get a TRO and then they try to push the

25   hearing back as far as they possibly can.  Frankly, we just

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

44

859PsigM

1   want to get a resolution to this.

2           MR. HIRSH:  I apologize that my parents have both

3   turned 80 and we are having a gathering in California that we

4   have had scheduled for a year.  This is a very important time

5   for my family.  I am trying to arrange a -- can your Honor give

6   me some available choices?

7           THE COURT:  I can --

8           MR. HIRSH:  -- that doesn't conflict with this

9   vacation.

10          THE COURT:  Well, I can do June 4.  It will not go

11  off, however.  There is no way that it is going to another, you

12  know, it can't continue past that day.

13          MR. HIRSH:  June don't is fine.  Can we have an early

14  morning hearing, your Honor?

15          THE COURT:  We can.

16          MR. HIRSH:  What time, your Honor, please?

17          THE COURT:  9:30?

18          MR. HIRSH:  Yes.  And, your Honor, this is a hearing

19  on preliminary injunction as to?

20          THE COURT::  As to what they are asking for.

21          MR. HIRSH:  That the Court will be signing, you want

22  what the order -- that opposing counsel are submitting?

23          THE COURT:  No.  It is a preliminary injunction

24  hearing on the request for the preliminary injunction which is

25  much broader than these TROs.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

859PsigM

1            I am going to sign one of those orders.

2            Let me just say it one more time.  Justice Freedman's

3    orders are extended as she has written them, until and unless I

4    sign other orders which will be stand-alone orders rather than

5    incorporated orders through the order to show cause document.

6            You guys can, you know, submit -- let me make it

7    clear, the bank really can't submit more than what Judge

8    Freedman already granted them.

9            Mr. Hirsh, you wanted to put in some limitations about

10   customer contact.  They are going to object to those.  I may or

11   may not sign the Hirsh version versus the Justice Freedman

12   version.  But I want it to be a stand-alone document.

13           It seems to me that the other sort of open issue which

14   arose during this conference call concerns inspection of

15   judgment debtor facilities.  And I guess there is actually an

16   interesting question about, there is a stay in the Bankruptcy

17   Court that applies to the other judgment debtors for ten days

18   from yesterday.  And I don't know if that stay really may have

19   an impact on what the bank can do.  And maybe they've done

20   something that they shouldn't do.

21           So that's out there.  I can't resolve that at this

22   point.

23           But the hearing on June 4 is for the additional relief

24   over and above the TRO, or the TROs from Justice Freedman.  And

25   it involves a request for, basically, I guess, the biggest

46

859PsigM

1    difference is for a temporary receiver.

2              MR. FEUERSTEIN:  For the PI, that correct.

3              THE COURT:  That's the biggest thing that's different.

4              (Recess)

5              MR. FEUERSTEIN:  Your Honor, when we were before

6    Justice Freedman, one of the things she ordered Ahava of

7    California to produce was the books and records of the

8    corporation.  That was not memorialized in the two orders that

9    you have before you now.  But we did receive an organizational

10   document, and I believe an Articles of Incorporation, or

11   something to that effect.  That, to us, is not totally

12   sufficient.

13             And what we would ask for is that Ahava of California

14   be required to produce all its organizational material,

15   including anything to the extent of minutes or any other

16   corporate documents, as well as their financial information

17   which they were in part ordered to produce, but Mr. Hirsh had

18   hemmed and hawed about what he was going to give us.  If we

19   could get that order by the June 4 date, I think we could be

20   satisfied with that.

21             MR. HIRSH:  Your Honor, counsel's statement is

22   patently false.

23             THE COURT::  I'm glad that things are getting

24   better --

25             MR. HIRSH:  -- was to send the organizational

47

859PsigM

1    documents which is exactly what I did.  The other statements

2    that counsel has just stated to the Court are untrue.

3         THE COURT::  Okay, well, then I say to the bank's

4    counsel the same thing I said to you.  You want to serve a

5    document request in connection with the hearing, that's fine.

6    I don't have a problem with expedited discovery in the context

7    of a preliminary injunction hearing.

8         MR. FEUERSTEIN:  We will do that.

9         THE COURT:  There is nothing wrong with that.  I would

10   hope that, you know, on the issue of, you know, inspections,

11   that you are able to work something out.

12        MR. HIRSH:  Also as long as we are getting our shots

13   in as -- that is, Justice Freedman also ordered the bank to

14   make itself available to a deposition and to produce documents.

15   And I was supposed to come out and, a couple of days before the

16   deposition, Mr. Oleske, counsel for Signature Bank stated,

17   well, maybe we will show and maybe we won't show, and maybe we

18   will produce documents and maybe we won't produce documents.

19   And you will find out when you are here.

20        So they are playing cat and mouse with me after flying

21   out from California.  This has been the tenure of this

22   litigation, your Honor.

23        The notice I received of today's hearing was that all

24   that was bank sought had to do with a TRO, nothing was

25   mentioned about a receiver.

48

859PsigM

1          THE COURT:  That's right.  Because there is no request

2    for a receiver today before the Court.  The TRO is as limited

3    as I read to you.  It is simply to extend the preexisting TROs.

4    That's all.  Period.

5          MR. HIRSH:  What they are seeking also was an order to

6    show cause for the appointment of a receiver.

7          THE COURT:  So what?

8          MR. HIRSH:  If that had been stated in the notice, we

9    would have been --

10         THE COURT:  I am not even thinking about that problem

11   yet.  It is not before me until June 4, and you guys are going

12   to get a briefing schedule.

13         MR. HIRSH:  Okay.  Keep in mind, your Honor, the

14   holidays of which we observe.

15         THE COURT:  Well, why don't you tell me what they are.

16         MR. HIRSH:  June 9 and June 10 are Shavouth.

17         THE COURT:  Well, that's after anything that I care

18   about.

19         MR. HIRSH:  That's true, I apologize.  We're fine

20   between now and then, we're fine.

21         THE COURT:  Okay.  I think that we are done.  All

22   right, and I will finish signing off on the order to show

23   cause.  And it becomes then the responsibility of Signature

24   Bank's counsel to, you know, get that to you.  But they have --

25   you have local counsel here.  So I assume it is going to be

49

859PsigM

1    hand delivery on local counsel later today.

2            MR. FEUERSTEIN:  We can do that, your Honor.

3            MR. HIRSH:  Your Honor, could we also have a date for

4    our hearing on our motion to transfer -- dismiss --

5            THE COURT:  You haven't made your motion, that's a

6    paper motion.

7            MR. HIRSH:  Could we also have that heard on June 4?

8            THE COURT:  I don't know.  You can argue it.  I am not

9    promising you any decisions.  I just told you I am not here the

10   week before.  I am on trial.

11           MR. HIRSH:  We have a hearing now on June 4.

12           THE COURT:  That's exactly right, and what I am

13   saying -- look, you have to make your motion.  All right?

14   That's the very first thing you need to do.  And it is not

15   made.  The quicker you make it the quicker it is reasonable to

16   ask the bank to respond to it.

17           I am saying to you, I don't care if you want to argue

18   that motion on that day, fine with me.  I am just telling you

19   that I wouldn't expect any ruling on that day because I will

20   not even have been in the office the entire week before.  And I

21   will be on trial for a week between now and than.

22           Your motion isn't made.  So we are talking, you know,

23   pure theory.  As soon as you get your motion made, then we can,

24   you know, require the bank to respond to it.

25           And if you guys might be able to have a civilized

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

50

859PsigM

1    conversation with each other without me, you might even agree

2    on a briefing schedule on that motion.  It happens in most of

3    my other cases, the people are able to do that.

4              I think we are really done.  I am hanging up on you.

5              MR. FOX:  Thank you, your Honor.

6              MR. HIRSH:  Thank you.

7              MR. FEUERSTEIN:  Thank you, your Honor.

8

9                                o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT

E

# HERRICK

NEW YORK
NEWARK
PRINCETON

DAVID FEUERSTEIN

Direct Tel:  212.592.5927
Direct Fax:  212.545.3477

Email: dfeuerstein@herrick.com

May 19, 2008

**BY FACSIMILE**

Hon. Naomi R. Buchwald
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 2270
New York, NY 10007
Fax: (212) 805-7927

Re:  *Signature Bank v. Ahava Food Corp., et al., 08 Civ. 3893*

Dear Judge Buchwald:

This firm represents Signature Bank ("Signature" or the "Bank") in the above-captioned matter. Pursuant to Your Honor's individual rules and practices, and conference with Your Honor concerning defendants' failure to (i) produce the "triple-net lease" that the Judgment Debtors and Ahava of California ("AOC") entered into in or about September 2007 (the "Lease"), and (ii) timely provide dates for the depositions of Moise Banayan, Fariborz Banayan, Ana Banayan, Ari Katz and Ruben Beityakov. For the reasons discussed below, we respectfully request that the Court order defendants to produce the Lease immediately and provide deposition dates for the aforementioned witnesses this week.

First, the Lease is the *sine qua non* of the Judgment Debtors' and AOC's claim that there has been no fraudulent conveyance of the Judgment Debtors' assets. Indeed, as counsel for AOC stated at the May 9th hearing before Your Honor: "My client entered into a lease with St. Lawrence and with Lewis County. And is paying rent to those corporations for use of plants and equipment. How does my client's paying rent on a lease in any way constitute my client's fraudulently transferring away assets?" (5/9/08 Tr. at 18-19; *see also* 5/8/08 Bankr. Tr. at 6 (noting that AOC is "leasing substantially all of the assets of St. Lawrence Food Corp. and Lewis County Dairy Corp.").) And while the Court stated that the Lease "best be produced very quickly" (*see* 5/9/08 Tr. at 40), no such document as been made available for Signature's review. In fact, defendants have not even responded to Signature's request that the Lease be promptly produced.

Second, the Lease -- to the extent it authorizes the "leasing" of the Judgment Debtors' assets -- constitutes a breach of the Master Credit Facility, which unambiguously prohibits the Judgment Debtors (specifically, Lewis County Dairy, St. Lawrence, and Ahava

HERRICK

Hon. Naomi R. Buchwald
May 19, 2008
Page 2

Food Corp.) from selling, leasing or otherwise disposing of (i) "any of its properties or assets, whether or not pursuant to an order of a Governmental Authority, except in the normal course of business (including replacement of obsolete or worn out equipment)," (Master Credit Agreement, § 6.02), and (ii) "notes, accounts receivable or other obligations owing to it, with or without recourse, except for collection in the ordinary course of business" (id., § 6.05). Thus, assuming the Lease states what defendants' counsel have claimed to date, Signature intends to seek leave to amend its Verified Amended Complaint to add claims against (i) the Judgment Debtors for breach of the Master Credit Facility, and (ii) AOC, for unjust enrichment.

Third, there is simply no legitimate reason that the Lease should not be produced. Indeed, given counsel's claims that the Lease represents an arm's-length transaction, that the Judgment Debtors are "separate companies" and AOC "is not the alter-ego of anyone", the Lease cannot be possibly be protected from disclosure. Nor, for that matter, can the request for a single document be considered overly burdensome. Accordingly, Signature requests that the Court order defendants to produce the Lease immediately.

Finally, defendants ought to be required to produce their witnesses for deposition prior to May 29th, the date on which Signature's reply submission is due to be served and filed. We had requested that Messrs. Hirsh and Antonucci provide us with dates for the depositions of the Banayans (Moise, Ana and Fariborz) and Messrs. Katz and Beityakov. To date, however, we have not heard back from Mr. Hirsh and Mr. Antonucci stated that it would "not [be] possible" for him to produce any witness before May 29th (leaving only May 30th and June 2nd as possible dates for deposition prior to the June 3rd hearing). Obviously, defendants should not be heard to complain about the "competency" of Signature's evidence if they are unwilling to engage in proper discovery. Signature, therefore, requests that the Court order defendants' counsel to provide dates prior to May 29th for the depositions of the witnesses identified by the Bank.

Respectfully submitted,

David Feuerstein

DF:jo

cc: Robert Hirsh, Esq.
Lawrence Fox, Esq.
David Antonucci, Esq.

**EXHIBIT**

F

# ROBERT W. HIRSH & ASSOCIATES

Attorneys At Law
8383 WILSHIRE BOULEVARD, SUITE 510
BEVERLY HILLS, CALIFORNIA 90211

TELEPHONE
310-275-7800

FACSIMILE
310-275-4050

May 16, 2008

RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

JUN 16 2008

UNITED STATES DISTRICT JUDGE

**VIA FACSIMILE: 212-805-7927**
Honorable Naomi R. Buchwald
United States District Judge
500 Pearl Street, Room 2270
New York, New York 10007

Re: Ahava 002/Signature Bank v. Ahava Food Corp. et. al. 08 Civ. 3893 (NRB)(MHD)

Your Honor:

Defendant Ahava of California LLC requests a 2 business day extension of its time to file and serve its opposition papers to plaintiff Signature Bank's June 6, 2008 OSC from May 22, 2008 to May 27, 2008 for any and all of the following reasons:

1. This is a very large project. The relief being sought is very serious. More time is needed to do a proper job;

2. When the court made the briefing schedule, I had not been served with the moving papers, and accordingly, I was not in a position to state how much time I needed to prepare a response; and,

3. I am preparing the opposition. My New York co-counsel is largely unavailable due to his pre-existing professional commitments.

We have no objection to extending the Bank's period of time to file a reply. I would greatly appreciate a prompt response to this request. Thank you for your anticipated courtesy and cooperation.

Very truly yours,

Robert W. Hirsh

cc: Mara Levin, via fax: 212-545-3448
David Antonucci, via fax: 315-788-1643
Lawrence Fox, via fax: 212-826-3640

EXHIBIT

G

# HERRICK

New York
Newark
Princeton

DAVID FEUERSTEIN
Direct Tel: 212.592.5927
Direct Fax: 212.545.3477

Email: dfeuerstein@herrick.com

May 23, 2008

VIA FACSIMILE

David Antonucci, Esq.
12 Public Square
Watertown, NY 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211

Re:  *Signature Bank v. Ahava Food Corp., et al.*, 08 Civ. 3893

Gentlemen:

During yesterday's teleconference with the Court, I represented that I would advise the parties and the Court about what Signature will require in order to adequately conduct its inspection of the collateral that is located at the Lowville, Ogdensburg and Brooklyn properties. Accordingly, I have set forth below the Bank's needs, and certain other requests:

First, the Bank will require full access to the plants and the equipment residing therein, including the ability to view and touch each piece of equipment. Such access is necessary so that the Bank can match the serial numbers on the equipment with the serial numbers on its lists of pledged collateral and ensure that the equipment is operational. Additionally, the Bank will require an employee with working knowledge of each respective plant to be available for questions relative to the equipment, its location and other issues. As you may be aware, this is precisely what was provided to the Bank during its initial appraisals.

Second, the Bank will require full access to all computers and related systems at all locations so that it can make mirror images of these systems. This should include any laptop computers that may have been acquired by the defendants to run the businesses. This also requires that a person be available to turn on and access each computer.

Third, the Bank requests that the books and records of the Judgment Debtors be provided when the Bank begins its inspection of the Brooklyn property.[1] Indeed, in an effort to be most efficient, we think it makes the most sense for the documents to be made available in Brooklyn, so that that inspection can occur simultaneously with the Bank's inspection of the Brooklyn property.

---

[1] The Bank's request for the books and records was first made over one-week ago and was clarified again on May 20th in an email between counsel.

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

2 PARK AVENUE, NEW YORK, NY 10016 · TEL 212.592.1400 · FAX 212.592.1500 · www.herrick.com
HF 4163505 v.1 #04461/0011 05/23/2008 12:18 PM

HERRICK

May 23, 2008
Page 2

Finally, on a somewhat related matter, we are enclosing for everyone's review and approval the last version of the confidentiality order that was discussed between the Bank and counsel for Ahava of California. We're sending this around now in an attempt to avoid any further delay and to ensure that all documents relevant to our requests are promptly produced.

Sincerely,

David Feuerstein

cc:     Judge Michael H. Dolinger (via facsimile)

EXHIBIT

H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
SIGNATURE BANK,                       :

            Plaintiff,     :            ORDER

     -against-                   :       08 Civ. 3893 (NRB)(MHD)

                        :
AHAVA FOOD CORP. d/b/a NORTH
COUNTRY CHEESE CORP., et al.,   :

          Defendants.   :
------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


    The Court having conducted a telephone conference today with counsel for the parties, it is hereby ordered as follows:


    1. The inspections by the plaintiff Bank at the Lowville, Ogdensburg and Brooklyn properties is to be conducted on May 28 and 29, 2008. The purpose of the inspections is to determine whether there has been any impairment of the Bank's collateral and for discovery purposes. The inspections are to be conducted in a manner consistent with the request of the Bank reflected in the May 23, 2008 letter to the Court from David Feuerstein, Esq., except in one respect. Except with the consent of the defendants, the Bank will not be permitted to copy the hard drives of the computers found on the premises. Rather, defendants may print out for the Bank hard copies of all documents pertaining to accounts receivable, accounts

1

payable, checks and the equipment at the premises (with the latter category limited to the time period from June 2007 to the present). Defendants may alternatively choose, however, to let the Bank's representatives copy the hard drives, or all portions of the hard drives corresponding to the foregoing categories. If defendants choose the latter option, they are to so advise plaintiff's counsel by no later than noon May 27, 2008.

2. If the Bank intends, based on these inspections or otherwise, to contend on its pending motion that there has been an impairment of collateral, it is to so advise defendants' counsel by June 4, 2008 and is to produce at the same time any documents pertaining to such impairment at the same time. In that event, defendants may conduct a Rule 30(b)(6) deposition of the Bank on all matters pertaining to such impairment on June 5, 2008.

3. Defendants are to produce all documents responsive to previously served requests by the Bank by May 29, 2008. The Ahava-Food-Company defendants are to produce their documents at an agreed-upon location in Rockland County.

4. If the Ahava-of-California defendants object to production of any of the requested categories of documents, they are to advise the Bank's counsel by the close of business today as to which

2

categories and why. If the parties cannot reach agreement on any such document dispute, the Bank is to notify the court by the morning of May 27, 2008, and in that case we will conduct a telephone conference to resolve such disputes same day at 12:30 p.m. The documents that are produced by these defendants are to be made available in New York at locations specified by these defendants' counsel.

5. If defendants intend to seek production of documents from the Bank, they are to serve those requests by May 27, 2008 and the Bank is to respond and produce the requested documents by June 9, 2008.

6. We deny the oral request of the Ahava-of-Califoria defendants for an order precluding the Bank from contacting those defendants' customers.

7. The Bank's deposition of the Ahava-of-California defendants through Fariborz Banayan is to be conducted in California at a location designated by the Bank on June 2, 2008 starting at 9:30 a.m.

8. The Bank's deposition of the Ahava-Food-Corporation defendants through Moise Banayan is to be conducted in Watertown,

3

New York or another location agreed upon by counsel for the Bank and for these defendants on June 6, 2008 beginning at 9:30 a.m.

9. The Ahava-of-California defendants are to provide to the Bank's counsel by no later than 10:00 a.m. on May 26, 2008 the addresses of defendants Ari Katz and Ruben Beityakov. If the Bank intends to seek their depositions, it is to serve on them appropriate subpoenas by no later than May 27, 2008 calling for their depositions on June 4, 2008.

10. The Bank is to make Mr. Robert Bloch available for a Rule 30(b)(6) deposition on June 12, 2008, and is to have available, in the event they are needed for a deposition on June 13, 2008, Messrs Michael Menlo and Thomas Kasulka.

11. The Bank's reply papers on their pending motion are to be served and filed by June 11, 2008.

12. The defendants' sur-reply papers are to be served and filed by June 16, 2008.

13. Counsel for the parties are to advise each other and the court by June 16, 2008 whether they wish an evidentiary hearing on the motion and, if so, they are to specify on what factual issues

4

they wish to offer evidence and which witnesses they intend to call.

14. The court will conduct a hearing on June 18, 2008 commencing at 10:00 a.m. to hear any testimony that any of the parties wishes to add to the record. If the parties request oral argument for that time, we will also hear it.

15. The foregoing discovery is in aid of our resolution of the Bank's pending motion and is without prejudice to the right of the parties to conduct additional discovery, pertinent to other issues in the case, that may be pursued in the wake of the Court's disposition of the Bank's motion.

Dated: New York, New York
        May 23, 2008

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

5

Copies of the foregoing Order have been mailed today to:

David Feuerstein, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

David Antonucci, Esq.
12 Public Square
Watertown, New York 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard
Suite 510
Beverly Hills, California 90211

EXHIBIT

I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SIGNATURE BANK,

                 Plaintiff,     :          ORDER

       -against-      :   08 Civ. 3893 (NRB)(MHD)

AHAVA FOOD CORP. d/b/a NORTH   :
COUNTRY CHEESE CORP., et al.,   :

            Defendants.  :
--------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

    The Court having conducted a telephone conference today with
counsel for plaintiff and the Ahava-of-California defendants
concerning disputes about the production of documents to the
plaintiff (counsel for the other defendants having chosen not to
participate), it is hereby ordered as follows:

    1. The Ahava-of-California defendants produced documents to
the plaintiff in New York commencing on May 29, 2008. Although the
Bank asserts that some categories of requested documents were not
produced, these defendants' counsel represents that his clients
have produced to the Bank all responsive documents within their
custody or control. Accordingly, at the telephone conference we
reiterated the pre-existing obligation of these defendants to
produce all such documents by May 29, 2008 and further directed
that, in the event that these defendants discovered additional
responsive documents before the start of the deposition of their

principal on June 2, 2008, they are to produce all such documents as soon as located. We further specified that if any documents within the custody or control of these defendants are not produced in this fashion, these defendants will be precluded from using them in connection with the pending motion and any resultant hearing. Since plaintiff will be free to question these defendants' principal about these matters at his forthcoming deposition, no further relief is warranted on this point at present.

2. If these defendants wish to seek an expense award in connection with their document production, they are to proceed by formal motion.

3. Consistent with our prior scheduling orders, if plaintiff has failed to notify defendants by the end of today (at midnight) of any contention that there has been an impairment of the physical collateral, then plaintiff will be deemed to have waived any such contention for purposes of the pending motion.

Dated: New York, New York
      May 30, 2008

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Order have been mailed today to:

David Feuerstein, Esq.
John Oleske, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

David Antonucci, Esq.
12 Public Square
Watertown, New York 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard
Suite 510
Beverly Hills, California 90211

Lawrence Fox, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017

EXHIBIT

J



# HERRICK

NEW YORK
NEWARK
PRINCETON

DAVID FEUERSTEIN
Direct Tel: 212.592.5927
Direct Fax: 212.545.3477

Email: dfeuerstein@herrick.com

*ENDORSED ORDER*
*All transcripts are to be ordered on*
*an overnight basis (if that option is*
*available). They are to be delivered I counsel for*
*The witness on the date of receipt and reviewed*
*and signed by the witness by no later than June 16, 2008.*
*The request to depose Mr. Friedbauer*
*is denied without prejudice. If the*
*Bank makes a compelling case of*
Judge Michael H. Dolinger *need (a vf*
United States District Court *defendants intend*
500 Pearl St., Room 1670 *testimony) we will*
New York, NY 10007 *reconsider.*

RECEIVED
JUN 3 2008
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

6/4/08

Re:     Signature Bank v. Ahava Food Corp., et al.

Dear Judge Dolinger:

On behalf of Signature Bank ("Signature" or the "Bank") I write to advise Your Honor of two issues concerning the parties' preparation for the June 18, 2008 hearing on the Bank's application for a preliminary injunction and temporary receiver.

First, at the end of yesterday's deposition of Fariborz Banayan, the parties could not agree to a date by which deposition transcripts would be reviewed and signed by the witnesses. In the Bank's view, corrected and signed transcripts ought to be produced prior to the June 18th hearing in the event that the hearing requires the presentation of evidence. To that end, I suggested that the parties have until June 16, 2008 to submit corrected and signed transcripts, and that any transcript not signed would be considered final for purposes of an evidentiary hearing on June 18th. While this date affects the Bank far more than defendants -- since the Bank's witnesses are not scheduled to be deposed until June 12th and 13th -- Mr. Hirsh rejected the proposal and suggested instead that we allow the "chips to fall where they may." The Bank, however, is concerned that without a final transcript, (i) witnesses will have the freedom to disclaim their testimony as "inaccurately transcribed," and/or (ii) Mr. Hirsh will claim that the deposition testimony is somehow inadmissible.[1] Accordingly, the Bank requests that the Court set a date by which all deposition transcripts will be deemed corrected and signed for purposes of the June 18th hearing.[2]

Second, Signature requests permission to schedule the deposition of Robert Friedbauer, the accountant for Ahava of California ("AOC") and the Judgment Debtors. As yesterday's deposition made clear, Mr. Friedbauer is the person most knowledgeable about the

---

[1] In that vein it is worth noting that Mr. Hirsh objected to, and moved to strike, virtually all of the documentary evidence that accompanied the Bank's Order to Show Cause, including documents that were produced by AOC.

[2] Given that the parties have until June 16, 2008 to advise each other and the Court whether an evidentiary hearing will be necessary, Signature respectfully suggests that June 17th may be a more appropriate date.

06/04/2008 09:15 FAX 6386935 NRB MHD    JUDGE ROBINSON    Case 1:08-cv-03893-NRB-MHD    Document 42-12    Filed 07/07/2008    Page 3 of 3

JUN 03 2008 14:09 FR HERRICK FEINSTEIN LLP2 592 1500 TO 12128057928    P.03

HERRICK

June 3, 2008
Page 2

basis for AOC's inclusion of Moise Banayan in AOC's 2006 tax returns (even though Moise Banayan had purportedly conveyed his interest to his brother Fariborz Banayan in August 2005). Accordingly, the Bank respectfully requests permission to depose Mr. Friedbauer on June 11, 2008.

Respectfully Submitted,

David Feuerstein

DF/fc

HF 4184412 v.1 #06426/0023 06/03/2008 01:55 PM

EXHIBIT

K

## ROBERT W. HIRSH & ASSOCIATES

Attorneys At Law
8383 WILSHIRE BOULEVARD, SUITE 510
BEVERLY HILLS, CALIFORNIA 90211

TELEPHONE
310-275-7800

FACSIMILE
310-275-4050

June 3, 2008

RECEIVED
JUN 3 2008
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

**VIA FACSIMILE: 212-805-7928**
Honorable Michael H. Dolinger
United States Magistrate Judge
500 Pearl Street, Room 2270
New York, New York 10007

Re: Ahava.002/Signature Bank v. Ahava Food Corp. et. al. 08 Civ. 3893 (NRB)(MHD)

Your Honor:

As you recall, I represent defendant Ahava of California LLC ("Ahava CA") in the above referenced case. I write about a few "time of the essence" issues, which require immediate adjudication. I also respond to David Feuerstein's ("DF") June 3, 2008 letter.

**Time of the Essence Request for Relief Re: Bank's Non-Cooperation re: Impairment Claim**
This Court ordered plaintiff Signature Bank's ("the Bank") to serve me no later than tomorrow with documents supporting any "impairment" claim (and to make best efforts to serve me with the documents earlier). Today, I spoke with DF to inquire. He was unable to tell me how I would be served, when I would be served, and how many documents existed. He was even unable to identify the actual alleged impairment. Further, my recollection is that when your honor made the discovery schedule, the "impairment" witnesses being contemplated by the Bank at that time related to alleged impairment of physical collateral, i.e. equipment at the two upstate NY dairy manufacturing plants which Ahava CA is renting. This Court later ordered that the Bank provide me with documents by May 30, 2008 re: impairment of physical collateral or the Bank waived the issue. The Bank never provided me with any documents and the issue is waived. Yesterday, the Bank represented to you and me in a conference call for the first time that it planned to produce Robert Bloch ("Bloch") re: the issue of impairment of non-physical collateral (even though I don't recall this issue even being part of the moving papers). Today, when I spoke with DF, the story changed again: a man named Gibbons might be produced and Bloch might be produced. DF told me he did not know what was going on re: documents or witnesses. This puts me in an awkward position because I must line up a court reporter, and coordinate telephonic depositions which are taking place at the Kornstein Veisz firm in NYC. Again, I am telephonically taking the depositions. At this point, it is very apparent that the Bank is not cooperating as it should be doing. Request is made that the Bank be barred from producing any evidence of impairment. In the alternative, request is made that unless I receive the documents by June 4, 2008, 9:00 am, the Bank should be barred from raising this issue. Similarly, request is made that unless I receive the names of the deponents by close of business today, the Bank be barred from raising this issue.

ENDORSED ORDER

*As previously directed, plaintiff is to provide to defendants' counsel any documents pertaining to any alleged financial impairment today (June 4). This is to be done by no later than 5 p.m. [New York time], and is to include personal delivery to counsel, whether by fax, email or otherwise.*

*M. Dolinger USMJ*

<u>VIA FACSIMILE: 212-805-7928</u>
Honorable Michael H. Dolinger
June 2, 2008
p. 3

### Response to 6/3/08 DF Letter

DF's letter re: deposition correction is incomplete. It also puts words in my mouth. Here are the facts which DF's letter omits. As of this time, we do not have any transcript from the court reporter re: yesterday's deposition, and I have no estimate from the Bank when it would be arriving. On June 4, 2008, from 7:00 am to probably around 2:00 pm, Faraborz Banayan ("FB") is being deposed. On June 5, 2008, I am probably in deposition all day re: the impairment witnesses, unless of course my above requested relief is granted. On June 6, 2008, in the morning, we have a hearing in the Ahava CA/Signature Bank California lawsuit. June 7, 2008 is the Sabbath. June 8, 2008 in the evening starts the very holy holiday of Shavous, which requires preparation. June 9 and 10, 2008 is Shavous. On June 11, 2008, we have two depositions noticed in this case. On June 12, 2008, Bloch is being deposed. On June 13, 2008, two other bank witnesses are being deposed. June 14, 2008 is the Sabbath. Since the Bank has placed FB's company, i.e. Ahava CA at risk, FB intends to attend these depositions. From 1:00 am to 7:00 am, FB is running his business. Once again, the Bank's failing to consider anyone's needs but its own, and has created a problem which it is forcing upon everyone else.

Robert Freidbauer ("RF") should not be ordered deposed for multiple reasons. First, your honor made the discovery schedule, your honor very clearly and repeatedly asked all sides what discovery it wanted. Based upon this, we crafted a discovery schedule. The Bank chose not to depose RF. At all times, the Bank has **known about RF. The Bank should be required to live by its representations to the court and** counsel. Second, there is no time to take and/or prepare for the deposition. See the above discussed timetable.

I am available all day today to speak with the court.

Very truly yours,

Robert W. Hirsh

cc: David Feuerstein, via fax: 212-545-3477
   David Antonucci, via fax: 315-788-1643
   Lawrence Fox, via fax: 212-826-3640

**EXHIBIT**

# L

Case 1:08-cv-03893-NRB-MHD    Document 42-14    Filed 07/07/2008    Page 2 of 2



---

## Signature v. Ahava - Documents re Impairment

Wednesday, June 4, 2008 1:47 PM

**From:** "Feuerstein, David" <dfeuerstein@herrick.com>

**To:** hirshlaw@yahoo.com

**Cc:** "Joel Rosner" <jrosner@kvwmail.com>, "Oleske, John" <joleske@herrick.com>

5_08 Inventory Summary.PDF (454KB), Gibbons Summary.PDF (181KB),
12_07 Inventory.PDF (741KB), 12_07 AR.PDF (849KB), 5.6mm AR.PDF (3186KB),
3.9mm AR.PDF (5576KB)

---

Rob,

Attached are the impairment documents that you've requested.

As I stated in my letter to you, the Bank designated for copying — but did not receive — a number of documents, some of which were relied upon by Mr. Gibbon in his impairment analysis. We'd ask again that you promptly make those documents available to us. With respect to the accounts receivable report that we're missing, we can provide you the back-up for those numbers if you want — my understanding is that it consists of five boxes of invoices. We've also included for your review some rough excel spreadsheets that Mr. Gibbon prepared from the documents that he reviewed while in Brooklyn.

Please let me know as soon as possible when you intend to begin the deposition and where the deposition will be taking place.

Thanks.

Dave
David Feuerstein, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: 212-592-5927
Fax: 212-545-3477

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and destroy the original and any copies. Any tax advice contained in this communication is not intended and cannot be used for the purpose of avoiding tax-related penalties.

**EXHIBIT**

# M

Page 1

1                          Gibbon
2   UNITED STATES DISTRICT COURT
3   FOR THE SOUTHERN DISTRICT OF NEW YORK
4   ---------------------------x
5   SIGNATURE BANK,
6                    Plaintiff,
7    -against-                        08 Civ.3893(NRB)
8   AHAVA FOOD CORP., LEWIS COUNTY
     DAIRY CORP., ST. LAWRENCE FOOD
9   CORP. d/b/a PRIMO FOODS, YONI
     REALTY, LLC, SCHWARTZ AND SONS
10  QUALITY DISTRIBUTORS, INC.,
     MOISE BANAYAN, ANA BANAYAN a/k/a
11  CHANA BANAYAN, REBECCA BANAYAN
     a/k/a REBECCA BARIMYAN a/k/a
12  REBECCA BANAYAN-LIEBERMAN,
     FARIBORZ BANAYAN a/k/a AARON
13  BANAYAN, RUBEN BEITYAKOV, ARI
     KATZ, AHAVA OF CALIFORNIA, LLC
14  d/b/a AHAVA NATIONAL FOOD
     DISTRIBUTOR and NORTH COUNTRY
15  MANUFACTURING, and JOHN DOE
     COMPANIES 1 through 10,
16
                    Defendants.
17  ---------------------------x
18
19
20       DEPOSITION OF EDWARD C. GIBBON
21           New York, New York
22          Thursday, June 5, 2008
23  Reported by:
24  Bryan Nilsen
25  JOB NO. 203539

### Edward C. Gibbon

|  | Page 2 |
|---|---|
| 1 | Gibbon |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | June 5, 2008 |
| 7 | 9:00 a.m. |
| 8 | |
| 9 | |
| 10 | Deposition of EDWARD C. GIBBON, |
| 11 | held at the offices of Kornstein, Veisz, |
| 12 | Wexler & Pollard, LLP, 757 Third Avenue, |
| 13 | New York, New York, before Bryan Nilsen, a |
| 14 | Notary Public of the State of New York. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 4**

```
 1              Gibbon
 2 ------------------ I N D E X ------------------
 3 WITNESS          EXAMINATION BY          PAGE
 4 EDWARD C. GIBBON   MR. HIRSH..................7
 5              MR. FEUERSTEIN...........107
 6
 7 HEARING                       PAGES
 8 BEFORE MAGISTRATE JUDGE DOLINGER........16 to 25
 9 BEFORE MAGISTRATE JUDGE DOLINGER......135 to 158
10
11 -------------- INFORMATION REQUESTS ------------
12 DIRECTIONS: page  8, line 15 page  9, line 11
13          page 11, line 6 page 12, line  2
14          page 163, line  5
15
16 RULINGS:   page 19, line 24 page 20, line 4
17 MOTIONS:   page 113, line 13
18
19
20 ------- MARKED AT THE REQUEST OF COUNSEL -------
21 MARKED:    page 29, line 17 page 106, line 16
22          page 103, line  6 page 132, line  2
23          page 134, line 12
24
25
```

**Page 3**

```
 1              Gibbon
 2 A P P E A R A N C E S:
 3
 4 HERRICK FEINSTEIN LLP
 5 Attorneys for Plaintiff
 6    2 Park Avenue
 7    New York, New York 10016
 8 BY:  DAVID T. FEUERSTEIN, ESQ.
 9
10 ROBERT W. HIRSH & ASSOCIATES
11 Attorneys for Defendant Ahava of California LLC
12    8383 Wilshire Boulevard, Suite 510
13    Beverly Hills, California 90211
14 BY:  ROBERT W. HIRSCH, ESQ. (Via Telephone)
15
16 KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
17 Attorneys for Defendant Ahava of California LLC
18    757 Third Avenue
19    New York, New York 10017
20 BY: JOEL H. ROSNER, ESQ.
21
22
23
24
25
```

**Page 5**

```
 1              Gibbon
 2 ------------------ EXHIBITS ------------------
 3 DEFENDANT'S                    FOR ID.
 4  1  Copy of e-mail listing and attaching
 5     impairment documents....................6
 6  2  Eight-page document entitled 5/8
 7     inventory summary.......................6
 8  3  Seven-page document entitled Gibbons
 9     summary.................................6
10  4  Eight-page document entitled 12/7
11     inventory...............................6
12  5  17-page document entitled 12/7 AR.........6
13  6  65-page document entitled 5.6 MMAR........6
14  7  99-page document entitled 3.9 MMAR........7
15
16     ** EXHIBITS RETAINED BY REPORTER **
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

**Edward C. Gibbon**

Page 98

1            Gibbon
2    A.   I don't believe the bank had any
3 discussions with me about alternate sources of
4 covering the Ahava Food's debt if that's what
5 your question is.
6    Q.   That's my question.
7         At any time?
8    A.   No.
9    Q.   What about the bank's attorney, did
10 they ever have this kind of conversation with
11 you?
12   A.   No.
13   Q.   Did anyone ever have this kind of
14 conversation with you?
15      MR. FEUERSTEIN:   Objection, asked
16   and answered.
17   A.   No.
18   Q.   What about Mr. Rosenberg, did he
19 ever have this kind of conversation with you?
20   A.   No.
21   Q.   Did you ever communicate to the bank
22 as a result of your December inspection of the
23 Brooklyn facility's records that you thought
24 that there had been fraudulent transfers into
25 Ahava of California from any entity?

Page 99

1            Gibbon
2      MR. FEUERSTEIN:   Objection. I'm
3    going to reiterate the objection that I
4    made some time ago now that this still has
5    nothing to do with impairment.
6      You can answer the question.
7    A.   I don't believe we were able to
8 conclude anything about the nature of the
9 transactions other than that we saw invoices
10 being issued by Ahava of California.
11   Q.   Same question except that in terms
12 of fraudulent transfers I'm asking about alter
13 ego?
14      MR. FEUERSTEIN:   Same objection.
15   A.   I'm not sure what you mean by alter
16 ego.
17   Q.   I'll reask the question so we have
18 it clear.
19      As of December 2007 did you ever
20 opine to anyone that you believed that Ahava of
21 California was the alter ego of any entity or
22 that Ahava of California had received a
23 fraudulent transfer from any entity?
24      MR. FEUERSTEIN:   Can you just read
25   that question back, please.

Page 100

1            Gibbon
2      (Record read.)
3      MR. FEUERSTEIN:   I'm going to object
4 to the form.
5      MR. HIRSH:   I'll break it up.
6 BY MR. HIRSH:
7    Q.   As of December 2007 did you opine to
8 any person that you believed Ahava of California
9 was any other person's alter ego?
10      MR. FEUERSTEIN:   Objection to the
11   form.
12   A.   I'm still not sure what alter ego
13 means.
14   Q.   As of December 2007 did you opine to
15 anyone that you thought there was any type of
16 impropriety relating to Ahava of California?
17      MR. FEUERSTEIN:   Objection.
18   A.   No.
19   Q.   At any time have you ever opined to
20 any person that there had been impropriety
21 relating to Ahava of California?
22      MR. FEUERSTEIN:   Object to the form.
23   A.   No.
24   Q.   As you sit here today do you believe
25 that Ahava of California has engaged in any

Page 101

1            Gibbon
2 improper conduct?
3      MR. FEUERSTEIN:   Objection.
4      He doesn't have to answer that
5    question. This is completely outside --
6      MR. HIRSH:   Why, because you don't
7    want him to?
8      MR. FEUERSTEIN:   No, because it's
9    completely outside the scope of his
10   opinion.
11      MR. HIRSH:   Okay.
12      MR. FEUERSTEIN:   I mean come on.
13 I've let you go about an hour now on
14 things that are totally irrelevant to
15 impairment.
16      MR. HIRSH:   I don't agree.
17      Can you read back the question,
18 Mr. Court Reporter -- or are you going to
19 instruct him not to answer until I get the
20 magistrate on the phone?
21      MR. FEUERSTEIN:   I'll take my
22 instruction away, but if this goes on any
23 longer I'll get the magistrate on the
24 phone.
25      MR. HIRSH:   Good.

26 (Pages 98 to 101)

## Edward C. Gibbon

Page 102

1            Gibbon
2       MR. FEUERSTEIN: I want you to
3  explain to me, Rob --
4       MR. HIRSH: I'm not explaining
5  anything. Let's just move on.
6       MR. FEUERSTEIN: Fine.
7       MR. HIRSH: Mr. Court Reporter,
8  please read back the question.
9       (Record read.)
10      MR. FEUERSTEIN: You can answer the
11 question.
12   A.   The documents that I've been able to
13 review so far do not allow me to render any kind
14 of opinion in regard to the operations of Ahava
15 of California.
16 MK      MR. HIRSH: Mark that, Mr. Court
17 Reporter.
18   Q.   As you sit here today do you have
19 any opinion as to whether or not Ahava of
20 California has impaired its own collateral?
21      Strike that.
22      As you sit here today do you have
23 any opinion as to whether or not Ahava of
24 California has transferred any of its assets
25 away outside of the ordinary course of business?

Page 103

1            Gibbon
2       MR. FEUERSTEIN: Object to the form.
3   A.   The information I've reviewed so far
4  does not allow me to form an opinion in that
5  regard.
6  MK      MR. HIRSH: Mark that.
7    Q.   As you sit here today do you have
8  any opinion as to whether or not Ahava of
9  California has impaired its own assets?
10   A.   What I've seen so far is that the
11 accounts receivable and inventory balances that
12 I reviewed as of December have decreased
13 significantly as of May 29th.
14      MR. HIRSH: Mr. Court Reporter,
15 could you please read back the question.
16      And, sir, I believe the question
17 calls for a yes or no.
18      (Record read.)
19      MR. FEUERSTEIN: Object to the form.
20   A.   I don't have an opinion.
21   Q.   As you sit here today do you have
22 any opinion as to whether or not Ahava of
23 California has impaired any asset belonging to
24 Ahava Foods?
25   A.   The information I reviewed so far

Page 104

1            Gibbon
2  indicates that the receivables and inventory
3  balances are significantly lower now than they
4  were back in December.
5    Q.   I'm going to have the court reporter
6  read back the question again, and I'll ask you
7  to answer the question with a yes or a no.
8       MR. FEUERSTEIN: Objection.
9       MR. HIRSH: Mr. Court Reporter,
10 please read it back.
11      MR. FEUERSTEIN: Mr. Gibbon, to the
12 extent you can answer yes or no you may.
13 If you can't, you can't.
14      (Record read.)
15   A.   I don't have an opinion on that
16 based on the information I reviewed so far.
17   Q.   Same question but instead of Ahava
18 Foods, Schwartz and Son?
19      You can simply say same answer if
20 the answer is the same.
21   A.   Same answer.
22   Q.   Same question but with respect to
23 Yoni Realty?
24   A.   Same answer.
25   Q.   Same question with respect to Moise

Page 105

1            Gibbon
2  Banayan?
3    A.   Same answer.
4    Q.   Same question with respect to Lewis
5  County Dairy Corp.?
6    A.   Same answer.
7    Q.   Same question with respect to
8  St. Lawrence Food Corporation?
9    A.   Same answer.
10   Q.   Same question with respect to Primo
11 Foods?
12   A.   Same answer.
13   Q.   Same question with respect to
14 anyone?
15   A.   I'm not sure what you mean by
16 anyone.
17   Q.   The rest of the world?
18   A.   I can't answer that question.
19   Q.   So it's the same answer?
20      MR. FEUERSTEIN: No, it's not.
21   A.   I don't understand the question.
22   Q.   Okay. As you sit here today do you
23 have any opinion as to whether or not Ahava of
24 California has received any asset belonging to
25 Ahava Food Corporation for which it did not pay

27 (Pages 102 to 105)

## Edward C. Gibbon

Page 106

1              Gibbon
2 consideration?
3      A.   The information --
4          MR. FEUERSTEIN: Objection.
5      A.   Sorry.
6          The information I've reviewed so far
7 doesn't allow me to form an opinion.
8      Q.   So the answer is you don't know?
9      A.   I don't know.
10     Q.   Same question but instead of Ahava
11 Food Corporation, Lewis County Dairy Corp.?
12     A.   Just to clarify the question again
13 can you repeat it?
14         MR. HIRSH: Mr. Court Reporter.
15         (Record read.)
16     A.   I have no opinion.
17     Q.   Same answer?
18     A.   Same answer.
19     Q.   Same question but now St. Lawrence
20 Food Corporation?
21     A.   Same answer.
22     Q.   Same question but now Primo Foods?
23     A.   Same answer.
24     Q.   Same question but now Yoni Realty?
25     A.   Same answer.

Page 107

1              Gibbon
2      Q.   Same question but now Schwartz and
3 Son?
4      A.   Same answer.
5      Q.   Same question but now Moise Banayan?
6      A.   Same answer.
7          MR. HIRSH: Let's take a short
8 break.
9          (Recess taken: 11:57 a.m.)
10         (Proceedings resumed: 12:17 p.m.)
11         MR. HIRSH: I have no further
12 questions.
13         MR. FEUERSTEIN: Okay. I have a few
14 questions that I want to follow up on.
15 EXAMINATION BY
16 MR. FEUERSTEIN:
17     Q.   First of all, Mr. Gibbon, during
18 your inspection of the Brooklyn warehouse in
19 December of 2007 did you see anything concerning
20 a lease or more leases with respect to Ahava
21 Foods, Schwartz and Sons, Lewis County and/or
22 St. Lawrence?
23         MR. HIRSH: Objection, leading and
24 compound.
25     A.   I believe I did see a lease document

Page 108

1              Gibbon
2 but I don't recall exactly which entity it had
3 to do with.
4      Q.   Did you see a lease between Ahava of
5 California and Lewis County Dairy?
6      A.   I believe I did.
7      Q.   Do you know what that lease said?
8      A.   I don't recall.
9      Q.   Did you see a lease between Ahava of
10 California and St. Lawrence?
11     A.   I don't recall.
12     Q.   Did you see a lease between Schwartz
13 and Sons and Ahava of California?
14     A.   I don't recall.
15     Q.   Did you see an agreement between
16 Schwartz and Sons and Ahava of California?
17     A.   I don't recall.
18     Q.   Did you have any understanding as of
19 December 2007 whether Ahava of California was
20 the tenant of the Brooklyn facility?
21     A.   I don't believe I had that
22 understanding.
23     Q.   Did you know whether Ahava of
24 California as of December 2007 was running the
25 Lewis County facility upstate New York?

Page 109

1              Gibbon
2      A.   I don't believe I was aware of that.
3      Q.   Did you have any understanding as of
4 December 2007 whether Ahava of California was
5 running the upstate plant in St. Lawrence?
6      A.   I was not aware of that.
7      Q.   I want you to assume the following
8 hypothetical for me.
9          Assume for a moment that when you
10 visited the upstate -- strike that -- when you
11 visited the Brooklyn facility in December 2007
12 that the account receivable document that you
13 reviewed and that you discussed with Mr. Hirsh
14 was actually the account receivable document for
15 Ahava of California.
16         Do you understand me so far?
17     A.   Could you just repeat the question,
18 please.
19         MR. HIRSH: I'm going to object that
20         it's vague and it's an incomplete
21         hypothetical.
22         MR. FEUERSTEIN: I wasn't finished
23         with it, Rob, I was just getting started.
24         So allow me.
25         MR. HIRSH: Okay.

28 (Pages 106 to 109)

## Edward C. Gibbon

Page 110

```
1              Gibbon
2 BY MR. FEUERSTEIN:
3      Q.   Assume for a moment that Exhibit 5,
4 which you discussed with Mr. Hirsh, is actually
5 an account receivable document listing the
6 accounts receivable for Ahava of California and
7 its D/B/As.  Are you with me so far?
8      A.   Yes.
9      Q.   And now assume that the account
10 receivable aging document that you reviewed at
11 the Brooklyn plant on May 29 is also an account
12 receivable document for Ahava of California.
13          With me still?
14     A.   Yes.
15     Q.   In that case do you have an opinion
16 as to whether there was impairment of the
17 accounts receivable?
18          MR. HIRSH: Objection, incomplete
19     hypothetical, vague.
20     A.   My opinion is that there would be
21 impairment of the accounts receivable based on
22 the significant decrease from the first point of
23 data to the second point of data.
24     Q.   And do you happen to know whether
25 between December of 2007 -- still within my
```

Page 111

```
1              Gibbon
2 hypothetical -- and May of 2008 inventory
3 increased?
4          MR. HIRSH: Objection, incomplete
5     hypothetical, and vague.
6      A.   To my knowledge inventory decreased
7 by a million dollars in the December time frame
8 to $680,000 as reflected in I think it's
9 Exhibit 2 here in the May time frame.
10     Q.   So is it fair to say, Mr. Gibbon,
11 that based on the documents that you reviewed
12 and assuming my hypothetical with respect to
13 Ahava of California that the collateral from
14 December 2007 to May 2008 is impaired?
15          MR. HIRSH: Objection, lack of
16     foundation, incomplete hypothetical, and
17     vague.
18     A.   Based on comparing the starting
19 point and the ending point of the collateral and
20 the significant decrease in both accounts
21 receivable and inventory, I would say the
22 collateral seems to be impaired.
23     Q.   I'm going to change the hypothetical
24 for a bit now.
25          Assume for a moment that the
```

Page 112

```
1              Gibbon
2 accounts receivable on Exhibit 5 were
3 transferred from the Ahava entities -- and by
4 "Ahava entities" I mean Ahava Food, Schwartz and
5 Sons, Lewis County, and St. Lawrence -- to Ahava
6 of California prior to December 2007.
7          Follow me so far?
8      A.   Assume that those receivables were
9 transferred from the old Ahava entities to Ahava
10 of California?
11     Q.   Right.  And assume that that
12 transfer occurred for a lack of or zero or
13 de minimis consideration.
14          Okay?  Still with me?
15     A.   Yes.
16     Q.   I'm going to ask you the same
17 question -- strike that.
18          Also assume now that the accounts
19 aging document that you reviewed on May 29th in
20 the Brooklyn facility was an accounts aging
21 document for Ahava of California.
22          Okay?  Are you with me so far?
23     A.   Yes.
24     Q.   Do you have an opinion, Mr. Gibbon,
25 whether the collateral was impaired from
```

Page 113

```
1              Gibbon
2 December 2007 to May 2008?
3          MR. HIRSH: Objection, incomplete
4     hypothetical, vague, ambiguous, no
5     foundation.
6      A.   Based on the significant decrease
7 between the two amounts the collateral appears
8 to be impaired.
9      Q.   And you're basing that not just on
10 the account receivable documents but also on the
11 inventory documents you received, correct?
12     A.   Yes.
13 MO      MR. HIRSH: Objection, calls for a
14     legal conclusion. Move to strike.
15     Q.   I'm going to ask you one more
16 hypothetical.
17          Assume for me for a moment that
18 Ahava of California is considered by courts or
19 legally to be the same entity or one in the same
20 with what I described for you earlier as the
21 Ahava entities, Ahava Food Corp, St. Lawrence,
22 Lewis County, and Schwartz and Sons.
23          Are you with me so far?
24     A.   Yes.
25     Q.   Do you have an opinion, assuming
```

29 (Pages 110 to 113)

**Edward C. Gibbon**

Page 114

1          Gibbon
2 that fact, whether the collateral from December
3 of 2007 was impaired as of May 2008?
4          MR. HIRSH: Objection, incomplete
5     hypothetical, vague, ambiguous, and calls
6     for a legal conclusion.
7     A.   Based on the significant decrease
8 between the two dates the collateral appears to
9 be impaired.
10     Q.   And that's based not just on the
11 accounts receivable documents but also on the
12 inventory, correct?
13     A.   Yes.
14     Q.   Mr. Gibbon, you were at the Brooklyn
15 facility on May 29th, correct?
16     A.   Yes.
17     Q.   What entity were you told that you
18 would be -- strike that.
19          With respect to the documents that
20 were provided to you on May 29th which entity's
21 documents were you told that those came from?
22          MR. HIRSH: Objection, lack of
23     foundation, and vague, and compound.
24     A.   My understanding from talking to Rob
25 Bloch was that we were going to get access to

Page 115

1          Gibbon
2 the Ahava of California books and records, which
3 was where all the activity was at this point in
4 time.
5     Q.   I think I have just one more
6 question.
7          You've noted a few times,
8 Mr. Gibbon -- strike that.
9          I have more than one question.
10          When you were at the plant, the
11 Brooklyn facility, in December of 2007 what was
12 your understanding as to which entity's
13 documents you were reviewing?
14     A.   My understanding was that we would
15 have access to the Ahava of California books and
16 records as well as the bank statements relating
17 to all of the related entities in the prior
18 grouping.
19     Q.   I said December 2007, not May.
20     A.   Oh, I'm sorry. I'm thinking of May.
21 My mistake.
22          MR. HIRSH: You've got to lead him
23     better than that, Mr. Feuerstein.
24          MR. FEUERSTEIN: I guess I didn't
25     learn as well as you did from me.

Page 116

1          Gibbon
2     A.   Let me step back and think about
3 December.
4          MR. HIRSH: You actually are allowed
5     to lead an expert, so that's why I'm not
6     objecting to your leading.
7          It didn't do you much good, but
8     you're allowed to.
9     A.   In December when we went in we were
10 not specifically focusing on any entity. It was
11 any bank records that existed that may involve
12 the transactions involving accounts receivable.
13     Q.   Okay. Now I think I have one more
14 question.
15          MR. HIRSH: I didn't hear that.
16          MR. FEUERSTEIN: I said now I think
17     I only have one more question.
18          MR. HIRSH: Never trust a lawyer,
19     Mr. Gibbon, that says he only has one more
20     question.
21 BY MR. FEUERSTEIN:
22     Q.   Mr. Gibbon, a couple of times today,
23 or maybe more than a couple, you answered
24 Mr. Hirsh by saying or categorizing your answer
25 as based on what I reviewed. Do you recall

Page 117

1          Gibbon
2 those answers, vaguely?
3     A.   Yes, I do.
4     Q.   Were there documents that you
5 expected to find on May 26, 2008, in your
6 inspection of the Brooklyn facility that were
7 not provided?
8          And I think, by the way, just for
9 clarification, I think I may have misspoken, I
10 meant May 29th.
11          MR. HIRSH: Objection, speculative,
12     vague, ambiguous.
13     A.   Yes, there was a number of documents
14 that were not provided based on a listing of
15 documents requested by Signature Bank prior to
16 our arrival.
17     Q.   Let me ask the question this way --
18          MR. HIRSH: It wasn't one more
19     question.
20          MR. FEUERSTEIN: Sorry.
21 BY MR. FEUERSTEIN:
22     Q.   Can you list for me generally what
23 documents or category of documents you reviewed
24 during your examination in December of 2007?
25     A.   The documents we reviewed in

30 (Pages 114 to 117)

**Edward C. Gibbon**

Page 118

1          Gibbon
2  December were limited based on what was
3  presented to us by the company.
4          They primarily included bank
5  statements, which were primarily Signature Bank
6  statements.
7          It also included the accounts
8  receivable aging report that is one of the
9  exhibits here, as well as the inventory report
10 that's one of the exhibits here.
11         I don't believe there was much else
12 provided at that time.
13     Q.   Were you provided with a general
14 ledger?
15     A.   No.
16     Q.   Did you ask whether a general ledger
17 existed?
18     A.   Yes.
19     Q.   And what was the answer?
20     A.   The answer was -- and I'm speaking
21 to Moise at that point and he said he would
22 speak with his accountant or his CFO and see if
23 he could produce that for us.
24     Q.   Were there any records concerning
25 cash accounts receivable?

Page 119

1          Gibbon
2      A.   We did not receive any cash receipts
3  journals at that time.
4      Q.   How about check registries?
5      A.   We did not receive any check
6  registers at that time.
7      Q.   Did you ask whether either of those
8  existed?
9          MR. HIRSH:  Keep your voice up.
10         MR. FEUERSTEIN:  My question, Rob,
11     was did you ask whether either of those
12     existed.
13     A.   Yes, both of those were on the
14 document request list back in December.
15     Q.   And what was the response that you
16 received?
17     A.   The response was that he would see
18 if he could provide that information to us, but
19 it was not provided.
20     Q.   In your I believe 350 to 500
21 collateral exams of financial records are the
22 documents that we just discussed typically
23 provided by companies?
24         MR. HIRSH:  Objection, improper
25     hypothetical.

Page 120

1          Gibbon
2          MR. FEUERSTEIN:  It's not a
3  hypothetical.
4          MR. HIRSH:  Beyond the scope of what
5  he's supposed to be giving an opinion of,
6  vague, speculative.
7      A.   The documents that were requested in
8  December and again in May were the same standard
9  document request list that we would typically
10 use for any collateral examination.
11     Q.   Mr. Gibbon, in response to an
12 earlier question by Mr. Hirsh concerning the
13 inspection in 2007, December of 2007, he asked
14 you which entities you believed you were
15 reviewing documents, and I believe your answer
16 was St. Lawrence, Lewis County, and Ahava Food.
17         Do you recall any other entities
18 that you may have been reviewing at that time?
19     A.   Yes, I do.  Schwartz and Sons was
20 also one of the entities we were looking at.
21         MR. FEUERSTEIN:  That's all the
22     questions I have.  Thank you, Mr. Gibbon.
23         MR. HIRSH:  I have some redirect.
24 BY MR. HIRSH:
25     Q.   Mr. Gibbon, what steps did you take

Page 121

1          Gibbon
2  to prepare for this deposition?
3          MR. FEUERSTEIN:  Objection, outside
4      the scope.  That's not redirect.
5      Q.   Would you answer the question,
6  please?
7      A.   I attended a meeting yesterday with
8  counsel and with Rob Bloch, and I also reviewed
9  my files from the previous visits.
10     Q.   Did you carefully review your files?
11     A.   Yes.
12     Q.   How many hours did you take in
13 reviewing your files?
14     A.   I would estimate two hours.
15         MR. FEUERSTEIN:  Rob, I'm going to
16     put a standing objection to all these
17     questions that they're outside the scope
18     of my examination.
19     Q.   How long was your meeting yesterday
20 with Rob Bloch and the attorneys?
21     A.   It was approximately 1 hour and 45
22 minutes.
23     Q.   Where was the meeting held?
24     A.   At the offices of the attorneys.
25     Q.   Where is that?

31 (Pages 118 to 121)

### Edward C. Gibbon

Page 122

```
1            Gibbon
2    A.   It is I think at 2 Park Avenue in
3 New York City.
4    Q.   And what did Rob Bloch say to you at
5 that meeting?
6    A.   Rob Bloch and I didn't have a lot of
7 dialogue at that meeting.  It was mostly between
8 Rob and the attorneys and myself and the
9 attorneys.
10   Q.   Please state what the attorneys told
11 you for an hour and 45 minutes at yesterday's
12 meeting.
13        MR. FEUERSTEIN:  Objection,
14    mischaracterizes testimony.
15   A.   We reviewed in general the
16 procedures that would take place at the
17 deposition.  We also reviewed certain documents
18 including some of them that were transmitted to
19 you yesterday afternoon.
20   Q.   Did anybody put you through a
21 practice session of the deposition, questions
22 and answers?
23   A.   There were no sample questions asked
24 of me if that's what you're asking.
25   Q.   That's what I'm asking.
```

Page 123

```
1            Gibbon
2        How many depositions have you had in
3 your career?
4    A.   This will be the first one.
5    Q.   Did the attorneys discuss with you
6 the deposition rules of the road, just what
7 depositions are about?
8        MR. FEUERSTEIN:  Nobody can prepare
9    Ted for you, Rob.
10   A.   The answer is yes.
11       MR. HIRSH:  I'll take that as a
12    compliment.
13 BY MR. HIRSH:
14   Q.   Now, after I finished my examination
15 of you earlier we went off the record and then
16 Mr. Feuerstein examined you.  Did you have a
17 conversation with Mr. Feuerstein during that
18 break?
19   A.   Yes.
20   Q.   In fact, you talked about all of the
21 questions that he asked you during his
22 examination, correct?
23       MR. FEUERSTEIN:  Objection, assumes
24    facts, lack of foundation.
25   A.   No, he did not.
```

Page 124

```
1            Gibbon
2    Q.   Did he talk to you about any of the
3 subject areas that he was going to ask you?
4    A.   Yes.
5    Q.   What did he say to you?
6    A.   He mentioned that I had forgotten
7 about Schwartz and Sons as one of the entities
8 that we had looked at.
9    Q.   What else did he tell you?
10   A.   He said it seemed to be going fairly
11 well and he said he would propose a hypothetical
12 question to me at some point during the
13 deposition.
14   Q.   Did he discuss that hypothetical
15 with you?
16   A.   He did not.
17   Q.   Did he tell you that he would be
18 leading you and that you should agree with his
19 conclusion?
20       MR. FEUERSTEIN:  Objection, lacks
21    foundation.
22   A.   He did not.
23   Q.   Did he tell you that your testimony
24 was damaging to Signature Bank?
25       MR. FEUERSTEIN:  Objection.
```

Page 125

```
1            Gibbon
2    A.   He did not.
3    Q.   Did he tell you anything else other
4 than what you stated?
5    A.   I don't believe so.
6    Q.   How long was your conversation with
7 him?
8    A.   Approximately two minutes.
9    Q.   What did you do for the remaining
10 time?
11   A.   I think I've reviewed with you the
12 extent of our conversation.  Perhaps it was less
13 than two minutes.
14   Q.   We were off the record would you say
15 about ten or fifteen minutes?
16   A.   Are you talking about when we were
17 on breaks?
18   Q.   Yes.
19       MR. FEUERSTEIN:  No, he means the
20    last break.
21   A.   Oh, just the most recent one?
22       MR. FEUERSTEIN:  Yes.
23   A.   No, I didn't speak to the attorney
24 on the most recent break.
25   Q.   So you didn't speak to him between
```

32 (Pages 122 to 125)

## Edward C. Gibbon

Page 126

1         Gibbon
2 the time that I stopped my examination and the
3 time of Mr. Feuerstein's examination of you?
4     A.   No.  He was on a phone call
5 elsewhere and I was in the room here with the
6 court reporter for part of the time and by
7 myself for the rest of the time.
8     Q.   When did you have the conversation
9 with him about the hypothetical?
10     A.   I believe that was in first break.
11 I'm not certain.
12     Q.   Now, during Mr. Feuerstein's
13 examination of you he asked you questions about
14 collateral.  What did you understand
15 Mr. Feuerstein to mean when he used the term
16 "collateral"?
17     A.   Collateral in this case refers to
18 accounts receivable and inventory.
19     Q.   Whose accounts receivable?
20         MR. FEUERSTEIN:  Objection.
21         The questions were couched in my
22     hypothetical.
23     Q.   Whose accounts receivable did you
24 understand Mr. Feuerstein to be asking you
25 about?

Page 127

1         Gibbon
2     A.   The accounts receivable and
3 inventory of Ahava Foods and Ahava of
4 California.
5     Q.   So in December of 2007 are you
6 saying that you were asked by the bank to
7 inspect records, review records concerning the
8 collateral of Ahava of California?
9         MR. FEUERSTEIN:  Objection.
10     A.   No, I think I may have said that
11 when I was referring to the May meeting in
12 December we were focused on Ahava Foods and in
13 general any other entities that we may have run
14 into in terms of accounts receivable
15 transactions on the bank statements.
16     Q.   Who do you understand to have an
17 interest -- when you say collateral -- let's
18 back up for a second.
19         When you say "collateral" can you
20 define that term, please?
21         MR. FEUERSTEIN:  Objection, asked
22     and answered.
23     Q.   You're an MBA.  Can you define the
24 term "collateral"?
25     A.   Collateral in this case is accounts

Page 128

1         Gibbon
2 receivable on inventory that are assets securing
3 the loan offered by Signature Bank.
4     Q.   Is it your understanding that Ahava
5 of California was a borrower for Signature Bank?
6         MR. FEUERSTEIN:  Objection.
7     A.   As far as I understand Ahava Foods
8 was the borrower of Signature Bank.
9     Q.   Why would you apply the term
10 "collateral" then to Ahava of California as you
11 did in your earlier answer?
12         MR. FEUERSTEIN:  Objection.
13     A.   My understanding was that the
14 business that was formerly being conducted by
15 Ahava Foods was now being conducted by Ahava of
16 California.
17     Q.   When did you come to that
18 understanding?
19         MR. FEUERSTEIN:  I'm going to object
20     again, outside the scope of
21     cross-examination.
22     A.   I believe that would have been prior
23 to the April 25th visit to the Brooklyn
24 facility.
25     Q.   How did you come to that

Page 129

1         Gibbon
2 understanding?
3         MR. FEUERSTEIN:  Same objection.
4     A.   That would have been through
5 discussions with Rob Bloch.
6     Q.   When did these discussions take
7 place?
8     A.   I believe that would have been
9 either the 24th or the 23rd of April, prior to
10 our visit to the facility.
11     Q.   And he told you that was the bank's
12 position?
13         MR. FEUERSTEIN:  Same objection.
14     A.   I believe he said that the sales
15 volume that was formerly going through Ahava
16 Foods was being -- now passing through Ahava of
17 California.
18         MR. HIRSH:  Would the court reporter
19     repeat that.
20         (Record read.)
21 BY MR. HIRSH:
22     Q.   Do you recall him telling you
23 anything else?
24         MR. FEUERSTEIN:  Same objection.
25     A.   Well, again, he had a court order

33 (Pages 126 to 129)

# Edward C. Gibbon

Page 130

1           Gibbon
2 allowing us access to the facility to examine
3 the books and records.
4      Q.   Did you conclude based upon
5 Mr. Bloch's statements -- strike.
6           Did you reach any conclusion based
7 upon Mr. Bloch's statements?
8           MR. FEUERSTEIN: Objection.
9           Conclusions about what?
10          MR. HIRSH: Any.
11     A.   No, Mr. Bloch was providing
12 background as to what we might be investigating.
13     Q.   In fact he told you that he wants
14 you to try to find evidence to support this
15 argument, correct?
16          MR. FEUERSTEIN: Objection, assumes
17     facts not in evidence, lack of foundation.
18     A.   Could you repeat the question?
19          MR. HIRSH: Mr. Court Reporter.
20          (Record read.)
21     A.   I don't believe he said that. I
22 think he said that in general the activities,
23 the business activities of Ahava Foods were --
24 there was no more significant activity and that
25 the volume was passing through Ahava of

Page 131

1           Gibbon
2 California. So we were going to investigate the
3 books and records of Ahava of California at the
4 Brooklyn facility.
5      Q.   Did he tell you that he wanted you
6 to try to find evidence to support this
7 argument?
8           MR. FEUERSTEIN: Objection.
9      A.   In general we were looking at bank
10 statements to see where accounts receivable
11 transactions were being received in and
12 disbursed to.
13     Q.   Did you find any evidence that Ahava
14 of California had taken anything belonging to
15 any other person?
16          MR. FEUERSTEIN: Objection, outside
17     the scope of this expert's testimony.
18     A.   In April we did not get access to
19 the books and records.
20     Q.   That wasn't my question.
21          MR. HIRSH: Mr. Court Reporter,
22     please read back the question which calls
23     for a yes or a no.
24          (Record read.)
25     A.   No.

Page 132

1           Gibbon
2 MK        MR. HIRSH: Mark that.
3 BY MR. HIRSH:
4      Q.   Now, as an MBA you're aware that
5 there are many situations in business which can
6 cause a change in accounts receivable, correct?
7      A.   Yes.
8      Q.   What are some of those factors?
9      A.   Sales --
10          MR. FEUERSTEIN: Before you answer
11     I'm just going to again object. This is
12     all outside the scope of my redirect -- or
13     my cross-examination rather.
14     Q.   Go ahead.
15     A.   Sales volume can change, customers
16 can pay invoices, or invoices can be credited
17 from the accounts receivable for other reasons.
18     Q.   Let me ask you this question.
19          Assume for argument's sake that
20 Ahava of California customers weren't paying
21 their bills because the bank contacted them and
22 told them don't pay your bills. Do you think
23 this would be an important factor for you to
24 know in rendering any opinion?
25          MR. FEUERSTEIN: Objection, outside

Page 133

1           Gibbon
2     the scope.
3      A.   I would think, if anything, that
4 would tend to increase the accounts receivable
5 since cash might not be being received.
6      Q.   That's assuming you're dealing with
7 the same entity, correct?
8           MR. FEUERSTEIN: Objection. I don't
9     even understand the question.
10     Q.   Do you understand my question?
11     A.   No. Can you clarify?
12     Q.   Sure. You would be making the
13 assumption that the accounts receivable records
14 that you reviewed in December were the same
15 accounts receivable records for the same
16 company, apples and apples, as in May, correct?
17     A.   The assumption that I made was that
18 I was reviewing the only accounts receivable
19 records that existed as those were the ones that
20 were provided to me by the company.
21     Q.   So you assumed that you were looking
22 at apples and apples, that the accounts
23 receivable records that you reviewed in December
24 were of the same company that you were reviewing
25 in May?

34 (Pages 130 to 133)

## Edward C. Gibbon

Page 134

```
1              Gibbon
2       MR. FEUERSTEIN: Objection.
3    A.  I assumed that I was reviewing the
4  entire accounts receivable asset in December and
5  again the entire accounts receivable asset in
6  May.
7    Q.  And you don't know that to be the
8  case, correct?
9       MR. FEUERSTEIN: Objection.
10   A.  No, I do not know that to be the
11 case.
12 MK      MR. HIRSCH: Mark that.
13 BY MR. HIRSH:
14   Q.  When you were dealing with Moise
15 Banayan in December of 2007 did you have any
16 understanding as to what companies you were
17 dealing with him concerning?
18      MR. FEUERSTEIN: Still an objection
19   as outside the scope of my
20   cross-examination.
21   A.  My understanding was that we were
22 reviewing Ahava Foods and any of the related
23 entities as well as any entities where accounts
24 receivable transactions may be flowing in from
25 and to.
```

Page 135

```
1              Gibbon
2    Q.  Can you identify the entities?
3    A.  The ones that we know about are
4  Ahava Foods, the Schwartz and Sons, the Lewis
5  County Dairy, and there's another upstate dairy
6  facility --
7    Q.  St. Lawrence?
8    A.  That's the one.
9       Those are the ones we were aware of
10 going in.
11      MR. HIRSH: I've got nothing
12   further.
13      MR. ROSNER: David?
14      MR. FEUERSTEIN: I've got nothing.
15      MR. ROSNER: Okay, we're done.
16      MR. HIRSH: Let's go off the record
17 for a second.
18      (Discussion off the record.)
19      (The following proceedings taken
20   before Judge Dolinger via teleconference.)
21      MR. ROSNER: We have an issue that
22 has arisen. We've closed the deposition
23 and the parties want to address to you.
24      MR. HIRSH: Good morning, your
25 Honor.
```

Page 136

```
1              Gibbon
2       JUDGE DOLINGER: Hello.
3       MR. HIRSH: You will be pleased to
4  know that the deposition went smoothly and
5  it just completed.
6       JUDGE DOLINGER: Terrific.
7       MR. HIRSH: Your intervention was
8  very helpful. Thank you.
9       We have an issue. Here's the deal.
10 Our hearing before you is on June 18th.
11 This witness, unlike Fariborz Banayan, is
12 available to review the transcript
13 whenever he gets it. It will take a half
14 a day he says. He's available to do it
15 next week.
16      So what I would like to do is
17 instead of ordering it overnight I'd like
18 to possibly get it to him let's say early
19 next week, the 9th or 10th, which is not
20 his holiday, and have the answers got back
21 to me maybe like two days later.
22      Because, unlike Fariborz Banayan,
23 this is a critical witness for the case,
24 this is their impairment witness.
25      On the 15th or the 16th, I don't
```

Page 137

```
1              Gibbon
2  know which day yet, I'm traveling to
3  New York, and I need to prepare my
4  outlines and everything. And this witness
5  can do it, he has no scheduling problem.
6       So if possible I really would like
7  to get it to him in a couple of days and
8  get my answer back a day or two later
9  because that works with his schedule.
10      MR. FEUERSTEIN: Your Honor, this is
11 Dave Feuerstein. I mean the court had
12 issued an order with respect to how to
13 handle deposition transcripts. I didn't
14 really think this had to be put in front
15 of you.
16      To us it was just something that was
17 we were trying to stay consistent with
18 your order, which is to provide the
19 witness with the transcript the next day
20 if that's available and he will get it
21 back by the 16th.
22      MR. HIRSH: The issue really is -- I
23 mean if we have to pay the extra buck for
24 the court reporter to order it by
25 tomorrow, I mean we'll cough up the money.
```

35 (Pages 134 to 137)

**EXHIBIT**

# N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
SIGNATURE BANK,

                      :

             Plaintiff,                 <u>ORDER</u>

                      :

       -against-            08 Civ. 3893 (NRB)(MHD)

                      :

AHAVA FOOD CORP. d/b/a NORTH
COUNTRY CHEESE CORP., <u>et al.</u>,   :

             Defendants.   :
-----------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

The Court having conducted a telephone conference today with counsel for plaintiff and the Ahava Food Corp. defendants concerning deposition issues, we ruled as follows:

1. In view of the abbreviated length of the deposition today of Moise Banayan (which is expected to end by 2:30 p.m.), plaintiff may resume the deposition on June 8, 2008 at 10 a.m. at an agreed location in or near Monsey, New York.

2. Defendants' counsel may participate in the resumed deposition by telephone.

3. Plaintiff's counsel is to supply today to defendants' counsel copies of those documents that he currently anticipates showing to the witness at the resumed deposition of Mr. Banayan.

Dated: New York, New York
     June 6, 2008


                         MICHAEL H. DOLINGER
                         UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Order have been mailed today to:

David Feuerstein, Esq.
John Oleske, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

David Antonucci, Esq.
12 Public Square
Watertown, New York 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard
Suite 510
Beverly Hills, California 90211

Lawrence Fox, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017

**EXHIBIT**

**O**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SIGNATURE BANK,

               Plaintiff,    :         ORDER

       -against-     :   08 Civ. 3893 (NRB)(MHD)

AHAVA FOOD CORP. d/b/a NORTH
COUNTRY CHEESE CORP., et al.,  :

          Defendants.  :
--------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

The Court having conducted a telephone conference today with counsel for the parties, it was ordered as follows:

1. Plaintiff having failed to make timely delivery, pursuant to court order, of documents requested by the Ahava Food Corp. defendants and due by June 9, 2008, the Bank is to provide all such documents in hand to both sets of defendants' attorneys by no later than 5:00 p.m. today (New York time for delivery to the New York attorney and California time for delivery to the California attorney).

2. The depositions of Bank personnel noticed by the Ahava Food Corp. defendants and scheduled for June 12 and 13, 2008 are adjourned to June 13 and 17, 2008 respectively.

1

3. If the Bank wishes to resist the oral application of the Ahava Food Corp. defendants for payment of their counsel's travel expenses in coming to New York City twice for the foregoing depositions, it may serve and file an explanatory affidavit and memorandum of law by June 18, 2008.

4. The Bank's reply papers in support of its preliminary injunction motion remain due today. Defendants' sur-reply papers are to be served and filed (with courtesy copies to chambers) by June 19, 2008.

5. The court will conduct a telephone status conference on June 20, 2008 at 11:00 a.m.

Dated: New York, New York
       June 11, 2008

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

2

Copies of the foregoing Order have been mailed today to:

David Feuerstein, Esq.
John Oleske, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

David Antonucci, Esq.
12 Public Square
Watertown, New York 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard
Suite 510
Beverly Hills, California 90211

Lawrence Fox, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017

**EXHIBIT**

**P**

# H ERRICK

NEW YORK
NEWARK
PRINCETON

JOHN OLESKE

Direct Tel:   212.592.5981
Direct Fax:  212.545.3448
Email:  joleske@herrick.com

June 11, 2008

**VIA FACSIMILE**
Judge Michael H. Dolinger
United States District Court
500 Pearl St., Room 1670
New York, NY 10007

Re:     Signature Bank v. Ahava Food Corp., et al.

Dear Judge Dolinger:

I write on behalf of Signature Bank ("Signature" or the "Bank"). In light of the Court's ruling with respect to the production of documents to AOC's California counsel, and the indefinite adjournment of the previously-scheduled hearing, Signature has instructed us to withdraw its motion by order to show cause for the appointment of a temporary receiver. Signature believes that alternate means of protecting its interests are available that may achieve its goal more efficiently and without the need for additional expedited discovery and motion practice that the continued prosecution of its motion would require.

However, Signature fully intends to continue prosecuting its case on the merits, and to prove that AOC is a fraudulent conveyee and/or an alter ego of the Judgment Debtors. To that end, Signature respectfully requests that a Rule 16 conference be scheduled at the Court's convenience so that the parties and the Court can establish a timetable for discovery and further motion practice.

I am available to discuss these matters at the Court's convenience.

Respectfully submitted,

John Oleske

cc:     David Antonucci, Esq.
Robert Hirsh, Esq.

FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

HP 4195937 v.1 #00406/0023 06/11/2008 12:01 PM

2 PARK AVENUE, NEW YORK, NY 10016 · TEL 212.592.1400 · FAX 212.592.1500 · www.herrick.com

EXHIBIT

Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SIGNATURE BANK,

              Plaintiff,    :         ORDER

        -against-     :    08 Civ. 3893 (NRB)(MHD)

AHAVA FOOD CORP. d/b/a NORTH
COUNTRY CHEESE CORP., et al.,  :

            Defendants.  :
--------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

USDC SONY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/12/08

    The Court having conducted a telephone conference on June 11, 2008 with counsel for the parties, it was ordered as follows:

    1. Plaintiff having requested leave to withdraw its pending motion for a preliminary injunction appointing a receiver, that request is granted and the motion is deemed withdrawn.

    2. If any of the defendants intend to seek relief in connection with the filing and the withdrawal of the plaintiff's motion, they are to serve and file that motion by no later than July 7, 2008.

    3. Those defendants who have been served and have not responded to the complaint are to do so by no later than July 7, 2008.

4. Plaintiff is to provide to defendants' counsel, by no later than June 12, 2008, copies of all proofs of service of the complaint. Counsel for the defendants are to notify plaintiff's attorneys by June 18, 2008 whether any defendants whom they represent and who have not yet been properly served will consent to the attorney accepting service of the summons and complaint.

5. If any party intends to amend a pleading, he is to do so, whether by stipulation or motion, by no later than July 7, 2008.

6. All fact discovery is to be completed by no later than September 30. 2008.

7. Plaintiff is to provide to defendants by October 15, 2008, its designation of expert witnesses and all of the other information required by Fed. R. Civ. P. 26(a)(2)(B). Defendants are to provide the equivalent information to plaintiff by no later than November 5, 2008. All remaining expert-witness discovery is to be completed by no later than November 19, 2008.

8. The parties are to submit a joint pre-trial order by no later than December 10, 2008 unless a potentially dispositive motion has been served and filed by that date.

Dated: New York, New York
        June 12, 2008

_____

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Order have been mailed today to:

David Feuerstein, Esq.
John Oleske, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

David Antonucci, Esq.
12 Public Square
Watertown, New York 13601

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard
Suite 510
Beverly Hills, California 90211

Lawrence Fox, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017

**EXHIBIT**

R



| | |
|---|---|
| April 23, 2008 | review notice of hearing from Oleske | .2 |
| | review/analyze email from Oleske | .2 |
| | telephone call with Commercial Division clerk | .2 |
| | telephone call with court clerk Tom Schiel | .3 |
| | telephone call with Fox | .2 |
| | telephone call with fox | .1 |
| | prepare email to Oleske | .3 |
| | review email from Fox to Oleske re: Exhibits | .1 |
| | telephone call with Commercial Division clerk | .3 |
| | telephone call with Ms. Nickerson | .5 |
| | prepare letter to court's secretary | .4 |
| | telephone call with Antonucci | .2 |
| | telephone call with Fox | .3 |
| | conference call with court, Fox and opposing counsel | .4 |
| | review email from Fox re: SDT motion | .1 |
| | review email from Fox to client | .1 |
| | telephone call with Fox | .4 |
| | review amended verified complaint, Oleske affirmation, and prepare for NY court hearing | 4.0 |
| | prepare second amended depo notice | .4 |
| April 24, 2008 | review email from client | .2 |
| | telephone call with Fox | .1 |
| | telephone call with Fox | .2 |
| | telephone call with Fox | .2 |
| | telephone call with Fox | .1 |
| | telephone call with client | .2 |
| | telephone call with Fox | .3 |
| | telephone call with Antonucci | .3 |
| | review/analyze email from Oleske with OSC | .4 |
| | review email from Antonucci | .1 |
| | conference call with Larry and Aaron | .8 |

 

telephone call from Antonucci .1
telephone call with Antonucci .4
telephone call with Fox .2
telephone call with Fox .3

telephone call with Fox .2

telephone call to Todd Robinson .2
telephone call to Aaron's voice mail .1

April 25, 2008  continue reviewing/analyzing documents and preparing fact memo 6.0
review email from Fox .1
telephone call to Fox's voice mail 1
review/analyze email from Oleske .2

review email from Oleske .1
review email from Feurstein .1
telephone call with client .3
telephone call from client .1
telephone message from Feurstein .1
telephone call with Fox .7
prepare email to Oleske .5
telephone calls with Aaron .2

prepare email to Oleske .5
telephone call from Robinson .1
review Fox email/memo re: 4/25/08 hearing .2

review/analyze letter from Mara Levin to Judge Buchwald .5
telephone call with Fox .3

April 28, 2008  review email from client .1
review email from Oleske .1
review email from client .1
prepare email to client .1
review email from Oleske .2
telephone call with Fox .2
review email from Fox .1
review email from Oleske .1
review email from Fox .1
review email from Oleske .1
review email from Rosner via Fox .1
telephone call with Karen, Judge Buchwald's secretary .2

telephone call with Fox .2
telephone call with court clerk Josh 3
telephone call with Antonucci .2
review email from Oleske .1
prepare email to Oleske .2
review/revise/rewrite Fox letter to court; multiple drafts; conversations with Fox

|  |  |  |
|---|---|---|
| review email from client | 3.3 |
| respond to email from client | .1 |
|  | .1 |
| April 29, 2008 | prepare for court hearing before Judge Buchwald | .5 |
| | telephone call with Aaron | .2 |
| review 4/29 Levin letter to court | .2 |
| review/analyze Antonucci letter to court and Bankruptcy OSC re: automatic stay to all defendants except Ahava CA | .3 |
| telephone call from Fox | .2 |
| review/analyze 4/29 Levin letter to court | .3 |
| conference call with Judge Buchwald, Feurtein, Levin, Eisenberg, Fox, and Antonucci | 1.2 |
| telephone call with Fox | .3 |
| telephone call with client | .2 |
| review judgment in first NY case | .2 |
| review Fox letter to Oleske re: SDT | .1 |
| review Fox letter/email to client | .1 |
| review client email | .1 |
| telephone call with Dan Weiner | .2 |
| telephone call with Oleske | .5 |
| telephone call with Antonucci | .3 |
| telephone call with Aaron | .2 |
| telephone call with Aaron | .1 |
| review email from client | .1 |
| review email from Oleske | .1 |
| telephone call with client | .1 |
| telephone call from Aaron | .1 |
| telephone call from Aaron | .2 |
| April 30, 2008 | client meeting | .1 |
| | telephone call with Todd Robinson | .2 |
| review/analyze Antonucci letter | .3 |
| review/analyze Eisenberg letter with attachments to Bankruptcy court | .3 |
| telephone call from Aaron re: possible injunction | .3 |
| telephone call from Aaron | .2 |
| review fax materials from Aaron, i.e. Signature Bank correspondence | .2 |
| telephone call from client | .1 |

HOURS BILLED AT $400.00 PER HOUR:

11.5

COSTS

| travel and mileage | .00 |
| photocopying | 33.00 |
| fax charges | 344.00 |
| postage | 3 .00 |
| messenger fee | .00 |
| telephone | 150.00 (Est) |
| filing fees | .00 |
| Lexis Search | .00 |
| process | |

TOTAL COSTS:          530 .00

CURRENT CHARGES:  

AMOUNTS OWING:  



## PROFESSIONAL CHARGES

| May 1, 2008 | Review email from client | .1 |
| | Send email to client | .1 |
| | Telephone call from Fox | .2 |
| | Telephone call with Antonucci | .3 |
| | Review email from Aaron | .1 |
| | Review email from client | .1 |
| | Prepare email to Oleske | .2 |
| | | |
| May 2, 2008 | Review email from Oleske | .1 |
| | Review email from Antonucci to Oleske | .1 |
| | Telephone call with Antonucci | .2 |
| | Telephone call with client | .1 |
| | Review email from Fox | .1 |
| | Conference call with Fox and Rosner | .2 |
| | Prepare email to Oleske | .3 |
| | Review email from Joel Rosner | .1 |
| | | |
| May 5, 2008 | Review email from Fox | .1 |
| | Prepare email to Fox | .1 |
| | | |
| May 6, 2008 | Review email from Rosner | .1 |
| | Prepare email to Rosner | .1 |
| | Prepare email to Fox | .1 |
| | Telephone call with Fox | .2 |

4.0

May 7, 2008 Telephone call with Fox — .1
Telephone call with Judge Buchwald clerk Josh from SDNY — .2

Telephone call with Antonucci — .1

Telephone call with Antonucci — .5
Telephone call with client — .1
Conference call with Fox and Rosner — .3
Prepare email to Fox — .1
Client meeting — .3
Review Assignment of Interest and Consent of Managing Member; revise fact memo — .3
Review/analyze letter from Mara Levin to Judge Buchwald — .6
Telephone call with client — .1
Prepare letter to Judge Buchwald in response to Mara Levin letter — 1.4
Prepare second letter to Judge Buchwald requesting pre motion conference — 1.5

May 8, 2008 Telephone call with Joel Rosner — .2
Telephone call with chambers of Judge Buchwald re: setting telephone conference — .2
Telephone calls to Antonucci's office and cell with substantive messages — .1

Telephone call with Fox — .3
Telephone call with Rosner — .2
Review email from Oleske — .2
Respond to email from Oleske — .2

Telephone call with chambers of Judge Buchwald re: setting telephone conference — .2
Review/analyze Mara Levin's 5/8 letter to the Court — .5
Prepare response letter to Court to Ms. Levin's letter — .8
Review email from Oleske — .2
Telephone call from Fox — .2
Prepare letter to Judge Buchwald — 1.8

May 9, 2008 Telephones call from Fox; conference call with Fox, Judge and opposing counsel — 2.2
Review notice from Levin re: inspection — .2
Review email from Fox — .1
Review email from Feurstein — .1
Review two emails between Oleske and Antonucci — .1

Telephone call from Fox — .3
Telephone with court clerk — .1
Telephone call to Reporter's office — .2

Telephone call to Feurstein — .2
Prepare email to Feurstein — .2
Review email from Fox — .1
Send email to Fox — .1
Telephone call with client — .1
Initial review of OSC — 2.5
Prepare proposed stand alone order to lodge with Judge Buchwald — 1.0
Prepare email to Fox — .3

18.5

Review email from Feurstein .1

Review Bloch, Oleske, and Levin decl    d motion
to strike    3.5

May 14, 2008  Review email from Antonucci    .1
Review email from Feuerstein    .1
Send email to Antonucci    .1
Send email to Feuerstein    .1

Re    .1
Send email to Feurstein and others    .2
Review email from Feuerstein    .1
Send email to counsel    .1
Review email from Feuerstein    .1
Send email to counsel    .1
Telephone call to Freidbauer's office    .1
Review/analyze email from client    .2
Review email from Feurstein    .1
Prepare email to Feurstein    .2

May 15, 2008  Telephone call from Robert Freibeur    .1
Telephone call to Freibaur    .2
Review/analyze letter from Judge Buchwald    .4
Review/analyze letter from Feuerstein to court    .5
Prepare letter to Judge Buchwald    1.0
Review letter from Feuerstein    .2
Continue preparing opposition to Bank's OSC    7.0

May 16, 2008  Review email from Rosner    .2
Telephone call to Rosner    .1
Short client meeting    .2
Review email from Fox    .1
Telephone call with Fox    .2
Prepare letter to court    .5
Review/analyze letter from Antonucci to Feurstein    .5
Prepare letter to Antonucci    1.0
Telephone call to Rosner    .1

Telephone call with client    .2

Review letter from Antonucci to court    .1
Review letter from Feuerstein to court    .2
Review letter from court    .1
Telephone call with Fox    .1
Continue preparing opposition to Bank's OSC    4.0



May 10, 2008
(Night)          Client meeting                                                                    .1

May 11, 2008
                 Review short email from Fox re: responsive pleading                               .2

                 Strategize                                                                        .3
                 Review Fox email re: expanded scope of new TRO language                           .2

                 Review Fox email re: ideas re: OSC and lengthy memo                              2.0
                 Legal research re: FRCP 65 and potential OSC re: TRO                               .5

                 Client meeting                                                                    .8
                 Send email to Fox                                                                 .2

May 12, 2008     Telephone call from client                                                        .1
                 Telephone call with Fox                                                           .2
                 Telephone call with Fox                                                           .2
                 Telephone call with Fox and Joel                                                  .1
                 Revise proposed order                                                             .2
                 Prepare letter to court                                                           .2
                 Review letter from Antonucci                                                      .2
                 Telephone call with Antonucci                                                     .2

                 Review email from client                                                          .1
                 Review email from client                                                          .1
                 Review email from client                                                          .1
                 Review email from client                                                          .1

May 13, 2008
                 Review letter from Antonucci to court                                             .2
                 Review/analyze letter from Feurstein to court along with Bank's proposed order    .5

                 Telephone call to chambers                                                        2
                 Read/analyze 5/8/08 bankruptcy transcript in Moshe Banayan proceeding, make notes in memo
                 re: pertinent portions, and make excepts                                         1.7
                 Read/analyze 5/9/08 USDC transcript in NY case                                   1.5
                 Prepare letter to Judge Buchwald                                                 1.3
                 Review letter from Herrick to court with attachment                               .1
                 Telephone call to chambers                                                        2
                 Prepare letter to court                                                           .2
                 Review email from Feurstein                                                       .1
                 Prepare email response to Feuertein                                               .2
                 Review email Doc Requests from Oleske and legal research re: response time        .5
                 Review email from Joel Rosner                                                     .1
                 Send email to Joel Rosner                                                         .2

                                                                                                  16.7



Telephone call with Rosner

HOURS BILLED AT $400.00 PER HOUR: 

## COSTS

| | |
|---|---|
| travel and mileage | .00 |
| photocopying | 25 .00 |
| fax charges | 83 .00 |
| postage | 5 .00 |
| messenger fee | 0.00 |
| telephone | 164.00 (Est) |
| filing fees | .00 |
| Lexis Search | .00 |
| process | |

**TOTAL COSTS:**      282.00

**CURRENT CHARGES :** 

**AMOUNTS OWING:** 

**REQUESTED ADDITIONAL RETAINER:** 1

**REQUESTED PAYMENT:** 



### PROFESSIONAL CHARGES

May 19, 2008  Review letter from Feuerstein                                                          .2
   Telephone call from client                                                         .1

   Telephone call with Rosner                                                          .3

   Review letter from Herrick to judge                                                 .5
   Telephone call with Fox                                                             1.5
   Telephone call with client                                                          .1
   Telephone call with client                                                          .1
   Telephone call with Rosner                                                          .1
   Telephone call with Rosner                                                          .1
   Telephone call with client                                                          .1
   Revise Moise declaration                                                            .3
   Revise Hirsh declaration                                                            .3
   Revise Faraborz declaration                                                         1.6
   Telephone call with client                                                          .2
   Send email to Rosner                                                                .2
   Review 5/14 email from client with attached 37 page appraisal of equipment dated 8/1/07   1.0



May 22, 2008  Review email from Antonucci                                                            .1
   Telephone call with Antonucci                                                       .4
   Telephone call from client                                                          .1
   Telephone call to client                                                            .1
   Telephone call to Fox                                                               .1
   Telephone call to chambers                                                          .1
   Review Feurstein email                                                              .1
   Prepare email to Feuerstein                                                         .1
   Review /analyze Antonucci letter                                                    .2
   Review/analyze Feurstein letter                                                     .2
   Prepare letter to court                                                             .4
   Prepare for court hearing                                                           .3
   Telephonic court hearing with Judge Buchwald                                        1.7
   Telephone call with client                                                          .2
   Telephone call with Fox                                                             .3

| | | |
|---|---|---:|
| | Strategize | .5 |
| | Prepare email to Antonucci | .4 |
| | Telephone call with Aaron | .3 |
| | Review email from court | .1 |
| | Prepare email to Rosner | .1 |
| | Review email from Rosner | .1 |
| | Prepare email to Rosner | N/C |
| | Prepare email to client | .2 |
| May 23, 2008 | Telephone call with Feurstein | 1.5 |
| | Review email from Antonucci | .2 |
| | Telephone call with Fox | .2 |
| | Prepare for conference call | .5 |
| | Conference call with Magistrate Judge | 2.5 |
| | Telephone call with client | .5 |
| | Review email from client | .1 |
| | Review email from client | .1 |
| | Review email from Feurstein | .1 |
| | Review email from Feurstein | .1 |
| | Telephone call with Feurstein | 1.0 |
| | Telephone call with Feurstein | .5 |
| | Telephone call with Feurstein | .2 |
| | Telephone call with client | .1 |
| | Telephone call with client | .1 |
| | Telephone call with client | .1 |
| | Telephone call with client | .1 |
| | Telephone call with Feurstein | .2 |
| | Review document demands and prepare responses thereto; revisions | 2.9 |
| | Conference call with Feurstein | .8 |
| | Prepare email to Feurstein | 2 |
| | Review email from Feurstein | .2 |
| | Review email from client re: M & I attachment letter from Mara Levin | .2 |
| May 24, 2008 (night) | | |
| | Prepare letter to Feuerstein | .4 |
| | Review email from client re: discovery | .2 |
| May 25, 2008 | Review email from client | .1 |
| | Telephone call with Feuerstein | .2 |
| May 26, 2008 | Review message from Feuerstein | .1 |
| | Review email from Feuerstein | .1 |
| | Prepare email to Feuerstein | .2 |
| | Telephone call with client | 2 |
| | Telephone call with Feurstein | .7 |

16.3

May 27, 2008 Prepare for court conference                                          .5
            Review letter from Feuerstein                                          .2
            Conference call with MJ Dollinger and opposing counsel                 .8
            Review email from Rosner                                               .1
            Telephone call from Dollinger's chambers                               .1
            Multiple Telephone calls with client                                   1.5
            Telephone call with Larry Fox re: document production                  .5
            Telephone calls with Robert Feinstein                                  1.0
            Review email from Feuerstein                                           .1
            Review/analyze court order                                             1.0
            Telephone conference with Feuerstein                                   .6

May 28, 2008 Review email from Feuerstein                                          .2
            ~~Conference call~~
            Client meeting                                                         1.0
            Conference call with client and Joel Rosner re: document production    .3
            Review/analyze Antonucci email dated 5/27                              .4
            Review multiple emails from Joel re: opposition to receivership motion .3
            Review letter from Feuerstein                                          .3
            Review email from Feuerstein                                           .1
            Telephone call with Feuerstein                                         .5
            Telephone call with client                                             .2
            ~~Telephone call with client~~
            Telephone call with client                                             .2
            ~~[redacted]~~

May 29, 2008 Telephone call with Rosner                                            .2
            Telephone call with Rosner                                             .2
            Prepare email to Feuerstein                                            .3
            Review email from Feuerstein                                           .1
            Telephone call with Rosner                                             .1
            Telephone call with client                                             .2
            Review/analyze proposed interim settlement offer re: receivership motion .4
            ~~Telephone call from client~~
            ~~Telephone call from client~~                                         .1
            Telephone call with Feuerstein                                         .4
            Review email from Feuerstein                                           .1
            Telephone call with Feuerstein                                         .2
            Telephone call with client                                             .2
            Telephone call with Feuerstein                                         .5
            Strategize re: [redacted]                                              .7
            Telephone call with client                                             .2
            Telephone call from Rosner                                             .1
            Telephone call with client                                             .3
            Telephone call with Rosner                                             .2
            Telephone call with client                                             .2
            Telephone call with client                                             .3
            Telephone call with Rosner                                             .2
            Telephone call with Feuerstein                                         .5
            Telephone call with client                                             .2
            ~~Telephone call from Rosner~~
            ~~[redacted]~~
            Telephone call with Feurstein re: documents and interpreter           .5

Telephone call to Rosner — .2

Telephone call with client — .3
Telephone call with client — .3
Review email from Feuerstein with depo notice — .2
Prepare email to Feuerstein — .2
Review/analyze Feuerstein email re: document production — 1.0
Review email from Feuerstein — .1
Prepare response email to Feuerstein — .3
Review email from Feuerstein — .1

May 30, 3008  Telephone call with Joel Rosner — .3
Review/analyze email from Rosner with lengthy attachment re: document production — .4

Review/analyze email from client sent yesterday — .2
Review/analyze email from Feuerstein sent late yesterday — .2
Review email from client — .2
Review email from client — .2
Review email from client — .3
Send email to Feuerstein — .5
Review letter to court from Oleske — .5
Telephone call from client — .1

Telephone call with Rosner — .3
Telephone call to MJ Dolinger's chambers — .2
Telephone call to Rosner — .3
Prepare letter to MJ Dolinger — 1.8
Review email from Antonucci — .1
Prepare email to Antonucci — .2
Review email from Oleske — .1
Telephone call from client — .1
Review email from Oleske — .1
Telephone call from Oleske — .1
Telephone call to Oleske — .1
Telephone call with Oleske — .2
Conference call with MJ Dollinger and Oleske — 1.0

Telephone call with client — .2

May 31, 2008
(night)
Review email from Feuerstein — .1
Prepare email to Feuerstein — .2
Review email from Antonucci — .1
Prepare email to Antonucci — .2
Client Meeting- Depo Prep — 1.5
Review/analyze 5/30 court order — .3

HOURS BILLED AT $400.00 PER HOUR: 

                                        COSTS

| | |
|---|---|
| travel and mileage | .00 |
| photocopying | 54.00 |
| fax charges | 122 .00 |
| postage | .00 |
| messenger fee | .00 |
| telephone | 75.00 (Est) |
| filing fees | .00 |
| Lexis Search | .00 |
| process | |

TOTAL COSTS:    251 .00

CURRENT CHARGES :

AMOUNTS OWING:



## PROFESSIONAL CHARGES

| | |
|---|---:|
| June 1, 2008 Client meeting, for depo prep | 2.5 |
| June 2, 2008 Defend Deposition of Fariborz Banayan; Travel; telephone call to Freidbauer | 8.5 |
|    Review email from Fox re: court order | .1 |
|    Review court order | .3 |
|    Review ███████████ | ███ |
| June 3, 2008 Telephone call to Freidbauer; start preparing Freidbauer declaration | .5 |
|    Telephone call with client | .2 |
|    Telephone call with Fox | .3 |
|    Review Oleske email to Rosner | .1 |
| ████████████████████████████████████████████████ | ███ |
| ██████████████ with attached exhibits in opposition to abstention motion ██████ | |
| ██████████████ | ███ |
|    Telephone call with client | .1 |
|    Telephone call to Feurstein's office | .1 |
|    Telephone call from client | .2 |
|    Telephone call to MJ Dolinger's chambers | .2 |
|    Telephone call with Feuerstein | .3 |
|    Prepare letter to Magistrate Judge Dolinger | 1.8 |
|    Telephone call with Freidbauer | .2 |
|    Telephone call with Joel Rosner | .1 |
|    Telephone call with Joel Rosner | .1 |
|    Telephone call with Manny Velez | .2 |
|    Telephone call with Freidbauer | .2 |
|    Telephone call with Freidbauer | .2 |
|    Prepare Freidbauer declaration | .7 |
|    Telephone call with Freidbauer | .2 |
| ████████████████████ and multiple email ██████████ | ███ |
|    Telephone call with client | .1 |
| ██████████████ | ███ |
|    Telephone call with MJ Dolinger's clerk | .1 |
|    Telephone call with Freidbauer; revise declaration | .4 |
|    Review email from Oleske | .1 |
|    Send email to Oleske | .1 |
|    Review email from Feuerstein | .1 |
|    Send email to Feuerstein | .1 |
|    Review email from Antonucci | .1 |
|    Send email to Antonucci | .1 |
|    Prepare for depo, session 2 of Fariborz | .5 |
|    Send email to Fox and Rosner | .1 |
|    Start preparing for Impairment Witness depo | 1.0 |
|    Telephone call from Rosner | .2 |

193

June 4, 2008  Defend Fariborz depo; travel                                              6.5

          Review email from Feuerstein's secy                                        .1
          Review /analyze letter from Feuerstein                                     .3
          Review email from Rosner and attached pro hac vice order                   .2
          Review email from Fox                                                      .1
          Send email to Fox                                                          .1

          Telephone call with Feuerstein                                             .3
          Telephone call with Freidbauer                                             .2
          Telephone call with Feuerstein                                             .3
          Telephone call with Feuerstein                                             .3
          Review email from Feuerstein with "Impairment Exhibits"                   1.3
          Review email from client                                                   .1
          Review email from Rosner                                                   .1
          Review email from client                                                   .1
          Review email from Joel                                                     .1
          Review emails from Antonucci and send return email                         .2

          Telephone call from Feuerstein                                             .2
          Telephone call from Feuerstein                                             .2
          Prepare for Gibbon Depo                                                   1.5
          Review letter from Fourstein re: depo transcripts and Friebauer depo       .3
          Review order re: depo transcripts and Friebauer depo                      .3
          Review order re: Impairment claim documents                                .1
          Review Feurstein letter re: document production                            .2
          Review first order from MJ Dolinger                                        .2
          Review second order from MJ                                                .2

          Review MJ Dolinger 6/5 order                                               .2

June 5, 2008  Take Gibbon Depo                                                          4.5
          Review email from Feurstein                                                .2
          Telephone call to Antonucci's office                                       .2
          Review Freidbauer tax return for address                                   .2
          Review court order re: Freidbauer depo and depo transcripts                .3
          Review email from Feuerstein                                               .1

June 6, 2008
          Telephone call with client                                                .2
          Telephone call from Rebecca Fisher                                         .2
          Telephone call from Freidbauer                                             .1
          Telephone call to Freidbauer                                               .1
          Telephone call from Freidbauer                                             .1
          Telephone call to Freidbauer                                               .1
          Telephone call with Rebecca Fisher                                         .1
          Telephone call with Joel Rosner                                            .1

          Telephone call with client                                                .2
          Telephone call from Freidbauer                                             .1
          Review order from Dolinger                                                 .3

| | | |
|---|---|---|
| | Telephone call to Freidbauer | .1 |
| | Telephone call with Feuerstein | .2 |
| | Prepare letter to Rebecca Fisher | .2 |
| | Prepare letter to MJ Dolinger | .3 |
| | ~~Telephone~~ | .5 |
| | ~~Review email from client and forward~~ | |
| | Prepare email to client | .2 |
| | Telephone call to Feuerstein | .7 |
| June 7, 2008 (night) | Prepare lengthy settlement email | .5 |
| | Telephone call with client | .3 |
| June 8, 2008 | Telephone call with client | .1 |
| | ~~Conference call with Moshe~~ | |
| June 10, 2008 (night) | Telephone call with client | .1 |
| | ~~email~~ | |
| | ~~from Antonucci~~ | |
| | Review email from court | .1 |
| | Review second email from court | .1 |
| | Review email from Antonucci re: court hearing | .2 |
| | Prepare email to client | .1 |
| June 11, 2008 | Review denial of Ahava CA request for non-consideration of Fariborz depo at receivership hearing | .1 |
| | Review/analyze 6/10 Antonucci letter to court | .2 |
| | Review/analyze 6/10 Oleske letter to court in response to Antonucci letter | .2 |
| | Review email from client | .1 |
| | Review voice mail message from client | .1 |
| | Review second email from client | .1 |
| | Telephone calls with client | .2 |
| | Telephone call from Antonucci's office | .1 |
| | Second telephone call with Antonucci's office | .1 |
| | Prepare email to Antonucci | .1 |
| | Conference call with court and Antonucci | .3 |
| | ~~Conference~~ | |
| | Review/analyze new court order | .3 |
| | Telephone call from Oleske | .3 |
| | Telephone call with Antonucci | .3 |
| | Prepare email to client | .3 |
| | Review /analyze letter from Oleske | .2 |
| | Review email from client | .1 |
| | ~~Telephone~~ | |
| | ~~Legal~~ | |
| | Telephone conference with MJ Dolinger, Antonucci, Oleske and Levin | .8 |
| | Conference call with client and Moshe | .2 |
| | ~~Conference~~ | |

7.3



 HOURS BILLED AT $400.00 PER HOUR:

COSTS

| | |
|---|---|
| travel and mileage | .00 |
| photocopying | 35.00 |
| fax charges | 154.00 |
| postage | .00 |
| messenger fee | .00 |
| telephone | 180.00 (Est) |
| filing fees | .00 |
| Lexis Search | .00 |
| FB Depo Transcripts | 1600.00 |

TOTAL COSTS:        1969.00

CURRENT CHARGES 

AMOUNTS OWING: 1



ROBERT W. HIRSH
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-274-8507; Facsimile: 310-275-4050

SETH EISENBERGER (SE-6769)
108 Airport Executive Park
Nanuet, New York 10954
Telephone: 845-426-3400; Facsimile: 845-426-3401

Attorneys for Defendant, Counter-claimant and Cross-claimant Ahava of California, LLC

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SIGNATURE BANK,                                        :
                                                       :
                          Plaintiff,                   :      08 Civ. 3893 (NRB)
                                                       :
        - against -                                    :
                                                       :
AHAVA FOOD CORP., LEWIS COUNTY DAIRY                    :
CORP., ST. LAWRENCE FOOD CORP. d/b/a PRIMO             :
FOODS, YONI REALTY, LLC, SCHWARTZ AND                  :
SONS QUALITY DISTRIBUTORS, INC., MOISE                 :
BANAYAN, ANA BANAYAN a/k/a CHANA                       :
BANAYAN, REBECCA BANAYAN a/k/a REBECCA                 :
BARIMYAN a/k/a REBECCA BANAYAN-                        :
LIEBERMAN, FARIBORZ BANAYAN a/k/a                      :
AARON BANAYAN, RUBEN BEITYAKOV,                        :
ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a               :
AHAVA NATIONAL FOOD DISTRIBUTOR                        :
and NORTH COUNTRY MANUFACTURING, and                   :
JOHN DOE COMPANIES 1 through 10                        :
                                                       :
                          Defendants.                  :
-------------------------------------------------------------------X

1

## DECLARATION OF LAWRENCE C. FOX

I, Lawrence C. Fox, declare:

1.       I am a partner in the law firm of Kornstein, Veisz, Wexler & Pollard, LLP, former local counsel for defendant, counter-claimant, and cross-claimant Ahava of California, LLC ("Ahava CA") in this case.  Each fact contained in this declaration is within my personal knowledge.

2.       This declaration is submitted in support of Ahava CA's motion for sanctions against plaintiff Signature Bank ("the Bank") and its attorneys.  I am the partner at my firm responsible for the work and billing on this case.

3.       From April 23, 2008 through June 5, 2008, our associate, Joel H. Rosner, and I spent significant time defending Ahava CA against the Bank's Order to Show Cause re: Preliminary Injunction and for Appointment of Receiver ("the Motion") which included: reviewing and analyzing the Motion; legal research; factual research; document review; assisting in the writing of Ahava CA's Opposition to the Motion; reviewing and assisting in the preparation of letters, faxes and emails; participating in telephonic court hearings; preparing for and attending document productions and depositions; and other tasks relating to opposing the Motion.  The chart below shows, by day, the number of hours that I ("LCF") and Mr. Rosner ("JHR") devoted to particular tasks in connection with the Motion, with the work descriptions taken verbatim from the bills.  All of this work and these hours were billed to Ahava CA.

2

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 4/23/08 - LCF | Read Order to Show Cause, new Complaint and Affirmation; e-mail re exhibits; phone conversation with Hirsh, Aaron re new papers; phone conversations with Hirsh re logistics and appearance on Order to Show Cause; research re receivership | 2.5 |
| 4/24/08 - LCF | Prepare for, and conference with Judge Freedman; research re receivership and related subjects; phone conversation with Hirsh to report on conference | 4.5 |
| 4/25/08 - LCF | E-mails Oleske re various issues; phone conversations with Aaron re Bank's attempts to get access at Beard Street; read Herrick e-mails; memo re hearing with Judge Freedman; read Herrick letter to Judge Buchwald | 2.5 |
| 4/28/08 - LCF | Work on letter to Judge Buchwald; phone conversations with Hirsh re same; work on revisions | 3.0 |
| 4/29/08 - LCF | Long phone conference with Judge Buchwald; phone conversations with Hirsh, Aaron re same | 2.0 |
| 5/08/08 - LCF | E-mails re new Order to Show Cause | .2 |
| 5/09/08 - LCF | Extended court conference with Judge Buchwald re TROs and follow-up conference with Hirsh and Aaron; extended phone conversation with Hirsh and conference with Rosner re strategy for opposition to receivership/injunction motion; intensive work on factual/legal outline for opposition; read Bank papers, including bankruptcy hearing transcripts; phone conversation with Adrian re problem at Lowville | 7.5 |
| 5/10/08 - LCF | Work on factual/legal outline for opposition to receivership/injunction motion; e-mail re issues on TRO relief | 4.5 |
| 5/19/08 - LCF | Review, annotate, Hirsh drafts of opposing papers on receivership/ injunction motion; extended phone conversation with Hirsh re revisions | 3.0 |

3

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 5/21/08 - LCF | Intensive work on revisions to brief opposing receivership/injunction; e-mails Hirsh re same; review discovery correspondence | 7.5 |
| 5/22/08 - LCF | Intensive work on revisions to brief opposing receivership/injunction; e-mails Hirsh re same; supervise filing | 5.5 |
| 5/27/08 - LCF | Phone conversation with Hirsh re discovery issues and Rosner participation in inspection and production | .3 |
| 5/09/08 - JHR | Meeting with Fox; telephone conference call with Rob Hirsh and Fox; review of Order to Show Cause papers and bankruptcy hearing; telephone conversation with Rob Hirsh; research re: New York Law Journal choice of law for alter ego and fraudulent transfer | 5.7 |
| 5/16/08 - JHR | Telephone conversation with Rob Hirsh; review of correspondence; research re: OSC for preliminary injunction and temporary receiver (fraudulent transfer, alter ego, etc.) | 3.9 |
| 5/19/08 - JHR | Research re: OSC for preliminary injunction and temporary receiver (fraudulent transfer, alter ego, etc.); review of draft papers for our opposition to the OSC (Declarations, Memo of Law, etc), assembling exhibits for oppositions; telephone conversations with Fox and Rob Hirsh | 4.0 |
| 5/20/08 - JHR | Research re OSC for preliminary injunction and temporary receiver (fraudulent transfer, alter ego, etc.), review of draft papers for our opposition to the OSC (Declarations, Memo of Law, etc), assembling exhibits for opposition; telephone conversations with Fox, Rob Hirsh, Robert Friedbauer and Fariborz Banayan | 6.8 |

4

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 5/21/08 - JHR | Research re OSC for preliminary injunction and temporary receiver (fraudulent transfer, alter ego, etc.); review of draft papers for our opposition to the OSC (Declarations, Memo of Law, etc.), assembling exhibits for opposition; telephone conversations with Fox, Rob Hirsh and Fariborz Banayan | 4.8 |
| 5/22/08 - JHR | Review of draft papers for our opposition to the OSC (Declarations, Memo of Law, etc.); preparation and filing of opposition | 5.3 |
| 5/29/08 - JHR | On-site inspection at AOC Brooklyn facility (110 Beard St); telephone conversation with Rob Hirsh and Fox | 11.9 |
| 5/30/08 - JHR | Review of correspondence; telephone conversation with counsel for Signature Bank, Rob Hirsh, and AOC personnel | 1.4 |
| 6/03/08 - JHR | Telephone conversations with plaintiff's counsel, Rob Hirsh and Esquire Reporting (deposition) | .6 |
| 6/04/08 - JHR | Telephone conversation with Rob Hirsh and David Feuerstein; review of documents and preparation for impairment of collateral deposition; Supplemental Declaration of Robert Friedbauer | 1.8 |
| 6/05/08 - JHR | Telephone conversation with Rob Hirsh; deposition re impairment of collateral | 5.6 |
| **TOTALS** | **LCF HOURS:  43** **JHR HOURS:  51.8** | |

4.      My time on this case has been billed to Ahava CA at the rate of $450 per hour.

Accordingly, for the 43 hours of my time itemized above, Ahava CA was billed $19,350.  Mr.

Rosner's time on this case has been billed to Ahava CA at the rate of $335 per hour.

Accordingly, for the 51.8 hours of Mr. Rosner's time itemized above, Ahava CA was billed

$17,353.  In addition, Ahava CA incurred costs advanced by my firm in connection with the

Motion and attendant tasks. These sums total $756.50, consisting of estimated duplicating costs

5

directly related to the Motion of $500, plus $256.50 in transcript fees. Ahava CA thus incurred a total of $37,459.50 in fees and costs from my firm in connection with its defense of the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in New York, New York, on July 2, 2008.

Lawrence C. Fox