Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Attorneys for Plaintiff
  Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

                              **Electronically-Filed Document**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SIGNATURE BANK,                      :

              Plaintiff,     :   **08 CIV. 3893 (NRB)**

                      :

        - against -     :

                      :

AHAVA FOOD CORP. d/b/a NORTH COUNTRY  :
CHEESE CORP., LEWIS COUNTY DAIRY CORP., :  **NOICE OF MOTION**
ST. LAWRENCE FOOD CORP. d/b/a PRIMO   :
FOODS, YONI REALTY, LLC, SCHWARTZ AND :
SONS QUALITY DISTRIBUTORS, INC., MOISE  :
BANAYAN, ANA BANAYAN a/k/a CHANA     :
BANAYAN a/k/a ANA BREZNITSKY, REBECCA :
BANAYAN a/k/a REBECCA BARIMYAN a/k/a  :
REBECCA BANAYAN-LIEBERMAN, FARIBORZ :
BANAYAN a/k/a AARON BANAYAN, RUBEN   :
BEITYAKOV, ARI KATZ, AHAVA OF         :
CALIFORNIA, LLC d/b/a AHAVA NATIONAL   :
FOOD DISTRIBUTOR and NORTH COUNTRY   :
MANUFACTURING, AQUENT LLC, BUSINESS  :
FUNDING ASSOCIATES LLC, and JOHN DOES 1 :
through 50,                     :

             Defendants.
------------------------------------------------------------- x

     **PLEASE TAKE NOTICE** that Plaintiff Signature Bank, by its attorneys Herrick,

Feinstein, LLP, shall move, before the Honorable Naomi Rice Buchwald , U.S.D.J., United

States Courthouse, Room 21A, 500 Pearl Street, New York, New York, 10007, for the entry of

an Order granting Plaintiff leave to amend its Amended Verified Complaint in the form of the proposed pleading attached hereto pursuant to F.R.C.P. 15(a)(2).

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, Plaintiff shall rely upon the this Notice of Motion, the attached proposed pleading, and the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Leave to Amend.

**PLEASE TAKE FURTHER NOTICE** that counsel for Plaintiff hereby requests oral argument.

Dated:    New York, New York
          July 7, 2008                    HERRICK, FEINSTEIN LLP

                                          By:_____
                                              Mara B. Levin
                                              David Feuerstein
                                              John Oleske
                                          2 Park Avenue
                                          New York, New York 10016
                                          Telephone:    (212) 592-1400
                                          Facsimile:    (212) 592-1500
                                          *Attorneys for Plaintiff Signature Bank*

Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.                                    **Electronically-Filed Document**
Attorneys for Plaintiff Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

SIGNATURE BANK,                                    :

                    Plaintiff,                     :        **08 CIV. 3893 (NRB)**

                                                   :
          - against -                              :

                                                   :
AHAVA FOOD CORP. d/b/a NORTH COUNTRY               :        **[PROPOSED]**
CHEESE CORP., LEWIS COUNTY DAIRY CORP.,            :        **SECOND AMENDED COMPLAINT**
ST. LAWRENCE FOOD CORP. d/b/a PRIMO               :
FOODS, YONI REALTY, LLC, SCHWARTZ AND              :
SONS QUALITY DISTRIBUTORS, INC., MOISE             :
BANAYAN, ANA BANAYAN a/k/a CHANA                   :
BANAYAN a/k/a ANA BERESNITZKY, REBECCA             :
BANAYAN a/k/a REBECCA BARIMYAN a/k/a               :
REBECCA BANAYAN-LIEBERMAN, FARIBORZ                :
BANAYAN a/k/a AARON BANAYAN, RUBEN                 :
BEITYAKOV, ARI KATZ, MIRIAM SCHWARTZ,              :
YEHUDA BANAYAN, AHAVA OF CALIFORNIA,               :
LLC d/b/a AHAVA NATIONAL FOOD                      :
DISTRIBUTOR and NORTH COUNTRY                      :
MANUFACTURING, AQUENT LLC, BUSINESS                :
FUNDING ASSOCIATES LLC, and JOHN DOES 1            :
through 50,                                         :

                    Defendants.
------------------------------------------------------------- x

          Plaintiff Signature Bank ("Signature" or "the Bank"), by its attorneys, Herrick,

Feinstein LLP, for its Second Amended Complaint against defendants alleges as follows:

### NATURE OF THE ACTION

          1.        This complaint seeks equitable and monetary relief arising from the

unlawful and fraudulent conduct of defendants, who have been engaged in a conspiracy to evade the $9.3 million judgment entered by this Court on March 14, 2008 (the "Judgment") against Moise Banayan, Ana Banayan, Ahava Food Corp. ("Ahava"), Lewis County Dairy Corp. ("Lewis County Dairy"), St. Lawrence Food Corp. ("St. Lawrence"), Yoni Realty LLC ("Yoni") and Schwartz and Sons Quality Distributors, Inc. ("Schwartz & Sons") (collectively referred to as the "Judgment Debtors") in a prior lawsuit (the "Initial Lawsuit").

2.    Roughly two months ago -- before this Court issued its Judgment awarding Signature over $9.3 million -- Moise Banayan stated under oath that the Judgment Debtors were earning on average "more than $160,000 in gross profit per week." Today, however, Mr. Banayan claims that the Judgment Debtors are no longer "active" and cannot satisfy the Bank's judgment.

3.    The reason for this is simple. From no later than December 1, 2007 to the present, Mr. Banayan and the other defendants have conspired to transfer the assets of the Judgment Debtors to Ahava of California, LLC (and perhaps other entities affiliated with Moise Banayan) in an effort to shield those assets from the Judgment Debtors' indebtedness to Signature which resulted in the Judgment.

4.    By Moise Banayan's own admission, the business once operated by the Judgment Debtors is now being operated solely by Ahava of California under the d/b/a of Ahava National Food Distributor and North Country Manufacturing. In furtherance of this scheme designed to deprive Signature of the collateral pledged in connection with the Judgment Debtors' indebtedness, defendants caused the Judgment Debtors to fraudulently assign virtually all of their accounts receivable and intangible property to Ahava of California.

5.    In fact, in March 2007, defendants caused the Judgment Debtors to assign,

2

*nunc pro tunc*, all of their registered trademarks to Ahava of California. And, in a further effort to evade this Court's Judgment, the Judgment Debtors, upon information and belief, effectively relinquished to Ahava of California (d/b/a Ahava National Food Distributor and North Country Manufacturing) for little or no consideration, all of their real and personal property, and all of their operations as a going concern -- including their office buildings, processing plants, delivery trucks, products, customer lists, and goodwill. The Judgment Debtors made these transfers pursuant to purported "leases," which in reality are only sham "paper" transactions, and which, even if made in exchange for valid consideration, violated the Judgment Debtors' security agreements with Signature.

6.      Upon information and belief, these fraudulent transfers and/or assignments were done for the sole purpose of allowing defendants to seamlessly continue the businesses of the Judgment Debtors while keeping the actual assets in the name of entities that were not named in the Initial Lawsuit.

7.      As a result of these fraudulent transfers, Ahava of California is purportedly the only "active company" left, and its reported revenues are now over $18 million. These annual sales figures closely resemble the Judgment Debtors' business in 2007 -- which should come as no surprise since Ahava of California has taken over the Judgment Debtors' businesses -- and is far greater than the $1 million in sales Ahava of California represented it was earning as late as February 7, 2008, and the roughly $378,000 in gross revenues Ahava of California declared on its 2006 tax return.

8.      While Ahava of California's business has rapidly grown without any legitimate explanation, Ahava of California has claimed -- in court papers and otherwise -- that it has absolutely no relationship to the Judgment Debtors. Yet, the evidence makes clear that

3

Ahava of California is, in fact, owned and/or controlled by Moise Banayan and serves as the

Judgment Debtors' alter ego.

9.    For example, the evidence adduced by Signature to date makes clear that:

(a)    **Moise Banayan and his brother co-own Ahava of California**.
Under the 2005 loan documents that Moise Banayan executed on
behalf of the Judgment Debtors, he unambiguously represented to
Signature that Ahava of California was an "affiliate non-obligor"
that he and his brother "owned". That representation was
confirmed in February and December of 2007, when Moise
Banayan (i) was identified as a "partner" in Ahava of California
(sharing 50% of the profits) on its Federal tax return; and (ii) told
Robert Bloch, a Senior Vice President of Signature, that he was a
partner in Ahava of California.

(b)    **Moise Banayan controls Ahava National Food Distributor (the
d/b/a of Ahava of California)**. In a 2006 OSHA decision, Mr.
Banayan was found to be the "president" of Ahava of California.
Mr. Banayan then confirmed this fact when he sent a letter to an
Ahava of California customer and represented to that customer that
he was the president of Ahava National Food Distributor (the d/b/a
for Ahava of California).

(c)    **Defendants treat Ahava of California and the Judgment
Debtors as effectively one in the same.** In addition to what is
described above, defendants shared office-space and a website
prior to Signature filing its lawsuit to enforce the judgment. Once
served with the complaint in this action, however, defendants (i)
represented that the Brooklyn office space once shared by the
Judgment Debtors and Ahava of California is now solely occupied
by Ahava of California, and (ii) shut down the website that was
shared by the Judgment Debtors and Ahava of California.

10.    While defendants have fraudulently transferred the Judgment Debtors'

assets to their alter ego, Ahava of California, defendants have engaged in other practices to

frustrate Signature's ability to enforce its Judgment.

11.    As one example, Ahava of California has pledged all of "its" assets to

third party factors in exchange for credit and/or financing. Upon information and belief, Ahava

of California presumably did not disclose to those factors that all of its assets were the proceeds

of fraudulent conveyances. As a result, Ahava of California has created a controversy over the priority of security interests between Signature and the third-party factors.

12.    Also defendants have repeatedly prevented Signature from exercising its contractual right under the loan documents to examine the Judgment Debtors' pledged collateral, thereby preventing Signature from conducting the due diligence required to sell those assets and satisfy its Judgment.

13.    Separately, neither the Judgment Debtors, nor their alter-ego Ahava of California, has paid Signature on approximately $2 million in overdrafts made on the Judgment Debtors' bank accounts with Signature, despite timely demand. Although Signature did not seek to recover these sums in the Initial Lawsuit, defendants' refusal to pay these amounts is consistent with their other attempts to evade their obligations to Signature.

14.    This fraudulent and impermissible conduct, coupled with the conduct described above, constitutes, among other things, breach of contract, conversion, fraud (both at common law and under New York's Debtor Creditor Laws) and a violation of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

15.    Indeed, defendants' scheme to shield the Judgment Debtors' assets through the purportedly "independent" Ahava of California is the culmination of the defendants' years-long pattern of deceit with respect to the financing and operation of their businesses. in connection with this scheme, defendants have committed dozens, if not hundreds, of the predicate acts listed in 18 U.S.C. § 1961, including, without limitation, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and transportation and receipt of stolen property (18 U.S.C. §§ 2314 and 2315). These violations of criminal law, committed in furtherance of defendants' scheme, continue

5

unabated to this day.

16.    Accordingly, Signature seeks an order (i) declaring that Ahava of California is an alter-ego of the Judgment Debtors, (ii) declaring that Signature's security interest in any collateral conveyed to AOC, and any of the proceeds thereof, is superior to the purported security interests of any third parties, (iii) rescinding all asset transfers, conveyances and/or assignments between the Judgment Debtors and any of the other named defendants, including but not limited to the trademark assignments and the sham leases, and (iv) awarding defendants damages, in an amount to be determined at trial but in no event less than $36 million plus reasonable attorneys' fees.

### THE PARTIES

17.    Plaintiff Signature Bank ("Signature" or "the Bank") is a New York banking corporation, with its principal place of business at 565 Fifth Avenue, New York, New York.

18.    Defendant Ahava Food Corp. d/b/a North Country Cheese Corp. ("Ahava Food") is a New York corporation, with its principal place of business at 110 Beard Street, Brooklyn, New York.

19.    Defendant Lewis County Dairy Corp. ("Lewis County Dairy") is a New York corporation, with its principal place of business at 7705 State Route 812, Lowville, New York.

20.    Defendant St. Lawrence Food Corp. d/b/a Primo Foods ("St. Lawrence') is a New York corporation, with its principal place of business at 30 Main Street, Ogdenburg, New York.

21.    Defendant Yoni Realty, LLC ("Yoni") is a New York corporation, with its

principal place of business at 110 Beard Street, Brooklyn, New York.

22.     Defendant Schwartz & Sons Quality Distributors, Inc. ("Schwartz & Sons") is a New York corporation with its principal place of business at 110 Beard Street, Brooklyn, New York.

23.     Defendant Ahava of California, LLC d/b/a Ahava National Food Distributor and North Country Manufacturing ("AOC") is a California Limited Liability Company, with its principal place of business at 908 Rose Avenue, Venice, California and offices at 236-280 Richard Street, Brooklyn, New York and/or 110 Beard Street, Brooklyn, New York.

24.     Defendant Moise Banayan is a resident of New York, with an address at 51 Parker Boulevard, Monsey, New York.

25.     Defendant Ana Banayan a/k/a Chana Banayan a/k/a Ana Beresnitzky is a resident of New York ("Ana Banayan"), with an address at 51 Parker Boulevard, Monsey, New York.

26.     Upon information and belief, defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman is a resident of New York, with addresses at 2606 East 24th Street, Brooklyn, New York, 205 Third Avenue, Apt. 2N, New York, New York and 215 East 96th Street, Apartment 40H, New York, New York.

27.     Defendant Fariborz Banayan a/k/a Aaron Banayan a/k/a Aaron Nanayan ("Fariborz Banayan") is a resident of California, with an address at 908 Rose Avenue, Venice, California.

28.     Defendant Ruben Beityakov is a resident of New York, with an address at 1977 East 22nd Street, Brooklyn, New York.

29.     Defendant Ari Katz is a resident of New York, with an unknown address and a place of business at 110 Beard Street, Brooklyn, New York.

30.     Upon information and belief, defendant Miriam Schwartz is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, Florida, and a place of business at 110 Beard Street, Brooklyn, New York.

31.     Upon information and belief, defendant Yehuda Banayan is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, and a place of business at 110 Beard Street, Brooklyn, New York.

32.     Defendant Aquent LLC is a Pennsylvania Limited Liability Company with its principal place of business at 711 Boylston Street, Boston, Massachusetts.

33.     Defendant Business Funding Services LLC is a New Jersey Limited Liability Company with its principal place of business at 100 Winston Drive, Suite 8FN, Cliffside Park, New Jersey.

34.     Defendants John Does 1 through 50 are, upon information and belief, fictitious trade names for the Corporate Defendants and/or the Judgment Debtors, or other individual co-conspirators in the fraudulent acts.

### JURISDICTION AND VENUE

35.     This Court has jurisdiction pursuant to pursuant to CPLR § 301, because plaintiff is a resident of this State.

36.     Venue in this county is proper pursuant to CPLR § 503, because plaintiff is a resident of this county.

8

**FACTUAL ALLEGATIONS**

*The Judgment Debtors Use Misrepresentations to*
*Secure Loans and Forbearances From Signature*

     37.    Since at least 1984, Moise Banayan has been operating an empire of businesses engaged in the kosher food business, under various iterations of the trade name "Ahava".

     38.    Beginning in August 22, 2005, and extending over the course of the following two years, Signature entered into a series of loan agreements with the Judgment Debtors, whereby Signature agreed to loan the Judgment Debtors approximately $9 million plus extend $2 million in overdrafts to finance their kosher food business. All of these loans were guaranteed personally by Moise Banayan, and some were personally guaranteed by his wife, Ana Banayan, and were further secured by security agreements giving Signature a first priority lien over substantially all of the assets of the Judgment Debtors, and liens on other assets of Moise and Ana Banayan, individually.

     39.    Signature agreed to make the original loans, and to subsequently extend additional credit and forbearances, based upon the misrepresentations by the Judgment Debtors of their assets and liabilities and the condition of their businesses, and due in part to their failure to disclose other indebtedness to third parties.

     40.    For example, in 2000, upon information and belief, Moise Banayan borrowed $4 million from an individual by the name of Isaac Chera pursuant to a "shtar" -- a form of IOU under Jewish law -- in order to refurbish and renovate the property owned by Yoni, which served as the headquarters for the Judgment Debtors' businesses. Upon information and belief, neither Moise Banayan, Ahava Food nor Yoni ever repaid the $4 million.

9

41.    Yet, in 2005, when negotiating the original loans, Moise Banayan used interstate wires and/or the U.S. Mail on repeated occasions to communicate with Signature with respect to the assets and liabilities of the Judgment Debtors, and the condition of their business and intentionally failed to disclose the $4 million loan borrowed from Isaac Chera which Moise Banayan had pledged a 49 percent interest in Yoni as collateral.

42.    Over the next two or so years, Moise Banayan negotiated forbearance agreements using interstate wires and/or the U.S. Mail and convinced Signature to extend the Judgment Debtors' time to pay, in exchange for additional guarantees and pledges of collateral.

43.    During one round of these negotiations, which occurred in the summer of 2007, Moise Banayan certified that he was the sole member of Yoni which owns defendants' Brooklyn headquarters to induce Signature to extend additional credit to the Judgment Debtors. (*See* Manager's Certificate of Yoni, annexed hereto as Exhibit A).

44.    While Mr. Banayan certified to Signature that he controlled 100 percent of the equity in Yoni, it turned out that that representation was false.  In fact, upon information and belief, Moise Banayan had transferred a 48.5 percent interest in Yoni roughly nine months earlier to an entity owned and/or controlled by Isaac Chera in order to satisfy all or portion of the $4 million obligation.  (*See* Stock Certificate identifying ISC 96 Beard LLC, annexed hereto as Exhibit B).

45.    In early 2007, a third-party judgment in excess of $600,000 was entered against some of the Judgment Debtors.  Although the loan documents unambiguously required the Judgment Debtors to inform Signature of this judgment, Moise Banayan instead concealed it, and fraudulently omitted them from his numerous communications with Signature through interstate wires and/or the U.S. mail to delay any default by the Judgment Debtors and any

10

foreclosure proceedings by the Bank.

46.     In fact, much like defendants have done here with Ahava of California, Moise Banayan and other Judgment Debtors attempted to frustrate the judgments against them by creating an alleged "independent" entity -- in this case, Schwartz & Sons -- that would be responsible for "distributing" the goods sold by the Ahava Food and Lewis County Dairy.

47.     At the time, Moise Banayan represented to Signature that Schwartz & Sons was owned by another, unrelated individual by the name of Miriam Schwartz, and was designated to sell Ahava Food products to the Hasidic community.

48.     Upon information and belief, Miriam Schwartz, who is married to Moise Banayan's nephew, Yehuda Banayan, with the knowledge and consent and at the direction of Yehuda Banayan, executed documents setting forth that she owned 100% of Schwartz & Sons in order to assist the Judgment Debtors with their scheme to defraud Signature Bank and other creditors of the Judgment Debtors.

49.     Indeed, shortly after this representation was made to the Bank, Schwartz & Sons became the primary distributor of the Judgment Debtors' products. Upon information and belief, the Judgment Debtors and their co-conspirators, Miriam Schwartz and Yehuda Banayan, were using Schwartz & Sons -- just like they are using AOC here -- as an "independent" entity to collect funds actually owed to the debtors to avoid having to pay under that third party judgment.

50.     In June 2007, however, in order for Moise Banayan to get further forbearance from the Bank, he represented to Signature that he was now the sole owner of Schwartz & Sons. At or around that time, much of the Judgment Debtors' receivables were going through Schwartz & Sons.

11

*The Judgment Debtors Default on their Loans and*
*Signature Obtains Its Judgment In the Initial Lawsuit*

51.     In August 2007, the Judgment Debtors and Signature entered into a series of forbearance agreements whereby, in exchange for extension of additional credit and deferral of the loans' due dates, Signature's security interests were expanded, the interest rates applicable to the Judgment Debtors' indebtedness were increased, and the overdrafts extended by Signature to the Judgment Debtors from time to time on their accounts were consolidated and added to the principal balance of the loans.

52.     After the August 2007 forbearance agreements, Signature continued to advance monies to the Judgment Debtors when their accounts had insufficient funds to cover checks and wires presented for payment thereby enabling the Judgment Debtors to maintain their credit with vendors and suppliers, and allowing the Judgment Debtors to remain in operation. Between August and November 2007, the Bank paid checks or wires that were presented to the Bank against the Judgment Debtors' accounts--in which there were insufficient funds to make payment--in an amount totaling approximately $1.8 million, exclusive of interest (the "Overdrafts").

53.     In November 2007, after the Judgment Debtors failed to pay the outstanding balance due on the loans and the Overdrafts, and stopped reporting and providing access to the books and records of the businesses, as they were required to do. Signature initiated the Initial Lawsuit against the Judgment Debtors in the Supreme Court for the State of New York, which sought an award of money damages in the amount of the unpaid loans, plus interest and costs. However, the Initial Lawsuit did not seek recovery of the Overdrafts made after the August 2007 forbearance agreements.

12

54.     In addition, in December 2007 and January 2008, Signature sent UCC 9-607 notices to many of the Judgment Debtors' customers (the names having been provided to Signature by Moise Banayan in connection with the loans) informing them of its first priority lien on substantially all of the Judgment Debtors' accounts receivable. Signature instructed the customers that all payments should be remitted to Signature, and not to the Judgment Debtors.

55.     On March 14, 2008, this Court granted summary judgment in the Initial Lawsuit to Signature and against all the Judgment Debtors (other than Ana Banayan) jointly and severally, in the amount of $9,338.962.18, and against Ana Banayan, individually, for $1,781,621.53.

56.     To date, the Judgment Debtors have refused to satisfy any portion of Signature's Judgment against them, and have refused to pay the Overdrafts. Instead, they have (i) interfered with Signature's ability to sell collateral under the UCC (as it has the right to do under the loan documents), and (ii) claimed that they are unable to satisfy the Judgment or pay the Overdrafts because they are no longer in operation.

***Defendants' Scheme to Evade the Judgment Unfolds***

57.     Upon information and belief, defendants knew long before this Court rendered the Judgment that the Judgment Debtors would be liable for over $11 million on account of the indebtedness under the loan documents and for the Overdrafts.

58.     In fact, defendants set their plan in motion months before the Judgment was entered as evidenced by a February 7, 2008 email from Moise Banayan to Amerisource Funding Inc. ("Amerisource"), a prospective lender, in which Moise Banayan confirmed that the businesses of the Judgment Debtors had been transferred to AOC in December 2007. Specifically, Moise Banayan stated:

13

Tanya,

Here is the corporate structure:

Today, as of December 1st 2007, there is only one active company: Ahava of California LLC which has tow [sic] DBA: Ahava National Food Distributor for the distribution center and North Country Manufacturing for the manufacturing end.

All invoices are generated by Ahava National Distributor or Ahava of California.

Historically

The distributor was Schwartz and Sons Quality Distributor, and Ahava of California LLC as well as Ahava Food Corp. The manufacturing end was Lewis County Dairy and St. Lawrence Food Corp.

Thanks Moshe.

(*See* Email dated February 7, 2008, annexed hereto as Exhibit C).

59.    Moise Banayan's comments are at odds with representations that he made to this Court that very same week, when he said in an affidavit filed in the Initial Lawsuit that "my companies" were on average, earning "more than $160,000 in gross *profit per week*" (*See* Affidavit of Moise Banayan, sworn to February 1, 2008, annexed hereto as Exhibit D, at ¶ 35) (emphasis added).

60.    Indeed, assuming that AOC is a wholly distinct entity from the Judgment Debtors (including Moise Banayan) -- as AOC has maintained -- Moise Banayan's companies, which were purportedly inactive, could not have been earning $160,000 in gross profits per week.

61.    On the other hand, if Moise Banayan owned or controlled AOC, as Signature believes to be the case, then Moise Banayan's February 2008 representations to this

14

Court might actually be truthful. In other words, his "companies" included AOC which was operating the business of the Judgment Debtors earning in excess of $160,000 gross profits per week.

62.    Whatever the case may be, it is clear that in or before December 2007, defendants began to engage in a scheme to transfer the Judgment Debtors' assets to AOC to avoid Signature's judgment. Defendants' scheme to avoid the Judgment is further evidenced by the following:

   *(1)*    *Delay, Delay, Delay*

63.    The loan documents make clear that Signature has the absolute right, after an Event of Default or non-payment, to "take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral." (*See* copy of Security Agreement dated August 27, 2007, annexed hereto as Exhibit E, at ¶ 8(h)).

64.    Notwithstanding this clear and unambiguous right, defendants have directed their employees to refuse Signature access to the property and premises where the pledged collateral resides.

65.    In fact, even as late as April 15, 2008, defendants refused Signature access to the facilities owned by the Judgment Debtors which have been fraudulently conveyed or leased to AOC.

66.    Defendants' tactics are designed to delay or frustrate altogether Signature's ability to rightfully take possession of its collateral.

67.    Similarly, Moise Banayan continues to correspond with Signature in an effort to stave off any action by Signature to foreclose on the collateral.

15

68.    Back in November and December 2007, Moise Banayan claimed that a "white knight" buyer and/or potential lending institutions had been located, and asked for various accommodations based on the benefits that would purportedly come to both parties if he was given time to negotiate.

69.    Upon information and belief, Moise Banayan made these statements with knowledge of their falsity, intending Signature to rely, while the defendants were engaged in transferring the Judgment Debtors' assets into the hands of AOC or other John Doe companies.

70.    Upon information and belief, Moise Banayan used interstate wires on at least seven separate occasions to further defendants' scheme with these emails. (*See* copies of emails between Moise Banayan and Signature, annexed hereto as Exhibit F).

(2)    *Diversion of the Judgment Debtors' Assets*

71.    While Moise Banayan and the Judgment Debtors were purportedly attempting to work out a solution to satisfy Signature, defendants were diverting the Judgment Debtors' assets to AOC.

72.    The assets included the Judgment Debtors' physical assets (such as the real property), trademarks, and accounts receivable, all of which were pledged as collateral for the Judgment Debtors' loans.    Thus, Signature has a right to those assets under the loan documents.

(a)    *Customer Lists and Accounts Receivable*

73.    As part of their plan to frustrate Signature's judgment, defendants arranged for the Judgment Debtors' customers to begin paying AOC for goods being manufactured by or that were purchased by the Judgment Debtors.

74.    For example, prior to the filing of the Initial Lawsuit, Moshes Discount

16

Supermarket in Brooklyn, was instructed to remit payments for goods sold and delivered to Schwartz & Sons, one of the Judgment Debtors. (*See* Invoice dated September 17, 2007, annexed hereto as Exhibit G).

75.     That account receivable, along with thousands of others, was pledged by the Judgment Debtors as collateral for the loans given by Signature.

76.     However, in December 2007, after it became clear that the Bank would seek legal redress, Schwartz & Sons instructed Moshes, by use of interstate wires and/or the U.S. Mail, to remit payment to "Ahava National" (the d/b/a of AOC), an entity that was not a defendant to the Initial Lawsuit. (*See* Invoice dated December 17, 2007, annexed hereto as Exhibit H.)

77.     It now appears, based on the email Moise Banayan sent Amerisource, that all of the Judgment Debtors' customers have been instructed by defendants, through the use of interstate wires and/or the U.S. Mail, to pay AOC on invoices issued, goods purchased for resale and/or products manufactured by the Judgment Debtors.

78.     Moreover, the fact that AOC has converted all of the Judgment Debtors' accounts receivable is separately confirmed by the fact that it provided a virtually identical list of accounts receivable to Amerisource in connection with its application for financing as Ahava Food had provided to Signature in connection with its request for forbearance.

      (b)     *Defendants' Nunc Pro Tunc Assignment*
            *of the Judgment Debtors' Trademarks*

79.     In addition to customer lists and accounts receivable, defendants caused the Judgment Debtors to transfer their trademarks to AOC.

80.     The trademarks, like the accounts receivable, were pledged by the

17

Judgment Debtors as collateral for the loans provided by Signature and Signature has a perfected UCC security interest in those trademarks.

81.     Nevertheless, on March 6, 2008, defendants used or caused the use of interstate wires and/or the U.S. Mail to transmit a request to the United States Patent and Trademark Office (the "USPTO") seeking an assignment *nunc pro tunc* to AOC of eleven different trademarks owned by Ahava Food.

82.     On March 7, 2008, the USPTO approved the request, and the assignment of the trademarks to AOC was recorded on the USPTO's internet-accessible database.  (*See* Abstracts of Assignment for each of the eleven trademarks reflecting their assignment *nunc pro tunc* to AOC, collected and annexed hereto as Exhibit I).

83.     The defendants' *nunc pro tunc* assignments of the Judgment Debtors' trademarks to AOC were critical to defendants' scheme.  Indeed, since these trademarks are the brand names by which the Judgment Debtors' customers know the Judgment Debtors' products, AOC had to own the marks in order to sell the Judgment Debtors' products without paying royalties to the Judgment Debtors (which would plainly be subject to Signature's liens).  Thus, defendants fraudulently conveyed the trademarks to AOC so the latter could seamlessly step into the business formerly operated by the Judgment Debtors.

84.     The defendants have attempted to retroactively legitimize the "sale" of the trademarks by producing a purported "agreement" between the Judgment Debtors and AOC, whereby AOC agreed to pay a debt owed by the Judgment Debtors to a third party.  (A copy of the trademark sale agreement is attached hereto as Exhibit J).  However, the "price" in the sale agreement bears no relationship to the actual value of the trademarks, which have never been formally appraised, but without which the business' value is significantly diminished.  Moreover,

18

the payments called for by the agreement were never did not flow to the Judgment Debtors, but rather, are to be made to another creditor of the Judgment Debtors who did not have a security interest in the trademarks. As such, the Judgment Debtors did not receive consideration for the trademarks that would allow the Judgment Debtors to compensate Signature for the loss of its collateral. Finally, in any event, the sale agreement itself was in direct violation of the Judgment Debtors' security agreements, which prohibit any such transfers:

> ...no Grantor will create or assume or permit to exist any...lien, security interest or other encumbrance, made or asserted in writing against the Collateral...other than Permitted Encumbrances.

[Exhibit E at p.2]

The "sale" of the trademarks is not a "Permitted Encumbrance" under the Security Agreement.

85.    The trademark "sale" to AOC was plainly intended to transfer valuable collateral securing Signature's loan to  the Judgment Debtors, interfering with Judgment Debtors' ability to sell the business and substantially reducing the value of the business which is dependent on ownership of the trademarks in order to sell Ahava Food products.

### (c)    Defendants' Assignment of the Judgment Debtors' Physical Assets

86.    In addition to transferring the Judgment Debtors' accounts receivable and trademarks, defendants caused possession and/or title to all of the Judgment Debtors' physical assets and operations to be transferred to AOC pursuant to a series of sham leases which, like the trademark sale agreement, directly violate the Judgment Debtors' August 27, 2007 Security Agreement with Signature. (Copies of the leases conveying the Judgment Debtors premises and equipment are collected and attached hereto as Exhibit K).

87.    Specifically, the Judgment Debtors' Brooklyn headquarters, and their two

19

upstate dairy plants, are now admittedly occupied solely by AOC, pursuant to purported lease and sublease agreements between the Judgment Debtors and AOC. Under one lease, AOC is subleasing the Judgment Debtors' Brooklyn distribution facility, although the purported lease does not identify how much AOC is supposedly obliged to pay in exchange for the use of all the equipment, employees, and ongoing operations that were being conducted by the Judgment Debtors at that location. Likewise, AOC is leasing the upstate dairy plants from LCD and St. Lawrence, for $12,000 and $15,000 per month, respectively. And, as with the Brooklyn facility, the purported leases have effectively turned over the Judgment Debtors' entire business at those locations to AOC. Thus, in exchange for these "leases" of the Judgment Debtors' business, which purportedly made approximately $18 million in sales in 2007, AOC is supposedly obliged to pay the Judgment Debtors a grand total of $27,000 per month.

88.    As shown above, the August 27, 2007 Security Agreement between Signature and the Judgment Debtors preclude any encumbrances on the Collateral, including the leases at issue here. As such, the purported leases represent a knowing and intentional violation of the security agreements through a series of fraudulent conveyances meant to evade the Judgment and the Judgment Debtors' other obligations to Signature.

***Macabee Food Corp.***

89.    The full story of defendants' attempt to frustrate their judgment creditors, including Signature, through the creation of alter-egos is well documented in their relationship with Macabee Food Inc. ("Macabee").

90.    In that case, Macabee was being billed by Ahava Food as late as April 13, 2007 for "Golan Part Skim Mozzarella", whose "Item Code" was 1711, and whose UPC was 720742691488. (*See* Invoice from Ahava Food to Macabee, dated April 13, 2007, annexed

20

hereto as Exhibit L).

91.    Then, on April 18, 2007 -- after Moise Banayan caused Schwartz & Sons to be used as the billing vehicle to avoid other judgment creditors -- Macabee received a letter from Ahava stating it was now using "Schwartz & Sons . . . to enhance our distribution." This letter was signed by Defendant Ari Katz as Director of Operations for Ahava Food (*See* Letter from Katz to Macabee dated April 18, 2007, annexed hereto as Exhibit M).

92.    Shortly thereafter, Macabee was invoiced by Schwartz & Sons. (*See* Invoice from Schwarts (sic) & Sons to Macabee, dated July 16, 2007, annexed hereto as Exhibit N).

93.    By November 2007, however, -- at or around the time the Judgment Debtors decided to stop making payments on their loans to Signature and began their fraudulent scheme -- Macabee started to receive invoices from AOC, for the exact same product it had originally purchased from Ahava in April 2007, *i.e.*, "Golan Part Skim Mozzarella", with an "Item Code" of 1711, and UPC of 720742691488. (*Compare* Invoice from AOC dated November 14, 2007, annexed hereto as Exhibit N, *with* Exhibit L).

94.    In order to explain to Macabee (and its other customers) the recurring change in payees, Defendant Ari Katz, who had previously sent a letter to Macabee on behalf of Ahava Food as its Director of Operations, sent a letter to Macabee now on behalf of Ahava National (the d/b/a for AOC), actually claiming that the switch from Schwartz & Sons was made because of "[t]he level of service and [because] customer service has been lacking"—despite the fact that the "service" was being performed by the same workers, whether their nominal employer was Ahava Food, Schwartz & Sons, or AOC. (*See* undated letter from Defendant Ari Katz, annexed hereto as Exhibit O).

21

95.    In other words, defendants' interactions with Macabee illustrate that defendants have long been engaged in a game of "Three Card Monty", all in an attempt to frustrate judgment creditors (like Signature) and continue their business unabated.

**Defendants' Dun & Bradstreet Report Makes Clear
that AOC is a Fraudulent Transferee**

96.    Prior to the initiation of this lawsuit, the Judgment Debtors had always represented to Signature that AOC was a small company, with little revenue to speak of. Moise Banayan testified under oath that he owned AOC and that it was essentially a "shell" company with no employees.

97.    AOC's 2006 Federal Income Tax returns, states that AOC's "gross receipts or sales" were merely $378,410. (*See* AOC 2006 tax return, annexed hereto as Exhibit P).

98.    As recently as February 7, 2008, AOC had reported that it had two employees and annual sales worth just $1 million. (*See* Dun & Bradstreet Report dated February 7, 2008, annexed hereto as Exhibit Q).

99.    Yet, two months later, by contrast, AOC's listing on Dun & Bradstreet, as amended by defendant Ruben Beityakov, reflects $18 million in annual sales revenue and a payroll of 150 employees. (*See* Dun & Bradstreet report dated April 22, 2008, annexed hereto as Exhibit R).

100.    These numbers further establish that AOC has now assumed the businesses of the Judgment Debtors. Indeed, the $18 million in revenue and 150 employees are numbers that closely approximate the figures applicable to the Judgment Debtors' business in the year 2007 (based upon current weekly sales figures provided by Moise Banayan).

101.    And since, upon information and belief, AOC never paid any consideration for the Judgment Debtors' businesses, the Dun & Bradstreet report confirms that AOC is a fraudulent transferee.

***Additional Evidence Makes Clear That***
***AOC is an Alter Ego of the Judgment Debtors***

102.    The documentary evidence also shows that AOC is an alter ego of the Judgment Debtors and is dominated and controlled by Moise Banayan.

103.    Specifically:

(a)    In the Master Credit Facility Agreement between the Judgment Debtors and Signature, the Judgment Debtors admitted that AOC was an affiliate of the Judgment Debtors and was owned by Moise and Fariborz Banayan. (*See* Schedule 3.11 of the Master Credit Facility Agreement dated August 22, 2005, annexed hereto as Exhibit S).

(b)    In a March 2007 email, Moise Banayan admitted to Signature that he was prepared to sell "**our** California operations" (*See* Email from Moise Banayan to Robert Bloch of Signature dated March 29, 2007, annexed hereto as Exhibit T), and has further admitted that AOC took over the businesses of the Judgment Debtors (*see* Exhibit C).

(c)    In AOC's 2006 tax returns, Moise Banayan is listed as a partner with a 50% ownership share. (*See* Exhibit R).

(d)    On or about December 23, 2007, Moise Banayan sent a letter to a customer that identifies him as the president of Ahava National. (*See* Letter from Moise Banayan to Rabbi Lasker dated December 23, 2007, annexed hereto as Exhibit U).

(e)    The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists Ahava National Food Distributor's principal location as 110 Beard Street, the very same address of Judgment Debtors, Ahava Food, Schwartz & Sons and Yoni. (*See* Certificate of Assumed Name annexed hereto as Exhibit V).

23

(f)     The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists North Country Manufacturing's principal location as 7705 State Route 812, Lowville, NY, the very same address of Judgment Debtor Lewis County Dairy. (*See* Certificate of Assumed Name annexed hereto as Exhibit W).

(g)     Moise Banayan lists the address for Ahava National on a letter sent to a customer as 236-280 Richard Street, Brooklyn, NY 11231, the same address as Ahava Food, Schwartz & Sons and Yoni. (*See* Exhibit X).

(h)     AOC's offices are also variously listed as located either at 236-280 Richard Street, Brooklyn, NY -- an address for a building that also bears the 110 Beard Street address (*see* Exhibit O) or 96 Beard Street, Brooklyn (in the New York Department of State Register), which also bears the 110 Beard Street address, the home of Ahava Food and the other Judgment Debtors, Schwartz & Sons and Yoni.

(i)     A 2006 decision from an OSHA proceeding relating to the Judgment Debtors' operations in upstate New York identifies the owner of AOC as Moise Banayan. (*See* Decision, annexed hereto as Exhibit Y.)

(j)     Defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman, in her capacity as Office Manager, signed and certified the AOC's Limited Liability Statement filed with the State of California (*see* Limited Liability Statement, annexed hereto as Exhibit A), and was listed, until only weeks ago, as Sales Manager/Special Accounts on the now defunct website of Ahava Food. (*See* website contents, annexed hereto as Exhibit AA).

104.     Separate and apart from this evidence, the online Superpages directory lists AOC as having the same website as Ahava Food, www.ahavafoodcorp.com. (*See* Listing attached hereto as Exhibit BB).[1]

105.     Notably, the website instructed customers of Ahava Food to contact Aaron Banayan (a/k/a Fariborz Banayan) with respect to sales of Ahava Foods' products in California.

The website did not identify Aaron Banayan as operating a separate company called AOC, nor did it inform customers that they would be dealing with that company, and not Ahava Foods, if they wished to buy kosher dairy foods in California. (*See* Exhibit Z).

106.   Put simply, AOC is the Judgment Defendants' alter ego.

**AOC is an Ongoing Corrupt Enterprise,**
**All of Whose Income and Assets Belong to Signature**

107.   Now that defendants have transferred -- albeit fraudulently -- the assets of the Judgment Debtors, they are using that alter-ego to launder the Judgment Debtors' assets as quickly as possible, in order to allow defendants to abscond with whatever liquid capital can be extracted.

108.   Indeed, virtually every time AOC transacts business, it is dealing in stolen property (*i.e.*, the property that was fraudulently transferred to it by the Judgment Debtors). Thus, every time defendants receive compensation, income or reimbursement from AOC, they are knowingly receiving stolen property.

109.   Signature has thus far identified at least six separate instances in which defendants have used, or caused to be used, interstate wires or the U.S. Mail, to instruct customers to send AOC the proceeds from AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' scheme to evade the Judgment.

110.   The Judgment Debtors' customers from whom such payments have been fraudulently solicited through interstate wires and/or the U.S. Mail include Agriprocessors South, Altra Food Distribution, GMY Gourmet Food, Twin City Poultry, Macabee Foods and Moshe's Discount Supermarket, with at least one solicitation directed at each customer.

---

[1] Since the first complaint in this action was filed on April 2, 2008, the www.ahavafoodcorp.com website has been deactivated. Upon information and belief. defendants used, or caused to be used, interstate wires and/or the U.S.

25

111.    To be sure, these invoices reflect AOC's collection of money owed to the Judgment Debtors because they reference products bearing the trademarked brand names that were purportedly "assigned" by the Judgment Debtors. (*Compare* invoices included in Exhibits H and O reflecting sales of products bearing brand names "New Square" and "Golan" *with* Abstracts of Assignment for those trademarks included in Exhibit I).

112.    In addition, these customers are being told that if they adhere to the instructions from Signature to remit payment to Signature rather than the Judgment Debtors or any company affiliated with the Judgment Debtors, they will not be provided any additional product from AOC and will remain liable for their existing invoices.

113.    Upon information and belief, defendants are continuing to use, or causing to be used, interstate wires and/or the U.S. Mail to solicit payments from customers in connection with AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' fraudulent scheme to evade the Judgment.

114.    Furthermore, AOC has pledged all of its assets (in which Signature has a perfected UCC security interest properly belong to Signature) to two third-party factors, defendants Aquent LLC ("Aquent") and Business Funding Associates, LLC, ("BFA") in exchange for financing.    (Copies of UCC filings reflecting the pledge of assets to Aquent and BFA are collected and attached as Exhibit CC).    Because Signature has a perfected security interest in all of the assets transferred by the Judgment Debtors to AOC, these third-party factoring agreements are in violation of the Judgment Debtors' August 27, 2007 Security Agreement.    AOC's pledge of its assets has further frustrated Signature's attempt to recover its security, by clouding the issue of the existence and priority of the respective parties' security

---

Mail to transmit instructions to the Judgment Debtors' web hosting company to deactivate the website.

interests. Indeed, as a result of AOC's actions, there now exists a justifiable controversy between Signature, on the one hand, and AOC, Aquent, and BFA on the other hand, as to which parties hold a superior security interest in AOC's assets.

115.    The defendant's fraudulent conduct, the conveyance of assets in violation of the security agreements, and the alter-ego status of AOC all require that Signature be accorded a first priority security interest in all of AOC's assets, which represent either Collateral directly and fraudulently conveyed to AOC, or else proceeds derived from the use of those fraudulently conveyed assets, which must be considered part of the Collateral pursuant to the Uniform Commercial Code.

116.    The proceeds being reaped by AOC as a result of their fraudulent takeover of the Judgment Debtors' business, and AOC's continuing use of the Judgment Debtors' going-concern operations, there are the fruits of defendants' unlawful conduct.

117.    Upon information and belief, and to an extent known only to defendants, certain Judgment Debtors and non-Judgment Debtor defendants, including Moise Banayan, Ana Banayan, Aaron Banayan, Rebecca Banayan a, Ruben Beityakov, Ari Katz, Miriam Schwartz and Yehuda Banayan, have each, at least once, knowingly received proceeds of this criminal enterprise, whether in the form of salary, consulting fees, shareholder distributions, dividends, expense reimbursements, or otherwise, and have, upon information and belief, received each tranche of said proceeds into personal bank accounts controlled either by one or more of the defendants.

***Damages to Signature and Requested Relief***

118.    As a consequence of defendants' ongoing criminal conspiracy, and the extensive fraudulent conveyance of the Judgment Debtors' assets that is at the center of that

conspiracy, Signature's attempts to enforce its judgment against the Judgment Debtors have been frustrated, and the value of its collateral is being imperiled, if not actually damaged.

119.    Defendants' continued operation of the fraudulently-conveyed kosher food business of the Judgment Debtors threatens to destroy or impair the Bank's right to execute upon the collateral pledged to Signature, whether through mismanagement, abandonment, conversion, tarnishment of the Judgment Debtors' valuable trademarks, or otherwise.

120.    Signature, therefore, requests the following relief:

- Rescission of the fraudulent conveyances of the Judgment Debtors' business to AOC;

- Transfer of the conveyed assets directly to Signature;

- Declaratory judgment that AOC is an alter-ego of the Judgment Debtors and the Individual Defendants;

- Declaratory judgment that Signature's security interests in AOC's assets are superior to that of any other party;

- Compensatory damages resulting from the Judgment Debtors' failure to make payment to Signature on account of the Overdrafts in breach of the loan agreements;

- Accounting of all of the books, records, and other financial information of all of the corporate defendants; and

- Compensatory and punitive damages on account of the  RICO violation and other wrongdoing (tripled pursuant to the RICO statute) and reasonable attorneys' fees.

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFEDANTS

### (RICO: Violation of 18 U.S.C. § 1962(a))
### (Use of Racketeering Income to Acquire an Interest in or to Establish or Operate an Enterprise Engaged in or Affecting Interstate Commerce)

121.    Signature repeats and realleges paragraphs 1 through 119 above, as if set forth here in full.

122.    Income received by defendants from the Judgment Debtors and/or Ahava

28

of California was derived from a pattern of racketeering activity.

123.    Defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate Ahava of California.

124.    Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate an enterprise-in-fact consisting of all of the defendants.

125.    The predicate acts committed by defendants as part of a pattern of racketeering activity include:

      (a)    Mail Fraud (18 U.S.C. § 1341)

      (b)    Wire Fraud (18 U.S.C. § 1343)

      (c)    Bank Fraud (18 U.S.C. § 1344)

      (d)    Money Laundering (18 U.S.C. § 1956)

      (e)    Transportation of Stolen Property (18 U.S.C. § 2314)

      (f)    Receipt of Stolen Property (18 U.S.C. § 2315)

126.    Ahava of California is a business engaged in and/or affecting interstate commerce.  Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

127.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce.  Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

128.    Defendants' use of income derived from a pattern of racketeering activity

to acquire an interest in or establish or operate Ahava of California has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of enforcing its Judgment against the Judgment Debtors.

129.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. §1962(a) described above.

130.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(b))
### (Use of Racketeering Income to Acquire or Maintain an Interest in an Enterprise Engaged in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)

131.    Signature repeats and realleges paragraphs 1 through 129 above, as if set forth here in full.

132.    Income received by defendants from the Judgment Debtors and/or Ahava of California was derived from a pattern of racketeering activity.

133.    Defendants used income received from the Judgment Debtors and/or Ahava of California to acquire or maintain an interest in Ahava of California through a pattern of racketeering activity.

134.    Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to acquire or maintain an interest in an enterprise-in-fact consisting of all of the defendants through a pattern of racketeering activity.

135.   The predicate acts committed by defendants as part of a pattern of racketeering activity include:

      (a)   Mail Fraud (18 U.S.C. § 1341)

      (b)   Wire Fraud (18 U.S.C. § 1343)

      (c)   Bank Fraud (18 U.S.C. § 1344)

      (d)   Money Laundering (18 U.S.C. § 1956)

      (e)   Transportation of Stolen Property (18 U.S.C. § 2314)

      (f)   Receipt of Stolen Property (18 U.S.C. § 2315)

136.   Ahava of California is a business engaged in and/or affecting interstate commerce.  Upon information and belief, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

137.   Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce.  Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

138.   Defendants' use of income derived from a pattern of racketeering activity to acquire or maintain an interest in Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

139.   Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. §1962(b) described

above, plus reasonable attorneys' fees.

140.    Signature respectfully requests a judgment against the Judgment Debtors

for compensatory damages in an amount to be determined at trial, and for punitive damages in

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c), plus

reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(c))
### (Use of Racketeering Income to Conduct or Participate in Conducting an Enterprise
### Engaged in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)

141.    Signature repeats and realleges paragraphs 1 through 139 above, as if set

forth here in full.

142.    Income received by defendants from the Judgment Debtors and/or Ahava

of California was derived from a pattern of racketeering activity.

143.    Defendants used income received from the Judgment Debtors and/or

Ahava of California to conduct or participate in conducting Ahava of California through a

pattern of racketeering activity.

144.    Alternatively, defendants used income received from the Judgment

Debtors and/or Ahava of California to conduct or participate in conducting an enterprise-in-fact

consisting of all of the defendants through a pattern of racketeering activity.

145.    The predicate acts committed by defendants as part of a pattern of

racketeering activity include:

    (a)    Mail Fraud (18 U.S.C. § 1341)

    (b)    Wire Fraud (18 U.S.C. § 1343)

    (c)    Bank Fraud (18 U.S.C. § 1344)

(d)    Money Laundering (18 U.S.C. § 1956)

(e)    Transportation of Stolen Property (18 U.S.C. § 2314)

(f)    Receipt of Stolen Property (18 U.S.C. § 2315)

146.    Defendants' pattern of racketeering is open-ended and ongoing, and poses the threat of continuing criminal conduct.

147.    Ahava of California is a business engaged in and/or affecting interstate commerce. Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

148.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce. Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

149.    Defendants' use of income derived from a pattern of racketeering activity to conduct or participate in conducting Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

150.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(c) described above.

151.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in

33

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(d))
### (Conspiracy to Violate RICO)

152.    Signature repeats and realleges paragraphs 1 through 150 above, as if set forth here in full.

153.    Each of defendants agreed with at least one of the other defendants to commit acts and/or omissions in furtherance of a common conspiracy to violate 18 U.S.C. § 1962.

154.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(d) described above.

155.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 273-a)

156.    Signature repeats and realleges paragraphs 1 through 154 above, as if set forth here in full.

157.    The conveyances made by the defendants of the Judgment Debtors' assets to Ahava of California, whether by lease, sale or otherwise, were made without fair consideration.

158.    At the time of certain of the conveyances, the Judgment Debtors were indebted to Signature, were defendants in an action for money damages or were debtors in the Judgment in such action that had been docketed against them.

159.    A final judgment has been rendered against the Judgment Debtors that remains unsatisfied.

160.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets belonging to the Judgment Debtors to Ahava of California, and directing Ahava of California to transfer all such assets directly to Signature.

## SIXTH CLAIM FOR RELIEF
## AGAISNT THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 276)

161.    Signature repeats and realleges paragraphs 1 through 159 above, as if set forth here in full.

162.    At the time of the conveyances, the Judgment Debtors knew that they owed a debt to Signature and that Signature was making efforts to collect its debts from the Judgment Debtors.

163.    The conveyances made by the Judgment Debtors to Ahava of California were made with the actual intent to hinder, delay, and defraud Signature.

164.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets to Ahava of California belonging to the Judgment Debtors, and directing the defendants to transfer all such assets directly to Signature.

## SEVENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Common-Law Fraud)

35

165.    Signature repeats and realleges paragraphs 1 through 163 above, as if set forth here in full.

166.    By failing to disclose the conveyances from the Judgment Debtors to Ahava of California, the defendants made material omissions of fact.

167.    Defendants' omissions constituted false representations of material facts.

168.    Defendants intended for Signature to rely on their fraudulent omissions.

169.    Signature has, in fact, reasonably and justifiably relied on defendants' fraudulent omissions to its detriment.

170.    Signature has been damaged by its reliance on defendants' omissions, in that it has been deprived of its ability to foreclose and/or collect on the collateral pledged to it under the Judgment Debtors' loans.

171.    Signature respectfully requests a judgment against defendants for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million.

## EIGHTH CLAIM FOR RELIEF
## AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Declaratory Judgment)

172.    Plaintiff repeats and realleges paragraphs 1 through 170 above, as if set forth here in full.

173.    Ahava of California is completely dominated and controlled by Moise Banayan and some or all of the other Judgment Debtors.

174.    Ahava of California is being used, and has been used in the past by the defendants as a successor-in-interest to the Judgment Debtors' business, despite the fact that

36

Ahava of California has been paid no consideration whatsoever.

175.     Signature respectfully requests that the Court enter a declaratory judgment stating that Ahava of California is an alter ego of the Judgment Debtors.

## NINTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Conversion)

176.     Plaintiff repeats and realleges paragraphs 1 through 174 above, as if set forth here in full.

177.     Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the defendants.

178.     Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the individual defendants, which property was acquired by the individual defendants from any of the corporate defendants.

179.     Defendants' possession of said property is unauthorized.

180.     Defendants have acted to exclude the rights of Signature over said property.

181.     To the extent that said property includes money, it is specifically identifiable as that money derived from the unlawful operations and activities of the corporate defendants, and is subject to an obligation to be returned to Signature.

182.     Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Breach of Contract)

183.     Plaintiff repeats and realleges paragraphs 1 through 181 above, as if set

forth here in full.

184.    The agreements between Signature and the Judgment Debtors are valid,

binding and enforceable contracts.

185.    By conveying ownership of its trademarks to AOC, and by leasing its

property to AOC including its real estate, equipment and entire ongoing concerns, all in violation

of the security provisions of the agreements, the Judgment Debtors have breached those

agreements.

186.    Signature has fully performed its obligations under its agreements with the

Judgment Debtors.

187.    As a result of the Judgment Debtors' breach of their agreements, Signature

has lost control of collateral pledged to secure its loans to the Judgment Debtors.

188.    Signature respectfully requests a judgment against the Judgment Debtors

for compensatory damages as a result of these breaches in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
## AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Rescission)

189.    Plaintiff repeats and realleges paragraphs 1 through 187 above, as if set

forth here in full.

190.    The agreements between Signature and the Judgment Debtors are valid

and binding contracts.

191.    By conveying ownership of its trademarks to AOC, and by leasing their

property to AOC, both in violation of the security provisions of the agreements, the Judgment

Debtors have breached those agreements.

192.    The Judgment Debtors' breach of their agreements with Signature has substantially defeated the purpose of those agreements.

193.    The Judgment Debtors' breach of their agreements with Signature was material and willful.

194.    Signature respectfully requests a judgment against the Judgment Debtors rescinding all agreements between the Judgment Debtors and AOC whereby the Judgment Debtors purported to convey an ownership or leasehold interest in any collateral pledged to Signature pursuant to the agreements between Signature and the Judgment Debtors.

## TWELFTH CLAIM FOR RELIEF AS AGAINST THE JUDGMENT DEBTORS

### (Breach of Contract)

195.    Plaintiff repeats and realleges paragraphs 1 through 193 above, as if set forth here in full.

196.    The agreements between Signature and the Judgment Debtors are valid and binding contracts.

197.    Pursuant to the agreements between Signature and the Judgment Debtors, the Judgment Debtors are liable for payments of all Overdrafts on their accounts with Signature.

198.    By failing to pay Signature for the Overdrafts on their accounts with Signature, the Judgment Debtors have breached their agreements with Signature.

199.    Signature has fully performed its obligations under its agreements with the Judgment Debtors.

200.    As a result of the Judgment Debtors' breach of their agreements with Signature, Signature has been damaged, in that it remains unpaid on approximately $2 million in

overdrafts made by the Judgment Debtors on their accounts with Signature.

201.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, but in no event less than $2 million.

## THIRTEENTH CLAIM FOR RELIEF
### AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Declaratory Judgment)

202.    Plaintiff repeats and realleges paragraphs 1 through 200 above, as if set forth here in full.

203.    AOC has pledged all of its assets, including all of its accounts receivable, to third-party factors in exchange for financing.

204.    All of AOC's assets were either directly fraudulently conveyed to it by the Judgment Debtors in violation of the Judgment Debtors' agreements with Signature, or else represent proceeds generated by the use of those fraudulently-conveyed assets.

205.    Because AOC's assets either represented Signature's collateral under its agreements with the Judgment Debtors, or else were derived from the use of those assets, all of AOC's assets are properly subject to Signature's superior security interest in the assets.

206.    Signature respectfully requests that the Court enter a declaratory judgment stating that Signature's security interest in AOC's assets is superior to that of Aquent or BFA, or any other subsequent lienholder.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in favor of plaintiff and against defendant as follows:

40

(i)     rescinding the fraudulent conveyances to Ahava of California and directing that

(ii)    all assets so conveyed be transferred directly to Signature;

(iii)   declaring that Ahava of California is an alter ego of the Individual Defendants and the Judgment Debtors ;

(iv)    ordering an accounting of all of the books, records, and other financial information of all of the corporate defendants;

(v)     awarding plaintiff compensatory damages on account of the Judgment Debtors' failure to pay to Signature for the Overdrafts in an amount to be determined at trial but no less than $2 million;

(vi)    awarding plaintiff punitive damages in the amount of $1 million;

(vii)   tripling the award of compensatory and punitive damages pursuant to the RICO statute;

(viii)  awarding plaintiff attorneys' fees, costs, and disbursements pursuant to the RICO statute, the loan agreements and to the extent permitted otherwise by law; and

(ix)    awarding plaintiff such further relief as the Court deems just and proper.

Dated:  New York, New York
        July 7, 2008                 HERRICK, FEINSTEIN LLP

                                     By:_____
                                        Mara B. Levin
                                        David Feuerstein
                                        John Oleske
                                     2 Park Avenue
                                     New York, New York 10016
                                     Telephone:   (212) 592-1400
                                     Facsimile:   (212) 592-1500
                                     *Attorneys for Plaintiff Signature Bank*

# EXHIBIT A

# YONI REALTY, LLC

## Manager's Certificate

### (as to Organizational and Related Matters)

I, Moise Banayan, hereby certify as follows:

1.    I am the sole Member and the sole Manager of YONI REALTY, LLC, a New York limited liability company ("the Company").

2.    Attached hereto as <u>Exhibit A</u> is a true and complete copy of the Articles of Organization of the Company and all amendments thereto (collectively, the "<u>Articles of Organization</u>") and such Articles of Organization are in full force and effect on and as of the date hereof and has not been further amended, supplemented, revoked or repealed.

3.    Attached hereto as <u>Exhibit B</u> is a true and complete copy of the Operating Agreement of the Company as in effect on the date hereof.

4.    Attached hereto as <u>Exhibit C</u> is a true copy of resolutions (the "<u>Resolutions</u>") adopted by me as the sole Member and the Manager of the Company. The Resolutions have not been amended or revoked and are in full force and effect on the date of this Certificate.

5.    Attached hereto as <u>Exhibit D</u> is a true copy of a Certificate of Good Standing of the Company.

6.    There are no proceedings for the dissolution or liquidation of the Company either commenced or threatened.

**IN WITNESS WHEREOF,** I have executed this Certificate as of August 22, 2005.

Moise Banayan,
Manager

Exhibit A

Exhibit B

Exhibit C

Exhibit D

12

13

## YONI REALTY, LLC

### Manager's Certificate

### (as to Organizational and Related Matters)

I, Moise Banayan, hereby certify as follows:

1.    I am the sole Member and the sole Manager of YONI REALTY, LLC, a New York limited liability company ("the Company").

2.    Attached hereto as <u>Exhibit A</u> is a true and complete copy of the Articles of Organization of the Company and all amendments thereto (collectively, the "<u>Articles of Organization</u>") and such Articles of Organization are in full force and effect on and as of the date hereof and has not been further amended, supplemented, revoked or repealed.

3.    Attached hereto as <u>Exhibit B</u> is a true and complete copy of the Operating Agreement of the Company as in effect on the date hereof.

4.    Attached hereto as <u>Exhibit C</u> is a true copy of resolutions (the "<u>Resolutions</u>") adopted by me as the sole Member and the Manager of the Company. The Resolutions have not been amended or revoked and are in full force and effect on the date of this Certificate.

5.    Attached hereto as <u>Exhibit D</u> is a true copy of a Certificate of Good Standing of the Company.

6.    There are no proceedings for the dissolution or liquidation of the Company either commenced or threatened.

**IN WITNESS WHEREOF**, I have executed this Certificate as of August 27th, 2007.

Moise Banayan,
Manager

## ASSIGNMENT OF MEMBERSHIP INTEREST
### (Yoni Realty, LLC)

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST ("Assignment") made as of the 8th day of February, 2007 by and between MOISE BANAYAN ("Assignor") and ISC 96 BEARD STREET, LLC ("Assignee").

WHEREAS, Assignor is the owner and holder of a ninety-eight percent (98%) membership interest in Yoni Realty, LLC, a New York limited liability company (the "Company");

WHEREAS, pursuant to an Agreement of Sale dated December 20, 2006 between Assignor and Assignee (the Contract"), Assignee has agreed to sell to Assignee and Assignee agreed to purchase from Assignor a forty-eight and one half percent (48.5%) membership interest in the Company (the "Membership Interest").

NOW, THEREFORE, for ten ($10.00) dollars and other good and valuable consideration paid by Assignee to Assignor, Assignor and Assignee hereby agree as follows:

1.    Assignment.  Assignor hereby sells, assigns, transfers and conveys to Assignee the Membership Interest, free and clear of all security interests, liens, pledges, hypothecations and encumbrances of any kind or nature whatsoever.

2.    Assumption.  Assignee hereby accepts from Assignor the Membership Interest.

3.    Indemnification of Assignee.  Assignor shall indemnify, defend and hold harmless Assignee from and against any liability, loss, cost or expense (including but not limited to reasonable attorney's fees and expenses) incurred by Assignee as a result of Assignor's failure to perform any of its obligations as holder of the Membership Interest to the extent that such obligations accrued prior to the date hereof.

4.    Successors and Assigns.  This Assignment and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

5.    Governing Law.  The parties agree that this Assignment shall be governed by the laws of the State of New York.

6.    Section Headings.    The section headings in this Assignment are for convenience only and are not intended to be a part of this Assignment and shall not be construed to modify, explain or alter any of the terms, covenants or conditions herein contained.

7.    Counterparts.  This Assignment may be executed in any number of

counterparts, each of which, when taken together, shall constitute one and the same Assignment.

IN WITNESS WHEREOF, this Assignment has been executed and delivered as of the date first above written.

_____
Moise Banayan

ISC 96 BEARD STREET, LLC

By: ISC 96 Beard Street MM, LLC,
    Managing Member

By: _____
    Isaac Chera,
    Managing Member

## EXHIBIT B



YONI REALTY, LLC

NEW YORK

The Limited Liability Company Registered to Issue Units Without Par Value

This Certifies that ISC 96 BEARD LLC is the _____ Percent registered owner of a _____ profits interest in the above LLC transferable capital _____ only on the books of the Company in accordance with the Company's Operating Agreement.

In Witness Whereof, the said Company has caused this Certificate to be signed by two of its duly authorized members and its Seal to be hereunto affixed this 24 day of August A.D. 2006

**EXHIBIT C**

## Jessica Hampton

| | |
|---|---|
| **From:** | Tanya Boczek |
| **Sent:** | Thursday, February 07, 2008 5:38 PM |
| **To:** | Jessica Hampton; Veronica Rivera; Anna Davis |
| **Subject:** | FW: Ahava corporate structure |

I had asked for a corporate family tree when we were going to finance Schwartz but since we are only doing Ahava of California, here is a brief narrative of that entity and its d/b/a's.

**From:** Ahavafood@aol.com [mailto:Ahavafood@aol.com]
**Sent:** Thursday, February 07, 2008 6:30 PM
**To:** Tanya Boczek
**Subject:** corporate structure

Tanya,

Here is the corporate structure:

Today,  As of December 1st 2007, there is only one active company: Ahava of California LLC which has tow DBA: Ahava national Food distributor for the distribution center and North country Manufacturing for the manufacturing end.

All invoices are generated by Ahava National Distributor or Ahava of california.

Historically

The distributor was  Schwartz and sons quality distributor, and Ahava of California LLCas well as Ahava Food Corp.,  The manufacturing end was Lewis County Dairy and St Lawrence food corp.

Thanks   Moshe

Who's never won? Biggest Grammy Award surprises of all time on AOL Music.

2/7/2008

**EXHIBIT D**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------

SIGNATURE BANK, N.A.,

                              Plaintiff,

          -against-

AHAVA FOOD CORP., LEWIS COUNTY
DAIRY CORP., ST. LAWRENCE FOOD
CORP., YONI REALTY, LLC, MOISE
BANAYAN, ANA BANAYAN and
SCHWARTZ AND SONS, INC.,

                              Defendants.

-------------------------------------

Index No.  604256/07

(Hon. Helen E. Freedman)

**AFFIDAVIT IN
OPPOSITION TO
PLAINTIFF'S MOTION
FOR SUMMARY
JUDGMENT IN LIEU OF
COMPLAINT**

STATE OF NEW YORK  )
                                        ss.:
COUNTY OF KINGS      )

          MOISE BANAYAN, being duly sworn, deposes and says:

          1.      I am the President and owner of defendants Ahava Food Corp. ("Ahava"),

Lewis County Dairy Corp. ("Lewis County"), St. Lawrence Food Corp. ("St. Lawrence")

and Schwartz and Sons, Inc. ("Schwartz"), the majority owner of defendant Yoni Realty,

LLC ("Yoni"), and the husband of defendant Ana Banayan.  I make this affidavit in

opposition to the motion of plaintiff Signature Bank, N.A. ("Signature") for summary

judgment in lieu of complaint pursuant to CPLR 3213.  I am personally familiar with the

facts set forth in this affidavit.

## Background

2.      I am a 1979 graduate of the University of British Columbia with a Master's degree in Business Administration.  I have worked for more than twenty-three years in the kosher dairy food industry.

3.      I founded Ahava Dairy Products Corp. in 1983 and Ahava in 1999, both in Brooklyn, New York.  Under my direct management, Ahava has grown to become the single largest distributor and manufacturer of kosher dairy food products to the ethnic Jewish market in the United States.  Ahava distributes a variety of dairy and deli food products, including milk, cheese and deli meats, to every major Jewish geographic market.

4.      I founded Lewis County in 1994 in Lewis County, New York.  Lewis County is a milk processing plant that produces the kosher dairy products that Ahava and Schwartz distribute.  Lewis County manufactures milk, yogurt, cheese, butter and other dairy products.  Lewis County has won numerous awards and national attention for the quality of its dairy products.

5.      I founded St. Lawrence in 2003 in St. Lawrence County, New York.  St. Lawrence is also a milk processing plant that produces the kosher dairy products that Ahava and Schwartz distribute.  St. Lawrence manufactures cheeses such as mozzarella, muenster, cheddar and American cheese.  Today, St. Lawrence is the largest exporter of kosher mozzarella to Israel.

6.    I founded Schwartz in 2007 in Brooklyn, New York.  Like Ahava, Schwartz is in the business of dairy food distribution.  I founded Schwartz as a means to distribute kosher dairy products to ultra-orthodox Jewish neighborhoods.

7.    Ahava, Lewis County, St. Lawrence and Schwartz presently employ more than 165 people in total.

8.    I founded Yoni in 2000 in Brooklyn, New York.  Yoni manages real property at 110 Beard Street, Brooklyn, New York, where the distribution centers operated by Ahava and Schwartz are located.

**Signature's Loans**

9.    Since its inception, Ahava and my other companies have established credit lines and used commercial loans for the purposes of working capital, financing for manufacturing equipment, new acquisitions and project development.  I had good working relationships with those financial institutions — including Fleet Bank, Commerce Bank and Merrill Lynch — that extended credit to me and my companies.

10.    In 2005, Signature approached me with an offer to consolidate Ahava, Lewis County and St. Lawrence's then-existing credit lines and loans with Merrill Lynch and NBT Bank.  As an added incentive to borrow from Signature, Signature offered Ahava an additional credit line of $7.5 million, approximately $4 million more than the combined credit line that Ahava, Lewis County and St. Lawrence maintained at the time with Merrill Lynch and NBT Bank.

11.    On August 22, 2005, as a consolidation of Ahava's existing loans, Ahava and Signature entered into a Master Credit Facility Agreement.  Ahava executed two

promissory notes in the total amount of $7.5 million and a guarantee in connection with that Agreement. (A copy of the Master Credit Facility Agreement is attached hereto as Exhibit 1; copies of the two promissory notes are annexed as Exhibits 1-2 to the affidavit of Signature's Vice President Robert Bloch, sworn to on December 27, 2007 ("Bloch Aff."), previously submitted by plaintiff; a copy of the guarantee is annexed as Exhibit 8 to the Bloch Aff.)

12.    In connection with the Master Credit Facility Agreement, Signature also loaned Lewis County $750,000 for its short-term equipment needs ("the short-term equipment loan"), which Signature repeatedly renewed. Lewis County executed a promissory note and Ahava executed a continuing guaranty in connection with the short-term equipment loan. (A copy of this promissory note is annexed as Exhibit 3 to the Bloch Aff.; a copy of the continuing guaranty is annexed as Exhibit 9 to the Bloch Aff.)

13.    From August 2005 through March 2007, Ahava regularly made timely payments of principal and interest on its promissory notes to Signature. By March 2007, Ahava had repaid more than $600,000 in principal and more than $800,000 in interest on those promissory notes.

## The Unrelated Judgments Against My Companies

14.    In November 2005, the New York State Commissioner of Labor obtained a $62,000 judgment against Lewis County arising from management overtime classification for some of Lewis County's employees.

15.     In July 2006, some of Ahava's suppliers — Cape Vincent Milk Producers Cooperative, Inc., Marble City Bulk Milk Cooperative, Inc., Seaway Milk Producers Cooperative, Inc. and Northern New York Bulk Milk Producers Cooperative, Inc. (collectively, "the co-ops") — obtained a $100,000 judgment against Ahava, Lewis County and St. Lawrence. This judgment concerned the sale of real property by the co-ops to St. Lawrence. Ahava has an account receivable for $116,000 reserved to pay for this judgment; however, Signature has asserted a claim on that account, preventing this judgment from being paid.

16.     In January 2007, M&I First National Leasing Corp. ("M&I") obtained a $700,000 judgment against Ahava, Lewis County and me. In April 2007, M&I obtained a second judgment in the same matter for $60,000 in attorney's fees. Both judgments arise from lawsuits involving financing of a waste management treatment plant at Lewis County. I and the other defendants in this matter have filed a motion to reconsider as well a notice of appeal of those judgments; both our appeal and motion to reconsider are pending.

17.     These judgments, in matters in no way involving Signature, constituted an event of default under certain covenants set forth in the Master Credit Facility Agreement. (*See* Exh. 1 at § 7(i), p. 41.) In March 2007, despite the fact that Ahava had made timely payments on the Signature promissory notes, Signature declared Ahava in default on the promissory notes and demanded repayment. Signature also refused to renew Lewis County's short-term equipment loan, thereby placing that loan in default.

18.    Signature and I then sought to resolve these covenant defaults and Lewis County's default on the short-term equipment loan.  On June 11, 2007, Ahava, Lewis County, St. Lawrence, Yoni, my wife and I entered into a Forbearance Agreement with Signature.  (A copy of the Forbearance Agreement is annexed as Exhibit 5 to the Bloch Aff.)

19.    On August 27, 2007, Signature and Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I executed the Joinder Agreement, Waiver, and First Amendment to Forbearance Agreement ("the First Amendment"), which amended the Forbearance Agreement.  (A copy of the First Amendment is annexed as Exhibit 6 to the Bloch Aff.)  I and the other parties to the First Amendment executed that document in order to add Schwartz as a new obligor to the Forbearance Agreement and to reflect Ahava's failure to pay loan interest as a new default to the Forbearance Agreement. This default on interest was the first instance of Ahava's financial default; as explained below, this default was caused by Signature's affirmative conduct.  I and the other parties to the First Amendment also executed a promissory note and a Joint and Several Guaranty of Payment Agreement in connection with the First Amendment.  (A copy of this promissory note is annexed as Exhibit 4 to the Bloch Aff.; a copy of the Joint and Several Guaranty of Payment Agreement is annexed as Exhibit 10 to the Bloch Aff.)

20.    On September 11, 2007, Signature and Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I executed the Second Amendment to Forbearance Agreement ("the Second Amendment") for the purposes of renewing our

previous guarantees. (A copy of the Second Amendment is annexed as Exhibit 7 to the

Bloch Aff.)

<u>**Signature's Imposition Of New Management**</u>

21.    Signature used the Forbearance Agreement to exert direct control over the

management and operation of my companies. As a condition for its entry into the

Forbearance Agreement, Signature demanded that I engage a "consultant" on a full-

time basis, noting that this entity must be satisfactory to it. (*See* Bloch Aff. Exh. 5 at §

7(b), p. 5 and Bloch Aff. Exh. 6 at § 3(f), p. 7.)

22.    Signature introduced me to, and required me to engage, a firm known as

Getzler Henrich Management & Financial Consultants ("Getzler Henrich"), located in

Manhattan. At Signature's insistence, I hired Mark Samson ("Samson") and Fred

Getzler ("Getzler") of Getzler Henrich. Samson worked from Ahava's offices in

Brooklyn, while Getzler worked from Lewis County's office in Lowville, New York.

Five weeks after Getzler started working, Getzler Henrich had to replace Getzler —

who was more than 75 years old and infirm — with Ronald Geuring.

23.    Ahava, Lewis County, St. Lawrence, Yoni, Schwartz, my wife and I

entered into the Forbearance Agreement on the express understanding that Getzler

Henrich would work for us, at my direction. Thus, the First Amendment explicitly

stated that Getzler Henrich "shall work on a full time basis . . . *for the Obligors.*" (Bloch

Aff. Exh. 6 at § 3(f), p. 7; emphasis supplied.) As the President and owner of Ahava,

Lewis County, St. Lawrence, Schwartz and Yoni, I expected Getzler Henrich to report to

me and respond to my directions.

24.     That was not the case.  Instead, it soon became clear that Getzler Henrich had no intention of reporting to me or taking directions from me.  In fact, Samson — who had absolutely no experience in the kosher dairy food industry — sought to remove me from effective control of my own companies by excluding me from senior management meetings, informing my employees that I was no longer their boss, and making management and operational decisions that affected the core of my business. Samson repeatedly expressed his belief that Getzler Henrich was in control of my companies.  (*See, e.g.*, email from Mark Samson dated Sept. 27, 2007, a copy of which is attached hereto as Exhibit 2.)

25.     After I hired Getzler Henrich, Signature repeatedly informed me that I should not make any decisions with respect to management or operation of my companies, but instead give Getzler Henrich full control of my companies.  Signature made these demands in the presence of Getzler Henrich, after which Getzler Henrich acknowledged its control of my companies.

26.     Getzler Henrich's management of my companies was disastrous.  During its engagement, Getzler Henrich implemented numerous decisions that severely damaged the financial well-being of Ahava and my other companies.  These decisions included the following:

- Getzler Henrich claimed to have found a loss of $175,000 per week in inventory and implemented the diversion of 30% of Ahava's milk supply, or about 440,000 pounds of raw milk per week, in order to discover the source of the purported inventory loss.  The diversion in milk supply required Ahava to sell the diverted milk at a loss.  As a result, Ahava, Lewis Country and St. Lawrence lost nearly $75,000 per week for eight

weeks. The source of the inventory loss — which may well have never existed in the first place — was never discovered.

- Unable to find the purported inventory loss with its tactic of diverting supply, Getzler Henrich then terminated the supply agreement between my companies and Vandervicken Hahn's farm, one of my companies' four suppliers of raw kosher milk. This termination damaged my companies' ability to supply our customers with dairy product, reducing company sales and profitability, and resulted in a permanent loss of 225,000 pounds of milk per week, valued at more than $55,000. My companies still have not recovered from this termination, since it is extremely difficult to obtain reliable suppliers of raw kosher milk.

- Getzler Henrich placed higher priority on preparation of reports for Signature than the day-to-day operations of my companies. As a consequence, the core management staff of my companies became paralyzed. For example, Getzler Henrich gave Ahava's Sales Manager, who was responsible for pricing control as well as credit and customer service, a new position and title of "business analyst," with the sole duty of preparing weekly financial reports for Getzler Henrich. During this time, market prices for dairy products rapidly and substantially increased. Getzler Henrich's removal of the Sales Manager from his duties caused a delay in my companies' adjustment to this price rise, and my companies lost over $170,000 per week for a total of $1.3 million. Also, Getzler Henrich instructed members of Ahava's Credit Department, who were responsible for collecting accounts receivable, to spend their time preparing accounts receivable reports instead. As a result, our collection on accounts receivable decreased on average by more than $100,000 per week.

- Not surprising for someone who had no experience in the kosher dairy food industry, Samson exercised poor judgment in dealing with my companies' business relationships. For example, Samson extended lines of credit to some of Ahava's customers who lacked sufficient credit or financial resources. As a result, accounts receivable aged over 90 days (which are typically uncollectable) soon grew from less than $500,000 to more than $1.2 million. Getzler Henrich also instituted a policy for paying only the current invoices of Ahava's vendors. The industry practice — and Ahava's policy prior to Getzler Henrich's interference — had been to maintain accounts payable with its vendors so that Ahava, each week, paid invoices from several weeks earlier. This abrupt change in policy caused Ahava's weekly payments to apply to current invoices rather than past invoices, which artificially created past-due invoices that put Ahava

in default with its vendors.  This poor management decision caused Ahava to lose a major supplier and forced Ahava to use an overdraft of $400,000 to cover payments to its vendors.

- Getzler Henrich also acted imprudently in using Lewis County's financial resources.  For example, Getzler Henrich authorized salary increases for all employees at Lewis County without evaluation of particular employees' merit.  Getzler Henrich also demanded more than $120,000 in unnecessary work, including "beautification" projects such as installing new floors and renovating the plant's walls and roof.

- Getzler Henrich also acted imprudently in using Lewis County's human resources.  For example, Getzler Henrich removed members of Lewis County's maintenance department from their duties, which resulted in a 50% reduction in plant productivity.

27.    Getzler Henrich carried out these policies through November 23, 2007.

28.    On numerous occasions, I voiced my strenuous disagreement with Getzler Henrich's decisions concerning the management and operation of my companies. However, due to Signature's insistence on Getzler Henrich's governance, I was unable to prevent Getzler Henrich from carrying out its actions.  Signature forced me to leave Getzler Henrich in place because it repeatedly threatened to withdraw its financial support if I terminated Getzler Henrich.  (*See, e.g.*, email from Robert Bloch to me dated Nov. 21, 2007, a copy of which is attached hereto as Exhibit 3.)

29.    By late November 2007, the financial situation of my companies had grown so dire that I realized that, without my intervention, Getzler Henrich would soon drive my companies into bankruptcy.

30.    On November 23, 2007, I halted my payment of fees to Getzler Henrich, in effect terminating them.  Even then, Signature insisted that I continue to work with

Getzler Henrich, offering to increase my overdraft allowance to allow me to pay Getzler

Henrich's fees. I refused.

31.     From June to November 2007, Ahava lost more than $5 million as the

direct result of Getzler Henrich's poor decisions and ill-conceived policies.

Additionally, I was forced to pay Getzler Henrich more than $450,000 in fees during this

time.

32.     Signature's insistence on Getzler Henrich was the sole reason that I

engaged that firm. In turn, Getzler Henrich's poor management and operational

decisions were the sole reason for my companies' failure to pay on the promissory

notes.

## Getzler Henrich's Continuing Interference

33.     Beginning in July 2007, I engaged in discussions with various entities —

including Greystone Business Credit II, LLC ("Greystone") and Rosenthal & Rosenthal

Inc. ("Rosenthal") — to enter into an alternative credit facility that would allow me and

my companies to pay Signature under the promissory notes.

34.     Prior to entering into any credit facilities, Greystone and Rosenthal

conducted audits of my companies. Getzler Henrich interfered with these audits by

dictating those documents that were withheld from the auditors, restricting senior

management's contact with the auditors, adjusting dates of accounts payable to appear

older than they actually were, and disregarding generally accepted accounting

principles in the calculation of debt. Without my knowledge or authorization, Getzler

Henrich also conducted meetings with representatives of Greystone and Rosenthal in

Page 12

which Getzler Henrich portrayed Ahava as a severely mismanaged company and

criticized my credibility and management of Ahava.  Getzler Henrich falsely described

the situation as one that could be saved only by Getzler Henrich.  As a result, Rosenthal

withdrew its proposed term sheet and Greystone conditioned its proposed loan on my

permanent removal from management of my companies.  Neither entity provided a

credit facility to me or my companies.

35.     Since the departure of Getzler Henrich in November 2007, my companies

have returned to profitability.  On average, we now make more than $160,000 in gross

profit per week.

_____
MOISE BANAYAN

Sworn to before me this
1st day of February 2008.

_____
Notary Public

# <u>EXHIBIT E</u>

*EXECUTION VERSION*

## SECURITY AGREEMENT

This SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of August 27, 2007, made by AHAVA FOOD CORP., a New York corporation ("**Ahava**"), ST. LAWRENCE FOOD CORP., a New York corporation ("**SLF**"), LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD**"), and SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC., a New York corporation ("**Schwartz**" and, together with Ahava, SLF and LCD, collectively, the "**Grantors**" and each, individually, a "**Grantor**"), in favor of SIGNATURE BANK, having an office at 565 Fifth Avenue, New York, New York 10017 (together with its successors and assigns, herein called the "**Bank**").

## RECITALS:

**A.**      Reference is made to the Forbearance Agreement, dated as of June 11, 2007, as amended by a Joinder Agreement, Waiver and First Amendment to Forbearance Agreement, dated as of the date hereof (as the same may be further amended, amended and restated, modified or supplemented from time to time, the "**Forbearance Agreement**"), by and among the Grantors, Moise Banayan ("**MB**"), Chana Banyan ("**CB**"), Yoni Realty, LLC ("**Yoni**"), and the Bank.

**B.**      Reference is made to the Promissory Note, dated the date hereof, made by SLF and Ahava (collectively and individually referred to herein as the "**Borrower**"), payable to the order of the Bank in the original principal amount of $1.75 million (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Forbearance Note**").

**C.**      Pursuant to the Forbearance Note and Section 8 of the Forbearance Agreement, the Bank has agreed to make a loan to the Borrower on a joint and several basis, on and subject to the terms and conditions set forth therein.

**D.**   '    The Grantors (other than SLF and Ahava), MB and CB have, pursuant to the Joint and Several Guaranty of Payment Agreement, unconditionally guaranteed the Obligations (defined below).

**E.**      Each Grantor will receive substantial benefits from the execution, delivery, and performance of the obligations of the Forbearance Loan Documents (as defined in the Forbearance Agreement) and each is, therefore, willing to enter into this Agreement.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Bank hereby agree as follows:

## AGREEMENT:

**1.**      **Security Interest; Definitions.**

(a)      As security for the due and punctual payment and performance of any and all of the present and future Obligations (defined below), each Grantor hereby collaterally assigns, mortgages, pledges, hypothecates and grants to the Bank a first lien on and security interest in (subject only to Permitted Encumbrances (defined below)) all assets of such Grantor set forth, referred to, or listed on, Schedule I hereto and made a part hereof (all such assets being hereinafter referred to as the "**Collateral**").

HF 3639701v.7 #06406/0023

(b)    Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Forbearance Note.

(c)    As used herein, the following terms shall have the following meanings:

"**Account Debtor**" has the meaning set forth in Section 7(e) below.

"**Agreement**" means this Security Agreement, including all schedules, exhibits and annexes hereto, as he same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Borrower**" has the meaning set forth in the recitals hereto.

"**Collateral**" has the meaning set forth in Section 1(a) above.

"**Event of Default**" has the meaning set forth in Section 8 below.

"**Forbearance Agreement**" has the meaning set forth in the recitals hereto.

"**Forbearance Note**" has the meaning set forth in the recitals hereto.

"**Obligations**" has the meaning set forth in the Forbearance Note.

"**Permitted Encumbrances**" means (i) "Permitted Encumbrances" (as such term is defined in the Master Credit Agreement (as defined in the Forbearance Agreement)) and (ii) Liens (as such term is defined in the Master Credit Agreement) created in favor of the Bank securing the Obligations.

2.    **Title; Liens and Encumbrances.**

Each Grantor represents and warrants that such Grantor is, or to the extent that this Agreement states that the Collateral is to be acquired after the date hereof, will be, the owner of the Collateral, having good and marketable title thereto, free from any and all liens, security interests, encumbrances and claims, other than Permitted Encumbrances; no Grantor will create or assume or permit to exist any such lien, security interest, encumbrance or claim on or against the Collateral except for Permitted Encumbrances, and such Grantor will promptly notify the Bank of any such other claim, lien, security interest or other encumbrance, made or asserted in writing against the Collateral and will defend the Collateral against any claim, lien, security interest or other encumbrance, other than Permitted Encumbrances.

3.    **Representations and Warranties; Location of Collateral and Records; Business and Trade Names.**

(a)    Each Grantor represents and warrants that it has no place of business, offices where such Grantor's books of account and records are kept, or places where the Collateral consisting of goods (including equipment and inventory) is used, stored or located, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank of any change in the foregoing representation. Each Grantor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to on Schedule II and at none other. Each Grantor further covenants that except for books and records delivered to the Bank or an agent for the Bank, no

2

Grantor will store, use or locate any of the Collateral consisting of books and records at any place other than as listed on Schedule II hereto.

(b)      Each Grantor represents and warrants that it currently uses no business or trade names, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank, in sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by such Grantor for billing purposes.

(c)      Each Grantor represents and warrants that to its knowledge it has complied and is in compliance in all material respects with all applicable provisions of the Fair Labor Standards Act, including, without limitation, the minimum wage and overtime rules of such Act, and covenants each Grantor will continue to comply with such Act.

4.      **Perfection of Security Interest.**

Each Grantor will cooperate with the Bank in the Bank's filing of one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, in each case in order to perfect the Bank's security interest in the Collateral, in form satisfactory to the Bank. Each Grantor will pay all filing or recording costs with respect thereto, and all costs of filing or recording this Agreement or any other instrument, agreement or document executed and delivered pursuant hereto (including the cost of all federal, state or local mortgage, documentary, stamp or other similar taxes), in each case, in all public offices where filing or recording is deemed by the Bank to be necessary or desirable. Each Grantor hereby authorizes the Bank to take all action (including, without limitation, the filing of any Uniform Commercial Code Financing Statements or amendments thereto without the signature of such Grantor) that the Bank may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Agreement.

5.      **General Covenants.**

Each Grantor shall:

(a)      furnish the Bank from time to time at the Bank's request written statements and schedules further identifying and describing the Collateral in such detail as the Bank may reasonably require;

(b)      advise the Bank promptly, in sufficient detail, of any substantially adverse change in the value of the Collateral, and of the occurrence of any event that is reasonably likely to have a material adverse effect on the value of the Collateral or on the Bank's security interest therein;

(c)      comply in all material respects with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, applicable to the Collateral or any part thereof or to the operation of such Grantor's business, provided that such Grantor may contest any acts, rules, regulations, orders and directions of such bodies or officials in any reasonable manner that will not, in the Bank's opinion, adversely affect its rights or the priority of its security interest in any of the Collateral;

(d)      perform and observe in all material respects all covenants, restrictions and conditions contained in any document, instrument or agreement executed in connection herewith providing for payment of taxes, maintenance of insurance and otherwise relating to the Collateral, as though such covenants, restrictions and conditions were fully set forth in this Agreement;

3

(e)     promptly notify the Bank of all disputes with account debtors involving amounts in excess of $25,000; and

(f)     promptly execute and deliver to the Bank such further deeds, mortgages, assignments, security agreements or other instruments, documents, certificates and assurances and take such further action as the Bank may from time to time in its sole discretion deem necessary to perfect, protect or enforce its security interest in the Collateral or otherwise to effectuate the intent of this Agreement and the other Forbearance Loan Documents.

6.     <u>Assignment of Insurance.</u>

At or prior to the execution hereof, the Grantors shall deliver to the Bank copies of, or certificates of the issuing companies with respect to, endorsements of any and all policies of insurance owned by any of the Grantors covering or in any manner relating to the Collateral, in form and substance reasonably satisfactory to the Bank, naming the Bank as an additional insured party as its interest may appear and indicating that no such policy will be cancelled or otherwise terminated without at least thirty (30) days' prior written notice from the insurer to the Bank and the Grantors agree that such no such policy will be reduced in coverage or amount without at least thirty (30) days' prior written notice to the Bank. As further security for the due payment and performance of the Obligations, the Grantors hereby collaterally assign to the Bank all sums, including returned or unearned premiums, that may become payable under or in respect of any policy of insurance owned by any Grantor covering or in any manner relating to the Collateral, and each Grantor hereby directs each insurance company issuing any such policy to make payment of sums directly to the Bank after the occurrence and during the continuance of an Event of Default (defined below). Each Grantor hereby appoints the Bank as its attorney-in-fact and authorizes the Bank in its or in the Bank's name to endorse any check or draft representing any such payment and to execute any proof of claim, subrogation receipt and any other document required by such insurance company as a condition to or otherwise in connection with such payment, and, upon the occurrence and during the continuation of an Event of Default, to cancel, assign or surrender any such policies. All such sums received by the Bank shall be applied by the Bank to satisfaction of the Obligations or, to the extent that such sums represent unearned premiums in respect of any policy of insurance on the Collateral refunded by reason of cancellation, toward payment for similar insurance protecting the respective interests of the Grantors and the Bank, or as otherwise required by applicable law, and to the extent not so applied shall be paid over to the Grantors entitled thereto.

7.     <u>Collections.</u>

(a)     Subject to the other provisions of this Section 7, each Grantor may collect all checks, drafts, cash or other remittances (i) in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, (ii) in payment of any Collateral sold, transferred, leased or otherwise disposed of, or (iii) in payment of or in account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, or leased or otherwise disposed of, and all of the foregoing amounts so collected shall be held in trust by such Grantor for, an the property of, the Bank and shall not be commingled with other funds, money or property of such Grantor.

(b)     After the occurrence and during the continuance of an Event of Default, upon the written demand of the Bank for the payment of any Obligations, each Grantor will immediately upon receipt of all such checks, drafts, cash or other remittances in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, deliver any such items to the

4

Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement. Each Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect thereto.

(c)     Each Grantor will immediately upon receipt of all checks, drafts, cash or other remittances in payment for any Collateral sold, transferred, leased or otherwise disposed of, or in payment or on account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, leased or otherwise disposed of, deliver any such items to the Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement, such Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect hereto.

(d)     Each Grantor will promptly notify the Bank in writing of the return or rejection of any goods represented by any accounts, contract rights or general intangibles and such Grantor shall forthwith account therefore to the Bank in cash without demand or notice and until such payment has been received by the Bank, such Grantor will receive and hold all such goods separate and apart, in trust for an subject to the security interest in favor of the Bank, and the Bank is authorized to sell, for such Grantor's account and at such Grantor's sole risk, all or any part of such goods.

(e)     After the occurrence and during the continuance of an Event of Default, each Grantor hereby authorizes and directs each Person (each, an "**Account Debtor**") liable to such Grantor in respect of such Grantor's accounts, contract rights or general intangibles, upon the occurrence and during the continuance of an Event of Default and upon notice from the Bank to such Account Debtor, to pay directly to the Bank all monies as and when due such Grantor from such Account Debtor, and upon such notice to such Account Debtor, to draw and deliver to the order of the Bank any and all checks and other instruments for the payment of or in respect of such Grantor's accounts, contract rights or general intangibles, and to accept the receipts of the Bank therefor.

(f)     All of the foregoing remittances shall be applied and credited by the Bank first to satisfaction of the Obligations then due and payable or as otherwise required by applicable law, and to the extent not so credited or applied, shall be paid over to the applicable Grantor.

8.    Events of Default.

Upon the occurrence and during the continuation of any of the following (each an "Event of Default"):

(a)     any Event of Default (as defined in the Forbearance Note) shall occur;

(b)     non-payment when due of any of the Obligations;

(c)     the failure of a Grantor to perform any agreement on its part to be performed (other than the agreements, obligations and covenants referred to in the foregoing items (a) and (b)) hereunder or under any of the Forbearance Loan Documents, governing any of the Obligations and

5

such failure shall remain unremedied for a period of thirty (30) days following the occurrence of such failure;

(d)    at any time any representation in any financial or other statement of a Grantor (delivered to the Bank by or on behalf of a Grantor) is untrue or omits any material fact;

(e)    if a material adverse change shall occur in the financial condition of a Grantor, or a guarantor of any of the Obligations;

(f)    if a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) who is an individual shall die or become disabled, or (a Grantor which is a partnership, limited liability company or corporation) shall be dissolved or shall become insolvent (however evidenced);

(g)    upon the suspension of business by a Grantor, or upon the issuance of any warrant, process, or order of attachment, garnishment of lien and/or the filing of a lien as a result thereof against any of the property of a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) where the amount claimed is in excess of $50,000 in the aggregate; or

(h)    upon the making by a Grantor (or any endorser, guarantor or surety) of an assignment for the benefit of creditors under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, composition, receivership, liquidation or dissolution law or statute of any jurisdiction,

then the Bank shall have the right, with or without notice to each Grantor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, to direct payment under any equipment lease, account, general intangible or other item to be made directly to the Bank, and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Bank shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as the Bank in its sole discretion may deem advisable, and it shall have the right to purchase at any such sale; and, if any Collateral shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, the Bank shall have the right, at its option, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate.  At the Bank's request, each Grantor shall assemble the Collateral and make it available to the Bank at places that the Bank shall select, whether at such Grantor's premises or elsewhere, and make available to the Bank, without rent, all of such Grantor's premises and facilities for the purpose of the Bank's taking possession of, removing or putting the Collateral in saleable or disposable form.  The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by the Bank, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which the Bank shall account to each Grantor for any surplus proceeds.  If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Bank is legally entitled, each Grantor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the Forbearance Note, and the reasonable fees of any

6

attorneys employed by the Bank to collect such deficiency. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands against the Bank arising out of the repossession, removal, retention or sale of the Collateral.

Notwithstanding anything contained above in this Section 8 to the contrary, to the extent that an Existing Default or an Additional Default (as defined in the Forbearance Agreement) constitutes an Event of Default, then such Event of Default shall be deemed waived to the same extent as such Existing Default or Additional Default is so waived pursuant to the Forbearance Agreement, and shall be subject to the Forbearance Agreement.

## 9.    Costs and Expenses.

Any and all fees, out of pocket costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by the Bank, in connection with the preparation of this Agreement and all other documents relating hereto and the consummation of this transaction, the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral, or the enforcing, foreclosing, retaking, holding, storing, processing, selling or otherwise realizing upon the Collateral and the Bank's security interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Agreement relates, shall be borne and paid by the Grantors promptly after written demand by the Bank and until so paid shall be added to the principal amount of the Obligations and shall bear interest at the default rate set forth in the Forbearance Note of the amount overdue or, if applicable, as prescribed in the case of a default or event of default under documentation governing other Obligations.

## 10.    Power of Attorney.

Each Grantor authorizes the Bank and does hereby make, constitute and appoint the Bank, and any officer or agent of the Bank, with full power of substitution, as such Grantor's true and lawful attorney-in-fact, with power, in its own name or in the name of such Grantor: (a) to endorse any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Bank; (b) to sign and endorse any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against any debtor, assignments, verifications and notices in connection with accounts, and other documents relating to Collateral; (c) to pay or discharge any taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) to open any safe deposit box or bank vault in order to take possession of any Collateral; and (f) generally, to do, at the Bank's option and at such grantor's expense, at any time, or from time to time, all acts and things that the Bank deems necessary to protect, preserve and realize upon the Collateral and the Bank's security interest therein; and such grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof; provided, however, that none of the actions described in clauses (a) through (e) of this sentence may be taken by the Bank unless and until an Event of Default has occurred and is continuing. This power of attorney shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

## 11.    Notices.

HF 3639701v.7 #06406/0023

All notices and other communications pursuant to this Agreement shall be given and deemed given in the manner prescribed by the Forbearance Agreement (and the applicable portion of the Forbearance Agreement is hereby incorporated herein by reference). Any party hereto may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

### 12. **Other Security.**

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other Person then the Bank shall have the right in its sole discretion to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Bank's rights and remedies hereunder.

### 13. **Deposits.**

Any and all deposits or other sums at any time credited by or due from the Bank to a Grantor, whether in regular or special depository accounts or otherwise, shall at all times constitute additional collateral for the Obligations, and, so long as an Event of Default shall have occurred and be continuing, may be set-off by the Bank against any Obligations at any time whether or not they are then due and whether or not other collateral held by the Bank is considered to be adequate.

### 14. **Governing Law.**

This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

### 15. **Miscellaneous.**

(a)    Beyond the safe custody thereof, the Bank shall have no duty as to the collection of any Collateral in its possession or control or in the possession or control of any agent or nominee of the Bank, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    No course of dealing between any Grantor and the Bank, nor any failure to exercise, nor any delay in exercising, on the part of the Bank, any right, power or privilege hereunder or under any of the other Forbearance Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)    All of the Bank's rights and remedies with respect to the Collateral, whether established hereby or by the other Forbearance Loan Documents, or by any other agreements, instruments or documents or by law, shall be cumulative and may be exercised singly or concurrently.

(d)    The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

8

(e)     This Agreement is subject to modification only by a writing signed by the parties hereto.

(f)     The benefits and burdens of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided, however, that the rights and obligations of any Grantor under this Agreement shall not be assigned or delegated without the prior written consent of the Bank, and any purported assignment or delegation without such consent shall be void.

(g)     EACH GRANTOR AND THE BANK MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FORBEARANCE LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE BANK TO EXTEND CREDIT.

(h)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (A) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements of modifications set forth herein) (B) any reference herein to any Person shall be construed to include such Person's successors and assigns, (C) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (D) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules of this Agreement, and (E) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**16.     Term of Agreement.**

The term of this Agreement shall commence on the date hereof and this Agreement shall continue in full force and effect, and be binding upon each Grantor, until all of the Obligations have been fully paid and performed (and any lending commitment of the Bank to a Grantor have been terminated), and such payment and performance (and termination) have been acknowledged in writing by the Bank, whereupon this Agreement shall terminate.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

HF 3639701v.7 #06406/0023

IN WITNESS WHEREOF, each Grantor and the Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

**AHAVA FOOD CORP.**

By: _____
Name:
Title:

**ST. LAWRENCE FOOD CORP.**

By: _____
Name:
Title:

**LEWIS COUNTY DAIRY CORP.**

By: _____
Name:
Title:

**SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.**

By: _____
Name:
Title:

[Signature Page to Security Agreement]

BANK:

**SIGNATURE BANK**

By: _[signature]_
Name: Thomas Kasulka
Title: SVP, Group Director

[Signature Page to Security Agreement]

## SCHEDULE I TO SECURITY AGREEMENT

(a)     All personal properties, personal assets and rights of each Grantor, wherever located, whether now owned or hereafter acquired or arising, including, without limitation, all personal property and fixtures of every kind and nature, all goods (including, without limitation, inventory, equipment and any accessions thereto), all instruments (including, without limitation, promissory notes), all documents, all accounts, all chattel paper (whether tangible or electronic), all deposit accounts, all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), all securities and all other investment property, all supporting obligations, any other contract rights or rights to the payment of money (including, without limitation, the right to receive all payments in connection with any and all equipment leases made by each Grantor as lessor), all insurance claims and proceeds, all commercial tort claims, and all general intangibles, including, without limitation, all payment intangibles, all income, cash, dividends, redemptions, return of capital or other distributions (in each case consisting of cash, cash equivalents or marketable securities), all patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, trade marks, customer lists and goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which such Grantor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of such Grantor, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics, and all books and records relating to any of the foregoing.

(b)     Any and all additions and accessions to the foregoing, all substitutions and replacements therefor and all products and proceeds thereof.

All terms defined in the Uniform Commercial Code of the State of New York and used herein shall have the same definitions herein as now specified therein and as such terms may hereafter be amended; provided, however, the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code of the State of New York rather than Article 3.

## SCHEDULE II TO SECURITY AGREEMENT

**Grantors' Chief Places of Business:**

    **Ahava:**

110 Beard Street, Brooklyn, NY 11231

    **SLF:**

30 Main Street, Ogdenburg, NY 13669

    **LCD:**

7705 State Route 812, Lowville, NY 13367

    **Schwartz:**

110 Beard Street, Brooklyn, NY 11231

**Offices Where Records Are Kept:**

    **Ahava:**

110 Beard Street, Brooklyn, NY 11231

    **SLF:**

110 Beard Street, Brooklyn, NY 11231

    **LCD:**

110 Beard Street, Brooklyn, NY 11231

    **Schwartz:**

110 Beard Street, Brooklyn, NY 11231

**Other Locations Where Collateral Is Stored, Used or Located:**

    **Ahava:**

110 Beard Street, Brooklyn, NY 11231

**SLF:**

110 Beard Street, Brooklyn, NY 11231

**LCD:**

110 Beard Street, Brooklyn, NY 11231

**Schwartz:**

110 Beard Street, Brooklyn, NY 11231


## Business and Trade Names Used by Grantors:

**Ahava:**

Ahava Food Corp.

Morning Select

Slim U

Ahava

New Square

Best Mooo

Primo

Miki

Kahal

Table Select

**SLF:**

St. Lawrence Food Corp.

**LCD:**

Lewis County Dairy Corp.

**Schwartz:**

None

HF 3639701v.7 #06406/0023

**<u>EXHIBIT F</u>**

**Bloch, Robert**

| | |
|---|---|
| **From:** | Ahavafood@aol.com |
| **Sent:** | Monday, November 05, 2007 9:55 AM |
| **To:** | Bloch, Robert; msamson@getzlerhenrich.com |
| **Subject:** | Recent E mails |

Rob,

I wish I could snap my finger and get you all that you want in an instance, things take time.

I have forwarded my communication with Steve Polivy for you to see that I have been very active to get the requested documents. According to his last email, I should get the documents by Tuesday. I will forward same to you as soon as they arrive.

Apparently the documents never made it back from the IDA, so it is now being forwarded to all parties.

The issue with Ikey is complex:

1.    The Morgan Stanley loan requires Ahava position to be as it is. (I do not know this as a fact, this is what Ikey tells me) Once I get the documents, this issue will be resolved.

2.    Assuming I sell to Ikey, I need a lease to stay as a tenant. This needs to be negotiated.

3.    I will communicate to Ikey your instruction and will commit to sell my 51% to reduce the bank's debt. **Are you sure you want me to do this?** You understand that you will be getting $1M or less. I believe my position is worth much more. Please confirm in writing as Ikey wants a written binding commitment on my part, as he has to spend money to redo the mortgage and reposition his tax, what ever that means. He says if he owns more than 49% than he will lose a lot on tax.

4.    In addition the tax rebate on the property valued at $300,000 per annum will terminate.

5.    At time of sale AFC will have to pay the 3% mortgage recording tax that has not been paid, as the building will no longer be an IDA building.

6.    His offer of $200,000 loan is not free, I did not pursue it as I am not sure what he wants for it. I do not have any free and clear collateral to give him. If the bank wants to pursue this angle than lets discuss a real collateral and money in excess of $200,000. Ikey is involved in a $1.6 billion investment firm (I don't recall their name but they bought out Kinneret), may be he can buy out the equipment etc.

7.    Lastly, my passing on the information to the bank re Ikey's position re the guarantee was only that of a messenger. As they say don't shoot the messenger. He is a powerful man and you are a powerful bank. Please keep small guys like me out. My intention was not in any way to diminish

your collateral.  I am sorry if it came the wrong way.

Going Forward:
Even though I agree with your understanding that Clairvest might not be a buyer today, but they would move in the event of turn around. They have indicated same over and over. The company is only weeks from a complete turn around.

In my opinion The bank should not demand the sale of the Yoni shares but instead take them as a pledge and fund the company for a complete turn around and sell to clairvest or like. This building valuation will increase to $18M and more within next 3 - 4 years.  That is a lot of money to give up. Why sell your position that could worth $4-$5M for $1M?

In addition I am in continued negotiation with buyers and hard money lenders

1.    BUYERS:
        There are two buyers that are interested to purchase the company on asset base basis. Both T5 Equity Partners and Willi food buy companies in distress and unlike Clairvest do not require positive EBIDTA.  The part owner, asset purchaser of Willi has held several meeting with us and will be coming to USA next week for further negotiation. Not interested in the plants just distribution. I trust you agree these should be pursuid.

2.    Hard Money lenders:
        The company could get money at 18-20% on asset base, inventory and AR. This money would be formula driven,  75% to 80% on AR and 25% to 40% on inventory, this could raise about $5M with $500,000 for working capital. Signature could cash in the Yoni for an additional $1M and hold on to the stock as well as equipment and other collateral, and a second position. Frankly I stopped pursuing any of these lenders. Would the bank be willing to let go of AR and inventory with terms that these are usually traded in to days market?

Tuesday Meeting:

        I do not have the money for the attorney's fee nor the time to go through another "Banayan bashing" session. As you are aware the company has already paid over $140,000 in joint attorney fees just during the last 90 days. I doubt that Denise will show up as I still have not paid him his requested $10,000 for last week meeting, he would most probably ask for a $20,000 wire transfer.

Please advise the purpose of the meeting.  What are we supposed to accomplish at the meeting besides beating me up?

   I suggest instead a work out session with Mark to map up the option that the bank chooses.

Thanks

Moise

4/8/2008

See what's new at AOL.com and Make AOL Your Homepage.

## Bloch, Robert

| | |
|---|---|
| **From:** | Ahavafood@aol.com |
| **Sent:** | Friday, January 18, 2008 12:17 PM |
| **To:** | Bloch, Robert; forest@rogers.com |
| **Subject:** | Re: Recapitalization |

Rob, Jeff,

The bank's position that the past 4 month scenario should be repeated, whereby the bank would run the company through the consultant is only acceptable if I am bought out. I am not interested to have the company continued to be runned to the ground and be a silence partner to it. I did it for 4 month due to the bank's demand and the results are anything but pretty.

The bank or Getzler or Zyrex together or separately could buy me out at a fair value. I will stay on as an employee for 30 to 60 days if you need.

I am ok to meet to negotiate a purchase price and short term, long term operational goals. Also just not to mislead any one the proposed meeting will not affect the current action being filed in California by Ahava of California.   Needless to say, AOC is not for sale.

I am currently in the documentation stage with Bibbi, which we could terminate if need be.

Thanks   Moise

In a message dated 1/18/2008 10:45:43 A.M. Eastern Standard Time, RBloch@signatureNY.com writes:

> Jeff & Moise:
>
> We remain interested in exploring all options relative to whether refinance and/or recapitalization of the Ahava / Lewis County / St Lawrence entity is possible.  However, and I believe you would agree, all discussions and negotiations of a potential transaction would require direct involvement of Moise as we are not willing to negotiate such a transaction through any intermediaries.
>
> Critical to any transaction being acceptable to Zarex (and its investors) and Signature is the requirement that professional management be retained to operate the businesses on a go forward basis.  This would not limit Moise from ownership but would limit his operational responsibilities and decision making abilities.
>
> Assuming we all acknowledge the above statements, I'd suggest an in person meeting be schedule to initiate the transaction parameters. Please let me know how you would like to proceed.
>
> Regards,

Rob

---

**From:** Jeffrey Kurtz [mailto:forest@rogers.com]
**Sent:** Wednesday, January 16, 2008 4:43 PM
**To:** Bloch, Robert
**Subject:** FW: Signature Bank

Rob, please note the response from Moise below.

Your comments would be appreciated.

Jeffrey.

---

**From:** Ahavafood@aol.com [mailto:Ahavafood@aol.com]
**Sent:** January 16, 2008 4:28 PM
**To:** lrupf@foundationmarkets.com
**Cc:** forest@rogers.com; rrwilson1@rogers.com
**Subject:** Re: Signature Bank

Les,

I want to first thank you for your continued interest to help me.

I guess we can have Jeffery to be our contact person to negotiate our position with the
bank.

4/8/2008

**Jeffery, please confirm with the bank that they are willing to accept you as the negotiator and accordingly i will work out a fee for your services  Thanks  Moise**

In a message dated 1/16/2008 1:38:31 P.M. Eastern Standard Time, lrupf@foundationmarkets.com writes:

Moise:

Earlier today, we had a telephone conference with three (3) signature bank officers (Rob Bloch, Nick DeMeo, Maria Hegi).

It is our understanding that while the bank will aggressively pursue the law suit against Ahava, they would be prepared to accommodate you to complete the mezzanine financing, proposed in our agreement, to avoid foreclosure.

As a reminder how the mezzanine financing would work, attached please find a copy of the term sheet we sent to you on December 10, 2007.

Please keep in mind that mezzanine financing will not happen without your willingness to adopt an acceptable reorganization plan and to assemble the management team that can implement it.

In order to avoid the Clarivest style fiasco, I will not arrange a meeting between Ahava and the mezzanine funding source until I am convinced that a workable reorganization plan is in place.

According to Rob Bloch, the bank is available to meet with you and your representative to discuss an interim arrangement (even though the law suit is in progress) to allow you time to complete the mezzanine funding.

Moise, the ball is in your park.  Perhaps, a good place to get the ball rolling is to talk to Jeffrey Kurtz, as he was a party to the telephone discussion with Rob Bloch.

Regards,

*Leslie I. Rupf*

**Zarex - Foundation Markets**

**Alliance for Value Chain Financing**

95 Wellington Street West, Suite 1200

Toronto-Dominion Centre

Toronto, ON  M5J 2Z9

Tel:        416-849-2312
Fax:       416-840-0826
E-Mail:    lrupf@foundationmarkets.com

Start the year off right. Easy ways to stay in shape in the new year.

Start the year off right. Easy ways to stay in shape in the new year.

4/8/2008

## Bloch, Robert

| | |
|---|---|
| **From:** | Ahavafood@aol.com |
| **Sent:** | Sunday, January 20, 2008 9:17 PM |
| **To:** | Bloch, Robert |
| **Cc:** | forest@rogers.com |
| **Subject:** | Re: Recapitalization |

Rob,

You must agree that at this time there is very little good faith left between us and the bank. Accordingly any deal needs to address this. The bank's appointed consultant running the company in effect is the take over of the company with no purchase price negotiated. You must understand that this is not an acceptable solution. You are and have been trying to force this on me, and I respectfully request this avenue to be abandoned for the good of both of us

According to Mark Samson, Tuscan is interested in the distribution entity with pay out to the bank and have the plant produce for them. The deal sounds good, and I believe it is real. Tuscan wants to roll up and I guess Jeff's group, and Tuscan need to communicate.

The deal is a full purchase deal and there is no need for my participation except to operate and guarantee supply from the plants.

From your email I assume you opt to go for mezzanine financing, and do a sell later. Under this scenario, the requested management change  would necessitates buying me out. It does not have to be a cash payout. Something along the line of your Email is acceptable. The bank debt is to be satisfied, Some future success fee, capital need for initial plant reserve, supply agreement.

For whatever is worth, Bibbi could close in the next 10 days or so. There are three facilities, AR, Inventory and Equipment. Under this deal the bank will maintain substantial interest in the company to be taken out at the time of sell. The company benefits here as it can negotiate a better sell price. I am not excited about Bibbi, but it is the only deal as far as financing is concerned.

Thanks  Moise

In a message dated 1/18/2008 6:25:29 P.M. Eastern Standard Time, RBloch@signatureNY.com writes:

> Moise:
>
> I would not rule anything out,  however we were not thinking about a day one cash pay out.  Our thoughts were more along the lines of an earn out of your personal liabilities to the Bank coupled with an ability to participate in Ahava's future success.  In addition to an active salaried role at the company.
>
> Thoughts?

Start the year off right. Easy ways to stay in shape in the new year.

## Bloch, Robert

**From:**    Ahavafood@aol.com
**Sent:**    Friday, March 21, 2008 7:35 AM
**To:**    Bloch, Robert
**Subject:** payoff

Good Morning Rob,

some updates

Victor concern about AEG is just the equipment, as they claim they had a lien on the equipment prior to Signature . He does not care about their other claims. His attorney is talking to AEG and will advise Victor accordingly.

I have told him that I am running out of time and if he is interested, he need to do something in a day or two.

He in essence agrees to give the bank a deposit of about $500,000 and also buy out the equipment at 75% of fire sale value. The bank will get over $1 to start and he needs 45 days to do the following:

1.    Get all the Rabbi permission and approval for the deal (a lot of politics are involved).
2.    To work out an asset transfer that would by pass all the judgments
3.    Work out a deal with $3M or so equipment law suits to keep the equipments.
4.    Get a new licence under Norman from department of Agriculture to operate.
5.    Settle with my brother.

If he does not close the bank will keep a small sum for damages.

He is visiting with his engineer to the plants this Wednesday, and the deposit deal could be closed within a week thereafter.

No indication on price until such times when he knows what it will cost him to make one plant from three.

Victor, has been buying and selling and consolidating plants for the last 20 years.

I am also negotiating with Empire chicken, but I dont think the bank is willing to wait. Empire chicken is a $110M outfit, I am sure you have heard of them. they are looking at a partnership, as they need a strong distributor. I like this deal, as I personally will stay in business and I think the bank would make out much, much better.

Lastly, I am working out a deal from Moriah Capital that was brought in by the  brokers who introduced Signature to me. It is buy out and a loan. They buy 50% of the company and lend us and pay you up front and on going. It is a complex deal, and it is not a bad deal, but I think your involvement is needed, I have asked them to call you. His name is Gregory Zilberstein 646 660

9646.   He will be in touch with you by Tuesday.   I assume they are awaiting UCC searches.

I still think we should cooperate to collect the old receivables, again it is up to you.

Today is purim, family time, so if you need to reach me please drop an email.

Have a pleasant day  Moise

---

Create a Home Theater Like the Pros. Watch the video on AOL Home.

**Bloch, Robert**

**From:**    Ahavafood@aol.com
**Sent:**    Thursday, March 27, 2008 1:16 PM
**To:**      Bloch, Robert
**Subject:** Re: Payoff

Yes, I know, they dont want to contact you until they have finished their due diligence and have a firm price in mind.

However this is a real deal. They are very interested and see the opportunity for their business. Let me tell you about them so when you meet them, you will have the tools to negotiate.

The players are the previous owners of Rocheach, Joya food, Mothers, and the now owner of Norman Dairy which is the only other manufacturer of supper kosher dairy products in USA besides us. Victor and Yossie Ostreichler, and Josheph Schlisser

They are capital rich, extremely so.

They are not interested, in the distribution, except that my brother should pack his bag and distribute in west coast on an exclusive basis.

They have their own system of distribution, very much different than ours, they use a lot of jobbers.

They want to make 1 plant out of the three plants.

The payoff to the bank will be their contribution to me, I will get zero actual payment but a pretty good position.

Since, I will be getting zero, i want to make sure the buy out price is high enough to release me in total.  Thanks  for your help

In a message dated 3/27/2008 8:54:56 A.M. Eastern Daylight Time, RBloch@signatureNY.com writes:

> Before we can determine whether you are or are not released of your obligations I need to understand the deal on the table.  So far I haven't seen anything.
>
> I look forward to hearing from them.
>
> Rob
>
> ----- Original Message -----
> From: Ahavafood@aol.com <Ahavafood@aol.com>
> To: Bloch, Robert
> Sent: Wed Mar 26 17:49:42 2008
> Subject: Payoff

Rob,

I sort of have good news. Victor and his staff visit to the plant was successful. He will move forth.

I will be meeting them this week to hopefully finalize. They will meet you as early as next week.

They feel AEG is an issue as it had a prior lien on the plant.

Please when you meet them, you must make a deal whereby I am totally released.

Thanks Moise

---

Create a Home Theater Like the Pros. Watch the video on AOL Home <http://home.aol.com/diy/home-improvement-eric-stromer?video=15?ncid=aolhom00030000000001> .

---

Create a Home Theater Like the Pros. Watch the video on AOL Home.

4/8/2008

## Bloch, Robert

**From:**     Ahavafood@aol.com
**Sent:**     Tuesday, April 01, 2008 9:23 AM
**To:**       Bloch, Robert
**Subject:** update

Rob,

Victor etAl are finalizing their position.

Meanwhile I met and negotiated with a private investor that Jim Jenko introduced.


He will put the following forth if you are interested.

Plant position $1M
AR position (subject to my brother approval, I am not going to start up with him unless there is an agreement in place) 60% less than 90, This will translate about $1.2, I am assuming as I do not know. The last time he shared this with me, the receivables were around $2.8.  I assume today they should be around $2.6 with under 90 around $2M.

No due diligence.

He will take 51% ownership of the obligators and secured position in AOC subject to my brother approval. He closes deals within 4 to 5 business days.

Let me know

Moise

---

Create a Home Theater Like the Pros. Watch the video on AOL Home.

4/8/2008

**Bloch, Robert**

**From:** Ahavafood@aol.com
**Sent:** Tuesday, April 01, 2008 1:39 PM
**To:** Bloch, Robert
**Subject:** Fwd: our meeting

Rob,

Here is another one, Klein Ice cream,  only wants the plant preferable one plant R  U interested?
How much do you want?

From: yenh@netvision.net.il
To: ahavafood@aol.com
CC: abba@koshericecream.com
Sent: 4/1/2008 10:48:46 A.M. Eastern Daylight Time
Subj: our meeting

Dear sir,

It was a pleasure to meet you yesterday with Mr. Klein.

I have great interest to move forward in purchasing your company, for this reason I will very
happy to receive more information.

Waiting for your comments and cooperation.

Best Regards
J.Benhamou

Create a Home Theater Like the Pros. Watch the video on AOL Home.

# **<u>EXHIBIT G</u>**



*Schwartz & Sons*

Vehicle#:                Driver#:000021 FLUK                     Date: 9/17/07 Time:15:14
Route#:000021   Transaction#:0000000000000042        Invoice#:02007077724047 Page:002

SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC
PO BOX 310636
Brooklyn, NY 11231

Tel. 718-243-0400                                                    Fax 718-243-0700

Account:00000 000004332 MOSES DISCOUNT SUPERMARKET        Order#:
Address:                326 AVE M
                        x6 - SHEH BKPR
                        Brooklyn,NY,11230

### Sales

| Item# Description | Case/Unit Units | Price | Amount |
|---|---|---|---|
| 0191 020742-00501 | 36/ 0 432 | 2.0000 | $864.00 |
| NEW SQ MILK REG HALF GALLON ( | 1/ 0 12 | 1.6500 | $18.60 |
| #195 720742-01190 | | | |
| NEW SQ APPLE CIDER (12xHG) | 14/ 9 112 | 2.2000 | $245.40 |
| 1954 020742-01122 | | | |
| NEW SQUARE ORANGE JUICE 8x59oz | 2/ 0 16 | 1.0000 | $16.00 |
| 2028 720742-00960 | 1/ 0 8 | 1.0000 | $8.00 |
| NEW SQ LEMONADE (*8-XHG) | | | |
| 2030 720742-33348 | 1/ 0 8 | 2.7500 | $22.00 |
| NEW SQ FRUIT PUNCH 8xHG | | | |
| 2076 720742-00705 | 1/ 0 8 | 3.0000 | $24.00 |
| NEW SQUARE GRAPEFRUIT JUICE 8x | | | |
| 2304 720742098621 4x8x80 | 10/ 0 80 | 2.3000 | $184.00 |
| NEW SQUARE ORANGE JUICE | | | |
| 2986 720742096052 | | | |
| NS ORANGE TANGO JUICE 8X64 | | | $1383.00 |
| | 67/ 0 676 | | |

| | List Price | Allowance | Net Amount |
|---|---|---|---|
| Sales | $1383.00 | $0.00 | $1383.00 |
| Total Allowances | | | $0.00 |
| Net sales pre tax | | | $1383.00 |
| Net Due This Invoice | | | $1383.00 |
| Previous Balance | | | $36581.99 |
| Total Amount Due: | | | $57964.99 |

POSTED

DUPLICATE

.

# EXHIBIT H

TOTAL P.03

Account:00000-000004392 MOSHES DISCOUNT SUPERMARKET..
Address:                 325 AVE M
                         x6 - SHEVI BKPR
                         Brooklyn,NY,11230

## Sales

| Item# Description | Case/Unit Units | Price | Amount |
|---|---|---|---|
| 0191 020742-00501 | 40/ 0 400 | 2.0000 | $960.00 |
| NEW SQ MILK REG HALF GALLON ( | | | |
| 1954 720742011224 | 24/ 0 192 | 2.2000 | $422.40 |
| NEW SQUARE ORANGE JUICE 8x69oz | | | |
| 2028 720742-00690 | 2/ 0 16 | 1.0000 | $16.00 |
| NEW SQ LEMONADE (*8*1H2) | | | |
| 2030 720742-33346 | 2/ 0 16 | 1.0000 | $16.00 |
| NEW SQ FRUIT PUNCH 8xHG | | | |
| 2076 720742-00705 | 2/ 0 16 | 2.7500 | $44.00 |
| NEW SQUARE GRAPEFRUIT JUICE 8x | | | |
| 2966 720742099057 | 10/ 0 80 | 2.3000 | $184.00 |
| NS ORANGE MANGO JUICE 6X64 | | | |
| | 80/ 0 800 | | $1642.40 |

| | List Price | Allowance | Net Amount |
|---|---|---|---|
| Sales | $1642.40 | $0.00 | $1642.40 |
| | | $0.00 | |
| Total Allowances | | | $1642.40 |
| Net sales pre tax | | | $1642.40 |
| Net Due This Invoice | | | $50696.73 |
| Previous Balance | | | |
| Total Amount Due: | | | $52341.13 |

### DUPLICATE

*Ahava National Food Distribut*

POSTED

Vehicle#:-        Driver#:000021 FLMK          Date: 12/17/07 Time: 14:34
Route#:060021 Transaction#:00000000000916      Invoice#:020007121721085 Page:001

ADABA NATIONAL FOOD DISTRIBUTOR
P.O. BOX 310248
BROOKLYN, NY 11231-

Tel. 718-254-8250                              Fax 718-242-0700

Account:00000 000004392 MOSHES DISCOUNT SUPERMARKET..    Credit:
Address:                 325 AVE M
                         x6 - SHEVI BKPR
                         Brooklyn,NY,11230

## Sales

| Item# Description | Case/Unit Units | Price | Amount |
|---|---|---|---|
| 0191 020742-00501 | 40/ 0 400 | 2.0000 | $960.00 |
| NEW SQ MILK REG HALF GALLON ( | | | |
| 1954 720742011224 | 24/ 0 192 | 2.2000 | $422.40 |
| NEW SQUARE ORANGE JUICE 8x69oz | | | |
| 2028 720742-00690 | 2/ 0 16 | 1.0000 | $16.00 |
| NEW SQ LEMONADE (*8*1H2) | | | |
| 2030 720742-33346 | 2/ 0 16 | 1.0000 | $16.00 |
| NEW SQ FRUIT PUNCH 8xHG | | | |
| 2076 720742-00705 | 2/ 0 16 | 2.7500 | $44.00 |
| NEW SQUARE GRAPEFRUIT JUICE 8x | | | |
| 2966 720742099057 | 10/ 0 80 | 2.3000 | $184.00 |
| NS ORANGE MANGO JUICE 6X64 | | | |
| | 80/ 0 800 | | $1642.40 |

| | List Price | Allowance | Net Amount |
|---|---|---|---|
| Sales | $1642.40 | $0.00 | $1642.40 |
| | | $0.00 | |
| Total Allowances | | | $1642.40 |
| Net sales pre tax | | | $1642.40 |
| Net Due This Invoice | | | $50696.73 |
| Previous Balance | | | |
| Total Amount Due: | | | $52341.13 |

### DUPLICATE

# <u>EXHIBIT I</u>



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

| | | | |
|---|---|---|---|
| **Serial #:** 74270547 | **Filing Dt:** 04/29/1992 | **Reg #:** 1820739 | **Reg. Dt:** 02/08/1994 |

**Registrant:** Ahava Dairy Products Corp.
**Mark:** MORNING SELECT

**Assignment: 1**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2201/0714 | **Received:** 12/28/2000 | **Recorded:** 12/13/2000 | **Pages:** 3 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA DAIRY PRODUCT CORP.
**Exec Dt:** 12/05/2000
**Entity Type:** CORPORATION
**Citizenship:** NEW YORK

**Assignee:** AHAVA FOOD CORP.
230 RICHARD STREET
BROOKLYN, NEW YORK 11230
**Entity Type:** CORPORATION
**Citizenship:** NEW YORK

**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
SHELDON H. KLEIN, ESQ.
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5339

**Assignment: 2**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3734/0221 | **Received:** 03/07/2008 | **Recorded:** 03/07/2008 | **Pages:** 4 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.
**Exec Dt:** 03/06/2008
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC
908 ROSE AVENUE
VENICE, CALIFORNIA 90291
**Entity Type:** LIMITED LIABILITY COMPANY
**Citizenship:** NONE

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:24 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |



## United States Patent and Trademark Office



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

**Serial #:** 75759774       **Filing Dt:** 07/26/1999       **Reg #:** 2795127       **Reg. Dt:** 12/16/2003
**Registrant:** AHAVA DAIRY PRODUCTS CORP.
**Mark:** BEST MOOO

**Assignment: 1**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3734/0221 | **Received:** 03/07/2008 | **Recorded:** 03/07/2008 | **Pages:** 4 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.                                         **Exec Dt:** 03/06/2008
                                                                       **Entity Type:** CORPORATION
                                                                       **Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC                              **Entity Type:** LIMITED LIABILITY COMPANY
            908 ROSE AVENUE                                         **Citizenship:** NONE
            VENICE, CALIFORNIA 90291
**Correspondent:** CHRISTINA R. WALKER
            1050 CONNECTICUT AVENUE, NW
            WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:24 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |



### United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | | |
|---|---|---|---|
| **Serial #:** 78322068 | **Filing Dt:** 11/03/2003 | **Reg #:** 3349275 | **Reg. Dt:** 12/04/2007 |

**Registrant:** Ahava Food Corp.

**Mark:** FRUIT YOGLICIOUS

**Assignment: 1**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3734/0221 | **Received:** 03/07/2008 | **Recorded:** 03/07/2008 | **Pages:** 4 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.

**Exec Dt:** 03/06/2008
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC
908 ROSE AVENUE
VENICE, CALIFORNIA 90291

**Entity Type:** LIMITED LIABILITY COMPANY
**Citizenship:** NONE

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

**| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

**Serial #:** 74571482          **Filing Dt:** 09/09/1994          **Reg #:** 1925643          **Reg. Dt:** 10/10/1995

**Registrant:** Ahava Dairy Products, Inc.

**Mark:** NEW SQUARE

**Assignment: 1**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2201/0714 | **Received:** 12/28/2000 | **Recorded:** 12/13/2000 | **Pages:** 3 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA DAIRY PRODUCT CORP.

**Exec Dt:** 12/05/2000
**Entity Type:** CORPORATION
**Citizenship:** NEW YORK

**Assignee:** AHAVA FOOD CORP.
230 RICHARD STREET
BROOKLYN, NEW YORK 11230

**Entity Type:** CORPORATION
**Citizenship:** NEW YORK

**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
SHELDON H. KLEIN, ESQ.
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5339

**Assignment: 2**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3734/0221 | **Received:** 03/07/2008 | **Recorded:** 03/07/2008 | **Pages:** 4 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.

**Exec Dt:** 03/06/2008
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC
908 ROSE AVENUE
VENICE, CALIFORNIA 90291

**Entity Type:** LIMITED LIABILITY COMPANY
**Citizenship:** NONE

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

**Serial #:** 75884384     **Filing Dt:** 01/03/2000          **Reg #:** 2404337          **Reg. Dt:** 11/14/2000
**Registrant:** AHAVA DAIRY PRODUCTS INC.
**Mark:** THE HEIGHT OF GOOD TASTE

**Assignment: 1**

**Reel/Frame:** 2201/0714     **Received:** 12/28/2000          **Recorded:** 12/13/2000          **Pages:** 3
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA DAIRY PRODUCT CORP.                    **Exec Dt:** 12/05/2000
                                                          **Entity Type:** CORPORATION
                                                          **Citizenship:** NEW YORK

**Assignee:** AHAVA FOOD CORP.                            **Entity Type:** CORPORATION
           230 RICHARD STREET                             **Citizenship:** NEW YORK
           BROOKLYN, NEW YORK 11230
**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
               SHELDON H. KLEIN, ESQ.
               1050 CONNECTICUT AVENUE, N.W.
               WASHINGTON, D.C. 20036-5339

**Assignment: 2**

**Reel/Frame:** 3734/0221     **Received:** 03/07/2008          **Recorded:** 03/07/2008          **Pages:** 4
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA FOOD CORP.                            **Exec Dt:** 03/06/2008
                                                          **Entity Type:** CORPORATION
                                                          **Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC                    **Entity Type:** LIMITED LIABILITY COMPANY
           908 ROSE AVENUE                                **Citizenship:** NONE
           VENICE, CALIFORNIA 90291
**Correspondent:** CHRISTINA R. WALKER
               1050 CONNECTICUT AVENUE, NW
               WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

**Serial #:** 74588137    **Filing Dt:** 10/20/1994    **Reg #:** 2159177    **Reg. Dt:** 05/19/1998
**Registrant:** AHAVA DAIRY PRODUCTS INC.
**Mark:** YOU CAN'T CHOOSE A BETTER MILK

**Assignment: 1**
**Reel/Frame:** 2201/0714    **Received:** 12/28/2000    **Recorded:** 12/13/2000    **Pages:** 3
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA DAIRY PRODUCT CORP.    **Exec Dt:** 12/05/2000
    **Entity Type:** CORPORATION
    **Citizenship:** NEW YORK
**Assignee:** AHAVA FOOD CORP.    **Entity Type:** CORPORATION
230 RICHARD STREET    **Citizenship:** NEW YORK
BROOKLYN, NEW YORK 11230
**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
SHELDON H. KLEIN, ESQ.
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5339

**Assignment: 2**
**Reel/Frame:** 3734/0221    **Received:** 03/07/2008    **Recorded:** 03/07/2008    **Pages:** 4
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA FOOD CORP.    **Exec Dt:** 03/06/2008
    **Entity Type:** CORPORATION
    **Citizenship:** NONE
**Assignee:** AHAVA OF CALIFORNIA, LLC    **Entity Type:** LIMITED LIABILITY COMPANY
908 ROSE AVENUE    **Citizenship:** NONE
VENICE, CALIFORNIA 90291
**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | | |
|---|---|---|---|
| **Serial #:** 76418962 | **Filing Dt:** 06/07/2002 | **Reg #:** 2960129 | **Reg. Dt:** 06/07/2005 |

**Registrant:** Ahava Food Corp.

**Mark:** OF GOLAN

**Assignment: 1**

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3734/0221 | **Received:** 03/07/2008 | **Recorded:** 03/07/2008 | **Pages:** 4 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.

**Exec Dt:** 03/06/2008
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC
908 ROSE AVENUE
VENICE, CALIFORNIA 90291

**Entity Type:** LIMITED LIABILITY COMPANY
**Citizenship:** NONE

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

**Serial #:** 75590471     **Filing Dt:** 11/17/1998     **Reg #:** 2283410     **Reg. Dt:** 10/05/1999
**Registrant:** AHAVA DAIRY PRODUCTS INC.
**Mark:** ACHUZA

### Assignment: 1

| | | |
|---|---|---|
| **Reel/Frame:** 2201/0714     **Received:** 12/28/2000 | **Recorded:** 12/13/2000 | **Pages:** 3 |
| **Conveyance:** NUNC PRO TUNC ASSIGNMENT | | |
| **Assignor:** AHAVA DAIRY PRODUCT CORP. | **Exec Dt:** 12/05/2000 | |
| | **Entity Type:** CORPORATION | |
| | **Citizenship:** NEW YORK | |

**Assignee:** AHAVA FOOD CORP.                    **Entity Type:** CORPORATION
230 RICHARD STREET                    **Citizenship:** NEW YORK
BROOKLYN, NEW YORK 11230
**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
SHELDON H. KLEIN, ESQ.
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5339

### Assignment: 2

**Reel/Frame:** 3734/0221     **Received:** 03/07/2008     **Recorded:** 03/07/2008     **Pages:** 4
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA FOOD CORP.                    **Exec Dt:** 03/06/2008
                    **Entity Type:** CORPORATION
                    **Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC                    **Entity Type:** LIMITED LIABILITY COMPANY
908 ROSE AVENUE                    **Citizenship:** NONE
VENICE, CALIFORNIA 90291
**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | | |
|---|---|---|---|
| **Serial #:** 76445519 | **Filing Dt:** 08/29/2002 | **Reg #:** 2721299 | **Reg. Dt:** 06/03/2003 |

**Registrant:** AHAVA FOOD CORP.

**Mark:** GIDEON

**Assignment: 1**

**Reel/Frame:** 3734/0221      **Received:** 03/07/2008      **Recorded:** 03/07/2008      **Pages:** 4

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.      **Exec Dt:** 03/06/2008
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC      **Entity Type:** LIMITED LIABILITY COMPANY
908 ROSE AVENUE      **Citizenship:** NONE
VENICE, CALIFORNIA 90291

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

USPTO Assignments on the Web
Case 1:08-cv-03893-NRB-MHD    Document 44-4    Filed 07/07/2008    Page 31 of 39
Page 1 of 1



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

**Serial #:** 75737077    **Filing Dt:** 06/24/1999    **Reg #:** 2716873    **Reg. Dt:** 05/20/2003
**Registrant:** AHAVA DAIRY PRODUCTS INC.
**Mark:** SLIM U

**Assignment: 1**

**Reel/Frame:** 2201/0714    **Received:** 12/28/2000    **Recorded:** 12/13/2000    **Pages:** 3
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA DAIRY PRODUCT CORP.    **Exec Dt:** 12/05/2000
                                            **Entity Type:** CORPORATION
                                            **Citizenship:** NEW YORK

**Assignee:** AHAVA FOOD CORP.    **Entity Type:** CORPORATION
230 RICHARD STREET    **Citizenship:** NEW YORK
BROOKLYN, NEW YORK 11230
**Correspondent:** ARENT, FOX, KINTNER, PLOTKIN & KAHN PLLC
SHELDON H. KLEIN, ESQ.
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5339

**Assignment: 2**

**Reel/Frame:** 3734/0221    **Received:** 03/07/2008    **Recorded:** 03/07/2008    **Pages:** 4
**Conveyance:** NUNC PRO TUNC ASSIGNMENT
**Assignor:** AHAVA FOOD CORP.    **Exec Dt:** 03/06/2008
                                  **Entity Type:** CORPORATION
                                  **Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC    **Entity Type:** LIMITED LIABILITY COMPANY
908 ROSE AVENUE    **Citizenship:** NONE
VENICE, CALIFORNIA 90291
**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office**



Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | | |
|---|---|---|---|
| **Serial #:** 76544918 | **Filing Dt:** 08/27/2003 | **Reg #:** 3038963 | **Reg. Dt:** 01/10/2006 |

**Registrant:** Ahava Food Corp.

**Mark:** AHAVA

**Assignment: 1**

**Reel/Frame:** 3734/0221    **Received:** 03/07/2008    **Recorded:** 03/07/2008    **Pages:** 4

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** AHAVA FOOD CORP.    **Exec Dt:** 03/06/2008

**Entity Type:** CORPORATION

**Citizenship:** NONE

**Assignee:** AHAVA OF CALIFORNIA, LLC    **Entity Type:** LIMITED LIABILITY COMPANY
908 ROSE AVENUE    **Citizenship:** NONE
VENICE, CALIFORNIA 90291

**Correspondent:** CHRISTINA R. WALKER
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036

Search Results as of: 04/11/2008 02:25 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

# EXHIBIT J

## TRADEMARK PURCHASE AGREEMENT

This Agreement is entered into on February 20th, 2008, between AHAVA FOOD

CORPORATION, a New York corporation ("AFC"), and AHAVA OF CALIFORNIA, LLC, a

California limited liability company ("AOC").

## RECITALS

1.      AFC was a defendant in an action brought by American Equities Group, Inc.

against AFC and others in the United States District Court for the Southern District of New

York, entitled *American Equities Group, Inc. v. Ahava Dairy Products Corp., et al.,* Case No. 01

Civ. 5207 (RWS) (the "AEG Action").

2.      In February 2008, the parties to the AEG Action entered into a Stipulation and

Agreement of Settlement (the "Stipulation"), which provides, *inter alia,* (i) for a judgment to be

entered against AFC in the amount of $325,000 (the "AFC Judgment"), and (ii) for defendants to

remit to AEG a total of $250,000, payable in 10 monthly installments commencing March 13,

2008 (the "Settlement Payment").  The Stipulation also provides that in the event of the failure to

pay any of the installments of the Settlement Payment when due, and the default is not cured

within the period specified in the Stipulation, then AEG may, *inter alia,* enter judgment against

AFC in the amount of $3.5 million.

3.      AOC has agreed to satisfy the AFC Judgment in full and to fund the Settlement

Payment for AFC's benefit, in exchange for AFC's transfer and assignment to AOC of all right,

title and interest possessed and owned by AFC in the following registered trademarks: New

Square, reg no. 1,925,643, Morning Select,reg .no. 1,820, 739, , Ahava, reg no. 3,038,963,

OFGolan, reg. no. 2,960,129 Best Mooo, reg. no. 2,795,127,  Golan, the Height of good taste,,

reg. no. 2,404,337, 50% share of Hod Golan, reg no 2,629,824, Achuza, reg no 2,283,410, ,

You cant choose a better milk reg no. 2,159,177, , SlimU reg. no. 2,716,873, Gideaon reg no

2,721,299, fruityoglicious reg no. 3,349,275 (the "Trademarks").

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the mutual undertakings described below, the

parties agree as follows:

1.    AFC hereby irrevocably transfers, conveys and assigns to AOC all of AFC's

right, title and interest, and right of exclusive use, in and to the Trademarks, effective as of the

date of this Agreement.

2.    AFC represents and warrants that it owns and has exclusive possession of the

Trademarks, free and clear of any liens, mortgages, encumbrances, and rights of any third person

to the use of the Trademarks.

3.    AOC shall satisfy the AFC Judgment by payment of the judgment, with accrued

interest thereon, to AEG, in 12 monthly equal payments to start after the completion of the

Settlement installment payments due to AEG.

4.    AOC shall pay the Settlement Payment, and each installment payment thereof, in

the manner in which they are required to be paid according to the terms of the Stipulation.

5.    The parties agree to execute such other further documents, consents, and

authorizations as may be necessary to effectuate the intent and purpose of this Agreement.

2

6.     This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

7.     The terms of this Agreement may not be changed and/or modified except by a writing signed by the party or parties whose rights, obligations and/or interests under this Agreement are being changed and/or modified.

8.     This agreement shall be construed and enforced in accordance with the laws of the state of California.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the date first above written.


AHAVA FOOD CORPORATION          AHAVA OF CALIFORNIA, LLC,

By: _____          By: _____
Name:                            Name:

Moise Banayan  President          Fariborz Banayan  Member

3

# TRADEMARK ASSIGNMENT

WHEREAS, AHAVA FOOD CORP., a New York corporation, having its principal place of business at 110 Beard Street, Brooklyn, New York 11231 (hereinafter "Assignor"), has adopted, used and is using the trademarks listed in the attached Schedule of Trademarks (the "Marks"); has registered the Marks in the United States Patent and Trademark Office under the registration numbers listed in the Schedule of Trademarks; and is the sole owner of the entire right, title and interest in and to the Marks and the registrations therefor, together with the good will of the business symbolized by the Marks; and

WHEREAS, AHAVA OF CALIFORNIA, LLC, a California limited liability company, having its principal place of business at 908 Rose Avenue, Venice, California 90291 (hereinafter "Assignee"), desires to acquire the entire right, title and interest in and to the Marks, together with the good will of the business symbolized thereby and the registrations therefor.

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign and transfer to said Assignee, and its successors and assigns, *nunc pro tunc,* as of February 20, 2008, the entire right, title and interest in and to the Marks, together with the good will of the business symbolized thereby, and the United States Trademark registrations therefor, as listed in the attached Schedule of Marks.

AHAVA FOOD CORP.

By: _____

Moise Banayan
President

Date: 03/06/08

## SCHEDULE OF TRADEMARKS

| Trademark | Reg. No. | Reg. Date |
|---|---|---|
| NEW SQUARE | 1925643 | 10-10-1995 |
| MORNING SELECT | 1820739 | 2-8-1994 |
| AHAVA | 3038963 | 1-10-2006 |
| OF GOLAN | 2960129 | 6-7-2005 |
| BEST MOOO | 2795127 | 12-16-2003 |
| ACHUZA | 2283410 | 10-5-1999 |
| THE HEIGHT OF GOOD TASTE | 2404337 | 11-14-2000 |
| YOU CAN'T CHOOSE A BETTER MILK | 2159177 | 5-19-1998 |
| SLIM U | 2716873 | 5-20-2003 |
| FRUIT YOGLICIOUS | 3349275 | 12-4-2007 |
| GIDEON | 2721299 | 6-3-2003 |

SCHEDULE

| Trademark | Reg. No. | Reg. Date |
| --- | --- | --- |
| HOD GOLAN | 2,629,824 | 10-8-2002 |

# **EXHIBIT K**

# Commercial Lease

This lease is made between _LEWIS COUNTY DAIRY Corp_

of _AHAVA OF CALIFORNIA_ , herein called Lessor, and

, herein called Lessee. Lessee hereby offers to lease from Lessor the

premises situated in the City of _Lowville_ , County of _LEWIS_

State of _NY_ , described as _DAIRY Plant_

upon the following TERMS and CONDITIONS:

**1. Term and Rent.** Lessor demises the above premises for a term of _5_ years, commencing _August 29/07_
, 20 _07_ , and terminating on _August 28_ , 20 _12_ , or sooner as provided herein at the annual rental
of _SEE ATTACHED_ Dollars ($ _ATTACHED_) payable in equal installments in advance on the first day
of each month for that month's rental, during the term of this lease. All rental payments shall be made to Lessor, at the address
specified above.

**2. Use.** Lessee shall use and occupy the premises for _DAIRY Manufacturing_ . The premises shall
be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose. Lessee shall not use
the premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous
substance, chemical, thing, or device.

**3. Care and Maintenance of Premises.** Lessee acknowledges that the premises are in good order and repair, unless
otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the premises in good and safe condition,
including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the premises
and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted. Lessee
shall be responsible for all repairs required, excepting the roof, exterior walls, structural foundations, and

_SEE ATTACHED_

which shall be maintained by Lessor. Lessee shall also maintain in good condition such portions adjacent to the premises, such
as sidewalks, driveways, lawns and shrubbery, which would otherwise be required to be maintained by Lessor.

**4. Alterations.** Lessee shall not, without first obtaining the written consent of Lessor, make any alterations, additions, or
improvements, in, to or about the premises.

**5. Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and
federal authorities now in force, or which may hereafter be in force, pertaining to the premises, occasioned by or affecting the
use thereof by Lessee.

**6. Assignment and Subletting.** Lessee shall not assign this lease or sublet any portion of the premises without prior written
consent of the Lessor, which shall not be unreasonably withheld. Any such assignment or subletting without consent shall be
void and, at the option of the Lessor, may terminate this lease.

**7. Utilities.** All applications and connections for necessary utility services on the demised premises shall be made in the name
of Lessee only, and Lessee shall be solely liable for utility charges as they become due, including those for sewer, water, gas,
electricity, and telephone services. In the event that any utility or service provided to the premises is not separately metered,
Lessor shall pay the amount due and separately invoice Lessee for Lessee's pro rata share of the charges. Tenant shall pay such
amounts within fifteen (15) days of invoice. Lessee acknowledges that the leased premises are designed to provide standard of-
fice use electrical facilities and standard office lighting. Lessee shall not use any equipment or devices that utilize excessive elec-
trical energy or that may, in Lessor's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

**8. Entry and Inspection.** Lessee shall permit Lessor or Lessor's agents to enter upon the premises at reasonable times and
upon reasonable notice, for the purpose of inspecting the same, and will permit Lessor at any time within sixty (60) days prior to
the expiration of this lease, to place upon the premises any usual "To Let" or "For Lease" signs, and permit persons desiring to

lease the same to inspect the premises thereafter.

**9. Parking.** During the term of this lease, Lessee shall have the nonexclusive use in common with Lessor, other tenants of the building, their guests and invitees, of the nonreserved common automobile parking areas, driveways, and foot ways, subject to rules and regulations for the use thereof as prescribed from time to time by Lessor. Lessor reserves the right to designate parking areas within the building or in a reasonable proximity thereto, for Lessee and Lessee's agents and employees. Lessee shall provide Lessor with a list of all license numbers for the cars owned by Lessee, its agents and employees. Separated structured parking, if any, located about the building is reserved for Lessees of the building who rent such parking spaces. Lessee hereby leases from Lessor _____ spaces in such a structural parking area, such spaces to be on a first-come first-served basis. In consideration of the leasing to Lessee of such spaces, Lessee shall pay a monthly rental _____ Dollars ($_____) per space throughout the term of the lease. Such rent shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals.

**10. Possession.** If Lessor is unable to deliver possession of the premises at the commencement hereof, Lessor shall not be liable for any damage caused thereby, nor shall this lease be void or voidable, but Lessee shall not be liable for any rent until possession is delivered. Lessee may terminate this lease if possession is not delivered within _____ days of the commencement of the term hereof.

**11. Indemnification of Lessor.** To the extent of the law, Lessor shall not be liable for any damage or injury to Lessee, or any other person, or to any property, occurring on the demised premises or any part thereof. Lessee agrees to indemnify and hold Lessor harmless from any claims for damages which arise in connection with any such occurrence. Said indemnification shall include indemnity from any costs or fee which Lessor may incur in defending said claim.

**12. Insurance.** Lessee, at his expense, shall maintain plate glass and public liability insurance including bodily injury and property damage insuring Lessee and Lessor with minimum coverage as follows:

Lessee shall provide Lessor with a Certificate of Insurance showing Lessor as additional insured. The Certificate shall provide for a ten-day written notice to Lessor in the event of cancellation or material change of coverage. To the maximum extent permitted by insurance policies which may be owned by Lessor or Lessee, Lessee and Lessor, for the benefit of each other, waive any and all rights of sub rogation which might otherwise exist.

If the leased premises or any other part of the building is damaged by fire or other casualty resulting from any act of negligence of Lessee or any of Lessee's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Lessee shall be responsible for the costs of repair not covered by insurance.

**13. Eminent Domain.** If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Lessee's use of the premises, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent, and any additional rent, shall be apportioned as of the termination date, and any rent paid for any period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a claim for any taking of fixtures and improvements owned by Lessee, and for moving expenses.

**14. Destruction of Premises.** In the event of a partial destruction of the premises during the term hereof, from any cause, Lessor shall forthwith repair the same, provided that such repairs can be made within sixty (60) days under existing governmental laws and regulations, but such partial destruction shall not terminate this lease, except that Lessee shall be entitled to a proportionate reduction of rent while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business of Lessee on the premises. If such repairs cannot be made within said sixty (60) days, Lessor, at his option, may make the same within a reasonable time, this lease continuing in effect with the rent proportionately abated as aforesaid, and in the event that Lessor shall not elect to make such repairs which cannot be made within sixty (60) days, this lease may be terminated at the option of either party. In the event that the building in which the demised premises may be situated is destroyed to an extent of not less than one-third of the replacement costs thereof, Lessor may elect to terminate this lease whether the demised premises be injured or not. A total destruction of the building in which the premises may be situated shall terminate this lease.

**15. Lessor's Remedies on Default.** If Lessee defaults in the payment of rent, or any additional rent, or defaults in the performance of any of the other covenants or conditions hereof, Lessor may give Lessee notice of such default and if Lessee does not cure any such default within _____30_____ days, after the giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such _____30_____ days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this lease on not less than _____30_____ days' notice to Lessee. On the date specified in such notice the term of this lease shall terminate, and Lessee shall then quit and surrender the premises to Lessor, without extinguishing Lessee's liability. If this lease

© 2004, Socrates Media, LLC
LF140-1 • Rev. 04/04

shall have been so terminated by Lessor, Lessor may at any time thereafter resume possession of the premises by any lawful means and remove Lessee or other occupants and their effects. No failure to enforce any term shall be deemed a waiver.

**16. Security Deposit.** Lessee shall deposit with Lessor on the signing of this lease the sum of 38,000 Dollars ($ 0 ) as security for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided. If Lessor applies any part of the deposit to cure any default of Lessee, Lessee shall on demand deposit with Lessor the amount so applied so that Lessor shall have the full deposit on hand at all times during the term of this lease.

**17. Tax Increase.** In the event there is any increase during any year of the term of this lease in the City, County or State real estate taxes over and above the amount of such taxes assessed for the tax year during which the term of this lease commences, whether because of increased rate or valuation, Lessee shall pay to Lessor upon presentation of paid tax bills an amount equal to 100 % of the increase in taxes upon the land and building in which the leased premises are situated. In the event that such taxes are assessed for a tax year extending beyond the term of the lease, the obligation of Lessee shall be proportionate to the portion of the lease term included in such year.

**18. Common Area Expenses.** In the event the demised premises are situated in a shopping center or in a commercial building in which there are common areas, Lessee agrees to pay his prorata share of maintenance, taxes, and insurance for the common area.

**19. Attorney's Fees.** In case suit should be brought for recovery of the premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

**20. Waiver.** No failure of Lessor to enforce any term hereof shall be deemed to be a waiver.

**21. Notices.** Any notice which either party may or is required to give, shall be given by mailing the same, postage prepaid, to Lessee at the premises, or Lessor at the address specified above, or at such other places as may be designated by the parties from time to time.

**22. Heirs, Assigns, Successors.** This lease is binding upon and inures to the benefit of the heirs, assigns and successors in interest to the parties.

**23. Option to Renew.** Provided that Lessee is not in default in the performance of this lease, Lessee shall have the option to renew the lease for an additional term of 60 months commencing at the expiration of the initial lease term. All of the terms and conditions of the lease shall apply during the renewal term except that the monthly rent shall be the sum of $20,000. ___ . The option shall be exercised by written notice given to Lessor not less than 90 days prior to the expiration of the initial lease term. If notice is not given in the manner provided herein within the time specified, this option shall expire.

**24. Subordination.** This lease is and shall be subordinated to all existing and future liens and encumbrances against the property.

**25. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in ___ . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**26. Entire Agreement.** The foregoing constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties. The following Exhibits, if any, have been made a part of this lease before the parties' execution hereof:   *SEE Attached* · ·   *Equipment list* MB FB

Signed this 29th day of August , 20 07 .

Lessor: _Rivi Benson_

Lessee: _Fariborz Bananaj_

## Amendment to Lease dated August 29, 2007

**This agreement amends and supplements the lease agreement** (the `lease`)made this August 29th 2007 by and between Lewis County Dairy Corp. ( the "Landlord"), with an office at 100 Beard Street, Brooklyn, New York and Ahava of California,LLC a California Limited Liability Company (" Tenant" ), with an office at 908 Rose Av Vanice California.

    1.   <u>Premises and Equipment.</u> Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord (a) the land, the buildings and other improvements located at Route 812 ,Lowville, New York and more particularly described (the "Premises") and (b) all of the personal property and equipment located at the Premise, including, without limitation, the items presently therein (the "Equipment"). The list of such equipment is attached in schedule "A".

    2.   <u>Terms and Early Termination term.</u>  Tenant shall have the right to terminate this Lease at any time upon 90 days prior written notice to Landlord within the first year of this agreement.

    3.   <u>Rent.</u>  Tenant agrees to pay rent during the term of this Lease as per the following rent schedule: With the signing of this contract the tenet is to pay a six month advance rate at $6,000 per month for a total sum of $36,000. Thereafter from march 1st 2008 the rent shall increase to $12,000 per month for the remainder of this lease. Payable on the first of each month.

    4.   <u>Landlord's Default.</u> The Landlord failure to timely pay its obligations to any creditor holding an interest of whatever kind in the premises or the equipment outlined in schedule "A" constitutes a default by landlord in addition to any other conditions of default set forth in the lease.

    5.   <u>Right of Tenant to Cure Landlord's Default.</u>  If Landlord defaults in the making of any payment or the doing of any act required under this Lease, Tenant may make such payment or do such act and shall be entitled to set-off the amount of such payment against the Rent owed under this Lease.

    6. <u>Severability</u> In the event any portion of this amendment shall be declared void, invalid or illegal the remainder of the agreement shall remain in full force and effect. In the event of a dispute between the lease and this amendment, this amendment shall govern provided, however, that no provision of this amendment shall invalidate or impair the lease.

    7. <u>Applicable Law and Venue</u> This agreements shall be construed in accordance with the laws of the State of New York. Jurisdiction and venue are agreed to be the Supreme Court of the State of New York, County of Lewis.

    8. <u>Modification</u>. This agreement and the lease may not be modified except by a writing signed by all parties to this agreement.

9.   Independent Status The parties acknowledge that this agreement is the only relationship between the parties and that neither party is the employee, agent, subsidiary, shareholder or neither is responsible for the actions of the other.

10.   Successors and Assigns This agreement is binding upon the parties hereto and their successors and assigns.

11.   Notices Notices shall be sent to the parties at the addresses set forth above.

IN WITNESS WHEREOF, the parties have entered into this agreement.

IN WITNESS WHEREOF, the parties have entered into this agreement.

Ahava of California LLC                    Lewis County Dairy Corp.


By                                         By

Fariborz Banayan Sole Managing member      Moise Banayan President

Witness                                    Witness

Joseph N Cohn
Aug 29 2007                                Aug. 29th 2007.

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 2000 | **Centrifugal Seperator**<br>Make: Westfalia<br>Model: ASA5-01-076<br>Serial #: 1720706<br>Stainless steel 24" CIP, 7,560 RPM |
| 1 | 1999 | **Tub filler**<br>Make: ATS<br>Model: SP1-2L<br>Serial #: 0999<br>Stainless steel bulk tub filler with cello over wrapper, RF sealer, turret film unwind, die cutter, scrap rewind, 3 head with PLC controls, auto feed and discharge |
| 1 | 2002 | **Vertical Silo**<br>Make: Walker<br>10,000 USG stainless steel refrigerated, Tri-clover air vales, CIP spray balls, front mount agitator, front manway, Anderson AV-9000 digital chart recorder |
| 1 | 2002 | **Refrigerated box truck**<br>Make: International<br>Model: 4400<br>VIN: 1HTMSAAR62T033924<br>T/A 6 X 4, DT 466 275 HP, Eaton Fuller 8 speed Syncro-Stick transmission, 28' aluminum box with Carrier reefer, spring suspension, 102,752 miles |
|  |  |  |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 2003 | **Condensed milk processing system**<br>Make:        Alaqua<br>(2) stainless steel 1,320 USG single wall hinged lid vertical water feed tanks, 60 USG balance tank, APV stainless steel heat exchangers, (2) evaporator steam jacketed cone bottom processing tanks, stainless steel piping and pumps, all associated equipment |
| 1 | 2000 | **Bottle filler**<br>Make:        Franz<br>30 head automatic rotary plastic bottle filler, 1 Qt. - 1/2 USG with feed conveyor |
| 2 | 2002 | **Vertical Silo**<br>Make:        Walker<br>Serial #:    PC24662<br>Stainless steel 40,000 USG refrigerated with CIP spray balls, Tri-clover air valves, 1 HP front mounted agitator, front manway, Anderson AV-9000 dogota; chart recorders |
| 1 | 2000 | **Whey separator**<br>Make:        Separators Inc.<br>Model:       MR-PX214<br>Serial #:    2937333<br>36" stainless steel high speed centrifugal |
|  |  |  |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 2005 | **Processing tank**<br>Make:    Walker<br>Model:   PZ SP6<br>Serial #:  41007<br>Stainless steel 800 USG dome top, full sweep agitator, steam jacketed |
| 1 | 2001 | **Processing tank**<br>Make:    Vialac<br>Stainless steel batch processing tank, dome top, steam jacketed, 440 USG with 1 HP full sweep agitator |
| 1 | 2006 | **Bottle filler**<br>Make:    General Films<br>Portable stainless steel bag-in box filler |
| 1 |  | **Vacuum packer**<br>Make:    Koch<br>Model:   Ultra-Vac II<br>Semi-automatic twin chamber with gas flush |
| 1 | 2002 | **Processing tank**<br>Make:    Walker<br>Model:   PZ<br>Stainless steel Glycol jacketed, top hatch, 1/2 HP full sweep agitator, 300 USG, CIP spray balls |
| 3 |  | **Cheese vat**<br>Stainless steel steam jacketed open top, 28" X 64" X 40" with bridge mounted twin traveling agitators |
|  |  |  |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | 1971 | **Vertical Silo**<br>Make:        Walker<br>Model:        VSHT-2139R<br>Serial #:        7848<br>40,000 USG stainless steel refrigerated, Tri-clover air valves, front mount agitaor, CIP spray balls, front manway, Partlow and Anderson digital chart recorders |
| 1 | | **Tanks and Fixtures**<br>Lot of assorted stainless steel small balance tanks, accumulation tables, stainless steel pumps, free standing sinks, COP tanks, and related equipment |
| 1 | 1999 | **Processing tank**<br>Make:        Feldmeier<br>stainless steel batch tank, 1 HP full sweep agitator, dome top, electronic load cells on four legs with Weightronix WI-127 digital read out |
| 1 | | **Processing tank**<br>Make:        Walker<br>Model:        PZ 600<br>Stainless steel cold water jacketed, dome top, front manway, full sweep agitator |
| 1 | 2002 | **Processing tank**<br>Make:        Walker<br>Model:        PZ800<br>Stainles steel dome top wit full sweep agitator |
| | | |



| Qty | Year | Description |
|---|---|---|
| 2 | | **Equalizing tank**<br>Make:        Secado<br>Model:       Galaxy<br>Stainless steel cone bottom, 3,000 USG |
| 1 | | **Processing tank**<br>Stainless steel vertical cold water jacketed, 1,250 USG with full sweep agitator |
| 1 | | **Processing tank**<br>Stainless steel vertical cold water jacketed, 1,000 USG with full sweep agitator |
| 1 | | **Processing tank**<br>Make:        Cherry Burrell<br>Stainless steel batch processing tank, Glycol jacketed, 5 HP full sweep agitator with gear reduction, 850 USG |
| 1 | | **Processing tank**<br>Stainless steel 1,000 USG dome top, full sweep agitator, top hatch, cold water jacketed |
| 1 | | **Homogenizer**<br>Make:        Geulin<br>Stainless steel 3 piston |
| 1 | 1965 | **Butter Churn**<br>Make:        Paasch & Silkborg<br>Model:       NCE<br>Serial #:      9518<br>Cold water jacketed continuous with CIP |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | **CIP system**<br>150 USG rectangular steam jacketed tank, 150 USG single wall hinged lid stainless steel tank, 500 USG steam jacketed hot water feed tank, 5 - 7 1/2 HP pumps |
| 1 | | **CIP system**<br>(2) Stainless steel steam jacketed tanks, stainless steel pumps, PLC controls, Anderson ACR700 digital chart recorder |
| 1 | 1979 | **Processing tank**<br>Make:    Walker<br>Model:   PZ-ST<br>Stainless steel steam jacketed, top hatch, 1/2 HP agitator, 200 USG |
| 1 | 1989 | **Heat Exchanger**<br>Make:    Proflow<br>Model:   AR56-5<br>Stainless steel 56 size plate frame |
| 2 | | **Printer**<br>Make:    Domino<br>Model:   A300SE<br>Ink jet encoders with DRO |
| 1 | | **Homogenizer**<br>Make:    Gaulin<br>Stainless steel 3 piston |
| 1 | | **Whipping machine**<br>Make:    Cherry Burrell<br>Stainless steel vertical cylinder 40 HP drive |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | **Chiller**<br>Make:     Cherry Burrell<br>Model:     648L<br>Stainless steel twin barrel<br>thermulator, 6" diameter X 48" |
| 1 | | **Lab equipment**<br>Lot of assorted including INDEX<br>SNAPSHOT tester, Orion and<br>Corning digital Ph meters, digital lab<br>balances, digital parts counting<br>scales, Leica dark field colony<br>counter, environmental test chambers<br>and incubators |
| 3 | | **Horizontal tank**<br>Stalless steel refrigerated 6,800 USG<br>with CIP spray balls, Tri-clover air<br>valves, front mounted agitators,<br>Anderson AJ-300 chart recorder |
| 1 | 1957 | **Horizontal tank**<br>Make:     Chicago Stainless<br>Stainless steel refrigerated, CIP<br>spray balls, Tri-clover air valves, 5<br>HP stainless steel pump, front hatch |
| 1 | | **Chiller**<br>Make:     Cherry Burrell<br>Model:     624L<br>Stainless steel twin barrel<br>thermulator, 6" diameter X 24" |
| | | |

# Commercial Lease

This lease is made between _St Lawrence Feed Corp._
of _____, herein called Lessor, and
_Ahava of California LLC_, of _____
_____ herein called Lessee. Lessee hereby offers to lease from Lessor the
premises situated in the City of _Edensburg_, County of _St Lawrence_,
State of _NY_, described as _Cheese Plant_
_____

upon the following TERMS and CONDITIONS:

**1. Term and Rent.** Lessor demises the above premises for a term of _5_ years, commencing _Oct 30 Sw_
_Sept_ 20 _07_, and terminating on _Oct 29 IX_ 20 _12_, or sooner as provided herein at the annual rental
of _Each pmt IX_ Dollars ($ _15,000_ ) payable in equal installments in advance on the first day
of each month for that month's rental, during the term of this lease. All rental payments shall be made to Lessor at the address
specified above.

**2. Use.** Lessee shall use and occupy the premises for _Cheese Making_. The premises shall
be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose. Lessee shall not use
the premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous
substance, chemical, thing, or device.

**3. Care and Maintenance of Premises.** Lessee acknowledges that the premises are in good order and repair, unless
otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the premises in good and safe condition,
including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the premises
and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted. Lessee
shall be responsible for all repairs required, excepting the roof, exterior walls, structural foundations, and: _____
_____ _SEE ATTACHED_ _____ _____
_____
_____

which shall be maintained by Lessor. Lessee shall also maintain in good condition such portions adjacent to the premises, such
as sidewalks, driveways, lawns and shrubbery, which would otherwise be required to be maintained by Lessor.

**4. Alterations.** Lessee shall not, without first obtaining the written consent of Lessor, make any alterations, additions, or
improvements, in, to or about the premises.

**5. Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and
federal authorities now in force, or which may hereafter be in force, pertaining to the premises, occasioned by or affecting the
use thereof by Lessee.

**6. Assignment and Subletting.** Lessee shall not assign this lease or sublet any portion of the premises without prior written
consent of the Lessor, which shall not be unreasonably withheld. Any such assignment or subletting without consent shall be
void and, at the option of the Lessor, may terminate this lease.

**7. Utilities.** All applications and connections for necessary utility services on the demised premises shall be made in the name
of Lessee only, and Lessee shall be solely liable for utility charges as they become due, including those for sewer, water, gas,
electricity, and telephone services. In the event that any utility or service provided to the premises is not separately metered,
Lessor shall pay the amount due and separately invoice Lessee for Lessee's pro rata share of the charges. Tenant shall pay such
amounts within fifteen (15) days of invoice. Lessee acknowledges that the leased premises are designed to provide standard of-
fice use electrical facilities and standard office lighting. Lessee shall not use any equipment or devices that utilize excessive elec-
trical energy or that may, in Lessor's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

**8. Entry and Inspection.** Lessee shall permit Lessor or Lessor's agents to enter upon the premises at reasonable times and
upon reasonable notice, for the purpose of inspecting the same, and will permit Lessor at any time within sixty (60) days prior to
the expiration of this lease, to place upon the premises any usual "To Let" or "For Lease" signs, and permit persons desiring to

lease the same to inspect the premises thereafter.

**9. Parking.** During the term of this lease, Lessee shall have the nonexclusive use in common with Lessor, other tenants of the building, their guests and invitees, of the nonreserved common automobile parking areas, driveways, and foot ways, subject to rules and regulations for the use thereof as prescribed from time to time by Lessor. Lessor reserves the right to designate parking areas within the building or in a reasonable proximity thereto, for Lessee and Lessee's agents and employees. Lessee shall provide Lessor with a list of all license numbers for the cars owned by Lessee, its agents and employees. Separated structured parking, if any, located about the building is reserved for Lessees of the building who rent such parking spaces. Lessee hereby leases from Lessor _____ spaces in such a structural parking area, such spaces to be on a first-come first-served basis. In consideration of the leasing to Lessee of such spaces, Lessee shall pay a monthly rental _____ Dollars ($_____) per space throughout the term of the lease. Such rent shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals.

**10. Possession.** If Lessor is unable to deliver possession of the premises at the commencement hereof, Lessor shall not be liable for any damage caused thereby, nor shall this lease be void or voidable, but Lessee shall not be liable for any rent until possession is delivered. Lessee may terminate this lease if possession is not delivered within _____ days of the commencement of the term hereof.

**11. Indemnification of Lessor.** To the extent of the law, Lessor shall not be liable for any damage or injury to Lessee, or any other person, or to any property, occurring on the demised premises or any part thereof. Lessee agrees to indemnify and hold Lessor harmless from any claims for damages which arise in connection with any such occurence. Said indemnification shall include indemnity from any costs or fee which Lessor may incur in defending said claim.

**12. Insurance.** Lessee, at his expense, shall maintain plate glass and public liability insurance including bodily injury and property damage insuring Lessee and Lessor with minimum coverage as follows:

Lessee shall provide Lessor with a Certificate of insurance showing Lessor as additional insured. The Certificate shall provide for a ten-day written notice to Lessor in the event of cancellation or material change of coverage. To the maximum extent permitted by insurance policies which may be owned by Lessor or Lessee, Lessee and Lessor, for the benefit of each other, waive any and all rights of sub rogation which might otherwise exist.

If the leased premises or any other part of the building is damaged by fire or other casualty resulting from any act of negligence of Lessee or any of Lessee's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Lessee shall be responsible for the costs of repair not covered by insurance.

**13. Eminent Domain.** If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Lessee's use of the premises, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent, and any additional rent, shall be apportioned as of the termination date, and any rent paid for any period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a claim for any taking of fixtures and improvements owned by Lessee, and for moving expenses.

**14. Destruction of Premises.** In the event of a partial destruction of the premises during the term hereof, from any cause, Lessor shall forthwith repair the same, provided that such repairs can be made within sixty (60) days under existing governmental laws and regulations, but such partial destruction shall not terminate this lease, except that Lessee shall be entitled to a proportionate reduction of rent while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business of Lessee on the premises. If such repairs cannot be made within said sixty (60) days, Lessor, at his option, may make the same within a reasonable time, this lease continuing in effect with the rent proportionately abated as aforesaid, and in the event that Lessor shall not elect to make such repairs which cannot be made within sixty (60) days, this lease may be terminated at the option of either party. In the event that the building in which the demised premises may be situated is destroyed to an extent of not less than one-third of the replacement costs thereof, Lessor may elect to terminate this lease whether the demised premises be injured or not. A total destruction of the building in which the premises may be situated shall terminate this lease

**15. Lessor's Remedies on Default.** If Lessee defaults in the payment of rent, or any additional rent, or defaults in the performance of any of the other covenants or conditions hereof, Lessor may give Lessee notice of such default and if Lessee does not cure any such default within _____30_____ days, after the giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such _____30_____ days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this lease on not less than _____30_____ days' notice to Lessee. On the date specified in such notice the term of this lease shall terminate, and Lessee shall then quit and surrender the premises to Lessor, without extinguishing Lessee's liability. If this lease

shall have been so terminated by Lessor, Lessor may at any time thereafter resume possession of the premises by any lawful means and remove Lessee or other occupants and their effects. No failure to enforce any term shall be deemed a waiver.

**16. Security Deposit.** Lessee shall deposit with Lessor on the signing of this lease the sum of _____ Dollars ($ _____ _CA_ ) as security for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided. If Lessor applies any part of the deposit to cure any default of Lessee, Lessee shall on demand deposit with Lessor the amount so applied so that Lessor shall have the full deposit on hand at all times during the term of this lease.

**17. Tax Increase.** In the event there is any increase during any year of the term of this lease in the City, County or State real estate taxes over and above the amount of such taxes assessed for the tax year during which the term of this lease commences, whether because of increased rate or valuation, Lessee shall pay to Lessor upon presentation of paid tax bills an amount equal to _/00_ % of the increase in taxes upon the land and building in which the leased premises are situated. In the event that such taxes are assessed for a tax year extending beyond the term of the lease, the obligation of Lessee shall be proportionate to the portion of the lease term included in such year.

**18. Common Area Expenses.** In the event the demised premises are situated in a shopping center or in a commercial building in which there are common areas, Lessee agrees to pay his prorata share of maintenance, taxes, and insurance for the common area.

**19. Attorney's Fees.** In case suit should be brought for recovery of the premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

**20. Waiver.** No failure of Lessor to enforce any term hereof shall be deemed to be a waiver.

**21. Notices.** Any notice which either party may or is required to give, shall be given by mailing the same, postage prepaid, to Lessee at the premises, or Lessor at the address specified above, or at such other places as may be designated by the parties from time to time.

**22. Heirs, Assigns, Successors.** This lease is binding upon and inures to the benefit of the heirs, assigns and successors in interest to the parties.

**23. Option to Renew.** Provided that Lessee is not in default in the performance of this lease, Lessee shall have the option to renew the lease for an additional term of _60_ months commencing at the expiration of the initial lease term. All of the terms and conditions of the lease shall apply during the renewal term except that the monthly rent shall be the sum of $ _2500 0_ ___. The option shall be exercised by written notice given to Lessor not less than _90_ days prior to the expiration of the initial lease term. If notice is not given in the manner provided herein within the time specified, this option shall expire.

**24. Subordination.** This lease is and shall be subordinated to all existing and future liens and encumbrances against the property.

**25. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in _____ _____ . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**26. Entire Agreement.** The foregoing constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties. The following Exhibits, if any, have been made a part of this lease before the parties' execution hereof:

*SEE ATTACHED*     *MB*
                    *FB*

Signed this _30th_ day of _October_ , 200_7_ .

Lessor: _____

Lessee: _____

Case 1:08-cv-03893-NRB-MHD    Document 18-4    Filed 05/22/2008    Page 5 of 35

**Amendment to Lease dated October 30th, 2007**

This agreement amends and supplements' the lease agreement (The `lease') made this October 30th 2007 by and between St Lawrence Food Corp. ( the "Landlord"), with an office at 30 main street, Odgensburg, New York and Ahava of California, LLC a California Limited liability corporation (" Tenant" ), with an office at 908 Rose Av Venice California.

1.   <u>Premises and Equipment.</u>    Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord (a) the land, the buildings and other improvements located at 30 main street Odgensburg, New York and more particularly described (the "Premises") and (b) all of the personal property and equipment located at the Premise, including, without limitation, the items presently therein (the "Equipment"). The list of such equipment is attached in schedule "A".

2.   <u>Term and Early Termination term.</u>    Tenant shall have the right to terminate this Lease at any time upon 90 days prior written notice to Landlord within the first year of this agreement. The term of the lease shall be for a period of 5 years commencing on the 30th day of October 2007 and concluding upon the 29th day of October 2012.

3.   <u>Rent.</u>    Tenant agrees to pay rent during the term of this Lease as per the following rent schedule: With the signing of this contract the tenet is to pay a four month advance rate at $15,000 per month for a total sum of $60,000. Thereafter from march 1st 2008 the rent shall be paid on the first of each and every month for $15,000 per month.

4. <u>Landlord's Default.</u>    The Landlord failure to timely pay its obligations to any creditor holding an interest of whatever kind in the premises or the equipment outlined in schedule 'A" constitutes a default by landlord in addition to any other conditions of default set forth in the lease.

5.   <u>Right of Tenant to Cure Landlord's Default.</u>    If Landlord defaults in the making of any payment or the doing of any act required under this Lease, Tenant may make such payment or do such act and shall be entitled to set-off the amount of such payment against the Rent owed under this Lease.

6.   <u>Severability</u> In the event any portion of this amendment shall be declared void, invalid or illegal the remainder of the agreement shall remain in full force and effect. In the event of a dispute between the lease and this amendment, this amendment shall govern provided, however, that no provision of this amendment shall invalidate or impair the lease.

7.   <u>Applicable Law and Venue</u> This agreements shall be construed in accordance with the laws of the State of New York. Jurisdiction and venue are agreed to be the Supreme Court of the State of New York, County of Lewis.

8.   <u>Modification.</u>  This agreement and the lease may not be modified except by a writing signed by all parties to this agreement.

9.    <u>Independent Status</u> The parties acknowledge that this agreement is the only relationship between the parties and that neither party is the employee, agent, subsidiary, shareholder or neither is responsible for the actions of the other:

10.    <u>Successors and Assigns</u> This agreement is binding upon the parties hereto and their successors and assigns.

11.    <u>Notices</u> Notices shall be sent to the parties at the addresses set forth above.

IN WITNESS WHEREOF, the parties have entered into this agreement.

IN WITNESS WHEREOF, the parties have entered into this agreement.


Ahava of California LLC                     St Lawrence Food Corp.


By _____                   By _____

Fariborz Banayan Sole managing Member       Moise Banayan  President

Witness                                     Witness

Joseph H Cohen                              October 30th 2007.
October 30, 2007

| Qty | Year | Description |
|-----|------|-------------|
| 2 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 35,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 4 | 2002 | **Processing tank**<br>Make:       Cherry Burrell<br>Stainless steel steam jacketed starter tanks, 650 USG- 60" diameter X 52", 24" top hatch on dome top, 1/2 HP agitators, CIP spray balls, ABB digital chart recorder, Allen Bradley PLC controls |
| 1 | | **CIP system**<br>(3) stainless steel tanks- 36" diameter X 48", 7 1/2 HP circulating pump with AC TECH drive control, 20 HP delivery pump with AC TECH drive control, 2" - 2.5" piping with TENOR 763 PLC chemical delivery system and digital control panel, Anderson digital chart recorder |
| | | **CIP system**<br>(2) 36" X 42" X 72" stainless steel tanks, 5 HP pump with AC TECH drive control, stainless steel piping, foamer, (3) ACR 700 digital chart recorder, PLC controls, (3) pump AFTROL MAGNUM III chemical system, stainless steel hot water delivery surge tank |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | 2001 | **Centrifugal Separator**<br>Make:    Separators Inc.<br>Model:    MRPX 213<br>36" whey separator, 4,500 RPM with digital drive control |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 30,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | 2002 | **Water treatment system**<br>Reverse osmosis water purification system, skid mounted stainless steel, 4" diameter X 40 tube system, (4) Fristam 10 HP pumps, (2) Fristam 25 HP pumps, AC drive controls on all pumps, PLC controls |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 2 | 2002 | **Vacuum packer**<br>Make:        Multivac<br>Model:       C-500<br>dual chamber stainless steel with gas flush |
| 1 | | **Water treatment system**<br>Ultra-fine water purification membrane type system, skid mounted stainless steel, 4" diameter X 38 tube, (4) Fristam 25 HP stainless steel pumps, 3 stage system, AC drive controls on all pumps, PLC controls |
| 1 | 2002 | **Cheese former**<br>Make:        COMAT<br>Model:       M50B4<br>Stainless steel with hopper feed, 4 tube extruder head with assorted dies, 18" wide with 8" diameter heads |
| 1 | | **CIP system**<br>(3) stainless steel tanks with chemical pumps, foamer, AC TECH digital drive controls on pumps, PLC controls, ABB Commander 1900 digital chart recorder |
| 1 | | **Machine Shop**<br>Assorted machine tools and service equipment |
| | | |

| Qty | Year | Description |
|-----|------|-------------|
| 1 | | **Cheese shredder**<br>Make:         Urschell<br>24" stainless steel rotary with 10 HP drive, 6' X 48" diameter stainless steel ambient air tumble dryer with segmented feed conveyor- discharge conveyor |
| 9 | | **Horizontal tank**<br>Stainless steel refrigerated, 7,200 USG with front agitator, front hatch, CIP spray balls, Tri-clover air valves |
| 5 | | **Cheese vat**<br>Make:         Stoelting<br>Stainless steel open top steam jacketed oval, 60" X 48" X 32' with overhead bridge traveling dual agitators, 2" piping, digital temp controls |
| 2 | 1988 | **HTST system**<br>Make:         Alfa Laval<br>Model:         H7-RC<br>Stainless steel plate press heat exchanger, 100 USG stainless steel balance tank, stainless steel piping and pumps, ABB PLC controls, AC TECH drive controls on all pumps, Anderson AV-900 digital chart recorder |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 50,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |

| Qty | Year | Description |
|---|---|---|
| 1 | 1989 | **Boiler**<br>Make:       Cleaver Brooks<br>Model:      CB400-600<br>Serial #:   L85851<br>400 HP gas-oil fired packaged steam |
| | | **Lab equipment**<br>Lot of assorted |
| 1 | | **Vertical Silo**<br>Stainless steel vertical refrigerated 35,000 USG, Tri-clover air valve, CIP spray balls, front hatch, 1 HP front mounted agitator, digital chart recorder |
| 1 | | **CIP system**<br>(3) stainless steel tanks- 36" diameter X 48", 7 1/2 HP circulating pump with AC TECH drive control, 20 HP delivery pump with AC TECH drive control, 2" - 2.5" piping with TENOR 783 PLC chemical delivery system and digital control panel, Anderson digital chart recorder |
| 1 | | **Cheese shredder**<br>Make:       Urschell<br>Stainless steel portable |
| 1 | | **Cheese cutter**<br>Make:       Urschell<br>Stainless steel portable cuber |
| 1 | | **Tanks and Fixtures**<br>Lot of assorted stainless steel sinks, tables, rolling COP tanks, surge tanks, balance tanks, and related |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | Pallet rack<br>Lot of assorted |
| | 1975 | Boiler<br>Make:      Cleaver Brooks<br>Serial #:      L59963<br>400 HP gas-oil fired packaged steam,<br>new tubes installed 2005 |
| 1 | | Cheese cutter<br>Make:      Tu-Way<br>Stainless steel pneumatic up acting<br>automatic cuber, 12" X 15" platform |
| 1 | 1995 | Air Compressor<br>Make:      Ingersoll Rand<br>Model:      SSREP50SE<br>Rotary screw with digital controls, 50<br>HP |
| 1 | 2005 | Ice maker<br>Make:      Alcion<br>Model:      Ice-o-matic<br>48" bin automatic |
| 1 | 1996 | Forklift<br>Make:      Toyota<br>Model:      42-GFCGU18<br>Solid tire LP, 3,000# with side shift,<br>11,399 Hrs. |
| 1 | | Air Compressor<br>Make:      Ingersoll Rand<br>Model:      T-30<br>25 HP twin cylinder with air holding<br>tank |
| | | |

| Qty | Year | Description |
|---|---|---|
| 1 | | **Mixing tank**<br>Stainless steel seam jacketed, 48" X 52" 500 USG with .5 HP lightning mixer |
| 1 | | **Heat Exchanger**<br>Make:      Ahborn<br>Model:      151<br>Stainless steel plate press |
| 1 | | **Metal detector**<br>Make:      Safeline<br>Model:      Powerphase |
| 2 | | **Box taper**<br>Make:      Little David<br>Top/bottom with Micro-Jet encoders |
| 1 | | **Cooling tank**<br>Stainless steel with overhead bridge crane, (2) 1/2 ton electric chain fall hoists, 24' X 48" X 36" |
| 1 | | **Cleaning tank**<br>Portable COP steam coil jacketed with 3 HP pump, 90" X 28" X 30" |
| 1 | | **Baler**<br>Model:      HP-50<br>60" hydraulic vertical |
| 1 | | **Extruder**<br>Make:      Tramaline<br>Stainless steel twin cylinder, 12' X 8" |
| 1 | 1963 | **Heat Exchanger**<br>Make:      Chester Jensen<br>Model:      HMC<br>Stainless steel 55 size plate press frame |

## SETTLEMENT AGREEMENT

November 27th 2007

This is an settlement agreement between Ahava of California.LLC (AOC) a California limited liability corporation  with an address of 908 Rose Venice California  and Schwartz and Sons Quality Distributor (SSQD) a NY corporation with an address of 110 Beard street Brooklyn NY, as follows:

Whereas there exist a certain lease agreement (LEASE) dated October 26 2006 between Yoni realty LLC  a NY limited Liability company with various addresses on Beard and Richard street Brooklyn NY  (YONI) and Ahava Food Corp. (AFC)  a NY corporation with address 110 Beard Street Brooklyn and,

Whereas AFC assigned and SSQD assumed the LEASE on July 30th 2007 for a period of two years in an agreement dated July 30th 2007, as attached and

Whereas Signature bank no longer honors any check drawn by SSQD, and thus SSQD can no longer fulfill the required financial obligations of the LEASE and such nonpayment will put the mortgage with YONI in default and would cause serious financial loss to the sole owner and stock holder of SSQD, Moise Banayan and,

Whereas SSQD bought certain office and warehouse items and software, from AFC as per agreement dated July 30th 2007, and that the parties agree that these items have a value of $40,000 or less and,

Whereas SSQD now owes AOC over $780,000 for merchandize that it has purchased and not paid for. And now SSQD claims that it is unable to pay its debt to AOC, and,

Whereas due to this debt AOC has stopped shipping and selling to SSQD and,

Whereas SSQD now has run out of its inventory and has bounced checks to its employees and truck leasing companies and various vendors and farmers and utility companies and the utility companies have given SSQD shut down notices and SSQD is no longer operating, and,

Whereas SSQD has certain outstanding account Receivable

NOW THE PARTIES AGREE TO SETTLE AS FOLLOWS:

AOC assumes the LEASE and obligations and SSQD agree to this assumption and give up all its right and title in this lease agreement for the remaining period of two years starting July 30th 2007, ending July 29th 2009 and thus secures the value of stock of Moise Banayan in Yoni.

AOC now purchases the entire office asset and warehouse equipment that SSQD purchased according to an agreement dated July 30th 2007 between AFC and SSQD for $40,000 and reduces SSQD obligation by same.

SSQD remains fully obliged for the balance of its debt to AOC.

It is further understood that AOC by assuming the LEASE will NOT take on or pay any equipment lease obligation of SSQD or AFC.

It is further understood that AOC by assuming the LEASE will NOT take on any trucking lease or any other contractual obligation of AFC and SSQD.

It is further understood that AOC by assuming the LEASE is NOT required to pay any vendor of SSQD and AFC.

SSQD further agrees that it will collect its receivables to satisfy its debt to AOC, and Moise Banayan will invest his time and collect from SSQD until obligations to SSQD have been satisfied.

Signed for

Schwartz & Sons Quality Distributors

_Moise Banayan_

Moise Banayan

President

Ahava of California

_Fariborz Banayan_

Fariborz Banayan

Managing member

## LEASE ASSUMPTION AGREEMENT

July 30th 2007

This is an assumption agreement between Ahava Food Corp. (AFC) a NY corporation and Schwartz and Sons Quality Distributor (SSQD)a NY corporation as follows:

Whereas there exist a certain lease agreement (LEASE) dated October 26 2006 between Yoni realty LLC and Ahava Food Corp. and,

Whereas Signature bank has been served by M&I a seizure order against AFC,(JUDGMENT) and, consequently AFC is unable to satisfy the financial obligations as required by the lease agreement due to the enforcement of the JUDGMENT by M&I and,

Whereas in addition to above, AFC can no longer meet its financial obligations to the vendors for the equipment (EQUIPMENT) that are used at the location that is subject of the LEASE, and is asking SSQD to take on these payment obligations so that AFC not lose the EQUIPMENT,

Whereas AFC owns and has title to certain physical office and warehouse asset namely computers and software and telephone system and all other equipment that is needed to operate a distribution facility (ASSET) and

Whereas AFC leases trucks for delivery and distribution (TRUCK) and,

Whereas AFC is asking SSQD to enter into an agreement with Signature bank and join and take on the obligations of AFC, and Signature has agreed for SSQD to join (JOINDER).

Now comes SSQD for consideration listed above, and assumes the LEASE and AFC agree to this assumption and gives up all it's right and title in this lease agreement for a period of two years from above date.

Further, SSQD for the value of the lease payment for the EQUIPMENT and for the value of and consideration of the JOINDER will lease and use the TRUCK for the period of this lease, and buys the ASSET from AFC

Signed for

Ahava Food Corp.                                    Schwartz & Sons Quality Distributors

*M. Banayan*                                         *M. Banayon.*

Moise Banayan                                        Moise Banayan

President AFC                                        President SSQD

# **<u>EXHIBIT L</u>**

Cus PO# F041307618 04/13/07

AHAVA FOOD CORP.
110 Beard Street
BROOKLYN, NY11231
718-243-0400
718-243-0700



MACABEE FOOD INC.
BOB SILVERMAN & ERIC 914-403-2730
140 WEST COMMERCIAL AVE
Moonachie, NJ 07074

| Item | UPC | Item Code | Quantity Cases | Pieces | Price |
|------|-----|-----------|----------------|--------|-------|
| GOLAN PART SKIM MOZZARELLA 8x6lb | 720742691488 | 1711 | 5260.77 lbs. | | 2.20 |

Total Cases 0.00
Total Weighted Items 5260.77
Total Lbs. 5260.77

Total: 11,573.69
Amount Paid: 0.00
Grand Total: 11,573.69

Page no 1

04/13/07

# **<u>EXHIBIT M</u>**

# AHAVA FOOD CORP.

## 110 BEARD STREET BROOKLYN, N.Y.

**PHONE 718 243-0400**                    **FAX 718 243-0700**

April 18, 2007

Dear Valued Customer,

In response to many requests for better service, we have began to use the services of Schwartz & Sons Quality Distributors and Primo Kosher Food, to enhance our distribution.

Depending on the location, customers will receive service from one of the above and accordingly labeled. There would be no change in your price and terms, but better service. The delivery tickets will be appropriately marked.

Most customers will continue to receive deliveries through Ahava Food Corp.

Please feel free to call us here at any time, and I thank you for your support.

Yours,

Ari Katz
Director of Operations

# **<u>EXHIBIT N</u>**



*Sport Driven*

```
INVOICE P070507885 07/08/07
Cus PO#


SCHWARTZ & SONS QUALITY DISTRIBUTOR
PO BOX 310638
Brooklyn, NY 11231-
718-243-0400



            MACABEE FOOD INC.
            BOB SILVERMAN & ERIC 914-403-2730
            140 WEST COMMERCIAL AVE
            Moonachie, NJ 07074
```

| Item | UPC | Item Code | Quantity Cases | Pieces | Price | Total |
|------|-----|-----------|----------------|--------|-------|-------|
| GOLAN PART SKIM MOZZARELLA 8x5.5lb | 720742691488 | 1711 | 5835.37 lbs. | | 3.00 | 17506.11 |

```
                                       ============
Total Cases                                 0.00
Total Weighted Items                     5835.37
Total Lbs.                               5835.37

                              Total:    17,506.11
                              Amount Paid:   0.00
                              Grand Total: 17,506.11
```

*Code Date
7-2-7*

*7-9-7
128 cs.*



```
============================================================================
Page no 1                                                          07/08/07
```

# EXHIBIT O

```
INVOICE P111407222 11/14/07
Cus PO#


AHAVA OF CALIFORNIA
236-280 RICHARD STREET
BROOKLYN, NY 11231-
718-254-8242




          MACABEE FOOD INC.
          BOB SILVERMAN & ERIC 914-403-2730
          140 WEST COMMERCIAL AVE
          Moonachie, NJ 07074


                            Item    Quantity
                            Code   Cases  Pieces    Price      Total
Item                 UPC
===============================================================================
GOLAN PART SKIM MOZZARELLA 8x5lb    720742691488 1711  1535.32 lbs.    3.05     4682.73
PRIMO SAPORE P/S MOZZARELLA CHEESE 8x6LB      2592  1481.54 lbs.    3.05     4518.70
                                    ============
                                        0.00
Total Cases
Total Weighted Items                  3016.86
Total Lbs.                            3016.86

                    Customer Discount:     0.00
                              Total:  9,201.42
                       Amount Paid:      0.00
                       Grand Total:  9,201.42
```

*64es*

===============================================================================

# EXHIBIT P

# AHAVA NATIONAL FOOD DISTRIBUTOR

## PO BOX # 310648

## BROOKLYN.N.Y.11231

TEL: 718 -254-8230                    FAX: 718 -243 -0700

Dear Valued Customer,

Please be advised that we have ceased our relationship with Schwartz and Sons Quality Distributors. The level of service and customer service has been lacking.

Effective immediately we will be serving you direct.          Please make all inquiries and payments to:

### AHAVA NATIONAL FOOD DISTRIBUTOR

Please note our new address on your invoice and statement so there is no confusion as to the mailing address.

### AHAVA NATIONAL FOOD DISTRIBUTOR

### P.O. BOX 310648

### BROOKLYN NY 11231

Should you have any further questions please don't hesitate to contact our office at 718-254-8230.

Thank You

Ari Katz

VP

Operations

# **<u>EXHIBIT Q</u>**

AHACA 02/13/2007 12:42 PM

| Form **1065** | **U.S. Return of Partnership Income** | OMB No. 1545-0099 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2006, or tax year beginning ............ , ending ............ ▶ See separate instructions. | **2006** |

| A Principal business activity | Use the IRS label. Other- wise, print or type. | Name of partnership **AHAVA OF CALIFORNIA LLC** | D Employer identification number **95-4846136** |
|---|---|---|---|
| B Principal product or service | | Number, street, and room or suite no. If a P.O. box, see the instructions. **908 ROSE AVE.** | E Date business started **3/08/2000** |
| C Business code number | | City or town, state, and ZIP code **VENICE      CA 90291** | F Total assets (see the instructions) $ **115** |

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change (5) ☐ Amended return
H Check accounting method: (1) ☐ Cash (2) ☒ Accrual (3) ☐ Other (specify) ▶ ............
I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ .......... 2
J Check if Schedule M-3 required (attach Schedule M-3) ☐

Caution. Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | 1a | Gross receipts or sales ............ | 1a | 378,410 | |
| | b | Less returns and allowances ............ | 1b | | 1c | 378,410 |
| | 2 | Cost of goods sold (Schedule A, line 8) ............ | 2 | 301,460 |
| | 3 | Gross profit. Subtract line 2 from line 1c ............ | 3 | 76,950 |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) ............ | 4 | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) ............ | 5 | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) ............ | 6 | |
| | 7 | Other income (loss) (attach statement) ............ | 7 | |
| | 8 | Total income (loss). Combine lines 3 through 7 ............ | 8 | 76,950 |

| | | | | |
|---|---|---|---|---|
| **Deductions** (see the instructions for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) ............ | 9 | |
| | 10 | Guaranteed payments to partners ............ | 10 | |
| | 11 | Repairs and maintenance ............ | 11 | |
| | 12 | Bad debts ............ | 12 | |
| | 13 | Rent ............ | 13 | 46,425 |
| | 14 | Taxes and licenses          See Statement 1 | 14 | 2,200 |
| | 15 | Interest ............ | 15 | 14,164 |
| | 16a | Depreciation (if required, attach Form 4562) | 16a | | | |
| | b | Less depreciation reported on Schedule A and elsewhere on return | 16b | | 16c | |
| | 17 | Depletion (Do not deduct oil and gas depletion.) ............ | 17 | |
| | 18 | Retirement plans, etc. ............ | 18 | |
| | 19 | Employee benefit programs ............ | 19 | |
| | 20 | Other deductions (attach statement)          See Statement 2 | 20 | 12,720 |
| | 21 | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 ............ | 21 | 75,509 |
| | 22 | Ordinary business income (loss). Subtract line 21 from line 8 ............ | 22 | 1,441 |
| | 23 | Credit for federal telephone excise tax paid (attach Form 8913) ............ | 23 | |

| **Sign Here** | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge. | May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No |
|---|---|---|
| | ▶ Signature of general partner or limited liability company member manager    Date | |

| **Paid Preparer's Use Only** | Preparer's signature | Date 2/13/07 | Check if self-employed ▶ | Preparer's SSN or PTIN 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 |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | ROBERT L. FRIEDBAUER, CPA P.O. BOX 446 TEANECK, NJ         07666-0446 | | EIN ▶ 22-3205970 Phone no. 201-692-8188 |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.
DAA

Form 1065 (2006)

65 (2006)   **AHAVA OF CALIFORNIA LLC**   95-4846136                    Page 2

**Schedule A    Cost of Goods Sold (see the instructions)**

| | | |
|---|---|---:|
| 1 | Inventory at beginning of year | |
| 2 | Purchases less cost of items withdrawn for personal use | 87,605 |
| 3 | Cost of labor | |
| 4 | Additional section 263A costs (attach statement)                    See Statement 3 | 213,855 |
| 5 | Other costs (attach statement) | 301,460 |
| 6 | Total. Add lines 1 through 5 | |
| 7 | Inventory at end of year | 301,460 |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 301,460 |

9a   Check all methods used for valuing closing inventory:

   (i) ☐ Cost as described in Regulations section 1.471-3

   (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

   (iii) ☐ Other (specify method used and attach explanation) ▶

b   Check this box if there was a writedown of "subnormal" goods as described in Regulations section 1.471-2(c) ▶ ☐

c   Check this box if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) .... ☐ Yes ☐ No

d   Do the rules of section 263A (for property produced or acquired for resale) apply to the partnership? .............. ☐ Yes ☐ No

e   Was there any change in determining quantities, cost, or valuations between opening and closing inventory? ........ ☐ Yes ☐ No

   If "Yes," attach explanation.

**Schedule B    Other Information**

| | | Yes | No |
|---|---|:---:|:---:|
| 1 | What type of entity is filing this return? Check the applicable box: | | |
| a | ☐ Domestic general partnership    b ☐ Domestic limited partnership | | |
| c | ☐ Domestic limited liability company    d ☒ Domestic limited liability partnership | | |
| e | ☐ Foreign partnership    f ☐ Other ▶ | | |
| 2 | Are any partners in this partnership also partnerships? | | X |
| 3 | During the partnership's tax year, did the partnership own any interest in another partnership or in any foreign entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? If yes, see instructions for required attachment | | X |
| 4 | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| 5 | Does this partnership meet all three of the following requirements? | | |
| a | The partnership's total receipts for the tax year were less than $250,000; | | |
| b | The partnership's total assets at the end of the tax year were less than $500,000; and | | |
| c | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item N on Schedule K-1 | X | |
| 6 | Does this partnership have any foreign partners? If "Yes," the partnership may have to file Forms 8804, 8805 and 8813. See the instructions | | X |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, a return under section 6111 to provide information on any reportable transaction? | | |
| 9 | At any time during calendar year 2006, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for Form TD F 90-22.1. If "Yes," enter the name of the foreign country. ▶ | | X |
| 10 | During the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520. See the instructions | | X |
| 11 | Was there a distribution of property or a transfer (for example, by sale or death) of a partnership interest during the tax year? If "Yes," you may elect to adjust the basis of the partnership's assets under section 754 by attaching the statement described under Elections Made By the Partnership in the instructions | | X |
| 12 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return ▶ | | |

**Designation of Tax Matters Partner (see the instructions)**

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

| Name of designated TMP ▶ | | Identifying number of TMP ▶ | |
|---|---|---|---|
| Address of designated TMP ▶ | | | |

Form **1065** (2006)

DAA

3/2007 12:43 PM

Page 3

| 5 (2006) | AHAVA OF CALIFORNIA LLC | 95-4846136 | | |
|---|---|---|---|---|
| | **Partners' Distributive Share Items** | | | Total amount |
| | | | | 1,441 |

| | | | | |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary business income (loss) (page 1, line 22) | | 1 | |
| | 2 Net rental real estate income (loss) (attach Form 8825) | | 2 | |
| | 3a Other gross rental income (loss) | 3a | | |
| | b Expenses from other rental activities (attach statement) | 3b | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a | | 3c | |
| | 4 Guaranteed payments | | 4 | |
| | 5 Interest income | | 5 | |
| | 6 Dividends: a Ordinary dividends | | 6a | |
| | b Qualified dividends | 6b | | |
| | 7 Royalties | | 7 | |
| | 8 Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | 8 | |
| | 9a Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | 9a | |
| | b Collectibles (28%) gain (loss) | 9b | | |
| | c Unrecaptured section 1250 gain (attach statement) | 9c | | |
| | 10 Net section 1231 gain (loss) (attach Form 4797) | | 10 | |
| | 11 Other income (loss) (see instructions) Type ▶ | | 11 | 1,441 |
| Deductions | 12 Section 179 deduction (attach Form 4562) | | 12 | |
| | 13a Contributions | | 13a | |
| | b Investment interest expense | | 13b | |
| | c Section 59(e)(2) expenditures: | | | |
| | (1) Type ▶                  (2) Amount ▶ | | 13c(2) | |
| | d Other deductions (see instructions) Type ▶ | | 13d | |
| Self-Employment | 14a Net earnings (loss) from self-employment | | 14a | |
| | b Gross farming or fishing income | | 14b | |
| | c Gross nonfarm income | | 14c | 76,950 |
| Credits | 15a Low-income housing credit (section 42(j)(5)) | | 15a | |
| | b Low-income housing credit (other) | | 15b | |
| | c Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | | 15c | |
| | d Other rental real estate credits (see instructions) Type ▶ | | 15d | |
| | e Other rental credits (see instructions) Type ▶ | | 15e | |
| | f Other credits (see instructions) Type ▶ | | 15f | |
| Foreign Transactions | 16a Name of country or U.S. possession ▶ | | | |
| | b Gross income from all sources | | 16b | |
| | c Gross income sourced at partner level | | 16c | |
| | Foreign gross income sourced at partnership level | | | |
| | d Passive ▶       e Listed categories (attach statement) ▶       f General limitation ▶ | | 16f | |
| | Deductions allocated and apportioned at partner level | | | |
| | g Interest expense ▶       h Other ▶ | | 16h | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | | |
| | i Passive ▶       j Listed categories (attach statement) ▶       k General limitation ▶ | | 16k | |
| | l Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ | | 16l | |
| | m Reduction in taxes available for credit (attach statement) | | 16m | |
| | n Other foreign tax information (attach statement) | | | |
| Alternative Minimum Tax (AMT) Items | 17a Post-1986 depreciation adjustment | | 17a | |
| | b Adjusted gain or loss | | 17b | |
| | c Depletion (other than oil and gas) | | 17c | |
| | d Oil, gas, and geothermal properties-gross income | | 17d | |
| | e Oil, gas, and geothermal properties-deductions | | 17e | |
| | f Other AMT items (attach statement) | | 17f | |
| Other Information | 18a Tax-exempt interest income | | 18a | |
| | b Other tax-exempt income | | 18b | |
| | c Nondeductible expenses | | 18c | |
| | 19a Distributions of cash and marketable securities | | 19a | |
| | b Distributions of other property | | 19b | |
| | 20a Investment income | | 20a | |
| | b Investment expenses | | 20b | |
| | c Other items and amounts (attach statement) | | | |

Form **1065** (2006)

DAA

| 6 | Other current assets (attach statement) | | | | | |
|---|---|---|---|---|---|---|
| 7 | Mortgage and real estate loans | | | | | |
| 8 | Other investments (attach statement) | | | | | |
| 9a | Buildings and other depreciable assets | | 6,620 | | | 0 |
| b | Less accumulated depreciation | | 6,620 | | 6,620 | |
| 10a | Depletable assets | | | | 6,620 | |
| b | Less accumulated depletion | | | | | |
| 11 | Land (net of any amortization) | | | | | |
| 12a | Intangible assets (amortizable only) | | | | | |
| b | Less accumulated amortization | | | | | |
| 13 | Other assets (attach statement) | | | | | 115 |
| 14 | Total assets | | 1,323 | | | 115 |

**Liabilities and Capital**

| 15 | Accounts payable | | | | | |
|---|---|---|---|---|---|---|
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | | 500 |
| 17 | Other current liabilities (attach statement) | | | | | |
| 18 | All nonrecourse loans | | | | | |
| 19 | Mortgages, notes, bonds payable in 1 year or more | | | | | |
| 20 | Other liabilities (attach statement) | | 47,211 | | | 44,062 |
| 21 | Partners' capital accounts | | -45,888 | | | -44,447 |
| 22 | Total liabilities and capital | | 1,323 | | | 115 |

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income (Loss) per Return
Note. Schedule M-3 may be required instead of Schedule M-1 (see instructions).

| 1 | Net income (loss) per books | 1,441 | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
|---|---|---|---|---|---|
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a | Tax-exempt interest $ | |
| 3 | Guaranteed payments (other than health insurance) | | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | a | Depreciation $ | |
| a | Depreciation $ | | | See Statement 4 | 1,441 |
| b | Travel and entertainment $ | | 8 | Add lines 6 and 7 | 1,441 |
| | | | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | 0 |
| 5 | Add lines 1 through 4 | 1,441 | | | |

## Schedule M-2 Analysis of Partners' Capital Accounts

| 1 | Balance at beginning of year | -45,888 | 6 | Distributions: a Cash | |
|---|---|---|---|---|---|
| 2 | Capital contributed: a Cash | | | b Property | |
| | b Property | | 7 | Other decreases (itemize): | |
| 3 | Net income (loss) per books | 1,441 | | | |
| 4 | Other increases (itemize): | | 8 | Add lines 6 and 7 | |
| 5 | Add lines 1 through 4 | -44,447 | 9 | Balance at end of year. Subtract line 8 from line 5 | -44,447 |

DAA

Form 1065 (2006)

AHAVA OF CALIFORNIA LLC                                    2/13/2007 12:42 PM
846136                    **Federal Statements**
12/31/2006

### Statement 1 - Form 1065, Page 1, Line 14 - Taxes

| Description | Amount |
|---|---|
| NYS CORP TAX | $ 500 |
| CALIFORNIA STATE TAX | 1,700 |
| Total | $ 2,200 |

### Statement 2 - Form 1065, Page 1, Line 20 - Other Deductions

| Description | Amount |
|---|---|
| TELEPHONE | $ 7,261 |
| POSTAGE | 94 |
| ADVERTISING | 775 |
| OFFICE SUPPLIES | 485 |
| CONSULTANTS | 752 |
| MISCELLANEOUS | 1,793 |
| REPAIRS & MAINTENANCE | 1,560 |
| Total | $ 12,720 |

2007 12:12 PM

**Form 562**

**Depreciation and Amortization**

(Including Information on Listed Property)

▶ See separate instructions.    ▶ Attach to your tax return.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0172

**2006**

Attachment Sequence No. **67**

Name(s) shown on return
**HAVA OF CALIFORNIA LLC**

Identifying number
**95-4846136**

Business or activity to which this form relates
**Regular Depreciation**

## Part I    Election To Expense Certain Property Under Section 179

Note: If you have any listed property, complete Part V before you complete Part I.

| | | | |
|---|---|---|---|
| 1 | Maximum amount. See the instructions for a higher limit for certain businesses | 1 | 108,000 |
| 2 | Total cost of section 179 property placed in service (see instructions) | 2 | |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 | 430,000 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 | 108,000 |

| | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| 6 | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | 7 | | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | |
| 9 | Tentative deduction. Enter the smaller of line 5 or line 8 | 9 | 0 |
| 10 | Carryover of disallowed deduction from line 13 of your 2005 Form 4562 | 10 | 6,620 |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instructions) | 11 | 1,441 |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | 12 | 1,441 |
| 13 | Carryover of disallowed deduction to 2007. Add lines 9 and 10, less line 12 ▶ | 13 | 5,179 | |

Note: Do not use Part II or Part III below for listed property. Instead, use Part V.

## Part II    Special Depreciation Allowance and Other Depreciation (Do not include listed property.) (See instructions.)

| | | | |
|---|---|---|---|
| 14 | Special allowance for qualified New York Liberty or Gulf Opportunity Zone property (other than listed property) placed in service during the tax year (see instructions) | 14 | |
| 15 | Property subject to section 168(f)(1) election | 15 | |
| 16 | Other depreciation (including ACRS) | 16 | |

## Part III    MACRS Depreciation (Do not include listed property.) (See instructions.)

### Section A

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2006 | 17 | 0 |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

### Section B-Assets Placed in Service During 2006 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only-see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b    5-year property | | | | | | |
| c    7-year property | | | | | | |
| d    10-year property | | | | | | |
| e    15-year property | | | | | | |
| f    20-year property | | | | | | |
| g    25-year property | | | 25 yrs. | | S/L | |
| h    Residential rental property | | | 27.5 yrs. | MM | S/L | |
| | | | 27.5 yrs. | MM | S/L | |
| i    Nonresidential real property | | | 39 yrs. | MM | S/L | |
| | | | | MM | S/L | |

### Section C-Assets Placed in Service During 2006 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b    12-year | | | 12 yrs. | | S/L | |
| c    40-year | | | 40 yrs. | MM | S/L | |

## Part IV    Summary (see instructions)

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | 21 | |
| 22 | Total. Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations-see instr. | 22 | |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 23 | |

For Paperwork Reduction Act Notice, see separate instructions.

DAA

**There are no amounts for Page 2**

Form **4562** (2006)

651106
OMB No. 1545-0069

☐ Final K-1    ☐ Amended K-1

**2006**

For calendar year 2006, or tax
year beginning _____
ending _____

Treasury
Service

**Part III    Partner's Share of Current Year Income,
Deductions, Credits, and Other Items**

**Share of Income, Deductions,**
See back of form and separate instructions.

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) 720 | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction 720 | 19 | Distributions |
| 13 | Other deductions | 20 | Other Information |
| 14 C | Self-employment earnings (loss) 38,475 | | |

**Part I    Information About the Partnership**

A Partnership's employer identification number
95-4846136

B Partnership's name, address, city, state, and ZIP code
AHAVA OF CALIFORNIA LLC

908 ROSE AVE.
VENICE                    CA 90291

C IRS Center where partnership filed return
Ogden, UT  84201-0011

D ☐ Check if this is a publicly traded partnership (PTP)
E ☐ Tax shelter registration number, if any _____
F ☐ Check if Form 8271 is attached

**Part II    Information About the Partner**

G Partner's identifying number
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

H Partner's name, address, city, state, and ZIP code
MOISE BANAYAN

51 PARKER BLVD.
MONSEY                    NY 10952

I ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member
J ☒ Domestic partner   ☐ Foreign partner
K What type of entity is this partner?  Individual
L Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 50.000000 % | 50.000000 % |
| Loss | 50.000000 % | 50.000000 % |
| Capital | 50.000000 % | 50.000000 % |

M Partner's share of liabilities at year end:
Nonrecourse ............ $ _____
Qualified nonrecourse financing ...... $ _____
Recourse ............ $ 22,281

N Partner's capital account analysis:
Beginning capital account ...... $ -22,945
Capital contributed during the year ...... $ 720
Current year increase (decrease) ...... $ _____
Withdrawals & distributions ...... $ ( _____ )
Ending capital account ...... $ -22,225

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

* See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2006

DAA

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0099

| | | |
|---|---|---|
| **...ner# 1** | | |
| **...le K-1** | **2006** | |
| **...1065)** | | |

**Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

...ent of the Treasury
...l Revenue Service

For calendar year 2006, or tax
year beginning _____
ending _____

**...artner's Share of Income, Deductions,
Credits, etc.** ▶ See back of form and separate instructions.

**Part I    Information About the Partnership**

A  Partnership's employer identification number
**95-4846136**

B  Partnership's name, address, city, state, and ZIP code
**AHAVA OF CALIFORNIA LLC**

**908 ROSE AVE.**
**VENICE             CA 90291**

C  IRS Center where partnership filed return
**Ogden, UT  84201-0011**

D  ☐ Check if this is a publicly traded partnership (PTP)

E     Tax shelter registration number, if any

F  ☐ Check if Form 8271 is attached

**Part II    Information About the Partner**

G  Partner's identifying number
**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**

H  Partner's name, address, city, state, and ZIP code
**BANAYAN FARIBORZ**

· **908 ROSE AVE.**
**VENICE             CA 90291**

I  ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

J  ☒ Domestic partner    ☐ Foreign partner

K  What type of entity is this partner?  **Individual**

L  Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 50.000000 % | 50.000000 % |
| Loss | 50.000000 % | 50.000000 % |
| Capital | 50.000000 % | 50.000000 % |

M  Partner's share of liabilities at year end:

| | | |
|---|---|---|
| Nonrecourse | $ | |
| Qualified nonrecourse financing | $ | |
| Recourse | $ | 22,281 |

N  Partner's capital account analysis:

| | | |
|---|---|---|
| Beginning capital account | $ | -22,943 |
| Capital contributed during the year | $ | |
| Current year increase (decrease) | $ | 721 |
| Withdrawals & distributions | $ ( | ) |
| Ending capital account | $ | -22,222 |

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| | 721 | | |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | | |
| | 721 | | |
| 13 | Other deductions | 20 | Other information |
| 14 C | Self-employment earnings (loss) | | |
| | 38,475 | | |

\* See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see instructions for Form 1065.

**Schedule K-1 (Form 1065) 2006**

DAA

# EXHIBIT R



**Decide with Confidence**

**Comprehensive Report**

To save report(s) to your PC, click here for instructions.                    📄 Print this Report

**Enhanced Format:** View this report with charts and graphs for quicker decision making.

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 264727800L

ATTN: **kasulka**                    Report Printed: FEB 07 2008

# Overview

BUSINESS SUMMARY

**AHAVA OF CALIFORNIA LLC**
**908 Rose Ave**
**Venice, CA 90291**

**D&B D-U-N-S Number:**    09-280-8075



This is a **single** location.

| | |
|---|---|
| **Telephone:** | 310 450-9669 |
| **Manager:** | F BANAYAN, PRIN |
| **Year started:** | 2000 |
| **Employs:** | 2 |
| **Sales:** | $1,000,000(Proj) |
| **History:** | CLEAR |
| **SIC:** | 5141 |
| **Line of business:** | Food broker |

**Credit Score Class: 3**
Moderate risk of severe payment delinquency over next 12 months



**Financial Stress Class: 1**
Low risk of severe financial stress over the next 12 months



**12-Month D&B PAYDEX®: 76**
When weighted by dollar amount, payments to suppliers average 6 days beyond terms.



**D&B Rating:**                    —

☑ **D&B**
**Exclusive**

## EXECUTIVE SUMMARY

The **Financial Stress Class of 1** for this company shows that firms with this classification had a failure rate of 1.2% (120 per 10,000), which is lower than the average of businesses in D&B's database

The **Credit Score class of 3** for this company shows that 14.3% of firms with this classification paid one or more bills severely delinquent, which is lower than the average of businesses in D&B's database.

| Predictive Scores | This Business | Comments |
|---|---|---|
| Financial Stress Class | 1 | Failure Rate lower than the average of businesses in D&B's database |
| Financial Stress Score | 1422 | Highest Risk: 1,001; Lowest Risk: 1,875 |
| Credit Score Class | 3 | Probability of Severely Delinquent Payment is lower than the average of businesses in D&B's database. |
| Credit Score | 457 | Highest Risk: 101; Lowest Risk: 670 |

| Other Key Indicators | | |
|---|---|---|
| PAYDEX Scores | 6 days beyond terms | Pays more slowly than the average for its industry of 3 days beyond terms |
| Industry Median | 3 days beyond terms | |
| Present management control | 8 years | |
| UCC Filings | UCC filing(s) are not reported for this business | |
| Public Filings | No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database | |
| History | Is clear | |

### CREDIT CAPACITY SUMMARY

**D&B Rating:--**

The blank rating symbol should not be interpreted as indicating that credit should be denied. It simply means that the information available to D&B does not permit us to classify the company within our rating key and that further enquiry should be made before reaching a decision. Some reasons for using a "-" symbol include: deficit net worth, bankruptcy proceedings, insufficient payment information, or incomplete history information. For more information, see the D&B Rating Key.

| Sales: | $1,000,000(Proj) | Payment Activity: |  |
|---|---|---|---|
| # of Employees Total: | 2 | (based on 5 experiences) |  |
|  |  | Average High Credit: | $8,887 |
|  |  | Highest Credit: | $25,000 |
|  |  | Total Highest Credit: | $35,550 |

---

**Jump to:**

Overview    |    Payments    |    Public Filings    |    History & Operations    |    Banking & Finance

## Scores  ☑ **D&B** **Exclusive**

### FINANCIAL STRESS SUMMARY

The Financial Stress Summary Model predicts the likelihood of a firm ceasing business without paying all creditors

D&B Comprehensive Report: AHAVA OF CALIFORNIA LLC                Page 3 of 11

in full, or reorganization or obtaining relief from creditors under state/federal law over the next 12 months. Scores were calculated using a statistically valid model derived from D&B's extensive data files.

**Financial Stress Class: 1** 

Low risk of severe financial stress, such as a bankruptcy, over the next 12 months.

**Incidence of Financial Stress**

| | |
|---|---|
| Among Businesses with this Class: | 1.20% (120 per 10,000) |
| Average of Businesses in D&B's Database: | 2.60% (260 per 10,000) |

**Financial Stress National Percentile: 76** (Highest Risk: 1; Lowest Risk: 100)

**Financial Stress Score: 1422** (Highest Risk: 1,001; Lowest Risk: 1,875)

The Financial Stress Score of this business is based on the following factors:

- No record of open suit(s), lien(s), or judgment(s) in the D&B files.

**Notes:**

- The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.
- The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations with loss to creditors. The Average Incidence of Financial Stress is based on businesses in D&B's database and is provided for comparative purposes.
- The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.
- The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Financial Stress Class, Percentile, Score and Incidence statistics are based on sample data from 2004.



| Norms | National % |
|---|---|
| This Business | 76 |
| Region: PACIFIC | 50 |
| Industry: WHOLESALE | 58 |
| Employee Range: 1-9 | 38 |
| Years in Business: 6-10 | 37 |

Region=PACIFIC
Industry=WHOLESALE
Employee Range=1-9
Years in Business=6-10

This business has a Financial Stress Percentile that shows:

D&B Comprehensive Report: AHAVA OF CALIFORNIA LLC                Page 4 of 11

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in business.

**CREDIT SCORE CLASS SUMMARY**

The Credit Score Class predicts the likelihood of a firm paying in a severely delinquent manner (90+ Days Past Terms) over the next twelve months. It was calculated using statistically valid models and the most recent payment information in D&B's files.

**Credit Score Class: 3**



Moderate risk of severe payment delinquency over next 12 months.

**Incidence of Delinquent Payment**

| | |
|---|---|
| Among Companies with this Class: | 14.30% |
| Average Compared to Businesses in D&B's Database: | 20.10% |

**Credit Score Percentile: 53** (Highest Risk: 1; Lowest Risk: 100)

**Credit Score: 457** (Highest Risk: 101; Lowest Risk: 670)

The Credit Score of this business is based on the following factors:

- 14% of trade dollars indicate slow payment(s) are present.
- No record of open suit(s), lien(s), or judgment(s) in the D&B files.

**Notes:**

- The Credit Score Class indicates that this firm shares some of the same business and payment characteristics of other companies with this classification. It does not mean the firm will necessarily experience delinquency.
- The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.
- The Percentile ranks this firm relative to other businesses. For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.
- The Credit Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Credit Class, Percentile, Score and Incidence statistics are based on sample data from 2004.

| Norms | National % |
|---|---|
| This Business | 53 |
| Region:<br>PACIFIC | 52 |
| Industry:<br>WHOLESALE | 60 |
| Employee Range:<br>1-9 | 58 |



| Years in Business: | |
|---|---|
| **6-10** | 54 |

Region=PACIFIC
Industry=WHOLESALE
Employee Range=1-9
Years in Business=6-10

This business has a Credit Score Percentile that shows:

- Lower risk than other companies in the same region.
- Higher risk than other companies in the same industry.
- Higher risk than other companies in the same employee size range.
- Higher risk than other companies with a comparable number of years in business.

**Jump to:**

Overview    |    Scores    |    Public Filings    |    History & Operations    |    Banking & Finance

# Payments ☑ D&B EXCLUSIVE

**PAYMENT TRENDS**

| | | | | |
|---|---|---|---|---|
| **Total Payment Experiences in D&B's File:** | 5 | **Current PAYDEX is:** | 76 | equal to 6 days beyond terms |
| **Payments Within Terms** (not dollar weighted) | 91% | **Industry Median is:** | 78 | equal to 3 days beyond terms |
| **Total Placed For Collection:** | 0 | **Payment Trend currently is:** | ⟷ | **unchanged,** compared to payments three months ago |
| **Average Highest Credit:** | $8,887 | | | |
| **Largest High Credit:** | $25,000 | Indications of slowness can be the result of dispute over merchandise, skipped invoices, etc. Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed. | | |
| **Highest Now Owing:** | $20,000 | | | |
| **Highest Past Due:** | $2,500 | | | |

**PAYDEX Scores**

Shows the D&B PAYDEX scores as calculated on the most recent 3 months and 12 months of payment experiences.

The D&B PAYDEX is a unique, dollar weighted indicator of payment performance based on up to payment experiences as reported to D&B by trade references. A detailed explanation of how to read and interpret PAYDEX scores can be found at the end of this report.



**3-Month D&B PAYDEX: 76**
When weighted by dollar amount, payments to suppliers average 6 days beyond terms.

Based on payments collected over last 3 months.



**12-Month D&B PAYDEX: 76**
When weighted by dollar amount, payments to suppliers average 6 days beyond terms.

Based on payments collected over last 12 months.

**PAYDEX Yearly Trend**

**12 Month PAYDEX Scores Comparison to Industry**

|  | 3/07 | 4/07 | 5/07 | 6/07 | 7/07 | 8/07 | 9/07 | 10/07 | 11/07 | 12/07 | 1/08 | 2/08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| This Business | UN | UN | UN | UN | UN | UN | 74 | 74 | 77 | 77 | 76 | 76 |
| Industry Quartiles |  |  |  |  |  |  |  |  |  |  |  |  |
| Upper |  | 80 |  | 80 |  |  | 80 |  |  | 80 |  |  |
| Median |  | 78 |  | 78 |  |  | 78 |  |  | 78 |  |  |
| Lower |  | 71 |  | 71 |  |  | 71 |  |  | 71 |  |  |

Shows the trend in D&B PAYDEX scoring over the past 12 months.



**Last 12 Months**

Based on payments collected over the last 12 months.

- Current PAYDEX for this Business is 76, or equal to 6 days beyond terms
- The 12-month high is **77**, or equal to 5 days beyond terms
- The 12-month low is **unavailable**

**PAYDEX Comparison to Industry**

D&B Comprehensive Report: AHAVA OF CALIFORNIA LLC

Shows PAYDEX scores of this Business compared to the Primary Industry from each of the last four quarters. The Primary Industry is Food broker, based on SIC code 5141.

**Quarterly PAYDEX Scores Comparison to Industry**

| Previous Year | 3/06 | 6/06 | 9/06 | 12/06 |
|---|---|---|---|---|
| This Business | UN | UN | UN | UN |
| **Industry Quartiles** | | | | |
| Upper | 80 | 80 | 80 | 80 |
| Median | 78 | 77 | 77 | 78 |
| Lower | 68 | 69 | 70 | 70 |

| Current Year | 3/07 | 6/07 | 9/07 | 12/07 |
|---|---|---|---|---|
| This Business | UN | UN | 74 | 77 |
| **Industry Quartiles** | | | | |
| Upper | 80 | 80 | 80 | 80 |
| Median | 78 | 78 | 78 | 78 |
| Lower | 71 | 71 | 71 | 71 |



**Last 12 Months**

Based on payments collected over the last 4 quarters.

| Score Comparison Key: | ▷ This Business | ▲ Industry upper quartile |
|---|---|---|
| | | ■ Industry median |
| | | ▼ Industry lower quartile |

- Current **PAYDEX** for this Business is **76**, or equal to 6 days beyond terms
- The present industry **median score** is **78**, or equal to 3 days beyond terms.

- Industry upper quartile represents the performance of the payers in the 75th percentile
- Industry lower quartile represents the performance of the payers in the 25th percentile

**Payment Habits**

For all payment experiences within a given amount of credit extended, shows the percent that this Business paid within terms. Provides number of experiences used to calculate the percentage, and the total dollar value of the credit extended.

| $ Credit Extended | % of Payments Within Terms | # Payment Experiences | $ Total Dollar Amount |
|---|---|---|---|



Based on payments collected over the last 12 months.

Payment experiences reflect how bills are met in relation to the terms granted. In some instances, payment beyond terms can be the result of disputes over merchandise, skipped invoices, etc.

**PAYMENT SUMMARY**

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

There are 5 payment experiences in D&B's file for the most recent 12 months, with 3 experiences reported during the last three month period.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary industries:

| | Total Rcv'd (#) | Total Dollar Amts ($) | Largest High Credit ($) | Within Terms (%) | Days Slow <31 | 31-60 | 61-90 | 90> (%) |
|---|---|---|---|---|---|---|---|---|
| **Top industries:** | | | | | | | | |
| Radiotelephone commun | 2 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Short-trm busn credit | 1 | 25,000 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Truck rental/leasing | 1 | 10,000 | 10,000 | 50 | 50 | 0 | 0 | 0 |
| Nonclassified | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| **Other payment categories:** | | | | | | | | |
| Cash experiences | 0 | 0 | 0 | | | | | |
| Payment record unknown | 0 | 0 | 0 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collections:** | | | | | | | | |
| With D&B | 0 | 0 | 0 | | | | | |
| Other | 0 | N/A | 0 | | | | | |
| Total in D&B's file | 5 | | 25,000 | | | | | |

The highest **Now Owes** on file is $20,000 The highest **Past Due** on file is $2,500

Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed. Indications of slowness can be result of dispute over merchandise, skipped invoices, etc.

**PAYMENT DETAILS**

**Detailed payment history**

| Date Reported (mm/yy) | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within |
|---|---|---|---|---|---|---|

| | | | | | | (months) |
|---|---|---|---|---|---|---|
| 12/07 | Ppt | 25,000 | 20,000 | 0 | | 1 mo |
| | Ppt-Slow 30 | 10,000 | 5,000 | 2,500 | | 1 mo |
| 11/07 | Ppt | 50 | 50 | | | 2-3 mos |
| 07/07 | Ppt | 500 | 500 | 0 | | 1 mo |
| | Ppt | 0 | 0 | 0 | | 1 mo |

Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.

**Jump to:**

Overview    |    Scores    |    Payments    |    History & Operations    |    Banking & Finance

# Public Filings

PUBLIC FILINGS

A check of D&B's public records database indicates that no filings were found for AHAVA OF CALIFORNIA LLC at 908 Rose Ave, Venice CA.

D&B's extensive database of public record information is updated daily to ensure timely reporting of changes and additions. It includes business-related suits, liens, judgments, bankruptcies, UCC financing statements and business registrations from every state and the District of Columbia, as well as select filing types from Puerto Rico and the U.S. Virgin Islands.

D&B collects public records through a combination of court reporters, third parties and direct electronic links with federal and local authorities. Its database of U.S. business-related filings is now the largest of its kind.
GOVERNMENT ACTIVITY

**Activity summary**

| | |
|---|---|
| Borrower (Dir/Guar): | NO |
| Administrative debt: | NO |
| Contractor: | NO |
| Grantee: | NO |
| Party excluded from federal program(s): | NO |

**Possible candidate for socio-economic program consideration**

| | |
|---|---|
| Labor surplus area: | YES (2007) |
| Small Business: | YES (2007) |
| 8(A) firm: | N/A |

The details provided in the Government Activity section are as reported to Dun & Bradstreet by the federal government and other sources.

**Jump to:**

Overview    |    Scores    |    Payments    |    Public Filings    |    Banking & Finance

# History & Operations

HISTORY

The following information was reported **11/03/2007**:

**Management:**    FARIBORZ BANAYAN, MEMBER
                   FARIBORZ B MEMBER, PRIN

Business operates as a Limited Liability Company in the State of California as of March 8, 2000.

Ownership information provided verbally by sources on Apr 30 2003.

Business started 2000.

FARIBORZ BANAYAN born 1960. 1990 graduated from Rabbinical College Of America, Morristown, NJ. No past employer experience in the past ten years.

FARIBORZ B MEMBER. Work history unknown.

### BUSINESS REGISTRATION

CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE AS OF JAN 18 2008:

This data is for informational purposes only, certification can only be obtained through the Sacramento Office of the California Secretary of State.

**Registered Name:**      AHAVA OF CALIFORNIA, LLC

**Business type:**        LIMITED LIABILITY
                          COMPANY
**State of organization:** CALIFORNIA
**Filing date:**          MAR 08 2000
**Registration ID:**      200007310022
**Status:**               ACTIVE

**Where filed:**          SECRETARY OF STATE/CORPORATIONS DIVISION, SACRAMENTO, CA

**Registered agent:**     FARIBORZ BANAYAN, 908 ROSE AVENUE, VENICE, CA, 902910000

### OPERATIONS

11/03/2007

**Description:**  Operates as food broker.

                  Terms are net 30 days. Has 40 account(s). Sells to commercial concerns. Territory : Local.

**Employees:**    2 which includes partners.

**Facilities:**   Operates from residence of principal.

### SIC & NAICS

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

51419901          Food brokers

**NAICS:**
424410    General Line Grocery Merchant
          Wholesalers

Jump to:

Overview        |        Scores        |        Payments        |        Public Filings        |        History & Operations

# Banking & Finance

KEY BUSINESS RATIOS

D&B has been unable to obtain sufficient financial information from this company to calculate business ratios. Our check of additional outside sources also found no information available on its financial performance.
To help you in this instance, ratios for other firms in the same industry are provided below to support your analysis of this business.

**Based on this number of establishments:** 22

### Industry Norms based on 22 establishments

|  | This Business | Industry Median | Industry Quartile |
|---|---|---|---|
| **Profitability** | | | |
| Return on Sales | UN | 1.0 | UN |
| Return on Net Worth | UN | 30.4 | UN |
| **Short-Term Solvency** | | | |
| Current Ratio | UN | 2.0 | UN |
| Quick Ratio | UN | 0.9 | UN |
| **Efficiency** | | | |
| Assets Sales | UN | 12.3 | UN |
| Sales / Net Working Capital | UN | 19.7 | UN |
| **Utilization** | | | |
| Total Liabs / Net Worth | UN | 137.6 | UN |

UN = Unavailable

FINANCE

**11/03/2007**

Sources contacted declined information on July 19, 2007.

CUSTOMER SERVICE

If you have questions about this report, please call our Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. If you are outside the U.S. contact your local D&B office.

*** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry. Call Dun & Bradstreet's Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. or visit our website at www.dnb.com.

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 264727800L

**<u>EXHIBIT S</u>**



**D&B**
Decide with Confidence

# Comprehensive Report

📄 Print this Report

ATTN: **LexisNexis**                    Report Printed: APR 22 2008

# Overview

**BUSINESS SUMMARY**

**AHAVA OF CALIFORNIA, LLC**
**908 Rose Ave**
**Venice, CA 90291**

**D&B D-U-N-S Number:**    09-280-8075

This is a **headquarters** location.
Branch(es) or division(s) exist.

**Mailing address:** PO Box 310648
Brooklyn, NY 11231

**Telephone:**    310 450-9669

**Manager:**    FARIBORZ BANAYAN, MBR

**Year started:**    2000

**Employs:**    155 (5 here)

**Sales E:**    $18,000,000
**History:**    CLEAR
**SIC:**    5143
5149

**Line of business:**    Whol dairy products, whol groceries

**Credit Score Class:**    **2**
Moderate risk of severe payment delinquency over next 12 months



**Financial Stress Class:**    **1**
Low risk of severe financial stress over the next 12 months



**12-Month D&B PAYDEX®:**    **79**
When weighted by dollar amount, payments to suppliers average 2 days beyond terms.



**D&B Rating:**    **1R3**
**Number of employees:**    1R is **10 or more** employees.

**Composite credit appraisal:**    3 is **fair.**



**EXECUTIVE SUMMARY**

The **Financial Stress Class of 1** for this company shows that firms with this classification had a failure rate of

1.2% (120 per 10,000), which is lower than the average of businesses in D&B's database

The **Credit Score class of 2** for this company shows that 4.6% of firms with this classification paid one or more bills severely delinquent, which is lower than the average of businesses in D&B's database.

| Predictive Scores | This Business | Comments |
|---|---|---|
| **Financial Stress Class** | 1 | Failure Rate lower than the average of businesses in D&B's database |
| **Financial Stress Score** | 1480 | Highest Risk: 1,001; Lowest Risk: 1,875 |
| **Credit Score Class** | 2 | Probability of Severely Delinquent Payment is lower than the average of businesses in D&B's database. |
| **Credit Score** | 524 | Highest Risk: 101; Lowest Risk: 670 |
| **Other Key Indicators** | | |
| **PAYDEX Scores** | 2 days beyond terms | Pays more promptly than the average for its industry of 3 days beyond terms |
| **Industry Median** | 3 days beyond terms | |
| **Present management control** | 8 years | |
| **UCC Filings** | UCC filing(s) are reported for this business | |
| **Public Filings** | No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database | |
| **History** | Is clear | |

## CREDIT CAPACITY SUMMARY

**D&B Rating:**      **1R3**
     **Number of employees:**      1R indicates **10 or more** employees.
     **Composite credit appraisal:** 3 is **fair.**

The 1R and 2R ratings categories reflect company size based on the total number of employees for the business. They are assigned to business files that do not contain a current financial statement. In 1R and 2R Ratings, the 2, 3, or 4 creditworthiness indicator is based on analysis by D&B of public filings, trade payments, business age and other important factors. 2 is the highest Composite Credit Appraisal a company not supplying D&B with current financial information can receive. For more information, see the D&B Rating Key.

| | | | |
|---|---|---|---|
| **Sales:** | $18,000,000 | **Payment Activity:** | |
| **# of Employees Total:** | 155 (5 here) | (based on 14 experiences) | |
| | | **Average High Credit:** | $14,603 |
| | | **Highest Credit:** | $45,000 |
| | | **Total Highest Credit:** | $190,600 |

---

**Jump to:**

Overview   |   Payments   |   Public Filings   |   History & Operations   |   Banking & Finance

# Scores ☑ **D&B EXCLUSIVE**

## FINANCIAL STRESS SUMMARY

The Financial Stress Summary Model predicts the likelihood of a firm ceasing business without paying all creditors in full, or reorganization or obtaining relief from creditors under state/federal law over the next 12 months. Scores were calculated using a statistically valid model derived from D&B's extensive data files.



**Financial Stress Class:** **1**

|  | High | Moderate | Low |

Low risk of severe financial stress, such as a bankruptcy, over the next 12 months.

### Incidence of Financial Stress

Among Businesses with this Class:        1.20% (120 per 10,000)
Average of Businesses in D&B's Database:  2.60% (260 per 10,000)

**Financial Stress National Percentile:** **94** (Highest Risk: 1; Lowest Risk: 100)

**Financial Stress Score:** **1480** (Highest Risk: 1,001; Lowest Risk: 1,875)

The Financial Stress Score of this business is based on the following factors:

- 3% of trade dollars indicate slow payment(s) are present.
- Control age or date entered in D&B files indicates higher risk.
- Payment experiences exist for this firm which are greater than 60 days past due.

### Notes:

- The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.
- The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations with loss to creditors. The Average Incidence of Financial Stress is based on businesses in D&B's database and is provided for comparative purposes.
- The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.
- The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Financial Stress Class, Percentile, Score and Incidence statistics are based on sample data from 2004.



| Norms | National % |
|---|---|
| This Business | 94 |
| Region: **PACIFIC** | 50 |
| Industry: **WHOLESALE** | 58 |
| Employee Range: **100-499** | 99 |
| Years in Business: **6-10** | 37 |

This business has a Financial Stress Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Higher risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in business.

**CREDIT SCORE CLASS SUMMARY**

The Credit Score Class predicts the likelihood of a firm paying in a severely delinquent manner (90+ Days Past Terms) over the next twelve months. It was calculated using statistically valid models and the most recent payment information in D&B's files.

**Credit Score Class: 2**



Moderate risk of severe payment delinquency over next 12 months.

**Incidence of Delinquent Payment**

Among Companies with this Class:          4.60%
Average Compared to Businesses in D&B's Database: 20.10%

**Credit Score Percentile: 84** (Highest Risk: 1; Lowest Risk: 100)

**Credit Score: 524** (Highest Risk: 101; Lowest Risk: 670)

The Credit Score of this business is based on the following factors:

- No record of open lien(s), or judgment(s) in the D&B files.
- Business does not own facilities.

**Notes:**

- The Credit Score Class indicates that this firm shares some of the same business and payment characteristics of other companies with this classification. It does not mean the firm will necessarily experience delinquency.
- The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.
- The Percentile ranks this firm relative to other businesses.For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.
- The Credit Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Credit Class, Percentile, Score and Incidence statistics are based on sample data from 2004.

| Norms | National % |
|---|---|
| This Business | 84 |
| Region: **PACIFIC** | 52 |
| Industry: **WHOLESALE** | 60 |
| Employee Range: **100-499** | 75 |

D&B Comprehensive Report: AHAVA OF CALIFORNIA, LLC                    Page 5 of 13



**Financial Stress Norms Comparison (%)**

Region=PACIFIC
Industry=WHOLESALE
Employee Range=100-499
Years in Business=6-10

Years in Business:
**6-10**                    54

This business has a Credit Score Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in business.

Jump to:

Overview    |    Scores    |    Public Filings    |    History & Operations    |    Banking & Finance

# Payments  ☑ D&B EXCLUSIVE

**PAYMENT TRENDS**

| | | |
|---|---|---|
| **Total Payment Experiences in D&B's File:** | 14 | |
| **Payments Within Terms:** (not dollar weighted) | 82% | |
| **Total Placed For Collection:** | 0 | |
| **Average Highest Credit:** | $14,603 | |
| **Largest High Credit:** | $45,000 | |
| **Highest Now Owing:** | $15,000 | |
| **Highest Past Due:** | $1,000 | |

| | | |
|---|---|---|
| **Current PAYDEX is:** | 79 | equal to 2 days beyond terms |
| **Industry Median is:** | 78 | equal to 3 days beyond terms |
| **Payment Trend currently is:** | ⟷ | **unchanged,** compared to payments three months ago |

Indications of slowness can be the result of dispute over merchandise, skipped invoices, etc. Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

**PAYDEX Scores**

Shows the D&B PAYDEX scores as calculated on the most recent 3 months and 12 months of payment experiences.

The D&B PAYDEX is a unique, dollar weighted indicator of payment performance based on up to payment experiences as reported to D&B by trade references. A detailed explanation of how to read and interpret PAYDEX scores can be found at the end of this report.





Based on payments collected over last 3 months.

Based on payments collected over last 12 months.

**PAYDEX Yearly Trend**

**12 Month PAYDEX Scores Comparison to Industry**

|  | 5/07 | 6/07 | 7/07 | 8/07 | 9/07 | 10/07 | 11/07 | 12/07 | 1/08 | 2/08 | 3/08 | 4/08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **This Business** | UN | UN | UN | UN | 74 | 74 | 77 | 77 | 76 | 79 | 79 | 79 |
| **Industry Quartiles** | | | | | | | | | | | | |
| Upper | | 80 | | | 80 | | | 80 | | | 80 | |
| Median | | 77 | | | 77 | | | 78 | | | 78 | |
| Lower | | 72 | | | 72 | | | 73 | | | 72 | |

Shows the trend in D&B PAYDEX scoring over the past 12 months.



**Last 12 Months**

Based on payments collected over the last 12 months.

- Current PAYDEX for this Business is 79, or equal to 2 days beyond terms
- The 12-month high is **79**, or equal to 2 days beyond terms
- The 12-month low is **unavailable**

**PAYDEX Comparison to Industry**

Shows PAYDEX scores of this Business compared to the Primary Industry from each of the last four quarters. The Primary Industry is Whol dairy products, whol groceries, based on SIC code 5143.

**Quarterly PAYDEX Scores Comparison to Industry**

Previous Year

| | 6/06 | 9/06 | 12/06 | 3/07 |
|---|---|---|---|---|
| **This Business** | UN | UN | UN | UN |
| **Industry Quartiles** | | | | |
| Upper | 80 | 80 | 80 | 80 |
| Median | 78 | 77 | 77 | 77 |
| Lower | 72 | 71 | 72 | 72 |

Current Year

| | 6/07 | 9/07 | 12/07 | 3/08 |
|---|---|---|---|---|
| **This Business** | UN | 74 | 77 | 79 |
| **Industry Quartiles** | | | | |
| Upper | 80 | 80 | 80 | 80 |
| Median | 77 | 77 | 78 | 78 |
| Lower | 72 | 72 | 73 | 72 |



**Last 12 Months**

Based on payments collected over the last 4 quarters.

| **Score Comparison Key:** | ▷ This Business | ▲ Industry upper quartile |
|---|---|---|
| | | ■ Industry median |
| | | ▼ Industry lower quartile |

- Current **PAYDEX** for this Business is **79**, or equal to 2 days beyond terms
- The present industry **median score** is **78**, or equal to 3 days beyond terms

- Industry upper quartile represents the performance of the payers in the 75th percentile
- Industry lower quartile represents the performance of the payers in the 25th percentile

**Payment Habits**

For all payment experiences within a given amount of credit extended, shows the percent that this Business paid within terms. Provides number of experiences used to calculate the percentage, and the total dollar value of the credit extended.

| $ Credit Extended | % of Payments Within Terms | # Payment Experiences | $ Total Dollar Amount |
|---|---|---|---|



Based on payments collected over the last 12 months.

Payment experiences reflect how bills are met in relation to the terms granted. In some instances, payment beyond terms can be the result of disputes over merchandise, skipped invoices, etc.

**PAYMENT SUMMARY**

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

There are 14 payment experiences in D&B's file for the most recent 12 months, with 13 experiences reported during the last three month period.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary industries:

| | Total Rcv'd (#) | Total Dollar Amts ($) | Largest High Credit ($) | Within Terms (%) | Days Slow <31 31-60 61-90 90> (%) | | | |
|---|---|---|---|---|---|---|---|---|
| **Top industries:** | | | | | | | | |
| Radiotelephone commun | 2 | 550 | 500 | 91 | 0 | 0 | 0 | 9 |
| Excavation contractor | 1 | 45,000 | 45,000 | 100 | 0 | 0 | 0 | 0 |
| Electrical contractor | 1 | 40,000 | 40,000 | 100 | 0 | 0 | 0 | 0 |
| Ret computer/software | 1 | 35,000 | 35,000 | 100 | 0 | 0 | 0 | 0 |
| Short-trm busn credit | 1 | 25,000 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Whol durable goods | 1 | 20,000 | 20,000 | 100 | 0 | 0 | 0 | 0 |
| Truck rental/leasing | 1 | 10,000 | 10,000 | 50 | 50 | 0 | 0 | 0 |
| Lcl truck-w/o storage | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg frozen specialty | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg soap/detergents | 1 | 1,000 | 1,000 | 0 | 100 | 0 | 0 | 0 |
| Ret misc merchandise | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Nonclassified | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| **Other payment categories:** | | | | | | | | |
| Cash experiences | 1 | 750 | 750 | | | | | |
| Payment record unknown | 0 | 0 | 0 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collections:** | | | | | | | | |
| With D&B | 0 | 0 | 0 | | | | | |
| Other | 0 | N/A | 0 | | | | | |
| Total in D&B's file | 14 | | 45,000 | | | | | |

The highest **Now Owes** on file is $15,000 The highest **Past Due** on file is $1,000

Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed. Indications of slowness can be result of dispute over merchandise, skipped invoices, etc.

**PAYMENT DETAILS**

**Detailed payment history**

| Date Reported (mm/yy) | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 03/08 | Ppt | 25,000 | 15,000 | 0 | | 1 mo |
| | Ppt | 5,000 | 0 | 0 | N30 | 2-3 mos |
| | Ppt-Slow 30 | 10,000 | 2,500 | 100 | | 1 mo |
| | Slow 30 | 1,000 | 1,000 | 1,000 | N30 | 1 mo |
| | (005) | 750 | 0 | 0 | | 1 mo |
| Â | Â Cash own option. | | | | | |
| 02/08 | Ppt | 45,000 | 5,000 | 0 | N7 | 1 mo |
| | Ppt | 40,000 | 0 | 0 | N30 | 2-3 mos |
| | Ppt | 35,000 | 2,500 | 0 | N30 | 1 mo |
| | Ppt | 20,000 | 15,000 | 0 | N30 | 1 mo |
| | Ppt | 7,500 | 7,500 | 0 | N7 | 1 mo |
| | Ppt | 750 | 0 | 0 | N30 | 2-3 mos |
| 01/08 | Ppt | 500 | 500 | 0 | | 1 mo |
| | Slow 90+ | 50 | 50 | 50 | | 1 mo |
| 11/07 | Ppt | 50 | 50 | | | 2-3 mos |

Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of disputes over merchandise, skipped invoices etc.

Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.

---

Jump to:

Overview | Scores | Payments | History & Operations | Banking & Finance

# Public Filings

**PUBLIC FILINGS**

The following data includes both open and closed filings found in D&B's database on the subject company.

| Record Type | # of Records | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |
| UCC's | 2 | 04/10/2008 |

The following Public Filing data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

**UCC FILINGS**

Collateral:          All Inventory - All Account(s) - All General intangibles(s) - All Equipment - All

| | |
|---|---|
| | Chattel paper |
| **Type:** | Original |
| **Sec. party:** | BIBBY FINANCIAL SERVICES (MIDWEST), INC., DOWNERS GROVE, IL |
| **Debtor:** | AHAVA OF CALIFORNIA, LLC |
| **Filing number:** | 087142084276 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, SACRAMENTO, CA |
| | |
| **Date filed:** | 01/02/2008 |
| **Latest Info Received:** | 01/10/2008 |

| | |
|---|---|
| **Type:** | Termination |
| **Sec. party:** | BIBBY FINANCIAL SERVICES (MIDWEST), INC., DOWNERS GROVE, IL |
| **Debtor:** | AHAVA OF CALIFORNIA, LLC |
| **Filing number:** | 0871538030 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, SACRAMENTO, CA |
| | |
| **Date filed:** | 04/10/2008 |
| **Latest Info Received:** | 04/15/2008 |
| **Original UCC filed date:** | 01/02/2008 |
| **Original filing no.:** | 087142084276 |

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

### GOVERNMENT ACTIVITY

**Activity summary**

| | |
|---|---|
| Borrower (Dir/Guar): | NO |
| Administrative debt: | NO |
| Contractor: | NO |
| Grantee: | NO |
| Party excluded from federal program(s): | NO |

**Possible candidate for socio-economic program consideration**

| | |
|---|---|
| Labor surplus area: | N/A |
| Small Business: | YES (2008) |
| 8(A) firm: | N/A |

The details provided in the Government Activity section are as reported to Dun & Bradstreet by the federal government and other sources.

---

**Jump to:**

Overview    |    Scores    |    Payments    |    Public Filings    |    Banking & Finance

# History & Operations

### HISTORY

The following information was reported **03/25/2008**:

**Management:**    FARIBORZ BANAYAN, MBR
RUBEN BEITYAKOV, MBR

This is a Limited Liability Company formed in California March 8, 2000.

Business started 2000.

FARIBORZ BANAYAN born 1960. Work history unknown.

RUBEN BEITYAKOV. Work history unknown.

---

**BUSINESS REGISTRATION**

CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE AS OF APR 11 2008:

This data is for informational purposes only, certification can only be obtained through the Sacramento Office of the California Secretary of State.

| | |
|---|---|
| **Registered Name:** | AHAVA OF CALIFORNIA, LLC |
| **Business type:** | LIMITED LIABILITY COMPANY |
| **State of organization:** | CALIFORNIA |
| **Filing date:** | MAR 08 2000 |
| **Registration ID:** | 200007310022 |
| **Status:** | ACTIVE |
| **Where filed:** | SECRETARY OF STATE/CORPORATIONS DIVISION, SACRAMENTO, CA |
| **Registered agent:** | FARIBORZ BANAYAN, 908 ROSE AVENUE, VENICE, CA, 902910000 |

**OPERATIONS**

03/25/2008

**Description:** Wholesales dairy products (except dried or canned). Wholesales groceries or related products, specializing in juices.

Has 40 account(s). Terms are net 30 days and varies upon customer contract. Sells to retailers and commercial concerns. Territory : Regional.

**Employees:** 155 which includes partners. 5 employed here.

**Facilities:** Occupies premises in a building.

**Branches:** This business has additional branches; detailed branch information is available in D&B's linkage or family tree products.

**SIC & NAICS**

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

| | |
|---|---|
| 51430000 | Dairy products, except dried or canned |
| 51490502 | Juices |

**NAICS:**

| | |
|---|---|
| 424430 | Dairy Products (except Dried or Canned) Merchant Wholesalers |
| 424490 | Other Grocery and Related Product Merchant Wholesalers |

Jump to:

---

# Banking & Finance

### UPDATE

### 03/25/2008

On Mar 25 2008, Ruben Beityakov, Mbr submitted the following estimates dated Mar 25 2008.

### KEY BUSINESS RATIOS

D&B has been unable to obtain sufficient financial information from this company to calculate business ratios. Our check of additional outside sources also found no information available on its financial performance.
To help you in this instance, ratios for other firms in the same industry are provided below to support your analysis of this business.

**Based on this number of establishments:** 14

### Industry Norms based on 14 establishments

|  | This Business | Industry Median | Industry Quartile |
|---|---|---|---|
| **Profitability** | | | |
| **Return on Sales** | UN | 1.8 | UN |
| **Return on Net Worth** | UN | 13.7 | UN |
| **Short-Term Solvency** | | | |
| **Current Ratio** | UN | 1.4 | UN |
| **Quick Ratio** | UN | 0.8 | UN |
| **Efficiency** | | | |
| **Assets Sales** | UN | 44.6 | UN |
| **Sales / Net Working Capital** | UN | 18.5 | UN |
| **Utilization** | | | |
| **Total Liabs / Net Worth** | UN | 192.2 | UN |

UN = Unavailable

### FINANCE

### 03/01/2008

On February 26, 2008, Ruben Beityakov, Mbr, confirmed company name, address, principals and operational information using Dun & Bradstreet's Internet-based update method (eUpdate) at www.dnb.com.

As of February 28 2008 a search of Dun & Bradstreets Public Record database found no open suits, liens, judgements or UCCs to which AHAVA OF CALIFORNIA, LLC at 908 Rose Ave, Venice CA was named defendant or debtor. Public records received hereafter will be entered into the database and will be included in reports which contain a Public Filings section.

### CUSTOMER SERVICE

If you need any additional information or have any questions, please call the D&B Online Customer Customer Service Center at 1-800-234-3867

Case 1:08-cv-03893-NRB-MHD    Document 44-6    Filed 07/07/2008    Page 25 of 36

# <u>EXHIBIT T</u>

# SIGNATURE BANK

## Schedule 3.11 – Subsidiaries or Affiliates of
## Ahava Food Corp. or the Obligors

1. No Obligor has any subsidiary.

2. The name, jurisdiction and ownership of each Obligor, all of which are affiliates of each other, are as follows:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava Food Corp. | NY | Moise Banayan- Sole shareholder |
| St. Lawrence Food Corp. | NY | Moise Banayan - Sole shareholder |
| Lewis County Dairy Corp. | NY | Moise Banayan - Sole shareholder |
| Yoni Realty, LLC | NY | Moise Banayan - Sole Member |

3. Non-obligor affiliates:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava of California, LLC | CA | Moise Banayan - and Fariborz Banayan - Members |
| Ahava Dairy Products Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |
| Ahava Dairy Manufacturing Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |

# EXHIBIT U

**Bloch, Robert**

| | |
|---|---|
| **From:** | Ahavafood@aol.com |
| **Sent:** | Thursday, March 29, 2007 10:56 PM |
| **To:** | Bloch, Robert |
| **Subject:** | M&I |

Rob,

The way I see it, there are three options open to me:

First is to pay M&I in full. This will leave me the option to pursue the appeal. I will raise the fund by selling our California operation. The sale wont effect Signature collateral or AFC general operation or profit. But it does weaken the long term goal of mine to sell the entire company to APEX. This option is most costly, but the sales would net more than the debt.

Second option is to make a deal with them and pay them less and give up our right of appeal.

Third option would be to sweat it out. No payment and pursue the appeal. This option does not cost anything just patience.

I like the third option, you most likely prefer the first.

What about a meeting after the holidays to discuss.

Thanks   Moise
.

See what's free at AOL.com.

# **EXHIBIT V**

**AHAVA NATIONAL FOOD DISTRIBUTOR**
**236-280 Richard Street**
**Brooklyn NY  11231**

12/23/2007

Dear Rabbi Meir Lasker

It has come to my attention that Signature bank has sent out communications requesting fraudulence diversion of proceeds from our sales.

This is not authorized by our company. You are not to divert any payment to Signature.

All sales generated by us must be paid to us exclusively.  You will continue to be liable for all your debt to the company if any payment is diverted.  Your account will not be credited.

There is no liability to signature at all.

We have not borrowed or engaged in any security agreement with Signature. Their letter is misleading and we will take appropriate legal remedy to protect ourselves.

Please be advised that your only legal responsibility is to pay according to your invoice.

Please feel free to contact us if you have any question.


Thanks


Moshe Banayan

President

# EXHIBIT W

```
. Y. S. DEPARTMENT OF STATE
IVISION OF CORPORATIONS                      ALBANY, NY  12231-0001
                              FILING  RECEIPT
================================================================================
NTITY NAME : AHAVA OF CALIFORNIA, LLC

OCUMENT TYPE : ASSUMED NAME LTD LIABILITY CO
================================================================================
   FILER:                              FILED:  10/18/2007
   ------                              CASH#:  186953
                                       FILM#:  20071018060

   ALLSTATE CORPORATE SERVICES
   41 STATE STREET
   SUITE 415
   ALBANY          NY    12207



   PRINCIPAL LOCATION
   ------------------

   110 BEARD STREET

   BROOKLYN.
   NY    11231




   COMMENT:


   ASSUMED NAME
   ------------
   AHAVA NATIONAL FOOD DISTRIBUTOR



================================================================================
ERVICE COMPANY  : ALLSTATE CORPORATE SERVICES CORP.        CODE:  9I
                                                           BOX :  81


EES        60.00                    PAYMENTS:  60.00
---                                 --------
ILING :    25.00                    CASH    :
OUNTY :      .00                    CHECK   :
OPIES :    10.00                    C CARD  :  60.00
ISC   :      .00
ANDLE :    25.00
                                    REFUND  :
                                    ------
================================================================================
                    DO3HD104                   DOS-281 (04/2007)
```

DRAWDOWN
ALLSTATE 91

CERTIFICATE OF ASSUMED NAME

OF

**Ahava of California, LLC**

Pursuant to Section 130 of the General Business Law

It is hereby certified that:

**FIRST:**     The name of the entity is:

**Ahava of California, LLC**

**SECOND:**     The entity was formed or authorized under the Limited Liability Company Law.

**THIRD:**     The entity shall conduct business under the assumed name of:

**AHAVA NATIONAL FOOD DISTRIBUTOR**

**FOURTH:**     The principle place of business in New York State is 110 Beard Street, Brooklyn, NY 11231

**FIFTH:**     The County in which business will be conducted under the assumed name is:

Kings County

**SIXTH:**     The address of each location where business will be carried on or transacted under the assumed name is:

110 Beard Street, Brooklyn, NY 11231

Dated October 16, 2007

Steven Weiss, Authorized Person
Allstate Corporate Services Corp.
41 State Street, Suite 415
Albany, New York 12207

1



- - - - - - - - - - - - - - - - - - - - - - - - - - -

## CERTIFICATE OF ASSUMED NAME

## OF

## Ahava of California, LLC

Pursuant to Section 130 of the General Business Law

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Filed by:

> Allstate Corporate Services
> 41 State Street, Suite 415
> Albany, New York 12207

CUSTOMER REFERENCE # 2119740

# EXHIBIT X

```
N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS                                  ALBANY, NY  12231-0001
                                   FILING  RECEIPT
================================================================================
ENTITY NAME : AHAVA OF CALIFORNIA, LLC

DOCUMENT TYPE : ASSUMED NAME LTD LIABILITY CO
================================================================================
   FILER:                                    FILED:  06/13/2007
   ------                                     CASH#:  180284
                                              FILM#:  20070613078
   ALLSTATE CORPORATE SERVICES
   41 STATE STREET, STE 415

   ALBANY           NY     12207



   PRINCIPAL LOCATION
   ------------------

   7705 STATE ROUTE 812

   LOWVILLE
   NY    11367



   COMMENT:


   ASSUMED NAME
   ------------
   NORTH COUNTRY MANUFACTURING




================================================================================
SERVICE COMPANY  : ALLSTATE CORPORATE SERVICES CORP.          CODE:  9I
                                                              BOX :  81


FEES      60.00                          PAYMENTS:   60.00
----                                     --------
FILING :  25.00                          CASH    :
COUNTY :    .00                          CHECK   :
COPIES :  10.00                          C CARD  :   60.00
MISC   :    .00
HANDLE :  25.00
                                         REFUND  :
                                         ------

================================================================================
   2117134                  DO3HD104                  DOS-281 (04/2007)
```

DRAWDOWN
ALLSTATE 9I

CERTIFICATE OF ASSUMED NAME

OF

AHAVA OF CALIFORNIA, LLC

———

Pursuant to Section 130 of the General Business Law

It is hereby certified that:

**FIRST:**    The name of the entity is:

**AHAVA OF CALIFORNIA, LLC**

**SECOND:**    The entity was formed or authorized under the Limited Liability Company Law.

**THIRD:**    The entity shall conduct business under the assumed name of:

**NORTH COUNTRY MANUFACTURING**

**FOURTH:**    The principle place of business in New York State is: 7705 State Route 812, Lowville, NY 13367

**FIFTH:**    The County in which business will be conducted under the assumed name is:

Lewis County

**SIXTH:**    The address of each location where business will be carried on or transacted under the assumed name is:

7705 State Route 812, Lowville, NY 13367

Signed on June 12, 2007

*Steven Weiss*

Steven Weiss, Authorized Person
Allstate Corporate Services
41 State Street, Suite 415
Albany, New York 12207

1

DRAWDOWN
ALLSTATE 9I

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## CERTIFICATE OF ASSUMED NAME

## OF

## AHAVA OF CALIFORNIA, LLC

Pursuant to Section 130 of the General Business Law

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Filed by:

Allstate Corporate Services
41 State Street, Suite 415
Albany, New York  12207

CUSTOMER REFERENCE # 2117134

# <u>EXHIBIT Y</u>

| SECRETARY OF LABOR, | |
| Complainant, | |
| v. | OSHRC DOCKET NO. 03-1533 |
| LEWIS COUNTY DAIRY CORP., | |
| Respondent. | |

Appearances:

William G. Staton, Esquire                    Susan G. Kellman, Esquire
Evanthia Voreadis, Esquire                   Law Offices of Susan G. Kellman
U.S. Department of Labor                     Brooklyn, New York
New York, New York                           For the Respondent.
For the Complainant.

Before:        G. Marvin Bober
               Administrative Law Judge

### *DECISION AND ORDER*

This matter is before the Occupational Safety and Health Review Commission ("the Commission") pursuant to section 10(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* ("the Act"). The Occupational Safety and Health Administration ("OSHA") conducted an inspection of Respondent, Lewis County Dairy Corp. ("Lewis"), on January 29 and 30, 2003; the facility of Respondent Lewis is a kosher dairy that is located in Lowville, New York. As a result of the inspection, on July 28, 2003, OSHA issued to Lewis a 33-item serious citation, a two-item willful citation and a one-item "other" citation; the penalties proposed total $141,000.00. Lewis filed a timely notice of contest, in which it contested the citations and proposed penalties. An administrative trial was held in this matter in New York, New York, on June 9-10 and 14-16, 2004, and a further administrative trial was held in Syracuse, New York, on April 25 and 26, 2006. ☞ Both parties have submitted post-trial and supplemental briefs, and this matter is ready for disposition.

### *Background*

As indicated above, Lewis operates a kosher dairy located in Lowville, New York; the facility processes milk and also produces milk products such as yoghurt, butter and cheese. On January 29, 2003, OSHA Compliance Officers ("CO's") Scott Schrilla and Andrew Palhof arrived at the facility to inspect it. ☞ An employee directed them to the main office, where they met with Melissa Hirsch, the human resources manager. ☞ The CO's identified themselves and asked to speak to the person in charge of safety or the plant manager. Ms. Hirsch contacted Christopher Tehonica, the safety

coordinator, and Karen Karelus, the quality control supervisor, and, when they arrived, the CO's explained why they were there. The CO's went to a room identified as being shared by Ms. Hirsch and Mr. Tehonica, and they held an opening conference with Ms. Hirsch, Ms. Karelus and Mr. Tehonica. The CO's then went to a different room, along with Ms. Hirsch and Mr. Tehonica, to view the facility's injury records. ℘ When the CO's requested the OSHA 300 illness and injury logs, both Ms. Hirsch and Mr. Tehonica stated that there were none. The CO's next asked for any written safety programs, including a hazard communication ("HAZCOM") program, a lockout/tagout ("LOTO") program, and a confined space program; however, neither Ms. Hirsch nor Mr. Tehonica was aware of any such programs. (Tr. 33-37, 363, 370-72, 405-08, 424, 576-85, 742, 807, 823).

The CO's conducted the walk-around inspection, accompanied by Mr. Tehonica, on January 29 and 30, 2003. The CO's saw numerous conditions they considered violations, and CO Schrilla interviewed employees and management personnel during the inspection. On February 7, 2003, CO Schrilla returned to the facility with his supervisor, Christopher Adams, the OSHA office assistant area director ("AAD"), to interview Thomas Spencer, the general manager of Lewis. CO Schrilla also went back to the facility on March 5, 2003, and obtained signed statements from Ms. Hirsch, Ms. Karelus and Ronald Stone, the plant manager. After the inspection was completed, CO Schrilla held a telephonic closing conference with Mr. Tehonica and Mr. Spencer; CO Palhof was also present for the conference. (Tr. 37-52, 361-62, 494-500, 552; C-73, C-74, C-75).

### *Credibility Determination*

Respondent Lewis asserts in its post-trial brief that the two CO's were biased and that their testimony was not credible. Lewis further asserts that its main witness, Mr. Tehonica, was more credible because his testimony was less self serving and also because it was more consistent with other evidence in the record. I do not agree.

The testimony of CO's Schrilla and Palhof concerning the opening conference, including the documents they requested and the responses of Ms. Hirsch and Mr. Tehonica, is summarized above in the background portion of this decision. Mr. Tehonica also testified in this regard, but his testimony was very much at odds with the testimony of the two CO's. Mr. Tehonica first explained his safety responsibilities, noting that he became the safety coordinator in September 2002 and that Mr. Spencer appointed him to the position because he wanted the facility to be "fully safety organized" and because he (Mr. Tehonica) would not be "pushed around" by employees and would have the "final say" as to safety. ℘ However, Mr. Tehonica then testified that upon arriving at the office pursuant to Ms. Hirsch's call, and after the CO's identified themselves, Ms. Hirsch started "going off" about how she, Ms. Karelus and Mr. Stone were the authority figures in the facility and that he (Mr. Tehonica) was only the safety coordinator and had no authority to hire or fire. Mr. Tehonica also testified that after the CO's began the opening conference, he left to call Mr. Spencer and Mr. Stone; he was unable to reach Mr. Spencer and left him a message, but he reached Mr. Stone, who asked

him to come by and pick him up. According to Mr. Tehonica, he returned to the meeting for about two minutes and then, after advising Ms. Karelus, left to pick up Mr. Stone. Mr. Tehonica indicated that he returned with Mr. Stone in about 30 minutes, near the conclusion of the meeting, which ended about five minutes later. Mr. Tehonica said no one asked him anything during that time and that CO Schrilla's testimony that he had asked him (Mr. Tehonica) about safety programs was not correct. He also said he went on the inspection with the CO's because Ms. Hirsch "ordered" him to and that while he thought he should have been in control of the inspection, from the company's standpoint, it was clear that CO Schrilla mainly wanted to talk to Mr. Stone, Ms. Karelus and Ms. Hirsch; Mr. Tehonica therefore took a "code of silence," and although he answered questions the CO's asked him, he offered no other information. (Tr. 763-67, 776-87, 995-96).

In my view, the foregoing testimony of Mr. Tehonica is simply not credible. In particular, I compare his statement that he was made safety coordinator because employees would not push him around and he would have the final say as to safety with his statement that he went on the inspection because Ms. Hirsch ordered him to and that he only answered questions and did not offer anything; I also note his testimony that Ms. Hirsch was not his supervisor and that Mr. Stone, the plant manager, did not direct him one way or the other as to the OSHA inspection. (Tr. 764-67, 782-83, 787, 995-97). Further, I found Mr. Tehonica's testimony about a number of the cited conditions in this case not credible. For example, Mr. Tehonica testified that Lewis had written safety policies in effect when he became safety coordinator; specifically, he stated that in September 2002, there were written HAZCOM, confined space and LOTO programs in place. (Tr. 767-68). His testimony about these programs on cross-examination, however, was vague and inconsistent. He first indicated he had found the programs in Mr. Spencer's office, but he then indicated that he had also located them in various other parts of the facility. He also indicated that it had taken him three or four months to compile the documents that comprised the programs but then indicated that he had held meetings on the programs very shortly after becoming the safety coordinator. Finally, he testified that he did not know if copies of the programs had been provided to employees previously but that he himself had not given out the programs after he became the safety coordinator. (Tr. 999-1008, 1070-73).

In addition to the above, I observed the demeanor of the two CO's and Mr. Tehonica on the witness stand, including their body language and facial expressions. I found CO's Schrilla and Palhof to be accurate and clear in their testimony; however, I found significant parts of Mr. Tehonica's testimony to be inaccurate and equivocal. Based on these findings, and for the reasons set out *supra*, I credit the testimony of CO's Schrilla and Palhof over that of Mr. Tehonica. Accordingly, I find as fact that the beginning of the inspection occurred in the way that the CO's described it and that Ms. Hirsch and Mr. Tehonica both told the CO's that Lewis had no OSHA 300 logs and that they were unaware of any written confined space, HAZCOM or LOTO programs at the facility.

## *Serious Citation 1 - Item 1*

This item alleges a violation of the general duty clause, section 5(a)(1) of the Act, stating that fiberglass ladders were in use at the facility that had damage such as cracked side rails and bent cross bracing; this item further alleges that fiberglass ladders in use at the facility had side rails with repairs and had not been inspected.

To prove a section 5(a)(1) violation, the Secretary must prove that the "cited employer failed to free the workplace of a hazard that was recognized by the cited employer or its industry, that was causing or likely to cause death or serious physical harm, and that could have been materially reduced or eliminated by a feasible and useful means of abatement." *Pelron Corp.* 12 BNA OSHC 1833, 1835 (No. 82-388, 1986). CO Schrilla testified that he observed and photographed two portable fiberglass ladders at the facility; one had a bent and cracked side rail, as well as damaged cross bracing, and both of the ladders had repaired side rails. ℘ Mr. Tehonica and Allen Lashbrooks, a maintenance employee, both told the CO that the ladders were used by employees and that the ladders were not inspected on a regular basis. CO Schrilla further testified that although there was no specific OSHA standard addressing fiberglass or plastic ladders, there was an ANSI standard that did; according to CO Schrilla, the ANSI standard prohibited any alteration of fiberglass ladder side rails. (Tr. 53-59, 76-78, 591-99; C-2, C-3).

In support of this citation item, the Secretary offered into evidence C-1, the 2000 revision of ANSI A14.5, the ANSI standard covering portable reinforced plastic ladder safety. (Tr. 54-58). Section 9.4.1 of the standard provides, in pertinent part, as follows:

> The ladder shall be inspected periodically, preferably before each use....Where structural damage or other hazardous defect is found, the ladder shall be taken out of service and either discarded or repaired by a competent mechanic.

In addition, section 9.4.2 of the standard states as follows:

> Broken or bent ladders shall be marked and taken out of service until they are repaired by a competent mechanic or destroyed in such a manner as to render them useless. The user shall not attempt to repair a defective side rail.

It is clear from the foregoing that the fiberglass ladders at the facility were not in compliance with ANSI A14.5, in that they had not been inspected as required and the side rails on both had been repaired. Further, CO Schrilla testified that the condition of the ladders was a serious hazard; employees standing on the ladders would be 4 to 6 feet from the floor, and a fall of 6 feet could result in broken bones. ℘ (Tr. 59). Based on the evidence of record, I find that the Secretary has met her burden of proving the alleged violation. ℘ This item is therefore affirmed as a serious violation.

The Secretary has proposed a penalty of $1,400.00 for this item. In determining penalties, the Commission must give due consideration to the four statutory factors, that is, the gravity of the

violation, the size of the employer's business, the good faith of the company and its previous history of OSHA violations. *See* section 17(j) of the Act, 29 U.S.C. § 666(j). The record shows that the cited condition was rated as having medium severity and lesser probability, for a gravity-based penalty of $2,000.00. Further, Lewis was given 20 and 10 percent reductions for size and history, respectively; however, no reduction was given for good faith. ℘ (Tr. 60-62).

CO Schrilla testified that the 20 percent reduction for size was based on his determining that Lewis and Ahava of California ("Ahava"), another company located in the same facility and having the same owner, Moise Banayan, together had 140 to 150 employees; he explained that Ms. Hirsch told him Lewis had 72 employees, that she also gave him employee lists for both companies showing a total of over 200 employees, and that due to what Ms. Hirsch told him and the fact that some names appeared on both lists, he concluded that the total number of employees was 140 to 150. ℘ (Tr. 61-62, 612-14, 621-29, 1083, 1086-88; C-122, C-123). Moise Banayan, however, testified that Lewis had 45 to 55 employees during 2002 and 2003 and that Ahava had 20 to 25 employees during that period, for a total of up to 80 employees; he explained that C-122 and C-123 showed all of the employees the two companies had ever had and that the January 2003 date on C-122 and C-123 reflected only the date the documents were printed. ℘ (Tr. 1295, 1332-35, 1344-57, 1375-76). After Mr. Banayan's testimony, that the highest number of employees at the facility would have been about 80, counsel for the Secretary stated that he "accept[ed] that." (Tr. 1354-55). On the basis of the Secretary's counsel's acceptance of Mr. Banayan's testimony, I find that the total number of employees at the facility during the relevant period was about 80.

In view of the foregoing, I conclude Lewis is entitled to a 40 percent reduction of the penalty for size rather than the 20 percent about which the CO testified, in addition to the 10 percent reduction for history. ℘ Accordingly, a penalty of $1,000.00 is assessed for this item. ℘

### *Serious Citation 1 - Item 2*

As amended, this item alleges a violation of section 5(a)(1), or, in the alternative, 29 C.F.R. 1910.212(a)(1); however, as the Secretary addresses only the alleged violation of the specific standard in her post-hearing brief, the alleged violation of section 5(a)(1) is deemed abandoned. This item alleges that two machines did not have the requisite guarding. The cited standard states as follows:

> One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operations, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are–barrier guards, two-hand tripping devices, electronic safety devices, etc.

In regard to Item 2a, CO Schrilla testified that he saw a rigid pipe threading machine in the maintenance area that had a manual on/off switch but did not have a constant pressure switch. He further testified that the machine had rotating parts on it that were driven by a very strong motor and that there had been cases documented in which severe injuries and even fatalities had occurred when

constant pressure switches were not used. He explained that with machines having just an on/off switch, employees had gotten caught in the moving parts and wound around the machines. He also explained that manufacturers offered constant pressure foot pedals that required the operator to have a foot on the pedal for the machine to work and that the machine would stop as soon as the operator's foot was taken off the pedal. The CO said that Mr. Lashbrooks and Mr. Tehonica both told him that the machine was used in the condition in which he saw it. (Tr. 62-64, 601-02).

To establish a violation of a specific standard, the Secretary must show that (1) the cited standard applies, (2) the standard was not met, (3) employees had access to the violative condition, and (4) the employer knew or could have known of the condition with the exercise of reasonable diligence. *Astra Pharmaceutical Prod.*, 9 BNA OSHC 2126, 2129 (No. 78-6247, 1981). Moreover, as Lewis notes, to establish a violation of 29 C.F.R. 1910.212(a)(1), the Secretary must:

> prove that a hazard within the meaning of the standard exists in the employer's workplace. *Armour Food Co.*, 14 BNA OSHC 1817, 1821 (No. 86-247, 1990). In order to meet this burden, the Secretary must do more than show that it may be physically possible for an employee to come into contact with the unguarded machinery in question. Rather, the Secretary must establish that employees are exposed to a hazard as a result of the manner in which the machine functions and the way it is operated. *Id.*; *Rockwell Int'l Corp.*, 9 BNA OSHC 1092, 1097-98 (No. 12470, 1980).

*Jefferson Smurfit Corp.*, 15 BNA OSHC 1419, 1421 (No. 89-553, 1991).

As Lewis points out, CO Schrilla did not observe the machine operate, and it was unplugged when he saw it. (Tr. 602-04). Further, CO Schrilla did not identify the particular rotating parts that presented a hazard or describe how an employee operating the machine could have gotten caught in the operating parts. Finally, the CO's photo of the machine sheds no light on this matter, *see* C-4, and there was no evidence that anyone had ever been injured from using the machine. On the basis of the evidence of record, the Secretary has not proved the alleged violation. Item 2a is vacated.

In regard to Item 2b, CO Schrilla testified that a conveyor that was used to convey product in the filling room had an area that was a hazard. In particular, he testified as follows:

> [T]here's a portion of the conveyor where it returns, where it comes off the tail pulley, and before it gets to the first return, the bottom pulley, where the conveyor actually sagged down below the frame of the ... conveyor. And, when it sagged down, it came back up, the portion of the conveyor created a pinch point on itself....It's a typical kind of conveyor you see in ... food processing ..., where they're compiled of a series of hard plastic, almost looks like a treadle kink. And, when it returns on the bottom, there are pinch points that can pinch or grab the employee's clothes. (Tr. 64-65).

CO Schrilla stated that he saw an employee walking next to the conveyor whose clothes were within 4 inches of the conveyor. He said the condition could have caused serious injuries such as

broken bones and that it could have been corrected by placing a guard next to the conveyor. He also said that he spoke to Mr. Tehonica and Ms. Karelus about the condition. (Tr. 64-65, 74-75).

As Lewis notes, the CO did not give the speed at which the conveyor moved or describe its size and configuration. He also did not provide the length or width of the unguarded part of the conveyor, and he did not describe the heights of the pinch points from the floor or state specifically how an employee could be caught in them; despite his testimony about the employee walking by the conveyor, he did not state that the employee walked by the unguarded portion. Finally, as in Item 2a, there was no evidence that anyone had ever been injured by the conveyor. The Secretary has failed to demonstrate the alleged violation. Item 2b is vacated.

### *Serious Citation 1 - Item 3*

This item alleges a violation of 29 C.F.R. 1910.22(a)(1), which provides that "[a]ll places of employment, passageways, storerooms, and service rooms shall be kept clean and orderly and in a sanitary condition." CO Schrilla testified that there was a set of stairs going from the milk receiving area to the rest of the facility and that the concrete at the top of the stairs was damaged; he saw employees using the stairs, and one was carrying two buckets of chemicals as he used the stairs. The CO said the condition created a tripping hazard and that a fall on the stairs could result in broken bones or, in the case of someone carrying chemicals, chemical burns. He also said that C-5 and C-6, two photos of the area, showed the stairs and the damaged area, respectively; he considered the violation serious due to the injuries that could have occurred. (Tr. 78-81).

Lewis does not dispute the existence of the condition; it contends, rather, that the Secretary failed to prove that the cited area was "dirty, disorderly or unsanitary." I do not agree. One definition of "orderly" is "neat or tidy in arrangement; in good order." *See Webster's New World Dictionary, Second College Edition* (1972). On the basis of the record, the Secretary has shown the alleged violation, including the knowledge element, in that the condition was readily apparent. (Tr. 803-07). She has also shown the violation was serious. This citation item is consequently affirmed.

A penalty of $1,400.00 has been proposed for this item. The record shows this item was given medium severity and lower probability, and the gravity-based penalty was $2,000.00. (Tr. 81-82). In view of the factors noted *supra*, and the reductions applied, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 4*

This item alleges a violation of 29 C.F.R. 1910.23(c)(1), setting out three instances of missing

standard railings on platforms or open-sided floors. The cited standard provides, in relevant part, that:

> Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder.

As to Item 4a, CO Schrilla testified that he observed a storage platform in the storage room that had no guardrails; the platform was about 7 feet above the floor and was approximately 15 by 20 feet. The CO learned that employees went up on the platform to remove materials, and Mr. Tehonica told the CO that he himself went up on the platform. (Tr. 82-83).

As to Item 4b, CO Schrilla testified that in the mixing room, a platform to the side of the batch tank was about 6 feet above the floor; employees were required to work from the platform, and there were no mid-rails on the three open sides of the platform. (Tr. 83).

As to Item 4c, CO Schrilla testified that there was a storage platform at the top of the stairs in the maintenance area that had no mid-rail on its open side; the platform was about 12 feet from the floor, and employees were required to move materials up to and down from the platform. (Tr. 83).

The CO said that these items were classified as serious violations because falls from the platforms to the concrete floors below could have resulted in serious injuries, such as broken bones. He identified C-7 and C-8 as photos of the platforms cited in Items 4b and 4c, respectively, and he marked on the photos where the mid-rails should have been. (Tr. 83-88).

Lewis contends that the Secretary did not prove that the missing guardrails exposed employees to falls as alleged. However, the evidence clearly shows that employees utilized all three of the cited platforms. Moreover, the standard, as I read it, assumes a hazard if any of the required guardrails are missing; the platform cited in Item 4a did not have any guardrails at all, and while the platforms cited in Items 4b anc 4c had the required top rails, they did not have the required mid-rails. *See* 29 C.F.R. 1910.23(e)(1), which states that a standard railing *shall* consist of a top rail, intermediate rail and posts (emphasis added). I find that the Secretary has met her burden of proving the alleged violation, including the employer knowledge element, in that the platforms were all in plain view and Mr. Tehonica used one of them himself. Item 4 is affirmed as a serious violation.

A total penalty of $1,750.00 has been proposed for Item 4. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 88). Considering the relevant factors and the applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 5*

Item 5 alleges a violation of 29 C.F.R. 1910.23(d)(1)(ii), which states as follows:

Every flight of stairs having four or more risers shall be equipped with standard stair railings or standard handrails as specified in paragraphs (d)(1)(i) through (v) of this section, the width of the stair to be measured clear of all obstructions except handrails....
(ii) On stairways less than 44 inches wide having one side open, one stair railing on open side.

The record shows this item involved the stairs leading up to the platform that was cited in Item 4c, *supra*. CO Schrilla testified that the stairs, which were 12 feet high at the highest point, had well over four risers and that the stairs were also less than 44 inches wide. He further testified that the lack of an intermediate rail on the open side was a serious hazard as employees carried materials up and down the stairs and a fall could have resulted in injuries such as broken bones. (Tr. 88-91; C-8).

I find that the Secretary has met her burden in regard to this item. Although the stairs had a top rail, as shown in C-8, a "standard railing" consists of not only a top rail but also an intermediate rail. *See* 29 C.F.R. 1910.23(e)(1). I conclude that the standard, as written, assumes a hazard if either rail is missing. I also conclude that the testimony of CO Schrilla and C-8, his photo of the stairs, establish the alleged violation. This item is therefore affirmed as a serious violation.

The Secretary has proposed a penalty of $1,750.00 for this item. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 90). In view of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 6*

Items 6a and 6b allege violations of 29 C.F.R. 1910.36(h)(2) and 29 C.F.R. 1910.37(a)(3), asserting an egress means was blocked by snow and ice. Those standards provide, respectively, that:

The outdoor exit route must be covered if snow or ice is likely to accumulate along the route, unless the employer can demonstrate that any snow or ice accumulation will be removed before it presents a slipping hazard.
Exit routes must be free and unobstructed. No materials or equipment may be placed, either permanently or temporarily, within the exit route. The exit access must not go through a room that can be locked, such as a bathroom, to reach an exit or exit discharge, nor may it lead into a dead-end corridor. Stairs or a ramp must be provided where the exit route is not substantially level.

CO Schrilla testified that there were two exit doors from the trailer at the site where the company's offices were located. One of the exit doors would not open when he tried it, and he discovered that this was due to the snow that had accumulated outside of the door because of the lack of an overhead covering. The CO took two photos of the condition. One, C-9, shows the inside of the

door with an "EXIT" sign on it; the other, C-10, shows the outside of the exit after the snow accumulation had been cleared away. The CO further testified that the condition was a serious hazard because employees could suffer burns or smoke inhalation, or even death, if there were a fire in the trailer and they were unable to get out. (Tr. 91-94, 638-41, 730-31).

The CO's testimony and his photos clearly establish violations of the cited standards. Moreover, Lewis presented nothing to rebut the Secretary's evidence, and it does not address this item in its post-trial brief. Items 6a and 6b are affirmed as serious violations.

A total penalty of $1,750.00 has been proposed for Item 6. This item was given a high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 95). In light of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### _Serious Citation 1 - Item 7_

This item alleges a violation of 29 C.F.R. 1910.37(e), which states as follows:

Employers must install and maintain an operable employee alarm system that has a distinctive signal to warn employees of fire or other emergencies, unless employees can promptly see or smell a fire or other hazard in time to provide adequate warning to them. The employee alarm system must comply with § 1910.165.

CO Schrilla testified that he determined during his inspection that there was no alarm system at the facility; the CO made this determination by speaking with Mr. Tehonica and other employees. The CO further testified that the facility had many different rooms and dead ends and that an alarm system was necessary so that employees could exit quickly in the case of a fire or other emergency. The CO considered the lack of an alarm system a serious hazard in that employees could suffer burns or smoke inhalation if a fire occurred in the facility. (Tr. 94-98, 642-43).

The CO's testimony demonstrates the alleged violation. In addition, Mr. Tehonica admitted at the hearing that the facility had no alarm system at the time of the inspection, and Lewis does not address this item in its brief. (Tr. 814). This item is affirmed as a serious violation.

The Secretary has proposed a penalty of $1,750.00 for this item. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00 (Tr. 98). Based on the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### _Serious Citation 1 - Item 8_

Item 8 alleges a violation of 29 C.F.R. 1910.106(d)(2)(i), which provides as follows:

Only approved containers and portable tanks shall be used. Metal containers and portable tanks meeting the requirements of and containing products authorized by chapter I, title

49 of the Code of Federal Regulations ... shall be deemed to be acceptable.

CO Schrilla observed a plastic 5-gallon container in the maintenance area that was about half full; Mr. Tehonica told him that it had gasoline in it and that it was used to power a snow blower. The CO took C-11, a photo of the container, and he noted that it was not approved to store gasoline as it was not metal and did not have a self-closing valve or flame arrester. He considered the condition a serious violation; someone using the container could have spilled some of the gasoline, and, if a spark had occurred, a fire could have resulted that could have caused serious burns. (98-101).

The testimony of the CO shows the alleged violation. Mr. Tehonica admitted the condition at the hearing, and Lewis does not address this item in its brief. ☞ (Tr. 815). Item 8 is consequently affirmed as a serious violation.

A penalty of $1,750.00 has been proposed for this item. This item was given a rating of high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 101). In view of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 9*

Item 9 alleges a violation of 29 C.F.R. 1910.133(a)(1), which states that:

> The employer shall ensure that each affected employee uses appropriate eye or face protection when exposed to eye or face hazards from flying particles, molten metal, liquid chemicals, acids or caustic liquids, chemical gases or vapors, or potentially injurious light radiation.

The record shows that Lewis employees used caustic chemicals and sulfuric acid to clean production equipment; in addition, the material safety data sheets ("MSDS's") the chemical supplier provided indicated the various chemicals the employees used were hazardous and required the use of eye and face protection. ☞ CO Schrilla testified that he spoke with employee Beverly Hirschey, who said she dispensed chemicals for cleaning purposes; she indicated she sometimes wore safety glasses but normally did not wear any eye or face protection. Another employee, who worked in the lab, told him she used sulphuric acid and generally did not wear facial protection, although she sometimes wore safety glasses, and Scott Hamill, a truck driver, told him he had to add sulphuric acid to tanker trucks and used no protection to do so. The CO observed employee Steven Edick carrying two buckets of chemicals without using any protective equipment; Mr. Edick said the buckets held caustic and acid, and he made no response when asked why he wore no protection. ☞ CO Schrilla spoke to Mr. Stone, who said he knew that employees did not always wear eye protection and that it was difficult to get them to do so as they found it uncomfortable. (Tr. 102-09, 118-21).

CO Schrilla further testified that not using eye and face protection was a serious hazard in that skin burns or loss of eyesight could result; he said safety glasses were inadequate, that safety goggles and a face shield were needed to protect against splashes, and that he did not see any goggles or face shields in use at the facility. The CO also said that Ms. Hirsch gave him employee accident/illness reports; one showed that in August 2002 Ms. Hirschey was pumping "CIP Cleaner" when it splashed

on her face, neck and chest, and another showed that in May 2002 Charles Strickland was cleaning a vat with "LP Acid" when it splashed in his eye. (Tr. 106, 110-15, 119-20; C-83, C-84).

Mr. Tehonica testified about the personal protective equipment ("PPE") that was available at the facility at the time of the inspection, such as face shields, goggles, glasses, aprons and gloves. He said most people were "pretty good" about wearing PPE and that Ms. Hirschey and Mr. Edick were "probably the two safest people" in the facility, but he admitted that Mr. Edick was not wearing PPE when the CO's saw him with the buckets of chemicals. (Tr. 816-20, 842-43). Moreover, the testimony of cleaning employee Jessica Hoch that Ms. Hirschey had trained her in the proper PPE to wear for carrying chemicals and for cleaning and that she had never seen Ms. Hirschey working without the proper PPE is belied by what Ms. Hirschey told the CO's and by C-84, the report for Ms. Hirschey noted *supra*. (Tr. 104-05, 375-76, 462, 466, 910-17). Finally, Lewis does not address this item in its brief. The testimony of the CO's is credited, and this item is affirmed as a serious violation. ℘

A penalty of $3,500.00 has been proposed for this item. This item was given a high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 107). Considering the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed.

### *Serious Citation 1 - Item 10*

This item alleges a violation of 29 C.F.R. 1910.138(a). That standard provides that:

Employers shall select and require employees to use appropriate hand protection when employees' hands are exposed to hazards such as those from skin absorption of harmful substances; severe cuts or lacerations; severe abrasions; punctures; chemical burns; thermal burns; and harmful temperature extremes.

As in the previous item, the record shows that Lewis employees used caustic chemicals and sulphuric acid to clean equipment; the record also shows that the MSDS's for the chemicals called for the use of hand protection to protect employees from skin burns. CO Schrilla testified that he learned from the same employees he talked to about eye and face protection, that is, Beverly Hirschey, Steven Edick and Scott Hamill, that they also did not wear hand protection when dispensing and using the chemicals. The CO further testified that the failure to wear hand protection was a serious hazard because contact with the chemicals could burn the skin. (Tr. 118-22). Based on the CO's testimony, the evidence set out in the discussion relating to Item 9, *supra*, and my findings in that regard, the Secretary has established the alleged violation. ℘ Moreover, Lewis does not address this item in its brief. Item 10 is therefore affirmed as a serious violation.

The Secretary has proposed a penalty of $1,400.00 for this item. This item was given a rating of medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 122). In

light of the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 11*

Item 11 alleges a violation of 29 C.F.R. 1910.146(c)(2), which states that:

> If the workplace contains permit spaces, the employer shall inform exposed employees, by posting danger signs or by any other equally effective means, of the existence and location of and the danger posed by the permit spaces.
> NOTE: A sign reading "DANGER–PERMIT-REQUIRED CONFINED SPACE, DO NOT ENTER" or using other similar language would satisfy the requirement for a sign.

CO Schrilla observed tanks in the mixing area that were labeled as permit-required confined spaces; however, there were about seven tanks in the area that were not labeled as required. ꙫ He determined the tanks were permit-required confined spaces because they had limited access and hazards inside, such as rotating parts and the potential for reduced oxygen, and because employees entered the tanks to clean them or to work on agitators. ꙫ The CO said the failure to label the tanks was a serious hazard; if a tank an employee entered had an oxygen-reduced atmosphere or its agitator blades started up unexpectedly, the result could be serious injury or death. He also said that C-16 was a photo he took of one of the tanks and that it was not labeled when he saw it. (Tr. 122-27).

As the Secretary notes, a "confined space" is defined at 29 C.F.R. 1910.146(b) as a space that:

> (1) Is large enough and so configured that an employee can bodily enter and perform assigned work; and
> (2) Has limited or restricted means for entry or exit (for example, tanks, vessels, silos, storage bins, hoppers, vaults, and pits are spaces that may have limited means of entry); and
> (3) Is not designed for continuous employee occupancy.

As the Secretary further notes, a "permit-required confined space" is defined at 29 C.F.R. 1910.146(b) as a confined space that has one or more of the following characteristics:

> (1) Contains or has a potential to contain a hazardous atmosphere;
> (2) Contains a material that has the potential for engulfing an entrant;
> (3) Has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes downward and tapers to a smaller cross-section; or
> (4) Contains any other recognized serious safety or health hazard.

Lewis does not address this item in its brief, and Mr. Tehonica's testimony, that there were only two tanks that were not labeled as required, was not persuasive in light of the CO's contrary testimony and my credibility findings set out at the beginning of this decision. (Tr. 826-27). Mr. Tehonica's further testimony that Mr. Edick only entered the tanks part way to work on or clean the agitators was also not persuasive, especially since he then stated that Mr. Edick did "not always" go all the way into the tanks when he performed such work. (Tr. 829-31). Based on the CO's testimony, the language of the standard, and the above definitions, I find that the Secretary has proved the alleged violation. This item is affirmed as a serious violation.

A penalty of $3,500.00 has been proposed for this item. This item was considered to have high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 127). Based on the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed.

### *Serious Citation 1 - Item 12*

Item 12 alleges a violation of 29 C.F.R. 1910.146(c)(4), which provides as follows:

If the employer decides that its employees will enter permit spaces, the employer shall develop and implement a written permit space program that complies with this section. The written program shall be available for inspection by employees and their authorized representatives.

The evidence relating to Item 11, *supra*, establishes that Lewis employees entered tanks that were permit-required confined spaces; in view of that evidence and the language of the cited standard, Lewis was required to have a written permit space program. CO Schrilla testified that such a program should state which tanks are covered, what the hazards in the tanks are, and what has to be done before entry; he also testified that Ms. Hirsch, Mr. Tehonica, Mr. Bush, Mr. Stone and Ms. Karelus all told him that they were unaware of a written confined space program. (Tr. 127-28).

Mr. Tehonica testified that he had no discussions with CO Schrilla during the inspection about a confined space program and that he never told the CO that Lewis did not have one. (Tr. 833). However, in the credibility determination discussion at the beginning of this decision, I found that Ms. Hirsch and Mr. Tehonica both told the CO's that they were unaware of any written confined space program at the facility. (Tr. 37, 363, 372, 585). I further found that Mr. Tehonica's testimony concerning the inspection and the safety programs that Lewis had was not persuasive. Based on my credibility findings, the testimony of CO Schrilla in regard to Items 11 and 12, and the fact that Lewis does not address this item in its brief, I conclude that the Secretary has demonstrated the alleged violation. This item is accordingly affirmed as a serious violation.

The Secretary has proposed a penalty $3,500.00 for this item. This item was given a high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 129). Considering the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed.

### *Serious Citation 1 - Item 13*

This item alleges a violation of 29 C.F.R. 1910.147(c)(4)(i), which states that:

Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section.

As set out in the credibility determination portion of this decision, Lewis did not have a written

LOTO program at the time of the inspection. This finding was based on the testimony of CO's Schrilla and Palhof that, when they asked about Lewis having such a program, Ms. Hirsch and Mr. Tehonica both stated that they were unaware of a written LOTO program. ☞ (Tr. 37, 363, 371, 424). CO Schrilla also testified that although Mr. Spencer believed there was a LOTO program, and while he did come up with some specific procedures for particular machines, Ms. Karelus and Mr. Stone, as well as maintenance employees Allen Lashbrooks and Ken Yousey, all told the CO that they were unaware of any lockout procedures or of any such procedures being used. (Tr. 129-31).

Item 13a alleges Lewis did not have a specific LOTO procedure for a new machine called the Franz bottling machine, and CO Schrilla testified that there was no LOTO procedure for the machine. (Tr. 130). Item 13b alleges Lewis was not utilizing any specific procedures for locking out equipment such as the Franz bottling machine, ATS machines, agitators, pumps, separators, and whipping and cheese machines. CO Schrilla testified that Mr. Lashbrooks and Mr. Yousey were the employees who did the type of work on the cited machines that would require LOTO procedures so that unexpected startup of equipment could not cause injuries. He further testified that he observed work being done on a separator and on a cheese vat; the equipment had moving parts that required LOTO procedures, and none were being used. In addition, Mr. Lashbrooks, Mr. Yousey, Ms. Karelus and Mr. Stone all told the CO that no LOTO procedures were utilized. ☞ The CO said the violation was serious, as being caught in moving parts could cause injuries like amputations and broken bones. (Tr. 129-31, 142). The Secretary has proved the alleged violation. Item 13 is affirmed as a serious violation.

A total penalty of $3,500.00 has been proposed for Item 13. This item was considered to have high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 131-32). In light of the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed

### *Serious Citation 1 - Item 14*

Item 14a alleges a violation of 29 C.F.R. 1910.147(c)(5)(i), which provides that:

Locks, tags ... or other hardware shall be provided by the employer for isolating, securing or blocking of machines or equipment from energy sources."

CO Schrilla testified that he asked Mr. Lashbrooks and Mr. Yousey if they had locks for locking out equipment; both said they did not, and Ms. Karelus and Mr. Stone were also unaware of any such locks. The CO was taken to see the facility's two lockout boxes, but, when they were opened, there were no locks in them. ☞ The CO identified C-17, C-18 and C-20 as his photos of the boxes. (Tr. 134-39). The CO's testimony establishes the alleged violation. ☞

Item 14b alleges a violation of 29 C.F.R. 1910.147(c)(5)(ii), which provides that:

Lockout devices and tagout devices shall be singularly identified; shall be the only devices(s) used for controlling energy; shall not be used for other purposes...."

CO Schrilla testified that he did see three lockout-type locks at the facility; however, one was

being used to lock a sliding door, and the other two were being used to lock up the personal cabinet of an employee. ♥ The CO further testified that lockout locks are not to be used for other purposes because then they will not be available for locking out equipment. (Tr. 139-40). The CO's testimony demonstrates the alleged violation.

The CO testified that the cited conditions were serious, in that severe injuries can occur when lockout locks are not used when required. (Tr. 139-40). Further, Lewis does not address Item 14 in its brief. Items 14a and 14b are consequently affirmed as serious violations.

A total penalty of $3,500.00 has been proposed for Item 14. This item was given a high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 140-41). Considering the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed.

### *Serious Citation 1 - Item 15*

Item 15a alleges a violation of 29 C.F.R. 1910.147(c)(7)(i). That standard states that:

The employer shall provide training to ensure that the purpose and function of the energy control program are understood by employees and that the knowledge and skills required for the safe application, usage, and removal of the energy controls are acquired by employees.

Item 15b alleges a violation of 29 C.F.R. 1910.147(c)(6)(i). That standard states that:

The employer shall conduct a periodic inspection of the energy control procedure at least annually to ensure that the procedure and the requirements of this standard are being followed.

CO Schrilla testified that Mr. Lashbrooks, Mr. Yousey, Mr. Bush and Mr. Edick all told him that they had had no LOTO training; the CO also testified that of the procedures the facility did have, only Mr. Spencer seemed to be aware of them, and that without a program, no training or annual review could be conducted. The CO stated that failing to train employees in LOTO could cause serious injuries such as amputations and broken bones. (Tr. 141-42). Based on the CO's testimony, Mr. Tehonica's testimony that LOTO training was provided is not credited. (Tr. 836-37, 1078). Further, Lewis does not address Item 15 in its brief. Items 15a and 15b are affirmed.

A total penalty of $3,500.00 has been proposed for Item 15. This item was given a high severity and greater probability, and the gravity-based penalty was $5,000.00. (Tr. 142-43). Due to the relevant factors and applicable reductions, a penalty of $2,500.00 is assessed.

### *Serious Citation 1 - Item 16*

This item alleges a violation of 29 C.F.R. 1910.157(g)(1), which provides as follows:

Where the employer has provided portable fire extinguishers for employee use in the

workplace, the employer shall also provide an educational program to familiarize employees with the general principles of fire extinguisher use and the hazards involved with incipient stage fire fighting.

The record shows that Lewis has 29 portable fire extinguishers in its facility. (Tr. 838). CO Schrilla testified that Mr. Tehonica, Mr. Lashbrooks and Mr. Stone all told him that employees used the extinguishers; in fact, the CO learned there had been a fire in the facility's tanker bay about a week before and that extinguishers had been used at that time. When CO Schrilla asked if employees had been trained in extinguisher use, he was told that no training had been done; the CO noted that without training, using a fire extinguisher could result in severe burns. (Tr. 142-44, 700-01).

Mr. Tehonica testified that he had given fire extinguisher training to Lewis employees in November of 2002 and that CO Schrilla had never asked him or anyone else in his presence about fire extinguisher training. (Tr. 837-42). However, based on my credibility findings *supra*, the CO's testimony is credited over that of Mr. Tehonica. Moreover, Lewis does not address this item in its brief. The record establishes the alleged violation, and this item is affirmed.

The Secretary has proposed a penalty of $1,750.00 for this item. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 144). Based on the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 17*

This item alleges a violation of 29 C.F.R. 1910.176(b), which provides that:

Storage of material shall not create a hazard. Bags, containers, bundles, etc., stored in tiers shall be stacked, blocked, interlocked and limited in height so that they are stable and secure against sliding or collapse.

CO Schrilla testified that a storage platform in the facility's storage room had a damaged vertical support beam and horizontal support beams that had "bowing" in them; the latter beams were bowed about 3 inches, which indicated damage, and the CO circled the horizontal support beams in C-23, his photo of the bottom of the platform. The CO further testified that materials and supplies were stored up on the platform, that employees went up on the platform to retrieve and replace the materials and supplies, and that the platform was a serious hazard; if the support beams were to collapse, an employee could sustain serious injuries such as bone fractures. (Tr. 145-48).

Lewis contends that the cited standard is a general materials storage standard that does not address structural requirements for storage platforms and that the Secretary has failed to prove that the standard applies. I disagree. The first sentence of the standard states that "[s]torage of material shall

not create a hazard." In addition, the CO's testimony about the damaged vertical beam and the bowed horizontal beams certainly implies that the platform was overloaded, and he expressly stated that the platform was a serious hazard. Finally, C-95, the NYSIF report, references this condition and describes the platform as "severely overloaded." It also states that the condition could result in "structural failure and collapse" and "extreme bodily harm and potential fatalities." *See* C-95, ¶ 19. Based on the record, the Secretary has proved the alleged violation. This item is affirmed as serious.

The Secretary has proposed a penalty of $1,400.00 for this item. This item was given a rating of medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 148). In light of the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 18*

Item 18a alleges a violation of 29 C.F.R. 1910.176(e), which states that "[c]learance signs to warn of clearance limits shall be provided."

Item 18b alleges a violation of 29 C.F.R. 1910.304(c)(2). That standard provides as follows:
*Clearance from ground.* Open conductors shall confirm to the following minimum clearances:
(i) 10 feet–above finished grade, sidewalks, or from any platform or projection from which they might be reached.
(ii) 12 feet–over areas subject to vehicular traffic other than truck traffic.
(iii) 15 feet–over areas other than those specified in paragraph (c)(2)(iv) of this section that are subject to truck traffic.
(iv) 18 feet–over public streets, alleys, roads, and driveways.

The record shows that there were overhead power lines outside of the lab area of the facility. CO Schrilla observed Lewis employees driving fork trucks underneath the lines, and Mr. Tehonica told him the lines heated the lower warehouse. The CO testified that there were no signs in the area indicating the clearance for the lines. He also testified that there was not a 12-foot clearance beneath one of the lines; he used a ruler to measure from the ground to the top of one of the fork trucks and found that distance to be about 6.5 feet, and he estimated the distance from the top of the truck to the line to be about 3 feet, for a total of approximately 9.5 feet. ꝰ CO Schrilla identified C-26 as his photo of the condition, and he circled the power line in question. The CO said the failure to have the required sign and clearance was a serious hazard; running into a line with a truck could result in electrocution or in knocking the line down and someone else being injured. (Tr. 149-54).

Mr. Tehonica testified that while he thought all three of the power lines shown in C-26 were energized at the time of the inspection, he later found out that the lowest line, the one the CO had been concerned about, was not; he explained that he and Mr. Lashbrooks had inspected both ends of the line

and had discovered that neither was connected. Mr. Tehonica further testified that he had later measured the two higher lines and had found them to be 11 feet 2 inches and 12 feet 2 inches from the ground, respectively; Mr. Tehonica then had Mr. Lashbrooks put extensions on the lines so that they were both 12 feet 10 inches from the ground. (Tr. 845-52).

Lewis did not offer any testimony as to the required clearance sign. Moreover, in view of my credibility determinations in this matter, Mr. Tehonica's testimony about the line being de-energized was not persuasive. I find, accordingly, that the lowest line was energized at the time of the inspection and that its distance from the ground, as CO Schrilla testified, was approximately 9.5 feet. The Secretary has proved both of the cited conditions, and Items 18a and b are affirmed as serious violations.

A total penalty of $1,750.00 has been proposed for Item 18. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 152-53). In view of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### Serious Citation 1 - Item 19

Item 19 alleges a violation of 29 C.F.R. 1910.178(p)(1). The cited standard provides that:

If at any time a powered industrial truck is found to be in need of repair, defective, or in any way unsafe, the truck shall be taken out of service until it has been restored to safe operating condition.

CO Schrilla testified that he observed a powered industrial truck in the facility's charging area that had some bare copper exposed on its charging wires. He also testified that there were employees in the area and that the condition was a serious hazard because of the potential for someone to have contacted the wires or for sparks to have caused a fire or explosion. The CO identified C-28 as his photo of the condition, and he circled the area showing the exposed wires. (Tr. 154-56).

The CO's testimony establishes the alleged violation, including employer knowledge of the condition. ▽ Lewis did not present any evidence to rebut the CO's testimony, and it does not address this item in its brief. This item is affirmed.

A penalty of $1,400.00 has been proposed for this item. This item was given a medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 156). Considering the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### Serious Citation 1 - Item 20

This item alleges violations of 29 C.F.R. 1910.212(a)(1); the terms of the cited standard are set out in the discussion relating to Item 2, *supra*.

As to Item 20a, CO Schrilla observed an employee pour farmer's cheese into a hopper on top of a machine in the farmer's cheese room. The employee then pushed the cheese down with his hands, and his hands were within inches of the ingoing nip point created by the machine's two star-shaped metal wheels, which were rotating and interlocking. The CO identified C-30 as his photo of the machine, and he said that the cover, shown to the left of the machine in C-30, was on top of the machine when it was being operated. He also said that guarding could be provided either by extending the height of the cover or by placing a mesh on top so that employees could not reach the rotating metal parts. (Tr. 156-59, 162).

As to Item 20b, CO Schrilla observed a machine called the ATS filling machine in the filling room. He testified that there was a metal "plate" on the side of the machine that moved up and down and created a pinch point with the base of the machine. There were employees in the area, and he saw one employee reach in to make adjustments and to move the plastic cover that was being placed on top of the machine; in doing so, the employee's hand was within an inch of the metal plate. The CO identified C-29 as his photo of the machine, and he circled the plate. He said that placing a guard in front of the plate would prevent employees from getting into the pinch point. (Tr. 159-63).

Lewis does not address this item in its brief, and Mr. Tehonica testified only about the abatement of the cited conditions; specifically, he said that a new farmer's cheese machine was purchased and that a guard was made for the ATS filling machine. (Tr. 854-58). Based on the record, the Secretary has established the alleged violations. She has also shown the violations were serious; the CO testified that employees using the unguarded machines could get fingers caught, which could result in fractures. (Tr. 162-63). This citation item is affirmed.

A total penalty of $1,750.00 has been proposed for Item 20. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 163). Based on the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 21*

Item 21 alleges a violation of 29 C.F.R. 1910.212(a)(5). The standard provides that:

When the periphery of the blades of a fan is less than seven (7) feet above the floor or working level, the blades shall be guarded. The guard shall have openings no larger than one-half (½) inch.

CO Schrilla observed an operating heater fan suspended from the ceiling in the silo room. He noted that two of the slats were missing from its guard, which created openings of 1.75 by 12 inches

and 3.5 by 12 inches, and he measured the fan and found it to be 6 feet 3 inches from the ground. He also noted that employees walked through that area and also worked in the silo room and that the missing slats exposed employees to the rotating fan blades. The CO identified C-32 as his photo of the fan, and he stated that the condition was a serious hazard because of the potential for being struck by the fan's blades and serious injuries such as lacerations. (Tr. 163-65).

I find the Secretary has established the alleged violation; an employee, particularly one who was 6 feet or taller, could have inadvertently contacted the rotating fan blades while walking through or working in the area and been seriously injured. This item is affirmed as a serious violation.

The Secretary has proposed a penalty of $1,400.00 for this item. This item was rated as having medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 165). In view of the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 22*

Item 22 alleges a violation of 29 C.F.R. 1910.215(b)(9), which states as follows:

Safety guards of the types described in subparagraphs (3) and (4) of this paragraph, where the operator stands in front of the opening, shall be constructed so that the peripheral protecting member can be adjusted to the constantly decreasing diameter of the wheel. The maximum angular exposure above the horizontal plane of the wheel spindle as specified in paragraphs (b)(3) and (4) of this section shall never be exceeded, and the distance between the wheel periphery and the adjustable tongue or the end of the peripheral member at the top shall never exceed one-fourth inch.

CO Schrilla observed a pedestal grinder in the maintenance area that did not have a tongue guard on it; a tongue guard is a metal piece that comes down on top of the guard so that if the wheel breaks the piece will stay inside the guard and not come out and strike the operator. The CO identified C-33 as his photo of the grinder, and he circled the area where the guard should have been in place. The CO said that Mr. Lashbrooks told him that he used the grinder almost daily; he also said that the condition was a serious hazard because a piece of broken wheel striking the operator can cause injuries such as lacerations. (Tr. 166, 169-70).

Lewis did not rebut the CO's testimony, and it does not address this item in its brief. Further, Mr. Tehonica, who observed the condition with the CO, testified that a guard was later made for the pedestal grinder. (Tr. 858-59). In light of the CO's testimony, I find that the Secretary has shown the alleged violation. This citation item is therefore affirmed as a serious violation.

A penalty of $1,400.00 was proposed for this item. This item was considered to have medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr.). In light of the

relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 23*

Item 23a alleges a violation of 29 C.F.R. 1910.219(c)(2)(i). That standard provides that:

All exposed parts of horizontal shafting seven (7) feet or less from floor or working platform, excepting runways used exclusively for oiling, or running adjustments, shall be protected by a stationary casing enclosing shafting completely or by a trough enclosing sides and top or sides and bottom of shafting as location requires.

As to Item 23a(a), CO Schrilla observed an unguarded rotating shaft on an agitator motor; the shaft was in the silo room, it was attached to the end of the silo, and it was about 3 feet off the floor. The CO testified that employees walked through and worked in the area and that, as the silo room was not very wide, employees walking by the shaft would be within a foot or a foot and a half of it. The CO marked the location of the shaft on C-39, his photo of the condition. (Tr. 170-74).

In regard to Item 23a(b), CO Schrilla observed an unguarded rotating shaft with projections in the mixing area; the shaft was about 3 feet from the ground, and it was coming off of a horizontal tank. The CO testified that the shaft was 2 to 3 inches from the edge of a platform employees used and that he saw employees access the platform. The CO marked the location of the shaft on C-37, his photo of the condition. (Tr. 175-77).

As to Item 23a(c), CO Schrilla observed another unguarded rotating shaft in the mixing area; the shaft was on a floor-based pump, and it was about 1 foot off the floor, as shown in C-38, his photo of the shaft. The CO testified that he saw employees tending to the mixing tanks and that to do so they had to step over the pump, which brought them within inches of the rotating shaft. (Tr. 177-83).

With respect to Item 23a(d), CO Schrilla observed unguarded rotating shafts in the filling department; the shafts were on top of the filling machine, and they were about 5.5 feet from the ground, as shown in C-34, his photo of the condition. The CO testified that he saw employees reaching over the shafts to put caps on product containers and that, when they did so, their sleeves were almost touching the shafts. (Tr. 183-85).

CO Schrilla said the unguarded shafts were cited as serious due to the hazard of clothing being caught by and an employee being drawn into a shaft, resulting in lacerations or fractures; he also said the conditions could have been abated by putting covers on the shafts. (Tr. 171, 174, 177, 185-86).

Based on the foregoing, I conclude that the Secretary has met her burden of establishing the alleged violation. Item 23a is therefore affirmed as a serious violation.

Item 23b alleges a violation of 29 C.F.R. 1910.219(c)(3). That standard states that:

Vertical and inclined shafting seven (7) feet or less from floor or working platform, excepting maintenance runways, shall be enclosed with a stationary casing in accordance with requirements of paragraphs (m) and (o) of this section.

CO Schrilla observed an unguarded vertical shaft on a whipping machine in the filling department; the shaft was 2.5 to 3 feet off the ground in the machine, and he saw employees walking past the machine, coming within a foot of the shaft. The CO testified that the shaft could be guarded by putting up a barrier, and he identified C-35 as his photo of the shaft; he circled the area showing the shaft. The CO further testified that the condition was cited as serious because of the potential for being caught by the shaft, which could result in broken bones and severe lacerations. (Tr. 186-88). In view of the CO's testimony, the Secretary has demonstrated the alleged violation. Item 23b is accordingly affirmed as a serious violation.

The Secretary has proposed a total penalty of $1,400.00 for Item 23. This item was given a medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 188-89). Considering the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### Serious Citation 1 - Item 24

Item 24a alleges a violation of 29 C.F.R. 1910.219(d)(1), which provides as follows:

Pulleys, any parts of which are seven (7) feet or less from the floor or working platform, shall be guarded in accordance with the standards specified in paragraphs (m) and (o) of this section.

CO Schrilla observed four unguarded pulleys on a cheese vat in the cheese room; there were two 4-inch pulleys and two 7-inch pulleys, with semi-V belts between them, and they were located 4 to 5 feet above the floor. The CO testified that the pulleys were right above the vat's speed control and that employees said they had to reach up to change the speed while the vat was operating; they also said the vat had been operated without guards for well over six months, and the CO saw the guards for the pulleys leaning against a wall. The CO further testified that the unguarded pulleys were a serious hazard because getting caught between the pulleys and the belts could result in fractures and severe lacerations. C-40 is the CO's photo of the condition. (Tr. 189-94).

Item 24b alleges a violation of 29 C.F.R. 1910.219(e)(3)(i), which states that "[v]ertical and inclined belts shall be enclosed by a guard conforming to standards in paragraphs (m) and (o) of this section." The record shows that this item refers to the semi-V belts between the two pulleys, as shown in C-40, which were also unguarded; CO Schrilla testified that the hazard was the same, that is, that of being caught between the pulleys and belts. (Tr. 193-94).

Lewis contends the Secretary has not met her burden of showing exposure to the alleged hazard because the CO did not see the machine operate. I disagree. The CO testified that employees told him

they had to reach up to change the vat's speed when the vat was operating; he also testified that the speed control was right below the pulleys and that he saw the guards for the equipment leaning against the wall. (Tr. 189-92). C-40 supports the CO's testimony, and I find that the Secretary has proved the alleged violations. ☞ Items 24a and b are affirmed as serious violations.

A total penalty of $1,400.00 has been proposed for Item 24. This item was rated as having medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 194). In light of the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 25*

This item alleges a violation of 29 C.F.R. 1910.219(f)(3), which states that "[a]ll sprocket wheels and chains shall be enclosed unless they are more than seven (7) feet above the floor or platform." CO Schrilla saw an unguarded sprocket and chain conveyor system in the dock area; the system consisted of two 10-inch-diameter sprockets and chains that were about 1.5 feet above the ground, and, when he saw it, the conveyor was moving cases to a washing machine. The CO observed an employee loading the cases into the washer, and, while he was not next to the conveyor at that time, he told the CO that he had to work right next to it when he put the cases onto the opposite end of the conveyor, at which time his hands were right next to the unguarded sprockets and chains. The CO testified that the condition was a serious hazard, in that getting caught by the sprocket and chain system could result in fractures and lacerations. C-41 is the CO's photo of the end of the system where the employee indicated he put the cases on the conveyor. (Tr. 195, 199-200, 207).

Lewis presented no evidence to rebut the CO's testimony, and it does not address this item in its brief. In view of the CO's testimony, I conclude that the Secretary has established the alleged violation. Item 25 is therefore affirmed as a serious violation.

A penalty of $1,400.00 has been proposed for this item. This item was given a medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 207). Considering the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### *Serious Citation 1 - Item 26*

Item 26 alleges a violation of 29 C.F.R. 1910.242(b), which provides that "[c]ompressed air shall not be used for cleaning purposes except where reduced to less than 30 p.s.i....." CO Schrilla testified that compressed air was being used for cleaning purposes in both the cheese room and the slicing room; he tested the lines with a gauge and found both to be at 112 p.s.i. He further testified that

he spoke to employees working in both areas, who told him they used the air lines for cleaning, and that Mr. Tehonica also told him that the lines were used for cleaning. The CO said the condition was serious, in that compressed air of over 100 p.s.i. can inject air under the skin and cause an embolism. He also said that he took C-42, a photo of one of the lines. (Tr. 208-12).

Lewis does not address this matter in its brief, and Mr. Tehonica testified only about abating the cited condition, that is, "reducers" were put on the air lines shortly after the inspection. (Tr. 867). The Secretary has shown the alleged violation. This item is affirmed as a serious violation.

A penalty of $1,400.00 has been proposed for this item. This item was considered to have medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 211). Based on the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### Serious Citation 1 - Item 27

Item 27 alleges a violation of 29 C.F.R. 1910.243(c)(1), which states that "[a]brasive wheels shall be used only on machine provided with safety guards...." CO Schrilla observed a portable angle grinder that did not have a guard, and employees he spoke to told him they used the grinder. The CO also testified that the type of guard needed was a semicircle guard that would cover part of the grinding wheel; the purpose of the guard was to keep the operator from contacting the rotating blade or being struck by a broken blade, which could cause serious injuries. (Tr. 212, 218-19).

Mr. Tehonica was present when the CO saw the grinder, and he testified that the grinder was not in use at that time; he admitted, however, that the grinder was available for use, and he also admitted that Mr. Lashbrooks used it. (Tr. 867-70, 1037-38). The evidence of record establishes the alleged violation, and Lewis does not address this item in its brief. This item is affirmed as serious.

The Secretary has proposed a penalty of $1,400.00 for this item. This item was rated as having medium severity and lesser probability, and the gravity-based penalty was $2,000.00. (Tr. 219-20). In view of the relevant factors and applicable reductions, a penalty of $1,000.00 is assessed.

### Serious Citation 1 - Item 28

Item 28a alleges a violation of 29 C.F.R. 1910.303(b)(2). The cited standard states that "[l]isted or labeled equipment shall be used or installed in accordance with any instructions included in the listing or labeling." CO Schrilla observed a Type NM cable, which is rated to be installed inside of a wall to protect it from damage, running down a wall to the floor in plain view in the company's main office. He tested the cable with an electrical meter called an AC sensor and found that it had electrical

power going through it. C-44 is his photo of the cable. (Tr. 220-22, 256, 260).

Item 28b alleges a violation of 29 C.F.R. 1910.305(b)(1), which states that "[c]onductors entering boxes, cabinets, or fittings shall also be protected from abrasion, and openings through which conductors enter shall be effectively closed." CO Schrilla observed another Type NM cable entering a ceiling-mounted box, not through the actual fittings, but between the cover plate and the metal box itself. He also saw that the same cable, where it exited the wall-mounted switch box, did not go through the fittings as required to prevent abrasion; rather, it went over the top of the box and in between the box and cover plate. The CO tested the cable with his AC sensor and determined that it was live. C-43 and C-45 are his photos of the cable as he saw it. (Tr. 222-27).

CO Schrilla testified the conditions cited in Items 28a and 28b were serious hazards because, if the cables had become damaged, they could have caused serious electrical shocks. (Tr. 227-28). Lewis presented no evidence to rebut the CO's testimony, and it does not address this item in its brief. The Secretary has shown the alleged violations, and Items 28a and 28b are affirmed as serious.

A total penalty of $1,750.00 has been proposed for Item 28. This item was given high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 228). In light of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### Serious Citation 1 - Item 29

Item 29a alleges a violation of 29 C.F.R. 1910.303(g)(2)(i), which provides that "[l]ive parts of electric equipment operating at 50 volts or more shall be guarded against accidental contact by approved cabinets or other forms of approved enclosures...." CO Scrilla observed a panel box in the facility's ice bank room, a small building outside of the main facility; the box was open and had parts in it, and when he tested it with his AC sensor he found it was live. ⅋ The CO testified that the open box was a hazard; the room was small, about 10 by 12 feet, maintenance employees Allen Lashbrooks and Kenneth Yousey told him they worked in the room, and someone contacting a part in the box could have been electrocuted. ⅋ The CO also testified that the box was shown on the left in C-46, his photo of the condition. (Tr. 228-30, 238-41).

Lewis notes Mr. Tehonica's testimony that the cover was off the box because an electrical subcontractor had been working on it and had left to get a part; the subcontractor returned later that day, and the cover was replaced on the box. (Tr. 870-73). CO Schrilla agreed that the cover was on the floor in the room, but he did not recall Mr. Tehonica saying anything about a contractor working on the box. (Tr. 677). Based on my credibility findings in this case, the CO's testimony is credited over that of Mr. Tehonica. Lewis also contends that the Secretary has not shown employee exposure to the

cited condition; however, in light of the testimony of the CO and Mr. Tehonica, I find that she has. The Secretary has proved the alleged violation, and Item 29a is affirmed as serious.

Item 29b alleges five instances of violation of 29 C.F.R. 1910.305(b)(1), asserting that breaker boxes in various locations had exposed energized parts; the terms of the cited standard are set out in the discussion pertaining to Item 28b, *supra*. ℘ CO Schrilla testified as follows in regard to Items 29b (a) through 29b(e). As to each item, he observed a breaker box with missing breakers; the missing breakers exposed the bus bar, which was energized, and the AC sensor was used to verify that each box was in fact energized. In Item 29b(a), the box was in the bottling area; C-47 is the CO's photo of the box, and the CO circled the area of concern in C-47. In Item 29b(b), the breaker box was in the ramp area; C-50 is the CO's photo of the box, and he circled the area of concern. In Item 29b(c), the breaker box was in the ice bank room; the box was next to the panel box cited in Item 29a, and photo C-46 shows the breaker box on the right. In Item 29b(d) the breaker box was in the lower warehouse; there is evidently no photo of this instance. In Item 29b(e), the breaker box was in the security shack, and the CO took photo C-48, which shows CO Palhof testing the box. (Tr. 231-45).

CO Schrilla also testified about employee exposure as to each instance. In Item 29b(a), in the bottling area, he saw employees walking within a foot of the box, and he noted that because the circuits in the box would have to be turned on and off, employees would be exposed to the condition. In Item 29b(b), he saw employees walking right by the box, in that it was near the ramp, and at one point, Mr. Stone was standing right by the box watching the CO's. In Item 29b(c), there were no employees in the ice bank room when CO Schrilla was there; he noted, however, that the same maintenance employees that he spoke to in regard to Item 29a would also have been exposed to this condition. In Item 29b(d), there were no employees working in the lower warehouse when he was there, but he stated that Mr. Tehonica spent about 75 percent of his time in the warehouses. In Item 29b(e), CO Schrilla saw employees in the security shack when he was there, and he pointed out that almost all of the employees had to go to the shack to clock in and out. (Tr. 234-36, 239-44).

Mr. Tehonica was present when the CO's made the foregoing observations, and he saw the AC sensor light up when they tested the boxes. (Tr. 726, 873-74). Lewis does not dispute employee exposure as to Item 29b(a), but it contends that the Secretary has not proved exposure as to the other items. I disagree. The CO testified, as to Item 29b(a), that the circuits in the box would have to be turned on and off and that employees would thus be exposed to the energized bus bar. This testimony is equally true for the other 29b instances, and the Secretary has met her burden of showing exposure. I find, therefore, that the Secretary has proved the alleged violations; she has also proved the serious nature of the violations, due to the testimony of CO Schrilla that contacting the exposed parts in the boxes could result in death. (Tr. 235-37, 240-42, 245). Item 29b is affirmed as serious.

A total penalty of $1,750.00 has been proposed for Item 29. This item was considered to be high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 245-46). Due to the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 30*

This item alleges a violation of 29 C.F.R. 1910.304(a)(2), which provides that "[n]o grounded conductor may be attached to any terminal or lead so as to reverse designated polarity." In the lower warehouse, CO Schrilla observed a whey truck that was plugged into an outlet with an extension cord; he used his AC sensor to test the outlet and discovered that it had reversed polarity, that is, the hot and neutral lines were wired backwards. The CO said the condition was a serious hazard; if there had been a short or a fault, any equipment plugged into the outlet could have become energized and contact with the equipment could have caused a shock or even electrocution. (Tr. 256-59).

The CO's testimony establishes the violative condition, and Lewis presented no evidence to rebut his testimony. ℘ Lewis contends, however, that the Secretary did not prove that it had knowledge of the outlet's condition, noting the violation was not in plain view and that constructive knowledge therefore cannot be found. However, as set out in the discussions for Items 28, 29, 31 and 32, there were a number of other conditions in the facility that violated OSHA's electrical standards. Moreover, as found in footnote 33, *supra*, Respondent's procedures for detecting safety problems were deficient. Finally, C-95, the NYSIF report, notes a number of electrical hazards at the facility. *See* C-95, ¶¶ 12, 14 and 16. Under these circumstances, I find that Lewis could have discovered the cited condition with the exercise of reasonable diligence. This item is affirmed as a serious violation.

The Secretary has proposed a penalty of $1,750.00 for this item. This item was rated as having high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 259). Considering the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 31*

Item 31 alleges a violation of 29 C.F.R. 1910.304(f)(4). ℘ The cited standard states that "[t]he path to ground from circuits, equipment, and enclosures shall be permanent and continuous."

As to Item 31a, CO Schrilla testified there was a fan mounted in a doorway in the silo area; he put his AC sensor on the fan's frame and the sensor lit up, indicating the fan was not grounded, and he explained that the AC sensor picks up not only the presence of AC power but also detects whether equipment is grounded. The CO identified C-56 as a photo of the fan. (Tr. 259-62).

As to Item 31b, CO Schrilla testified that he used his sensor on the frame of a bottling machine, located in the bottling area, and the sensor indicated the machine was not grounded; after some discussion with plant personnel, CO Palhof used a different type of tester, which confirmed that the machine was not grounded. CO Schrilla identified C-55 as a photo of the testing of the bottling

machine with the AC sensor. (Tr. 262-64, 680-81).

As to Item 31f, CO Schrilla testified that in the storage area, there was a series of light fixtures with metal holders; the AC sensor was used to test the holders, and the sensor indicated the fixtures were not grounded. The CO identified C-57 as a photo showing the testing of one of the fixtures with the sensor. (Tr. 264-65).

As to Item 31g, CO Schrilla testified that a scale in the filling room was plugged into the wall and that when he tested it the senor indicated the scale was not grounded; he pulled the plug out of the wall and saw it had no ground pin. The CO identified C-58 as a photo of the scale. (Tr. 265-67).

CO Schrilla stated that all four conditions were hazards, in that, if any of the equipment or one of the fixtures had had a fault or a short and an employee had touched it, a shock or even electrocution could have resulted; the hazard was exacerbated in the bottling area and the filling room because those areas were wet. (Tr. 261, 264-67).

Lewis contends that the AC sensor the CO used was not a reliable means of determining whether the cited equipment was grounded, and Respondent's counsel questioned the CO extensively in that regard. However, the CO testified that the AC sensor was the device he was taught to use. He said that, according to the manufacturer's instructions, the sensor was to be placed on a metal part of the equipment in question and that if the equipment was not grounded the sensor would light up. He also said he had not found the sensor to make mistakes; in fact, when plant personnel had questioned his determination concerning the bottling machine, CO Palhof had used a different sensor, a more advanced type that actually quantified the resistance present, which had confirmed that the bottling machine was not grounded. (Tr. 677-85, 732-33, 739-40, 743).

Mr. Tehonica agreed he was present when the CO tested the equipment and that he had seen the sensor light up, but he disputed the CO's finding that the bottling machine and the light fixtures were not grounded; he said the fixtures were disconnected before the inspection and that Mr. Spencer had tested the bottling machine after the inspection with an ohms meter and found it to be grounded. (Tr. 873-82). However, Mr. Tehonica offered no testimony as to the other two pieces of equipment. Moreover, he did not address CO Schrilla's testimony regarding CO Palhof testing the bottling machine with a different type of tester to confirm that it was not grounded. Finally, in light of my credibility determinations in this case, Mr. Tehonica's testimony is found to be unpersuasive. I conclude that the Secretary has met her burden of proving the alleged violations and that she has also

shown the knowledge element, based on my findings in that regard in the discussion relating to Item 30, *supra*. Items 31a, b, f and g are affirmed as serious violations.

A total penalty of $1,750.00 has been proposed for Item 31. This item was given high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 268). In view of the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Serious Citation 1 - Item 32*

Item 32a alleges a violation of 29 C.F.R. 1910.305(e)(1), which states that:

Cabinets, cutout boxes, fittings, boxes and panelboard enclosures in damp or wet locations shall be installed so as to prevent moisture or water from entering and accumulating within the enclosures. In wet locations the enclosures shall be weatherproof.

CO Schrilla observed two electrical boxes mounted on the wall in the mixing area; there were openings in the bottoms of the boxes, and there was also rust and water marks on the bottoms of the boxes. The CO spoke to employees who worked in the area, as well as Ms. Karelus, and learned that the area was hosed down every night to clean it. He said the condition was hazardous because water could enter the openings and cause electrical shocks and death. He also said that C-59 was his photo showing one of the openings and CO Palhof testing the box to verify that it was energized. The CO stated that the condition could have been corrected by buying plugs for the holes. (Tr. 268-70).

The Secretary has established the alleged violation, and Lewis does not address this item in its brief. Item 32a is affirmed as a serious violation.

Item 32b alleges four instances of violation of 29 C.F.R. 1910.305(j)(2)(ii), asserting that receptacles exposed to water had covers that were not closed. The cited standard states that "[a] receptacle installed in a wet or damp location shall be suitable for the location." As to Item 32b(a), CO Schrilla saw a receptacle in the cooler area that was exposed to water as its cover not closed; the receptacle was tested with the AC sensor and found to be energized, and it also had an extension cord plugged into it that went to a radio that was playing. There were watermarks on the outlet, and the CO learned the area was washed down often. C-60 is the CO's photo of the receptacle.(Tr. 271-72).

As to Item 32b(b), CO Schrilla observed a receptacle in the cheese room that also was exposed to water; the cover was missing, the faceplate was coming away from the box, and the CO saw watermarks on the outlet and learned the area was hosed down daily. The receptacle was tested with the AC sensor and found to be energized, and there was an extension cord plugged into the receptacle that went to another radio. C-62 is the CO's photo of the receptacle. (Tr. 273-75).

As to Item 32b(c), CO Schrilla saw a receptacle in the mixing department that was exposed to

water; its cover was open, and the receptacle was cut to allow a "cheater" to go into the outlet. The receptacle was found to be energized, by means of the sensor, and an employee, Mr. Bush, told the CO the area was washed down daily. C-61 is the CO's photo of the receptacle. (Tr. 275-77).

As to Item 32b(d), CO Schrilla observed a fourth receptacle, this one in the filling room, that was damaged and had a cover that would not close. There were conductors plugged into the receptacle, and the conductors were tested with the sensor to verify they were energized. Ms. Karelus told the CO the area was hosed down daily, and the CO saw that the receptacle had plastic wrapped around it and that there was water inside the plastic. (Tr. 277-78).

The Secretary has demonstrated the alleged violations. She has also demonstrated that the violations were serious, based upon the CO's testimony that contact with outlets in wet locations could result in severe shocks or electrocution. (Tr. 273-78). Lewis does not address this item in its brief. Item 32b is accordingly affirmed as a serious violation.

A total penalty of $1,750.00 has been proposed for Item 32. This item was considered to have high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 279). Based on the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.


### *Serious Citation 1 - Item 33*

Item 33a alleges a violation of 29 C.F.R. § 1910.1200(e)(1), which provides as follows:

Employers shall develop, implement, and maintain at each workplace, a written hazard communication program which at least describes how the criteria specified in paragraphs (f), (g), and (h) of this section for labels and other forms of warning, material safety data sheets, and employee information and training will be met....

The record shows that Respondent's employees used hazardous chemicals to clean equipment at the facility. (Tr. 102-06, 118-22, 280). *See also* Items 9 and 10, *supra*. The record also shows, as set out in the credibility determination part of this decision, that Lewis had no written HAZCOM program at the time of the inspection. The CO's determined this fact from asking Mr. Tehonica and Ms. Hirsch, who both said they were unaware of a written HAZCOM program. (Tr. 37, 279-80, 363, 371, 424). Further, CO Schrilla testified that various employees he talked to, *i.e.*, Mr. Lashbrooks, Mr. Youscy, Mr. Bush and Mr. Edick, confirmed there was no such program. (Tr. 279-80). Finally, as the Secretary points out, Lewis never produced a HAZCOM program during the inspection, and C-95, the NYSIF report, also notes the lack of a HAZCOM program. (Tr. 280, C-95, ¶ 9). The Secretary has established the alleged violation, and Item 33a is affirmed as a serious violation.

Item 33b alleges a violation of 29 C.F.R. 1910.1200(h)(1), which provides that:

Employers shall provide employees with effective information and training on hazardous

chemicals in their work area at the time of their initial assignment, and whenever a new physical or health hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (*e.g.*, flammability, carcinogenicity) or specific chemicals. Chemical-specific information must always be available through labels and material safety data sheets.

The employees noted above in Item 33a also told CO Schrilla they had not received any HAZCOM training; they knew that material safety data sheets ("MSDS's") were located in the break room, but they had not been trained in the hazards of the chemicals they worked with. In addition, CO Schrilla spoke to Ed Ayers, the representative of the company that supplied the various chemicals that Lewis used; Mr. Ayers stated that he had given some training to Lewis employees but not what was required by the HAZCOM standard. (Tr. 119, 281).

Mr. Tehonica testified that employees received training in the chemicals they used through film strips, safety meetings and Mr. Ayers. He said the film strips were there when he became safety coordinator and that they addressed HAZCOM information; he also said that he held about ten safety meetings before the OSHA inspection and that those meetings covered MSDS's as well as protective gear to wear when using chemicals. (Tr. 885-90, 1075-78). Mr. Tehonica admitted, however, that the training that Mr. Ayers provided did not meet the HAZCOM standard's requirements. (Tr. 1038-40). Moreover, Lewis presented no evidence to show that the film strips and safety meetings Mr. Tehonica testified about covered the required information. Finally, while Lewis disputes the applicability of the standard and the serious nature of the hazard in its brief, it does not mention Mr. Tehonica's testimony or contend that the standard was met. Based on the testimony of CO Schrilla, the Secretary has shown the alleged violation. Item 33b is affirmed as a serious violation.

A total penalty of $1,750.00 has been proposed for Item 33. This item was given high severity and lesser probability, and the gravity-based penalty was $2,500.00. (Tr. 282). Due to the relevant factors and applicable reductions, a penalty of $1,250.00 is assessed.

### *Willful Citation 2 - Item 1*

This item alleges both a serious and a willful violation of 29 C.F.R. 1910.132(a), which states as follows:

Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption,

inhalation or physical contact. ℗

As to Item 1a, CO Schrilla learned that in the milk receiving area, an employee named Kevin Morak was required to go up on top of tanker trucks to facilitate the unloading and cleaning process. The CO spoke to Mr. Morak, who said he had not worn any fall protection for his work on the tanker trucks for one and a half to two weeks. ℗ The CO also spoke to Mr. Tehonica, who agreed that fall protection was needed and indicated that one of the harnesses that had been used had been damaged about three months before; Ms. Karelus and Mr. Stone, however, did not recall fall protection being used in the milk receiving area. CO Schrilla testified that the tops of the tanker trucks were 11 feet from the ground and that the failure to use fall protection was a serious hazard; a fall of 11 feet could result in serious injuries or death, and he knew of a case in another facility where a worker had fallen 11 feet from the top of a tanker truck, causing the worker's death. ℗ The CO identified C-70 as his photo of the area, showing a tanker truck with its hatch open. (Tr. 282-86, 289-91).

As to Item 1b, CO Schrilla observed a tanker truck in another area of the facility, the whey waste area; he explained that whey was a byproduct of the facility's processes and that it was shipped out in tanker trucks. He spoke to an employee, Scott Hanley, who said he was a truck driver, that he got on top of the whey waste tanker trucks to open and close their hatches and to add chemicals, and that he used no fall protection when he was up on the trucks. CO Schrilla testified that the whey waste area was in an outside location and that there were no attachment points for fall protection; however, he gave examples of what could be utilized to provide protection. He also testified that the condition was a serious hazard, as a fall of 11 feet could cause serious or fatal injuries, and he identified C-69 as his photo of the tanker truck he saw in the whey waste area. (Tr. 292-97).

CO Schrilla testified that Lewis knew of the cited conditions, pointing out that the NYSIF report noted the lack of fall protection for work on tanker trucks; he also pointed out that Ms. Karelus, Mr. Stone and Mr. Tehonica all knew that fall protection was needed and was not in use and that, in the February 7, 2003 meeting the CO had with Mr. Spencer, Mr. Spencer said he knew fall protection was needed and thought it had been ordered. ℗ (Tr. 283, 286-88, 291, 295, 338-39, 343-46).

Lewis concedes that a "brief" violation of the cited standard existed in regard to Item 1a, noting the testimony of Mr. Tehonica that the facility had two safety harnesses and three lanyards at the time. He said that one harness and two lanyards were used in the tanker bay area, that one lanyard was kept attached to a steel pipe in the ceiling that was put in as an attachment point, and that workers who went up on the tankers tied off the lanyard on the harness to the lanyard on the pipe; he also said that a welder who was using the other harness and lanyard had burned the lanyard during his welding work about two weeks before and that the welder had taken the lanyard from the steel pipe. ℗ Mr. Tehonica noted that he had called OSHA after the inspection and had spoken to CO Palhof about devising a different kind of fall protection system in the tanker bay area. (Tr. 787-93).

Mr. Tehonica's testimony is not credited. First, Mr. Tehonica told CO Schrilla during the inspection that it was a harness that had been damaged about three months before the inspection. (Tr. 283, 291). Second, CO Schrilla never mentioned a steel pipe as an attachment point during his testimony, and Ms. Karelus and Mr. Stone both told him they did not recall fall protection being used in the milk receiving area. (Tr. 283). Third, C-95, the NYSIF report, notes the lack of fall protection for work on tanker trucks. (C-95, ¶ 6). Fourth, CO Palhof testified that when Mr. Tehonica called, he and Mr. Tehonica had discussed installing an anchorage point in the ceiling; according to the CO, Mr. Tehonica said he was unsure what they could use for an anchorage point as there were pipes at the ceiling and the anchorage point needed to be below the pipes. (Tr. 381-82). Finally, while Lewis apparently had at least one harness and lanyard at the time of the inspection, it is clear that Lewis employees were not using any fall protection when they worked on the tanker trucks at the site. Item 1a is affirmed as a serious violation.

In regard to Item 1b, Lewis contends that it was not in violation of the standard because the Secretary did not prove there was a feasible means of compliance. In support of its contention, Lewis notes the following passage in C-72, the OSHA interpretation of 29 C.F.R. 1910.132:

[I]t would not be appropriate to use the personal protection equipment standard, 29 C.F.R. 1910.132(d), to cite exposure to fall hazards from the tops of rolling stock, unless employees are working atop stock that is positioned inside of or contiguous to a building or other structure where the installation of fall protection is feasible. In such cases, fall protection systems often can be and in fact are used in many facilities in the industry.

As a preliminary matter, it is unclear to me whether the reference to 1910.132(d) in the above excerpt is an error, as Lewis suggests, or whether the passage does in fact refer to 1910.132(d), which addresses hazard assessment and equipment selection. However, even assuming that the excerpt refers to 1910.132(a), I disagree with Respondent's contention. First, C-69, the CO's photo of the tanker truck in the whey waste area, shows the truck parked right next to a building. Second, CO Schrilla testified as follows with respect to systems that Lewis could have put in place:

What I've seen in the past and would work here, there's a couple different ways. One's a single point suspension where they have actually a frame that comes up and a retractable lifeline. I've seen frames with four posts in the center, in the center rail with a lifeline that moves along that rail that employees tie off. And I've seen facilities that have actual stairways and then a platform that comes down, they lower the platform right next to the truck and there's guardrails all the way around the sides. (Tr. 293-94).

On the basis of the CO's testimony, I find that the Secretary has shown that there were feasible means of compliance with the standard. Item 1b is affirmed as a serious violation.

Turning to the willful classification, the Secretary, in order to establish that a violation was willful, must show that it was committed "with intentional, knowing or voluntary disregard for the requirements of the Act or with plain indifference to employee safety." *See, e.g., Williams Enter., Inc.,*

13 BNA OSHC 1249, 1256 (No. 85-355, 1987), and cases cited therein. As *Williams* further explains:

> A willful violation is differentiated by a heightened awareness – of the illegality of the conduct or conditions – and by a state of mind – conscious disregard or plain indifference. *Id*. at 1256-57.

As indicated *supra*, C-95 is an excerpt from the NYSIF report dated January 16, 2002, issued to Lewis following a survey of the facility on January 15, 2002. ☞ (Tr. 315, 983-94). C-95 is captioned "Survey of the Workplace," and the first paragraph of C-95 states as follows:

> The results of the workplace survey that was conducted at your facility are listed below. These items are part of the overall consultation and your insurer must verify that you have complied with this section of the report upon the reinspection that must be conducted within six months of the date of receipt of this report.

C-95 then goes on to list 29 conditions that are to be addressed, some of which have been noted previously in this decision. As to the cited condition, C-95 states that "[a] proper and approved OSHA fall arrest system for tank truck sampling and loading operations must be installed. Presently, no system to protect employee on a working platform from falling." C-95, ¶ 6. Mr. Tehonica testified that when he was appointed safety coordinator, Mr.Spencer gave him a copy of C-95 and discussed it with him. Mr. Tehonica further testified that after becoming safety coordinator, he called Veronica Migon, the NYSIF representative who had been working with Lewis to correct the conditions in C-95; Ms. Migon told him that her objective was for Lewis to be compliant so that it could lower its insurance premiums. Mr. Tehonica said that Melissa Hirsch had been working with Ms. Migon before he became safety coordinator and that he learned that Ms. Migon had been to the facility several times; he also said that Ms. Migon followed up with him and visited the facility about twice a month to make sure he was making progress on the items in C-95. (Tr. 983-93, C-99).

In addition to the above, the record shows that Ms. Hirsch was the safety coordinator before Mr. Tehonica. According to C-74, the written statement she gave CO Schrilla, Moise Banayan, the owner of Lewis, told her to meet with the NYSIF investigator after C-95 was issued, that she was the safety coordinator, and that she was to "get on top of" the safety issues. ☞ Ms. Hirsch began meeting with Ms. Migon and ordering safety equipment, and she also planned a safety meeting for June 5, 2002; before the meeting was held, however, Mr. Spencer told her to stop meeting with Ms. Migon and to do nothing else as to safety; she was also told her equipment orders had been put on "hold." ☞ Ms. Hirsch advised Ms. Migon what had happened, after which Ms. Migon scheduled two meetings with Mr. Spencer, but he did not appear for them. Ms. Migon also wrote to Mr. Banayan, who contacted Ms. Hirsch and asked why she was not doing anything about the safety issues; Ms. Hirsch reminded Mr. Banayan that Mr. Spencer had relieved her of that responsibility and that she had written him (Mr. Banayan) in that regard. Mr. Spencer appointed Mr. Tehonica safety coordinator in September 2002, and after that point Ms. Hirsch and Mr. Tehonica both met with Ms. Migon and worked on safety issues at the facility. In C-74, Ms. Hirsch said Mr. Tehonica had ordered fall protection for the milk receiving area and that Mr. Spencer had known of the order. ☞ She also said that Mr. Spencer had stated that some of the items in C-95 were not needed and that

others were too expensive. Finally, she said there was no cooperation from management, meaning Mr. Spencer, Mr. Banayan and others, in regard to safety.

Based on the foregoing, Lewis management, that is, Thomas Spencer, the general manager, and Moise Banayan, the owner, had specific notice of the need for fall protection for work on top of tanker trucks in January 2002 due to C-95. Despite this notice and the efforts of Ms. Migon, Ms. Hirsch and Mr. Tehonica, Lewis had not complied with the requirement a year later, when the OSHA inspection took place. Besides these facts, Mr. Stone stated in C-73 that there had been no fall protection for seven to eight years in the milk receiving area. Mr. Stone said he had agreed that fall protection was necessary when Mr. Tehonica brought it to his attention, and he told Mr. Tehonica to discuss it with Mr. Spencer; when no fall protection appeared, Mr. Stone spoke to Mr. Spencer, who said that a harness and lanyard had been ordered. In his statement, Mr. Stone said he did not know why there was still no fall protection in the milk receiving area. Ms. Karelus stated in C-75 that she was aware of the need for fall protection in the milk receiving area; she also knew it was not being used and that it had been requested.

When CO Schrilla and AAD Adams met with Mr. Spencer on February 7, 2003, Mr. Spencer told them he thought fall protection had been ordered. Mr. Spencer then called the company's Brooklyn office and spoke with Yehutta Banayan, the individual responsible for purchasing, who said the fall protection had not been ordered but that it would be and would be delivered within a few days. CO Schrilla asked Mr. Spencer why the fall protection had not been ordered immediately, when the first request was put in; Mr. Spencer stated that orders relating to production were filled right away but that if an order did not involve production it would not be filled until Yehutta Banayan spoke to the owner and the owner approved the order. (Tr. 338-39, 499-500).

I find that Lewis was in willful violation of the cited standard. Lewis management had specific notice of the cited hazard in January 2002 and, notwithstanding the efforts of the NYSIF consultant and the Lewis personnel assigned to address the facility's safety issues, the cited hazard still existed a year later when OSHA arrived. Moreover, it is reasonable to infer from the record that Thomas Spencer had not followed up with the Brooklyn office to ensure the fall protection had been ordered and that Moise Banayan had made a conscious decision to not fill Mr. Tehonica's request for fall protection, even though both knew the equipment was required. Finally, even after Mr. Spencer called Brooklyn and Yehutta Banayan told him the fall protection would be ordered and would arrive in a few days, there was still no fall protection in use on the tanker trucks about a month later; this fact is

established by C-73, C-74 and C-75, the statements CO Schrilla took from Mr. Stone, Ms. Hirsch and Ms. Karelus on March 5, 2003. Under the circumstances of this case, I find that the Secretary has shown that Lewis acted with conscious disregard of the standard's requirements and/or plain indifference to employee safety. This item is accordingly affirmed as a willful violation. ✌

The Secretary has proposed a total penalty of $44,000.00 for this item. This item was given a high severity and lesser probability, and the gravity-based penalty was $55,000.00. (Tr. 296). In light of the relevant factors and applicable reductions, a penalty of $27,500.00 is assessed.

### *Willful Citation 2 - Item 2*

This item alleges both a serious and a willful violation of 29 C.F.R. 1910.151(b), which provides as follows:

> In the absence of an infirmary, clinic, or hospital in near proximity to the workplace which is used for the treatment of all injured employees, a person or persons shall be adequately trained to render first aid. Adequate first aid supplies shall be readily available. ✌

CO Schrilla testified he asked Mr. Tehonica about first aid supplies on January 29, 2003, and that Mr. Tehonica told him there was a kit in the guard shack, where Cynthia Peck, the head of security, was stationed. He and CO Palhof went to the guard shack the next morning, and, when they looked inside the kit, it had very little in it; there was a CPR mask, a few rubber gloves, a few small gauze pads, and some tape. The CO said the kit should have had other items, such as trauma and burn dressings, larger gauze pads, and band aids, and that not having basic first aid supplies can cause an injury to be worse, particularly if it is a major injury and there is nothing to help control it before an ambulance arrives. He also said no one mentioned there were other first aid kits at the facility and that he did not see any other kits during the inspection; further, Ms. Peck indicated that the first aid supplier had not been there for some time, ✌ that one order of supplies had been returned, and that there was a lack of first aid supplies, and Ms. Karelus and Mr. Stone also indicated that there was a lack of first aid supplies in their written statements. ✌ (Tr. 300-04, 343, 701-04, 722).

Ms. Migon, the NYSIF consultant who worked with Ms. Hirsch and Mr. Tehonica to get the facility into compliance, testified that during her site visit of November 20, 2002, she walked through all the departments with Mr. Tehonica, at which time she noticed there were no first aid kits. She spoke to Mr. Tehonica about the lack of kits, and she mentioned it to Ms. Hirsch after the walk-around; she also wrote a follow-up letter to Ms. Hirsch, dated November 22, 2002, in which she repeated that she had seen no kits and that there should be one in every department. ✌ During a subsequent visit, Ms. Migon saw several first aid kits in the office area, and Ms. Hirsch indicated she had ordered them; Ms. Migon expressed her approval and stated they should be distributed, but Ms. Hirsch said she could not because she had been told she had to return them. (Tr. 1190-94, 1198-1200, 1229-30; C-

99).

Mr. Tehonica, Ms. Peck and Moise Banayon also testified about the kits. Mr. Tehonica testified that besides the kit in the guard shack, which was a large kit, there were seven or eight smaller kits in other areas at the time of the OSHA inspection, including the office, the ATS or packaging room, the slicing room, the maintenance shop, and the cheese room. He said the kits held items such as band aids, ointments, gauze, tape and aspirin, and that he replenished the smaller kits from the guard shack kit; Ms. Peck replenished that kit by ordering supplies from Zee Medical. He also said he checked the smaller kits periodically and that there were times when he replenished them and by the next day they were half empty. ℘ Mr. Tehonica noted that he referred the CO's to the guard shack because CO Schrilla asked him where the first aid station was; CO Schrilla never asked him about first aid supplies or other kits. He also noted that on her visits in November and December 2002, he and Ms. Migon only walked through the areas where he had made corrections, that many of the kits were kept in cabinets, and that she never asked him about first aid kits. ℘ Mr. Tehonica said that he never saw the November 22, 2002 letter Ms. Migon wrote and that no one ever discussed it with him. (Tr. 894- 905, 1041-42, 1057-65, 1386-87, 1395-96, 1413, 1419-21, 1427, 1431-32, 1443-44, 1450-52).

Ms. Peck testified there was a large first aid kit in the guard shack and that there were also kits in the office, the maintenance shop, the ATS room and the lab at the time of the OSHA inspection. ℘ She could not say if she looked in the kit when CO Schrilla was there, but she knew it contained ointments, a CPR mask, bandages, tape and pads; she did not recall him asking her any questions about the kit, and she also could not recall when she had last looked in the kit, although she said it would have been no more than a week before his arrival because someone would have come to the shack for first aid. ℘ Ms. Peck further testified that she worked in purchasing at Lewis from about the end of 1998 to about the beginning of 2002, when she began working in the guard shack as head of security; she bought first aid supplies from Zee Medical when she was in purchasing, and the Zee Medical representative came automatically every six to eight weeks to replenish the kits with any items they needed. She said that once she began her security job she no longer bought first aid supplies and that Yehutta Banayan, the purchaser for Lewis, did so; however, at least once after she became head of security she had the Zee Medical representative fill the kits, and, because she did so without Yehutta Banayon's permission, the ibuprofen and possibly some other items were returned. Ms. Peck was unaware of Ms. Hirsch requesting any first aid supplies or kits in 2002. (Tr. 928-62).

Moise Banayon testified that besides the one in the guard shack, there were kits in the office, the cheese room, the slicing room and the mixing room. ℘ He believed the kits were installed around mid-2002, but he did not know what specifically was in them or how often they were filled. He said the kits Ms. Migon saw were sent back because they were purchased from a vendor that Lewis no longer used and because the number of kits was kept to a minimum due to theft; the kits were also kept only half filled and were put in tool cabinets in the departments where they were located. He also said that someone walking through the facility would not see the kits and that while Mr. Tehonica and other plant personnel knew where they were Ms. Hirsch would not have known because she did not go into the plant itself. Mr. Banayon stated he had never seen C-99 or the letter attached to it before this proceeding began and that no one, including NYSIF and Lewis personnel, had ever told him there was an issue with the first aid kits at the facility. (Tr. 1302, 1316-17, 1323- 24, 1357-71).

It is clear there are some significant discrepancies in the foregoing testimony. CO Schrilla, for

example, testified he asked Mr. Tehonica about first aid supplies, not a first aid station, and he and CO
Palhof both testified they spoke to Ms. Peck about first aid supplies and that she made the statements
set out *supra*; no one they talked to mentioned other kits, and they saw no others during the inspection.
(Tr. 300-04, 367-69, 404, 701-04). Further, while the Lewis witnesses all testified about other first aid
kits in the plant, their testimony about the kits' locations did not agree. (Tr. 898-99, 934-36, 1041-42,
1324, 1419-20). In addition, Ms. Peck's testimony that Zee Medical visited the facility automatically
every six to eight weeks to fill the kits conflicts with her statement to CO Schrilla that Zee Medical
only went to the facility at the request of Lewis; also, her testimony that she stopped ordering first aid
supplies after becoming head of security is contrary to her telling the CO's that she ordered those
supplies, and that she did is supported by invoices showing she placed phone orders with Zee Medical
on June 9 and July 7, 2004. ℘ (Tr. 302-03, 367-68, 704; 938-44, 951, 954, 959-60, R-12). Finally, Ms.
Peck herself testified that some first aid supplies were returned, and that they were is supported by an
invoice dated May 14, 2002, indicating that an entire order totaling $84.60 was returned. (Tr. 951-52;
R-12). I have already found the CO's to be credible witnesses, and based on that finding and the
record as a whole, their testimony is credited over that of Ms. Peck and Mr. Tehonica. ℘

I also credit the testimony of Ms. Migon about not seeing any first aid kits in the facility and
mentioning this fact to both Mr. Tehonica and Ms. Hirsch. ℘ Her letter to Ms. Hirsch of November
22, 2002, which is attached to C-99, plainly states that she did not see any kits during her November
20, 2002 visit. ℘ Moreover, C-96 is a hand-written note Mr. Tehonica sent to Mr. Spencer stating
that he needed certain supplies for the December 11, 2002 "inspection." The list attached to C-96
sets out several items, including "first aid supplies and or kits," and Mr. Tehonica admitted that he
wrote C-96. (Tr. 1014, 1065). Also, it is clear the "inspection" he referred to in C-96 was Ms.
Migon's visit of that date, in light of C-134, her letter of December 16, 2002, after her visit of
December 11, 2002.

In view of the above, I find that there were inadequate supplies in the first aid kit in the guard
shack; this finding is supported by the CO's testimony and by the statements of Mr. Stone, Ms. Hirsch
and Ms. Karelus, all of which indicate there was a lack of first aid supplies. *See* C-73, C-74, C-75. I
further find that other than the kit in the guard shack, there were no other first aid kits or supplies in the
facility at the time of the inspection. ℘ This finding is supported by the fact that Mr. Tehonica and
Ms. Peck did not mention any other kits or supplies to the CO's. It is also supported by the fact that
the CO's and Ms. Migon did not see any kits in the facility during their respective inspections.
Finally, it is supported by C-96, Mr. Tehonica's request for "first aid kits and or supplies," and by the
fact that Ms. Hirsch, pursuant to the testimony of Ms. Migon and Mr. Banayon, ordered several first
aid kits which were then returned. In reaching this finding, I do not credit the testimony of Mr.
Tehonica and Mr. Banayan indicating that Ms. Migon and the CO's did not see the other first aid kits
because they were kept in cabinets; it is reasonable to infer that if this were true, Ms. Peck and Mr.
Tehonica would have told the CO's, and Mr. Tehonica would have told Ms. Migon, that such was
the case. Based on the record, Lewis was in violation of the cited standard. The violation was
serious, in view of the testimony of CO Schrilla in that regard. (Tr. 301-03).

With respect to the willful classification, CO Schrilla testified the classification was based on

management's knowledge of the lack of supplies, the returned supplies, and the fact that NYSIF had indicated the need for supplies. (Tr. 303). As noted above, C-73, C-74 and C-75 are the March 5, 2003 statements of Mr. Stone, Ms. Hirsch and Ms. Karelus. In C-73, Mr. Stone said he told Mr. Spencer first aid supplies were needed after the supplies were returned. In C-74, Ms. Hirsch stated that first aid supplies were ordered but then removed because they cost too much. In C-75, Ms. Karelus said she knew first aid supplies were lacking, that Mr. Tehonica, Ms. Hirsch and Ms. Peck had notified Yehutta Banayan and Mr. Spencer, and that it was not taken care of as it was "a money issue."

Further evidence of management's knowledge of the cited condition is C-96, the note that Mr. Tehonica sent to Mr. Spencer requesting "first aid supplies and or kits" after his November 2002 meeting with Ms. Migon; as indicated *supra*, the request was made because of Mr. Tehonica's upcoming meeting with Ms. Migon on December 11, 2002. Moreover, Mr. Banayan knew of the first aid kits that Ms. Hirsch had ordered, although he testified they were returned as they were ordered from a company Lewis no longer did business with. According to Mr. Banayan, he was not aware of C-99, the fax that Ms. Hirsch sent to him and Ruben Baityouchoub, the company's controller, until the OSHA proceeding was underway; as noted above, Ms. Hirsch attached Ms. Migon's November 22, 2002 letter to C-99. Mr. Banayan's testimony as to the reason the kits were returned is not credible, in light of other evidence, *i.e.*, C-74 and C-75, indicating that first aid supplies were returned due to their cost; this conclusion is supported by Mr. Spencer's statement to CO Schrilla, set out in the discussion relating to Citation 2, Item 1 ("Item 1"), that orders not relating to production were not filled until Yehutta Banayan spoke to Moise Banayan and the latter approved the order. (Tr. 499-500). Mr. Banayan's testimony that he never saw C-99 or the letter attached to it also appears to be unreliable, although it is certainly possible that he did not actually read the letter or that he overlooked the part about first aid kits, especially since that part is near the end of the letter. (Tr. 1361-63).

Based on the foregoing, management officials had knowledge that the facility lacked first aid supplies. Regardless, in my opinion, the Secretary has not shown the violation was willful, especially as compared to Item 1. First, the cited condition was not one of those set out in C-95, the NYSIF report that Lewis received in January 2002; as noted in the Item 1 discussion, the lack of fall protection was included in C-95, and both Mr. Spencer and Moise Banayan had seen C-95. (Tr. 983-85; C-74, p. 1). Second, although Ms. Migon's November 22, 2002 letter, which was attached to C-99, was written notice from NYSIF that first aid kits were needed, the record does not show that Moise Banayan

actually read that letter and, in particular, the part about first aid kits; likewise, there is no evidence that Mr. Spencer ever saw that letter. Third, while Mr. Spencer was evidently informed by employees that first aid supplies and/or kits were needed in May 2002 and again in November 2002, and while Moise Banayan was aware that the first aid kits Ms. Hirsch had ordered were returned, I do not believe that these circumstances, without more, are sufficient to demonstrate a willful violation. Finally, I note that when CO Schrilla asked Mr. Spencer about fall protection and first aid kits during their February 7, 2003 meeting, Mr. Spencer phoned Yehutta Banayan, who said that the fall protection and kits would be ordered and would arrive in a few days. (Tr. 338-39, 499). The record shows that unlike the fall protection, which still was lacking when CO Schrilla returned on March 5, 2003, first aid supplies and kits were ordered on February 13, 2003. *See* R-12. ℘ Thus, it is clear that Lewis responded to CO Schrilla's questions about first aid kits on February 7 by ordering first aid kits and supplies the following week. In my view, the evidence does not establish that the violation was willful. This item is accordingly affirmed as a serious violation.

The Secretary has proposed a penalty of $32,000.00 for this item; however, this penalty is based upon the willful classification. The record shows that this item was considered to be of low severity and lesser probability. (Tr. 304). Moreover, a gravity-based penalty of $1,500.00 is appropriate for a serious violation that is of low severity and lesser probability. ℘ In view of the relevant factors and applicable reductions, a penalty of $750.00 is assessed.

### *"Other" Citation 3 - Item 1*

This item alleges a violation of 29 C.F.R. 1904.29(a), asserting that Lewis did not maintain OSHA 300 logs for 2002 and 2003. The cited standard requires the employer to use the OSHA 300 form, or equivalent forms, for recordable injuries and illnesses. The record clearly shows the alleged violation, in that, when the CO's asked for the company's OSHA 300 illness and injury logs, both Ms. Hirsch and Mr. Tehonica told them that there were none. (Tr. 36, 354-55). Further, Lewis does not address this matter in its brief. This citation item is affirmed as an "other" violation.

A penalty of $1,400.00 has been proposed for this item. I find this penalty excessive, especially since it is the same amount that was proposed for many of the serious violations in this case. I conclude that a penalty of "zero" is appropriate; consequently, no penalty is assessed for this item.

### ***ORDER***

Based upon the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Items 1 through 33 of Serious Citation 1, except for Item 2, are AFFIRMED as serious violations, and a total penalty of $44,500.00 is assessed for these items.

2. Item 2 of Serious Citation 1 is VACATED.

3. Item 1 of Willful Citation 2 is AFFIRMED as a willful violation, and a penalty of $27,500.00 is assessed for this item.

4. Item 2 of Willful Citation 2 is AFFIRMED as a serious violation, and a penalty of $750.00 is assessed for this item.

5. Item 1 of "Other" Citation 3 is AFFIRMED as an "other" violation; no penalty is assessed.

/s/
G. Marvin Bober
Judge, OSHRC

Dated: August 14, 2006
      Washington, D.C.

# EXHIBIT Z



# State of California
## Kevin Shelley
## Secretary of State

**LIMITED LIABILITY COMPANY – STATEMENT OF INFORMATION**

Filing Fee $20.00 – If Amendment, See Instructions

**IMPORTANT- Read Instructions Before Completing This Form**

1. LIMITED LIABILITY COMPANY NAME: (Do not alter if name is preprinted.)

    AHAVA OF CALIFORNIA, LLC
    908 ROSE AVENUE
    VENICE CA 90291                                    3413

This Space For Filing Use Only

IF THERE HAS BEEN NO CHANGE IN ANY OF THE INFORMATION CONTAINED IN THE LAST COMPLETE STATEMENT OF INFORMATION FILED WITH THE CALIFORNIA SECRETARY OF STATE, CHECK THE BOX AND PROCEED TO ITEM 12.

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION |
|---|---|
| **200007310022** | **CA** |

4. PRINCIPAL EXECUTIVE OFFICE

    STREET ADDRESS

    CITY                                    STATE          ZIP CODE

5. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (FOR DOMESTIC ONLY)

    STREET ADDRESS

    CITY                                    STATE  **CA**    ZIP CODE

6. CHECK THE APPROPRIATE PROVISION BELOW AND NAME THE AGENT FOR SERVICE OF PROCESS

    [  ]    AN INDIVIDUAL RESIDING IN CALIFORNIA.

    [  ]    A CORPORATION WHICH HAS FILED A CERTIFICATE PURSUANT TO CALIFORNIA CORPORATIONS CODE SECTION 1505.

    AGENT'S NAME:

7. ADDRESS OF THE AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL

    ADDRESS

    CITY                                    STATE  **CA**    ZIP CODE

8. DESCRIBE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY.

9. LIST THE NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER. ATTACH ADDITIONAL PAGES, IF NECESSARY.

a.  NAME
    ADDRESS
    CITY                                    STATE          ZIP CODE

b.  NAME
    ADDRESS
    CITY                                    STATE          ZIP CODE

c.  NAME
    ADDRESS
    CITY                                    STATE          ZIP CODE

10. CHIEF EXECUTIVE OFFICER (CEO), IF ANY:
    NAME
    ADDRESS
    CITY                                    STATE          ZIP CODE

11. NUMBER OF PAGES ATTACHED, IF ANY:

12. THIS STATEMENT IS TRUE, CORRECT, AND COMPLETE.

    _Rebecca Banayan_

    TYPE OR PRINT NAME OF PERSON COMPLETING FORM     SIGNATURE     Office Manager    TITLE    1/7/03    DATE

**DUE DATE:    03/31/2004**

SEC/STATE FORM LLC-12R (REV. 01/03/03)                    APPROVED BY SECRETARY OF STATE

# EXHIBIT AA

Case 1:08-cv-03893-NRB-MHD    Document 44-10    Filed 07/07/2008    Page 4 of 12



Return To
Home Page

## CONTACT US TO PLACE AN ORDER OR CUSTOMER SERVICE:

??????????? NEW YORK AREA:????????? ?????????????????Sales help and Customer Service:
?????????????????????????????????????????????????????????????????????????????
Office:? ??????????? 718-243-0400
?????????????????????????????????????????????????????????????????????????????
Fax:????? ??????????? 718-243-0700

??????????? OUTSIDE NEW YORK THROUGHOUT US AND INTERNATIONAL:
?????????????????????????????????????????????????????????????????????????????
Sales Manager-Special Accounts
?????????????????????????????????????????????????????????????????????????????
Rebecca Banayan-Lieberman
?????????????????????????????????????????????????????????????????????????????
Office:????????????? 718-243-0400 x 243
?????????????????????????????????????????????????????????????????????????????
Cellular:??????????? 516-779-3589
?????????????????????????????????????????????????????????????????????????????
Fax:????????????????? 718-243-0700
?????????????????????????????????????????????????????????????????????????????
Email:????????????????? RBAN1000@aol.com

??????????? CALIFORNIA AREA:????????????????????????? Sales help and Customer Service:
?????????????????????????????????????????????????????????????????????????????
Aaron Banayan
?????????????????????????????????????????????????????????????????????????????
Office:????????????? 310-450-9669
?????????????????????????????????????????????????????????????????????????????
Fax:????????????????? 310-664-0039

??????????? CONTACT US VIA EMAIL:? ???????????
RBAN1000@aol.com??????????????????????????????????????????????????????

# EXHIBIT BB

Home | .

# superpages.com® we know around here℠



**Brooklyn, NY**

| Businesses |
| People |

Search for: | Dairy Stores | in | Brooklyn NY |    [ Search ]  ▶ S

Yellow Pages  ➡  Phone Book  ➡  Brooklyn Phone Book  ➡  **Brooklyn Dairy Stores in Brooklyn NY**

**Dairy Stores Results**        Names with *Dairy Stores*

[ ▼ Sort Results and Viewing ]   [ ▶ Narrow My Search ]   Show More Categories           [ Compare ]

Sort: **By Advertiser** | A-Z | Distance | Rating | Local Only    Show results within: Brooklyn NY    Show: 15 per page

**Sponsored Results**

### Dean & Deluca Inc
All Your Catering & Gourmet Food Needs. Proudly Serving all NY City
560 Broadway Frnt 2, New York, NY 10012
www.dean-deluca.com

[ more info ]  [ phone ]  [ email ]  [ map ]

★★★★☆
Reviews (1) - Rate It

▶ Send
☐ Compare

**Tags:** Caterers, Dairy Stores, Gourmet Foods Retail

**All Listings**
**Report Incorrect Listings >**

### 13 Super Millers
5214 13th Avenue, Brooklyn, NY 11219

[ more info ]  [ phone ]  [ map ]

★★★★☆
Reviews (1) - Rate It

✎ Edit
+ Save
▶ Send
☐ Compare

**Tags:** Dairy Stores

### Agostinia Torres
657 Myrtle Avenue, Brooklyn, NY 11205

[ more info ]  [ phone ]  [ map ]

Be the first to Rate It

✎ Edit
+ Save
▶ Send
☐ Compare

**Tags:** Dairy Stores, Cheese Shops

### Ahava Food Corporation
110 Beard Street, Brooklyn, NY 11231
http://www.ahavafoodcorp.com

[ phone ]  [ map ]

Be the first to Rate It

✎ Edit
+ Save
▶ Send

**Tags:** Dairy Stores, Stationery Retail, Bookstores

---

**Ahava Of California**
96 Beard, Brooklyn, NY 11231
http://www.ahavafoodcorp.com
[more info] [phone] [map]
**Tags:** Dairy Stores, Dairy Products Wholesale & Manufacturers

Be the first to Rate It
✎ Edit
+ Save
▶ Send
☐ Compare

---

**Aiello Dairy**
573 Hicks Street, Brooklyn, NY 11231
[more info] [phone] [map]
**Tags:** Dairy Stores, Cheese Shops

Be the first to Rate It
✎ Edit
+ Save
▶ Send
☐ Compare

---

**Baquita Cheese**
1307 Foster Avenue, Brooklyn, NY 11230
[more info] [phone] [map]
**Tags:** Dairy Stores, Cheese Shops

Be the first to Rate It
✎ Edit
+ Save
▶ Send
☐ Compare

---

Bay Parkway Deli & Grocery
6409 Bay Parkway, Brooklyn, NY 11204
[phone] [map]
**Tags:** Dairy Stores, Dairy Products Wholesale & Manufacturers

Be the first to Rate It
✎ Edit
+ Save
▶ Send

---

**Bedford Cheese Shop**
141 North 4th Street, Brooklyn, NY 11211
http://www.bedfordcheeseshop.com
[more info] [phone] [map]
**Tags:** Dairy Stores, Cheese Shops

Be the first to Rate It
✎ Edit
+ Save
▶ Send
☐ Compare

---

**Berger Sandor Rabbi**
1527 56th Street, Brooklyn, NY 11219
[more info] [phone] [map]
**Tags:** Eggs, Clergy

Be the first to Rate It
✎ Edit
+ Save
▶ Send
☐ Compare

---

Bertram S Inc
1242 57th Street, Brooklyn, NY 11219
[phone] [map]
**Tags:** Eggs, Eggs Wholesale

Be the first to Rate It
✎ Edit
+ Save
▶ Send

**<u>EXHIBIT CC</u>**

**LexisNexis**® *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selec

Source: Public Records > Find Filings > Judgments & Liens > Combined Judgments & Liens > **Combined Judgment and Liens Filings and UCC Lien Filings** ⓘ
Terms: **ahava of california** (Edit Search | Suggest Terms for My Search)

☑ Select for FOCUS™ or Delivery
☐

**\*\*\*THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY.** CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE SACRAMENTO OFFICE OF THE CALIFORNIA SECRETARY OF STATE\*\*\*

**CALIFORNIA SECRETARY OF STATE, UCC RECORD**

**DEBTOR(S): AHAVA OF CALIFORNIA,** LLC [BUSINESS]
908 ROSE AVENUE
VENICE, CA 90921

**SECURED PARTIES:** AQUENT LLC [BUSINESS]
711 BOYLSTON STREET AFS
BOSTON, MA 02116

**FILING DATE:** 05/09/2008

**FILING TIME:** 06:21 AM PACIFIC TIME

**EXPIRATION DATE:** 05/09/2013

**FILING NUMBER:** 087157175667

**STATUS:** UNLAPSED

**TYPE:** FINANCING STATEMENT

**COLLATERAL:** 0871571756 - ALL ASSETS

**NUMBER OF PAGES:** 1

Source: Public Records > Find Filings > Judgments & Liens > Combined Judgments & Liens > **Combined Judgment and Liens Filings and UCC Lien Filings** ⓘ
Terms: **ahava of california** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, July 7, 2008 - 5:01 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

**LexisNexis**®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**LexisNexis®** *Total Research System*                    Switch Client ┊ Preferences ┊ Sign Out ┊ ❓ Help

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selec

Source: <u>Public Records</u> > <u>Find Filings</u> > <u>Judgments & Liens</u> > <u>Combined Judgments & Liens</u> > **Combined Judgment and Liens Filings and UCC Lien Filings** ⓘ

Terms: **ahava of california** (<u>Edit Search</u> | <u>Suggest Terms for My Search</u>)

✔Select for FOCUS™ or Delivery

☐

**\*\*\*THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY.** CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE SACRAMENTO OFFICE OF THE CALIFORNIA SECRETARY OF STATE\*\*\*

### CALIFORNIA SECRETARY OF STATE, UCC RECORD

**DEBTOR(S): AHAVA OF CALIFORNIA** LLC [BUSINESS]
908 ROSE AVE
VENICE CALIFORNIA, CA 90921

**SECURED PARTIES:** BUSINESS FUNDING ASSOCIATES LLC [BUSINESS]
100 WINSTON DRIVE SUITE 8FN
CLIFFSIDE PARK N.J., AL 07010

**FILING DATE:** 04/07/2008

**FILING TIME:** 06:21 AM PACIFIC TIME

**EXPIRATION DATE:** 04/07/2013

**FILING NUMBER:** 087153043576

**STATUS:** UNLAPSED

**TYPE:** FINANCING STATEMENT

**COLLATERAL:** 0871530435 - ALL ASSETS OF THE DEBTOR, WHETHER PRESENTLY EXISTING OR HEREAFTER CREATED OR ACQUIRED, AND WHEREVER LOCATED INCLUDING BUT NOT LIMITED TO A; ALL ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, DOCUMENTS, EQUIPMENT, GENERAL INTANGIBLES, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER OF CREDIT RIGHTS, MONEY, AND ALL DEBTOR'S BOOKS AND RECORDS WITH RESPECT TO ANY OF THE FORGOING, AND ALL CASH PROCEEDS, AND / OR NO CASH PROCEEDS THEREOF, INCLUDING WITHOUT LIMITATION, INSURANCE PROCEEDS, AND ALL SUPPORTING OBLIGATIONS AND THE SECURITY THEREFORE OR FOR ANY RIGHT TO PAYMENT.

**NUMBER OF PAGES:** 1

Source: <u>Public Records</u> > <u>Find Filings</u> > <u>Judgments & Liens</u> > <u>Combined Judgments & Liens</u> > **Combined Judgment and Liens Filings and UCC Lien Filings** ⓘ
Terms: **ahava of california** (<u>Edit Search</u> | <u>Suggest Terms for My Search</u>)
View: Full
Date/Time: Monday, July 7, 2008 - 5:01 PM EDT

 **LexisNexis**®   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.