UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

| | |
|---|---|
| SIGNATURE BANK,<br><br>        Plaintiff,<br><br>     -against-<br><br>AHAVA FOOD CORP. d/b/a/ NORTH<br>COUNTRY CHEESE CORP., <u>et al.</u>,<br><br>        Defendants. | :   **LIMITED OBJECTION TO**<br>:   **MEMORANDUM & ORDER AND**<br>    **REPORT & RECOMMENDATION**<br>:   **DATED AUGUST 19, 2008**<br><br>:   08 Civ. 3893 (NRB) (MHD)<br><br>:<br><br>: |

---------------------------------------------------------x

Ahava of California, LLC, a California limited liability company, a defendant in the above-captioned litigation, and the debtor and debtor in possession (the "Chapter 11 Debtor") in a certain case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") pending as case no. 2:08-20524-TD, in the United States Bankruptcy Court for the Central District of California submits this Objection to the Memorandum & Order and Report & Recommendation dated August 19, 2008 (the "Order"),[1] and respectfully represents as follows:

## I.    <u>INTRODUCTION</u>

The present action is stayed against the Debtor and the Debtor's property pursuant to section 362 of the Bankruptcy Code. Signature Bank, the plaintiff, is therefore precluded from continuing the litigation against the Debtor and its property, *or attempting to prove claims against the Debtor*.

Signature Bank has relentlessly persisted in its attempts to prove its alleged claims against the Debtor by attempting to conduct discovery against two of the Debtor's key employees, Ruben Beityakov, the Debtor's Controller, and Ari Katz, the Debtor's General Manager (collectively, the "Debtor's Employees"). While Signature Bank argues that the

---

[1] A true and correct copy of the Order is attached as Exhibit 1 hereto. The Debtor respectfully requests that the Court take judicial notice of its files which contains the referenced Order as well as the other documents referenced herein.

discovery is intended solely to establish its claims against the Debtor's Employees, Signature Bank's motive is transparent. It seeks to conduct discovery against the Debtor's Employees, who also were the employees of Signature's judgment debtors, to prove that the Debtor allegedly is the alter ego of certain judgment debtors and/or the alleged recipient of fraudulent transfers from those judgment debtors. Signature Bank could not prove its claims directly against the Debtor without first seeking relief from the automatic stay from the Bankruptcy Court - which it has not done.

The Debtor has consistently maintained that the automatic stay precludes this discovery and that issues concerning the extent and scope of the automatic stay should be adjudicated by the Bankruptcy Court (where a motion on these issues is currently set for hearing on September 17, 2008); the Honorable Magistrate Judge Michael H. Dolinger, however, preliminarily found that the automatic stay does not extend to the Debtor's Employees or otherwise preclude Signature Bank's discovery.[2] Moreover, the Honorable Judge Dolinger did find that the Bankruptcy Court is the proper forum to adjudicate the issue of whether the Debtor's Employees should be protected by the automatic stay or a Section 105 injunction. Exhibit 1 at 4. The Debtor, therefore, respectfully submits this limited objection to the Order to the extent that the Order may permit Signature Bank to proceed with the depositions of the Debtor's Employees prior to the Bankruptcy Court adjudicating the Debtor's motion on September 17, 2008. Accordingly, the Debtor requests that this Court (1) defer to the Bankruptcy Court regarding the issue of the scope and extent of the automatic stay (which will render the current Order moot) or,

---

[2] The Court also found that having the Debtor's Employees appear for a one-day deposition would not disrupt the Debtor's chapter 11 efforts; however, the Court may not have considered the fact that the Debtor's Employees would need to spend days preparing for the depositions by reviewing piles and piles of documents that apparently have been produced to Signature Bank. Taking the Debtor's Employees away from their duties under sections 521, 1106 and 1007 of the Bankruptcy Code, at this critical stage of the reorganization case (*i.e.*, when the Debtor is getting ready to proposed a disclosure statement and plan of reorganization by November 12, 2008, and is in the midst of settlement discussion with Signature Bank in contemplation of such filings, while preparing to host Signature Bank's field examiner and auditor on the premises (by agreement) in the next couple of weeks, would disrupt the daily operations of the Debtor and detract from the Debtor's reorganization efforts.

in the alternative, (2) find that the automatic stay extends to the Debtor's Employees in the present circumstances.

## II.    ARGUMENT

### A.    This Court Should Defer to the Bankruptcy Court Regarding the Scope and Extent of the Automatic Stay of 11 U.S.C. § 362.

Respectfully, the Debtor submits that issues concerning the scope and extent of the automatic stay should be determined by the Bankruptcy Court in the Central District of California, particularly since the Debtor filed a motion to determine the applicability and scope of the automatic stay with the Bankruptcy Court.  As referenced in the letter to Judge Dolinger dated August 15, 2008, the Debtor filed a motion for an order: (a) Extending the Automatic Stay to Nondebtor Entities[3]; or, in the Alternative, (b) Enjoining Litigation Against Nondebtor Entities Pursuant to Section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Stay Motion").[4]  That Stay Motion is set for hearing on September 17, 2008.

Given the pendency of the Stay Motion before the Bankruptcy Court, this Court should defer to the Bankruptcy Court on the issue of whether the automatic stay extends to the Debtor's Employees and, if not, whether it should be extended.  Deferring to the Bankruptcy Court is appropriate because issues concerning the administration of the bankruptcy estate, including the

---

[3] The term "Nondebtor Entities" as used in this submission means defendants Moshe Banayan, Lewis County Dairy Corporation, St. Lawrence Food, Ahava Food Corporation , and Schwartz & Sons Quality Distributors Inc. and any other person or entity that became a judgment debtor of Signature Bank pursuant to the judgment obtained by Signature in March 2008.

[4] Notably, the Debtor asserts in the Stay Motion that the stay of section 362 automatically extends to the Debtor's Employees in the present circumstances.  The Stay Motion then argues that, to the extent it does not automatically apply, that it should be extended under applicable case law.  Only as a third alternative does the Debtor seek an injunction under section 105 of the Bankruptcy Code.  The Debtor provided the necessary evidentiary basis for the relief requested in the Stay Motion and the Stay Motion was incorporated into the Debtor's letter to Judge Dolinger dated August 15, 2008.  A true and correct copy of the letter dated August 15, 2008, which includes the Stay Motion, is attached as Exhibit 2.

scope and extent of the automatic stay, should be resolved in a single forum to ensure consistent rulings on core bankruptcy issues and to promote judicial efficiency.[5]

Based on the foregoing, this Court should abstain from ruling on the scope and extent of the automatic stay and permit the Bankruptcy Court to adjudicate the issues. Once the Bankruptcy Court adjudicates the issues, the request before this Court will become moot.

**B.    In the Event this Court Proceeds on the Issues Herein, the Stay of Section 362 Automatically Extends to the Debtor's Employees in the Current Situation.**

The continuation of this lawsuit against the Debtor's Employees violates the automatic stay of section 362 of the Bankruptcy Code. Section 362 prohibits the continuation of litigation against the Debtor or acts to obtain possession of, or exercise control over, property of the Debtor's estate. 11 U.S.C. § 362. Specifically, section 362(a) provides, in relevant part:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title, . . . operates as a stay, applicable to all entities, of –
>
> > (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> >
> > (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
> >
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
> >                                 ***
> > (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

*Id*. "The scope of protection afforded by the automatic stay provision is broad, and it bars any action which 'would inevitably have an adverse impact on the property of the bankruptcy estate.'" *In re Prudential Lines Inc*, 119 B.R. 430, 432 (S.D.N.Y. 1990).

---

[5] In addition, the Order appears to support this position. The Order states that the "pendency of that motion in the Bankruptcy Court, where it properly belongs, is reason enough to decline AOL's invitation to grant the same relief in this forum." Exhibit 1 at 4.

> The automatic stay... promotes[s] two principal purposes of the Bankruptcy Code. First, the automatic stay provides the debtor with a breathing spell from ... creditors. [Second,] the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.

*Shugrue v. Air Line Pilots Ass'n, Int'l* (*In re Ionosphere Clubs, Inc.*), 922 F.2d 984, 989 (2d Cir. 1990) (internal citations and quotation marks omitted); *In re AP Industries, Inc.*, 117 B.R. 789, 799 (Bankr. S.D.N.Y. 1990); *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999).

Here, Signature Bank's discovery and the continuation of the lawsuit against the Debtor's Employees violate the automatic stay because the continuance of the action against these individuals is a *de facto* continuation of the lawsuit against the Debtor. While Signature Bank is not conducting discovery directly against the "Debtor" (because even Signature Bank agrees that the discovery is stayed), it nonetheless seeks to prove indirectly what is prevented from proving directly by attempting to take discovery from the Debtor's Employees in order to prove claims against the Debtor. Signature Bank is seeking discovery regarding the Debtor's business and financial affairs, including its relationship with the Nondebtor Entities under the pretext that the Debtor's Employees are not the "Debtor." Signature Bank is attempting to obtain this information to prove its alter ego and RICO claims against the Debtor. *See generally* Exhibit 3.

Yet, this is the exact same type of information that it is prevented from seeking directly from the Debtor, *i.e.*, information that may or may not establish whether the Debtor is the alter ego of the Nondebtor Entities and/or a fraudulent transferee of the Nondebtor Entities. *See, e.g.*, *In re Colonial realty Co.*, 980 F.2d 125 (2d Cir. 1992) (a fraudulent transfer action [such as Signature's] commenced in another court against third party transferees of estate property is an action to recover a claim against the debtor and is subject to the automatic stay under Section 362(a)(1)).

If this litigation proceeds and Signature Bank obtains facts to establish that the Debtor is an alter ego of the judgment debtors, Signature Bank will argue that the determination is a conclusive adjudication against the Debtor, *i.e*, Signature Bank will attempt to capitalize on that

discovery and adjudications to the detriment of the Debtor, without the Debtor even participating in discovery. However, taking the depositions of a debtor's employees for the purpose of proving claims against a debtor is precluded by the automatic stay, no matter what pretext is given for the discovery. *See* 11 U.S.C. § 362.

Notwithstanding the foregoing, the Order states that the automatic stay does not prevent the discovery "even if the depositions in question unearth information that may be relevant to the Bank's stayed claims against the AOC." Order at 2. The Order is based on the ruling in *Miller v. Miller* (*In re Miller*), 262 B.R. 499 (B.A.P. 9th Cir. 2001). *Miller*, however, is distinguishable from the facts of the present case and supports the proposition that the stay prevents a party from obtaining discovery through third person that will be used to prove claims against a debtor.

In *Miller*, Louise Groner ("Groner") sued the debtor in state court alleging fraud and other causes of action. The debtor filed a cross-complaint against Groner and then filed a chapter 13. Groner then amended her complaint to add the debtor's husband as a defendant. While the action was stayed against the debtor, Groner continued to prosecute her claims against the debtor's husband by serving a third-party deposition subpoena (not a party deposition notice) to the debtor to be deposed as a third party witness for Groner's claims against the husband. While the debtor argued that the discovery violated the automatic stay, the court, on appeal, held that the discovery was permissible because the purpose of the discovery was for Groner to obtain information ***pertaining to her claims against the nondebtor husband***. *Id*. at 505. Discovery as part of the development of a case against non-debtor parties is permissible even where that information could eventually be used the Debtor.

In the present case, however, Signature Bank is ***not*** seeking discovery from the Debtor's Employees to prove claims against the Debtor's Employees directly, but is seeking the discovery to prove that the Debtor is the recipient of converted or fraudulently transferred property. For instance, Signature Bank alleges that the Debtor's Employees converted Signature Bank's property. Exhibit 3, ¶¶ 176-182. Nowhere does Signature Bank allege that those specific employees actually possess the property. It is clear that Signature Bank's theory is that the

Debtor's Employees converted the property for the Debtor and that the Debtor possesses the property. *See id.* According to Signature Bank, the Debtor is the party with the property and the party from which Signature Bank seeks to recover. The Debtor's Employees do not possess any of Signature Bank's property and Signature Bank cannot credibly argue that the purpose of the discovery is to obtain personal judgments against two of the Debtor's employees. *Id.* Thus, unlike in *Miller*, Signature Bank is not seeking discovery to prove independent claims against third parties (the Debtor's Employees), but is seeking the discovery to prove that the Debtor is the recipient of the alleged converted property.[6]

The automatic stay, therefore, prevents Signature Bank from conducting discovery on the Debtor's Employees. This discovery is a continuation of the lawsuit against the Debtor and sought to prove claims against the Debtor.

## III.   CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Court abstain from ruling on the present issues and defer to the Bankruptcy Court regarding the scope and extent of the automatic stay or, in the alternative, finding that the automatic stay extends to the Debtor's Employees in the present circumstances.

---

[6] To the extent that Signature Bank legitimately seeks to prove claims against the Debtor's Employees, the discovery should, as argued in the motion to the Bankruptcy Court, also be stayed under the "unusual circumstances" test of *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) (extending the automatic stay when such an identity of interests exists between a debtor and third parties that a judgment against the third parties is said to be a judgment against the debtor). *See* Exhibit 2. While the Ninth Circuit has not yet expressly adopted or rejected the "unusual circumstances" test, at least two lower courts in the Ninth Circuit have utilized the test. *See Maxicare Health Plans, Inc. v. Centinela Mammoth Hsp.* (*In re Family Health Servs., Inc.*), 105 B.R. 937, 942 (Bankr. C.D. Cal. 1989); *Circle K Corp. v. Marks* (*In re Circle K Corp.*), 121 B.R. 257, 261 (Bankr. D. Ariz. 1990).

K&L GATES LLP

Dated:    Los Angeles, California
          August 29, 2008

By:    /s/ Josefina Fernandez McEvoy
       _____

       Josefina Fernandez McEvoy
       (admitted *pro hac vice*)

       10100 Santa Monica Boulevard
       Seventh Floor
       Los Angeles, California  90067
       Telephone: 310.552.5000
       Facsimile: 310.552.5001

       Proposed General Reorganization Attorneys
       for Debtor and Debtor-in-Possession

264344

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
SIGNATURE BANK,                          :

          Plaintiff,               :

     -against-                          :

AHAVA FOOD CORP. d/b/a NORTH
COUNTRY CHEESE CORP., et al.,       :

          Defendants.   :
-----------------------------------x

<u>MEMORANDUM & ORDER</u>
and
<u>REPORT & RECOMMENDATION</u>

08 Civ. 3893 (NRB)(MHD)

TO THE HONORABLE NAOMI R. BUCHWALD, U.S.D.J.:

By a series of letters to the court, defendant Ahava of California, LLC ("AOC") has sought to preclude the depositions in this case of two of its employees, Messrs. Ruben Beityakov and Ari Katz. The basis for this application is the filing by AOC of a petition for bankruptcy relief in California under Chapter 11 of the Bankruptcy Act. AOC argues, alternatively, that the automatic stay provisions of the Act preclude these depositions and that, in any event, these two employees are so important to the functioning of the company and to its preparation of financial data in connection with the bankruptcy proceeding that this court should enjoin their depositions for an extended period of time. Finally, in its most recent letter counsel for AOC suggests, in a one-sentence aside, that this court should consider transferring the entire case (or some part of it) to the California Bankruptcy

Court.[1]

None of these suggestions is persuasive, and we decline to stay or enjoin the noticed depositions. The depositions are properly sought to permit the Bank to acquire evidence pertinent to its contentions that parties other than AOC have transferred or caused to be transferred properties of the judgment debtor Ahava Food Corporation in order to defeat a judgment previously obtained by the Bank against that entity. The automatic litigation stay provision found in 11 U.S.C. § 362(a) does not prevent discovery in the current lawsuit even if the depositions in question unearth information that may be relevant to the Bank's stayed claims against AOC. See, e.g., In re Miller, 262 B.R. 499, 506-07 (BAP 9th Cir. 2001); see also Teachers Ins. & Annuity Ass'n v. Butler, 803 F.2d 61, 65 (2d Cir. 1986); In re Bidermann Indus. USA, Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996).

It bears mention that some courts have held that in "unusual circumstances" the automatic stay may be extended to non-bankruptcy parties "when there is such identity between the debtor and the .

---

[1] The defendant's request for a transfer occasions the hybrid nature of the current document, which is labeled as a Memorandum and Order insofar as it addresses discovery-related issues, and a Report and Recommendation insofar as it considers AOC's transfer request. Cf. Williams v. Beemiller, 527 F.3d 259, 265-66 (2d Cir. 2008).

2

. . defendant that the debtor may be said to be the real party defendant and that a judgment against the . . . defendant will in effect be a judgment against the debtor." <u>A.H. Robins Co. v. Piccinin</u>, 788 F.2d 994, 999 (4th Cir. 1986). The Ninth Circuit -- presumably the pertinent jurisdiction for present purposes -- has explicitly rejected that theory, <u>see Matter of Lockhard</u>, 884 F.2d 1171, 1179 (9th Cir. 1989), and we read the Second Circuit's decision in <u>Teachers Insurance</u> as reflecting an implicit rejection of that approach. <u>See</u> 803 F.2d at 65. In any event, AOC has not made the factual case for that argument.

Alternatively AOC argues for an injunction against the targeted discovery by the Bank, and in support of that argument it invokes 11 U.S.C. § 105(a).[2] As the Bank notes, however, to seek such relief the debtor must file an adversary proceeding in the Bankruptcy Court, <u>see Adelphia Communications Corp.</u>, 345 B.R. 69, 84-86 (Bankr. S.D.N.Y. 2006), and must demonstrate both likelihood of success on the merits and irreparable harm. <u>See In re Excel Innovations, Inc.</u>, 502 F.3d 1084, 1093-95 (9th Cir. 2007).

In an apparent concession to the Bank's point that a section

_____

[2] The cited provision empowers the court exercising bankruptcy jurisdiction to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

105(a) application must be made in Bankruptcy Court, AOC has just filed a motion, dated August 15, 2008, in the Central District of California Bankruptcy Court, seeking either an order extending the bankruptcy stay to Messrs. Beityakov and Katz or issuance of an injunction to prevent the Bank from continuing to litigate its case against employees of AOC, including Messrs. Beityakov and Katz. (See Aug. 15, 2008 letter to the Court from Josefina F. McEvoy, Esq., at exhibit).[3] The pendency of that motion in the Bankruptcy Court, where it properly belongs, is reason enough to decline AOL's invitation to grant the same relief in this forum. In any event, AOC has made no meaningful effort to demonstrate irreparable harm here since it offers no evidentiary basis for inferring that one-day depositions of Messrs. Beityakov and Katz will cause any harm -- irreparable or otherwise -- to the company.

Finally, in a single sentence at the conclusion of AOC's most recent letter to the court, it suggests that "in the interest of judicial economy, this Court [should] consider referring the above-referenced action to the district court in the Central District of California sua sponte pursuant to 28 U.S.C. § 157(a)." (Aug. 15, 2008 McEvoy letter at 2). Absent a formal application by AOC, including a showing of why this lawsuit -- which involves a host of

---

[3] The motion seeks relief as well with respect to Mr. Aaron Banayan a/k/a Fariborz Banayan, whose deposition is not currently being pursued here by the Bank.

4

New York based defendants, including the judgment debtor, and the presence here of the property that is the subject of the alleged fraudulent activity -- should be transferred to California and the Bankruptcy Court there, we see no basis for acting on this conclusory suggestion.

## CONCLUSION

For the reasons stated, the various applications of Ahava of California, LLC to bar the depositions of Messrs. Beityakov and Katz are denied. We recommend that defendant's request (or suggestion) that this case be transferred to the Bankruptcy Court in the Central District of California be denied without prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Naomi R. Buchwald, Room 2270, 500 Pearl Street, New York, New York 10007-1312, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of

Appeals. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985), <u>reh'g denied</u>,

474 U.S. 1111 (1986); <u>Small v. Sec'y of Health and Human Services</u>,

892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 72, 6(a), 6(d).

Dated: New York, New York
      August 19, 2008

RESPECTFULLY SUBMITTED,

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Memorandum and Order and Report and
Recommendation have been mailed this day to:

Mara Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016

David Antonucci, Esq.
12 Public Square
Watertown, NY 13601

Seth Eisenberger, Esq.
108 Airport Executive Park
Nanuet, New York 10954

Lawrence Fox, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, NY 10017

Josefina Fernandez McEvoy, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
10100 Santa Monica Boulevard, 7th Floor
Los Angeles, CA 90067

# EXHIBIT 2

# K&L|GATES

Kirkpatrick & Lockhart Preston Gates Ellis LLP
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, CA 90067

T 310.552.5000    www.klgates.com

August 15, 2008

**By FACSIMILE (212) 805-7928**

Hon. Michael H. Dolinger
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 2270
New York, NY 10007

     Re:    *Signature Bank v. Ahava Food Corp., et al.*, 08 Civ. 3893

Dear Judge Dolinger:

Introduction

     Ahava of California, LLC as debtor in possession in its Chapter 11 Case No. 2:08-20524-TD, pending in the United States Bankruptcy Court for the Central District of California (the "Debtor") respectfully submits this supplemental response to Signature Bank's submissions dated August 8, 2008 and August 14, 2008, concerning the issue of whether Signature Bank may continue discovery against two of the Debtor's key employees, Ruben Beityakov, the Debtor's Controller, and Ari Katz, the Debtor's General Manager (collectively, the "Debtor's Employees") in an action directly involving the Debtor.

Signature's Position

     In its submissions, Signature Bank expressly concedes the following: (i) it has received each of the documents requested of the Debtor's Employees; (ii) it contemplates taking discovery involving information about the Debtor; (iii) Ninth Circuit law is controlling on the issue of whether the automatic stay of Section 362(a) of the Bankruptcy Code may be extended to protect the Debtor's Employees or, alternatively, whether the litigation against the Debtors' Employees may be enjoined pursuant to section 105(a) of the Bankruptcy Code; and (iv) the Bankruptcy Court, not this Court, is the proper forum to adjudicate the issue, as the Debtor's seeking this Court's intervention "is not only procedurally defective, it will not further [the Debtor's] reorganization efforts."

The Debtor's Position

     Based on Signature Bank's submission of August 14, 2008, there appears to have been a communication failure between Signature Bank and the Debtor, which may have resulted in this Court's and the parties' investing unnecessary time on what appears to be a nonissue. In the context of the chapter 11 case and under the supervision of the Bankruptcy Court, the Debtor has repeatedly attempted to work cooperatively with Signature to, among other things, (i) facilitate the depositions of the Debtor's Employees, and (ii) provide access to Signature Bank to

**K&L|GATES**

Hon. Michael H. Dolinger
United States District Judge
August 15, 2008
Page 2

additional information that it may want from the Debtor, including information it has requested from third parties after the commencement of the chapter 11 case in violation of the automatic stay. However, rather than communicating and coordinating with the Debtor, Signature Bank elected to avail itself of this Court's availability to address the issue.

As it turns out, Signature appears to have, in its possession, the information it wants, which may explain its spurning of the Debtor's repeated proposal that the parties negotiate a non-coercive and fair discovery protocol that minimizes disruption to the Debtor's reorganization efforts. In light of Signature Bank's preference for the intervention of the Bankruptcy Court and, thus, the unnecessary use of judicial and estate resources to ultimately discuss possible dates to take the depositions of the Debtor's Employees, the Debtor has filed the attached motion for an order extending the automatic stay of Section 362 to the Debtor's Employees (and Rabbi Aaron Banayan, the Debtors' President), or, in the alternative, issuing a Bankruptcy Code section 105(a) injunction to avoid disruption to the Debtor's reorganization efforts at this critical juncture of the chapter 11 case. The Debtor respectfully refers the Court to the attached motion for an elaborate analysis of the facts and legal issues, and requests that it abstain (pursuant to 28 U.S.C. § 1334(c)(1)) from deciding Signature Bank's request for an order directing that the Debtor's Employees appear for a deposition forthwith, to the extent that both parties agree that the Bankruptcy Court is the proper forum to adjudicate the matter now before this Court.

Moreover, the Debtor respectfully asks that, in the interest of judicial economy, this Court consider referring the above-referenced action to the district court in the Central District of California *sua sponte* pursuant to 28 U.S.C. § 157(a).

Respectfully submitted,

Josefina F. McEvoy, Esq.

cc:
    Gary F. Eisenberg, Esq.
    David R. Feuerstein, Esq.
    Mara Levin, Esq.
    John Oleske, Esq.
    David Antonucci, Esq.
    Seth Eisenberger, Esq.
    Laurence Fox, Esq.
    Mr. Tom Hughes
    Ahava of California, LLC, Chapter 11 Debtor in Possession

**K&L GATES LLP**
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, California 90067
Telephone: 310.552.5000
Facsimile: 310.552.5001

Josefina Fernandez McEvoy (SBN 147138)
(josefina.mcevoy@klgates.com)
Michael J. Heyman (SBN 218147)
(michael.heyman@klgates.com)
Claire Shin (SBN 249492)
(claire.shin@klgates.com)

Proposed General Reorganization Attorneys for
Ahava of California, LLC, Debtor and Debtor-
in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>AHAVA OF CALIFORNIA, LLC, a California limited liability company, dba Ahava National Food Distributor and North Country Manufacturing,<br><br>Debtor.<br><br><br>Tax ID No.: 95-4846136 | Case No. 08-20524<br><br>Chapter 11<br><br>**DEBTOR'S MOTION FOR AN ORDER (A) EXTENDING THE AUTOMATIC STAY TO NON-DEBTOR PARTIES; OR, IN THE ALTERNATIVE, (B) ENJOINING LITIGATION AGAINST THE NON-DEBTOR PARTIES PURSUANT TO SECTION 105(A; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF RABBI AARON BANAYAN IN SUPPORT THEREOF**<br><br>Date:     September 17, 2008<br>Time:    10:30 a.m.<br>Place:   Courtroom 1345<br>         255 E. Temple Street<br>         Los Angeles, CA 90012 |

::ODMA\PCDOCS\LA\265686\1

**TO THE HONORABLE THOMAS B. DONOVAN, UNITED STATES BANKRUPTCY JUDGE; AND ALL PARTIES-IN-INTEREST AND THEIR ATTORNEYS OF RECORD:**

  Ahava of California, LLC ("Ahava" or the "Debtor"), a California limited liability company, debtor and debtor-in-possession in the above-captioned chapter 11 case, respectfully moves this Court for entry of an Order, (a) extending the automatic stay to non-debtor parties; or, in the alternative, (b) enjoining litigation against non-debtor parties pursuant to section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Motion"). By this Motion, the Debtor proposes extending the automatic stay (to the extent that it does not already apply) to three of the Debtor's key employees, Rabbi Aaron Banayan, aka Rabbi Fariborz Banayan, Ruben Beityakov, and Ari Katz (collectively, the "Debtor's Employees") all of whom are co-defendants with the Debtor in litigation pending in the United States District Court for the Southern District of New York (the "Federal Litigation") (the Debtor and employees are collectively referred to as the "Defendants"), or alternatively, the Debtor requests an order preliminarily enjoining Signature Bank from pursing the Federal Litigation against the Debtor's Employees. The relief sought herein and the reasons upon which it should be granted are more fully set forth below in the attached Memorandum of Points and Authorities.

<div align="center">K&L GATES LLP</div>

Dated:  August 15, 2008    By: */s/ Josefina Fernandez McEvoy*
                Josefina Fernandez McEvoy
                Michael J. Heyman
                Claire E. Shin

                Proposed General Reorganization Attorneys
                for Debtor and Debtor-in-Possession

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE .............................................................................2

III. BACKGROUND ....................................................................................................2

IV.  ARGUMENT ........................................................................................................12

    A.   The Automatic Stay Should be Extended to Protect the Debtor's Employees. ............12

        1.   The Automatic Stay Should be Extended to the Debtor's Employees Because the Employees are Essential to the Debtor's Reorganization Efforts.....................................................................................................14

        2.   The Automatic Stay Should be Extended to Protect the Debtor's Employees Because the Debtor is the Real Party in Interest in the Federal Litigation.............................................................................................16

        3.   The Automatic Stay Should be Extended to the Debtor's Employees Because the Federal Litigation Seeks to Obtain or Control Property of the Estate............................................................................................18

    B.   In the Alternative, the Court Should Enjoin the Federal Litigation Against the Debtor's Employees Pursuant to Section 105(a). ...............................19

        1.   Irreparable Harm .......................................................................................21

        2.   Probability of Success on the Merits.........................................................22

        3.   A Balance of the Hardships Tips in Favor of the Debtor...........................23

        4.   The Public Interest Will Be Promoted By An Injunction ..........................24

V.   CONCLUSION.....................................................................................................25

1

## TABLE OF AUTHORITIES

2

Cases                                                                              **Page**

3

A.H. Robins Co., Inc. v. Piccinin,
4  788 F.2d 994 (4th Cir. 1986)............................................. 13, 17, 18
Arnold v. Garlock,
5  278 F.3d 426 (5th Cir. 2001)............................................. 17
Canter v. Canter (In re Canter),
6  299 F.3d 1150 (9th Cir. 2002) ............................................ 21
Circle K Corp. v. Marks (In re Circle K Corp.),
7  121 B.R. 257 (Bankr. D. Ariz. 1990) ................................ 14
Harsh Investment Corp. v. Bialac ("In re Bialac"),
8  712 F.2d 426 (9th Cir. 1983)............................................. 13
Homestead Holdings Inc. v. Broome & Wellington (In re PTI Holding Corp.),
9  346 B.R. 820 (Bankr. D. Neb. 2006) .......................... 21, 22, 24
In re Arrow Huss, Inc.,
10  51 B.R. 853 (Bankr. D. Utah 1985) ............................ 14
In re Casner,
11  302 B.R. 695 (Bankr. E.D. Cal. 2003) ............................ 14
In re Pacific Gas and Elec. Co.,
12  263 B.R. 306 (Bankr. N.D. Cal. 2001) ............................ 21
In the Matter of Lockard,
13  884 F.2d 1171 (9th Cir. 1989)............................................. 18
Johns-Manville Corp. v. Asbestos Litigation Group,
14  49 B.R. 219 (S.D.N.Y. 1984) ............................................ 13
Maxicare Health Plans, Inc. v. Centinela Mammoth Hsp. (In re Family Health Servs., Inc.),
15  105 B.R. 937 (Bankr. C.D. Cal. 1989)....................... 14, 17, 22, 23
See In re Otero Mills, Inc.,
16  25 B.R. 1018 (D.N.M. 1982) ............................................ 14
Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations, Inc.),
17  502 F.3d 1086 (9th Cir. 2007) ................................... 19, 20, 22

18

Statutes

19

11 U.S.C. § 362 ........................................................................ passim
20 11 U.S.C. § 541 ........................................................................ 11, 18
11 U.S.C. § 542 ........................................................................ 11
21 28 U.S.C. § 1409 ...................................................................... 2
28 U.S.C. § 157(b)(2) ................................................................ 2
22 28 U.S.C. § 1334 ...................................................................... 2
28 U.S.C. § 1408 ...................................................................... 2
23 28 U.S.C. § 157(a) .................................................................... 2

24

25

26

27

28

::ODMA\PCDOCS\LA\265686\1

ii

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.      INTRODUCTION**

3          The Debtor seeks entry of an Order (a) extending the automatic stay to the Debtor's

4   Employees[1]; or in the alternative, (b) enjoining the Federal Litigation against the Debtor's Employees

5   pursuant to section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*) (the

6   "Bankruptcy Code") to avoid disruption of the Debtor's reorganization.  The Debtor's Employees are

7   *critical* to the Debtor's reorganization efforts.  Nonetheless, the plaintiff, Signature Bank ("Signature

8   Bank") *recently* served a Notice of Deposition in the Federal Litigation to Ruben Beityakov and Ari

9   Katz, respectively, and is attempting to conduct discovery on these key employees at a difficult early

10  phase in the Debtor's bankruptcy case.[2]  This continuation of the Federal Litigation against the

11  Debtor's Employees has already disrupted and will continue to disrupt the Debtor's operations and is

12  denying the Debtor the much-needed breathing spell to achieve a successful reorganization.[3]

13         Signature Bank has not relented.  Even though the Debtor has now filed for bankruptcy

14  protection due to this litigation onslaught, Signature Bank continues to aggressively prosecute the

15  Federal Litigation and is attempting to take significant discovery against the Mr. Beityakov and Mr.

16  Katz – *employees that are key to the Debtor's survival* – at the time when the Debtor most needs the

17  breathing spell to which it is entitled under the Bankruptcy Code.  At this important early juncture of

18  the bankruptcy case, the Debtor cannot risk the diversion of its resources, *i.e.*, the Debtor's

19  Employees' time and energy, necessary to respond to discovery and take depositions.  The Debtor,

20

21  _____

    [1] Mr. Banayan is technically not an employee of the Debtor, but paid through a 1099.

22
    [2] Since the commencement of this chapter 11 case, Signature Bank has improperly served Notices of
23  Subpoenas and requests for production of the Debtor's books and records to other nondebtor parties
    including Washington Mutual Bank, Capital One Bank, HSBC Bank, and Robert Friedbauer, the
24  Debtor's tax accountant.

25  [3] The parties have informally agreed to stay the discovery against Aaron Banayan, but this Motion
    includes Mr. Banayan in the requested relief to formalize that the parties' informal agreement
26  regarding discovery against Mr. Banayan.

27  In addition, there are several other defendants in the Federal Litigation, including other employees of
    the Debtor, but for purposes of this Motion, the relief sought herein is confined to those key
28  employees named above, subject to the Debtor's right to amend and/or supplement this Motion to
    include additional parties at a later time.

1    therefore, seeks an order extending the automatic stay to its three key employees or, in the alternative,

2    a preliminary injunction preventing Signature Bank from conducting discovery on the Debtor's

3    Employees at this time.  The Debtor's Employees need to continue to focus on stabilizing the

4    Debtor's business and financial affairs that were severely disrupted by Signature Bank's unlawful

5    execution of a judgment against certain third parties and clogging of the Debtor's collections that

6    nearly destroyed the viability of the Debtor.  The Debtor's Employees constitute the Debtor's senior

7    management team and as such need to devote their time and resources to the reorganization effort

8    without distraction.

9    **II.    JURISDICTION AND VENUE**

10        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).

11    Prosecution of the Federal Litigation disrupts the administration of this chapter 11 case. This is a core

12    proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§

13    1408 and 1409.

14    **III.    BACKGROUND**

15        The Debtor has been headquartered in Los Angeles, California, and under the control of its

16    sole member, ordained Rabbi Banayan since its formation on March 8, 2000.  Rabbi Banayan

17    maintains the Debtor's primary books and records in California.  The Debtor manufactures and

18    distributes kosher food products consumed by the strictest and most observant segment of the

19    orthodox Jewish community throughout the United States.

20        Moise Banayan, a New York resident and Rabbi Banayan's older brother, owned 50% of the

21    Debtor's membership units through August 15, 2005, when, pursuant to a certain Agreement and

22    Assignment of Interest and Consent of Managing Member, Rabbi Banayan purchased Moise

23    Banayan's entire interest for approximately $167,284.  Moise Banayan does not, and did not in the

24    past, control the Debtor's affairs directly or indirectly.

25        From inception, the Debtor purchased products made by different manufacturers and

26    distributors of kosher products including, but not limited to, certain entities owned and operated by

27    Moise Banayan: Lewis County Dairy Corporation ("Lewis Dairy" a dairy manufacturer), St.

28    Lawrence Food Corporation ("St. Lawrence Food" a cheese manufacturer), Ahava Food Corporation

1    ("Ahava Food") and Schwartz & Sons Quality Distributors Inc. ("Schwartz & Sons" and together

2    with Lewis Dairy, St. Lawrence Food and Ahava Food, the "Nondebtor Entities"). The Nondebtor

3    Entities do not, and did not in the past, control the Debtor's affairs directly or indirectly.

4        On or about August 29, 2007, the Debtor entered into a commercial lease with Lewis Dairy,

5    whereby Lewis Dairy as landlord granted Debtor as tenant, the use of the land, the buildings and

6    other improvements thereon at Route 812, Lowville, New York (the "Lewis Dairy Premises"), and all

7    of the personal property and equipment at the Lewis Dairy Premises, in exchange for the payment of

8    a six month rent advance at the market rate of $6,000 per month ($36,000), and, thereafter, the

9    payment of rent at the market rate of $12,000 per month through August 28, 2012 (the "Lewis Dairy

10   Lease"). Based on information and belief, Lewis Dairy shut down its operations before the Debtor

11   entered into the Lewis Dairy Lease, because certain judgment creditors garnished Lewis Dairy's bank

12   accounts and Lewis Diary ceased having any cash flow to fund its operations.

13       In addition, the Debtor invested approximately $175,000.00 to begin its operations at the

14   Lewis Dairy Premises as, among other things, it needed to purchase new equipment and upgrade the

15   existing equipment to manufacture dairy kosher products, and satisfy all unpaid payroll obligations so

16   the Debtor could re-employ Lewis Dairy's former employees who are highly trained and specialize in

17   the manufacturing of Cholev Yisrael products.

18       On or about October 30, 2007, the Debtor entered into a second commercial lease with St.

19   Lawrence Food, whereby St. Lawrence Food as landlord granted the Debtor as tenant, the use of the

20   land, the buildings and other improvements thereon, at 30 Main Street Odgensburg, New York (the

21   "St. Lawrence Food Premises"), and all of the personal property and equipment at the St. Lawrence

22   Food Premises, in exchange for the payment of a four month rent advance at the market rate of

23   $15,000 per month ($60,000), and, thereafter, the payment of rent at the market rate of $15,000 per

24   month through October 29, 2012 (the "St. Lawrence Food Lease"). Based on information and belief,

25   St. Lawrence Food shut down its operations before the Debtor entered into the St. Lawrence Food

26   Lease, because certain judgment creditors garnished St. Lawrence Food's accounts and St. Lawrence

27   was no longer able to sell its products to thereby generate revenues to fund its operations.

28

1         The Debtor invested approximately $350,000.00 to begin its operations at the St. Lawrence

2    Food Premises, as it needed to buy new equipment to manufacture kosher products, and satisfy

3    certain unpaid obligations, including payroll so the Debtor could re-employ St. Lawrence Food's

4    highly trained former employees.

5         On or about November 27, 2007, Schwartz & Sons and the Debtor entered into a certain

6    Settlement Agreement of even date, whereby, among other things, Schwartz & Sons (a) as sublessor

7    assigned to the Debtor as sublessee, its rights and title in certain lease agreement dated as of October

8    26, 2006, which, based on information and belief, was originally entered into by and between Yoni

9    Realty LLC as the landlord and Ahava Food as the tenant, and that Ahava Food assigned to Schwartz

10    & Sons on July 30, 2007, for a term from July 30, 2007 through July 29, 2009 (the "Brooklyn

11    Lease"); and (b) as seller assigned to the Debtor as buyer, its rights and title in certain personal assets

12    of Schwartz & Sons including inventory, equipment and furniture (together with the Brooklyn Lease,

13    the "Brooklyn Personal Property Assignment"). In support of and pursuant to the terms of the

14    Brooklyn Personal Property Assignment, the Debtor provided Schwartz & Sons the following legal

15    consideration: (i) the Debtor ceased its efforts to collect a balance in excess of $780,000.00 for

16    merchandise it sold and delivered to Schwartz & Sons; (ii) the Debtor purchased Schwartz & Sons'

17    remaining inventory of perishable finished foods (e.g. bottled milk, yogurt, cheese, sour cream,

18    orange juice, etc.) for approximately $839,930.00 (at 100% of its value rather than liquidation value;

19    the Debtor ended up writing off approximately $275,000.00 worth of inventory that perished), (iii)

20    the Debtor purchased Schwartz & Sons' office supplies, furniture, computers and software for

21    approximately $40,000.00; and (iv) the Debtor satisfied Schwartz & Sons' liabilities to certain

22    Schwartz & Sons' vendors, totaling approximately $200,000.00, that otherwise refused to sell their

23    products to the Debtor. Thus, pursuant to the terms and provisions of the Brooklyn Personal Property

24    Assignment, Schwartz & Sons granted Debtor the use of the land, building and other improvements

25    at 110 Beard Street, and 236-280 Richard Street, Brooklyn, New York (collectively, the "Brooklyn

26    Premises"), and sold the aforesaid personal property to the Debtor. The Debtor maintains its New

27    York administrative office and a warehouse at the Brooklyn Premises. Based on information and

28

1  belief, Schwartz & Sons was in business only for approximately five months, and had shut down its

2  operations before the Debtor entered into the Brooklyn Personal Property Assignment.

3       The Debtor maintains a warehouse at 2870 Lugo Street, Los Angeles, California 90023 to

4  facilitate its West Coast distributions.

5       On February 20, 2008, the Debtor acquired several trademarks from Ahava Food pursuant to

6  a Trademark Purchase Agreement (the "Trademarks").  As consideration for the Trademarks, the

7  Debtor agreed to pay the sum of $575,000.00, by satisfying a $325,000 judgment held by American

8  Equities Group, Inc. ("AEG"), a third party lender of Ahava Foods that held a first priority security

9  interest in the Trademarks, against Ahava Food, and funding a $250,000 settlement payment payable

10  in monthly installments of $25,000.00.  The Debtor understands that the settlement agreement

11  between AEG and Ahava Food was approved by the United States District Court for the Southern

12  District of New York, in an action bearing Case No. 01- Civ. 5207 (RWS) (the "AEG Action").

13  Further, Ahava Food ratified the sale of the Trademarks to the Debtor by executing and delivering a

14  Trademark Assignment dated as of March 6, 2008.  Thus, through the Trademarks Assignment

15  Ahava Food sold, assigned and transferred to the Debtor the Trademarks and its goodwill (including

16  its good relationship with its customers and vendors) effective retroactively as of February 20, 2008.

17  Upon a default under the aforesaid court approved settlement between AEG and Ahava Food, AEG is

18  entitled to obtain the entry of a judgment in the amount of $3.5 million.

19       The Debtor understands that Signature Bank extended a refinance loan and various other

20  loans to the Nondebtor Entities and Moise Banayan a few years ago, which apparently was secured

21  by the assets of the Nondebtor Entities and guaranteed by Moise Banayan and his wife Ana Banayan.

22  Upon the Nondebtor Entities' failure to pay those loans Signature commenced litigation in the

23  Southern District of New York against the Nondebtor Entities, Moise Banayan and others, excluding

24  the Debtor, to collect its loans.  This litigation resulted in Signature obtaining a judgment against the

25  Nondebtor Entities and Moise Banayan in the approximate sum of $9.3 million.

26       The Debtor has never had any relationship with Signature Bank; has never granted a security

27  interest or lien to Signature Bank with respect to its assets; was not a party to the Signature litigation

28  when Signature Bank received the judgment; and is not one of Signature's judgment debtors.

1      Immediately prior to the Debtor entering into the transactions described above with the

2  Nondebtor Entities, from June through November 2007, Signature Bank retained or caused the

3  Nondebtor Entities to retain a turnaround consultant:  Mark Samson, of Getzler Henrich, New York

4  to, among other things, assume operational control of the Nondebtor Entities, make business and

5  financial decisions on behalf of the Nondebtor Entities, make decisions concerning payroll and

6  promotion of employees, and develop a marketing plan and an action plan for liquidating the

7  Nondebtor Entities.  Signature Bank required the Nondebtor Entities to compensate Getzler Henrich

8  at the general rate of $38,500.00 per week even when it appeared that the Nondebtor Entities had

9  absolutely no cash to make those payments.  Thus, on or about November 26, 2008, Signature Bank

10  increased the Nondebtor Entities' overdraft to cover various payments owed to Getzler Henrich

11  thereby deepening the insolvency of the Nondebtor Entities.  As of November 26, 2007, Signature's

12  overdraft was $2,076,111.03; in fact, Signature Bank exceeded its own overdraft cap by $94,000.00

13  to permit the Nondebtor Entities to pay checks that Signature Bank approved in advance even though,

14  based on information and belief, the Nondebtor entities were insolvent.  Under the control of Getzler

15  Henrich's Mark Samson, Signature Bank advanced approximately $4,700,000.00 to the Nondebtor

16  Entities, thereby deepening the Nondebtor Entities' insolvency, and the Debtor's insolvency to the

17  extent that at least Schwartz & Sons could not pay its $780,000 of outstanding invoices to the Debtor

18  and, as admitted in the Motion (at 6, lines 16-18), Signature Bank improperly took control of all of

19  the Debtor's accounts receivable and collections.

20      In light of the dispute between Signature Bank, Moise Banayan and the Nondebtor Entities

21  over Signature Bank's tortious and inequitable conduct concerning the Debtor's business, on January

22  31, 2008, and again on April 15, 2008, the Debtor sent two letters to its customers instructing them to

23  pay to Signature Bank any monies the customers owed to the Nondebtor Entities in which Signature

24  Bank had a security interest.  Nonetheless, Signature Bank did not stop its aggressive campaign to

25  enforce what it perceived to be its ownership or security interest in the Debtor's property, including,

26  without limitation, the Debtor's accounts receivable and proceeds therefrom (collectively, the

27  "Property"), based on allegations of, among other things, a scheme between the Debtor and the

28  Nondebtor Entities.  Signature Bank blamed the Debtor for the alleged misconduct of Moise Banayan

1  and the Nondebtor Entities by alleging that the Debtor was a conspirator and alter ego of the

2  Nondebtor Entities and that the Debtor's accounts receivable, cash receipts and other Property

3  belonged to Signature Bank.  In furtherance of these allegations, Signature Bank took five primary

4  actions:

5        a.    Signature Bank's Letter Campaign Against the Debtor's Customers

6       Signature Bank sent three separate letters to the Debtor's customers making conclusory

7  assertions about the Debtor's relationship to the Nondebtor Entities and demanding that all invoices

8  be paid directly to Signature Bank.  Signature Bank sent the first letter in December 2007, the second

9  letter in January 2008 and the third letter in April 2008.  The letters further stated that if the Debtor's

10  customers refused to pay Signature Bank and continued to pay the Debtor, they would remain liable

11  for the debt to Signature Bank.

12        b.    Signature Bank's NY State Action Against the Debtor

13       On April 22, 2008, Signature filed an Amended Verified Complaint against the Debtor and

14  other defendants alleging that the Debtor is a fraudulent transferee of Moshe Banayan and the

15  Nondebtor Entities' entire business, because the Debtor never paid any consideration for its business;

16  the Debtor is an alter ego of Moshe Banayan and the Nondebtor Entities, and is completely

17  dominated and controlled by Moshe Banayan and the Nondebtor Entities, and the Debtor is an

18  ongoing corrupt enterprise dealing in stolen property, and  Signature is the owner of all of the

19  Debtor's personal property.

20        c.    Signature Bank's Litigation Against the Debtor's Customers

21       On July 2, 2008, Signature Bank filed a separate lawsuit in the New York Supreme Court

22  directly against 85 of the Debtor's largest customers demanding that they pay Signature Bank all

23  monies.

24        d.    Signature Bank's Federal Action Against the Debtor

25       On July 7, 2008, Signature Bank filed a proposed second amended complaint in the United

26  States District Court for the Southern District of New York adding, among others, the Debtor and

27  Aaron Banayan as defendants with the Nondebtor Entities.  A true and correct copy of the Federal

28  Complaint is attached as Exhibit 1.  In the Federal Complaint, Signature Bank contends that it is the

1   victim of a long-running conspiracy between Aaron Banayan, Moise Banayan, the Debtor and the

2   Nondebtor Entities to deprive Signature Bank of any ability to recover on its existing judgment

3   against the Nondebtor Entities. Signature further asserts that it is the owner of the Debtor's assets.

4        In the Federal Complaint, Signature asserts that the Defendants transferred the assets of the

5   Non-debtor Entities to the Debtor to shield those assets from Signature's judgment in the Initial

6   Litigation. Signature alleges, as part of this scheme, that the Non-debtor Entities fraudulently

7   assigned virtually all of their accounts receivable and intangible property to the Debtor. In the

8   Federal Litigation, Signature seeks several forms of relief, including, among others, rescission of the

9   conveyance of the Non-debtor Entities' assets to the Debtor; transfer of the conveyed assets directly

10   to Signature; declaratory judgment that the Debtor is the alter-ego of the Non-debtor Entities; and

11   declaratory judgment that Signatures' alleged security interests in the Debtor's assets are superior to

12   any other party. Within the Federal Litigation, Signature asserted 13 claims of relief, including:

13   RICO violations against all defendants (Counts 1, 2, 3, and 4); rescission of fraudulent conveyance

14   under New York Debtor and Creditor Law against all defendants and against the Debtor and Non-

15   debtor Entities jointly (Counts 5 and 6); common law fraud against all defendants (Count 7);

16   declaratory judgment that the Debtor is being used as a successor-in-interest to the Non-debtor

17   Entities (Count 8); conversion against all defendants (Count 9); breach of contract against all

18   defendants (Count 10); rescission against the Debtor and Non-debtor Entities jointly (Count 11);

19   breach of contract against the Non-debtor Entities (Count 12); and declaratory judgment that

20   Signature's security interest in the Debtor's assets is superior to all other parties against the Debtor

21   and Non-debtor Entities jointly (Count 13). Exhibit 1.

22       e.    Signature Bank Purports to Sell the Debtor's Equipment and Inventory and

23               Takes Action to Seize the Property

24        On June 18, 2008, Signature Bank, issued a Notice of Sale respecting the Nondebtor Entities'

25   purported property, and on July 9, 2008, Signature Bank conducted a sale of the Nondebtor Entities'

26   purported property, including goods, money, instruments, accounts, farm products, inventory,

27   equipment, documents, chattel paper, securities and general intangibles, and all proceeds therefrom.

28

1   Signature Bank was the successful bidder at what the Debtor is informed and believes, and thereon

2   alleges, was not a commercially reasonable sale.

3        Much of the property allegedly sold at auction, however, belonged to the Debtor – not the

4   Nondebtor Entities, i.e., the property sold included the Debtor's Property.  The Debtor had acquired

5   the Property through the aforementioned lease agreements, settlement agreement and sale transaction.

6   Thus, Signature Bank had no authority or right to sell (or purchase) the Property.  Moreover,

7   Signature Bank had and has no relationship with the Debtor, i.e., Signature Bank had and has no loan

8   agreement with the Debtor, no security agreement with the Debtor, and never filed UCC-1 Financing

9   Statements evidencing a security interest in any of the Debtor's Property.

10       Nonetheless, based on its purported sale and purchase of the Property, on July 11, 2008,

11  Signature Bank filed a Motion for an Order of Seizure and Temporary Restraining Order against the

12  Debtor in the District Court for the Southern District of New York seeking an immediate order

13  directing the sheriffs of the counties in which the Debtor operates (Lewis County, St. Lawrence

14  County, and Kings County) to seize all the Property at those locations and evict the Debtor from its

15  facilities.  On July 14, 2008, the District Court denied Signature Bank's request for a temporary

16  restraining order stating that Signature Bank had "failed to show good reason for an ex parte TRO";

17  but issued an order for the Debtor to Show Cause as to why the relief should not be entered.

18       a.    Signature Bank Improperly Begins Collecting the Proceeds from the Debtor's

19             Accounts Receivable

20       Notwithstanding the denial of the motion for a temporary restraining order, Signature Bank

21  persisted in its attempts to seize control of the Property, particularly the accounts receivable.  Due to

22  their intimidation of customers and even without having established the truthfulness its allegations,

23  the campaign began to succeed.  Some of the Debtor's customers paid Signature Bank and others,

24  confused about the situation, made no payments whatsoever.  The Debtor is informed and believes

25  that Signature Bank improperly collected between $50,000 and $200,000 of accounts belonging to

26  the Debtor.  In addition, the Debtor estimates that accounts receivable aggregating approximately

27  $750,000.00 would have otherwise been paid but for Signature's letter writing campaign,

28  exacerbating the liquidity crisis that led the Debtor to its bankruptcy filing on July 15, 2008.  While

1  the Debtor filed an action in the Los Angeles Superior Court to, among other things, enjoin Signature

2  Bank from continuing to interfere with the Debtor's operations and the State Court was poised to

3  issue the requested temporary restraining order, the restraining order was conditioned upon the

4  Debtor posting a $12 million dollar bond which it could not afford.

5    On July 15, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under

6  Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the

7  "Bankruptcy Code"), in an effort to restore cash flow, and to maintain the going concern value of its

8  Chapter 11 estate.  The Debtor is authorized to operate its business as debtor in possession pursuant

9  to sections 1107) and 1108) of the Bankruptcy Code.  As of the Petition Date, no security interest or

10  lien attached to the Debtor in favor of Signature Bank and Signature Bank have not proven that the

11  Debtor has any liability to it.

12    Pursuant to various orders of this Court entered with the consent of Signature Bank and

13  Aquent LLC, the Debtor is authorized to use cash collateral through August 27, 2008.

14    Pursuant to further order from this Court, the deadline for the Debtor to file its Schedule of

15  Assets and Liability and Statement of Financial Affairs is August 30, 2008.

16    The Debtor is substantially in compliance with all the reporting requirements of the United

17  States Trustee.

18    The Debtor has offered, repeatedly, to negotiate a discovery protocol with Signature Bank that

19  would be implemented with minimal disruption to the Debtor's reorganization case.  Notwithstanding

20  the Debtor's efforts to work cooperatively with Signature Bank, Signature Bank has continued its

21  aggressive litigation.  For instance, on July 22 and 23, 2008, Signature Bank served the following

22  Notices of Deposition (collectively, the "Deposition Notices")[4] on the following employees:

23    1. Ruben Beityakov – Mr. Beityakov is the Debtor's controller.  Mr. Beityakov is one of

24     the Debtor's most critical employees, handling the Debtor's financial affairs and many

25     of the Debtor's operational affairs.  Mr. Beityakov has been working tirelessly since

26     the Petition Date to stabilize the Debtor's financial affairs and assist counsel in

27

28  [4] True and correct copies of the Notices of Deposition of Ruben Beityakov and Ari Katz are
collectively attached as Exhibit 2.

1    understanding the Debtor's operations and further in assisting counsel in preparing the

2    initial pleadings and U.S. Trustee's 7-Day Package. Additionally, Mr. Beityakov has

3    been and will remain instrumental in working with the Debtor's proposed financial

4    advisors, Grant Thornton, in preparing a final cash collateral budget, evaluating the

5    Debtor's financial affairs on a going forward basis, preparing monthly operational

6    reports and, most importantly, assisting counsel in the preparation of a plan of

7    reorganization.

8    2.    <u>Ari Katz</u> – Mr. Katz is another essential employee of the Debtor. Mr. Katz is the

9    Debtor's operations manager. He is the person responsible for all daily operational

10    issues in the Brooklyn facility, and also coordinates operations in the Lowville and

11    Ogdensburg plants. Mr. Katz is in charge of hiring/firing employees, drivers, and

12    assistants, and is the person to whom most major daily operational issues are directed

13    when problems arise. Decl. of Aaron Banayan.

14    Rabbi Banayan is the Debtor's sole member and is the Debtor's President and Chief

15    Executive Officer. The Debtor cannot function without Rabbi Banayan's undivided attention to all

16    matters affecting the Debtor's finances and operations. Rabbi Banayan has been working extreme

17    hours, waking up at 1:00 a.m. and not stopping until approximately 4:30 p.m. six days a week to

18    ensure that the he attends to the multitude of operational and financial matters of the Debtor, ranging

19    from speaking to individual customers about their accounts to reviewing and authorizing pleadings to

20    be filed with the Bankruptcy Court. The Debtor expects that, as the Debtor stabilizes its business,

21    formulates a plan of reorganization and implements a plan of reorganization, Rabbi Banayan will be

22    central to these efforts and their success.

23    On August 12, 2008, the Debtor filed an adversary proceeding against Signature Bank for: (1)

24    Declaratory Relief Regarding 11 U.S.C. § 541; (2) Determination Regarding the Nature, Validity and

25    Enforceability of Lien; (3) Accounting; (4) Turnover of Estate Property Pursuant to 11 U.S.C. § 542;

26    and (5) Violations of the Automatic Stay of 11 U.S.C. § 362. (Adversary Proceeding 08-01664,

27    Docket No. 1).

28

IV.    **ARGUMENT**

A.    **The Automatic Stay Should be Extended to Protect the Debtor's Employees.**[5]

The Court should extend the automatic stay to the Debtor's Employees because: (1) the Debtor's Employees are central to the Debtor's reorganization efforts; (2) the interests of the Debtor and the Defendants are so intimately intertwined such that the Debtor is the real party in interest in the Federal Litigation;[6] and (3) the Federal Litigation is essentially an act to obtain possession of or control over property of the estate.

Section 362 of the Bankruptcy Code prohibits the commencement or continuation of litigation against the Debtor or acts to obtain possession of, or exercise control over, property of the Debtor's estate. 11 U.S.C. § 362. Specifically, section 362(a) provides:

> (a)    Except as provided in subsection (b) of this section, a petition filed under section 301,    302 or 303 of this title, . . . operates as a stay, applicable to all entities, of –

---

[5] The Debtor asserts that the automatic stay applies to the Debtor's Employees under the circumstances of this case without need for an extension. Section 362(a) of the Bankruptcy Code prohibits the continuation of an action against the Debtor. 11 U.S.C. § 362. While Signature Bank is not conducting discovery directly against the "Debtor," it nonetheless seeks to obtain indirectly what is prevented from doing directly by attempting to take discovery from the Debtor's Employees. Signature Bank is seeking discovery regarding the Debtor's business affairs and financial operations under the pretext that the Debtor's Employees are not the "Debtor." Yet, Signature Bank seeks the exact same type of information that it is prevented from seeking directly against the Debtor. For purposes of the automatic stay, however, Signature Bank's position not only facially offends the policy underlying the automatic stay by diverting the attention of its key employees away from their duties and requiring them to devote their time to preparing for depositions and responding to discovery, but completely eviscerates the purpose of automatic stay. If a creditor were permitted to simply claim that a debtor's employees are separate and apart from the debtor, and thus proceed, unhampered, to conduct all the same discovery that it would otherwise take against the debtor in an effort to prove claims against the debtor, the automatic stay would be meaningless. Taking the depositions of a debtor's employees, especially key employees from which you seek detailed information regarding a debtor, is a distinction without a difference for purposes of the automatic stay when the party seeking the discovery no doubt intends to use the information obtained to prove claims against the debtor

The Debtor, therefore, files this motion to extend the stay to the extent the automatic stay does not already preclude the continuation of the action against the Debtor's Employees which, the Debtor asserts, is, in reality, a continuation of the action against the Debtor.

[6] The only allegations against Messrs. Beityakov and Katz in the Federal Litigation appear to be that one of them sent one letter to one customer, and the other updated the Dow Jones listing of the Debtor's revenues to $18 million.

- 12 -

1
2
3
4

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

5

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

6
7

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
***

8
9

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

10   *Id.*  The automatic stay "is one of the fundamental debtor protections provided by the bankruptcy

11   laws," and "the scope of the automatic stay is undeniably broad." *Harsh Investment Corp. v. Bialac*

12   *("In re Bialac")*, 712 F.2d 426, 431 (9th Cir. 1983) (citing H.R. Rep. No. 95-595, 95th Cong., 2d

13   Sess. 340 (1977)).  The automatic stay:

14

15
16
17
18

…gives the debtor a breathing spell from his creditors.  It stops all collection efforts, all harassment, and all foreclosure actions. . . The automatic stay also provides creditor protection.  Without it, certain creditors would be able to pursue their own remedies against the debtor's property.  Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.  Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

19   *Id.*

20       Accordingly, the automatic stay prohibits one creditor from pursuing a remedy to the

21   disadvantage of other creditors, and it provides the debtor and its management a reasonable rest from

22   protracted litigation, during which time the Debtor may have an opportunity to formulate a plan of

23   reorganization.  *See A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986).  *See also*

24   *Johns-Manville Corp. v. Asbestos Litigation Group*, 49 B.R. 219, 225 (S.D.N.Y. 1984);

25       Although the automatic stay specifically addresses actions against a debtor, a court may

26   extend the protections of the automatic stay to non-debtor parties in unusual circumstances, *i.e.*, when

27   warranted under the facts and circumstances of a particular case.  *A.H. Robins Co., Inc. v. Piccinin*,

28   788 F.2d 994, 998 (4th Cir. 1986).  In *Robins*, the Fourth Circuit Court of Appeals held that, where a

1  suit is brought against a non-debtor defendant who is entitled to absolute indemnity by the debtor on

2  any judgment rendered against the non-debtor defendant, an "identity of interests" exists between the

3  debtor and the non-debtor defendant, which constitutes "unusual circumstances" that warrant the

4  extension of a section 362(a) stay to those non-debtor defendants. *Id.* at 999. This "identity of

5  interests" warrants the extension of the section 362(a) stay to non-debtor defendants because a

6  judgment against the non-debtor defendants would, in effect, be a judgment against the debtor. *Id.* In

7  addition, the automatic stay may be extended where it will facilitate the fundamental policy of

8  reorganization contained in the Bankruptcy Code. Extending the stay is permitted where it would

9  encourage reorganization. *See In re Otero Mills, Inc.*, 25 B.R. 1018, 1022 (D.N.M. 1982). *Cf. In re*

10 *Casner*, 302 B.R. 695, 700 (Bankr. E.D. Cal. 2003); *In re Arrow Huss, Inc.*, 51 B.R. 853, 856 (Bankr.

11 D. Utah 1985).

12      While the Ninth Circuit has not expressly adopted the unusual circumstances test set forth in

13 *Robins*, at least two courts in the Ninth Circuit have extended the automatic stay to non-debtors in

14 unusual circumstances. *See Maxicare Health Plans, Inc. v. Centinela Mammoth Hsp. (In re Family*

15 *Health Servs., Inc.)*, 105 B.R. 937, 942 (Bankr. C.D. Cal. 1989); *Circle K Corp. v. Marks (In re*

16 *Circle K Corp.)*, 121 B.R. 257, 261 (Bankr. D. Ariz. 1990) (staying litigation against officers of the

17 debtor). Here, the automatic stay should be extended to the Debtor's Employees for the following

18 reasons:

19          1.    The Automatic Stay Should be Extended to the Debtor's Employees Because

20                the Employees are Essential to the Debtor's Reorganization Efforts.

21      The undivided and uninterrupted participation of the Debtor's Employees is essential to the

22 Debtor's reorganization efforts. Nonetheless, the Deposition Notices all seek to obtain testimony

23 from these key employees during a fragile time in the Debtor's bankruptcy, concerning whether the

24 Debtor is the alter ego of the Nondebtor Entities, and whether the Debtor is the fraudulent transferee

25 of the assets of the Nondebtor Entities. Requiring the Debtor's Employees to defend the Federal

26 Litigation would materially hinder the Debtor's reorganization efforts. The Debtor's Employees are

27 critical to the operation of the Debtor's business, and the Debtor's compliance with its duties under

28 section 521 of the Bankruptcy Code including the extensive reporting requirements of the United

- 14 -

1  States Trustee, and each is required to devote his undivided time, effort and attention to the various

2  issues confronting the Debtor at this critical juncture.

3      Aaron Banayan is the Debtor's sole member and is the Debtor's President and Chief

4  Executive Officer.  The Debtor cannot function without Mr. Banayan's undivided attention to all

5  matters affecting the Debtor's finances and operations.  The Debtor expects that, as the Debtor

6  stabilizes its business, formulates a plan of reorganization and implements a plan of reorganization,

7  Mr. Banayan will be central to these efforts and their success.  Indeed, Mr. Banayan has worked

8  every day since the filing of the petition (except Saturdays, in recognition of the Shabbat, the day of

9  rest in the Judaism).  During those workdays, Mr. Banayan often awakens at 1:00 a.m. and does not

10  stop working until late in the afternoon to ensure that the he attends to the multitude of operational

11  and financial matters of the Debtor.  Mr. Banayan cannot be distracted from his responsibilities to the

12  Debtor.  Decl. of Aaron Banayan.

13      Ruben Beityakov is the Debtor's controller and the key person who oversees the Debtor's

14  financial affairs and many of the Debtor's operational affairs.  Mr. Beityakov has been working a

15  tremendous number of hours to address the financial impact of the Debtor's bankruptcy filing on

16  operations, to stabilize the Debtor's financial affairs, assist counsel in understanding the Debtor's

17  operations and further assist counsel in preparing the initial pleadings and U.S. Trustee's 7-Day

18  Package.  Mr. Beityakov has also been, and will continue to be, instrumental in working with the

19  Debtor's financial advisors, Grant Thornton, in preparing a final cash collateral budget, evaluating

20  the Debtor's financial affairs on a going forward basis, preparing monthly operational reports and,

21  most importantly, assisting counsel in the preparation of a plan of reorganization, which the Debtor

22  expects to file by November 14, 2008.  Mr. Beityakov spends nearly every minute of his days

23  consumed with addressing financial issues as they arise and attempting to stabilize the business an

24  assist in developing a long-term financial strategy.  Mr. Beityakov has been dealing with issues

25  ranging from vendors appearing on the premises of the Brooklyn facility demanding that they be

26  permitted to reclaim goods and fuel necessary for continued operations, to mulling through financial

27  records, educating counsel and the Debtor's financial advisors on the financial intricacies which must

28  be fully understood in order to formulate a plan, prepare himself and Rabbi Banayan for the Section

- 15 -

1   341(a) meeting of creditors set for September 9, 2008, and implement new cost-cutting measures

2   recommended by Grant Thornton, increase revenues now that its cash flow has been unclogged and

3   otherwise find solutions to the Debtor's cash flow difficulties.  Decl. of Aaron Banayan.

4         Ari Katz is another essential employee.  Mr. Katz is the Debtor's operations manager.  He is

5   the person responsible for all operational issues in the Brooklyn facility, and also coordinates

6   operations in the Lowville and Ogdensburg plants.  Mr. Katz is in charge of hiring/firing employees,

7   drivers, and assistants, and is the person to whom most major operational issues are directed when

8   problems arise.  Mr. Katz is the most knowledgeable manager of the basic day-to-day operational

9   issues.  The Debtor and its employees rely heavily on Mr. Katz's constant availability and attention to

10  operational details.  Mr. Kats is also instrumental to Grant Thornton's evaluation of the Debtor's

11  operational model and development of significant cost-cutting measures in contemplation of the

12  formulation of a reorganization plan. Decl. of Aaron Banayan.

13        Any psychological distractions or requirement to be physically absent from their duties poses

14  significant risks to the Debtor's operations at this time.  If Signature Bank is permitted to continue to

15  harass these employees, divert their attention from the reorganization efforts, and ultimately

16  propound discovery and take their depositions, the Debtor will suffer accordingly.  The impact of this

17  suffering could be devastating on the Debtor's business.  Decl. of Aaron Banayan.[7]

18        2.    The Automatic Stay Should be Extended to Protect the Debtor's Employees

19              Because the Debtor is the Real Party in Interest in the Federal Litigation.

20        The automatic stay should extend to the Debtor's Employees because the Debtor is the real

21  party in interest in the Federal Litigation and the claims asserted against the Debtor's Employees are

22  not independent from those asserted against the Debtor.  When a debtor's interests are inextricably

23  _____

24  [7] In addition, Mr. Beityakov and Mr. Katz assert a right to indemnification pursuant to the Debtor's
    operating agreement.  The operating agreement provides, in relevant part:

25
        5.4    Indemnification. the [sic] Company shall indemnify the Members, Managers, and
26             agents for all costs, losses, liabilities and damages paid or accrued by such Member,
               Manager or agent inn connection with the business of the Company, to the fullest extent
27             provided or allowed by the laws of California.

28  The expenditure of attorneys' fees and costs defending the Debtor's employees in the Federal
    Litigation would be a burdensome use of estate resources at this juncture in the case.

- 16 -

1  intertwined with a non-debtor party such that the debtor is the real party-in-interest in litigation, these

2  circumstances warrant extending the stay to the non-debtor parties. *In re Family Health Servs., Inc.*,

3  105 B.R. at 942; *see also Robins*, 788 F.2d at 1000-01; *Arnold v. Garlock*, 278 F.3d 426, 436, (5th

4  Cir. 2001) (acknowledging that a claim of a formal tie or contractual indemnification can create an

5  identity of interests).

6  　　　Here, the "identify of interests" between the Debtor and the Debtor's Employees warrants

7  extending the automatic stay to the Debtor's Employees.[8]  Signature Bank does not allege claims

8  against the Mr. Beityakov and Mr. Katz that are truly separate and apart from the claims against the

9  Debtor.  As seen in the Federal Litigation complaint, the majority of claims are *not* directed toward

10 these employees, but toward the Nondebtor Entities or the Debtor.  The complaint pays only limited

11 attention to Mr. Beityakov and Mr. Katz, except to the extent that they may have played some alleged

12 *de minimis* role (sending one collection letter and updating the Debtor's revenue listing in the Down

13 Jones report) in their capacities as employees of the Debtor.  For instance, Signature Bank sued each

14 every defendant in the Federal Litigation for conversion and breach of contract.  Exhibit 1.  Yet, it is

15 clear that Signature Bank is not alleging that Mr. Beityakov or Mr. Katz *individually* converted any

16 property or breached any contracts.  Signature Bank's fight is with Rabbi Banayan, the Debtor and

17 the other Nondebtor Entities.  While Mr. Beityakov and Mr. Katz should not be unnecessarily

18 dragged into that fight, Signature Bank is treating them as a single defendant with all other

19 defendants (much in the same manner that Signature Bank appears to have granted itself an

20 unrecorded security interest in the Debtor's assets, without agreement).

21 　　　To the extent that Signature Bank's true gripe is with Rabbi Banayan and the Debtor, the

22 Debtor and Rabbi Banayan also share an identity of interest because Signature Bank is alleging they

23 are one and the same.  As such, the Federal Litigation should not proceed against Rabbi Banayan

24 because to do so is to essentially attempt to obtain a judgment against the Debtor.  If Signature Bank

25 successfully establishes that Mr. Banayan is the Debtor's alter ego, this could be a conclusive

26 determination against the Debtor, without the Debtor participating in any discovery because the

27

28

---

[8] The Debtor denies that it is an alter ego of any party.

1    Federal Litigation is stayed against the Debtor by operation of Section 362(a).  Signature Bank

2    should not be permitted to obtain a judgment against Rabbi Banayan when that judgment would act

3    as a determination against the Debtor, as would be the case for an alter ego determination.  The

4    Debtor, therefore, is the real party in interest in the Federal Litigation and the Federal Litigation

5    should be stayed against the Debtor's Employees.

6            3.    The Automatic Stay Should be Extended to the Debtor's Employees Because

7                   the Federal Litigation Seeks to Obtain or Control Property of the Estate.

8          Pursuant to section 362(a)(3) of the Bankruptcy Code, "any act to obtain possession of

9    property of the estate or of property from the estate or to exercise control over property of the estate"

10   is automatically stayed upon the debtor's filing.  11 U.S.C. § 362(a)(3).  Property of the estate is

11   defined broadly to include "all legal or equitable interests of the debtor in property as of the

12   commencement of the case."  11 U.S.C. § 541(a)(1).  When the goal of any action against non-debtor

13   third parties is to *ultimately* obtain possession of, or to exercise control over, the debtor's property

14   namely the Debtor's books and records, section 362(a)(3) can operate to stay such actions against the

15   non-debtor parties.  *See Robins*, 788 F.2d at 942.  The Ninth Circuit has also held that where

16   "judicially cognizable property interests of the debtor are implicated, the automatic stay of section

17   362(a) may be read broadly to prevent creditors from proceeding in an action that indirectly affects

18   the debtor's property interests."  *In the Matter of Lockard*, 884 F.2d 1171, 1179 n.15 (9th Cir. 1989).

19         As set forth above, the Federal Litigation is essentially an effort to obtain an alter ego

20   judgment and enforce claims against the Debtor.  If the Federal Litigation proceeds against Rabbi

21   Banayan and Signature Bank establishes that Rabbi Banayan and the Nondebtor Entities are one and

22   the same, this could arguably be interpreted as a conclusive adjudication that the Debtor is also an

23   alter ego.  Undoubtedly, if Signature Bank establishes facts showing that Rabbi Banayan, the

24   Nondebtor Entities and the Debtor are all alter egos, Signature Bank will attempt to capitalize on

25   those adjudications to the detriment of the Debtor, without the Debtor even participating in discovery.

26   As such, Signature Bank is attempting to obtain a judgment against the Debtor under the pretext of

27   proceeding against only Rabbi Banayan and the Nondebtor Entities.  This is a back-door attempt to

28

1   obtain possession or control over property of the estate that Signature Bank could not otherwise

2   achieve directly against the Debtor.

3        Moreover, naming Mr. Beityakov and Mr. Katz as defendants in the Federal Litigation is a

4   pretext. Signature Bank has little interest in obtaining a judgment against these individual

5   employees, but is seeking to obtain any and all leverage possible in prosecution of its claims against

6   the Debtor *and attempting to obtain possession of the Debtor's, not Mr. Beityakov's and Mr. Katz's,*

7   *assets.* The only preliminary action that Signature Bank has taken was an attempt to obtain

8   possession of the Debtor's assets, not the Debtor's Employees' assets. Prosecution of the actions

9   against these employees, therefore, is ultimately an indirect means of recovering property from the

10  Debtor's estate. As such, the automatic stay should be extended to protect the Debtor's Employees.

11  **B.    In the Alternative, the Court Should Enjoin the Federal Litigation Against the**

12  **Debtor's Employees Pursuant to Section 105(a).**

13       Even if this Court finds that the Federal Litigation should not be stayed against the Debtor's

14  Employees pursuant to section 362(a), the action should be enjoined as to the Debtor's Employees

15  pursuant to the Court's equitable powers under section 105(a) because, as will be demonstrated

16  below, (i) the Debtor has established a reasonable likelihood of a successful reorganization, (ii)

17  prosecution of the Federal Litigation at this phase of the chapter 11 case against the Debtor's

18  Employees would harm the Debtor's ability to reorganize, (iii) the balance of the hardships to the

19  parties tips sharply in the Debtor's favor, and (iv) the public interest in preserving jobs and what

20  appears to be one of two major manufacturers and distributors of kosher products to the strictest and

21  most observant segment of the orthodox Jewish community in the United States, justifies it.

22       The Ninth Circuit Court of Appeals has established the standard that will govern proceedings

23  to enjoin litigation against non-debtors in *Solidus Networks, Inc. v. Excel Innovations, Inc., (In re*

24  *Excel Innovations, Inc.),* 502 F.3d 1086 (9th Cir. 2007). The underlying facts of this case are

25  relatively complex. Ned Hoffman, the founder and major shareholder of both Excel Innovations, Inc.

26  and Indivos Corporation, entered into a number of agreements with Indivos in 2000. Excel (which

27  also was a shareholder of Indivos) was a party to certain of those agreements,[9] which contained an

28

---

[9] Here, the Debtor is not a party to any agreement with Signature Bank.

- 19 -

1  arbitration clause, requiring any dispute arising from them to be deal with through binding

2  arbitration. In 2003, a dispute arose and Indivos began arbitration against Hoffman and Excel.  In

3  2004, the arbitrator granted partial summary judgment for Indivos and found Hoffman liable for

4  breach of contract; the arbitrator also found Excel liable as Hoffman's alter ego but denied other

5  summary judgment.[10]  In late 2004, Excel and Hoffman suffered another setback in their patent

6  infringement action against Indivos, and the court ruled that all patents Excel accused Indivos of

7  infringing were actually owned by Indivos.  Hoffman and Excel filed for bankruptcy, thereby

8  invoking the automatic stay, but Hoffman's case was later dismissed.  In 2005, Indivos refiled

9  litigation against Hoffman; the arbitrator permitted the continuation of the arbitration, but limited it to

10  claims involving only Hoffman.[11]  Prior to the close of the arbitration, Excel filed an adversary

11  proceeding against Indivos, Solidus, Hoffman, the arbitration company and the arbitrator, seeking

12  declaratory and injunctive relief concerning the arbitration.[12]  In its complaint, Excel argued that the

13  arbitration violated the automatic stay arising in its bankruptcy case.  The bankruptcy court granted

14  injunctive relief; and the Bankruptcy Appellate Panel affirmed.  The Ninth Circuit reversed.

15      The Ninth Circuit applied the traditional standard for preliminary injunctions to Section

16  105(a) injunctions which requires the moving party to show the following: "(1) a strong likelihood of

17  success on the merits, (2) the possibility of irreparable injury . . . if preliminary relief is not granted,

18  (3) a balance of hardships favoring the plaintiff and (4) advancement of public interest" where

19  warranted. *Excel Innovations, supra* at 1094.

20

21

22

---

23  [10] Here, Signature Bank has not established that the Debtor is the alter ego of the Nondebtor Entities
24  or their owner, Moise Banayan.

25  [11] Here, the only allegations against Messrs. Beityakov and Katz appear to be, respectively, that Mr.
    Beityakov updated the Debtor's Dow Jones listing to report $18 million in revenues for 2007, and
26  Mr. Katz sent one collection letter to a customer.

27  [12] Here, the Debtor's adversary complaint against Signature Bank seeks, among other things,
    declaratory relief concerning its assets over which Signature Bank has exercised control, and seek
28  injunctive relief against Signature Bank's violations of the automatic stay.  Thus, Signature's claims
    against the Debtor's Employees are not independent from its claims against the Debtor.

1    Alternatively, a court may grant the injunction if the movant demonstrates either a

2    combination of probable success on the merits and the possibility of irreparable injury or that serious

3    questions are raised and the balance of hardships tips sharply in its favor. *Id.*

4    The Ninth Circuit pointed out that under section 105(a) of the Bankruptcy Code a bankruptcy

5    court "may issue any order, process, or judgment that is necessary or appropriate to carry out the

6    provisions of this title." Section 105(a) gives the bankruptcy courts the power to stay actions that are

7    not subject to the automatic stay but "threaten the integrity of a bankrupt's estate," according to

8    *Canter v. Canter (In re Canter)*, 299 F.3d 1150 (9th Cir. 2002). In certain circumstances,

9    interference with the reorganization process alone can establish a basis for an injunction. *See In re*

10   *Pacific Gas and Elec. Co.*, 263 B.R. 306, 321 (Bankr. N.D. Cal. 2001); *Homestead Holdings Inc. v.*

11   *Broome & Wellington (In re PTI Holding Corp.)*, 346 B.R. 820, 825 (Bankr. D. Neb. 2006).

12   As set forth below, consideration of the aforesaid factors warrants issuance of an injunction

13   under section 105(a) to preserve the integrity and success of the Debtor's reorganization efforts.

14           1.    Irreparable Harm

15   "The loss of key participants at a crucial period in the operational life and reorganization of

16   the debtor may constitute irreparable harm to the estate and to the reorganization effort." *In re PTI*

17   *Holding Corp.*, 346 B.R. at 825 (Bankr. D. Neb. 2006).

18   Here, the timing of the discovery will negatively impact the Debtor's business which is now

19   approaching its peak selling season, and, consequently, could negatively impact the Debtor's

20   reorganization efforts.[13] The Debtor's business typically increases significantly in anticipation of the

21   Jewish High Holidays, Rosh Hashana (September 29 – October 1, 2008) and Yom Kippur (October

22   9, 2008), and Sukkot (October 14-20, 2008). The time frame leading to the holidays is typically a

23   peak selling period. Decl. of Aaron Banayan. The Debtor cannot divert its attention or suffer

24   distractions when it is now settling into the chapter 11 process and attempting to improve

25   performance so it can meet the feasibility requirement under its plan of reorganization.

26

27   [13] In addition, the Debtor's sole member and President, Rabbi Banayan, its management team, virtually all of the Debtor's employees and a significant number of the Debtor's customers all

28   observe the Jewish High Holidays. The Debtor totally shuts down production and distribution during this period. Accordingly, the Debtor must plan the administration of the case, and any pretrial negotiations by the parties must take these dates into account around observance of the holidays.

1    Therefore, failure to enjoin the Federal Litigation against the Debtor's Employees will

2    irreparably harm the Debtor's reorganization efforts and would thereby harm the Debtor's estate and

3    its creditors. The Debtor's Employees are working under heightened pressure to enable the Debtor to

4    timely comply with its section 521 duties, take advantage of the peak sale season, timely file a plan of

5    reorganization by November 14, 2008, while honoring their deep religious faith by observing the

6    High Holidays.

7        Tending to the aggressive discovery, claims and enforcement of judgments against them will

8    divert the Debtor's Employees from, *inter alia*, stabilizing the Debtor's business, collecting a

9    projected $9 in accounts receivable, and proposing a reorganization of the Debtor's business. Decl.

10   of Aaron Banayan.

11       2.     Probability of Success on the Merits

12       In *Excel Innovations* appellants contended that Excel must show likelihood of success on its

13   complaint in the adversary proceeding, while Excel argued that it need only show the likelihood of

14   success in reorganization. *The Ninth Circuit held that a debtor seeking to stay an action against a*

15   *nondebtor must show a reasonable likelihood of a successful reorganization.* "The inquiry for a

16   preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the

17   merits of the questions giving rise to the litigation will be decided." In a chapter 11 context, the

18   litigation would harm the debtor's ability to reorganize, and it makes sense to require showing "a

19   reasonable likelihood of a successful reorganization," according to *PTI Holding Corp, supra*.

20       Moreover, when a case is in its infancy, it is sufficient that the debtor merely show that

21   nothing has yet occurred in the chapter 11 case to warrant an inference that the debtor will be unable

22   to reorganize successfully. *In re Family Health Servs., Inc.*, 105 B.R. at 944. Here, the Debtor filed

23   its chapter 11 petition just over one ago. Notwithstanding that the Debtor had to file on an

24   emergency basis, the Debtor has already proven its ability and determination to effectuate a

25   successful reorganization. For instance, together with its financial advisors Grant Thornton, the

26   Debtor has already established a 13-week interim cash flow budget and is well on its way to

27   establishing a viable long term budget. The 13-week forecast shows that the Debtor is viable, has

28   reorganization value and is capable of proposing a feasible plan of reorganization. Indeed, the Debtor

1    and its financial advisors have spent a tremendous amount of energy, including working weekends, to

2    stabilize the Debtor's business and fully understand all operational and financial aspects of the

3    business.  The Debtor is in substantial compliance with the U.S. Trustee's requirements for operating

4    in a chapter 11.  The Debtor submitted its 7-Day Package to the U.S. Trustee's Office, without an

5    extension, and also quickly obtained approval of emergency motions to (1) pay prepetition wages; (2)

6    pay critical vendors, and (3) use cash collateral.  In addition, the Debtor has submitted timely weekly

7    reports to Signature Bank pursuant to the stipulated cash collateral.  Decl. of Aaron Banayan.

8            Given the relative infancy of the Debtor's case and the strong efforts already underway by the

9    Debtor, the Debtor's probability for success is positive and supports the granting of an injunction.

10    The Debtor is authorized to use cash collateral until at least August 27, 2008, with the consent of

11    Signature Bank and Aquent, and has already formulated and implemented its preliminary budget

12    which projects operating revenues in excess of $9 million by October 31, 2008 to take the Debtor

13    through the High Holiday season.

14            3.    A Balance of the Hardships Tips in Favor of the Debtor

15            A balancing of hardships tips markedly in favor of the Debtor.  Here, if the Federal Litigation

16    is not enjoined, the Debtor's Employees will be required to spend significant time and attention to

17    defending those actions.  Where a Debtor's limited resources, including its human capital, will be

18    drained and a substantial hardship imposed on the Debtor, this Court has found a substantial hardship

19    weighing in favor of the Debtor.  *See In re Family Health Servs., Inc.*, 105 B.R. at 944-45.

20    Specifically, in *Family Health Servs.*, this Court found such a hardship existed when non-debtor

21    defendants' time would be consumed with addressing pending litigation if such litigation was not to

22    be enjoined.  *Id.*  Similarly, in this case, the Debtor will be harmed if its controller and key manager

23    are not fully available to assist the Debtor as it navigates through chapter 11 and formulates and

24    proposes a timely reorganization strategy.  The Debtor would also be disadvantaged if its employees

25    involved in collections and customer relations are prevented from focusing on the most important

26    aspect of this case:  collection of revenues.  Drawing these personnel away from the Debtor at this

27    critical time clearly will impose an undue hardship on the Debtor, its estate and creditors.

28

- 23 -

1     By contrast, there is very limited, if any, evidence that an injunction would impose a hardship

2    on Signature Bank, the plaintiff in the Federal Litigation.  At worst, the enforcement of its judgments

3    and/or prosecution of its actions would merely be delayed.  Enforcement of judgments against the

4    Debtor, the real party in interest in each action, already are stayed pursuant to section 362(a)(2).  11

5    U.S.C. § 362(a)(2).  A mere postponement will not invalidate any rights of the parties to the Federal

6    Litigation, and prosecution of such litigation will simply be delayed.  *PTI Holdings Corp.*, 346 B.R.

7    at 831-32.  Moreover, the Debtor's reorganization efforts, facilitated by the automatic stay, may

8    actually provide a huge benefit to Signature Bank.  While Signature Bank may take the litigation

9    position that it is entitled to immediate and unqualified surrender of its perceived assets, the

10    liquidation value of Signature Bank's alleged collateral, consisting of the Debtor's equipment and

11    accounts receivable, does not appear nearly sufficient to satisfy Signature Bank's asserted claim

12    against the estate.  If the Debtor were shut down and liquidated today, Signature Bank would likely

13    receive very little, if anything given its junior alleged secured position, in return for its claim.

14    However, if the Debtor is preserved as a going concern, Signature Bank has a much greater chance of

15    recovering a greater portion of its alleged claim.

16     The balance of harm thus weighs heavily in favor of granting an injunction.  The Debtor will

17    be irreparably harmed if the Debtor's Employees' attention, time, energy and resources are diverted

18    at this juncture, but Signature Bank will suffer only a small delay and may actually benefit from the

19    delay.  In addition, the Debtor has offered to negotiate a discovery protocol that would give Signature

20    access to the information it wants and the witnesses it wants to depose.  However, Signature Bank

21    remains recalcitrant about taking the Debtor's Employees' deposition forthwith.  Signature Bank's

22    demand is seemingly inconsistent with its proclaimed desire to recover any value from this Debtor.

23        4.    The Public Interest Will Be Promoted By An Injunction

24     The public interest will be promoted if this Court grants the requested injunction.

25     First, the Debtor manufactures and distributes kosher food products consumed by the strictest

26    and most observant segment of the orthodox Jewish community throughout the United States.  The

27    Debtor appears to be one of only two manufacturers and distributors of such products in the United

28    States.  Accordingly, the public interest is served by protecting the Debtor's business and ensuring

1    that the manufacturing and distribution continue uninterrupted for the general benefit of the affected

2    community.

3         Second, permitting the reorganization to proceed with minimal disruption would preserve the

4    workers' jobs, including those in the manufacturing and administrative facilities, thereby promoting

5    the public interest.

6         An injunction is, therefore, in the public interest.

7    **V.    CONCLUSION**

8         Based on the foregoing, the Debtor respectfully requests that, to the extent the stay does not

9    already extend to the Debtor's Employees, the Court enter an order (a) extending the automatic stay

10   to the Debtor's Employees, or in the alternative, (b) enjoining Signature from pursing the Federal

11   Litigation against the Debtor's Employees by issuing a preliminary injunction.

12
                                        K&L GATES LLP
13

14

15   Dated:  August 15, 2008              By:   /s/ *Josefina Fernandez McEvoy*
                                                Josefina Fernandez McEvoy
16                                              Michael J. Heyman
                                                Claire E. Shin
17
                                                Proposed General Reorganization Attorneys
18                                              for Debtor and Debtor-in-Possession

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF FARIBORZ (AARON) BANAYAN

I, Fariborz (Aaron) Banayan, hereby declare as follows:

1.    I am the President and CEO of Ahava of California, LLC, a California limited liability company, debtor and debtor-in-possession herein (the "Debtor"). I submit this declaration in support of the Debtor's motion for an order, (a) extending the automatic stay to certain non-debtor parties; or in the alternative, (b) enjoining certain pre-petition litigation against the non-debtor parties. I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am the Debtor's sole member, President and Chief Executive Officer. I believe that I most devote my undivided attention to all matters affecting the Debtor's finances and operations and have been working long hours, often waking up at 1:00 a.m. and not stopping until the evening hours to ensure that I attend to the multitude of operational and financial matters of the Debtor. These issues range from speaking to individual customers about their accounts to reviewing and authorizing pleadings to be filed with the Bankruptcy Court. I expect that, as the Debtor stabilizes its business, formulates a plan of reorganization and implements a plan of reorganization, I will be constantly involved in these efforts and their success.

3.    Ruben Beityakov is the Debtor's controller. Mr. Beityakov is one of the Debtor's most critical employees, overseeing the Debtor's financial affairs and many of the Debtor's operational affairs. Mr. Beityakov has been working tirelessly since the Petition Date to stabilize the Debtor's financial affairs and assist counsel in understanding the Debtor's operations and further in assisting counsel in preparing the initial pleadings and U.S. Trustee's 7-Day Package. I anticipate that Mr. Beityakov will additionally be instrumental in working with the Debtor's financial advisors, Grant Thornton, in preparing a final cash collateral budget, evaluating the Debtor's financial affairs on a going forward basis, preparing monthly operational reports and, most importantly, assisting counsel in the preparation of a plan of reorganization.

4.    Ari Katz is an essential employee. Mr. Katz is the Debtor's operations manager. He is the person responsible for all operational issues in the Brooklyn facility, and also coordinates operations in the Lowville and Ogdensburg plants. Mr. Katz is in charge of hiring/firing employees,

1    drivers, and assistants, and is the person to whom most major operational issues are directed when

2    problems arise. Mr. Katz is the most knowledgeable manager of the basic day-to-day operational

3    issues. The Debtor and its employees rely heavily on Mr. Katz's constant availability and attention to

4    operational details. Mr. Kats is also instrumental to Grant Thornton's evaluation of the Debtor's

5    operational model and development of significant cost-cutting measures in contemplation of the

6    formulation of a reorganization plan.

7         5.    The Debtor simply cannot function without the combined efforts and attention of

8    myself, as well as Mr. Beityakov and Mr. Katz. Any distractions or requirement to be physically

9    absent from our respective duties poses significant risks to the Debtor's operations which could have

10   a devastating impact on the Debtor's business. Mr. Beityakov, Mr. Katz and I are key figures

11   responsible for the Debtor's survival and reorganization, and spend the overwhelming majority of our

12   time working on the Debtor's reorganization and stabilization efforts. Tending to the aggressive

13   discovery, claims and enforcement of judgments against them will divert our attention from, among

14   other things, stabilizing the Debtor's business and pursuing a reorganization of the Debtor's business.

15        6.    The Debtor filed its Chapter 11 petition on July 15, 2008. The Debtor has proven its

16   ability to operate under a chapter 11 since the filing of the bankruptcy petition. For instance, together

17   with its financial advisors Grant Thornton, the Debtor established an interim cash flow budget and is

18   well on its way to establishing a viable long term budget. Indeed, the Debtor and its financial

19   advisors have exerted a tremendous amount of energy, including working weekends, to stabilize the

20   Debtor's business and fully understand all operational and financial aspects of the business. The

21   Debtor has also exhibited a desire and ability to satisfy the U.S. Trustee's requirements of operating

22   in a Chapter 11. The Debtor submitted its 7-Day Package to the U.S. Trustee's Office, without an

23   extension, and also quickly obtained approval of emergency motions to (1) pay prepetition wages; (2)

24   pay critical vendors and (3) use cash collateral.

25        7.    In addition, the Debtor is actively engaged in discussions with Signature Bank and is

26   also actively exploring all of its options for reorganization. The Debtor obtained Signature Bank's

27   approval of the interim budget and expects that Signature Bank will similarly approve the long term

28   budget. The Debtor is further in the process of implementing a four-week financial analysis system

- 27 -

1 designed to permit the Debtor to forecast its operational expenses and collections, and then analyze

2 actual versus budgeted expenditures and collections. The system is designed to enable the Debtor to

3 not only prepare a budget, but critically review and adjust future budgets based on actual

4 expenditures and collections. The Debtor has also submitted timely weekly reports to Signature Bank

5 pursuant to the stipulated cash collateral.

6      8.     The timing of the discovery will negatively impact the Debtor's business which is now

7 approaching its peak selling season, and, consequently, could negatively impact the Debtor's

8 reorganization efforts. The Debtor's business typically increases significantly in anticipation of the

9 Jewish High Holidays, Rosh Hashana (September 29 – October 1, 2008) and Yom Kippur (October

10 9, 2008), and Sukkot (October 14-20, 2008). The time frame leading to the holidays is typically a

11 peak selling period. The Debtor cannot divert its attention or suffer distractions when it is now

12 settling into the chapter 11 process and attempting to improve performance so it can meet the

13 feasibility requirement under its plan of reorganization.

14      9.     A true and correct copy of Second Amended Complaint filed in the United States

15 District Court for the Southern District of New York is attached hereto as Exhibit 1 hereto.

16      10.     True and correct copies of the Notice of Deposition of Ruben Beityakov and Ari Katz

17 are collectively attached as Exhibit 2.

18      I declare under penalty of perjury under the laws of the United States of America and the

19 State of California that the foregoing is true and correct.

20      Executed on this 13th day of August 2008, at Los Angeles, California.

21

22                   /s/ *Aaron Banayan*_____

                      Fariborz (Aaron) Banayan

23

24

25

26

27

28

# EXHIBIT 1

Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Attorneys for Plaintiff Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

**Electronically-Filed Document**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

SIGNATURE BANK,                                          :

                 Plaintiff,    :    **08 CIV. 3893 (NRB)**

                             :

       - against -    :

AHAVA FOOD CORP. d/b/a NORTH COUNTRY    :    **[PROPOSED]**
CHEESE CORP., LEWIS COUNTY DAIRY CORP.,    :    **SECOND AMENDED COMPLAINT**
ST. LAWRENCE FOOD CORP. d/b/a PRIMO    :
FOODS, YONI REALTY, LLC, SCHWARTZ AND    :
SONS QUALITY DISTRIBUTORS, INC., MOISE    :
BANAYAN, ANA BANAYAN a/k/a CHANA    :
BANAYAN a/k/a ANA BERESNITZKY, REBECCA :
BANAYAN a/k/a REBECCA BARIMYAN a/k/a    :
REBECCA BANAYAN-LIEBERMAN, FARIBORZ    :
BANAYAN a/k/a AARON BANAYAN, RUBEN    :
BEITYAKOV, ARI KATZ, MIRIAM SCHWARTZ,    :
YEHUDA BANAYAN, AHAVA OF CALIFORNIA,    :
LLC d/b/a AHAVA NATIONAL FOOD    :
DISTRIBUTOR and NORTH COUNTRY    :
MANUFACTURING, AQUENT LLC, BUSINESS    :
FUNDING ASSOCIATES LLC, and JOHN DOES 1 :
through 50,    :

               Defendants.

------------------------------------------------------------- x

      Plaintiff Signature Bank ("Signature" or "the Bank"), by its attorneys, Herrick,

Feinstein LLP, for its Second Amended Complaint against defendants alleges as follows:

## NATURE OF THE ACTION

      1.     This complaint seeks equitable and monetary relief arising from the

**30**

unlawful and fraudulent conduct of defendants, who have been engaged in a conspiracy to evade the $9.3 million judgment entered by this Court on March 14, 2008 (the "Judgment") against Moise Banayan, Ana Banayan, Ahava Food Corp. ("Ahava"), Lewis County Dairy Corp. ("Lewis County Dairy"), St. Lawrence Food Corp. ("St. Lawrence"), Yoni Realty LLC ("Yoni") and Schwartz and Sons Quality Distributors, Inc. ("Schwartz & Sons") (collectively referred to as the "Judgment Debtors") in a prior lawsuit (the "Initial Lawsuit").

2.     Roughly two months ago -- before this Court issued its Judgment awarding Signature over $9.3 million -- Moise Banayan stated under oath that the Judgment Debtors were earning on average "more than $160,000 in gross profit per week." Today, however, Mr. Banayan claims that the Judgment Debtors are no longer "active" and cannot satisfy the Bank's judgment.

3.     The reason for this is simple. From no later than December 1, 2007 to the present, Mr. Banayan and the other defendants have conspired to transfer the assets of the Judgment Debtors to Ahava of California, LLC (and perhaps other entities affiliated with Moise Banayan) in an effort to shield those assets from the Judgment Debtors' indebtedness to Signature which resulted in the Judgment.

4.     By Moise Banayan's own admission, the business once operated by the Judgment Debtors is now being operated solely by Ahava of California under the d/b/a of Ahava National Food Distributor and North Country Manufacturing. In furtherance of this scheme designed to deprive Signature of the collateral pledged in connection with the Judgment Debtors' indebtedness, defendants caused the Judgment Debtors to fraudulently assign virtually all of their accounts receivable and intangible property to Ahava of California.

5.     In fact, in March 2007, defendants caused the Judgment Debtors to assign,

2

**31**

*nunc pro tunc*, all of their registered trademarks to Ahava of California. And, in a further effort to evade this Court's Judgment, the Judgment Debtors, upon information and belief, effectively relinquished to Ahava of California (d/b/a Ahava National Food Distributor and North Country Manufacturing) for little or no consideration, all of their real and personal property, and all of their operations as a going concern -- including their office buildings, processing plants, delivery trucks, products, customer lists, and goodwill. The Judgment Debtors made these transfers pursuant to purported "leases," which in reality are only sham "paper" transactions, and which, even if made in exchange for valid consideration, violated the Judgment Debtors' security agreements with Signature.

6.      Upon information and belief, these fraudulent transfers and/or assignments were done for the sole purpose of allowing defendants to seamlessly continue the businesses of the Judgment Debtors while keeping the actual assets in the name of entities that were not named in the Initial Lawsuit.

7.      As a result of these fraudulent transfers, Ahava of California is purportedly the only "active company" left, and its reported revenues are now over $18 million. These annual sales figures closely resemble the Judgment Debtors' business in 2007 -- which should come as no surprise since Ahava of California has taken over the Judgment Debtors' businesses -- and is far greater than the $1 million in sales Ahava of California represented it was earning as late as February 7, 2008, and the roughly $378,000 in gross revenues Ahava of California declared on its 2006 tax return.

8.      While Ahava of California's business has rapidly grown without any legitimate explanation, Ahava of California has claimed -- in court papers and otherwise -- that it has absolutely no relationship to the Judgment Debtors. Yet, the evidence makes clear that

3

**32**

Ahava of California is, in fact, owned and/or controlled by Moise Banayan and serves as the Judgment Debtors' alter ego.

9.    For example, the evidence adduced by Signature to date makes clear that:

(a)    **Moise Banayan and his brother co-own Ahava of California.** Under the 2005 loan documents that Moise Banayan executed on behalf of the Judgment Debtors, he unambiguously represented to Signature that Ahava of California was an "affiliate non-obligor" that he and his brother "owned". That representation was confirmed in February and December of 2007, when Moise Banayan (i) was identified as a "partner" in Ahava of California (sharing 50% of the profits) on its Federal tax return; and (ii) told Robert Bloch, a Senior Vice President of Signature, that he was a partner in Ahava of California.

(b)    **Moise Banayan controls Ahava National Food Distributor (the d/b/a of Ahava of California).** In a 2006 OSHA decision, Mr. Banayan was found to be the "president" of Ahava of California. Mr. Banayan then confirmed this fact when he sent a letter to an Ahava of California customer and represented to that customer that he was the president of Ahava National Food Distributor (the d/b/a for Ahava of California).

(c)    **Defendants treat Ahava of California and the Judgment Debtors as effectively one in the same.** In addition to what is described above, defendants shared office-space and a website prior to Signature filing its lawsuit to enforce the judgment. Once served with the complaint in this action, however, defendants (i) represented that the Brooklyn office space once shared by the Judgment Debtors and Ahava of California is now solely occupied by Ahava of California, and (ii) shut down the website that was shared by the Judgment Debtors and Ahava of California.

10.    While defendants have fraudulently transferred the Judgment Debtors' assets to their alter ego, Ahava of California, defendants have engaged in other practices to frustrate Signature's ability to enforce its Judgment.

11.    As one example, Ahava of California has pledged all of "its" assets to third party factors in exchange for credit and/or financing. Upon information and belief, Ahava of California presumably did not disclose to those factors that all of its assets were the proceeds

4

**33**

of fraudulent conveyances. As a result, Ahava of California has created a controversy over the priority of security interests between Signature and the third-party factors.

12.     Also defendants have repeatedly prevented Signature from exercising its contractual right under the loan documents to examine the Judgment Debtors' pledged collateral, thereby preventing Signature from conducting the due diligence required to sell those assets and satisfy its Judgment.

13.     Separately, neither the Judgment Debtors, nor their alter-ego Ahava of California, has paid Signature on approximately $2 million in overdrafts made on the Judgment Debtors' bank accounts with Signature, despite timely demand. Although Signature did not seek to recover these sums in the Initial Lawsuit, defendants' refusal to pay these amounts is consistent with their other attempts to evade their obligations to Signature.

14.     This fraudulent and impermissible conduct, coupled with the conduct described above, constitutes, among other things, breach of contract, conversion, fraud (both at common law and under New York's Debtor Creditor Laws) and a violation of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

15.     Indeed, defendants' scheme to shield the Judgment Debtors' assets through the purportedly "independent" Ahava of California is the culmination of the defendants' years-long pattern of deceit with respect to the financing and operation of their businesses. in connection with this scheme, defendants have committed dozens, if not hundreds, of the predicate acts listed in 18 U.S.C. § 1961, including, without limitation, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and transportation and receipt of stolen property (18 U.S.C. §§ 2314 and 2315). These violations of criminal law, committed in furtherance of defendants' scheme, continue

5

**34**

unabated to this day.

16.     Accordingly, Signature seeks an order (i) declaring that Ahava of California is an alter-ego of the Judgment Debtors, (ii) declaring that Signature's security interest in any collateral conveyed to AOC, and any of the proceeds thereof, is superior to the purported security interests of any third parties, (iii) rescinding all asset transfers, conveyances and/or assignments between the Judgment Debtors and any of the other named defendants, including but not limited to the trademark assignments and the sham leases, and (iv) awarding defendants damages, in an amount to be determined at trial but in no event less than $36 million plus reasonable attorneys' fees.

## THE PARTIES

17.     Plaintiff Signature Bank ("Signature" or "the Bank") is a New York banking corporation, with its principal place of business at 565 Fifth Avenue, New York, New York.

18.     Defendant Ahava Food Corp. d/b/a North Country Cheese Corp. ("Ahava Food") is a New York corporation, with its principal place of business at 110 Beard Street, Brooklyn, New York.

19.     Defendant Lewis County Dairy Corp. ("Lewis County Dairy") is a New York corporation, with its principal place of business at 7705 State Route 812, Lowville, New York.

20.     Defendant St. Lawrence Food Corp. d/b/a Primo Foods ("St. Lawrence') is a New York corporation, with its principal place of business at 30 Main Street, Ogdenburg, New York.

21.     Defendant Yoni Realty, LLC ("Yoni") is a New York corporation, with its

6

**35**

principal place of business at 110 Beard Street, Brooklyn, New York.

22.    Defendant Schwartz & Sons Quality Distributors, Inc. ("Schwartz & Sons") is a New York corporation with its principal place of business at 110 Beard Street, Brooklyn, New York.

23.    Defendant Ahava of California, LLC d/b/a Ahava National Food Distributor and North Country Manufacturing ("AOC") is a California Limited Liability Company, with its principal place of business at 908 Rose Avenue, Venice, California and offices at 236-280 Richard Street, Brooklyn, New York and/or 110 Beard Street, Brooklyn, New York.

24.    Defendant Moise Banayan is a resident of New York, with an address at 51 Parker Boulevard, Monsey, New York.

25.    Defendant Ana Banayan a/k/a Chana Banayan a/k/a Ana Beresnitzky is a resident of New York ("Ana Banayan"), with an address at 51 Parker Boulevard, Monsey, New York.

26.    Upon information and belief, defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman is a resident of New York, with addresses at 2606 East 24th Street, Brooklyn, New York, 205 Third Avenue, Apt. 2N, New York, New York and 215 East 96th Street, Apartment 40H, New York, New York.

27.    Defendant Fariborz Banayan a/k/a Aaron Banayan a/k/a Aaron Nanayan ("Fariborz Banayan") is a resident of California, with an address at 908 Rose Avenue, Venice, California.

28.    Defendant Ruben Beityakov is a resident of New York, with an address at 1977 East 22nd Street, Brooklyn, New York.

**36**

29.    Defendant Ari Katz is a resident of New York, with an unknown address and a place of business at 110 Beard Street, Brooklyn, New York.

30.    Upon information and belief, defendant Miriam Schwartz is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, Florida, and a place of business at 110 Beard Street, Brooklyn, New York.

31.    Upon information and belief, defendant Yehuda Banayan is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, and a place of business at 110 Beard Street, Brooklyn, New York.

32.    Defendant Aquent LLC is a Pennsylvania Limited Liability Company with its principal place of business at 711 Boylston Street, Boston, Massachusetts.

33.    Defendant Business Funding Services LLC is a New Jersey Limited Liability Company with its principal place of business at 100 Winston Drive, Suite 8FN, Cliffside Park, New Jersey.

34.    Defendants John Does 1 through 50 are, upon information and belief, fictitious trade names for the Corporate Defendants and/or the Judgment Debtors, or other individual co-conspirators in the fraudulent acts.

## JURISDICTION AND VENUE

35.    This Court has jurisdiction pursuant to pursuant to CPLR § 301, because plaintiff is a resident of this State.

36.    Venue in this county is proper pursuant to CPLR § 503, because plaintiff is a resident of this county.

8

**37**

## FACTUAL ALLEGATIONS

*The Judgment Debtors Use Misrepresentations to*
*Secure Loans and Forbearances From Signature*

37.    Since at least 1984, Moise Banayan has been operating an empire of
businesses engaged in the kosher food business, under various iterations of the trade name
"Ahava".

38.    Beginning in August 22, 2005, and extending over the course of the
following two years, Signature entered into a series of loan agreements with the Judgment
Debtors, whereby Signature agreed to loan the Judgment Debtors approximately $9 million plus
extend $2 million in overdrafts to finance their kosher food business.  All of these loans were
guaranteed personally by Moise Banayan, and some were personally guaranteed by his wife, Ana
Banayan, and were further secured by security agreements giving Signature a first priority lien
over substantially all of the assets of the Judgment Debtors, and liens on other assets of Moise
and Ana Banayan, individually.

39.    Signature agreed to make the original loans, and to subsequently extend
additional credit and forbearances, based upon the misrepresentations by the Judgment Debtors
of their assets and liabilities and the condition of their businesses, and due in part to their failure
to disclose other indebtedness to third parties.

40.    For example, in 2000, upon information and belief, Moise Banayan
borrowed $4 million from an individual by the name of Isaac Chera pursuant to a "shtar" -- a
form of IOU under Jewish law -- in order to refurbish and renovate the property owned by Yoni,
which served as the headquarters for the Judgment Debtors' businesses.  Upon information and
belief, neither Moise Banayan, Ahava Food nor Yoni ever repaid the $4 million.

9

**38**

41.     Yet, in 2005, when negotiating the original loans, Moise Banayan used interstate wires and/or the U.S. Mail on repeated occasions to communicate with Signature with respect to the assets and liabilities of the Judgment Debtors, and the condition of their business and intentionally failed to disclose the $4 million loan borrowed from Isaac Chera which Moise Banayan had pledged a 49 percent interest in Yoni as collateral.

42.     Over the next two or so years, Moise Banayan negotiated forbearance agreements using interstate wires and/or the U.S. Mail and convinced Signature to extend the Judgment Debtors' time to pay, in exchange for additional guarantees and pledges of collateral.

43.     During one round of these negotiations, which occurred in the summer of 2007, Moise Banayan certified that he was the sole member of Yoni which owns defendants' Brooklyn headquarters to induce Signature to extend additional credit to the Judgment Debtors. (*See* Manager's Certificate of Yoni, annexed hereto as Exhibit A).

44.     While Mr. Banayan certified to Signature that he controlled 100 percent of the equity in Yoni, it turned out that that representation was false.  In fact, upon information and belief, Moise Banayan had transferred a 48.5 percent interest in Yoni roughly nine months earlier to an entity owned and/or controlled by Isaac Chera in order to satisfy all or portion of the $4 million obligation.  (*See* Stock Certificate identifying ISC 96 Beard LLC, annexed hereto as Exhibit B).

45.     In early 2007, a third-party judgment in excess of $600,000 was entered against some of the Judgment Debtors.  Although the loan documents unambiguously required the Judgment Debtors to inform Signature of this judgment, Moise Banayan instead concealed it, and fraudulently omitted them from his numerous communications with Signature through interstate wires and/or the U.S. mail to delay any default by the Judgment Debtors and any

10

**39**

foreclosure proceedings by the Bank.

46.    In fact, much like defendants have done here with Ahava of California, Moise Banayan and other Judgment Debtors attempted to frustrate the judgments against them by creating an alleged "independent" entity -- in this case, Schwartz & Sons -- that would be responsible for "distributing" the goods sold by the Ahava Food and Lewis County Dairy.

47.    At the time, Moise Banayan represented to Signature that Schwartz & Sons was owned by another, unrelated individual by the name of Miriam Schwartz, and was designated to sell Ahava Food products to the Hasidic community.

48.    Upon information and belief, Miriam Schwartz, who is married to Moise Banayan's nephew, Yehuda Banayan, with the knowledge and consent and at the direction of Yehuda Banayan, executed documents setting forth that she owned 100% of Schwartz & Sons in order to assist the Judgment Debtors with their scheme to defraud Signature Bank and other creditors of the Judgment Debtors.

49.    Indeed, shortly after this representation was made to the Bank, Schwartz & Sons became the primary distributor of the Judgment Debtors' products. Upon information and belief, the Judgment Debtors and their co-conspirators, Miriam Schwartz and Yehuda Banayan, were using Schwartz & Sons -- just like they are using AOC here -- as an "independent" entity to collect funds actually owed to the debtors to avoid having to pay under that third party judgment.

50.    In June 2007, however, in order for Moise Banayan to get further forbearance from the Bank, he represented to Signature that he was now the sole owner of Schwartz & Sons. At or around that time, much of the Judgment Debtors' receivables were going through Schwartz & Sons.

11

**40**

Case 1:08-cv-03893-f   -MHD    Document 44-2    Filed 0/   /2008    Page 12 of 41

***The Judgment Debtors Default on their Loans and***
***Signature Obtains Its Judgment In the Initial Lawsuit***

51.    In August 2007, the Judgment Debtors and Signature entered into a series of forbearance agreements whereby, in exchange for extension of additional credit and deferral of the loans' due dates, Signature's security interests were expanded, the interest rates applicable to the Judgment Debtors' indebtedness were increased, and the overdrafts extended by Signature to the Judgment Debtors from time to time on their accounts were consolidated and added to the principal balance of the loans.

52.    After the August 2007 forbearance agreements, Signature continued to advance monies to the Judgment Debtors when their accounts had insufficient funds to cover checks and wires presented for payment thereby enabling the Judgment Debtors to maintain their credit with vendors and suppliers, and allowing the  Judgment Debtors to remain in operation. Between August and November 2007, the Bank paid checks or wires that were presented to the Bank against the Judgment Debtors' accounts--in which there were insufficient funds to make payment--in an amount totaling approximately $1.8 million, exclusive of interest (the "Overdrafts").

53.    In November 2007, after the Judgment Debtors failed to pay the outstanding balance due on the loans and the Overdrafts, and stopped reporting and providing access to the books and records of the businesses, as they were required to do. Signature initiated the Initial Lawsuit against the Judgment Debtors in the Supreme Court for the State of New York, which sought an award of money damages in the amount of the unpaid loans, plus interest and costs.  However, the Initial Lawsuit did not seek recovery of the Overdrafts made after the August 2007 forbearance agreements.

12

**41**

54.    In addition, in December 2007 and January 2008, Signature sent UCC 9-607 notices to many of the Judgment Debtors' customers (the names having been provided to Signature by Moise Banayan in connection with the loans) informing them of its first priority lien on substantially all of the Judgment Debtors' accounts receivable.  Signature instructed the customers that all payments should be remitted to Signature, and not to the Judgment Debtors.

55.    On March 14, 2008, this Court granted summary judgment in the Initial Lawsuit to Signature and against all the Judgment Debtors (other than Ana Banayan) jointly and severally, in the amount of $9,338.962.18, and against Ana Banayan, individually, for $1,781,621.53.

56.    To date, the Judgment Debtors have refused to satisfy any portion of Signature's Judgment against them, and have refused to pay the Overdrafts.  Instead, they have (i) interfered with Signature's ability to sell collateral under the UCC (as it has the right to do under the loan documents), and (ii) claimed that they are unable to satisfy the Judgment or pay the Overdrafts because they are no longer in operation.

***Defendants' Scheme to Evade the Judgment Unfolds***

57.    Upon information and belief, defendants knew long before this Court rendered the Judgment that the Judgment Debtors would be liable for over $11 million on account of the indebtedness under the loan documents and for the Overdrafts.

58.    In fact, defendants set their plan in motion months before the Judgment was entered as evidenced by a February 7, 2008 email from Moise Banayan to Amerisource Funding Inc. ("Amerisource"), a prospective lender, in which Moise Banayan confirmed that the businesses of the Judgment Debtors had been transferred to AOC in December 2007. Specifically, Moise Banayan stated:

13

**42**

Case 1:08-cv-03893-( 5-MHD    Document 44-2    Filed 0( 7/2008    Page 14 of 41

Tanya,

Here is the corporate structure:

Today, as of December 1st 2007, there is only one active company: Ahava of California LLC which has tow [sic] DBA: Ahava National Food Distributor for the distribution center and North Country Manufacturing for the manufacturing end.

All invoices are generated by Ahava National Distributor or Ahava of California.

Historically

The distributor was Schwartz and Sons Quality Distributor, and Ahava of California LLC as well as Ahava Food Corp. The manufacturing end was Lewis County Dairy and St. Lawrence Food Corp.

Thanks Moshe.

(*See* Email dated February 7, 2008, annexed hereto as Exhibit C).

59.    Moise Banayan's comments are at odds with representations that he made to this Court that very same week, when he said in an affidavit filed in the Initial Lawsuit that "my companies" were on average, earning "more than $160,000 in gross *profit per week*" (*See* Affidavit of Moise Banayan, sworn to February 1, 2008, annexed hereto as Exhibit D, at ¶ 35) (emphasis added).

60.    Indeed, assuming that AOC is a wholly distinct entity from the Judgment Debtors (including Moise Banayan) -- as AOC has maintained -- Moise Banayan's companies, which were purportedly inactive, could not have been earning $160,000 in gross profits per week.

61.    On the other hand, if Moise Banayan owned or controlled AOC, as Signature believes to be the case, then Moise Banayan's February 2008 representations to this

14

**43**

Court might actually be truthful. In other words, his "companies" included AOC which was operating the business of the Judgment Debtors earning in excess of $160,000 gross profits per week.

62.     Whatever the case may be, it is clear that in or before December 2007, defendants began to engage in a scheme to transfer the Judgment Debtors' assets to AOC to avoid Signature's judgment. Defendants' scheme to avoid the Judgment is further evidenced by the following:

    *(1)     Delay, Delay, Delay*

63.     The loan documents make clear that Signature has the absolute right, after an Event of Default or non-payment, to "take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral." (*See* copy of Security Agreement dated August 27, 2007, annexed hereto as Exhibit E, at ¶ 8(h)).

64.     Notwithstanding this clear and unambiguous right, defendants have directed their employees to refuse Signature access to the property and premises where the pledged collateral resides.

65.     In fact, even as late as April 15, 2008, defendants refused Signature access to the facilities owned by the Judgment Debtors which have been fraudulently conveyed or leased to AOC.

66.     Defendants' tactics are designed to delay or frustrate altogether Signature's ability to rightfully take possession of its collateral.

67.     Similarly, Moise Banayan continues to correspond with Signature in an effort to stave off any action by Signature to foreclose on the collateral.

15

**44**

68.     Back in November and December 2007, Moise Banayan claimed that a "white knight" buyer and/or potential lending institutions had been located, and asked for various accommodations based on the benefits that would purportedly come to both parties if he was given time to negotiate.

69.     Upon information and belief, Moise Banayan made these statements with knowledge of their falsity, intending Signature to rely, while the defendants were engaged in transferring the Judgment Debtors' assets into the hands of AOC or other John Doe companies.

70.     Upon information and belief, Moise Banayan used interstate wires on at least seven separate occasions to further defendants' scheme with these emails. (*See* copies of emails between Moise Banayan and Signature, annexed hereto as Exhibit F).

(2)     *Diversion of the Judgment Debtors' Assets*

71.     While Moise Banayan and the Judgment Debtors were purportedly attempting to work out a solution to satisfy Signature, defendants were diverting the Judgment Debtors' assets to AOC.

72.     The assets included the Judgment Debtors' physical assets (such as the real property), trademarks, and accounts receivable, all of which were pledged as collateral for the Judgment Debtors' loans. Thus, Signature has a right to those assets under the loan documents.

(a)     *Customer Lists and Accounts Receivable*

73.     As part of their plan to frustrate Signature's judgment, defendants arranged for the Judgment Debtors' customers to begin paying AOC for goods being manufactured by or that were purchased by the Judgment Debtors.

74.     For example, prior to the filing of the Initial Lawsuit, Moshes Discount

16

**45**

Supermarket in Brooklyn, was instructed to remit payments for goods sold and delivered to Schwartz & Sons, one of the Judgment Debtors. (*See* Invoice dated September 17, 2007, annexed hereto as Exhibit G).

75.    That account receivable, along with thousands of others, was pledged by the Judgment Debtors as collateral for the loans given by Signature.

76.    However, in December 2007, after it became clear that the Bank would seek legal redress, Schwartz & Sons instructed Moshes, by use of interstate wires and/or the U.S. Mail, to remit payment to "Ahava National" (the d/b/a of AOC), an entity that was not a defendant to the Initial Lawsuit. (*See* Invoice dated December 17, 2007, annexed hereto as Exhibit H.)

77.    It now appears, based on the email Moise Banayan sent Amerisource, that all of the Judgment Debtors' customers have been instructed by defendants, through the use of interstate wires and/or the U.S. Mail, to pay AOC on invoices issued, goods purchased for resale and/or products manufactured by the Judgment Debtors.

78.    Moreover, the fact that AOC has converted all of the Judgment Debtors' accounts receivable is separately confirmed by the fact that it provided a virtually identical list of accounts receivable to Amerisource in connection with its application for financing as Ahava Food had provided to Signature in connection with its request for forbearance.

(b)    *Defendants' Nunc Pro Tunc Assignment*
       *of the Judgment Debtors' Trademarks*

79.    In addition to customer lists and accounts receivable, defendants caused the Judgment Debtors to transfer their trademarks to AOC.

80.    The trademarks, like the accounts receivable, were pledged by the

17

**46**

Judgment Debtors as collateral for the loans provided by Signature and Signature has a perfected UCC security interest in those trademarks.

81.    Nevertheless, on March 6, 2008, defendants used or caused the use of interstate wires and/or the U.S. Mail to transmit a request to the United States Patent and Trademark Office (the "USPTO") seeking an assignment *nunc pro tunc* to AOC of eleven different trademarks owned by Ahava Food.

82.    On March 7, 2008, the USPTO approved the request, and the assignment of the trademarks to AOC was recorded on the USPTO's internet-accessible database.  (*See* Abstracts of Assignment for each of the eleven trademarks reflecting their assignment *nunc pro tunc* to AOC, collected and annexed hereto as Exhibit I).

83.    The defendants' *nunc pro tunc* assignments of the Judgment Debtors' trademarks to AOC were critical to defendants' scheme.  Indeed, since these trademarks are the brand names by which the Judgment Debtors' customers know the Judgment Debtors' products, AOC had to own the marks in order to sell the Judgment Debtors' products without paying royalties to the Judgment Debtors (which would plainly be subject to Signature's liens).  Thus, defendants fraudulently conveyed the trademarks to AOC so the latter could seamlessly step into the business formerly operated by the Judgment Debtors.

84.    The defendants have attempted to retroactively legitimize the "sale" of the trademarks by producing a purported "agreement" between the Judgment Debtors and AOC, whereby AOC agreed to pay a debt owed by the Judgment Debtors to a third party.  (A copy of the trademark sale agreement is attached hereto as Exhibit J).  However, the "price" in the sale agreement bears no relationship to the actual value of the trademarks, which have never been formally appraised, but without which the business' value is significantly diminished.  Moreover,

**47**

the payments called for by the agreement were never did not flow to the Judgment Debtors, but

rather, are to be made to another creditor of the Judgment Debtors who did not have a security

interest in the trademarks.  As such, the Judgment Debtors did not receive consideration for the

trademarks that would allow the Judgment Debtors to compensate Signature for the loss of its

collateral.  Finally, in any event, the sale agreement itself was in direct violation of the Judgment

Debtors' security agreements, which prohibit any such transfers:

> ...no Grantor will create or assume or permit to exist any...lien,
> security interest or other encumbrance, made or asserted in writing
> against the Collateral...other than Permitted Encumbrances.

> [Exhibit E at p.2]

The "sale" of the trademarks is not a "Permitted Encumbrance" under the Security Agreement.

85.     The trademark "sale" to AOC was plainly intended to transfer valuable

collateral securing Signature's loan to  the Judgment Debtors, interfering with Judgment

Debtors' ability to sell the business and substantially reducing the value of the business which is

dependent on ownership of the trademarks in order to sell Ahava Food products.

> (c)     *Defendants' Assignment of the*
> *Judgment Debtors' Physical Assets*

86.     In addition to transferring the Judgment Debtors' accounts receivable and

trademarks, defendants caused possession and/or title to all of the Judgment Debtors' physical

assets and operations to be transferred to AOC pursuant to a series of sham leases which, like the

trademark sale agreement, directly violate the Judgment Debtors' August 27, 2007 Security

Agreement with Signature.  (Copies of the leases conveying the Judgment Debtors premises and

equipment are collected and attached hereto as Exhibit K).

87.     Specifically, the Judgment Debtors' Brooklyn headquarters, and their two

**48**

upstate dairy plants, are now admittedly occupied solely by AOC, pursuant to purported lease

and sublease agreements between the Judgment Debtors and AOC. Under one lease, AOC is

subleasing the Judgment Debtors' Brooklyn distribution facility, although the purported lease

does not identify how much AOC is supposedly obliged to pay in exchange for the use of all the

equipment, employees, and ongoing operations that were being conducted by the Judgment

Debtors at that location. Likewise, AOC is leasing the upstate dairy plants from LCD and St.

Lawrence, for $12,000 and $15,000 per month, respectively. And, as with the Brooklyn facility,

the purported leases have effectively turned over the Judgment Debtors' entire business at those

locations to AOC. Thus, in exchange for these "leases" of the Judgment Debtors' business,

which purportedly made approximately $18 million in sales in 2007, AOC is supposedly obliged

to pay the Judgment Debtors a grand total of $27,000 per month.

88.     As shown above, the August 27, 2007 Security Agreement between

Signature and the Judgment Debtors preclude any encumbrances on the Collateral, including the

leases at issue here. As such, the purported leases represent a knowing and intentional violation

of the security agreements through a series of fraudulent conveyances meant to evade the

Judgment and the Judgment Debtors' other obligations to Signature.

***Macabee Food Corp.***

89.     The full story of defendants' attempt to frustrate their judgment creditors,

including Signature, through the creation of alter-egos is well documented in their relationship

with Macabee Food Inc. ("Macabee").

90.     In that case, Macabee was being billed by Ahava Food as late as April 13,

2007 for "Golan Part Skim Mozzarella", whose "Item Code" was 1711, and whose UPC was

720742691488. (*See* Invoice from Ahava Food to Macabee, dated April 13, 2007, annexed

**49**

hereto as Exhibit L).

91.     Then, on April 18, 2007 -- after Moise Banayan caused Schwartz & Sons to be used as the billing vehicle to avoid other judgment creditors -- Macabee received a letter from Ahava stating it was now using "Schwartz & Sons . . . to enhance our distribution." This letter was signed by Defendant Ari Katz as Director of Operations for Ahava Food (*See* Letter from Katz to Macabee dated April 18, 2007, annexed hereto as Exhibit M).

92.     Shortly thereafter, Macabee was invoiced by Schwartz & Sons. (*See* Invoice from Schwarts (sic) & Sons to Macabee, dated July 16, 2007, annexed hereto as Exhibit N).

93.     By November 2007, however, -- at or around the time the Judgment Debtors decided to stop making payments on their loans to Signature and began their fraudulent scheme -- Macabee started to receive invoices from AOC, for the exact same product it had originally purchased from Ahava in April 2007, *i.e.*, "Golan Part Skim Mozzarella", with an "Item Code" of 1711, and UPC of 720742691488. (*Compare* Invoice from AOC dated November 14, 2007, annexed hereto as Exhibit N, *with* Exhibit L).

94.     In order to explain to Macabee (and its other customers) the recurring change in payees, Defendant Ari Katz, who had previously sent a letter to Macabee on behalf of Ahava Food as its Director of Operations, sent a letter to Macabee now on behalf of Ahava National (the d/b/a for AOC), actually claiming that the switch from Schwartz & Sons was made because of "[t]he level of service and [because] customer service has been lacking"—despite the fact that the "service" was being performed by the same workers, whether their nominal employer was Ahava Food, Schwartz & Sons, or AOC. (*See* undated letter from Defendant Ari Katz, annexed hereto as Exhibit O).

21

**50**

95.     In other words, defendants' interactions with Macabee illustrate that defendants have long been engaged in a game of "Three Card Monty", all in an attempt to frustrate judgment creditors (like Signature) and continue their business unabated.

**_Defendants' Dun & Bradstreet Report Makes Clear_**
**_that AOC is a Fraudulent Transferee_**

96.     Prior to the initiation of this lawsuit, the Judgment Debtors had always represented to Signature that AOC was a small company, with little revenue to speak of. Moise Banayan testified under oath that he owned AOC and that it was essentially a "shell" company with no employees.

97.     AOC's 2006 Federal Income Tax returns, states that AOC's "gross receipts or sales" were merely $378,410. (*See* AOC 2006 tax return, annexed hereto as Exhibit P).

98.     As recently as February 7, 2008, AOC had reported that it had two employees and annual sales worth just $1 million. (*See* Dun & Bradstreet Report dated February 7, 2008, annexed hereto as Exhibit Q).

99.     Yet, two months later, by contrast, AOC's listing on Dun & Bradstreet, as amended by defendant Ruben Beityakov, reflects $18 million in annual sales revenue and a payroll of 150 employees. (*See* Dun & Bradstreet report dated April 22, 2008, annexed hereto as Exhibit R).

100.    These numbers further establish that AOC has now assumed the businesses of the Judgment Debtors. Indeed, the $18 million in revenue and 150 employees are numbers that closely approximate the figures applicable to the Judgment Debtors' business in the year 2007 (based upon current weekly sales figures provided by Moise Banayan).

**51**

101.    And since, upon information and belief, AOC never paid any consideration for the Judgment Debtors' businesses, the Dun & Bradstreet report confirms that AOC is a fraudulent transferee.

***Additional Evidence Makes Clear That***
***AOC is an Alter Ego of the Judgment Debtors***

102.    The documentary evidence also shows that AOC is an alter ego of the Judgment Debtors and is dominated and controlled by Moise Banayan.

103.    Specifically:

(a)    In the Master Credit Facility Agreement between the Judgment Debtors and Signature, the Judgment Debtors admitted that AOC was an affiliate of the Judgment Debtors and was owned by Moise and Fariborz Banayan. (*See* Schedule 3.11 of the Master Credit Facility Agreement dated August 22, 2005, annexed hereto as Exhibit S).

(b)    In a March 2007 email, Moise Banayan admitted to Signature that he was prepared to sell "**our** California operations" (*See* Email from Moise Banayan to Robert Bloch of Signature dated March 29, 2007, annexed hereto as Exhibit T), and has further admitted that AOC took over the businesses of the Judgment Debtors (*see* Exhibit C).

(c)    In AOC's 2006 tax returns, Moise Banayan is listed as a partner with a 50% ownership share. (*See* Exhibit R).

(d)    On or about December 23, 2007, Moise Banayan sent a letter to a customer that identifies him as the president of Ahava National. (*See* Letter from Moise Banayan to Rabbi Lasker dated December 23, 2007, annexed hereto as Exhibit U).

(e)    The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists Ahava National Food Distributor's principal location as 110 Beard Street, the very same address of Judgment Debtors, Ahava Food, Schwartz & Sons and Yoni. (*See* Certificate of Assumed Name annexed hereto as Exhibit V).

**52**

(f)     The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists North Country Manufacturing's principal location as 7705 State Route 812, Lowville, NY, the very same address of Judgment Debtor Lewis County Dairy. (*See* Certificate of Assumed Name annexed hereto as Exhibit W).

(g)     Moise Banayan lists the address for Ahava National on a letter sent to a customer as 236-280 Richard Street, Brooklyn, NY 11231, the same address as Ahava Food, Schwartz & Sons and Yoni. (*See* Exhibit X).

(h)     AOC's offices are also variously listed as located either at 236-280 Richard Street, Brooklyn, NY -- an address for a building that also bears the 110 Beard Street address (*see* Exhibit O) or 96 Beard Street, Brooklyn (in the New York Department of State Register), which also bears the 110 Beard Street address, the home of Ahava Food and the other Judgment Debtors, Schwartz & Sons and Yoni.

(i)     A 2006 decision from an OSHA proceeding relating to the Judgment Debtors' operations in upstate New York identifies the owner of AOC as Moise Banayan. (*See* Decision, annexed hereto as Exhibit Y.)

(j)     Defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman, in her capacity as Office Manager, signed and certified the AOC's Limited Liability Statement filed with the State of California (*see* Limited Liability Statement, annexed hereto as Exhibit A), and was listed, until only weeks ago, as Sales Manager/Special Accounts on the now defunct website of Ahava Food. (*See* website contents, annexed hereto as Exhibit AA).

104.     Separate and apart from this evidence, the online Superpages directory lists AOC as having the same website as Ahava Food, www.ahavafoodcorp.com. (*See* Listing attached hereto as Exhibit BB).[1]

105.     Notably, the website instructed customers of Ahava Food to contact Aaron Banayan (a/k/a Fariborz Banayan) with respect to sales of Ahava Foods' products in California.

**53**

The website did not identify Aaron Banayan as operating a separate company called AOC, nor did it inform customers that they would be dealing with that company, and not Ahava Foods, if they wished to buy kosher dairy foods in California. (*See* Exhibit Z).

106.    Put simply, AOC is the Judgment Defendants' alter ego.

### AOC is an Ongoing Corrupt Enterprise, All of Whose Income and Assets Belong to Signature

107.    Now that defendants have transferred -- albeit fraudulently -- the assets of the Judgment Debtors, they are using that alter-ego to launder the Judgment Debtors' assets as quickly as possible, in order to allow defendants to abscond with whatever liquid capital can be extracted.

108.    Indeed, virtually every time AOC transacts business, it is dealing in stolen property (*i.e.*, the property that was fraudulently transferred to it by the Judgment Debtors). Thus, every time defendants receive compensation, income or reimbursement from AOC, they are knowingly receiving stolen property.

109.    Signature has thus far identified at least six separate instances in which defendants have used, or caused to be used, interstate wires or the U.S. Mail, to instruct customers to send AOC the proceeds from AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' scheme to evade the Judgment.

110.    The Judgment Debtors' customers from whom such payments have been fraudulently solicited through interstate wires and/or the U.S. Mail include Agriprocessors South, Altra Food Distribution, GMY Gourmet Food, Twin City Poultry, Macabee Foods and Moshe's Discount Supermarket, with at least one solicitation directed at each customer.

---

[1] Since the first complaint in this action was filed on April 2, 2008, the www.ahavafoodcorp.com website has been deactivated. Upon information and belief. defendants used, or caused to be used, interstate wires and/or the U.S.

111.    To be sure, these invoices reflect AOC's collection of money owed to the Judgment Debtors because they reference products bearing the trademarked brand names that were purportedly "assigned" by the Judgment Debtors. (*Compare* invoices included in Exhibits H and O reflecting sales of products bearing brand names "New Square" and "Golan" *with* Abstracts of Assignment for those trademarks included in Exhibit I).

112.    In addition, these customers are being told that if they adhere to the instructions from Signature to remit payment to Signature rather than the Judgment Debtors or any company affiliated with the Judgment Debtors, they will not be provided any additional product from AOC and will remain liable for their existing invoices.

113.    Upon information and belief, defendants are continuing to use, or causing to be used, interstate wires and/or the U.S. Mail to solicit payments from customers in connection with AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' fraudulent scheme to evade the Judgment.

114.    Furthermore, AOC has pledged all of its assets (in which Signature has a perfected UCC security interest properly belong to Signature) to two third-party factors, defendants Aquent LLC ("Aquent") and Business Funding Associates, LLC, ("BFA") in exchange for financing. (Copies of UCC filings reflecting the pledge of assets to Aquent and BFA are collected and attached as Exhibit CC). Because Signature has a perfected security interest in all of the assets transferred by the Judgment Debtors to AOC, these third-party factoring agreements are in violation of the Judgment Debtors' August 27, 2007 Security Agreement. AOC's pledge of its assets has further frustrated Signature's attempt to recover its security, by clouding the issue of the existence and priority of the respective parties' security

---

Mail to transmit instructions to the Judgment Debtors' web hosting company to deactivate the website.

**55**

interests. Indeed, as a result of AOC's actions, there now exists a justifiable controversy between Signature, on the one hand, and AOC, Aquent, and BFA on the other hand, as to which parties hold a superior security interest in AOC's assets.

115. The defendant's fraudulent conduct, the conveyance of assets in violation of the security agreements, and the alter-ego status of AOC all require that Signature be accorded a first priority security interest in all of AOC's assets, which represent either Collateral directly and fraudulently conveyed to AOC, or else proceeds derived from the use of those fraudulently conveyed assets, which must be considered part of the Collateral pursuant to the Uniform Commercial Code.

116. The proceeds being reaped by AOC as a result of their fraudulent takeover of the Judgment Debtors' business, and AOC's continuing use of the Judgment Debtors' going-concern operations, there are the fruits of defendants' unlawful conduct.

117. Upon information and belief, and to an extent known only to defendants, certain Judgment Debtors and non-Judgment Debtor defendants, including Moise Banayan, Ana Banayan, Aaron Banayan, Rebecca Banayan a, Ruben Beityakov, Ari Katz, Miriam Schwartz and Yehuda Banayan, have each, at least once, knowingly received proceeds of this criminal enterprise, whether in the form of salary, consulting fees, shareholder distributions, dividends, expense reimbursements, or otherwise, and have, upon information and belief, received each tranche of said proceeds into personal bank accounts controlled either by one or more of the defendants.

*Damages to Signature and Requested Relief*

118. As a consequence of defendants' ongoing criminal conspiracy, and the extensive fraudulent conveyance of the Judgment Debtors' assets that is at the center of that

27

**56**

conspiracy, Signature's attempts to enforce its judgment against the Judgment Debtors have been frustrated, and the value of its collateral is being imperiled, if not actually damaged.

119.    Defendants' continued operation of the fraudulently-conveyed kosher food business of the Judgment Debtors threatens to destroy or impair the Bank's right to execute upon the collateral pledged to Signature, whether through mismanagement, abandonment, conversion, tarnishment of the Judgment Debtors' valuable trademarks, or otherwise.

120.    Signature, therefore, requests the following relief:

- Rescission of the fraudulent conveyances of the Judgment Debtors' business to AOC;

- Transfer of the conveyed assets directly to Signature;

- Declaratory judgment that AOC is an alter-ego of the Judgment Debtors and the Individual Defendants;

- Declaratory judgment that Signature's security interests in AOC's assets are superior to that of any other party;

- Compensatory damages resulting from the Judgment Debtors' failure to make payment to Signature on account of the Overdrafts in breach of the loan agreements;

- Accounting of all of the books, records, and other financial information of all of the corporate defendants; and

- Compensatory and punitive damages on account of the RICO violation and other wrongdoing (tripled pursuant to the RICO statute) and reasonable attorneys' fees.

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFEDANTS

**(RICO: Violation of 18 U.S.C. § 1962(a))**
**(Use of Racketeering Income to Acquire an Interest in or to Establish or Operate an Enterprise Engaged in or Affecting Interstate Commerce)**

121.    Signature repeats and realleges paragraphs 1 through 119 above, as if set forth here in full.

122.    Income received by defendants from the Judgment Debtors and/or Ahava

28

**57**

of California was derived from a pattern of racketeering activity.

123.    Defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate Ahava of California.

124.    Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate an enterprise-in-fact consisting of all of the defendants.

125.    The predicate acts committed by defendants as part of a pattern of racketeering activity include:

       (a)    Mail Fraud (18 U.S.C. § 1341)

       (b)    Wire Fraud (18 U.S.C. § 1343)

       (c)    Bank Fraud (18 U.S.C. § 1344)

       (d)    Money Laundering (18 U.S.C. § 1956)

       (e)    Transportation of Stolen Property (18 U.S.C. § 2314)

       (f)    Receipt of Stolen Property (18 U.S.C. § 2315)

126.    Ahava of California is a business engaged in and/or affecting interstate commerce. Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

127.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce. Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

128.    Defendants' use of income derived from a pattern of racketeering activity

**58**

to acquire an interest in or establish or operate Ahava of California has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of enforcing its Judgment against the Judgment Debtors.

129.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. §1962(a) described above.

130.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(b))
**(Use of Racketeering Income to Acquire or Maintain an Interest in an Enterprise Engaged in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)**

131.    Signature repeats and realleges paragraphs 1 through 129 above, as if set forth here in full.

132.    Income received by defendants from the Judgment Debtors and/or Ahava of California was derived from a pattern of racketeering activity.

133.    Defendants used income received from the Judgment Debtors and/or Ahava of California to acquire or maintain an interest in Ahava of California through a pattern of racketeering activity.

134.    Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to acquire or maintain an interest in an enterprise-in-fact consisting of all of the defendants through a pattern of racketeering activity.

30

**59**

135.    The predicate acts committed by defendants as part of a pattern of racketeering activity include:

<div style="margin-left: 2em;">

(a)    Mail Fraud (18 U.S.C. § 1341)

(b)    Wire Fraud (18 U.S.C. § 1343)

(c)    Bank Fraud (18 U.S.C. § 1344)

(d)    Money Laundering (18 U.S.C. § 1956)

(e)    Transportation of Stolen Property (18 U.S.C. § 2314)

(f)    Receipt of Stolen Property (18 U.S.C. § 2315)

</div>

136.    Ahava of California is a business engaged in and/or affecting interstate commerce.  Upon information and belief, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

137.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce.  Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

138.    Defendants' use of income derived from a pattern of racketeering activity to acquire or maintain an interest in Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

139.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. §1962(b) described

31

**60**

above, plus reasonable attorneys' fees.

140.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c), plus reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(c))
**(Use of Racketeering Income to Conduct or Participate in Conducting an Enterprise Engaged in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)**

141.    Signature repeats and realleges paragraphs 1 through 139 above, as if set forth here in full.

142.    Income received by defendants from the Judgment Debtors and/or Ahava of California was derived from a pattern of racketeering activity.

143.    Defendants used income received from the Judgment Debtors and/or Ahava of California to conduct or participate in conducting Ahava of California through a pattern of racketeering activity.

144.    Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to conduct or participate in conducting an enterprise-in-fact consisting of all of the defendants through a pattern of racketeering activity.

145.    The predicate acts committed by defendants as part of a pattern of racketeering activity include:

(a)    Mail Fraud (18 U.S.C. § 1341)

(b)    Wire Fraud (18 U.S.C. § 1343)

(c)    Bank Fraud (18 U.S.C. § 1344)

32

**61**

    (d)    Money Laundering (18 U.S.C. § 1956)

    (e)    Transportation of Stolen Property (18 U.S.C. § 2314)

    (f)    Receipt of Stolen Property (18 U.S.C. § 2315)

146.    Defendants' pattern of racketeering is open-ended and ongoing, and poses the threat of continuing criminal conduct.

147.    Ahava of California is a business engaged in and/or affecting interstate commerce. Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

148.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce. Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

149.    Defendants' use of income derived from a pattern of racketeering activity to conduct or participate in conducting Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

150.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(c) described above.

151.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in

**62**

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(d))
### (Conspiracy to Violate RICO)

152.    Signature repeats and realleges paragraphs 1 through 150 above, as if set forth here in full.

153.    Each of defendants agreed with at least one of the other defendants to commit acts and/or omissions in furtherance of a common conspiracy to violate 18 U.S.C. § 1962.

154.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(d) described above.

155.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 273-a)

156.    Signature repeats and realleges paragraphs 1 through 154 above, as if set forth here in full.

157.    The conveyances made by the defendants of the Judgment Debtors' assets to Ahava of California, whether by lease, sale or otherwise, were made without fair consideration.

34

**63**

158.    At the time of certain of the conveyances, the Judgment Debtors were indebted to Signature, were defendants in an action for money damages or were debtors in the Judgment in such action that had been docketed against them.

159.    A final judgment has been rendered against the Judgment Debtors that remains unsatisfied.

160.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets belonging to the Judgment Debtors to Ahava of California, and directing Ahava of California to transfer all such assets directly to Signature.

## SIXTH CLAIM FOR RELIEF
## AGAISNT THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 276)

161.    Signature repeats and realleges paragraphs 1 through 159 above, as if set forth here in full.

162.    At the time of the conveyances, the Judgment Debtors knew that they owed a debt to Signature and that Signature was making efforts to collect its debts from the Judgment Debtors.

163.    The conveyances made by the Judgment Debtors to Ahava of California were made with the actual intent to hinder, delay, and defraud Signature.

164.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets to Ahava of California belonging to the Judgment Debtors, and directing the defendants to transfer all such assets directly to Signature.

## SEVENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Common-Law Fraud)

35

**64**

165.    Signature repeats and realleges paragraphs 1 through 163 above, as if set forth here in full.

166.    By failing to disclose the conveyances from the Judgment Debtors to Ahava of California, the defendants made material omissions of fact.

167.    Defendants' omissions constituted false representations of material facts.

168.    Defendants intended for Signature to rely on their fraudulent omissions.

169.    Signature has, in fact, reasonably and justifiably relied on defendants' fraudulent omissions to its detriment.

170.    Signature has been damaged by its reliance on defendants' omissions, in that it has been deprived of its ability to foreclose and/or collect on the collateral pledged to it under the Judgment Debtors' loans.

171.    Signature respectfully requests a judgment against defendants for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million.

## EIGHTH CLAIM FOR RELIEF
## AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Declaratory Judgment)

172.    Plaintiff repeats and realleges paragraphs 1 through 170 above, as if set forth here in full.

173.    Ahava of California is completely dominated and controlled by Moise Banayan and some or all of the other Judgment Debtors.

174.    Ahava of California is being used, and has been used in the past by the defendants as a successor-in-interest to the Judgment Debtors' business, despite the fact that

36

65

Ahava of California has been paid no consideration whatsoever.

175.    Signature respectfully requests that the Court enter a declaratory judgment stating that Ahava of California is an alter ego of the Judgment Debtors.

## NINTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Conversion)

176.    Plaintiff repeats and realleges paragraphs 1 through 174 above, as if set forth here in full.

177.    Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the defendants.

178.    Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the individual defendants, which property was acquired by the individual defendants from any of the corporate defendants.

179.    Defendants' possession of said property is unauthorized.

180.    Defendants have acted to exclude the rights of Signature over said property.

181.    To the extent that said property includes money, it is specifically identifiable as that money derived from the unlawful operations and activities of the corporate defendants, and is subject to an obligation to be returned to Signature.

182.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Breach of Contract)

183.    Plaintiff repeats and realleges paragraphs 1 through 181 above, as if set

37

**66**

forth here in full.

184.    The agreements between Signature and the Judgment Debtors are valid, binding and enforceable contracts.

185.    By conveying ownership of its trademarks to AOC, and by leasing its property to AOC including its real estate, equipment and entire ongoing concerns, all in violation of the security provisions of the agreements, the Judgment Debtors have breached those agreements.

186.    Signature has fully performed its obligations under its agreements with the Judgment Debtors.

187.    As a result of the Judgment Debtors' breach of their agreements, Signature has lost control of collateral pledged to secure its loans to the Judgment Debtors.

188.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages as a result of these breaches in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
## AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Rescission)

189.    Plaintiff repeats and realleges paragraphs 1 through 187 above, as if set forth here in full.

190.    The agreements between Signature and the Judgment Debtors are valid and binding contracts.

191.    By conveying ownership of its trademarks to AOC, and by leasing their property to AOC, both in violation of the security provisions of the agreements, the Judgment Debtors have breached those agreements.

**67**

192.    The Judgment Debtors' breach of their agreements with Signature has substantially defeated the purpose of those agreements.

193.    The Judgment Debtors' breach of their agreements with Signature was material and willful.

194.    Signature respectfully requests a judgment against the Judgment Debtors rescinding all agreements between the Judgment Debtors and AOC whereby the Judgment Debtors purported to convey an ownership or leasehold interest in any collateral pledged to Signature pursuant to the agreements between Signature and the Judgment Debtors.

## TWELFTH CLAIM FOR RELIEF AS AGAINST THE JUDGMENT DEBTORS

### (Breach of Contract)

195.    Plaintiff repeats and realleges paragraphs 1 through 193 above, as if set forth here in full.

196.    The agreements between Signature and the Judgment Debtors are valid and binding contracts.

197.    Pursuant to the agreements between Signature and the Judgment Debtors, the Judgment Debtors are liable for payments of all Overdrafts on their accounts with Signature.

198.    By failing to pay Signature for the Overdrafts on their accounts with Signature, the Judgment Debtors have breached their agreements with Signature.

199.    Signature has fully performed its obligations under its agreements with the Judgment Debtors.

200.    As a result of the Judgment Debtors' breach of their agreements with Signature, Signature has been damaged, in that it remains unpaid on approximately $2 million in

**68**

overdrafts made by the Judgment Debtors on their accounts with Signature.

201.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, but in no event less than $2 million.

### THIRTEENTH CLAIM FOR RELIEF
### AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

#### (Declaratory Judgment)

202.    Plaintiff repeats and realleges paragraphs 1 through 200 above, as if set forth here in full.

203.    AOC has pledged all of its assets, including all of its accounts receivable, to third-party factors in exchange for financing.

204.    All of AOC's assets were either directly fraudulently conveyed to it by the Judgment Debtors in violation of the Judgment Debtors' agreements with Signature, or else represent proceeds generated by the use of those fraudulently-conveyed assets.

205.    Because AOC's assets either represented Signature's collateral under its agreements with the Judgment Debtors, or else were derived from the use of those assets, all of AOC's assets are properly subject to Signature's superior security interest in the assets.

206.    Signature respectfully requests that the Court enter a declaratory judgment stating that Signature's security interest in AOC's assets is superior to that of Aquent or BFA, or any other subsequent lienholder.

#### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in favor of plaintiff and against defendant as follows:

**69**

(i)    rescinding the fraudulent conveyances to Ahava of California and directing that

(ii)    all assets so conveyed be transferred directly to Signature;

(iii)    declaring that Ahava of California is an alter ego of the Individual Defendants and the Judgment Debtors ;

(iv)    ordering an accounting of all of the books, records, and other financial information of all of the corporate defendants;

(v)    awarding plaintiff compensatory damages on account of the Judgment Debtors' failure to pay to Signature for the Overdrafts in an amount to be determined at trial but no less than $2 million;

(vi)    awarding plaintiff punitive damages in the amount of $1 million;

(vii)    tripling the award of compensatory and punitive damages pursuant to the RICO statute;

(viii)    awarding plaintiff attorneys' fees, costs, and disbursements pursuant to the RICO statute, the loan agreements and to the extent permitted otherwise by law; and

(ix)    awarding plaintiff such further relief as the Court deems just and proper.

Dated:  New York, New York
       July 7, 2008

HERRICK, FEINSTEIN LLP

By: _____

Mara B. Levin
David Feuerstein
John Oleske
2 Park Avenue
New York, New York 10016
Telephone:  (212) 592-1400
Facsimile:  (212) 592-1500
*Attorneys for Plaintiff Signature Bank*

**70**

# EXHIBIT 2

Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Attorneys for Plaintiff
  Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

SIGNATURE BANK,                                          :
                                                        :
                        Plaintiff,                      :      08 Civ. 3893 (NRB)
                                                        :
        - against -                                     :
                                                        :
AHAVA FOOD CORP. d/b/a NORTH COUNTRY    :      **NOTICE OF DEPOSITION**
CHEESE CORP., LEWIS COUNTY DAIRY CORP., :
ST. LAWRENCE FOOD CORP. d/b/a PRIMO     :
FOODS, YONI REALTY, LLC, SCHWARTZ AND   :
SONS QUALITY DISTRIBUTORS, INC., MOISE  :
BANAYAN, ANA BANAYAN a/k/a CHANA        :
BANAYAN, REBECCA BANAYAN a/k/a          :
REBECCA BARIMYAN a/k/a REBECCA          :
BANAYAN-LIEBERMAN, FARIBORZ BANAYAN     :
a/k/a AARON BANAYAN, RUBEN BEITYAKOV,   :
ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a :
AHAVA NATIONAL FOOD DISTRIBUTOR and     :
NORTH COUNTRY MANUFACTURING, and        :
JOHN DOES 1 through 50,                 :
                                                        :
                        Defendants.                     :
------------------------------------------------------------- X

        **PLEASE TAKE NOTICE** that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, the testimony, upon oral examination of defendant Ruben Beityakov, as a party

witness, will be taken by stenographic means before a Notary Public who is not an attorney or

employee of an attorney, for any party or prospective party herein and is not a person who would

be disqualified to act as a juror because of interest or because of consanguinity or affinity to any

party herein, at the office of Herrick, Feinstein LLP on the 13th day of August, at 10:00 o'clock

**71**

in the forenoon of that day with respect to evidence material and necessary in the prosecution of this action.

Dated:  New York, New York
        July 22, 2008

                                    HERRICK, FEINSTEIN LLP


                                    By: _____
                                        Mara B. Levin
                                        David Feuerstein
                                        John Oleske
                                    2 Park Avenue
                                    New York, New York 10016
                                    Telephone:    (212) 592-1400
                                    Facsimile:    (212) 592-1500

                                    Attorneys for Plaintiff Signature Bank


TO:     David Antonucci, Esq.
        *Attorney for the Judgment Debtors*
        12 Public Square
        Watertown, NY 13601

        Seth Eisenberger, Esq.
        *Attorney for Ahava of California, LLC*
        108 Airport Executive Park
        Nanuet, NY 10954

        Josefina Fernandez-McEvoy
        K & L Gates
        *Attorneys for Ahava of California, LLC*
        10100 Santa Monica Blvd., 7th Floor
        Los Angeles, California 90067

        Robert Hirsh
        ROBERT W. HIRSH & ASSOCIATES
        *Attorneys for Ahava of California, LLC*
        8383 Wilshire Blvd, Suite 510
        Beverly Hills, CA 90211

                                    2

**72**

Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Attorneys for Plaintiff
  Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

SIGNATURE BANK,                                     :

                              Plaintiff,            :    08 Civ. 3893 (NRB)

            - against -                             :

                                                    :
AHAVA FOOD CORP. d/b/a NORTH COUNTRY                :    **NOTICE OF DEPOSITION**
CHEESE CORP., LEWIS COUNTY DAIRY CORP.,             :
ST. LAWRENCE FOOD CORP. d/b/a PRIMO                 :
FOODS, YONI REALTY, LLC, SCHWARTZ AND               :
SONS QUALITY DISTRIBUTORS, INC., MOISE              :
BANAYAN, ANA BANAYAN a/k/a CHANA                    :
BANAYAN, REBECCA BANAYAN a/k/a                      :
REBECCA BARIMYAN a/k/a REBECCA                      :
BANAYAN-LIEBERMAN, FARIBORZ BANAYAN                 :
a/k/a AARON BANAYAN, RUBEN BEITYAKOV,               :
ARI KATZ, AHAVA OF CALIFORNIA, LLC d/b/a            :
AHAVA NATIONAL FOOD DISTRIBUTOR and                 :
NORTH COUNTRY MANUFACTURING, and                    :
JOHN DOES 1 through 50,                             :

                                                    :
                              Defendants.           :
------------------------------------------------------------ X

      **PLEASE TAKE NOTICE** that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, the testimony, upon oral examination of defendant Ari Katz, as a party witness, will

be taken by stenographic means before a Notary Public who is not an attorney or employee of an

attorney, for any party or prospective party herein and is not a person who would be disqualified

to act as a juror because of interest or because of consanguinity or affinity to any party herein, at

**73**

the office of Herrick, Feinstein LLP on the 18th day of August, at 10:00 o'clock in the forenoon

of that day with respect to evidence material and necessary in the prosecution of this action.

Dated:   New York, New York
         July 22, 2008

                                        HERRICK, FEINSTEIN LLP


                                        By: _____
                                            Mara B. Levin
                                            David Feuerstein
                                            John Oleske
                                        2 Park Avenue
                                        New York, New York 10016
                                        Telephone:   (212) 592-1400
                                        Facsimile:   (212) 592-1500

                                        Attorneys for Plaintiff Signature Bank


TO:    David Antonucci, Esq.
       *Attorney for the Judgment Debtors*
       12 Public Square
       Watertown, NY  13601

       Seth Eisenberger, Esq.
       *Attorney for Ahava of California, LLC*
       108 Airport Executive Park
       Nanuet, NY 10954

       Josefina Fernandez-McEvoy
       K & L Gates
       *Attorneys for Ahava of California, LLC*
       10100 Santa Monica Blvd., 7th Floor
       Los Angeles, California  90067

       Robert Hirsh
       ROBERT W. HIRSH & ASSOCIATES
       *Attorneys for Ahava of California, LLC*
       8383 Wilshire Blvd, Suite 510
       Beverly Hills, CA  90211

**74**

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4
I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is K&L GATES LLP, 10100 Santa Monica Boulevard, Seventh Floor, Los Angeles, California 90067.

5

6
On **August 15, 2008**, I served the foregoing document(s):

7

8
**DEBTOR'S MOTION FOR AN ORDER (A) EXTENDING THE AUTOMATIC STAY TO NON-DEBTOR PARTIES; OR, IN THE ALTERNATIVE, (B) ENJOINING LITIGATION AGAINST THE NON-DEBTOR PARTIES PURSUANT TO SECTION 105(A); MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF RABBI AARON BANAYAN IN SUPPORT THEREOF**

9

10
**NOTICE OF DEBTOR'S MOTION FOR AN ORDER (A) EXTENDING THE AUTOMATIC STAY TO NON-DEBTOR PARTIES; OR, IN THE ALTERNATIVE, (B) ENJOINING LITIGATION AGAINST THE NON-DEBTOR PARTIES PURSUANT TO SECTION 105(A)**

11
on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed and sent as follows:

12

13
**SEE ATTACHED SERVICE LIST**

14

15
☒    **BY MAIL:**  I caused such envelope(s) to be deposited in the mail at Los Angeles, California with postage thereon fully prepaid to the office of the addressee(s) as indicated above.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day, with postage fully prepaid, in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

16

17

18
☐    **STATE**:  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

19

20
☒    **FEDERAL**:  I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

21
Executed on **August 15, 2008**, at Los Angeles, California.

22

23
Verastine Mills

24

25

26

27

28

264923

RECYCLED PAPER

1

**SERVICE LIST**
**In re Ahava of California, LLC**
2
**Case No. 2:08-bk-20524-TD**

3
**DEBTOR:**                              HSBC Bank, USA National Association
                                         One HSBC Center
4
Ahava of California, LLC                 29th Floor
908 Rose Avenue                          Buffalo, NY  14203
5
Venice, CA  90291
Attn:  Fariborz (Aaron) Banayan          Business Funding Associates LLC
6                                        100 Winston Drive
                                         Suite 8FN
**UNITED STATES TRUSTEE:**               Cliffside Park, NJ  07010
7

8
Office of the United States Trustee      Bibby Financial Services (Midwest), Inc.
Russell Clementson                       1400 Opus Place
725 S. Figueroa Street, Suite 2600       Suite 250
9
Los Angeles, CA  90017                   Downers Grove, IL  60515

10
**SECURED CREDITORS**                    Aquent LLC
                                         711 Boylston Street AFS
11
**COUNSEL FOR SIGNATURE BANK:**          Boston, MA  02116-2616

12
HERRICK FEINSTEIN LLP                    **COUNSEL FOR BUSINESS FUNDING**
Mara B. Levin, Esq.                      **ASSOCIATES**
13
David Feuerstein, Esq.
John Oleske, Esq.                        COHN LIFLAND PEARLMAN
14
2 Park Avenue                            HERRMANN & KNOPF
New York, NY  10016                      Leonard Z. Kaufmann
15                                       Park 80 Plaza West-One
                                         Saddle Brook, NJ  07663
HERRICK FEINSTEIN LLP
16
Gary F. Eisenberg
One Gateway Center                       **SPECIAL NOTICES**
17
Newark, NJ  07102
                                         **COUNSEL FOR AQUENT FINANCIAL**
18
SIGNATURE BANK                           **SERVICES**
565 Fifth Avenue
19
New York, NY  10017                      BUCHALTER NEMER
                                         Bernard D. Bollinger, Jr., Esq.
20
Jerron Investments                       Paul S. Arrow, Esq.
P.O. Box 66                              1000 Wilshire Boulevard, Suite 1500
21
Deerfield, IL  60015                     Los Angeles, CA  90017-2457

22
**COUNSEL FOR JOHANNA FOODS**            **COUNSEL FOR SIGNATURE BANK:**
PEPPER HAMILTON, LLP
23
Francis J. Lawall, Esq.                  JEFFER MANGELS BUTLER & MARMARO
Linda J. Casey, Esq.                     LLP
24
3000 Two Logan Square                    David M. Poitras, P.C.
18th and Arch Streets                  1900 Avenue of the Stars, 7th Floor
25
Philadelphia, PA  19103-2799             Los Angeles, CA  90067

26
                                         Attorney General
27                                       United States Department of Justice
                                         Ben Franklin Station
28                                       P.O. Box 683
                                         Washington, DC 20044

1  Civil Process Clerk
   United States Attorney's Office
2  Federal Building, Room 7516
   300 North Los Angeles Street
3  Los Angeles, CA 90012

4  Employment Development Department
   Bankruptcy Group MIC 92E
5  P.O. Box 826880
   Sacramento, CA 94280-0001
6
   Franchise Tax Board
7  Attention: Bankruptcy
   P.O. Box 2952
8  Sacramento, CA 95812-2952

9  Internal Revenue Service
   P.O. Box 21126
10 Philadelphia, PA 19114

11 Securities Exchange Commission
   5670 Wilshire Boulevard
12 11th Floor
   Los Angeles, CA 90036
13
   California State Board of Equalization
14 450 N. Street
   P.O. Box 942879
15 Sacramento, CA 94279-0001)

16 Internal Revenue Service
   Attention: Bankruptcy
17 300 N. Los Angeles Street
   Los Angeles, CA 90012
18
   **20 LARGEST UNSECURED**
19 **CREDITORS**

20 A. Lassonde, Inc.
   Attn: Jo-Ann Dawson
21 33368 Treasury Center
   Chicago, IL 60694-3300
22
   Adflex Corporation
23 Attn: Don Valentine
   300 Ormond Street
24 Rochester, NY 14605

25 Madison Container, LLC
   c/o Aquent Financial Services
26 325 Second Street
   Lockbox 414750
27 Lakewood, NJ 08701

28

Cash Service
Attn: Mendy Ebaz
Z.I. Les Doucettes
I Bis Avenue Des Morillons
95140 Garges Les Gonesse
Paris, France

Energy Cooperative N.Y. (0153086009)
Attn: Joe Mascara
403 Main St., Suite 411
Buffalo, NY 14205

Freedman Packaging Corp.
Attn: David
1547 East 16th Street
Brooklyn, NY 11230

Hughes Hubbard & Reed LLP
One Battery Parkway
New York, NY 10004

Industrial USA, Inc.
Attn: Ben
136 Wallabout St. Suite 6A
Brooklyn, NY 11211

ICMN Inc.
Attn: Abe Rice
383 Kinston Ave. Suite 314
Brooklyn, NY 11213

Johanna Foods, Inc.
Attn: Richi
Johanna Farms RD.
Flemington, NJ 08822-0272

Keyspan
Attn: Debby Cooney
P.O. Box 29212
Brooklyn, NY 11202

Kornstein Veise & Wexler
Attn: Larry Fox
757 Third Avenue
NY, NY 10017

Maadaney Yehiam (1993)LTD.
Attn: Micha
Kibbutz Yehiam 25125
Israel

---

264923                    3                    RECYCLED PAPER
                    **PROOF OF SERVICE**

1

2

3

Madison Container, LLC
325 Second Street
Lockbox 414750
Lakewood, NJ 08701

Mendon Truck Leasing and Rental
Attn: Joe
362 Kingsland Avenue
Brooklyn, NY 11222

Miki Delicatessen
Attn: Nira
13 Lazarov Street
Rishon Le Zion, 75654
Israel

National Grid (11791-17037)
P.O. Box 4798
Syracuse, NY 13221-4798

Robert W. Hirsh, Esq.
Robert W. Hirsh & Associates
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211

Rudox Engine and Equipment Corp.
Attn: David Suarez
P.O. Box 467
Carlstadt, NJ 07072

St. Lawrence Gas (589895-40634)
Attn: Joe Page
33 Stearns St.
P.O. Box 270
Massena, NY 13662

St. Andrews Smoky Delicacies S.A.
Attn: Ady
Chile Presidente Riesco 5711
Of 1201 Las Condes

Salem Truck Leasing, Inc.
Attn: Linds
9505 Ave D
Brooklyn, NY 11236

# EXHIBIT 3

Mara B. Levin, Esq.
David Feuerstein, Esq.
John Oleske, Esq.
Attorneys for Plaintiff Signature Bank
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Email: mlevin@herrick.com

**Electronically-Filed Document**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SIGNATURE BANK,

                 Plaintiff,

       - against -

AHAVA FOOD CORP. d/b/a NORTH COUNTRY
CHEESE CORP., LEWIS COUNTY DAIRY CORP.,
ST. LAWRENCE FOOD CORP. d/b/a PRIMO
FOODS, YONI REALTY, LLC, SCHWARTZ AND
SONS QUALITY DISTRIBUTORS, INC., MOISE
BANAYAN, ANA BANAYAN a/k/a CHANA
BANAYAN a/k/a ANA BERESNITZKY, REBECCA
BANAYAN a/k/a REBECCA BARIMYAN a/k/a
REBECCA BANAYAN-LIEBERMAN, FARIBORZ
BANAYAN a/k/a AARON BANAYAN, RUBEN
BEITYAKOV, ARI KATZ, MIRIAM SCHWARTZ,
YEHUDA BANAYAN, AHAVA OF CALIFORNIA,
LLC d/b/a AHAVA NATIONAL FOOD
DISTRIBUTOR and NORTH COUNTRY
MANUFACTURING, AQUENT LLC, BUSINESS
FUNDING ASSOCIATES LLC, and JOHN DOES 1
through 50,

                 Defendants.

------------------------------------------------------------ x

08 CIV. 3893 (NRB)

**[PROPOSED]**

**SECOND AMENDED COMPLAINT**

Plaintiff Signature Bank ("Signature" or "the Bank"), by its attorneys, Herrick,

Feinstein LLP, for its Second Amended Complaint against defendants alleges as follows:

### NATURE OF THE ACTION

1.     This complaint seeks equitable and monetary relief arising from the

unlawful and fraudulent conduct of defendants, who have been engaged in a conspiracy to evade the $9.3 million judgment entered by this Court on March 14, 2008 (the "Judgment") against Moise Banayan, Ana Banayan, Ahava Food Corp. ("Ahava"), Lewis County Dairy Corp. ("Lewis County Dairy"), St. Lawrence Food Corp. ("St. Lawrence"), Yoni Realty LLC ("Yoni") and Schwartz and Sons Quality Distributors, Inc. ("Schwartz & Sons") (collectively referred to as the "Judgment Debtors") in a prior lawsuit (the "Initial Lawsuit").

2.      Roughly two months ago -- before this Court issued its Judgment awarding Signature over $9.3 million -- Moise Banayan stated under oath that the Judgment Debtors were earning on average "more than $160,000 in gross profit per week." Today, however, Mr. Banayan claims that the Judgment Debtors are no longer "active" and cannot satisfy the Bank's judgment.

3.      The reason for this is simple. From no later than December 1, 2007 to the present, Mr. Banayan and the other defendants have conspired to transfer the assets of the Judgment Debtors to Ahava of California, LLC (and perhaps other entities affiliated with Moise Banayan) in an effort to shield those assets from the Judgment Debtors' indebtedness to Signature which resulted in the Judgment.

4.      By Moise Banayan's own admission, the business once operated by the Judgment Debtors is now being operated solely by Ahava of California under the d/b/a of Ahava National Food Distributor and North Country Manufacturing. In furtherance of this scheme designed to deprive Signature of the collateral pledged in connection with the Judgment Debtors' indebtedness, defendants caused the Judgment Debtors to fraudulently assign virtually all of their accounts receivable and intangible property to Ahava of California.

5.      In fact, in March 2007, defendants caused the Judgment Debtors to assign,

2

*nunc pro tunc*, all of their registered trademarks to Ahava of California. And, in a further effort to evade this Court's Judgment, the Judgment Debtors, upon information and belief, effectively relinquished to Ahava of California (d/b/a Ahava National Food Distributor and North Country Manufacturing) for little or no consideration, all of their real and personal property, and all of their operations as a going concern -- including their office buildings, processing plants, delivery trucks, products, customer lists, and goodwill. The Judgment Debtors made these transfers pursuant to purported "leases," which in reality are only sham "paper" transactions, and which, even if made in exchange for valid consideration, violated the Judgment Debtors' security agreements with Signature.

6.    Upon information and belief, these fraudulent transfers and/or assignments were done for the sole purpose of allowing defendants to seamlessly continue the businesses of the Judgment Debtors while keeping the actual assets in the name of entities that were not named in the Initial Lawsuit.

7.    As a result of these fraudulent transfers, Ahava of California is purportedly the only "active company" left, and its reported revenues are now over $18 million. These annual sales figures closely resemble the Judgment Debtors' business in 2007 -- which should come as no surprise since Ahava of California has taken over the Judgment Debtors' businesses -- and is far greater than the $1 million in sales Ahava of California represented it was earning as late as February 7, 2008, and the roughly $378,000 in gross revenues Ahava of California declared on its 2006 tax return.

8.    While Ahava of California's business has rapidly grown without any legitimate explanation, Ahava of California has claimed -- in court papers and otherwise -- that it has absolutely no relationship to the Judgment Debtors. Yet, the evidence makes clear that

3

Ahava of California is, in fact, owned and/or controlled by Moise Banayan and serves as the

Judgment Debtors' alter ego.

9.    For example, the evidence adduced by Signature to date makes clear that:

(a)    **Moise Banayan and his brother co-own Ahava of California.** Under the 2005 loan documents that Moise Banayan executed on behalf of the Judgment Debtors, he unambiguously represented to Signature that Ahava of California was an "affiliate non-obligor" that he and his brother "owned". That representation was confirmed in February and December of 2007, when Moise Banayan (i) was identified as a "partner" in Ahava of California (sharing 50% of the profits) on its Federal tax return; and (ii) told Robert Bloch, a Senior Vice President of Signature, that he was a partner in Ahava of California.

(b)    **Moise Banayan controls Ahava National Food Distributor (the d/b/a of Ahava of California).** In a 2006 OSHA decision, Mr. Banayan was found to be the "president" of Ahava of California. Mr. Banayan then confirmed this fact when he sent a letter to an Ahava of California customer and represented to that customer that he was the president of Ahava National Food Distributor (the d/b/a for Ahava of California).

(c)    **Defendants treat Ahava of California and the Judgment Debtors as effectively one in the same.** In addition to what is described above, defendants shared office-space and a website prior to Signature filing its lawsuit to enforce the judgment. Once served with the complaint in this action, however, defendants (i) represented that the Brooklyn office space once shared by the Judgment Debtors and Ahava of California is now solely occupied by Ahava of California, and (ii) shut down the website that was shared by the Judgment Debtors and Ahava of California.

10.    While defendants have fraudulently transferred the Judgment Debtors'

assets to their alter ego, Ahava of California, defendants have engaged in other practices to

frustrate Signature's ability to enforce its Judgment.

11.    As one example, Ahava of California has pledged all of "its" assets to

third party factors in exchange for credit and/or financing. Upon information and belief, Ahava

of California presumably did not disclose to those factors that all of its assets were the proceeds

of fraudulent conveyances.  As a result, Ahava of California has created a controversy over the priority of security interests between Signature and the third-party factors.

12.    Also defendants have repeatedly prevented Signature from exercising its contractual right under the loan documents to examine the Judgment Debtors' pledged collateral, thereby preventing Signature from conducting the due diligence required to sell those assets and satisfy its Judgment.

13.    Separately, neither the Judgment Debtors, nor their alter-ego Ahava of California, has paid Signature on approximately $2 million in overdrafts made on the Judgment Debtors' bank accounts with Signature, despite timely demand.  Although Signature did not seek to recover these sums in the Initial Lawsuit, defendants' refusal to pay these amounts is consistent with their other attempts to evade their obligations to Signature.

14.    This fraudulent and impermissible conduct, coupled with the conduct described above, constitutes, among other things, breach of contract, conversion, fraud (both at common law and under New York's Debtor Creditor Laws) and a violation of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

15.    Indeed, defendants' scheme to shield the Judgment Debtors' assets through the purportedly "independent" Ahava of California is the culmination of the defendants' years-long pattern of deceit with respect to the financing and operation of their businesses.  in connection with this scheme, defendants have committed dozens, if not hundreds, of the predicate acts listed in 18 U.S.C. § 1961, including, without limitation, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and transportation and receipt of stolen property (18 U.S.C. §§ 2314 and 2315). These violations of criminal law, committed in furtherance of defendants' scheme, continue

unabated to this day.

16.     Accordingly, Signature seeks an order (i) declaring that Ahava of California is an alter-ego of the Judgment Debtors, (ii) declaring that Signature's security interest in any collateral conveyed to AOC, and any of the proceeds thereof, is superior to the purported security interests of any third parties, (iii) rescinding all asset transfers, conveyances and/or assignments between the Judgment Debtors and any of the other named defendants, including but not limited to the trademark assignments and the sham leases, and (iv) awarding defendants damages, in an amount to be determined at trial but in no event less than $36 million plus reasonable attorneys' fees.

## THE PARTIES

17.     Plaintiff Signature Bank ("Signature" or "the Bank") is a New York banking corporation, with its principal place of business at 565 Fifth Avenue, New York, New York.

18.     Defendant Ahava Food Corp. d/b/a North Country Cheese Corp. ("Ahava Food") is a New York corporation, with its principal place of business at 110 Beard Street, Brooklyn, New York.

19.     Defendant Lewis County Dairy Corp. ("Lewis County Dairy") is a New York corporation, with its principal place of business at 7705 State Route 812, Lowville, New York.

20.     Defendant St. Lawrence Food Corp. d/b/a Primo Foods ("St. Lawrence') is a New York corporation, with its principal place of business at 30 Main Street, Ogdenburg, New York.

21.     Defendant Yoni Realty, LLC ("Yoni") is a New York corporation, with its

6

principal place of business at 110 Beard Street, Brooklyn, New York.

22.    Defendant Schwartz & Sons Quality Distributors, Inc. ("Schwartz & Sons") is a New York corporation with its principal place of business at 110 Beard Street, Brooklyn, New York.

23.    Defendant Ahava of California, LLC d/b/a Ahava National Food Distributor and North Country Manufacturing ("AOC") is a California Limited Liability Company, with its principal place of business at 908 Rose Avenue, Venice, California and offices at 236-280 Richard Street, Brooklyn, New York and/or 110 Beard Street, Brooklyn, New York.

24.    Defendant Moise Banayan is a resident of New York, with an address at 51 Parker Boulevard, Monsey, New York.

25.    Defendant Ana Banayan a/k/a Chana Banayan a/k/a Ana Beresnitzky is a resident of New York ("Ana Banayan"), with an address at 51 Parker Boulevard, Monsey, New York.

26.    Upon information and belief, defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman is a resident of New York, with addresses at 2606 East 24th Street, Brooklyn, New York, 205 Third Avenue, Apt. 2N, New York, New York and 215 East 96th Street, Apartment 40H, New York, New York.

27.    Defendant Fariborz Banayan a/k/a Aaron Banayan a/k/a Aaron Nanayan ("Fariborz Banayan") is a resident of California, with an address at 908 Rose Avenue, Venice, California.

28.    Defendant Ruben Beityakov is a resident of New York, with an address at 1977 East 22nd Street, Brooklyn, New York.

7

29.    Defendant Ari Katz is a resident of New York, with an unknown address and a place of business at 110 Beard Street, Brooklyn, New York.

30.    Upon information and belief, defendant Miriam Schwartz is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, Florida, and a place of business at 110 Beard Street, Brooklyn, New York.

31.    Upon information and belief, defendant Yehuda Banayan is a resident of New York and Florida, with an address at 1205 East 7th Street, Brooklyn, New York and 165 NW 96th Terrace, Pembroke Pines, and a place of business at 110 Beard Street, Brooklyn, New York.

32.    Defendant Aquent LLC is a Pennsylvania Limited Liability Company with its principal place of business at 711 Boylston Street, Boston, Massachusetts.

33.    Defendant Business Funding Services LLC is a New Jersey Limited Liability Company with its principal place of business at 100 Winston Drive, Suite 8FN, Cliffside Park, New Jersey.

34.    Defendants John Does 1 through 50 are, upon information and belief, fictitious trade names for the Corporate Defendants and/or the Judgment Debtors, or other individual co-conspirators in the fraudulent acts.

**JURISDICTION AND VENUE**

35.    This Court has jurisdiction pursuant to pursuant to CPLR § 301, because plaintiff is a resident of this State.

36.    Venue in this county is proper pursuant to CPLR § 503, because plaintiff is a resident of this county.

8

## FACTUAL ALLEGATIONS

***The Judgment Debtors Use Misrepresentations to
Secure Loans and Forbearances From Signature***

37.    Since at least 1984, Moise Banayan has been operating an empire of businesses engaged in the kosher food business, under various iterations of the trade name "Ahava".

38.    Beginning in August 22, 2005, and extending over the course of the following two years, Signature entered into a series of loan agreements with the Judgment Debtors, whereby Signature agreed to loan the Judgment Debtors approximately $9 million plus extend $2 million in overdrafts to finance their kosher food business.  All of these loans were guaranteed personally by Moise Banayan, and some were personally guaranteed by his wife, Ana Banayan, and were further secured by security agreements giving Signature a first priority lien over substantially all of the assets of the Judgment Debtors, and liens on other assets of Moise and Ana Banayan, individually.

39.    Signature agreed to make the original loans, and to subsequently extend additional credit and forbearances, based upon the misrepresentations by the Judgment Debtors of their assets and liabilities and the condition of their businesses, and due in part to their failure to disclose other indebtedness to third parties.

40.    For example, in 2000, upon information and belief, Moise Banayan borrowed $4 million from an individual by the name of Isaac Chera pursuant to a "shtar" -- a form of IOU under Jewish law -- in order to refurbish and renovate the property owned by Yoni, which served as the headquarters for the Judgment Debtors' businesses.  Upon information and belief, neither Moise Banayan, Ahava Food nor Yoni ever repaid the $4 million.

9

41.    Yet, in 2005, when negotiating the original loans, Moise Banayan used interstate wires and/or the U.S. Mail on repeated occasions to communicate with Signature with respect to the assets and liabilities of the Judgment Debtors, and the condition of their business and intentionally failed to disclose the $4 million loan borrowed from Isaac Chera which Moise Banayan had pledged a 49 percent interest in Yoni as collateral.

42.    Over the next two or so years, Moise Banayan negotiated forbearance agreements using interstate wires and/or the U.S. Mail and convinced Signature to extend the Judgment Debtors' time to pay, in exchange for additional guarantees and pledges of collateral.

43.    During one round of these negotiations, which occurred in the summer of 2007, Moise Banayan certified that he was the sole member of Yoni which owns defendants' Brooklyn headquarters to induce Signature to extend additional credit to the Judgment Debtors. (*See* Manager's Certificate of Yoni, annexed hereto as Exhibit A).

44.    While Mr. Banayan certified to Signature that he controlled 100 percent of the equity in Yoni, it turned out that that representation was false. In fact, upon information and belief, Moise Banayan had transferred a 48.5 percent interest in Yoni roughly nine months earlier to an entity owned and/or controlled by Isaac Chera in order to satisfy all or portion of the $4 million obligation. (*See* Stock Certificate identifying ISC 96 Beard LLC, annexed hereto as Exhibit B).

45.    In early 2007, a third-party judgment in excess of $600,000 was entered against some of the Judgment Debtors. Although the loan documents unambiguously required the Judgment Debtors to inform Signature of this judgment, Moise Banayan instead concealed it, and fraudulently omitted them from his numerous communications with Signature through interstate wires and/or the U.S. mail to delay any default by the Judgment Debtors and any

10

foreclosure proceedings by the Bank.

46.    In fact, much like defendants have done here with Ahava of California, Moise Banayan and other Judgment Debtors attempted to frustrate the judgments against them by creating an alleged "independent" entity -- in this case, Schwartz & Sons -- that would be responsible for "distributing" the goods sold by the Ahava Food and Lewis County Dairy.

47.    At the time, Moise Banayan represented to Signature that Schwartz & Sons was owned by another, unrelated individual by the name of Miriam Schwartz, and was designated to sell Ahava Food products to the Hasidic community.

48.    Upon information and belief, Miriam Schwartz, who is married to Moise Banayan's nephew, Yehuda Banayan, with the knowledge and consent and at the direction of Yehuda Banayan, executed documents setting forth that she owned 100% of Schwartz & Sons in order to assist the Judgment Debtors with their scheme to defraud Signature Bank and other creditors of the Judgment Debtors.

49.    Indeed, shortly after this representation was made to the Bank, Schwartz & Sons became the primary distributor of the Judgment Debtors' products. Upon information and belief, the Judgment Debtors and their co-conspirators, Miriam Schwartz and Yehuda Banayan, were using Schwartz & Sons -- just like they are using AOC here -- as an "independent" entity to collect funds actually owed to the debtors to avoid having to pay under that third party judgment.

50.    In June 2007, however, in order for Moise Banayan to get further forbearance from the Bank, he represented to Signature that he was now the sole owner of Schwartz & Sons.  At or around that time, much of the Judgment Debtors' receivables were going through Schwartz & Sons.

11

*The Judgment Debtors Default on their Loans and*
*Signature Obtains Its Judgment In the Initial Lawsuit*

51.     In August 2007, the Judgment Debtors and Signature entered into a series of forbearance agreements whereby, in exchange for extension of additional credit and deferral of the loans' due dates, Signature's security interests were expanded, the interest rates applicable to the Judgment Debtors' indebtedness were increased, and the overdrafts extended by Signature to the Judgment Debtors from time to time on their accounts were consolidated and added to the principal balance of the loans.

52.     After the August 2007 forbearance agreements, Signature continued to advance monies to the Judgment Debtors when their accounts had insufficient funds to cover checks and wires presented for payment thereby enabling the Judgment Debtors to maintain their credit with vendors and suppliers, and allowing the Judgment Debtors to remain in operation. Between August and November 2007, the Bank paid checks or wires that were presented to the Bank against the Judgment Debtors' accounts--in which there were insufficient funds to make payment--in an amount totaling approximately $1.8 million, exclusive of interest (the "Overdrafts").

53.     In November 2007, after the Judgment Debtors failed to pay the outstanding balance due on the loans and the Overdrafts, and stopped reporting and providing access to the books and records of the businesses, as they were required to do. Signature initiated the Initial Lawsuit against the Judgment Debtors in the Supreme Court for the State of New York, which sought an award of money damages in the amount of the unpaid loans, plus interest and costs. However, the Initial Lawsuit did not seek recovery of the Overdrafts made after the August 2007 forbearance agreements.

54.     In addition, in December 2007 and January 2008, Signature sent UCC 9-607 notices to many of the Judgment Debtors' customers (the names having been provided to Signature by Moise Banayan in connection with the loans) informing them of its first priority lien on substantially all of the Judgment Debtors' accounts receivable. Signature instructed the customers that all payments should be remitted to Signature, and not to the Judgment Debtors.

55.     On March 14, 2008, this Court granted summary judgment in the Initial Lawsuit to Signature and against all the Judgment Debtors (other than Ana Banayan) jointly and severally, in the amount of $9,338.962.18, and against Ana Banayan, individually, for $1,781,621.53.

56.     To date, the Judgment Debtors have refused to satisfy any portion of Signature's Judgment against them, and have refused to pay the Overdrafts. Instead, they have (i) interfered with Signature's ability to sell collateral under the UCC (as it has the right to do under the loan documents), and (ii) claimed that they are unable to satisfy the Judgment or pay the Overdrafts because they are no longer in operation.

***Defendants' Scheme to Evade the Judgment Unfolds***

57.     Upon information and belief, defendants knew long before this Court rendered the Judgment that the Judgment Debtors would be liable for over $11 million on account of the indebtedness under the loan documents and for the Overdrafts.

58.     In fact, defendants set their plan in motion months before the Judgment was entered as evidenced by a February 7, 2008 email from Moise Banayan to Amerisource Funding Inc. ("Amerisource"), a prospective lender, in which Moise Banayan confirmed that the businesses of the Judgment Debtors had been transferred to AOC in December 2007. Specifically, Moise Banayan stated:

Tanya,

Here is the corporate structure:

Today, as of December 1st 2007, there is only one active company: Ahava of California LLC which has tow [sic] DBA: Ahava National Food Distributor for the distribution center and North Country Manufacturing for the manufacturing end.

All invoices are generated by Ahava National Distributor or Ahava of California.

Historically

The distributor was Schwartz and Sons Quality Distributor, and Ahava of California LLC as well as Ahava Food Corp. The manufacturing end was Lewis County Dairy and St. Lawrence Food Corp.

Thanks Moshe.

(*See* Email dated February 7, 2008, annexed hereto as Exhibit C).

59.    Moise Banayan's comments are at odds with representations that he made to this Court that very same week, when he said in an affidavit filed in the Initial Lawsuit that "my companies" were on average, earning "more than $160,000 in gross *profit per week*" (*See* Affidavit of Moise Banayan, sworn to February 1, 2008, annexed hereto as Exhibit D, at ¶ 35) (emphasis added).

60.    Indeed, assuming that AOC is a wholly distinct entity from the Judgment Debtors (including Moise Banayan) -- as AOC has maintained -- Moise Banayan's companies, which were purportedly inactive, could not have been earning $160,000 in gross profits per week.

61.    On the other hand, if Moise Banayan owned or controlled AOC, as Signature believes to be the case, then Moise Banayan's February 2008 representations to this

Court might actually be truthful.  In other words, his "companies" included AOC which was operating the business of the Judgment Debtors earning in excess of $160,000 gross profits per week.

62.    Whatever the case may be, it is clear that in or before December 2007, defendants began to engage in a scheme to transfer the Judgment Debtors' assets to AOC to avoid Signature's judgment.  Defendants' scheme to avoid the Judgment is further evidenced by the following:

*(1)    Delay, Delay, Delay*

63.    The loan documents make clear that Signature has the absolute right, after an Event of Default or non-payment, to "take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral." (*See* copy of Security Agreement dated August 27, 2007, annexed hereto as Exhibit E, at ¶ 8(h)).

64.    Notwithstanding this clear and unambiguous right, defendants have directed their employees to refuse Signature access to the property and premises where the pledged collateral resides.

65.    In fact, even as late as April 15, 2008, defendants refused Signature access to the facilities owned by the Judgment Debtors which have been fraudulently conveyed or leased to AOC.

66.    Defendants' tactics are designed to delay or frustrate altogether Signature's ability to rightfully take possession of its collateral.

67.    Similarly, Moise Banayan continues to correspond with Signature in an effort to stave off any action by Signature to foreclose on the collateral.

15

68.    Back in November and December 2007, Moise Banayan claimed that a "white knight" buyer and/or potential lending institutions had been located, and asked for various accommodations based on the benefits that would purportedly come to both parties if he was given time to negotiate.

69.    Upon information and belief, Moise Banayan made these statements with knowledge of their falsity, intending Signature to rely, while the defendants were engaged in transferring the Judgment Debtors' assets into the hands of AOC or other John Doe companies.

70.    Upon information and belief, Moise Banayan used interstate wires on at least seven separate occasions to further defendants' scheme with these emails. (*See* copies of emails between Moise Banayan and Signature, annexed hereto as Exhibit F).

(2)    *Diversion of the Judgment Debtors' Assets*

71.    While Moise Banayan and the Judgment Debtors were purportedly attempting to work out a solution to satisfy Signature, defendants were diverting the Judgment Debtors' assets to AOC.

72.    The assets included the Judgment Debtors' physical assets (such as the real property), trademarks, and accounts receivable, all of which were pledged as collateral for the Judgment Debtors' loans. Thus, Signature has a right to those assets under the loan documents.

(a)    *Customer Lists and Accounts Receivable*

73.    As part of their plan to frustrate Signature's judgment, defendants arranged for the Judgment Debtors' customers to begin paying AOC for goods being manufactured by or that were purchased by the Judgment Debtors.

74.    For example, prior to the filing of the Initial Lawsuit, Moshes Discount

Supermarket in Brooklyn, was instructed to remit payments for goods sold and delivered to Schwartz & Sons, one of the Judgment Debtors. (*See* Invoice dated September 17, 2007, annexed hereto as Exhibit G).

75.    That account receivable, along with thousands of others, was pledged by the Judgment Debtors as collateral for the loans given by Signature.

76.    However, in December 2007, after it became clear that the Bank would seek legal redress, Schwartz & Sons instructed Moshes, by use of interstate wires and/or the U.S. Mail, to remit payment to "Ahava National" (the d/b/a of AOC), an entity that was not a defendant to the Initial Lawsuit. (*See* Invoice dated December 17, 2007, annexed hereto as Exhibit H.)

77.    It now appears, based on the email Moise Banayan sent Amerisource, that all of the Judgment Debtors' customers have been instructed by defendants, through the use of interstate wires and/or the U.S. Mail, to pay AOC on invoices issued, goods purchased for resale and/or products manufactured by the Judgment Debtors.

78.    Moreover, the fact that AOC has converted all of the Judgment Debtors' accounts receivable is separately confirmed by the fact that it provided a virtually identical list of accounts receivable to Amerisource in connection with its application for financing as Ahava Food had provided to Signature in connection with its request for forbearance.

        (b)    *Defendants' Nunc Pro Tunc Assignment*
                *of the Judgment Debtors' Trademarks*

79.    In addition to customer lists and accounts receivable, defendants caused the Judgment Debtors to transfer their trademarks to AOC.

80.    The trademarks, like the accounts receivable, were pledged by the

Judgment Debtors as collateral for the loans provided by Signature and Signature has a perfected UCC security interest in those trademarks.

81.    Nevertheless, on March 6, 2008, defendants used or caused the use of interstate wires and/or the U.S. Mail to transmit a request to the United States Patent and Trademark Office (the "USPTO") seeking an assignment *nunc pro tunc* to AOC of eleven different trademarks owned by Ahava Food.

82.    On March 7, 2008, the USPTO approved the request, and the assignment of the trademarks to AOC was recorded on the USPTO's internet-accessible database. (*See* Abstracts of Assignment for each of the eleven trademarks reflecting their assignment *nunc pro tunc* to AOC, collected and annexed hereto as Exhibit I).

83.    The defendants' *nunc pro tunc* assignments of the Judgment Debtors' trademarks to AOC were critical to defendants' scheme. Indeed, since these trademarks are the brand names by which the Judgment Debtors' customers know the Judgment Debtors' products, AOC had to own the marks in order to sell the Judgment Debtors' products without paying royalties to the Judgment Debtors (which would plainly be subject to Signature's liens). Thus, defendants fraudulently conveyed the trademarks to AOC so the latter could seamlessly step into the business formerly operated by the Judgment Debtors.

84.    The defendants have attempted to retroactively legitimize the "sale" of the trademarks by producing a purported "agreement" between the Judgment Debtors and AOC, whereby AOC agreed to pay a debt owed by the Judgment Debtors to a third party. (A copy of the trademark sale agreement is attached hereto as Exhibit J). However, the "price" in the sale agreement bears no relationship to the actual value of the trademarks, which have never been formally appraised, but without which the business' value is significantly diminished. Moreover,

the payments called for by the agreement were never did not flow to the Judgment Debtors, but rather, are to be made to another creditor of the Judgment Debtors who did not have a security interest in the trademarks. As such, the Judgment Debtors did not receive consideration for the trademarks that would allow the Judgment Debtors to compensate Signature for the loss of its collateral. Finally, in any event, the sale agreement itself was in direct violation of the Judgment Debtors' security agreements, which prohibit any such transfers:

> ...no Grantor will create or assume or permit to exist any...lien, security interest or other encumbrance, made or asserted in writing against the Collateral...other than Permitted Encumbrances.

[Exhibit E at p.2]

The "sale" of the trademarks is not a "Permitted Encumbrance" under the Security Agreement.

85.    The trademark "sale" to AOC was plainly intended to transfer valuable collateral securing Signature's loan to  the Judgment Debtors, interfering with Judgment Debtors' ability to sell the business and substantially reducing the value of the business which is dependent on ownership of the trademarks in order to sell Ahava Food products.

(c)    *Defendants' Assignment of the*
*Judgment Debtors' Physical Assets*

86.    In addition to transferring the Judgment Debtors' accounts receivable and trademarks, defendants caused possession and/or title to all of the Judgment Debtors' physical assets and operations to be transferred to AOC pursuant to a series of sham leases which, like the trademark sale agreement, directly violate the Judgment Debtors' August 27, 2007 Security Agreement with Signature. (Copies of the leases conveying the Judgment Debtors premises and equipment are collected and attached hereto as Exhibit K).

87.    Specifically, the Judgment Debtors' Brooklyn headquarters, and their two

upstate dairy plants, are now admittedly occupied solely by AOC, pursuant to purported lease and sublease agreements between the Judgment Debtors and AOC. Under one lease, AOC is subleasing the Judgment Debtors' Brooklyn distribution facility, although the purported lease does not identify how much AOC is supposedly obliged to pay in exchange for the use of all the equipment, employees, and ongoing operations that were being conducted by the Judgment Debtors at that location. Likewise, AOC is leasing the upstate dairy plants from LCD and St. Lawrence, for $12,000 and $15,000 per month, respectively. And, as with the Brooklyn facility, the purported leases have effectively turned over the Judgment Debtors' entire business at those locations to AOC. Thus, in exchange for these "leases" of the Judgment Debtors' business, which purportedly made approximately $18 million in sales in 2007, AOC is supposedly obliged to pay the Judgment Debtors a grand total of $27,000 per month.

88.    As shown above, the August 27, 2007 Security Agreement between Signature and the Judgment Debtors preclude any encumbrances on the Collateral, including the leases at issue here. As such, the purported leases represent a knowing and intentional violation of the security agreements through a series of fraudulent conveyances meant to evade the Judgment and the Judgment Debtors' other obligations to Signature.

*Macabee Food Corp.*

89.    The full story of defendants' attempt to frustrate their judgment creditors, including Signature, through the creation of alter-egos is well documented in their relationship with Macabee Food Inc. ("Macabee").

90.    In that case, Macabee was being billed by Ahava Food as late as April 13, 2007 for "Golan Part Skim Mozzarella", whose "Item Code" was 1711, and whose UPC was 720742691488. (*See* Invoice from Ahava Food to Macabee, dated April 13, 2007, annexed

hereto as Exhibit L).

91.    Then, on April 18, 2007 -- after Moise Banayan caused Schwartz & Sons to be used as the billing vehicle to avoid other judgment creditors -- Macabee received a letter from Ahava stating it was now using "Schwartz & Sons . . . to enhance our distribution." This letter was signed by Defendant Ari Katz as Director of Operations for Ahava Food (*See* Letter from Katz to Macabee dated April 18, 2007, annexed hereto as Exhibit M).

92.    Shortly thereafter, Macabee was invoiced by Schwartz & Sons. (*See* Invoice from Schwarts (sic) & Sons to Macabee, dated July 16, 2007, annexed hereto as Exhibit N).

93.    By November 2007, however, -- at or around the time the Judgment Debtors decided to stop making payments on their loans to Signature and began their fraudulent scheme -- Macabee started to receive invoices from AOC, for the exact same product it had originally purchased from Ahava in April 2007, *i.e.*, "Golan Part Skim Mozzarella", with an "Item Code" of 1711, and UPC of 720742691488. (*Compare* Invoice from AOC dated November 14, 2007, annexed hereto as Exhibit N, *with* Exhibit L).

94.    In order to explain to Macabee (and its other customers) the recurring change in payees, Defendant Ari Katz, who had previously sent a letter to Macabee on behalf of Ahava Food as its Director of Operations, sent a letter to Macabee now on behalf of Ahava National (the d/b/a for AOC), actually claiming that the switch from Schwartz & Sons was made because of "[t]he level of service and [because] customer service has been lacking"—despite the fact that the "service" was being performed by the same workers, whether their nominal employer was Ahava Food, Schwartz & Sons, or AOC. (*See* undated letter from Defendant Ari Katz, annexed hereto as Exhibit O).

21

95.     In other words, defendants' interactions with Macabee illustrate that defendants have long been engaged in a game of "Three Card Monty", all in an attempt to frustrate judgment creditors (like Signature) and continue their business unabated.

**Defendants' Dun & Bradstreet Report Makes Clear**
**that AOC is a Fraudulent Transferee**

96.     Prior to the initiation of this lawsuit, the Judgment Debtors had always represented to Signature that AOC was a small company, with little revenue to speak of. Moise Banayan testified under oath that he owned AOC and that it was essentially a "shell" company with no employees.

97.     AOC's 2006 Federal Income Tax returns, states that AOC's "gross receipts or sales" were merely $378,410. (*See* AOC 2006 tax return, annexed hereto as Exhibit P).

98.     As recently as February 7, 2008, AOC had reported that it had two employees and annual sales worth just $1 million. (*See* Dun & Bradstreet Report dated February 7, 2008, annexed hereto as Exhibit Q).

99.     Yet, two months later, by contrast, AOC's listing on Dun & Bradstreet, as amended by defendant Ruben Beityakov, reflects $18 million in annual sales revenue and a payroll of 150 employees. (*See* Dun & Bradstreet report dated April 22, 2008, annexed hereto as Exhibit R).

100.     These numbers further establish that AOC has now assumed the businesses of the Judgment Debtors. Indeed, the $18 million in revenue and 150 employees are numbers that closely approximate the figures applicable to the Judgment Debtors' business in the year 2007 (based upon current weekly sales figures provided by Moise Banayan).

101.    And since, upon information and belief, AOC never paid any consideration for the Judgment Debtors' businesses, the Dun & Bradstreet report confirms that AOC is a fraudulent transferee.

***Additional Evidence Makes Clear That***
***AOC is an Alter Ego of the Judgment Debtors***

102.    The documentary evidence also shows that AOC is an alter ego of the Judgment Debtors and is dominated and controlled by Moise Banayan.

103.    Specifically:

(a)    In the Master Credit Facility Agreement between the Judgment Debtors and Signature, the Judgment Debtors admitted that AOC was an affiliate of the Judgment Debtors and was owned by Moise and Fariborz Banayan. (*See* Schedule 3.11 of the Master Credit Facility Agreement dated August 22, 2005, annexed hereto as Exhibit S).

(b)    In a March 2007 email, Moise Banayan admitted to Signature that he was prepared to sell "**our** California operations" (*See* Email from Moise Banayan to Robert Bloch of Signature dated March 29, 2007, annexed hereto as Exhibit T), and has further admitted that AOC took over the businesses of the Judgment Debtors (*see* Exhibit C).

(c)    In AOC's 2006 tax returns, Moise Banayan is listed as a partner with a 50% ownership share. (*See* Exhibit R).

(d)    On or about December 23, 2007, Moise Banayan sent a letter to a customer that identifies him as the president of Ahava National. (*See* Letter from Moise Banayan to Rabbi Lasker dated December 23, 2007, annexed hereto as Exhibit U).

(e)    The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists Ahava National Food Distributor's principal location as 110 Beard Street, the very same address of Judgment Debtors, Ahava Food, Schwartz & Sons and Yoni. (*See* Certificate of Assumed Name annexed hereto as Exhibit V).

23

(f)    The Certificate of Assumed Name filed by AOC with New York State Department of State, Division of Corporations, lists North Country Manufacturing's principal location as 7705 State Route 812, Lowville, NY, the very same address of Judgment Debtor Lewis County Dairy. (*See* Certificate of Assumed Name annexed hereto as Exhibit W).

(g)    Moise Banayan lists the address for Ahava National on a letter sent to a customer as 236-280 Richard Street, Brooklyn, NY 11231, the same address as Ahava Food, Schwartz & Sons and Yoni. (*See* Exhibit X).

(h)    AOC's offices are also variously listed as located either at 236-280 Richard Street, Brooklyn, NY -- an address for a building that also bears the 110 Beard Street address (*see* Exhibit O) or 96 Beard Street, Brooklyn (in the New York Department of State Register), which also bears the 110 Beard Street address, the home of Ahava Food and the other Judgment Debtors, Schwartz & Sons and Yoni.

(i)    A 2006 decision from an OSHA proceeding relating to the Judgment Debtors' operations in upstate New York identifies the owner of AOC as Moise Banayan. (*See* Decision, annexed hereto as Exhibit Y.)

(j)    Defendant Rebecca Banayan a/k/a Rebecca Barimyan a/k/a Rebecca Banayan-Lieberman, in her capacity as Office Manager, signed and certified the AOC's Limited Liability Statement filed with the State of California (*see* Limited Liability Statement, annexed hereto as Exhibit A), and was listed, until only weeks ago, as Sales Manager/Special Accounts on the now defunct website of Ahava Food. (*See* website contents, annexed hereto as Exhibit AA).

104.    Separate and apart from this evidence, the online Superpages directory lists AOC as having the same website as Ahava Food, www.ahavafoodcorp.com. (*See* Listing attached hereto as Exhibit BB).[1]

105.    Notably, the website instructed customers of Ahava Food to contact Aaron Banayan (a/k/a Fariborz Banayan) with respect to sales of Ahava Foods' products in California.

The website did not identify Aaron Banayan as operating a separate company called AOC, nor did it inform customers that they would be dealing with that company, and not Ahava Foods, if they wished to buy kosher dairy foods in California. (*See* Exhibit Z).

106.    Put simply, AOC is the Judgment Defendants' alter ego.

*AOC is an Ongoing Corrupt Enterprise,*
*All of Whose Income and Assets Belong to Signature*

107.    Now that defendants have transferred -- albeit fraudulently -- the assets of the Judgment Debtors, they are using that alter-ego to launder the Judgment Debtors' assets as quickly as possible, in order to allow defendants to abscond with whatever liquid capital can be extracted.

108.    Indeed, virtually every time AOC transacts business, it is dealing in stolen property (*i.e.*, the property that was fraudulently transferred to it by the Judgment Debtors). Thus, every time defendants receive compensation, income or reimbursement from AOC, they are knowingly receiving stolen property.

109.    Signature has thus far identified at least six separate instances in which defendants have used, or caused to be used, interstate wires or the U.S. Mail, to instruct customers to send AOC the proceeds from AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' scheme to evade the Judgment.

110.    The Judgment Debtors' customers from whom such payments have been fraudulently solicited through interstate wires and/or the U.S. Mail include Agriprocessors South, Altra Food Distribution, GMY Gourmet Food, Twin City Poultry, Macabee Foods and Moshe's Discount Supermarket, with at least one solicitation directed at each customer.

---

[1] Since the first complaint in this action was filed on April 2, 2008, the www.ahavafoodcorp.com website has been deactivated. Upon information and belief. defendants used, or caused to be used, interstate wires and/or the U.S.

111.    To be sure, these invoices reflect AOC's collection of money owed to the Judgment Debtors because they reference products bearing the trademarked brand names that were purportedly "assigned" by the Judgment Debtors. (*Compare* invoices included in Exhibits H and O reflecting sales of products bearing brand names "New Square" and "Golan" *with* Abstracts of Assignment for those trademarks included in Exhibit I).

112.    In addition, these customers are being told that if they adhere to the instructions from Signature to remit payment to Signature rather than the Judgment Debtors or any company affiliated with the Judgment Debtors, they will not be provided any additional product from AOC and will remain liable for their existing invoices.

113.    Upon information and belief, defendants are continuing to use, or causing to be used, interstate wires and/or the U.S. Mail to solicit payments from customers in connection with AOC's illegal operation of the Judgment Debtors' business, in furtherance of defendants' fraudulent scheme to evade the Judgment.

114.    Furthermore, AOC has pledged all of its assets (in which Signature has a perfected UCC security interest properly belong to Signature) to two third-party factors, defendants Aquent LLC ("Aquent") and Business Funding Associates, LLC, ("BFA") in exchange for financing.  (Copies of UCC filings reflecting the pledge of assets to Aquent and BFA are collected and attached as Exhibit CC).  Because Signature has a perfected security interest in all of the assets transferred by the Judgment Debtors to AOC, these third-party factoring agreements are in violation of the Judgment Debtors' August 27, 2007 Security Agreement.  AOC's pledge of its assets has further frustrated Signature's attempt to recover its security, by clouding the issue of the existence and priority of the respective parties' security

---

Mail to transmit instructions to the Judgment Debtors' web hosting company to deactivate the website.

interests.   Indeed, as a result of AOC's actions, there now exists a justifiable controversy between Signature, on the one hand, and AOC, Aquent, and BFA on the other hand, as to which parties hold a superior security interest in AOC's assets.

115.    The defendant's fraudulent conduct, the conveyance of assets in violation of the security agreements, and the alter-ego status of AOC all require that Signature be accorded a first priority security interest in all of AOC's assets, which represent either Collateral directly and fraudulently conveyed to AOC, or else proceeds derived from the use of those fraudulently conveyed assets, which must be considered part of the Collateral pursuant to the Uniform Commercial Code.

116.    The proceeds being reaped by AOC as a result of their fraudulent takeover of the Judgment Debtors' business, and AOC's continuing use of the Judgment Debtors' going-concern operations, there are the fruits of defendants' unlawful conduct.

117.    Upon information and belief, and to an extent known only to defendants, certain Judgment Debtors and non-Judgment Debtor defendants, including Moise Banayan, Ana Banayan, Aaron Banayan, Rebecca Banayan a, Ruben Beityakov, Ari Katz, Miriam Schwartz and Yehuda Banayan, have each, at least once, knowingly received proceeds of this criminal enterprise, whether in the form of salary, consulting fees, shareholder distributions, dividends, expense reimbursements, or otherwise, and have, upon information and belief, received each tranche of said proceeds into personal bank accounts controlled either by one or more of the defendants.

***Damages to Signature and Requested Relief***

118.    As a consequence of defendants' ongoing criminal conspiracy, and the extensive fraudulent conveyance of the Judgment Debtors' assets that is at the center of that

conspiracy, Signature's attempts to enforce its judgment against the Judgment Debtors have been frustrated, and the value of its collateral is being imperiled, if not actually damaged.

119.     Defendants' continued operation of the fraudulently-conveyed kosher food business of the Judgment Debtors threatens to destroy or impair the Bank's right to execute upon the collateral pledged to Signature, whether through mismanagement, abandonment, conversion, tarnishment of the Judgment Debtors' valuable trademarks, or otherwise.

120.     Signature, therefore, requests the following relief:

- Rescission of the fraudulent conveyances of the Judgment Debtors' business to AOC;

- Transfer of the conveyed assets directly to Signature;

- Declaratory judgment that AOC is an alter-ego of the Judgment Debtors and the Individual Defendants;

- Declaratory judgment that Signature's security interests in AOC's assets are superior to that of any other party;

- Compensatory damages resulting from the Judgment Debtors' failure to make payment to Signature on account of the Overdrafts in breach of the loan agreements;

- Accounting of all of the books, records, and other financial information of all of the corporate defendants; and

- Compensatory and punitive damages on account of the RICO violation and other wrongdoing (tripled pursuant to the RICO statute) and reasonable attorneys' fees.

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFEDANTS

### (RICO: Violation of 18 U.S.C. § 1962(a))
### (Use of Racketeering Income to Acquire an Interest in or to Establish or Operate an Enterprise Engaged in or Affecting Interstate Commerce)

121.     Signature repeats and realleges paragraphs 1 through 119 above, as if set forth here in full.

122.     Income received by defendants from the Judgment Debtors and/or Ahava

28

of California was derived from a pattern of racketeering activity.

123.     Defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate Ahava of California.

124.     Alternatively, defendants used income received from the Judgment Debtors and/or Ahava of California to acquire an interest in or establish or operate an enterprise-in-fact consisting of all of the defendants.

125.     The predicate acts committed by defendants as part of a pattern of racketeering activity include:

      (a)     Mail Fraud (18 U.S.C. § 1341)

      (b)     Wire Fraud (18 U.S.C. § 1343)

      (c)     Bank Fraud (18 U.S.C. § 1344)

      (d)     Money Laundering (18 U.S.C. § 1956)

      (e)     Transportation of Stolen Property (18 U.S.C. § 2314)

      (f)     Receipt of Stolen Property (18 U.S.C. § 2315)

126.     Ahava of California is a business engaged in and/or affecting interstate commerce.  Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

127.     Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce.  Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

128.     Defendants' use of income derived from a pattern of racketeering activity

to acquire an interest in or establish or operate Ahava of California has damaged, and continues

to damage, Signature, in that Ahava of California is the vehicle by which defendants are

conspiring to deprive Signature of enforcing its Judgment against the Judgment Debtors.

129.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple

money damages from defendants on account of the violations of 18 U.S.C. §1962(a) described

above.

130.    Signature respectfully requests a judgment against the Judgment Debtors

for compensatory damages in an amount to be determined at trial, and for punitive damages in

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

### SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

**(RICO: Violation of 18 U.S.C. § 1962(b))**
**(Use of Racketeering Income to Acquire or Maintain an Interest in an Enterprise Engaged
in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)**

131.    Signature repeats and realleges paragraphs 1 through 129 above, as if set

forth here in full.

132.    Income received by defendants from the Judgment Debtors and/or Ahava

of California was derived from a pattern of racketeering activity.

133.    Defendants used income received from the Judgment Debtors and/or

Ahava of California to acquire or maintain an interest in Ahava of California through a pattern of

racketeering activity.

134.    Alternatively, defendants used income received from the Judgment

Debtors and/or Ahava of California to acquire or maintain an interest in an enterprise-in-fact

consisting of all of the defendants through a pattern of racketeering activity.

135.    The predicate acts committed by defendants as part of a pattern of racketeering activity include:

     (a)    Mail Fraud (18 U.S.C. § 1341)

     (b)    Wire Fraud (18 U.S.C. § 1343)

     (c)    Bank Fraud (18 U.S.C. § 1344)

     (d)    Money Laundering (18 U.S.C. § 1956)

     (e)    Transportation of Stolen Property (18 U.S.C. § 2314)

     (f)    Receipt of Stolen Property (18 U.S.C. § 2315)

136.    Ahava of California is a business engaged in and/or affecting interstate commerce.  Upon information and belief, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

137.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce.  Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

138.    Defendants' use of income derived from a pattern of racketeering activity to acquire or maintain an interest in Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

139.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. §1962(b) described

31

above, plus reasonable attorneys' fees.

140.     Signature respectfully requests a judgment against the Judgment Debtors

for compensatory damages in an amount to be determined at trial, and for punitive damages in

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c), plus

reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(c))
### (Use of Racketeering Income to Conduct or Participate in Conducting an Enterprise
### Engaged in or Affecting Interstate Commerce Through a Pattern of Racketeering Activity)

141.     Signature repeats and realleges paragraphs 1 through 139 above, as if set

forth here in full.

142.     Income received by defendants from the Judgment Debtors and/or Ahava

of California was derived from a pattern of racketeering activity.

143.     Defendants used income received from the Judgment Debtors and/or

Ahava of California to conduct or participate in conducting Ahava of California through a

pattern of racketeering activity.

144.     Alternatively, defendants used income received from the Judgment

Debtors and/or Ahava of California to conduct or participate in conducting an enterprise-in-fact

consisting of all of the defendants through a pattern of racketeering activity.

145.     The predicate acts committed by defendants as part of a pattern of

racketeering activity include:

     (a)     Mail Fraud (18 U.S.C. § 1341)

     (b)     Wire Fraud (18 U.S.C. § 1343)

     (c)     Bank Fraud (18 U.S.C. § 1344)

(d)    Money Laundering (18 U.S.C. § 1956)

(e)    Transportation of Stolen Property (18 U.S.C. § 2314)

(f)    Receipt of Stolen Property (18 U.S.C. § 2315)

146.    Defendants' pattern of racketeering is open-ended and ongoing, and poses the threat of continuing criminal conduct.

147.    Ahava of California is a business engaged in and/or affecting interstate commerce. Specifically, Ahava of California is a California corporation and maintains its books and records and bank accounts in that state, but does the majority of its business in the State of New York.

148.    Alternatively, the enterprise-in-fact consisting of all of the defendants is a business engaged in and/or affecting interstate commerce. Specifically, said enterprise in fact utilizes Ahava of California, a California corporation, as part of a unified enterprise with other businesses located in New York.

149.    Defendants' use of income derived from a pattern of racketeering activity to conduct or participate in conducting Ahava of California through a pattern of racketeering activity has damaged, and continues to damage, Signature, in that Ahava of California is the vehicle by which defendants are conspiring to deprive Signature of its Judgment against the Judgment Debtors.

150.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(c) described above.

151.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in

the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (RICO: Violation of 18 U.S.C. § 1962(d))
### (Conspiracy to Violate RICO)

152.    Signature repeats and realleges paragraphs 1 through 150 above, as if set forth here in full.

153.    Each of defendants agreed with at least one of the other defendants to commit acts and/or omissions in furtherance of a common conspiracy to violate 18 U.S.C. § 1962.

154.    Pursuant to 18 U.S.C. § 1964(c), Signature is entitled to an award of triple money damages from defendants on account of the violations of 18 U.S.C. § 1962(d) described above.

155.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million, which damages should be tripled pursuant to 18 U.S.C. § 1964(c).

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 273-a)

156.    Signature repeats and realleges paragraphs 1 through 154 above, as if set forth here in full.

157.    The conveyances made by the defendants of the Judgment Debtors' assets to Ahava of California, whether by lease, sale or otherwise, were made without fair consideration.

34

158.    At the time of certain of the conveyances, the Judgment Debtors were indebted to Signature, were defendants in an action for money damages or were debtors in the Judgment in such action that had been docketed against them.

159.    A final judgment has been rendered against the Judgment Debtors that remains unsatisfied.

160.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets belonging to the Judgment Debtors to Ahava of California, and directing Ahava of California to transfer all such assets directly to Signature.

## SIXTH CLAIM FOR RELIEF
## AGAISNT THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Rescission of Fraudulent Conveyances: Debtor & Creditor Law § 276)

161.    Signature repeats and realleges paragraphs 1 through 159 above, as if set forth here in full.

162.    At the time of the conveyances, the Judgment Debtors knew that they owed a debt to Signature and that Signature was making efforts to collect its debts from the Judgment Debtors.

163.    The conveyances made by the Judgment Debtors to Ahava of California were made with the actual intent to hinder, delay, and defraud Signature.

164.    Signature respectfully requests that the Court enter a judgment rescinding all conveyances of assets to Ahava of California belonging to the Judgment Debtors, and directing the defendants to transfer all such assets directly to Signature.

## SEVENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Common-Law Fraud)

35

165.    Signature repeats and realleges paragraphs 1 through 163 above, as if set forth here in full.

166.    By failing to disclose the conveyances from the Judgment Debtors to Ahava of California, the defendants made material omissions of fact.

167.    Defendants' omissions constituted false representations of material facts.

168.    Defendants intended for Signature to rely on their fraudulent omissions.

169.    Signature has, in fact, reasonably and justifiably relied on defendants' fraudulent omissions to its detriment.

170.    Signature has been damaged by its reliance on defendants' omissions, in that it has been deprived of its ability to foreclose and/or collect on the collateral pledged to it under the Judgment Debtors' loans.

171.    Signature respectfully requests a judgment against defendants for compensatory damages in an amount to be determined at trial, and for punitive damages in the amount of $1 million.

## EIGHTH CLAIM FOR RELIEF
## AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

### (Declaratory Judgment)

172.    Plaintiff repeats and realleges paragraphs 1 through 170 above, as if set forth here in full.

173.    Ahava of California is completely dominated and controlled by Moise Banayan and some or all of the other Judgment Debtors.

174.    Ahava of California is being used, and has been used in the past by the defendants as a successor-in-interest to the Judgment Debtors' business, despite the fact that

36

Ahava of California has been paid no consideration whatsoever.

175.     Signature respectfully requests that the Court enter a declaratory judgment stating that Ahava of California is an alter ego of the Judgment Debtors.

## NINTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Conversion)

176.     Plaintiff repeats and realleges paragraphs 1 through 174 above, as if set forth here in full.

177.     Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the defendants.

178.     Signature is the owner, and has the right to possession of, all of the Judgment Debtors' personal property now in the possession of any of the individual defendants, which property was acquired by the individual defendants from any of the corporate defendants.

179.     Defendants' possession of said property is unauthorized.

180.     Defendants have acted to exclude the rights of Signature over said property.

181.     To the extent that said property includes money, it is specifically identifiable as that money derived from the unlawful operations and activities of the corporate defendants, and is subject to an obligation to be returned to Signature.

182.     Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Breach of Contract)

183.     Plaintiff repeats and realleges paragraphs 1 through 181 above, as if set

forth here in full.

184.    The agreements between Signature and the Judgment Debtors are valid, binding and enforceable contracts.

185.    By conveying ownership of its trademarks to AOC, and by leasing its property to AOC including its real estate, equipment and entire ongoing concerns, all in violation of the security provisions of the agreements, the Judgment Debtors have breached those agreements.

186.    Signature has fully performed its obligations under its agreements with the Judgment Debtors.

187.    As a result of the Judgment Debtors' breach of their agreements, Signature has lost control of collateral pledged to secure its loans to the Judgment Debtors.

188.    Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages as a result of these breaches in an amount to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
### AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN

#### (Rescission)

189.    Plaintiff repeats and realleges paragraphs 1 through 187 above, as if set forth here in full.

190.    The agreements between Signature and the Judgment Debtors are valid and binding contracts.

191.    By conveying ownership of its trademarks to AOC, and by leasing their property to AOC, both in violation of the security provisions of the agreements, the Judgment Debtors have breached those agreements.

192.    The Judgment Debtors' breach of their agreements with Signature has substantially defeated the purpose of those agreements.

193.    The Judgment Debtors' breach of their agreements with Signature was material and willful.

194.    Signature respectfully requests a judgment against the Judgment Debtors rescinding all agreements between the Judgment Debtors and AOC whereby the Judgment Debtors purported to convey an ownership or leasehold interest in any collateral pledged to Signature pursuant to the agreements between Signature and the Judgment Debtors.

## TWELFTH CLAIM FOR RELIEF AS AGAINST THE JUDGMENT DEBTORS

### (Breach of Contract)

195.    Plaintiff repeats and realleges paragraphs 1 through 193 above, as if set forth here in full.

196.    The agreements between Signature and the Judgment Debtors are valid and binding contracts.

197.    Pursuant to the agreements between Signature and the Judgment Debtors, the Judgment Debtors are liable for payments of all Overdrafts on their accounts with Signature.

198.    By failing to pay Signature for the Overdrafts on their accounts with Signature, the Judgment Debtors have breached their agreements with Signature.

199.    Signature has fully performed its obligations under its agreements with the Judgment Debtors.

200.    As a result of the Judgment Debtors' breach of their agreements with Signature, Signature has been damaged, in that it remains unpaid on approximately $2 million in

overdrafts made by the Judgment Debtors on their accounts with Signature.

201. Signature respectfully requests a judgment against the Judgment Debtors for compensatory damages in an amount to be determined at trial, but in no event less than $2 million.

<div align="center">

**THIRTEENTH CLAIM FOR RELIEF**
**AGAINST THE JUDGMENT DEBTORS, AOC AND FARIBORZ BANAYAN**

**(Declaratory Judgment)**

</div>

202. Plaintiff repeats and realleges paragraphs 1 through 200 above, as if set forth here in full.

203. AOC has pledged all of its assets, including all of its accounts receivable, to third-party factors in exchange for financing.

204. All of AOC's assets were either directly fraudulently conveyed to it by the Judgment Debtors in violation of the Judgment Debtors' agreements with Signature, or else represent proceeds generated by the use of those fraudulently-conveyed assets.

205. Because AOC's assets either represented Signature's collateral under its agreements with the Judgment Debtors, or else were derived from the use of those assets, all of AOC's assets are properly subject to Signature's superior security interest in the assets.

206. Signature respectfully requests that the Court enter a declaratory judgment stating that Signature's security interest in AOC's assets is superior to that of Aquent or BFA, or any other subsequent lienholder.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiff respectfully requests judgment in favor of plaintiff and against defendant as follows:

<div align="center">40</div>

1

2

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

        I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and
not a party to the within action; my business address is **K&L GATES LLP**, 10100 Santa Monica
Boulevard, Seventh Floor, Los Angeles, California 90067.

4

5

        On **August 29, 2008**, I served the foregoing document(s):

6

**LIMITED OBJECTION TO MEMORANDUM & ORDER AND REPORT &
RECOMMENDATION DATED AUGUST 19, 2008**

7

8

on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s)
addressed and sent as follows:

9

10

        **SEE ATTACHED**

11

☒      **BY MAIL:**  I caused such envelope(s) to be deposited in the mail at Los Angeles, California
       with postage thereon fully prepaid to the office of the addressee(s) as indicated above.  I am
12       "readily familiar" with this firm's practice of collection and processing correspondence for
       mailing.  It is deposited with the U.S. Postal Service on that same day, with postage fully
13       prepaid, in the ordinary course of business.  I am aware that on motion of party served,
       service is presumed invalid if postal cancellation date or postage meter date is more than one
14       day after the date of deposit for mailing in affidavit.

15

16

17

18

19

20

21

☒      **FEDERAL**:  I declare that I am employed in the office of a member of the bar of this court at
       whose direction service was made.

22

Executed on August 29, 2008, at Los Angeles, California.

23

24

                                        _Martha Gruft_____
                                        Martha Gruft

25

26

27

28

RECYCLED PAPER

**PROOF OF SERVICE**

1  SIGNATURE BANK V. AHAVA FOOD CORP. d/b/a NORTH COUNTRY CHEESE CORP., et al.
2          CASE NO.  08 Civ. 3893 (NRB) (MHD)

| | |
|---|---|
| 3 David Peter Antonucci, Esq.<br>Antonucci Law Office, L.L.P.<br>4 12 Public Square<br>Watertown, New York 13601<br>5 Tel.: (315) 788-7300<br>Fax: (315) 788-1643<br>6 | Attorneys for Ahava Food Corp.<br>(*Cross Defendant*) |
| 7 Seth Eisenberger, Esq.<br>Law Office of S. Eisenberger<br>30 Broad Street<br>8 New York, New York 10004<br>Tel.: (845) 354-8621<br>9 Fax: (845) 362-4207 | Attorneys for Ahava of California, LLC<br>(*Counter Claimant*) |
| 10 Laurence C. Fox, Esq.<br>Kornstein, Veisz & Wexler, L.L.P.<br>11 757 Third Avenue<br>New York, New York 10017<br>12 Tel.: (212) 418-8600<br>Fax: (212) 826-3640<br>13 | Attorneys for Ahava of California, Inc.<br>(*Defendant*) |
| 14 Mara Beth Levin, Esq.<br>David Feuerstein, Esq.<br>John Oleske, Esq.<br>15 Herrick, Feinstein LLP<br>2 Park Avenue<br>16 New York, New York 10016<br>Tel.: (212) 592-1400<br>17 Fax: (212) 592-1500 | Attorneys for Signature Bank<br>(*Counter Defendant*) |

18
19
20
21
22
23
24
25
26
27
28

2

RECYCLED PAPER